No. 25-1579

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————

ASHTON ORR, *et al.*,
*Plaintiffs-Appellees*

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants.*

————————————

Appeal from the U.S. District Court for the District of Massachusetts

————————————

## PLAINTIFFS-APPELLEES' OPPOSITION TO
## MOTION FOR STAY PENDING APPEAL

————————————

JON W. DAVIDSON
LI NOWLIN-SOHL
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2500
jondavidson@aclu.org
lnowlin-sohl@aclu.org


JESSIE J. ROSSMAN
American Civil Liberties Union
Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
617-482-3170
jrossman@aclum.org

ISAAC D. CHAPUT
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
415-591-6000
ichaput@cov.com

ROBERT C. GIANCHETTI
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
212-841-1000
rgianchetti@cov.com

# TABLE OF CONTENTS

INTRODUCTION ..................................................................... 1

STATEMENT ......................................................................... 3

ARGUMENT ........................................................................... 6

    I.    THE GOVERNMENT HAS NOT SHOWN IT IS
        LIKELY TO SUCCEED ON THE MERITS. .......................... 7

        A.    The District Court Correctly Found the Policy
              Was Motivated by Animus, and the Government
              Fails to Challenge that Finding..................................... 8

        B.    The District Court Correctly Found that
              Plaintiffs Are Likely to Succeed on Their Equal
              Protection Claim. ........................................................ 10

        C.    The District Court Correctly Found that
              Plaintiffs Are Likely to Succeed on Their APA
              Claim. ........................................................................... 18

        D.    The District Court Correctly Rejected Defendants'
              Argument About Foreign Policy. ................................ 22

    II.    THE GOVERNMENT HAS NOT SHOWN
        IRREPARABLE INJURY. ................................................... 24

    III.    THE BALANCE OF EQUITIES AND PUBLIC
        INTEREST FAVOR MAINTAINING THE STATUS
        QUO. ............................................................................... 25

CONCLUSION ...................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. Dep't of State,*
766 F. Supp. 3d 74 (D.D.C. 2025) ...................................................... 19

*Beame v. Friends of the Earth,*
434 U.S. 1310 (1977) ...................................................... 24

*Becky's Broncos, LLC v. Nantucket,*
138 F.4th 73 (1st Cir. 2025) ...................................................... 6

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ...................................................... 13, 14

*Bradford v. Department of Labor,*
101 F.4th 707 (10th Cir. 2024) ...................................................... 21, 22

*Charlesbank Equity Fund II, Ltd. v. Blinds To Go, Inc.,*
370 F.3d 151 (1st Cir. 2004) ...................................................... 24

*Dillon v. Select Portfolio Servicing,*
630 F.3d 75 (1st Cir. 2011) ...................................................... 16, 24

*Does 1-3 v. Mills,*
39 F.4th 20 (1st Cir. 2022) ...................................................... 1, 6, 24

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ...................................................... 19

*Kent v. Dulles,*
357 U.S. 116 (1958) ...................................................... 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden,*
11 F.4th 12 (1st Cir. 2021) ...................................................... 8

*New York v. Trump,*
133 F.4th 51 (1st Cir. 2025) ...................................................... 18, 21, 22

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................ 6, 25

*Pub. Citizen v. U.S. Trade Representative,*
    5 F.3d 549 (D.C. Cir. 1993) ............................................... 19

*Regan v. Wald,*
    468 U.S. 222 (1984) ............................................................ 23

*Romer v. Evans,*
    517 U.S. 620 (1996) .............................................................. 8

*Sessions v. Morales-Santana,*
    582 U.S. 47 (2017) ............................................... 10, 11, 14

*Sherley v. Sebelius*
    689 F.3d 776 (D.C. Cir. 2012) ......................................... 22

*Sindicato Puertorriqueno de Trabajadores v. Fortuno,*
    699 F.3d 1 (1st Cir. 2012) .............................................. 25

*Smith v. Jenkins,*
    732 F.3d 51 (1st Cir. 2013) ............................................ 25

*Stanley v. Illinois,*
    405 U.S. 645 (1972) ............................................................ 16

*State v. Su,*
    121 F.4th 1 (9th Cir. 2024) ...................................... 18, 22

*Trump v. Hawaii,*
    585 U.S. 667 (2018) .............................................................. 9

*United States v. Carrillo-Lopez,*
    68 F.4th 1133 (9th Cir. 2023) ........................................... 8

*United States v. Skrmetti,*
    145 S. Ct. 1816 (2025) ............................................. *passim*

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................................ 14

*United Steelworkers of Am., AFL-CIO v. Textron, Inc.*,
  836 F.2d 6 (1st Cir. 1987) ...................................................................26

*Zemel v. Rusk*,
  381 U.S. 1 (1965)..............................................................................22

**Other Authorities**

Executive Order 14168, 90 Fed. Reg. 8615.....................................*passim*

# INTRODUCTION

The District Court's June 17 preliminary injunction safeguards the constitutional rights and safety of millions of transgender, intersex, and nonbinary Americans. It enjoins a policy the District Court found likely to deny these citizens equal protection, be motivated by animus, and be arbitrary and capricious. The government's belated Motion to Stay Pending Appeal ("Motion" or "Mot.") fails to justify abruptly upending the status quo more than a month after the injunction took effect—the same status quo previously in place for years without issue.

The government's arguments are wrong on their own terms, but there is an even more straightforward basis to deny the Motion: the government does not meaningfully challenge the District Court's finding that the policy was motivated by animus. As the District Court recognized when rejecting the stay request below, the animus finding is an independent basis for the injunction and is not even arguably affected by the Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). The Court should deny the Motion on that basis alone.

The arguments the government *does* make are wrong too. The challenged policy imposes a sex classification and therefore must survive

heightened scrutiny. The government seeks to use *Skrmetti* to return to its discriminatory policy, but *Skrmetti* is explicitly limited both to situations in which the challenged law does *not* facially classify on the basis of sex and to the "medical context." The government's policy here is undeniably a facial sex classification and does not concern medical treatment; *Skrmetti* does not change the fact that heightened scrutiny applies. Because the government's arguments hinge on the assumption that heightened scrutiny does not apply, they fail when it does apply. And the government has not shown any error in the District Court's finding that the policy likely is arbitrary and capricious; it instead puts forward the extraordinary, already-rejected position that, when the President orders an agency to do something, it can never be arbitrary and capricious. That cannot be—and is not—the law.

Nor can the government demonstrate it will face irreparable injury absent a stay. For *years* prior to the current policy, the government issued sex markers on passports as the injunction requires, so it cannot claim irreparable injury from having to continue that practice now. The District Court has repeatedly rejected the government's vague and unsupported burden arguments. And the government's hazy assertions about foreign

affairs are similarly unsupported (there is no evidence sex markers on passports have ever affected foreign affairs) and unsupportable (the President cannot order constitutional violations merely because they touch on foreign affairs).

In contrast to the government's lack of irreparable injury, the Class members protected by the injunction will, as the District Court found, face acute risks if the injunction is stayed. They will be denied constitutional rights, a substantial injury in itself. And identity documents with sex markers that differ from someone's gender identity expose them to violence, harassment, being "outed" every time they use the document, and severe psychological distress. Those compelling interests outweigh the government's groundless assertions, which it uses to justify a policy aimed at "rejection of the identity of an entire group—transgender Americans—who have always existed." ECF 74 ("First PI") at 28.

## STATEMENT

For decades and across five administrations, the government has permitted some form of self-selection of or change to sex markers on passports—first, from 1992, requiring various forms of medical

documentation, later permitting full self-selection. *See* First PI at 4–6. Since 2021, the government joined many other countries and states in also permitting "X" (*i.e.*, unspecified) sex markers. *Id.*

On January 20, 2025, President Trump signed Executive Order 14168, 90 Fed. Reg. 8615 ("EO"), purporting to impose definitions of sex that deny the existence of transgender, nonbinary, and intersex Americans. *Id.* at 6–8. The EO declares there are only two "sexes" that are immutable and determined "at conception." *Id.* Within days, the State Department adopted a policy to implement the EO, requiring passports to use sex assigned at birth (not "conception") and removing the option to obtain passports with an "X" marker ("Passport Policy" or "Policy"). *Id.* at 8.

Requiring transgender, intersex, and nonbinary Americans to use passports with sex markers discordant with their gender identities can result in severe harms. *See* First PI at 47–49; ECF 115 ("Second PI") at 24–26. As the District Court found, based on uncontested expert evidence, using such passports exposes people to "harassment" and "violence." Second PI at 24–26. It "increases their risk of experiencing anxiety, psychological distress, suicidality, discrimination, harassment,

and violence." *Id.* at 25. It can also interfere with treatment of gender dysphoria. *Id.*

Plaintiffs filed this case on February 7, 2025, alleging denial of equal protection under the Fifth Amendment; violations of the Fifth Amendment rights to travel and informational privacy; infringement of their First Amendment rights; and violations of the Administrative Procedure Act ("APA").

On April 18, the District Court granted Plaintiffs' motion for a preliminary injunction against enforcing the Policy as to six of seven originally named Plaintiffs.[1] It concluded that the Policy likely violates the equal protection guarantee of the Fifth Amendment; likely is driven by animus, rendering it impermissible under any level of constitutional scrutiny; and likely violates the APA both because it is arbitrary and capricious and because Defendants failed to follow the requirements of the Paperwork Reduction Act ("PRA").

---

[1] The District Court concluded that one named Plaintiff did not need preliminary injunctive relief because he possesses a passport with the sex marker he wants that will not expire until 2028.

On June 17, the District Court granted Plaintiffs' motions for class certification and to apply the First PI to members of the classes with a near-term need to obtain a passport ("PI Class members").

On July 9, Defendants moved the District Court to stay and dissolve the Second PI based on *Skrmetti*. The District Court denied the motion, holding that even if *Skrmetti* affected a portion of the equal protection claim (an issue it did not reach), the injunction rested on two independent bases that would not be affected by it: animus and the APA. ECF 130.

## ARGUMENT

The government bears the burden of justifying a stay pending appeal. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). It must: (1) make "a strong showing that [it] is likely to succeed on the merits"; (2) show that it "will be irreparably injured absent a stay"; (3) show that the "issuance of the stay will [not] substantially injure the other parties interested in proceeding"; and (4) show that "the public interest" favors a stay. *Does 1-3 v. Mills*, 39 F.4th 20, 24 (1st Cir. 2022) (citation omitted). This Court reviews the grant of "a preliminary injunction for abuse of discretion . . . [,] legal questions de novo, findings of fact for clear error, and the balancing of the four factors for abuse of discretion." *Becky's*

*Broncos, LLC v. Nantucket*, 138 F.4th 73, 77–78 (1st Cir. 2025) (citation

omitted). The government fails at each step.

## I.   THE GOVERNMENT HAS NOT SHOWN IT IS LIKELY TO SUCCEED ON THE MERITS.

The District Court has twice found that Plaintiffs are likely to

succeed on the merits, and the government fails to show that the District

Court's careful analysis was an abuse of discretion. Instead, the

government recycles an argument the District Court roundly rejected:

that *Skrmetti* requires a stay. But

> [w]hether or not *Skrmetti* alters the Court's conclusion that the Executive Order and Passport Policy must be reviewed under intermediate scrutiny . . . [,] the government has not argued that *Skrmetti* or any other change in law disturbs the Court's independent conclusion that PI Class members are likely to succeed on their claim that the Executive Order and Passport Policy are based on unconstitutional animus toward transgender Americans.

ECF 130 (citation omitted). *Skrmetti* also would not "alter[] the Court's

conclusion that PI Class members are likely to succeed on their

independent claim that the Passport Policy is arbitrary and capricious,

in violation of the APA." *Id.* (citation omitted). This Court can and should

end the analysis there. In any event, *Skrmetti* does not undermine the

District Court's equal protection findings.

7

**A. The District Court Correctly Found the Policy Likely Was Motivated by Animus, and the Government Fails to Challenge that Finding.**

The District Court found that the EO and Policy likely "spring from [impermissible] animus toward transgender Americans." First PI at 27; *see* Second PI at 21. The government only addresses this argument in passing, arguing in conclusory terms that it is incorrect. Mot. 17 (two-sentence argument). Because the government fails to meaningfully raise the issue in its opening brief, it is waived. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden*, 11 F.4th 12, 18 (1st Cir. 2021). The Court should deny the Motion on this ground alone.

In any event, the animus finding is correct. Whether a policy was motivated by animus is a fact-intensive determination subject to clear-error review, *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023), and Defendants point to *no* errors in the District Court's analysis. "[A] bare desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest," rendering government acts motivated by such animus invalid under even rational basis review. *Romer v. Evans*, 517 U.S. 620, 634 (1996) (cleaned up). When courts cannot "discern a relationship" between a policy and legitimate state

interest, or where a policy is "inexplicable by anything but animus," the policy is "incompatible with the right of equal protection." First PI at 27 (quoting *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)).

The District Court found that the Policy is "built on a foundation of irrational prejudice" and therefore cannot survive "under any standard of review." *Id.* at 32. The EO is "facially demean[ing to] transgender people's identity" and "candid in its rejection of the identity of . . . transgender Americans." *Id.* at 28. The "sheer breadth" of the government's attacks on transgender Americans and "constellation of close-in-time executive actions directed at [them] that contained powerfully demeaning language"—including attempts to erase references to gender, rollbacks of policies supporting vulnerable youth, and denial of gender-affirming care—reflect a moral disapproval of transgender Americans "inexplicable by anything but animus." *Id.* at 27–31.

*Skrmetti* affects none of this: it noted that the Sixth Circuit had concluded that challengers to the Tennessee law at issue there "had failed to establish . . . animus toward transgender individuals," 145 S. Ct. at

1827–28, but that says nothing about the District Court's findings for *this* Policy based on *this* record.

### B. The District Court Correctly Found that Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.

#### 1. The EO and the Passport Policy facially classify on the basis of sex, subjecting them to heightened scrutiny.

The EO and Passport Policy draw sex classifications on their face. *See* First PI at 20 ("These sex-based classifications are not incidental to the Passport Policy; rather, the sex-based line drawing is the very purpose of the EO and Passport Policy."). Said otherwise, they "contain[] sex-based classifications." *Skrmetti*, 145 S. Ct. at 1828; *see Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) ("heightened scrutiny . . . now attends all gender-based classifications" (cleaned up)).

The Passport Policy classifies based on sex in two ways. First, it "allows applicants to obtain a passport reflecting only their sex assigned at birth." First PI at 18. That "draw[s a] classification[] based on sex" because "applicants are explicitly treated differently based on their sex assigned at birth." *Id.* "A person who identifies as female can receive a passport marked 'F' if her sex assigned at birth was female, but not if her sex assigned at birth was male. Likewise, a person who identifies as male

can receive a passport marked 'M' if his sex assigned at birth was male, but not if his sex assigned at birth was female." *Id.* The Passport Policy "prohibit[s] conduct for one sex that it permits for the other," *Skrmetti*, 145 S. Ct. at 1831, since the Class members are denied sex markers "because of their sex assigned at birth, while similarly situated people can obtain passports consistent with their gender identity if they have a different sex assigned at birth," First PI at 21.

Second, the EO "states plainly that the federal government now must recognize that 'women are biologically female,' 'men are biologically male,' and there are only 'two sexes, male and female.'" *Id.* at 20 (quoting EO §§ 1–2). It therefore draws lines explicitly and unambiguously based on sex. "[W]here [the government] once allowed non-binary, intersex, and gender nonconforming applicants to obtain a passport with an 'X' sex marker, it has now eliminated that option." *Id.* at 18. And so, "[w]hereas before, the State Department classified sex as broader than the male/female binary, it now classifies sex based only on the male/female binary." *Id.* at 20. Those are "line[s] between" sexes the Constitution subjects to heightened scrutiny. *Morales-Santana*, 582 U.S. at 57 (cleaned up).

In response, the government relies almost entirely on *Skrmetti*. Mot. 10–16. There, the law allowed minors of any sex to receive hormones or puberty blockers for the treatment of conditions other than gender dysphoria. 145 S. Ct. at 1826–27. The Supreme Court concluded that the law classified based on age and medical use, not based on sex. *Id.* The Court emphasized that its decision was based on finding the law did not "create[] facial sex-based classifications." *Id.* at 1829. "In the medical context," the Court went on, "the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny." *Id.* at 11830. *Skrmetti*'s analysis was carefully limited to that medical context. *Id.*

By contrast, as explained above, the Passport Policy draws a facial classification, *supra* pp. 10–12, and does so outside of the medical context.

The Court also explained that *Skrmetti* does not "speak[] to a law that" "regulates a class of *persons* identified on the basis of a specified characteristic." *Skrmetti*, 145 S. Ct. at 1834 n.3 (emphasis in original). Yet the Passport Policy does precisely that by targeting the class of transgender people.

Beyond its misguided application of *Skrmetti*, the government has little to say. It attempts to frame the Policy as a mere "prohibition on self-selection" of sex, Mot. 13, but that reframing is both not true and is irrelevant under the law: the Passport Policy tells every American what they have to be and do based on their sex assigned at birth.

The government also miscasts the District Court's decision as overly reliant on *Bostock v. Clayton County*, 590 U.S. 644 (2020), and cites two *Skrmetti* concurrences to argue that this reliance was improper. Mot. 13–15. But the District Court's analysis is firmly rooted in well-settled equal protection law. *See* First PI at 17–22 (citing and applying Supreme Court equal protection precedents). The District Court cited *Bostock* in a single paragraph after explaining why the Policy is a sex classification under equal protection law—and even then, only to note that its conclusion "accords with the logic undergirding" *Bostock*. *Id.* at 18–19. Regardless of whether *Bostock* applies in equal protection cases—a question *Skrmetti* expressly said it did not consider, 145 S. Ct. at 1834, that two concurrences do not settle, and that should not be settled in this Circuit in the context of a stay motion—the District Court's sex classification conclusion here does not depend on *Bostock*.

If the Court is inclined to further analyze the *Bostock* issue, courts (including the District Court) have persuasively explained why *Bostock*'s reasoning applies in the equal protection context. First PI at 18–19 & n.5. The nonbinding views of two Justices who dissented in *Bostock* do not overcome those courts' thorough and thoughtful reasoning.

> ### 2. The District Court correctly found that the EO and the Passport Policy likely fail heightened scrutiny.

Because the Policy classifies on the basis of sex, it is subject to heightened scrutiny. *Morales-Santana*, 582 U.S. at 57. That alone is reason to deny a stay: the government does not argue that it can prevail under that standard; its argument depends on applying "deferential" rational basis review. Mot. 15–17.

Applying heightened scrutiny, the government bears the burden of showing an "exceedingly persuasive" justification and that its classification is "substantially related" to that objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up). The District Court correctly found that the government failed to meet its burden.

The District Court noted that the government abandoned any defense of the Policy on the bases in the EO, such as combatting

"idealogues who deny the biological reality of sex" or protecting "intimate single-sex spaces." First PI at 23. The government did "not attempt to justify" the policy on that basis, "[n]or could it." *Id.* "It is obvious that the Passport Policy, which denies some applicants passports that reflect their gender identity, has no relation to any claimed interest in keeping transgender women out of women's domestic abuse shelters, women's workplace showers, and other intimate single-sex places." *Id.* at 23–24 (citations omitted). So too, "there is no connection between the State Department's prior policy—which allowed applicants to obtain personal-use passports consistent with their gender identity—and any deprivation of cisgender women's 'dignity, safety, and well-being.' The sex listed on one person's passport has nothing to do with the dignity, safety, or wellbeing of another person." *Id.* (citations omitted).

Instead, the government put forward only one justification that did *not* appear in the EO: "maintaining a consistent definition of sex across the federal government." *Id.* at 24. But the District Court had no trouble rejecting that rationale because "[t]he government has introduced no evidence that, to the extent the definition of sex varied across federal agencies before the [EO], significant problems emerged." *Id.* at 25. The

District Court also rejected it as matter of basic constitutional principles: "That objective does not . . . rank as an important governmental interest that can sustain the constitutionality of the Passport Policy. Settled precedent instructs that a mere claim that a discriminatory policy is justified by an administrative convenience, like a desire for uniformity in data, cannot justify sex- and gender-based classifications." *Id.* at 24 (citing authorities).

The government provides no basis to disturb those findings here, let alone showing clear error. None of the government's cited cases held that uniformity alone satisfied heightened scrutiny. Mot. 22. Nor could they: the "Constitution recognizes higher values than speed and efficiency" in the face of denials of constitutional rights. *Stanley v. Illinois*, 405 U.S. 645, 656–57 (1972).

The government's newly asserted interest in using an "objective" criterion for sex determination, Mot. 15, is both waived and meritless. The government never raised this purported interest to the District Court (in two rounds of briefing), so it is waived in this Court. *Dillon v. Select Portfolio Servicing*, 630 F.3d 75, 82 (1st Cir. 2011). Even if it were not, the government did not introduce evidence below about any purported

problems in utilizing the "subjective" definitions in place for years under the prior passport policy. *See* Mot. 15–16 (citing no evidence). By contrast, the record is replete with evidence that denying sex markers that align with gender identity causes severe problems, including inviting violence. *Supra* Statement. That all aside, this argument inappropriately invites the Court to declare—in the posture of a Motion to Stay—that it agrees with the Administration that there is such a thing as an immutable sex based on sex assigned at birth; but that debate is not at issue in the injunction, which did not purport to resolve it.

In short, the government has failed to demonstrate any errors, let alone reversable ones, in the District Court's equal protection analysis.

### 3.    The Passport Policy fails rational basis review.

Even if the Court were to apply rational basis review, the District Court's findings and the record support affirmance. As the District Court found in the context of its APA review, the Passport Policy is irrational and unreasoned. First PI at 41–43. Further, the District Court found that the Passport Policy likely was motivated by unlawful animus, an improper purpose that cannot satisfy rational basis review. *Supra* I.A. And beyond that, the District Court rejected the government's uniformity

rationale as baseless and the rationales in the EO itself as unrelated to the context of passports. *Supra* I.B.2.

## C. The District Court Correctly Found that Plaintiffs Are Likely to Succeed on Their APA Claim.

As the District Court found, the Policy is reviewable under the APA and is arbitrary and capricious.[2]

### 1. The Passport Policy is subject to APA review.

The government's argument that the "Policy is not subject to review under the APA because it is compelled by" the EO, Mot. 17, "finds no foothold in the text of the APA or on-point case law," First PI at 34. "The APA contains no exception for agency actions . . . that carry out an executive order." *Id.* Courts have "never excepted a final rule from APA review because it carried out a presidential directive." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). This Court has rejected that argument. *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025) (holding actions subject to APA review because "the District Court did not review <u>the President's</u> actions for consistency with the APA. Rather, it reviewed— and ultimately enjoined—<u>the Agency Defendants'</u> actions under the

---

[2] Plaintiffs also maintain, and do not waive, their APA claim that the Policy violated the PRA.

Executive Orders"). Any other holding would permit "the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review." *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 83 (D.D.C. 2025), *stay denied*, 768 F. Supp. 3d 26 (D.D.C. 2025).

The government's only authority that concerns reviewability is *Franklin v. Massachusetts*, 505 U.S. 788 (1992), but that case is "limited to those cases in which the President has final constitutional or statutory responsibility for the *final* step necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (emphasis added). As the District Court found, the Policy directly affects Plaintiffs. *See* First PI at 35. The District Court made a series of findings about all the ways in which the agency has and will need to take its own actions beyond the EO—like developing a policy and processes for implementing it and adjudicating each individual passport application. *Id.* at 34–36. As a result, the Policy is subject to APA review and not within *Franklin*'s narrow exception.

## 2. The Passport Policy is arbitrary and capricious.

The District Court found that Plaintiffs are likely to succeed in their argument that the Policy is arbitrary and capricious. As it explained, agencies must "provide a reasoned explanation for [a] change that addresses any factual findings undergirding the changed policy that contradict those supporting the prior policy" and "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." First PI at 41 (cleaned up). Yet "[t]he record contains no evidence that the Agency Defendants fulfilled these obligations here." *Id.* There was no evidence the State Department engaged in any serious attempt to assess or weigh those issues or provide a reasoned explanation. *See id.* at 42. "Quite the contrary: the record indicates that the State Department considered virtually nothing aside from the Executive Order's directive when it developed the Passport Policy." *Id.*

The government fails to engage meaningfully with the District Court's findings, which alone supports affirmance. Mot. 18–19 (not addressing these grounds). Its sole argument is that because the Policy

implements the EO, it is not arbitrary and capricious because the State Department lacked any discretion. *Id.*

That stunning position ignores bedrock principles of law. As the District Court put it, blessing this view would "contravene settled precedent and would improperly insulate wide swaths of agency action from judicial review, so long as the government could point to a related executive order and a conferral of broad authority on an agency." First PI at 43. This Court also rejected this position in the context of reviewability, *New York*, 133 F.4th at 70 n.17, and other courts have rejected similar governmental attempts to insulate agencies from judicial review in this way, *supra* I.C.1.

The government's reliance on *Bradford v. Department of Labor*, 101 F.4th 707 (10th Cir. 2024), is misplaced. The excerpt about agencies not possessing discretion when the President orders something is best read, in context, as referring specifically to the President's authority to set procurement minimum wage rules—not a sweeping pronouncement that every time the President orders an agency to do something, it cannot possibly act arbitrarily and capriciously in doing that thing. *Id.* at 732. If *Bradford* were as broad as the government contends, it would be out of

step with the more widely accepted, better-reasoned approach discussed above, including this Court's approach in *New York*. Indeed, *Bradford* has also been criticized by later courts. *See Su*, 121 F.4th at 10 (critiquing *Bradford*'s "faulty interpretation").[3]

## D. The District Court Correctly Rejected Defendants' Argument About Foreign Policy.

The government argues across claims and stay elements that "[t]he preliminary injunction intrudes into the President's core foreign-affairs prerogatives." Mot. 21. And it hand-waves about newly invented government-speech concerns. *Id.* at 21–22. Both fail.

As for foreign policy, the District Court recognized that not all actions related to passports concern the President's "core foreign-affairs prerogatives." *Id.* For instance, the Supreme Court has distinguished between (1) "passport refusals based on the character of the particular applicant," which do not fall within that sphere, and (2) those implicating "foreign policy considerations affecting all citizens," which do. *Zemel v. Rusk*, 381 U.S. 1, 13 (1965). As a result, things like "selectively deny[ing]

---

[3] *Sherley v. Sebelius* merely held that agencies are limited by presidential directives. 689 F.3d 776, 784–85 (D.C. Cir. 2012). That is a far cry from holding an agency can never violate the APA when implementing those directives.

passports on the basis of political belief or affiliation" do not implicate the President's foreign-affairs powers. *Regan v. Wald*, 468 U.S. 222, 241 (1984); *see Kent v. Dulles*, 357 U.S. 116 (1958). As the District Court recognized, "the Passport Policy is based on characteristics peculiar to applicants like the plaintiffs—namely, their sex and gender"—so it falls outside the foreign-affairs prerogative. First PI at 39 (cleaned up).

More fundamentally, the District Court found that the government failed to substantiate or "explain how the Passport Policy pertains to foreign relations." *Id.* That Policy deals with sex markers—not anything to do with this country's relations with another country. The government's declarant never once mentioned any concrete foreign policy considerations this issue affects that the government now relies on. *See* ECF 53-1, ECF 89-1. The government accepts passports with these sex markers from travelers from other countries. ECF 30 at 16. Indeed, the government's other justifications undermine this foreign-affairs rationale: the EO "set a policy on sex across the federal government, including for all domestic purposes." First PI at 39.

Relatedly, the government argues for the first time on appeal that the injunction regulates government speech, Mot. 22, but the government never raised this argument below, so it is waived, *Dillon*, 630 F.3d at 82.

## II. THE GOVERNMENT HAS NOT SHOWN IRREPARABLE INJURY.

To obtain a stay, the government must demonstrate that it will be irreparably injured without one. *Does 1-3*, 39 F.4th at 25. The District Court issued the injunction on June 17, but Defendants did not file this Motion until a month later. The "delay in . . . seeking a stay vitiates much of the force of . . . allegations of irreparable harm." *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977); *Charlesbank Equity Fund II, Ltd. v. Blinds To Go, Inc.*, 370 F.3d 151 162 (1st Cir. 2004) (similar).

In addition, the government's asserted injuries do not hold up. The foreign-policy arguments are factually unsupported and legally wrong. *Supra* I.D. The government gestures at vague administrative "burdens," Mot. 23, but the District Court rejected that argument as a matter of fact and law, *see* Second PI at 28–31. The injunction would require only that the government employ *the same policy* it employed for years. *Id.* The government points to a declaration that it filed *after* the District Court granted the injunction, Mot. 23–24, but it is improper to consider

"evidence not presented to the district court" at the time it ruled on the preliminary injunction, *Smith v. Jenkins*, 732 F.3d 51, 76 (1st Cir. 2013). In any event, that declaration's conclusions about the purported burden are vague and speculative. *See* ECF 127-2.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR MAINTAINING THE STATUS QUO.

The government has failed to establish that the balance of the equities or public interest support a stay. Most importantly, a "stay will substantially injure" the Classes. *Nken*, 556 U.S. at 434. Deprivation of constitutional rights is itself an irreparable injury. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10–11 (1st Cir. 2012). Further, Class members face a risk of violence, harassment, being "outed" when using their passports, psychological distress, and other serious harms. *Supra* Statement; Second PI at 24–25 (finding "uncontroverted evidence of the harms"). Defendants offer no reason for this Court to overturn these findings.[4]

---

[4] The government makes the troubling assertion that it may try "to revoke and replace passports issued pursuant to the preliminary injunction." Mot. 24. It cites no authority that it may unilaterally revoke the passports of Class members issued under a valid court order, and doing so would violate statute and the Constitution. This threat further tilts the balance of equities in favor of Plaintiffs.

Defendants also attempt to manufacture error by suggesting that the District Court exceeded its authority in extending the injunction to Class members based on evidence relating to Named Plaintiffs. Mot. 25. But the District Court relied on evidence of *class-wide* harms from Plaintiffs' experts. Second PI at 24–25. And the District Court relied on Named Plaintiffs' evidence as "representative of the risk faced by all class members," which is common and appropriate in class actions. Second PI at 23–26; *see United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 7–8 (1st Cir. 1987). That evidence conclusively demonstrated that an injunction is necessary to protect Class members.

## CONCLUSION

The Court should deny the motion for a stay pending appeal.

July 28, 2025

Respectfully submitted,

/s/ *Isaac D. Chaput*
ISAAC D. CHAPUT
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
415-591-6000
ichaput@cov.com

JON W. DAVIDSON
LI NOWLIN-SOHL
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2500
jondavidson@aclu.org
lnowlin-sohl@aclu.org

JESSIE J. ROSSMAN
American Civil Liberties Union
Foundation of Massachusetts,
Inc.
One Center Plaza, Suite 850
Boston, MA 02108
617-482-3170
jrossman@aclum.org

ROBERT C. GIANCHETTI
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
212-841-1000
rgianchetti@cov.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,135 words. The motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared using proportionally spaced 14-point Century Schoolbook typeface.

July 28, 2025

*/s/ Isaac D. Chaput*
Isaac D. Chaput