No. 25-1579

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
_____

ASHTON ORR; ZAYA PERYSIAN; SAWYER SOE; CHASTAIN ANDERSON; DREW HALL; BELLA BOE; REID SOLOMON-LANE; VIKTOR AGATHA; DAVID DOE; AC GOLDBERG; RAY GORLIN; CHELLE LEBLANC, on behalf of themselves and others similarly situated,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in the official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES OF AMERICA,

Defendants-Appellants.

_____

On Appeal from the United States District Court For the District of Massachusetts
_____

## JOINT APPENDIX, VOL. I (pages 1-196)
_____

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
CHARLES W. SCARBOROUGH
LEWIS S. YELIN

  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave. NW, Rm. 7239*
  *Washington, D.C. 20530*
  *(202) 514-3425*
  *lewis.yelin@usdoj.gov*

**TABLE OF CONTENTS**

**Page**

Executive Order 14168 of January 20, 2025...................................................................... 1

ECF 1, Class Action Complaint for Declaratory and Injunctive Relief ......................... 5

ECF 30-1, Expert Declaration of Sarah D. Corathers, MD .......................................... 64

ECF 30-2, Expert Declaration of Ayden Scheim, Ph.D. ............................................. 113

ECF 30-3, Declaration of Zaya Perysian ...................................................................... 160

ECF 30-4, Declaration of Ashton Orr.......................................................................... 166

ECF 30-5, Declaration of Bella Boe.............................................................................. 173

ECF 30-6, Declaration of Chastain Anderson ............................................................. 179

ECF 30-7, Declaration of Drew Hall............................................................................. 183

ECF 30-8, Declaration of Reid Solomon-Lane............................................................. 191

ECF 30-9, Declaration of Sawyer Soe........................................................................... 194

Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents    8615

## Presidential Documents

Executive Order 14168 of January 20, 2025

## Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of ''woman'' improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2**. *Policy and Definitions.* It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) ''Sex'' shall refer to an individual's immutable biological classification as either male or female. ''Sex'' is not a synonym for and does not include the concept of ''gender identity.''

(b) ''Women'' or ''woman'' and ''girls'' or ''girl'' shall mean adult and juvenile human females, respectively.

(c) ''Men'' or ''man'' and ''boys'' or ''boy'' shall mean adult and juvenile human males, respectively.

(d) ''Female'' means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) ''Male'' means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) ''Gender ideology'' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) ''Gender identity'' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

Sec. 3. *Recognizing Women Are Biologically Distinct From Men.* (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms ''sex'', ''male'', ''female'', ''men'', ''women'', ''boys'' and ''girls'' the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term ''sex'' and not ''gender'' in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

Sec. 4. *Privacy in Intimate Spaces.* (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

App. 2

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled ''Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs'' of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

**Sec. 5.** *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

**Sec. 6.** *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

**Sec. 7.** *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) ''The White House Toolkit on Transgender Equality'';

(ii) the Department of Education's guidance documents including:

(A) ''2024 Title IX Regulations: Pointers for Implementation'' (July 2024);

(B) ''U.S. Department of Education Toolkit: Creating Inclusive and Non-discriminatory School Environments for LGBTQI+ Students'';

(C) ''U.S. Department of Education Supporting LGBTQI+ Youth and Families in School'' (June 21, 2023);

(D) ''Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela'' (June 21, 2023);

(E) ''Supporting Intersex Students: A Resource for Students, Families, and Educators'' (October 2021);

(F) ''Supporting Transgender Youth in School'' (June 2021);

(G) ''Letter to Educators on Title IX's 49th Anniversary'' (June 23, 2021);

(H) ''Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families'' (June 2021);

(I) ''Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County'' (June 22, 2021);

(J) ''Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students'' (June 9, 2021); and

(K) ''Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS'' (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled ''Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972''; and

(iv) the Equal Employment Opportunity Commission's ''Enforcement Guidance on Harassment in the Workplace'' (April 29, 2024).

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR, ZAYA PERYSIAN,
SAWYER SOE, CHASTAIN ANDERSON,
DREW HALL, BELLA BOE, and REID
SOLOMON-LANE, on behalf of themselves
and others similarly situated,

                             *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary
of State; and UNITED STATES OF
AMERICA,

                             *Defendants*.

Case No. _____

## CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

1.　　This is an action for declaratory and injunctive relief arising out of the Trump Administration's abrupt, discriminatory, and dangerous reversal of settled United States passport policy. The United States previously issued passports to transgender, intersex, and nonbinary people that reflected the sex they live as and express, rather than the sex they were assigned at birth. Under the government's new arbitrary and unlawful policy (the "Passport Policy"), the United States now refuses to issue passports to otherwise eligible Americans because they are transgender, intersex, or nonbinary—except on terms that expose them to grievous harms and violate their constitutional rights to equal protection, travel, privacy, and speech and flout the Administrative Procedure Act (the "APA").

2.　　The State Department previously permitted all people—including those who are transgender, intersex, and nonbinary—to obtain passports with sex designations that reflected the sex they live as. This included permitting individuals to use the male or female sex designation

that reflected the sex they live as and an "X" designation on passports available to individuals who do not identify as female or male or who did not want their sex specified on their passport. The previous State Department policy enhanced consistency across identification documents: most U.S. states permit transgender residents to have a sex designation on their driver's licenses that match the sex they live as and increasingly allow "X" designations as well. The federal Passport Policy rashly requires passports to list only either female or male based on newly concocted and scientifically inaccurate definitions of an individual's sex determined by whether they "belong[], at conception, to the sex that produces" either "the large" or "the small reproductive cell."

3.      The Passport Policy is unlawful and unconstitutional. It discriminates against individuals based on their sex and, as to some, their transgender status. It is motivated by impermissible animus. It cannot be justified under any level of judicial scrutiny, and it wrongly seeks to erase the reality that transgender, intersex, and nonbinary people exist today as they always have.

4.      The inevitable, immediate, and direct result of the Passport Policy is that transgender, intersex, and nonbinary people have been injured. Passports are critical documents for international travel and other purposes. For many of the people now barred from receiving a passport unless they accept one with the Trump Administration's inaccurate sex designation, they are forced to "out" themselves over and over again, harming them and imposing wrongful barriers to travel. Those who look at the passport—including anyone hostile to transgender people, as the Trump Administration is and officials in many countries are—may discern that a passport holder is transgender from a perceived mismatch between the sex designation on their passport and their appearance, and may question the validity of their passport. The results may be catastrophic, including causing serious psychological harm, denial of the ability to enter or leave a country, physical violence from people who despise transgender people, and even the passport holder being arrested and imprisoned by border control agents in foreign countries.

5.      The Passport Policy was the product of an animus-filled executive order issued by President Trump on the first day of his term, titled "Defending Women from Gender Ideology

Extremism and Restoring Biological Truth to the Federal Government," Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order") (attached as Exhibit A). On its face, the Executive Order declares that it is the policy of the federal government that there are only two sexes and that, for all federal legal purposes, sex is unalterably fixed at conception; it thus attempts to impose a government-wide policy that transgender, nonbinary, and some intersex people do not exist. The Executive Order also asserts without basis or evidence that individuals claim to be transgender only to invade women's private spaces. The Executive Order is transparently unlawful and unconstitutional. It also is unmoored from scientific and medical reality: Transgender people, intersex people, and people who do not identify as either (or exclusively) male or female exist. Scientific and medical authorities have recognized that fact, as have courts across the country, including the U.S. Supreme Court. In a stroke, the Executive Order seeks to rewrite those realities and replace them with the sole options of "male" or "female" as defined in the Executive Order based on no science, no evidence, and no meaningful explanation aside from empty, dehumanizing rhetoric.

6.     Though publicly silent, the State Department has already implemented its new Passport Policy. On information and belief, and according to many news reports, the Secretary of State has ordered the State Department to suspend processing of passport applications that seek to change the sex designation on a person's passport or that selected an "X" sex designation—sowing chaos and causing immediate irreparable harm. As further proof of implementation, after Plaintiff Zaya Perysian requested a new passport reflecting that she is a woman, she received her passport back on January 28, 2025 with an "M" sex designation, along with a form stating that the sex on her passport application had been "corrected."

7.     Without complying with its statutory obligation to provide a 60-day notice and comment period, the State Department has also changed its passport application forms to exclude the "X" sex designation option that has existed on the form for years.

8.     The Passport Policy and Executive Order are part of a broader assault against transgender and nonbinary people by this Administration and are part of a historical pattern of

federal and state governments attacking and seeking to erase transgender, intersex, and nonbinary people. The Executive Order's tortured definition of sex is already being implemented across the federal government to deny transgender people's rights, including in military service, education, other identification documents, and healthcare. It comes on the heels of similar attacks by various states—and by the first Trump Administration. And it is the latest in a decades-long line of governmental actions seeking to further oppress transgender and gender-nonconforming people.

9.      Plaintiffs are transgender or nonbinary Americans who have been harmed, and will continue to be harmed, by the Passport Policy. Because of the Passport Policy, as noted, one plaintiff had her passport returned by the State Department with a male sex designation despite the fact that she lives and expresses herself as a woman and her other identification documents correctly have a sex designation of female. Other plaintiffs have submitted their passports for renewal or to change their passport sex designation, which the State Department will deny under the Passport Policy. Still others are afraid to do so for fear the State Department will suspend their application and hold their passport, or will send back an unusable passport with the wrong sex designation. All have faced prior mistreatment due to their gender identities, and they fear that having incorrect sex designations on their passports will cause them further mistreatment— including putting them in danger.

10.      This suit seeks a declaration that the Passport Policy and Executive Order as applied to passports are unconstitutional, a declaration that the Passport Policy violates the APA, and a permanent injunction restoring the status quo ante. Declaratory and injunctive relief are needed to remedy the many constitutional and statutory violations the Passport Policy inflicts. Relief is needed on a class-wide basis to prevent class-wide harm to the hundreds of thousands, if not millions, of transgender, nonbinary, and intersex people in the United States who need a passport they can use without suffering harm.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1346 (civil actions against the United States).

12.     This Court has jurisdiction to review final agency actions under 5 U.S.C. § 702.

13.     This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

14.     Defendants are subject to personal jurisdiction in this Court.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are the United States, its agencies, and its officers sued in their official capacities. Plaintiffs Bella Boe, Sawyer Soe,[1] and Reid Solomon-Lane are residents of this District.  A substantial part of the events or omissions giving rise to this Complaint occurred in this District.

## PARTIES

**A.     Plaintiffs**

16.     Ashton Orr is a United States citizen and a resident of Morgantown, West Virginia.

17.     Zaya Perysian is a United States citizen and a resident of Santa Clarita, California.

18.     Sawyer Soe is a United States citizen and a resident of Salem, Massachusetts.

19.     Chastain Anderson is a United States citizen and lives near Richmond, Virginia.

20.     Drew Hall is a United States citizen and a permanent resident of Wisconsin.

21.     Bella Boe is a United States citizen and a resident of Cambridge, Massachusetts.

22.     Reid Solomon-Lane is a United States citizen and a resident of North Adams, Massachusetts.

**B.     Defendants**

23.     Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.  By statute, the President has authority to prescribe certain rules for the issuance of passports.  *See* 22 U.S.C. § 211a.

---

[1] "Bella Boe" and "Sawyer Soe" are pseudonyms used in this Complaint to refer to two of the plaintiffs.  A motion for leave for them to proceed under pseudonyms will be filed shortly with the Court.

5

24.     Defendant Department of State (the "State Department") is a federal executive department responsible for implementing the Executive Order.  It is an agency within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

25.     Defendant Marco Rubio is the Secretary of State.  He is responsible for supervising and directing the State Department.  He is sued in his official capacity.  By statute, the Secretary of State has authority to issue passports under rules prescribed by the president.  *See* 22 U.S.C. § 211a.  By executive order, the president has delegated the authority to prescribe those rules for passport issuance to the Secretary of State.  *See* Executive Order 11295, 31 Fed. Reg. 10,603 (Aug. 5, 1966).

26.     Defendant United States of America is the government of the United States and includes all government agencies and officials responsible for implementing the Passport Policy and the Executive Order as applied to passports.

27.     The State Department and Secretary Rubio are collectively referred to as the "Agency Defendants."

## ALLEGATIONS

**A.     Gender Identity, Transgender People, Nonbinary People, and Intersex People**

1.     <u>Gender Identity</u>

28.     "Gender identity" refers to a person's core, internal sense of belonging to a particular sex.  There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

29.     The concept of "sex" refers to multiple physiologic attributes, such as chromosomes, gonads (glands that produce hormones and gametes), and anatomy (internal and external reproductive parts), secondary sex characteristics that usually develop during puberty, and gender identity.  "Sex assigned at birth" refers to the designation of sex generally noted on a birth certificate shortly after birth, almost always based solely on the appearance of an infant's external

6

genitalia. The term "biological sex" is less precise than "sex assigned at birth" because it does not account, for example, for intersex conditions and gender identity.

30.    A person's gender identity is an essential part of their identity and very frequently predicts how they will be identified by others more accurately than their sex assigned at birth. For purposes of identity documents, including passports, a person's gender identity is the most important and accurate characteristic for determining what their sex is and what their sex designation should be.

31.    According to the American Medical Association, the American College of Physicians, the American Psychiatric Association, and 25 other major U.S. medical and psychological professional associations, "variations in . . . gender identity are a normal part of human development" and "research and experience shared by scholars, clinicians, and patients have shown that . . . efforts [to change someone's gender identity have not succeeded] and are harmful."[2]

2.    <u>Transgender People</u>

32.    Transgender people have a gender identity different from their sex assigned at birth. According to one set of surveys, more than 1.6 million Americans are transgender.[3]

33.    When a person's sex assigned at birth and gender identity align, the person is "cisgender."

---

[2] United States Joint Statement Against Conversion Efforts (completed Aug. 23, 2023), available at https://d3dkdvqff0zqx.cloudfront.net/groups/apaadvocacy/attachments/USJS-Final-Version.pdf.

[3] Jody Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Institute, UCLA School of Law 1 (2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf (last accessed Feb. 6, 2025).

3.    Nonbinary People

34.    "Nonbinary" people have a gender identity that is not exclusively male nor exclusively female.  According to one set of surveys, more than 1.2 million Americans identify as nonbinary.[4]

4.    Intersex People

35.    "Intersex" is a term used to describe a wide range of natural bodily variations, which some medical professionals refer to as "differences of sexual development."  Intersex people are born with sex characteristics that do not fit typical binary notions of bodies designated "male" or "female."  Intersex variations differ; some intersex traits may be discovered at birth, some may not be discovered until puberty, and some may never be discovered.  For example, intersex people can have certain variations in chromosomes, external genitals, internal reproductive organs, and hormone production and response that cause these variations in their bodies.  According to estimates by the United Nations, between 0.05% and 1.7% of the population is born with intersex traits—meaning there are potentially as many as 5.6 million intersex people in the United States.[5]

36.    During the initial gestation period, embryos with XX chromosomes and embryos with XY chromosomes appear the same in terms of their biological makeup.  Various aspects of the embryos later typically begin to develop differently depending on whether the embryo has XX or XY chromosomes.  This binary differential development is not always what occurs, however, and there are many variations in genitals, internal reproductive organs, hormones, and other aspects of the body that do not align with a strict sex binary.

---

[4] Bianca D.M. Wilson et al., *Nonbinary LGBTQ Adults in the United States*, Williams Institute, UCLA School of Law 2 (June 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Nonbinary-LGBTQ-Adults-Jun-2021.pdf (last accessed Feb. 6, 2025).

[5] United Nations Free & Equal, "Intersex People," Office of the United Nations High Commissioner for Human Rights 1 (2024), https://www.unfe.org/sites/default/files/download/Intersex%20factsheet%202024%20EN%20-%20CLEARED.pdf (last accessed Feb. 6, 2025)

37.     Some intersex people do not produce either (and some may produce both) the "large reproductive cell" or "small reproductive cell"—that is, the ovum and sperm—that are at the core of the definitions of female and male in the Executive Order.  Further, some intersex people may produce either sperm or ovum but have genitalia or chromosomes typically associated with the different sex (e.g., a person with testes who is assigned female at birth based on genitalia).

38.     Some intersex people are transgender because their gender identity is different from the sex they were assigned at birth.  Some intersex people, however, were assigned a sex at birth that is the same as their gender identity, meaning that they are cisgender.

5.     Gender Dysphoria and Gender-Affirming Care

39.     Gender dysphoria is a medically recognized condition defined by a marked incongruence between a person's gender identity and the sex they were assigned at birth, when accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.[6]  Many transgender people (including transgender people who are nonbinary or intersex) experience gender dysphoria.  Gender dysphoria is a serious medical condition that, if left untreated, can lead to debilitating depression and even suicidal ideation and acts.

40.     The treatment protocols for gender dysphoria are laid out in established, evidence-based clinical guidelines: (i) the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons and (ii) the World Professional Association for Transgender Health ("WPATH") Standards of Care ("SOC") for the Health of Transgender and Gender Diverse People, which was initially published in 1979 and is now in its eighth version, which was released in 2022.  These guidelines are supported by all major U.S. medical associations and reflect the professional consensus about the psychological, psychiatric,

---

[6] *See, e.g.*, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-5-TR* at 512–13 (2022).

9

hormonal, and surgical management of gender dysphoria. These clinical guidelines are comparable to clinical guidelines used to treat other medical conditions.

41.     It is the recognized standard of care to address gender dysphoria with social affirmation as well as medical treatment designed to bring a person's body and expression of their sex in line with their gender identity. This course of treatment has different components depending on the particular needs and age of each person.

42.     Treatment for gender dysphoria brings a person's social interactions, appearance, and body into greater alignment with the person's gender identity, which helps alleviate distress. Treatment for gender dysphoria may involve social transition, hormone treatment, and/or gender-affirming surgery or surgeries.

43.     Social transition involves shifting one's presentation and social functioning so that it is consistent with one's gender identity. Typically, it involves some or all of the following:

     a.   Change in clothing, hair, or appearance;

     b.   Change of name;

     c.   Change in pronouns (e.g., "she," "he," or "they");

     d.   Change in participating in gender-specific activities, events, or spaces; and

     e.   Change of the sex designation on identifying documents, including an individual's driver's license and passport.

44.     Treatment for gender dysphoria typically includes living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity.

45.     While social transition is adequate to treat gender dysphoria for some people, others may need other forms of treatment as well.

46.     Hormone treatment is used to help a person develop secondary sex characteristics consistent with their gender identity, which may affect how the person receiving such treatment physically presents and is perceived by others.

10

47.     Gender-affirming surgeries may include a wide variety of surgeries, many of which also affect how the person undergoing surgery physically presents and is perceived by others, such as augmentation mammoplasty, chest reconstruction surgery, and facial feminization surgery.

6.     <u>Violence and Discrimination Against and Harassment and Mistreatment of Transgender, Nonbinary, and Intersex People</u>

48.     Transgender, nonbinary, and intersex people often experience violence, harassment, discrimination, and social stigma when others learn that they are transgender, nonbinary, or intersex.

49.     For decades, transgender, nonbinary, and intersex people have been subject to numerous and varied attempts by both private individuals and government actors to discriminate against and oppress them, and to attempt to erase their existence.

50.     Transgender people are more likely to suffer harassment, discrimination, and violence than the population at large.  According to the National Center for Transgender Equality's U.S. Transgender Survey:

a.  Around a quarter (24%) of respondents had been physically attacked in a K-12 school because people thought they were transgender.

b.  In the year prior to completing the survey, 27% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or presentation.

c.  Nearly half (47%) of respondents had been sexually assaulted during their lifetime.

d.  Among respondents who had interacted with police, 58% of those whom the police perceived as transgender experienced some form of mistreatment.

e.  Twenty-five percent of transgender people were verbally harassed, 16% denied services or benefits, 9% asked to leave a location or establishment, and 2% assaulted or attacked after showing identification with a name or sex designation that did not match their gender presentation.

11

51.     For transgender people of color, these forms of mistreatment are even more common.

52.     As a result of these forms of mistreatment, 39% of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population as a whole.  Moreover, 40% percent of respondents attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population as a whole (4.6%).

53.     Nonbinary people are also subject to violence and discrimination, and many of the statistics regarding violence against transgender people include nonbinary people.[7]

54.     Intersex people also are more likely to suffer violence, discrimination, harassment, and mistreatment.  For instance, surveys indicate that anywhere from one quarter to half of intersex people had been subjected to violence.[8]

**B.     The Importance of Passports Consistent with the Sex a Person Lives As**

55.     A passport is an essential government-issued document that individuals use for various important purposes throughout their lifetime.

56.     Passports are necessary for travel outside of the country and for reentry into the United States.  *See* 8 U.S.C. § 1185(b).  Foreign countries generally bar entrance by U.S. citizens without a valid U.S. passport and/or condition issuance of a necessary visa on holding a valid U.S. passport.

---

[7] *See, e.g.*, Human Rights Campaign Foundation, *The Epidemic of Violence Against the Transgender & Gender-Expansive Community in the U.S.: The 2024 Report* (Nov. 2024), https://reports.hrc.org/an-epidemic-of-violence-2024 (last accessed Feb. 6, 2025); Skylar Davidson, *Gender inequality: Nonbinary transgender people in the workplace*, Cogent Social Sciences (2016).

[8] The Trevor Project, *The Mental Health and Well-being of LGBTQ Youth who are Intersex* at 4 (2021), https://www.thetrevorproject.org/wp-content/uploads/2021/12/Intersex-Youth-Mental-Health-Report.pdf (last accessed Feb. 6, 2025); ILGA-Europe and OII Europe, Diving Into the FRA LGBTI II Survey Data: Intersex Briefing (2023), https://www.ilga-europe.org/report/intersections-intersex-diving-into-the-fra-lgbti-ii-survey-data/ (last accessed Feb. 6, 2025).

57.     When traveling or living abroad, U.S. passports often are necessary for numerous purposes and often are the only form of identification carried by a U.S. citizen that is recognized or acknowledged by foreign authorities or private citizens.  A passport often is needed in other countries to check in to a hotel, to use a bank, to receive medical services and for many other purposes.

58.     If there is an emergency while abroad, passports are the primary way for a U.S. citizen to identify themself to U.S. officials, such as those at an embassy or consulate.

59.     Passports can also be useful or necessary for travel within the United States.  If a person does not have another valid form of identification, they generally cannot board a plane. Under the REAL ID Act, certain state identification documents will no longer be able to be used for domestic travel when the Act comes into effect on May 7, 2025.

60.     Passports are used in a wide variety of contexts as identification documents, such as determining eligibility for employment, enrolling in government programs, and engaging in a wide range of financial transactions.  Passports are also used to obtain other important forms of identification and can be used as an "identification of last resort" due to their widespread acceptance and the weight accorded a federal government document.  For instance, passports can often be used to obtain driver's licenses, as proof of age, as proof of citizenship, and for educational registration.

61.     Forcing transgender, nonbinary, and intersex people to carry and use identity documents that do not align with the sex they live and present themselves as, or denying them necessary identity documents, is inconsistent with protocols regarding social transition.  It can cause anxiety and distress to individuals who are transgender and result in discrimination and violence against them.  Additionally, for those who have struggled for years with the impact of external invalidation of their identity, the knowledge that their identification documents label them with a sex different from the sex they live as can, by itself, cause serious psychological injury.

62.     Recognizing the importance of identification documents, the American Medical Association "supports every individual's right to determine their gender identity and sex

designation on government documents" and urges that governments "allow for a sex designation or change of designation on all government IDs to reflect an individual's gender identity, as reported by the individual and without need for verification by a medical professional."[9]

63.     Forcing transgender people to carry and present identification that lists their sex as defined by the Executive Order can out them to officials and private citizen strangers as transgender, a profoundly private piece of information in which they have a reasonable expectation of privacy.  Such a policy deprives transgender people of significant control over the circumstances surrounding disclosure of their transgender identity, including when, where, how, and to whom their identity is disclosed.

64.     The Passport Policy also harms intersex people who are not transgender and who want an "M" or "F" sex designation on their passport.  If, for example, someone who is intersex lives their life as a woman and presents to others as a woman and therefore wants an "F" on their passport, but the Passport Policy would require them to have an "M" on their passport, that will wrongly suggest that they are transgender or will out them as being intersex.  Their being intersex is a profoundly private piece of information in which they have a reasonable expectation of privacy.  The Passport Policy therefore deprives them of significant control over the circumstances surrounding disclosure of the fact that they are intersex, including when, where, how, and to whom their identity is disclosed.

65.     The Passport Policy also harms nonbinary people who are not transgender and who want an "M" or "F" sex designation that is inconsistent with how the Executive Order defines their sex.  Someone who meets the Executive Order's definition of male but who is nonbinary and lives their life and presents as a woman and wants an F on their passport will have it disclosed against their will that they meet the Executive Order's definition of male.  That is a profoundly private piece of information in which they have a reasonable expectation of privacy.  The Passport Policy

---

[9] Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967, Am. Med. Ass'n (2021), https://policysearch.ama-assn.org/policyfinder/detail/gender?uri=%2FAMADoc%2FHOD.xml-0-5096.xml (last accessed Feb. 6, 2025).

therefore deprives them of significant control over the circumstances surrounding disclosure of the fact that they fall within the Executive Order's definition of male, including when, where, how, and to whom that is disclosed.

66.     Further, requiring people who want an "X" sex designation on their passport to instead have an "M" or "F" designation forces them to disclose whether they meet the Executive Order's definition male or female.  That is a profoundly private piece of information in which they have a reasonable expectation of privacy.  Such a policy deprives these people of control over the circumstances surrounding disclosure of that information, including when, where, how, and to whom that information is disclosed.

67.     Disclosure that someone is transgender, nonbinary, or intersex when they do not want that information disclosed subjects that person to harm, including an invasion of privacy.  It also subjects them to significant risks of discrimination and harassment in a variety of settings, including employment, travel, financial transactions, and in interactions with government employees, including, but not limited to, law enforcement personnel.  Disclosure of that information can seriously jeopardize a person's safety and subject the person to risk of bodily harm.

68.     In other countries and in the United States, violence, harassment, and other mistreatment of transgender, nonbinary, and intersex people is common and/or accepted, including at the hands of government officials.  If a transgender, nonbinary, or intersex person's passport displays a different sex designation on their passport than the person's gender identity and/or presentation, that mismatch could cause officials to question whether the person's passport is valid and interfere with their ability to travel.  It could also disclose that the person is transgender, nonbinary, or intersex to foreign officials and private citizens against the person's will.  In turn, that disclosure could result in violence, harassment, arrest, imprisonment, and other mistreatment

15

App. 19

of the person.  According to reports, hundreds of transgender people were killed around the world in 2023, and similar figures exist for prior years.[10]

69.    Having a sex designation on a passport that involuntarily discloses someone is transgender, nonbinary, or intersex can also cause harassment and discrimination while traveling within the United States.

### C.    The Passport Application and Issuance Process

70.    A U.S. passport is a travel document issued under the authority of the State Department attesting to the identity and nationality of the bearer.  As noted, to travel out of or into the country, a U.S. citizen must carry a U.S. passport.  *See* 8 U.S.C. § 1185.[11]

71.    Before a U.S. passport can be issued, the applicant "shall subscribe to and submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport."  22 U.S.C. § 213.  A passport application must be signed under penalty of perjury.  It is a criminal offense to willfully and knowingly make false statements in a passport application with intent to induce or secure issuance of a passport.  *See* 18 U.S.C. § 1542.

72.    A U.S. citizen applying for a passport for the first time must submit an Application for a U.S. Passport (DS-11).  A U.S. citizen applying for a renewal of an existing passport must submit a Renewal Application (DS-82).  Citizens can also submit a form to make corrections or name changes, including, until the Passport Policy prevented it, changes in the sex designation on one's passport (the DS-5504).

73.    The DS-11 contains various fields, including for "Sex."  "M" in this field indicates male and "F" indicates female.

---

[10] *See* Jamie Wareham, *Beaten, Stabbed and Shot: 320 Trans People Killed in 2023 - New Monitoring Report*, Forbes (Nov. 13, 2023), https://www.forbes.com/sites/jamiewareham/2023/11/13/beaten-stabbed-and-shot-320-trans-people-murdered-in-2023 (last accessed Jan. 30, 2025).

[11] Certain people who are not U.S. citizens may also utilize U.S. passports, such as residents of American Samoa.

74.     From 2010 until 2021, including throughout the first Trump Administration, the State Department permitted individuals to apply to change the sex designation on their passport with certification of a physician that they were being treated for a gender transition.

75.     Starting in 2021, the State Department permitted individuals to change the sex designation on their passport without a physician's certification.

76.     In 2021, the State Department announced it would permit individuals to select an "X" sex designation on their passport, which the State Department form described as denoting "unspecified or another gender identity."  This designation generally signifies that the bearer does not identify as male or female, identifies as both, or does not wish to specify their sex.  It is important to many transgender, intersex, and nonbinary people to have an "X" sex designation on their passport because that is most consistent with how the identify and/or present themselves or for privacy reasons, since a person reviewing a passport with an "X" sex designation will not know *why* the individual has an "X" sex designation.

77.     A United Nations agency, the International Civil Aviation Organization ("ICAO"), sets international standards for air transport, including for travel documents.  ICAO specifications for machine-readable travel documents have for decades required passports to display the "[s]ex of the holder, to be specified by . . . the capital letter 'F' for female, 'M' for male, or 'X' for unspecified."[12]

78.     Numerous other countries permit individuals to select the sex designation on their passport most appropriate for themself, including Australia, Denmark, Argentina, Greece, Brazil, Norway, Portugal, Ireland, and others.  Many other countries also permit "X" designation on their passports, including Germany, Pakistan, Taiwan, Austria, Canada, Columbia, and many of the countries that permit self-selection of designation.

---

[12] *Doc 9303, Machine Readable Travel Documents*, International Civil Aviation Organization at IV-14 (8th ed.  2021), https://www.icao.int/publications/documents/9303_p4_cons_en.pdf (last accessed Feb. 6, 2025).

**D.    The Executive Order**

79.    Donald J. Trump was inaugurated for the second time as President of the United States on January 20, 2025.

80.    That same day, President Trump signed the Executive Order, purporting to rely solely on 5 U.S.C. § 7301, which generally permits the President to issue regulations for employee conduct in the Executive Branch.

81.    The Executive Order states in its "Purpose" section that it is targeted against those it calls "ideologues who deny the biological reality of sex [who] have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers."  Executive Order § 1.  It declares that transgender people simply existing—or in its words, "[e]fforts to eradicate the biological reality of sex"—"fundamentally attack women by depriving them of their dignity, safety, and well-being."  *Id.*  It claims that "[t]his unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts."  *Id.*  And it calls gender identity an "inchoate social concept."  *Id.*

82.    The Executive Order explicitly references transgender people by suggesting that the government can prevent people from obtaining legal rights if they "self-identify" as a sex different from their sex assigned at birth—that is the definition of being transgender.

83.    The Executive Order attempts to invalidate the existence of transgender, intersex, and nonbinary people by wrongly proclaiming that there are only two sexes, definable and binary at conception.  Despite the order's insistence that it is communicating "biological truth," it is in fact inconsistent with science.

84.    To accomplish the Trump Administration's apparent goal of ending all legal recognition of and protections for transgender, nonbinary, and intersex people, the Executive Order states that "[i]t is the policy of the United States to recognize two sexes, male and female.  These

18

App. 22

sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It declares that the "Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy." *Id.* Among the definitions are:

a. "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

b. "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

c. "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

d. "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

e. "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

f. "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

g. "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

85.     The Executive Order directs the Secretary of State, as well as the Secretary of Homeland Security and Director of the Office of Personnel Management, to "implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order." *Id.* § 3(d).

86.     The Executive Order requires that, "[w]ithin 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order." *Id.* § 3(a).  It requires that all federal agencies and employees "enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.* § 3(b).

87.     The Executive Order also requires that all agencies "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages" and that agencies' "forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.* § 3(e).

88.     The Executive Order imposes various other rules related to gender, including with respect to federal employees' records, interpretation of various federal laws, recission of various agency policies, and proposals for legislation on the topic.  *See id.* §§ 3–7.

E.     **The State Department Implements the Executive Order Through the Passport Policy**

89.     On January 23, 2025, news outlets began reporting that Secretary Rubio had directed the State Department to implement the Executive Order as applied to passports.[13]  In particular, Secretary Rubio instructed in an internal State Department cable that "[t]he policy of the United States is that an individual's sex is not changeable" and that "sex, and not gender, shall

---

[13] *See* Joseph Gedeon, *Rubio Instructs Staff To Freeze Passport Applications with 'X' Sex Markers*, Guardian (Jan. 23, 2025), https://www.theguardian.com/us-news/2025/jan/23/trump-rubio-x-gender-passport (last accessed Feb. 6, 2025).

be used" on passports.[14]    As a result, State Department staff were ordered to "suspend any application where the applicant is seeking to change their sex marker" and "suspend any application requesting an 'X' sex marker."[15]

90.    Since then, numerous other news outlets have reported on this directive, including that it was made explicitly to implement the Executive Order.[16]

91.    The State Department has not published any public notices or other guidance on this change.

92.    As of February 7, 2025, the DS-11 (initial application) available online does not permit users to select an "X" in the Sex field.[17]    It includes only two boxes that can be checked, for "M" and "F."  The online fillable form that populates the Application likewise permits selecting only "M" or "F" in the Sex field and provides no "X" option.  The posted DS-11 states that it has an expiration date of December 31, 2023, implying that the State Department has replaced the currently-approved version of the form with an older version.  The same is now true of the DS-82

---

[14] *Id.*

[15] *Id.*

[16] *See, e.g.*, Jo Yurcaba *et al.*, *State Department To Suspend Passport Applications Seeking Sex-Marker Changes*, NBC News (Jan. 24, 2025), https://www.nbcnews.com/nbc-out/out-politics-and-policy/rubio-passport-sex-marker-changes-paused-trump-order-rcna189222 (last accessed Feb. 6, 2025); Shannon K. Kingston *et al.*, *State Department Halts 'X' Passport Gender Marker Applications*, ABC News (Jan. 24, 2025), https://abcnews.go.com/US/state-department-halts-passport-gender-marker-applications/story?id=118062178 (Jan. 30, 2025) (last accessed Feb. 6, 2025).

[17] *See* U.S. Department of State, Application for a U.S. Passport, OMB Control No. 1405-0004 (exp. Dec. 31, 2023), https://travel.state.gov/content/dam/passports/forms-fees/DS-11%20(12-31-2023)%20revision%20date%2012-2020.pdf (last accessed Feb. 7, 2025).

(renewal form) and DS-5504 (corrections and name changes), which include only "M" and "F" and have expiration dates of March 31, 2023 and November 30, 2022.[18, 19]

93.     Prior to changing the forms DS-11, DS-82, and DS-5504, the State Department did not issue a 60-day notice of its intent to make any changes to such forms, depriving the public of the opportunity to comment on such changes.

94.     The State Department has also removed references to transgender individuals from its public webpages.  For instance, the webpage previously entitled "LGBTQI+ Travelers" has been retitled "LGB" travelers and removed travel information related to transgender people.[20]  The Transportation Security Administration ("TSA") previously had webpages discussing screening procedures for transgender people and whether nonbinary individuals could apply for TSA

---

[18] *See* U.S. Department of State, U.S. Passport Renewal Application for Eligible Individuals, OMB Control No. 1405-0020 (exp. Mar. 31, 2023), https://travel.state.gov/content/dam/passports/forms-fees/DS-82%20(3-31-2023)%20revised%203-2020.pdf (last accessed Feb. 7, 2025); U.S. Department of State, Application for a U.S. Passport for Eligible Individuals, Correction, Name Change to Passport Issued 1 Year Ago or Less, and Limited Passport Replacement, OMB Control No. 1405-0160 (exp. Nov. 30, 2022), https://travel.state.gov/content/dam/passports/forms-fees/DS-5504-%202021.pdf (last accessed Feb. 7, 2025).

[19] The State Department has also, according to public reports, begun implementing the Executive Order in other ways, such as with a direction from the Acting Undersecretary for Management that all employees remove gender pronouns from their email signatures.  *See* Carla K. Johnson, Health info wiped from federal websites following Trump order targeting transgender rights, PBS (Jan. 31, 2025), https://www.pbs.org/newshour/health/health-info-wiped-from-federal-websites-following-trump-order-targeting-transgender-rights (last accessed Feb. 6, 2025).

[20] *Compare* U.S. Department of State, Bureau of Consular Affairs, LGB Travelers, https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/lgb.html (last accessed Feb. 6, 2025), *with* Michael K. Lavers, *Transgender people removed from State Department travel page*, Washington Blade (Jan. 31, 2025), https://www.washingtonblade.com/2025/01/31/transgender-people-removed-from-state-department-travel-page/ (reporting on prior version of webpage).

PreCheck.[21]  Those pages appear to no longer be online, but they have been captured by web archives and still appear in indexed search results as of January 30, 2025.[22]

95.    The State Department Foreign Affairs Manual (the "FAM") previously recognized that there were individuals that "do[] not fit typical definitions of male or female,"[23] but, although the FAM generally is available online, that section of the FAM is no longer accessible.[24]

96.    The Passport Policy includes at least (a) issuing new passports, renewing existing passports, and making changes to existing passports to comply with the Executive Order's definitions of male and female, including no longer issuing "X" designations on passports, and (b) refusing to grant or suspending processing of applications to issue new passports, renewed passports, and changes to passports that would not comply with the Executive Order's definitions of male and female, including no longer granting applications for "X" designations on passports.

### F.    President Trump and His Administration's Longstanding Animus Against Transgender People

97.    On its face, the Executive Order reflects animus against transgender people, as does the broader context in which it was adopted.

---

[21] *See, e.g.*, "What Are the Screening Procedures for Transgender Persons?," *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions/what-are-screening-procedures-for-transgender-persons (not accessible as of Jan. 30, 2025); "Can I Apply for TSA Precheck® with a Nonbinary Gender and Gender Non-conforming Identity Document on the TSA Precheck Application?," *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions/can-i-apply-for-tsa-precheckr-nonbinary-gender-and-gender-non (not accessible as of Jan. 30, 2025).

[22] *See, e.g.*, *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions (Jan. 17, 2025 22:19:17 GMT) [https://web.archive.org/web/20250117221917/https://www.tsa.gov/travel/frequently-asked-questions] (last accessed Feb. 6, 2025) (WebArchive version as of January 17 providing guidance to transgender and nonbinary people that has since been removed).

[23] *See* 7 Foreign Affairs Manual, 1350 Appendix M (as of 2015).

[24] *See* 7 Foreign Affairs Manual, https://fam.state.gov/Volumes/Details/07FAM (1300s section is inactive).

98.    For instance, President Trump has referred to transgender identities as "transgender insanity"[25] and has repeatedly referred to transgender people using derogatory labels, describing them as "deranged," "sick," and drug users.[26]

99.    In just his first two weeks in office, President Trump has issued a series of orders targeting transgender people.[27]

100.    He issued an executive order stating that being transgender while serving in the military "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."[28]  He issued another executive order referring to women who are transgender as "men" and calling their participation in women's sports "demeaning, unfair, and dangerous," asserting that it "results in the endangerment, humiliation, and silencing of women."[29] He issued yet another executive order falsely referring to medical treatment of transgender adolescents supported by evidence-based research and by every major professional health

---

[25] Bill Barrow, *Trump and Vance Make Anti-Transgender Attacks Central to Their Closing Argument Before Election Day*, PBS (Nov. 1, 2024), https://www.pbs.org/newshour/politics/trump-and-vance-make-anti-transgender-attacks-central-to-their-closing-argument-before-election-day (last accessed Feb. 6, 2025).

[26] *See Fact Sheet: Donald Trump on LGTBQ Issues: Transgender Americans*, GLAAD (Aug. 20, 2024), https://glaad.org/fact-sheet-trump-transgender (last accessed Feb. 6, 2025).

[27] In addition to the Executive Order and the orders discussed in the remainder of this section of the Complaint, other executive orders include: Exec. Order 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) (rescinding Biden Administration executive orders protecting transgender people); Exec. Order 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025) (prohibiting governmental employers from considering gender identity in hiring); Exec. Order 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (prohibiting teaching of transgender-related topics in schools).

[28] Exec. Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 § 1 (Jan. 27, 2025).

[29] *Keeping Men Out of Women's Sports* (Feb. 5, 2025) (number and Federal Register entry not yet assigned) (available at https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports/).

association in the country as "chemical and surgical mutilation" and said that such treatment "will be a stain on our Nation's history."[30]

101.    President Trump has referred to those who support transgender rights as "pushing the transgender cult."[31]

102.    Secretary Rubio, who is tasked with implementing the Executive Order as applied to passports and overseeing the Passport Policy, has referred to the existence of transgender people as "a harmful ideology" and stated that being transgender is "not real."[32]

103.    The Executive Order is deeply rooted in this same animus.

104.    As noted above, the Executive Order refers to transgender people as "ideologues who deny the biological reality of sex." Executive Order § 1. It inaccurately and offensively states that transgender people live as their true gender to "gain access to intimate single-sex spaces," with the implication that they do so for nefarious reasons, and to "depriv[e] [women] of their dignity, safety, and well-being." *Id.* It says that merely existing as a transgender person is to "attack women." *Id.*

**G.    Harm to Plaintiffs**

1.    <u>Ashton Orr</u>

105.    Ashton uses the pronouns "he" or "they." Ashton has lived in West Virginia his entire life and is thirty-five years old.

106.    Ashton is the Press Relations Manager for a national LGBTQ+ organization, advocating for transgender rights and equality.

---

[30] Exec. Order 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, title and § 1 (Jan. 28, 2025).

[31] *See Fact Sheet: Donald Trump on LGTBQ Issues: Transgender Americans*, GLAAD (Aug. 20, 2024), https://glaad.org/fact-sheet-trump-transgender (last accessed Feb. 6, 2025).

[32] Ken Scheck, *JD Vance Adds to Anti-LGBTQ+ Track Record with Census Letter*, Buckeye Flame (Nov. 13, 2023), https://thebuckeyeflame.com/2023/11/13/jd-vance-adds-to-anti-lgbtq-track-record-with-census-letter (last accessed Feb. 6, 2025) (letter co-written by then-Senator JD Vance and then-Senator Rubio).

107.    Ashton is a transgender man.  His sex assigned at birth was female, but he has a male gender identity.

108.    He was diagnosed with gender dysphoria in 2015, when he was twenty-five years old.

109.    Ashton has lived as a male in all aspects of his life since 2020.  He is known only as a man to his family, his workplace, and in his community in West Virginia.  It has not always been easy for Ashton to be himself in public spaces, and he has experienced significant discrimination and harassment as a result of being open about his transgender identity.  Having accurate identification documents helps Ashton navigate this world safely, as he is perceived as male by those who see him, and a male sex designation affirms his gender identity.

110.    Ashton was able to update his West Virginia driver's license in 2023 and his Social Security Administration record in 2024 to reflect an accurate name and male sex designation.  He typically travels by plane with multiple forms of identification in case he misplaces or loses either his passport or his driver's license.  However, this has recently presented issues for Ashton, as the information on his passport does not match his updated and accurate driver's license.

111.    For example, in early January 2025, Ashton flew from West Virginia to New York City.  Because his REAL ID has a male sex designation, and his passport had a female sex designation, he was flagged by the TSA and accused of presenting a fake identification document.  When TSA screened his REAL ID, they claimed it didn't match the documents they had on record for him.  He offered his passport to confirm his identity, and TSA accused him of presenting a fake identity document.  They repeatedly scanned his ID and took his photo multiple times before pulling him aside for further questioning.  It wasn't until Ashton was forced to explain in detail that he is a transgender man that they finally allowed him through.

112.     This experience prompted Ashton to take steps to update his passport.

113.    On January 16, 2025, Ashton sent his passport, renewal application, birth certificate, and marriage license to apply for an updated passport with an accurate sex designation of male and paid for expedited shipping and servicing given that he had imminent travel plans.  He

was informed that his application arrived on January 18 and began processing on January 22. The passport that Ashton sent with his application had a female sex designation, and his application requested an updated name and sex designation. To date, Aston has not received his passport.

114.    Most urgently, Ashton needs to travel to Ireland in March of 2025. He is traveling for a medical purpose and is terrified that he will not be able to keep his medical appointment without an accurate passport, delaying his ability to access medical care.

115.    Ashton is terrified that having an inaccurate sex designation on his passport will cause TSA agents, border officials, or airline staff to single him out for invasive questioning, scrutiny, or mistreatment. Ashton's past experiences of having his identity challenged, his passport refused, and being subjected to additional security screenings have led to extremely uncomfortable circumstances for him. Not having a passport with a sex designation of male could cause travel delays, missed flights, or even denial of entry to certain countries. Being forced to explain discrepancies in his documentation could out him as transgender in unsafe situations.

116.    Ashton is devastated that his country is trying to erase his identity and remove his ability to access accurate identification documents. Without an accurate passport, he will not feel safe traveling outside of the United States for any reason, let alone to make his medical appointment in March.

### 2.    Zaya Perysian

117.    Zaya Perysian is twenty-two years old and uses the pronouns "she" and "her." Zaya has lived in California since October of 2023, when she moved from New Jersey. Zaya was born in Michigan and left when she was twenty years old.

118.    Zaya is a transgender woman. Her sex assigned at birth was male, but she has a female gender identity.

119.    Zaya was diagnosed with gender dysphoria in 2020.

120.    Zaya has lived as a female in all aspects of her life since 2020, and she has been known since then only as female to her family, friends, her community in California, and her social

media followers online.  Today, she feels more like herself than ever.  It has been a long road for Zaya to feel safe and authentic in her body, and she is grateful to be living her truth in all aspects of her life.

121.    Zaya is a social media content creator, and her content focuses mainly on her life as a proud transgender woman.  She has documented her transition journey and has been able to connect with a community of LGBTQ+ individuals across the globe.  Zaya's content has also allowed her to connect with millions of people who are not LGBTQ+ and she has helped educate them on what it means to be transgender in today's society.

122.    Having accurate identification is extremely important to Zaya's safety and her ability to navigate the world.  During the first few years after coming out as transgender, before her identification documents were updated, Zaya faced significant harassment and was often put in uncomfortable situations while traveling.  She was subjected to intolerant gazes when airport personnel viewed her identification with an inaccurate, male sex designation but observed her female gender expression.  She has been patted down by TSA agents expressing their interest in confirming her sex, and she has had agents say that she was the "prettiest boy" they had ever seen.  It was devastating for Zaya to endure experiences like this, and it wasn't until she was able to update her driver's license that these occurrences became less frequent.

123.    Zaya updated her Michigan driver's license to her accurate female sex designation in June of 2021 and her accurate name in February of 2022.  She is in the process of getting a California driver's license, which will also reflect her accurate name and female sex designation.  In addition, Zaya has been able to update her sex designation with the Social Security Administration.  Because the passport she had in her possession had an inaccurate male sex designation, she knew that she needed to update her passport to be able to travel for work opportunities abroad.  Zaya was filled with anxiety when she learned about the Executive Order.

124.    Zaya had planned to travel outside of the United States in early February 2025 and submitted an expedited application to update the sex designation on her passport to female on January 23, 2025.

125. On January 24, Zaya received notice via email that her passport application was being processed. On January 28, her passport was returned to her through the mail with a notice stating: "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. The stated reason was "to match our records."

126. Angered, Zaya posted about the incident on her social media. A representative from CNN who heard about Zaya's situation called the State Department on her behalf to understand why this occurred, and the representative was told that the sex designation on Zaya's passport must be male in accordance with the Passport Policy. Zaya's passport now has a male sex designation, and the new expiration date is January 24, 2035. Unless Zaya is issued a correction, she will effectively have an unusable passport and will be unable to leave the country safely or comfortably for at least ten years. Zaya is perceived as female by those who see her, and using this passport will out her as transgender to people who would not otherwise have known.

127. This is particularly harmful to Zaya because she has been invited to many opportunities to connect and collaborate with other influencers abroad. Without accurate identification, she will not be able to engage in income-generating opportunities outside of the United States.

128. Zaya cannot practically travel with her current passport that does not reflect who she is. If Zaya were to present the current passport with a male sex designation, it could cause problems while interacting with TSA agents and other officers. She is even more afraid of encounters with officers in countries outside of the United States, where her passport may be the only identity document that would be accepted or recognized by officials, and where there is significant hostility towards the transgender community.

129. Zaya is devastated that her government would target her community with a policy that takes away her and other members of that community's ability to move around the world safely.

App. 33

3.    Sawyer Soe

130.    Sawyer Soe is thirty-five years old and primarily uses the pronouns "they" and "them."

131.    Sawyer works for a company that is a leader in video game development. Sawyer designs games and leads a creative team. They love what they do for work, as it allows them to express themselves creatively and build experiences that engage people of all ages. Sawyer's company has a global presence, with colleagues in the United States, Canada, South America, and Europe.

132.    Sawyer is a nonbinary person. Their sex assigned at birth was female, but they do not identify with a binary sex. The term "nonbinary" accurately captures their identity.

133.    Sawyer has lived as a nonbinary person in all aspects of their life since 2019. They have always known their gender identity to some degree, as they are naturally an androgynous person and that is typically how others perceive them. Today, Sawyer is fully themselves at work and among friends and family.

134.    Sawyer was able to obtain a Massachusetts driver's license with an "X" sex designation in July of 2023, and this has allowed them to navigate travel and daily interactions safely and comfortably. Having an "X" sex designation on their identity documents allows them to escape the arbitrary enforcement of an identity projected on them solely based on their sex assigned at birth. The "X" designation provides Sawyer with freedom and privacy that allows them to exist in a way that is free of a label that they did not choose for themselves and that is inconsistent with how they live.

135.    Sawyer has not been able to update their United States passport, which expired in 2019, in a similar manner. This was not something Sawyer sought to do during the earlier days of the COVID-19 pandemic that occurred soon after the passport's expiration because Sawyer did not travel then. Recently, Sawyer has begun traveling more. Sawyer's design team at work is planning an on-site collaboration with their colleagues in Canada, and Sawyer will be required to

travel internationally to Canada within the next three months, and potentially several more times in the coming year.

136.    Sawyer would feel safer if they had an "X" sex designation on their passport because it would be consistent with their identity, it would protect their privacy as it would prevent disclosure of their sex assigned at birth to strangers, and it would match the other identity documents that they currently carry.  Due to the Passport Policy, Sawyer will no longer be able to obtain an "X" sex designation on their passport that accurately reflects who they are, how they express their identity, and how others perceive them.

### 4.    Chastain Anderson

137.    Chastain Anderson has lived in the Richmond area since 2018, when she moved from Louisiana.  Chastain uses the pronouns "she" or "they."

138.    Chastain holds a Ph.D. in Molecular and Cell Biology and is a board-certified toxicologist.  She works as a Principal Scientist with a global consumer product company, where she has been employed for six years.  Chastain loves her job, and she loves working in the consumer toxicology space, specifically with respect to applying new and emerging technologies to issues impacting human health.

139.    Chastain is a transgender woman.  Her sex assigned at birth was male, but she has a female gender identity.

140.    She was diagnosed with gender dysphoria in 2015.

141.    Chastain has lived as a female in all aspects of her life since 2015.  Since then, she has been known only as a female to her family, to her workplace, and in her community.  Chastain legally changed her name to "Chastain" in September of 2016 via court order in Louisiana.

142.    When Chastain interacts with others, they perceive her as a female.  This is not only affirming for her, it keeps her safe.

143.    As Chastain's career has progressed, she now needs to travel internationally for work with increasing frequency.  She has a work conference in France in October that is sponsored

31

App. 35

by CORESTA, an organization whose mission is to promote and facilitate international cooperation and best practices in scientific research related to tobacco. It is important for Chastain's career and for her company that she attend this conference, as she has the requisite subject matter expertise to represent her company globally among scientists in her field of work.

144. Chastain was able to update her Virginia driver's license in 2019 to an accurate, female sex designation, but her passport has a male sex designation. She sent her passport in for expedited processing on December 27, 2024 to a passport agency in Philadelphia to receive an accurate, female sex designation.

145. Having a female sex designation on her driver's license has been very important to Chastain, as it has resulted in her rarely being misgendered when presenting her driver's license, which ensures her safety as she navigates local and domestic travel. Before having an accurate driver's license, she would face issues carrying out everyday tasks. For example, providing a driver's license with an inaccurate sex designation has outed Chastain as transgender when trying to attend concerts, order drinks, open a bank account, and lease an apartment.

146. Chastain is terrified that having an inaccurate sex designation on her passport will place her in uncomfortable and unsafe circumstances. Her fears are justified: in 2017, prior to updating her driver's license to her accurate sex designation, she had a harrowing experience going through a TSA security checkpoint at the Richmond Airport. Two agents isolated Chastain in a holding area, where she was left alone for thirty minutes, until a manager entered and conducted a strip search of her body. She believes that this was a direct result of the perception that her outward appearance did not match the sex designation on her license.

147. Chastain has reached a stage in her career that requires her to travel internationally more frequently, and traveling with an inaccurate passport is not a viable option for her. Chastain is suffering from anxiety knowing that a document that is supposed to help identify her will now not only make it harder to identify her, but will also likely put her safety at risk when she uses it, both abroad and during her return to the United States.

148.    Chastain is further concerned that having an inaccurate passport will lead to confusion and increased processing times when traveling internationally, and may result in missed calls, meetings, or flights, and in lost opportunities, creating a financial burden.  She is also disheartened that she will potentially lose out on advancement potential at her company given the fact that her cisgender colleagues will be able to attend important international meetings and conferences that she cannot.

5.    Drew Hall

149.    Drew Hall is twenty-five years old and use the pronouns "they" and "them."

150.    Drew is currently a Ph.D. student in Botany at the University of British Columbia ("UBC") in Vancouver, British Columbia in Canada.  Drew has lived in Vancouver since August 2022 when their program began, and they will live there until approximately 2027–2028 when their program concludes.  In addition to studying at UBC, Drew works as a Research Assistant and Teaching Assistant at their university.

151.    Drew's sex assigned at birth was male, but they do not have a male gender identity.

152.    Drew was diagnosed with gender dysphoria in August of 2024.

153.    Drew identifies as a nonbinary femme person, which means that even though their sex assigned at birth was male, they do not live as or identify as male and instead express themselves in a feminine manner.

154.    Drew has lived as a nonbinary person in all aspects of their life since 2024, and they have known that their gender identity was different than their sex assigned at birth since 2022.  Drew is known as a nonbinary person to their family, to their classmates and professors, and in their community.  Drew finally feels like themself and that those around them see them for who they are.

155.    Drew is frequently required to travel internationally because they have been studying and living full time in Canada for over two years and will be in Canada for several more years.  Drew's family lives in Wisconsin, and Drew travels back to the United States at least four

33

to five times a year. Two to three of those visits are typically to see their family in Wisconsin, and the other visits are to see close friends in Washington and Oregon, given their proximity to those two states. Most pressingly, Drew needs to travel to Wisconsin for a family wedding in May and for a botany conference in July.

156.    Drew legally changed their name by court order in Wisconsin in December 2024, and has updated the sex designation with the Social Security Administration and on their driver's license, which now both accurately reflect the name "Drew" and an "F" for their sex designation. Drew's birth certificate has an updated name but not an updated sex designation because Wisconsin requires a proof of sex change, which Drew cannot provide at this time.

157.    When Drew interacts with government officials, they do not perceive Drew as male. Instead, Drew is perceived as a femme person. This is not only affirming for Drew, it keeps them safe.

158.    Drew's United States passport (which is their only passport) still reflects an inaccurate name and a male sex designation. On January 9, 2025, Drew mailed their passport to the State Department's national processing center and requested an updated female sex designation and name change on their passport. Drew was notified by email that their passport arrived at the center on January 17. Drew has received no further updates since January 17 and does not know whether the agency will return a passport that accurately reflects how they identify and express their identity and that matches their other identity documents. Drew currently does not have access to their passport and therefore currently is unable to leave Canada.

159.    Drew relies on their passport frequently to travel back to the U.S. to see their family and friends. There are also many other reasons Drew uses their passport while living in Canada. To open a bank account in Vancouver, Drew is required to present their U.S. passport. Drew's employer (UBC) requires Drew's passport for their employment at the university. Any time Drew interacts with the Canadian government, they need to present their U.S. passport, as it is the only form of identification that Canada recognizes for non-citizens and non-permanent residents. Without their passport, Drew is facing many struggles residing in Canada. These problems are

34

being caused by the Agency Defendants' suspension of the processing of Drew's application for a changed sex designation and name change on their passport, and by the Agency Defendants holding Drew's current passport.

160.    Drew is deeply concerned that continuing to have a male sex designation on their passport will lead to negative and invasive interactions with border agents and TSA employees as a result of the increased hostility in the United States and elsewhere toward gender-nonconforming people like Drew—hostility that the Executive Order and Passport Policy embrace and cause. Given that their other identity documents have been updated, Drew is also worried that continuing to carry a passport with a name and sex designation that does not match their other identity documents will lead to even more confusion and distress each time they must present their passport. Additionally, continuing to have non-matching documents may present other challenges for Drew, including with respect to their temporary status documents in Canada, and when they visit places where multiple forms of identification are required. Drew's most recent encounters with border agents underscore these fears: border agents have regarded Drew with more suspicion due to their gender nonconformity.

161.    If Drew were to have to continue to carry a passport with a male sex designation, they are afraid that they will encounter additional, invasive scrutiny and harassment every time they use it, including because hostility toward gender nonconforming people like Drew has increased and continues to grow. Drew is not perceived as male given their feminine expression, and they would not feel safe traveling in the future, especially internationally, with documentation that inaccurately indicates a male sex designation. Given how they express their identity and the way they are perceived by other people, continuing to have a male sex designation on their passport will indicate to any person who looks at Drew's passport that they are transgender. This causes Drew significant anxiety, especially because of the recent increase in anti-transgender rhetoric and violence in the United States and elsewhere.

162.    Drew feels alienated knowing that the U.S. government refuses to recognize them for who they are. Having a passport that does not match who they are makes them afraid to return

to the United States.  And not having a passport—due to the State Department not returning it—also creates the significant challenges described above.

6.    Bella Boe

163.    Bella Boe has lived in Cambridge since 2024, when she moved from New Jersey. Bella is 18 years old and uses the pronouns "she" or "her."

164.    Bella is a freshman in college studying government.

165.    She is a transgender woman.

166.    She was diagnosed with gender dysphoria in 2017.

167.    Bella has lived as female in all aspects of her life since she was 11 years old. Today, she feels fully herself.  Bella is currently known only as female to her family, to staff and peers at her school, and in her communities in New Jersey and Cambridge.

168.    Bella is active on campus.  She is passionate about theater and the arts, and her school offers many opportunities for her to participate in international programs and theater productions.  Bella is currently the stage manager for her theater group at school, which means she manages and runs productions.  Bella loves being a stage manager because it provides her with an opportunity to build leadership skills and it allows her to be fully immersed in an art that she has loved and engaged in since she was six years old.  Bella's theater group travels around the world to put on shows for a range of audiences.  For example, she is excited to serve as stage manager for a production by her theatrical association in Bermuda in March 2025.

169.    Bella similarly hopes to study abroad while obtaining her undergraduate degree, and she plans on doing so in England.

170.    Bella is only able to partake in these opportunities because she has travel documents, like her passport, that accurately reflect who she is.  That safety allows her to fulfill her educational dreams and goals.

171.    When Bella travels and interacts with government officials, they perceive her as a female.  This is not only affirming for Bella, it keeps her safe.

172.    Bella's most recent passport, which she received in 2021, has a female sex designation.  She sent her passport in for renewal on January 23, 2025, to ensure that her current passport would remain usable for as long as possible.  Having a female sex designation on her passport affords Bella safety and reassurance while traveling.  She is terrified that, under the Passport Policy, she will no longer be able to travel safely.

173.    Bella would feel uncomfortable traveling with a passport that inaccurately stated a male sex designation.  Not only would this reflect an attempt to erase who she is, it would be confusing for government officials who would otherwise identify her as female based on her gender expression and invite additional, stressful scrutiny.  Bella does not want her passport to out her as transgender every time she uses it, especially when traveling outside of the United States in countries that are not accepting of transgender people.

174.    Without an accurate passport, Bella will be forced to miss out on many educational opportunities that her cisgender peers are afforded, including opportunities that would advance her own passions, education, and future career.  Without an accurate passport, Bella will not be able to leave the United States without anxiety and fear for her safety.

7.    Reid Solomon-Lane

175.    Reid Solomon-Lane is thirty-six years old and uses the pronouns "he" and "him."  He has lived in Massachusetts since July of 2022, when he moved there from Austin, Texas.  Reid lives in North Adams with his wife and three young children.

176.    Reid was a flight attendant for more than eight years and now serves as a flight coordinator for a volunteer pilot organization.

177.    Reid is a transgender man.  His sex assigned at birth was female, but he has a male gender identity.

178.    Reid was diagnosed with gender dysphoria in 2007.

179.    Reid has lived as a man in all aspects of his life since 2007.  Since then, he has been known only as male to his family, his workplace, and in his community in Massachusetts, and he

is perceived only as male by people who see him. This allows Reid to feel safe in interactions with new people and prevents him from having to come out as transgender with each encounter.

180.    This safety is especially essential for Reid while he is traveling.

181.    Reid is frequently required to travel internationally because his mother-in-law purchased a home in Ireland three years ago and spends a lot of her time there. Reid and his family travel to Ireland so that Reid's mother-in-law can see her grandchildren. Reid also visited Montreal in 2022 and has plans to return to Montreal with friends in the next year given that he and his family are just across the border from Canada.

182.    Reid legally changed his name in 2007 via court order in Texas. His name and sex designation have been updated with the Social Security Administration and on his driver's license, which now both accurately reflect his name and his being male.

183.    Reid's United States passport also reflects an accurate name and male sex designation, and expires in 2028. Having an accurate passport provides Reid comfort, especially when traveling with three young children outside of the United States. If Reid did not have a passport that reflects who he is, it would dramatically impact the way he travels. Reid would be less secure leaving the country with his children, as having a sex designation that so flagrantly does not match his outward gender expression would potentially put him and his children at risk. Because Reid's passport serves as an identity and citizenship document that accurately reflects his gender identity and presentation. He uses it for dentification and citizenship verification. Removing access to an accurate passport will cause Reid repeated stress and risk serious problems from it outing himself in routine interactions.

184.    Reid thought he was at the point in his life where he could live his life with safety and dignity, as an adult, as a husband, and as a parent. If his passport were to reflect a sex designation that is inconsistent with who he is, that safety and dignity will be taken away from him.

## CLASS ACTION ALLEGATIONS

185.    Plaintiffs bring this action for themselves and on behalf of others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2).  Plaintiffs seek certification of the following Classes:

      a.   All people who currently want, or in the future will want, to apply for, apply to renew, or apply to change a U.S. passport and wish to use an "M" or "F" sex designation on their passport that aligns with their gender identity but does not match how the Executive Order defines their sex; and

      b.   All people who currently want, or in the future will want, to apply for, apply to renew, or apply to change a U.S. passport and wish to use an "X" sex designation.

186.    Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families and (2) Defendants.

187.    The Classes are each so numerous that joinder of all members is impractical.  As alleged above, there are more than 1.6 million transgender people in the United States, more than 1.2 million nonbinary people, and as many as 5.6 million intersex people.  A high percentage of those people need and want to have passports with a sex designation the State Department will refuse to issue them under the Passport Policy.

188.    There are questions of law and fact common to the each whole Class, including (but not limited to):

      a.   Whether the Passport Policy and the Executive Order as applied to passports discriminate on the basis of sex in violation of the Fifth Amendment;

      b.   Whether the Passport Policy and the Executive Order as applied to passports discriminates on the basis of transgender status in violation of the Fifth Amendment;

      c.   Whether the Passport Policy and the Executive Order as applied to passports are motivated by illegitimate animus;

    d.   Whether the Passport Policy and the Executive Order as applied to passports infringe the Fifth Amendment rights to free movement and travel;

    e.   Whether the Passport Policy and the Executive Order as applied to passports infringe the Fifth Amendment right to privacy;

    f.   Whether the Passport Policy and the Executive Order as applied to passports infringe the First Amendment right to free speech and expression;

    g.   Whether the discrimination perpetuated by the Passport Policy and the Executive Order as applied to passports survives the requisite level of scrutiny, including:

        i.   The legitimacy and strength of the government interests asserted in support of it; and

       ii.   The extent to which it serves, is related to, or is tailored to those interests; and

    h.   Whether the Passport Policy is arbitrary, capricious, an abuse of discretion, or otherwise contrary to the APA.

189.    Plaintiffs' claims are typical of the claims of the Class members they represent. Plaintiffs have been harmed by the same Defendants and on the same basis as all members of the Classes they represent, including because Defendants' actions violate Plaintiffs' and the Class members' constitutional rights, are in violation of law, and are arbitrary and capricious and otherwise in violation of the APA.  Plaintiffs seek the same relief as all Class members they represent.

190.    Plaintiffs will fairly and adequately protect the interests of the Classes they represent and have retained counsel competent and experienced in similar litigation, including class actions.  Plaintiffs are committed to the vigorous prosecution of this suit and have no interests that are adverse to the Classes.  Plaintiffs are represented by experienced counsel from the American Civil Liberties Union Foundation, the ACLU Foundation of Massachusetts, and the law firm of Covington & Burling LLP.  The attorneys affiliated with the above law firm and

40

organizations, and who are appearing in this matter, have extensive experience in complex constitutional litigation and class action litigation. They also have extensive experience representing transgender litigants. Plaintiffs' counsel intends to describe their credentials more fully in any forthcoming motion for class certification.

191.    Defendants have acted or refused to act on grounds that apply generally to the Classes, and final injunctive or declaratory relief is appropriate for the Classes as a whole. The Passport Policy and the Executive Order as applied to passports apply to every member of the Classes and cause the same injuries. Defendants' refusal to provide Plaintiffs and members of the Classes with accurate sex designations on their passports—as a result of Defendants' views on the meaning of sex and animus toward transgender, intersex, and nonbinary people—applies to both entire Classes. Injunctive or declaratory relief that the Passport Policy and the Executive Order as applied to passports are unconstitutional and unlawful and that the Passport policy violates the APA would benefit the each entire Class in the same way and remedy the same injuries as to each entire Class.

192.    All Class members have been injured by Defendants' conduct and will continue to be injured by Defendants' conduct going forward unless declaratory or injunctive relief prevents that continued and future injury.

## CLAIMS

### FIRST CAUSE OF ACTION
### (Fifth Amendment – Equal Protection)
### All Defendants

193.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

194.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Supreme Court has held that the Due Process Clause includes a guarantee against the United States of equal protection of the laws equivalent to that guaranteed against the States by the Equal Protection Clause of the Fourteenth Amendment.

41

195.    The Passport Policy and the Executive Order as applied to passports violate the Fifth Amendment's equal protection guarantee in at least two distinct ways and do so both facially and as applied.  Defendants' actions have harmed Plaintiffs and the putative Class members by depriving them of the equal protection of the laws and will continue to deprive Plaintiffs and the putative Class members of that constitutional protection unless Defendants are permanently enjoined and their unlawful actions set aside.

**Discrimination Based on Sex**

196.    The Passport Policy and the Executive Order as applied to passports draw a facial sex-based classification; that cannot be justified under the requisite heightened scrutiny or under any standard of constitutional review.

197.    The Passport Policy and the Executive Order as applied to passports define "female" as a "person belonging, at conception, to the sex that produces the large reproductive cell" and "male" as a "person belonging, at conception, to the sex that produces the small reproductive cell," and then restricts sex designations on passports to those definitions of "male" and "female."  That is a sex classification.

198.    If, for example, Plaintiff Perysian, who lives and expresses herself as a woman, and has a female gender identity, were a "person belonging, at conception, to the sex that produces the large reproductive cell," the Passport Policy and the Executive Order as applied to passports would provide her a female sex designation on her passport.  But because Plaintiff Perysian is a "person belonging, at conception, to the sex that produces the small reproductive cell," the Passport Policy and the Executive Order as applied to passports force her to have a male sex designation on her passport.  Or if Plaintiff Solomon-Lane, who lives and expresses himself as a man, and has a male gender identity, were a "person belonging, at conception, to the sex that produces the small reproductive cell," the Passport Policy and the Executive Order as applied to passports would provide him a male sex designation on his passport.  But because Plaintiff Solomon-Lane is a "person belonging, at conception, to the sex that produces the large reproductive cell," the Passport Policy and the Executive Order as applied to passports prohibit that.

42

App. 46

199.    By issuing passports with a female sex designation to women who meet the Executive Order's definition of female but denying it to women who do not, and by issuing passports with a male sex designation to men who meet the Executive Order's definition of male but denying it to men who do not, the Passport Policy and the Executive Order as applied to passports facially classify based on sex.

200.    The Passport Policy and the Executive Order also classify on the basis of sex in its treatment of nonbinary and intersex people who desire an "X" sex designation on their passport. Rather than allowing them to obtain a sex designation that accords with how they live their lives and express themselves, or allowing them to obtain an unspecified sex designation, the Passport Policy and the Executive Order as applied to passports require that intersex and nonbinary people's sex designations conform to the Executive Order's definition of female or male. This facially enforces the government's binary and specific sex designations—that is, that a person the Executive Order defines as male must have a passport that labels that person as a man and a person the Executive Order defines as female must have a passport that labels that person as a woman regardless of how they live and express themselves.

201.    The Executive Order and Passport Policy were implemented in part because of, and not simply in spite of, their adverse effects on the ability of people to depart from overbroad expectations about sex. That, too, warrants heightened scrutiny as a sex classification.

202.    Defendants cannot justify the sex classification utilized by the Passport Policy and the Executive Order as applied to passports under the requisite heightened scrutiny or any level of equal protection scrutiny. The Passports Policy's sex classification is not substantially related to an important government purpose. Reversing the previous policy permitting Americans to passport sex designations that are consistent with the sex they live and express and replacing it with a policy that requires sex designations on passports that are not consistent with Americans' identities or expression does not rationally advance any legitimate government interest—let alone substantially advance an important governmental objective.

203.    In addition, the Passport Policy and the Executive Order as applied to passports are impermissibly premised on assumptions, expectations, stereotypes, or norms about the nature of sex, including that it is entirely determined by the definitions of male and female utilized by the Passport Policy and mandated by provided in the Executive Order, and their insistence that sex can only be a binary characteristic (*i.e.*, either male or female) notwithstanding that for some people it is not exclusively one or the other.  Under the Passport Policy and the Executive Order as applied to passports, Plaintiffs and the putative Class members are precluded from obtaining passports that they may use without violation of their rights and risking serious harms due to the assumption, expectation, stereotype, and norm that a person defined by the Passport Policy and the Executive Order as male must live and present as male, and a person so defined female must live and present as female.  Plaintiffs and the putative Class members do not adhere to that assumption, expectation, stereotype, and norm, and the Executive Order denies them usable passports entirely on that basis. If Plaintiffs and the putative Class members belonged, at conception, to the sex that produces a different size reproductive cell and adhered to the assumption, expectation, stereotype, and norm of such a sex, the Executive Order would permit Plaintiffs and the putative Class members to obtain a useable passport.

**Discrimination Based on Transgender Status**

204.    The Passport Policy and the Executive Order as applied to passports also classify citizens based on transgender status, and that classification cannot be justified under the requisite heightened scrutiny or under any standard of constitutional review.

205.    On its face, the Passport Policy and the Executive Order as applied to passports classify based on transgender status.

206.    The Passport Policy and the Executive Order as applied to passports deny transgender people, but not cisgender people, a passport that they can use without disclosing sensitive personal information about their transgender status and risking discrimination, harassment, and violence solely because they are transgender.  The Passport Policy and the

Executive Order as applied to passports therefore facially treat people differently on the basis of being transgender.

207.    Even if the Passport Policy and the Executive Order did not facially classify based on transgender status, they were implemented in part because of, and not simply in spite of, their adverse effects on transgender people.

208.    Classifications based on transgender status independently warrant heightened scrutiny.

209.    Transgender individuals as a group possess all the indicia of a suspect or quasi-suspect class that have been identified by the Supreme Court as requiring courts to apply heightened scrutiny.  Transgender people have obvious, immutable, or distinguishing characteristics that define that class as a discrete group and these characteristics bear no relation to transgender people's abilities to perform in or contribute to society.  Transgender people have historically been subject to discrimination across the country and remain a small minority of the American population that lacks the political power to protect itself through the political process. Gender identity is a core, defining trait that cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person should not be required to abandon it as a condition of equal treatment.

210.    Limiting a person's passport to whether they belonged at conception to a sex that produces a particular size reproductive cell does not substantially advance an important governmental interest.

211.    Further, the Passport Policy and the Executive Order as applied to passports fail any level of equal protection scrutiny because they were motivated by animus against transgender people, as illustrated both by the statements of animus described in this Complaint and by the text of the Executive Order itself.  As explained, President Trump and members of his Administration have repeatedly made derogatory and extreme comments about transgender people, including linking them as a class to violence and sexual predation.  The Executive Order itself wrongly states that those who identify as transgender are "ideologues who deny the biological reality of sex [and]

45

have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." Executive Order § 1. It repeatedly links being transgender with seeking to harm women. *See id.* There is no empirical support for these assertions, and they are deeply offensive to and dehumanizing of hundreds of thousands of transgender Americans who exist in every part of this country.

### SECOND CAUSE OF ACTION
### (Fifth Amendment – Right to Travel)
### All Defendants

212.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

213.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," and the Supreme Court has held that the liberties protected by this Due Process Clause include fundamental rights to free movement and travel, including travel abroad.

214.    The Executive Order infringes the constitutional rights of Plaintiffs and the putative Class members to free movement and travel, both facially and as applied.  Defendants' actions have harmed Plaintiffs and the putative Class members by violating their constitutional right to travel and will continue to violate that right unless the Defendants are permanently enjoined and their unlawful actions set aside.

215.    Federal law generally prohibits U.S. citizens from traveling out of or into the country without a valid U.S. passport.  *See* 8 U.S.C. § 1185(b).  Foreign countries likewise generally bar entrance by U.S. citizens without a valid U.S. passport and/or condition issuance of a necessary visa on holding a valid U.S. passport.  As explained in this Complaint, and incorporated here, when traveling abroad, U.S. passports are necessary or practically necessary for numerous purposes and are often the only form of identification carried by a U.S. citizen that will be recognized or acknowledged by foreign authorities or private citizens abroad.

46

216.    The Passport Policy and the Executive Order as applied to passports infringe the fundamental right of the Plaintiffs and the putative Class members to free movement and travel.

217.    The Passport Policy and Executive Order as applied to passports will entirely prevent certain transgender, nonbinary, and intersex individuals from leaving or returning to the United States because their gender identity is different from that specified by the Executive Order.

218.    The Passport Policy and the Executive Order as applied to passports force Plaintiffs and the putative Class members to either not receive a passport or to receive a passport that puts them at risk of harassment, discrimination, violence, and—in travel to some countries—arrest and imprisonment.  The Executive Order thereby gives Plaintiffs and the putative Class members a Hobson's choice: accept a passport that poses these extreme risks on the one hand or be denied any form of international travel or admittance back into the United States from foreign travel on the other.

219.    Many transgender, nonbinary, and intersex individuals present to the world consistent with their gender identity, rather than their sex as identified under the Executive Order's definitions of male and female. For such individuals, government authorities in the U.S. and around the world may question whether a person's passport is authentic or accurate due to the mismatch between the sex they present as and the sex designation on their passport.  For example, if someone is a transgender woman and presents as a woman but, under the Executive Order, is forced to select "M" on her passport because she is defined by the Passport Policy and the Executive Order as male, government authorities may question whether the passport is authentic and/or whether the holder is entitled to use it.  Foreign authorities who question whether a passport is authentic can create substantial difficulties or even dangerous treatment for transgender, intersex, and nonbinary Americans when traveling—including confiscation of the passport and detention, as well as arrest and imprisonment in countries where it is illegal to be transgender. Accordingly, the Passport Policy and Executive Order can directly and foreseeably result in substantial barriers to the exercise of the fundamental rights of Plaintiffs and the putative Class members to free movement and travel.

47

220.     Reversing the previous policy permitting Americans to obtain sex designations on passports that align with the sex they know themselves to be and present as and replacing it with a policy that requires sex designations on passports that do not do so does not rationally advance any legitimate government interest—let alone substantially advance an important governmental objective.

**THIRD CAUSE OF ACTION**
**(Fifth Amendment – Privacy)**
**All Defendants**

221.     Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

222.     The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," and the Supreme Court has held that the liberties protected by this Due Process Clause include avoiding forced disclosure of private and intimate information.

223.     Both facially and as applied, the Passport Policy and the Executive Order as applied to passports infringe the constitutional liberty interests of Plaintiffs and the putative Class members, including the right to maintain intimate information as private.  Defendants' actions have harmed Plaintiffs and the putative Class members by violating their constitutional rights and will continue to violate the rights of Plaintiffs and putative Class members unless the Defendants are permanently enjoined and their unlawful actions set aside.

224.     For transgender, nonbinary, and some intersex people, whether "at conception" they "belong[ed] to" "the sex that produces the large reproductive cell" or "the small reproductive cell" is highly sensitive and personal medical information.

225.     Requiring transgender, nonbinary, and intersex people to be identified as "male" or "female" on their passports, when that is not the sex they live and express, reveals private, intimate, and sensitive information about them to others without their consent, and is deeply invasive.  Such forced disclosure of a person's transgender, nonbinary, or intersex status can put their safety at

48

risk, given that transgender, nonbinary, and intersex people are often subject to violence, harassment, and mistreatment on the basis of not being cisgender or identifying in binary terms.

226.    Under the Passport Policy and Executive Order as applied to passports, Plaintiffs and the putative Class members are required to display their sex as determined by the Executive Order, when that does not match their gender identity or gender presentation. As a result, the Passport Policy and Executive Order as applied to passports force disclosure of Plaintiffs' and the putative Class members' transgender, nonbinary, or intersex status against their will, thereby revealing private, intimate, and sensitive information and potentially inviting violence, harassment, and mistreatment. By contrast, providing them "M" or "F" to align with their gender identity, or providing an "X," does not reveal this private and sensitive information.

227.    Because the Executive Order infringes a fundamental right, it is subject to strict scrutiny. It fails that scrutiny because it is not narrowly tailored to advance a compelling government interest. It also does not even rationally advance any legitimate government objective. The conclusory government interests identified in the text of the Executive Order are inaccurate and motivated by animus. In addition, denying transgender, nonbinary, and intersex people accurate passport sex designations is not rationally related to achieving even the illegitimate interests identified by the Executive Order.

### FOURTH CAUSE OF ACTION
#### (First Amendment)
#### All Defendants

228.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

229.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."

230.    The Passport Policy and the Executive Order as applied to passports violate the First Amendment rights of Plaintiffs and the putative Class members to free speech and expression.

231.    Under the First Amendment, the government cannot require a person to convey a controversial, ideologically-infused message with which they disagree.  The Passport Policy and the Executive Order as applied to passports force transgender people and individuals who do not identify as male or female to either (a) forgo having a passport or (b) express the government's counter-factual and ideologically-infused message that their sex is what the Executive Order defines it to be each time they apply for or use a passport with the definition of sex mandated by the Passport Policy and the Executive Order as applied to passports—a message with which they strongly disagree.

232.    The Passport Policy and the Executive Order as applied to passports therefore impermissibly require compelled speech.

233.    Underscoring that this is compelled speech, many people would reasonably fear that the Passport Policy raises the possibility that the Administration may seek to prosecute them for perjury if they fill out the sex designation field on the State Departments' passport application accurately, instead of following the Administration's factually incorrect definition of sex.[33]

234.    Even if the sex designation on a passport were considered government speech, the fact that the government forces the passport bearer to communicate the government's message every time they travel internationally, on all other occasions when passports must be used, or any other time when they are used, violates their First Amendment rights by forcing them to participate in the dissemination of an ideological message with which they do not agree.  A passport is an item that is readily associated with an individual, and the government cannot use it to force someone to convey the government's ideologically-infused speech with which they disagree.

235.    Because the Passport Policy and the Executive Order as applied to passports force individuals to communicate an ideological message with which they disagree, they are subject to strict scrutiny.  The Passport Policy and the Executive Order as applied to passports engage in this infringement of a First Amendment right without any meaningful justification, let alone the

_____

[33] For the avoidance of doubt, Plaintiffs do not agree that any such prosecution would be factually or legally appropriate.

compelling government interest that the Constitution requires. They also are not narrowly tailored to achieve any such interest. Even if a lower level of heightened scrutiny applied, the Passport Policy and the Executive Order as applied to passports would fail because they lack an important governmental objective, and the means the Defendants employ are not substantially related to achieving any legitimate and sufficient objective.

**FIFTH CAUSE OF ACTION**
**(Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*., 706 – Contrary to Constitutional Right, Power, Privilege or Immunity)**
**Agency Defendants**

236.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

237.    The APA, 5 U.S.C. §§ 500 *et seq.*, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2).

238.    The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order. The Secretary of State and State Department's Passport Policy and implementation of the Executive Order constitute a final agency action under the APA. As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment. Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department. For example, Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration. The

51

State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

239.    For the reasons described in the preceding claims, and incorporated here, the Passport Policy and any agency actions taken under the Executive Order are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), and therefore must be held unlawful and set aside.  In particular, as described above, those actions violate the Due Process Clause of the Fifth Amendment for multiple independent reasons and violate the First Amendment.

**SIXTH CAUSE OF ACTION**
**(Administrative Procedure Act, 5 U.S.C. §§ 500** *et seq.***, 706 – Arbitrary, Capricious, and Abuse of Discretion)**
**Agency Defendants**

240.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

241.    The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ."  5 U.S.C. § 706(2).

242.    The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order.  The Secretary of State and State Department's Passport Policy and implementation of the Executive Order constitute a final agency action under the APA.  As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment.  Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department.  For example,

52

Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration. The State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

243.    Agency actions taken under the Executive Order are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), for multiple independent reasons.

244.    The challenged agency actions are arbitrary, capricious, and an abuse of discretion because they are irrational and unreasonable:

    a. The classifications imposed by the Passport Policy (as mandated in the Executive Order) are not based on scientific or medical knowledge or evidence. To the contrary, they contradict current scientific and medical understandings and are based on an animus-laden view of sex, gender identity, and being transgender, nonbinary, or intersex, that is divorced from reality. Even though medical and scientific evidence—and the lives of millions of people—attests to the existence of transgender, nonbinary, and intersex people, the Passport Policy and Executive Order sweep that evidence aside in favor of empty rhetoric unmoored from facts.

    b. The Passport Policy (per the Executive Order) also defines "male" and "female" as a person who "at conception" "belong[s]" to the sex that produces the large or small reproductive cell—but, as explained above and incorporated here, embryos with either XX or XY chromosomes have undifferentiated reproductive cells during the initial period after conception.

    c. In addition, grouping all people into "male" and "female" based on which reproductive cell is likely to be produced ignores the established biological reality that some individuals are intersex and do not, at conception, belong to a sex that produces either large or small reproductive cells.

d. Requiring sex designations based upon the sex a person "belong[s]" to "at conception" based upon the reproductive cells they are likely to produce does not further an interest in accurately identifying passport holders.

245. Further, the challenged agency actions are arbitrary, capricious, and an abuse of discretion because they are unsupported by a reasoned explanation:

a. The Agency Defendants have provided no meaningful explanation for their removal of the option for people to use a designation for their sex as they live and express it, nor does the Executive Order do so.

b. The Agency Defendants have provided no meaningful explanation for their removal of the option for people to not specify their sex by using the "X" designation, nor does the Executive Order do so.

c. The Agency Defendants have provided no meaningful explanation for their attempt to proclaim it the policy of the United States that transgender, nonbinary, and intersex people do not exist. The Executive Order and Passport Policy entirely fail to address any of the medical and scientific evidence demonstrating the importance of legal recognition of transgender, nonbinary, and intersex people and the medical and practical importance of accurate identification.

d. Further, the Agency Defendants have failed to explain what alternatives, if any, were considered to address any potential legitimate interests the Passport Policy could serve, nor does the Executive Order do so. This includes less restrictive alternatives and those that do not discriminate on the basis of sex or being transgender, nonbinary, or intersex.

e. Relatedly, the Agency Defendants have failed to explain why the status quo ante—which the State Department implemented for years before the Executive Order—was in any way flawed, let alone sufficiently flawed to warrant this abrupt and substantial change, nor does the Executive Order do so.

54

246.    The Agency Defendants have also failed to consider or address numerous crucial aspects of the change in policy, nor does the Executive Order do so.  Most acutely, they have failed to consider or address the effects on transgender, nonbinary, and intersex people.  They have not even considered the effects on their own employees and the operation of the federal government. The Agency Defendants have failed to consider or address the many ways they are foreseeably, obviously, and directly harmed by the Passport Policy.  They failed to consider or address the needs of these individuals and their families to obtain accurate passports that do not expose them to mistreatment.

**SEVENTH CAUSE OF ACTION**
**(Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*., 706 – Failure to Observe Procedure**
**Required by Law )**
**Agency Defendants**

247.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

248.    The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law. . . ."  5 U.S.C. § 706(2)(D).

249.    The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order.  The Secretary of State and State Department's Passport Policy and implementation of the Executive Order constitute a final agency action under the APA.  As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment.  Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department.  For example,

Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration. The State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

250.    Agency actions taken under the Executive Order are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Under the Paperwork Reduction Act of 1980, 44 U.S.C. §§ 3501 *et seq.*, when a federal agency seeks to collect information from the public (often through government forms), it is obligated to "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information[.]" 44 U.S.C. 3506(c)(2)(A).

251.    As explained above, and incorporated here, the State Department has changed the forms used to apply for, apply for renewal of, and apply to change passports and replaced them with a form that does not permit collection of the "X" sex designation, but only permits collection of the "M" and "F." That change was not announced with 60 days' notice in the Federal Register or any other public consultation. Indeed, it was not announced at all. The State Department made the change surreptitiously, using forms that are labelled expired.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.      Issue declaratory judgment that (i) the Passport Policy and the Executive Order as applied to passports violate Plaintiffs' constitutional rights; and (ii) the Passport Policy is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law in violation of the APA;

b.      Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing the Passport Policy or the Executive Order as applied to passports, and require that they permit (i) changes to the "Sex" designation on passports to the same extent they did before the Executive Order and Passport Policy were issued, including allowing individuals to self-attest to what their sex is and (ii) the use of an "X" sex designation on passports and passport

applications to the same extent they did before the Executive Order and Passport Policy were issued;

        c.       Hold unlawful, set aside, and vacate any agency actions taken under Passport Policy or the Executive Order as applied to passports that had the purpose or effect of not permitting (i) changes to the "Sex" designation on passports to the same extent they did before the Executive Order and Passport Policy were issued, including allowing individuals to self-attest to what their sex is and (ii) the use of an "X" sex designation on passports and passport applications to the same extent they did before the Executive Order and Passport Policy were issued;

        d.       Certify classes as set forth in this Complaint and enter class-wide declaratory and injunctive relief as described above;

        e.       Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

        f.       Grant all such other and further relief as the Court may deem just and proper.

February 7, 2025                        Respectfully submitted,

                                     */s/ Jessie J. Rossman*
                                     Jessie J. Rossman (BBO # 670685)
                                     AMERICAN CIVIL LIBERTIES UNION
                                     FOUNDATION OF MASSACHUSETTS, INC.
                                     One Center Plaza, Suite 850
                                     Boston, MA 02108
                                     Telephone: 617-482-3170
                                     jrossman@aclum.org

Jon W. Davidson*
    (admitted only in California)
Li Nowlin-Sohl*
    (admitted only in Washington)
Sruti J. Swaminathan*
Malita V. Picasso*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
jondavidson@aclu.org
lnowlin-sohl@aclu.org
sswaminathan@aclu.org
mpicasso@aclu.org

Aditi Fruitwala*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
afruitwala@aclu.org

Isaac D. Chaput*
William P. Kasper*
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St, Suite 5400
San Francisco, California 94105
Telephone: 415-591-6000
Facsimile: 415-591-6091
ichaput@cov.com
wkasper@cov.com

Ansel F. Carpenter*
Gavin W. Jackson*
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: 424-332-4758
Facsimile: 424-332-4749
acarpenter@cov.com
gjackson@cov.com

58

Jonathan Thompson*
Sean M. Bender*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202-662-5891
Facsimile: 202-778-5891
jthompson@cov.com
sbender@cov.com

Yuval Mor*
Alyssa L. Curcio*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212-841-1000
Facsimile: 212-841-1010
ymor@cov.com
acurcio@cov.com

*Attorneys for Plaintiffs*

**Pro Hac Vice** Application Forthcoming

59

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR, ZAYA PERYSIAN,
SAWYER SOE, CHASTAIN ANDERSON,
DREW HALL, BELLA BOE, and REID
SOLOMON-LANE, on behalf of themselves
and others similarly situated,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary of
State; and UNITED STATES OF AMERICA,

*Defendants*.

Case No. 1-25-cv-10313

Hon. Julia E. Kobick

## EXPERT DECLARATION OF SARAH D. CORATHERS, MD

I, Sarah D. Corathers, hereby declare and state as follows:

1.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2.      The purpose of this report is to provide my expert opinions on: (1) the medical definitions of sex and gender identity; (2) the unworkable and inaccurate aspects of the government's binary definition of sex; and (3) the severe risk of harm to transgender, non-binary, and intersex individuals forced to use Passport identification that does not match their sex.

3.      I have actual knowledge of the matters stated in this report and have collected and cited relevant literature concerning the issues that arise in this litigation in the body of the report.

4.      In preparing this report, I reviewed Plaintiffs' Complaint (ECF. 1), and President Trump's Executive Order (ECF 1-1). I also relied on my scientific education and training, my research experience, my knowledge of the scientific literature in the pertinent fields, and my

clinical experience treating adolescents with gender dysphoria, as set out in my curriculum vitae, attached hereto as Exhibit A.

5.    The materials I have relied upon in preparing this report are the same types of materials that experts in my field regularly rely upon when forming opinions on these subjects. These materials are listed in the bibliography accompanying this declaration, attached hereto as Exhibit B.

6.    I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications, in response to statements and issues that may arise in my area of expertise, or in responses to expert opinions the Government may submit in this matter.

## BACKGROUND AND QUALIFICATIONS

7.    I received my medical degree from Wright State University in 2002.  I completed my residency in Internal Medical and Pediatrics at the University of Cincinnati and Cincinnati Children's Hospital between 2002-2006. I was the Chief Resident in Internal Medicine at the University of Cincinnati from 2006-2007. I completed a four-year combined Fellowship in Adult and Pediatric Endocrinology between 2009-2013 at the University of Cincinnati and Cincinnati Children's Hospital. Beginning in 2013, I was an Assistant Professor, Department of Pediatrics, Division of Endocrinology, at Cincinnati Children's Hospital. I became an Associate Professor in the Department of Pediatrics, Division of Endocrinology, in 2019. Since 2022, I have been the Clinical Director in the Division of Pediatric Endocrinology at Cincinnati Children's Hospital overseeing clinical operations and quality. Notably, the Division of Endocrinology at Cincinnati Children's Hospital was recognized by U.S. News and World Reports as #1 in the nation for Diabetes and Endocrinology in the 2023-2024 rankings, the same year Cincinnati Children's Hospital was also recognized as the #1 Best Children's Hospital in the nation. As of March 1, 2024, I am Associate Chief of Staff, Ambulatory Medicine at Cincinnati Children's Hospital.

9.      I have extensive experience working with children and adults with endocrine disorders, and I am an expert in the treatment of metabolic and hormone health concerns including hypogonadism, Differences of Sex Development (DSD) or Intersex conditions, and gender dysphoria. I also treat children, adolescents, and adults with other endocrine disorders including type 1 diabetes, Turner syndrome, and survivors of childhood cancers with lifelong hormone deficiencies.

10.     I am a member of the American Academy of Pediatrics, the Pediatric Endocrine Society, and the Endocrine Society.

11.     I currently see adult and pediatric patients at the Endocrinology Clinic at Cincinnati Children's Hospital, where I also serve as the Clinical Medical Director.

12.     I supervise the education of pediatric endocrinology fellows in care of transgender and gender non-conforming youth through didactic lectures and clinical practice.

13.     I have published over 70 peer reviewed articles on endocrine disorders and treatments. Among those, I have published on topics that include interdisciplinary care for transgender and gender non-conforming youth, shared decision making about gender-affirming hormone therapy, hormonal contraceptive choices for transgender adolescents and adults, and bone health among transgender youth undergoing pubertal suppression. I have also published an invited commentary about developing effective hormonal treatment paradigms for transgender youth. In addition, I am a contributing author on the International Turner Syndrome Clinical Practice Guidelines which reflect grading of available evidence and recommendations for care including estrogen hormone replacement.

14.     As part of my practice, I am familiar with the latest medical science and treatment protocols related to gender dysphoria and Differences of Sex Development (DSDs).

15.     I have served as an expert witness, been deposed and testified at trial in *Moe v. Yost*, 24-CV-002481 (Franklin County Ohio clerk of Courts of the Common Pleas).

16.     I am being compensated at a rate of $300 per hour. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

### PROCESS OF SEX DEVELOPMENT

17.     Sex development is a complex, multi-step process of activating and repressing factors dependent upon genetic instruction and subsequent embryologic differentiation in response to hormone signals.

18.     Sex refers to multiple physiologic attributes, such as chromosomes (genetic sex), gonads (glands that produce hormones), and anatomy (reproductive parts both inside and outside of the body), secondary sex characteristics that usually develop during puberty, and gender identity.

19.     Chromosomes carry genetic information. Two chromosomes, known and X and Y, are referred to as sex chromosomes. People with two X chromosomes will usually be female and people with one X and one Y chromosome will usually be male. The combination of chromosomes is determined at conception when the egg is fertilized.

20.     During the initial gestational period, embryos with XX and XY chromosomes appear the same. The future gonads (ovaries and testes) are undifferentiated, and there are two sets of structures called Mullerian and Wolffian ducts, and similar genital structures.

21.     A gene called SRY is usually found only on the Y chromosome. The SRY gene gives instructions to cells in the undifferentiated gonad to make a protein called testis determining factor (TDF). In response to TDF, the undifferentiated gonads develop into testes that can later produce Testosterone, which makes the Wolffian ducts develop into spermatic ducts. The testes

produce Mullerian Inhibiting Substance (MIS), which makes the Mullerian ducts disappear. Testosterone and dihydrotestosterone promote the development of male anatomic features including a penis and scrotum.

22.     In the presence of two X chromosomes and the absence of the SRY gene, ovaries form from the undifferentiated gonad. The Mullerian structures form a uterus, fallopian tubes, vagina, and labia in the absence of MIS to stop them from developing. The Wolffian ducts disappear when there is no Testosterone.

23.     After the seventh week of development, the testes release testosterone that causes undifferentiated genitals to develop in a male direction. In the absence of testosterone, or if the body cannot respond to testosterone, the undifferentiated genitals develop in a female direction. Both male and female genitals have corresponding parts because of common embryologic origins.

24.     Sex is usually assigned at birth based on physical characteristics; however, the physiologic aspects that contribute to a person's sex are not always aligned with each other. For example, some people may have chromosomes typically associated with males, but genitalia typically associated with females or vice versa.

25.     During male puberty, testes mature and begin to produce sperm. During female puberty, ovaries start to release eggs and menstrual periods begin.

26.     In a medical context, the terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" that does not account for differences of sex development or intersex conditions, fertility potential, or gender identity.[1]

---

[1] *See* Hembree, W.C., et al., *Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline.* J. Clin. Endocrinol. & Metab., 2017. **102**: 3869–3903, 3875, https://academic.oup.com/jcem/article/102/11/3869/4157558 (hereafter "Endocrine Guideline") ("Biological sex, biological male or female: These terms refer to physical aspects of maleness and femaleness. As these may not be in line with each other (e.g., a person with XY chromosomes may have female-appearing genitalia), the terms biological sex and biological male or female are imprecise and

5

**THE GOVERNMENT'S DEFINITION OF SEX IS IN CONFLICT WITH BIOLOGY**

27.     The Executive Order Section 2 (d) states that "'Female' means a person belonging, at conception, to the sex that produces the large reproductive cell" and Section 2 (e) states that "'Male' means a person belonging, at conception, to the sex that produces the small reproductive cell". These terms are not used in clinical medical practice or scientific discourse.

28.     The Executive Order's definition of sex is arbitrary and inconsistent with biology. Notably, the gonads that may later have capacity to produce reproductive cells are not present at conception. Impliedly, the reference to the "large reproductive cell" indicates egg or ova from an ovary and "small reproductive cell" means sperm from a testis.  What is certain is that there are many individuals whose gonads are not able to produce eggs or sperm. Furthermore, sperm production, when present, is not possible until male puberty, between the ages of 9-14 years.

29.     The government's definition of sex is inaccurate, conflates sex and fertility, neglects the existence of medical conditions that result in differences in sex development, individuals who face infertility for any reason, and the interrelation between sex and gender.

30.     In the United States, about 11% of women and 9% of men of reproductive age experience fertility issues.[2] The government's definition of sex that is dependent upon presence of reproductive cells is untenable given that fertility status is often not established until adulthood.

**DIFFERENCES OF SEX DEVELOPMENT**

31.     Medical conditions known as Differences of Sex Development (DSD) or Intersex

---

should be avoided.")

[2] National Health Statistics Report April 24, 2024, National Health Statistics Reports, Number 202, April 4, 2024

conditions describes a group of conditions in which biological sex development does not follow a typical path.[3]

32. Some intersex people will not develop the capacity to produce either the "large reproductive cell" or "small reproductive cell"—that is, the ovum and sperm – that are part of the definitions of female and male used by the Passport Policy.[4]

33. "Intersex" is an umbrella term used to describe a wide range of natural bodily variations. Intersex people are born with sex characteristics that do not fit typical binary notions of bodies designated "male" or "female." In some cases, intersex traits are visible at birth, while in others, they are not apparent until puberty—or later in life during fertility evaluation. Some variations may not be visibly apparent. Intersex people can have certain variations in chromosomes (genetic material), external genitals, internal reproductive organs, and hormone production and response that cause these variations in their bodies. Karyotype describes the set of chromosomes found in the cells of an individual person. Depending on karyotype, individuals with DSD are categorized into 46 XX DSD, 46 XY DSD, and sex chromosome or mixed chromosome DSD.[5]

34. There are many conditions that can be described as DSD or Intersex. The most frequent occurring are congenital adrenal hyperplasia (CAH) in XX individuals, complete or partial androgen insensitivity in XY individuals, and mixed gonadal dysgenesis. Conditions with

---

[3] Lee PA, Houk CP, Ahmed SF, Hughes IA., International Consensus Conference on Intersex organized by the Lawson Wilkins Pediatric Endocrine Society and the European Society for Paediatric Endocrinology. Consensus statement on management of intersex disorders. International Consensus Conference on Intersex. Pediatrics. 2006 Aug;118(2):e488-500.
[4] The Biological Reality of Sex and Intersex: A Response to the Executive Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" - Pediatric Endocrine Society
[5] Hughes IA, Nihoul-Fékété C, Thomas B, Cohen-Kettenis PT. Consequences of the ESPE/LWPES guidelines for diagnosis and treatment of disorders of sex development. Best Pract Res Clin Endocrinol Metab. 2007 Sep;21(3):351-65.

sex chromosome differences like Turner syndrome (usually a single X chromosome, 45 XO) and Klinefelter syndrome (usually an extra chromosome, 47 XXY) are sometimes included in the category of sex chromosome DSD.  Based on the inclusion criteria used to define DSD conditions, the incidence varies from 1:1000[6] to 1:4500[4] live births,  indicating a potential of 60,000 up to 5.6 million people with Intersex conditions in the United States.[7]  The prevalence of an isolated finding of atypical genitalia such as hypospadias, (opening of the urethra located somewhere other than the tip of the penis) or undescended testis may be as high as 1 in 300 births whereas the birth prevalence of infants who require further medical evaluation for a potential DSD diagnosis  is about 1 in 3000 and a smaller proportion of those births may experience delayed sex assignment due to a DSD diagnosis.[8]

35.     People who are born with a DSD may have ambiguous genitalia at birth, making it hard to determine a sex assignment based on anatomy. Some individuals have XY genetics but have genitals that appear female due to under virilization (lack of exposure or response to testosterone).  Conversely, some individuals have XX genetics with external genitals that appear male due to in utero Testosterone exposure but still have internal uterus and ovaries. Many DSD conditions are associated with inability to produce ova or sperm.

36.     There are many genes involved in sex development, and a mutation in any of these

---

[6] Blackless M, Charuvastra A, Derryck A, Fausto-Sterling A, Lauzanne K, Lee E. How sexually dimorphic are we? Review and synthesis. Am J Hum Biol. 2000 Mar;12(2):151-166. doi: 10.1002/(SICI)1520-6300(200003/04)12:2<151::AID-AJHB1>3.0.CO;2-F. PMID: 11534012.
[7] United Nations Free & Equal, "Intersex People," Office of the United Nations High Commissioner for Human Rights 1 (2024), https://www.unfe.org/sites/default/files/download/Intersex%20factsheet%202024%20EN%20-%20CLEARED.pdf (last accessed Feb. 6, 2025)
[8] Ahmed SF, Achermann J, Alderson J, Crouch NS, Elford S, Hughes IA, Krone N, McGowan R, Mushtaq T, O'Toole S, Perry L, Rodie ME, Skae M, Turner HE. Society for Endocrinology UK Guidance on the initial evaluation of a suspected difference or disorder of sex development (Revised 2021). Clin Endocrinol (Oxf). 2021 Dec;95(6):818-840. doi: 10.1111/cen.14528. Epub 2021 Jun 22. PMID: 34031907.

genes may lead to the development of a DSD: [9]

- SRY gene: the sex-determining region of the Y chromosome is the chief regulator of male sex differentiation; expression causes translation of SRY protein, which mediated testicular development.

- SOX9 gene: expression of this gene follows the SRY gene and is responsible for the differentiation of Sertoli cells.

- NR5A1/SF-1: The steroidogenic factor gene codes an important transcription factor involved in male development and steroid biosynthesis.

- DHH gene: The desert hedgehog gene plays a role in testicular differentiation.

- DAX/NROB1: Considered as an anti-testis factor up-regulated in the ovary.

- WT1: Codes a transcription factor involved in renal and gonadal development, mutation results in various congenital syndromes of abnormal genitourinary development.

- Wnt 4 and Wnt 7a: Wnt 4 suppresses male sexual differentiation and ovarian androgen production.

37.    Based on genetic variation, some people may have differences in how the gonads develop, which impacts the ability of the gonad to make hormones to drive usual anatomic development.

38.    Some individuals make hormones, but there is a block in an important part of the hormone synthesis pathway, an insensitivity to the hormone, or resistance at the level of the cellular receptor.  For example, development of male external genitalia requires the presence of

---

[9] Mehmood KT, Rentea RM. Ambiguous Genitalia and Disorders of Sexual Differentiation. [Updated 2023 Aug 28]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2025 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK557435/

dihydrotestosterone. Deficiency of this hormone, insensitivity, or resistance may lead to under-virilized genitalia in a person with XY chromosomes. Similarly, in a person with XX chromosomes, exposure to excess androgens leads to virilization of female genitalia, which may be due to excess production or exogenous exposure.

39.    A karyotype describes the size, shape, and number of chromosomes (genetic material) in a sample of cells from an individual. Most individuals have 46 chromosomes including two sex chromosomes, either X or Y. Intersex people develop differently in a variety of ways with classification based upon karyotype[10]:

- 46 XX DSD may experience disorder of gonadal development, disorder of androgen excess, or disorders such as Mayer-Rokitansky-Küster-Hauser Syndrome (not developing a vagina and/or uterus).

- 46 XY DSD may experience disorder of gonadal development, disorder of androgen synthesis, disorder of androgen function, persistence of Mullerian structures (developing a uterus, fallopian tubes, or vaginal canal with or without a penis and testes), and other unclassified disorders.

- Sex chromosome DSD may include Turner syndrome, Klinefelter syndrome, Mixed gonadal dysgenesis, and variants of these conditions.

**GENDER IDENTITY**

40.    Gender identity refers to a fundamental inner sense of self as female, male, a combination of both, or neither distinctly male nor female.

---

[10] Cools M, Nordenström A, Robeva R, Hall J, Westerveld P, Flück C, Köhler B, Berra M, Springer A, Schweizer K, Pasterski V; COST Action BM1303 working group 1. Caring for individuals with a difference of sex development (DSD): a Consensus Statement. Nat Rev Endocrinol. 2018 Jul;14(7):415-429. doi: 10.1038/s41574-018-0010-8. PMID: 29769693; PMCID: PMC7136158.

41.     Everyone has a gender identity and one's understanding of it may develop over time.

42.     A person's gender identity is an essential part of their identity and very frequently predicts how they will be identified by others more accurately than their sex assigned at birth.  For purposes of identity documents, including passports, a person's gender identity is the most accurate and least problematic characteristic for determining what their sex is.

43.     There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.[11]

44.     According to the American Medical Association, the American College of Physicians, the American Psychiatric Association, and 25 other major U.S. medical and psychological professional associations, "variations in . . . gender identity are a normal part of human development" and "research and experience shared by scholars, clinicians, and patients have shown that . . . efforts [to change someone's gender identity have not succeeded] and are harmful."[12]

### CISGENDER, TRANSGENDER, AND NON-BINARY PEOPLE

45.     The prefixes "cis" and "trans" are from Latin: "this side of" and "the other side of", respectively. In the context of chemistry, cis indicates that the functional groups on the same side of a molecule, while trans conveys that they are on opposing or transverse sides of a molecule.

46.     The prefixes cis and trans are applied to language describing gender identity to convey when gender identity aligns with sex assigned at birth, (cisgender), or when gender identity

---

[11] See statements from professional organizations that oppose gender identity conversion efforts: https://d3dkdvqff0zqx.cloudfront.net/groups/apaadvocacy/attachments/USJS-Final-Version.pdf
[12] Jody Herman et al., How Many Adults and Youth Identify as Transgender in the United States?, Williams Institute, UCLA School of Law 1 (2022), https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Trans-Pop-Update-Jun-2022.pdf (last accessed Feb. 6, 2025).

is different than sex assigned at birth (transgender).

47.     Most people have a gender identity that aligns with the sex they were designated at birth based on their external genitalia and are cisgender.[13]

48.     Transgender people have a gender identity different from the person's sex designated at birth. Approximately 1.6 million people in the United States identify as transgender.[14]

49.     Non-binary, gender diverse, or gender non-conforming are terms used to describe gender identities that are not either exclusively male or exclusively female. According to one set of surveys, more than 1.2 million Americans identify as are non-binary.[15] Some non-binary people consider themselves transgender because their sex assigned at birth does not align with their gender identity.  Other non-binary people do not consider themselves transgender. In addition, some transgender people consider themselves to be non-binary, and some do not.

50.     Some intersex people identify with sex assignment at birth and are considered cisgender; some identify as transgender or non-binary.

51.     Transgender and non-binary people have always existed, although the number of people who we know to be transgender has increased in recent times with increased visibility and alongside advances in modern medical treatments.[16]

---

[13] The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because all the physiological aspects of a person's sex are not always aligned with each other. *See* Hembree, W.C., et al., *Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline*. J. Clin. Endocrinol. & Metab.,2017.**102**:3869–3903, 3875, https://academic.oup.com/jcem/article/102/11/3869/4157558 (hereafter "Endocrine Guideline").

[14] Jody Herman et al., How Many Adults and Youth Identify as Transgender in the United States?, Williams Institute, UCLA School of Law 1 (2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf (last accessed Feb. 6, 2025).

[15] Bianca D.M. Wilson et al., Nonbinary LGBTQ Adults in the United States, Williams Institute, UCLA School of Law 2 (June 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Nonbinary-LGBTQ-Adults-Jun-2021.pdf (last accessed Feb. 6, 2025).

[16] Carswell, J.M., Lopez, X., and Rosenthal, S.M., *The evolution of adolescent gender-affirming care: An*

52.     There is considerable scientific evidence demonstrating a durable biological element underlying gender identity. For example, neuroanatomy studies of brain scan patterns often align with gender identity rather than external genitalia or chromosomes.[17] For example, Yokota et al reported that the shape of the corpus callosum, a structure in the brain, in transgender individuals was closer to subjects with shared gender identities than to subjects who shared the same sex designated at birth.[18] Results of genetic, biologic, and neuroscience studies support the concept that gender identity is not simply a psychosocial construct, but likely reflects a complex interplay of biological, environmental, and cultural factors, which may explain why attempts to change gender identity in intersex patients to match external genitalia or chromosomes are often unsuccessful.[19] Among individuals with XX chromosomes and congenital adrenal hyperplasia (CAH) there is higher exposure to androgens (masculinizing hormones) in utero that corresponds to higher rates of male gender identity compared to those who do not have similar in utero exposure to Testosterone.[20] Individuals with XY chromosomes and complete androgen insensitivity have tissues that are not able to respond to Testosterone and often have female gender identity. Identical twins (twins who share the exact same genetic material) are more likely to both experience transgender identity compared to sets of fraternal twins (non-identical).[21]

---

*historical perspective*. Horm. Res. Paediatr., 2022. **95**(6): p. 649-656.

[17]  Saraswat A, Weinand JD, Safer JD. Evidence supporting the biologic nature of gender identity. Endocr Pract. Feb 2015;21(2):199-204. doi:10.4158/ep14351.ra

[18] Yokota, Y., Kawamura, Y., & Kameya, Y. (2006, January). Callosal shapes at the midsagittal plane: MRI differences of normal males, normal females, and GID. In *2005 IEEE Engineering in Medicine and Biology 27th Annual Conference* (pp. 3055-3058). IEEE.

[19] Rosenthal SM. Approach to the patient: transgender youth: endocrine considerations. J Clin Endocrinol Metab. Dec 2014;99(12):4379-89. doi:10.1210/jc.2014-1919

[20] Dessens AB, Slijper FM, Drop SL. Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. Arch Sex Behav. Aug 2005;34(4):389-97. doi:10.1007/s10508-005-4338-5

[21] Heylens G, De Cuypere G, Zucker KJ, et al. Gender identity disorder in twins: a review of the case report literature. J Sex Med. Mar 2012;9(3):751-7. doi:10.1111/j.1743-6109.2011.02567.x

13

## GENDER DYSPHORIA: DIAGNOSIS AND TREATMENT

53.     Gender dysphoria describes the significant emotional distress or impairment in social, occupational, or other important areas of functioning that stems from the incongruence between a person's gender identity and sex designated at birth, and/or body characteristics. Many transgender, non-binary, and intersex people experience gender dysphoria.

54.     Gender dysphoria is recognized as a diagnosis in the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM V").[22] To be diagnosed with gender dysphoria, the incongruence between a person's gender identity and designated sex must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning. There are two separate diagnoses for gender dysphoria, one for gender dysphoria in childhood and the other for gender dysphoria in adolescence and adulthood.

55.     Being transgender is not itself a mental health condition; however, stigma, bullying, and untreated gender dysphoria can lead to severe anxiety, depression, and suicidality. Efforts to change a transgender person's gender identity is associated with adverse mental health outcomes, including suicidality.[23] Mental health and psychosocial support are essential components of care for transgender and gender diverse people as detailed in the Endocrine Society Clinical Care Guideline, published by a professional organization of more than 18,000 endocrinologists.

56.     When appropriately treated, gender dysphoria can be effectively managed.

57.     The treatment protocols for gender dysphoria are laid out in established, evidence-

---

[22] See, e.g., Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders: DSM5-TR at 512–13 (2022)

[23] Turban JL, Beckwith N, Reisner SL, Keuroghlian AS. Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults. JAMA Psychiatry. Sep 11 2019;77(1):1-9. doi:10.1001/jamapsychiatry.2019.2285

based clinical guidelines: (i) the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, and (ii) the World Professional Association for Transgender Health ("WPATH") Standards of Care ("SOC") for the Health of Transgender and Gender Diverse People, which was initially published in 1979 and is now in its eighth version, which was released in 2022. These guidelines are supported by all major U.S. medical associations and reflect the professional consensus about the psychological, psychiatric, hormonal, and surgical management of gender dysphoria.

58. It is the recognized standard of care to address gender dysphoria with individualized treatment approach designed to bring a person's body and expression of their sex in line with their gender identity. This course of treatment has different components depending on the needs of each person. A professional healthcare provider recommends an individualized course of treatment based on their exercise of professional judgment to achieve the goal of reducing a patient's gender dysphoria. As with other forms of healthcare, the patient considers the benefits, risks, and alternatives of available options and makes treatment decisions in consultation with that provider.

59. Treatment for gender dysphoria brings a person's social interactions, appearance, and body into greater alignment with the person's gender identity, which helps alleviate the distress associated with gender dysphoria. Treatment for gender dysphoria may involve social transition, hormone treatment, non-surgical voice therapy, and/or gender-affirming surgery or surgeries.

60. Gender affirming care refers to support from mental health and medical providers.

61. Transgender individuals report several-fold higher rates of depression, anxiety, suicidal ideation, suicide attempt, and self-harm without lethal intent, compared to their cisgender counterparts, and gender affirming care is known to improve mental health outcomes.[24]

---

[24] Turban JL, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS One. 2022 Jan

62.     Hormone treatment with estrogen or testosterone is used to help a person develop secondary sex characteristics consistent with their gender identity, which may affect how the person receiving such treatment physically presents and is perceived by others.

63.     Gender affirming surgeries may include a wide variety of surgeries, many of which also affect how the person undergoing surgery physically presents and is perceived by others, such as augmentation mammoplasty, chest reconstruction surgery, and facial feminization surgery.

64.     Gender-affirming medical care may also be appropriate or indicated for some non-binary people.

65.     There is nothing unique about undergoing hormone treatment to sustain one's health. Gender-affirming medical care is also appropriate for cisgender people with hypogonadism (low levels of estrogen or testosterone). Other common examples of treatment with hormone therapy for social emotional or gender affirming purposes in cisgender population include use of testosterone in boys with constitutional delay of growth and puberty to "jump start" puberty, and use of estrogen and androgen receptor blockers for girls with polycystic ovarian syndrome (PCOS) to minimize undesired facial and body hair.

### TRANSGENDER, NONBINARY AND INTERSEX PEOPLE EXPERIENCE HIGH LEVELS OF DISCRIMINATION, HARASSMENT AND VIOLENCE.

66.     Transgender, nonbinary, and intersex people often experience violence, harassment, discrimination, and social stigma when others learn that they are transgender, nonbinary, or intersex.

67.     For decades, transgender, nonbinary, and intersex people have been subject to numerous and varied attempts by both private individuals and government actors to discriminate

---

12;17(1):e0261039. doi: 10.1371/journal.pone.0261039. Erratum in: PLoS One. 2023 Jun
12;18(6):e0287283. doi: 10.1371/journal.pone.0287283. PMID: 35020719; PMCID: PMC8754307.

against and oppress them, and to attempt to erase their existence.

68.     Transgender people are more likely to suffer harassment, discrimination, and violence than the population at large.  According to the National Center for Transgender Equality's U.S. Transgender Survey:

- Around a quarter (24%) of respondents had been physically attacked in a K-12 school because people thought they were transgender.

- In the year prior to completing the survey, 27% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or presentation.

- Nearly half (47%) of respondents had been sexually assaulted during their lifetime.

- Among respondents who had interacted with police, 58% of those whom the police perceived as transgender experienced some form of mistreatment.

- Twenty-five percent of transgender people were verbally harassed, 16% denied services or benefits, 9% asked to leave a location or establishment, and 2% assaulted or attacked after showing identification with a name or sex designation that did not match their gender presentation.

69.     For transgender people of color, these forms of mistreatment are even more common.

70.     As a result of these forms of mistreatment, 39% of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population.  Moreover, 40% percent of respondents attempted suicide in their lifetime— nearly nine times the attempted suicide rate in the U.S. population as a whole (4.6%).

71.     Nonbinary people are also subject to violence and discrimination, and many of the

statistics regarding violence against transgender people include nonbinary people.

72.      Intersex people also are more likely to suffer violence, discrimination, harassment, and mistreatment.  For instance, surveys indicate that anywhere from one quarter to half of intersex people had been subjected to violence.

### SOCIAL TRANSITION IS AN IMPORTANT COMPENENT FOR THE TREATMENT OF GENDER DYSPHORIA

73.      For transgender people, social transition means presenting in public part- or full-time in a way that is congruent with their gender identity.

74.      Social transition can include modifications to appearance through changing hairstyles, clothing, wearing garments that augment physical aspects such as a binder to flatten chest or inserts in a bra to enhance chest.

75.      Social transition can also include coming out to family, friends, classmates, co-workers.

76.      Social transition may also include the use of a new name, pronouns, and changing legal and identifying documents to match chosen name, pronouns, and gender identity such as driver's license and passport.

77.      Treatment for gender dysphoria includes living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity.

78.      Decisions regarding social transition are individualized after considering the potential benefits of alleviating psychological distress and the potential risks including family and peer rejection, harassment, and safety concerns. [25]

79.      While social transition is adequate to treat gender dysphoria for some people, others

---

[25] Management of the transgender adolescent, Olson J, Forbes C, Belzer M, Arch Pediatr Adolesc Med. 2011 Feb;165(2):171-6

may need other forms of gender-affirming care as well.

80.     In my own clinical practice and in review of available literature, I've observed the importance of social transition within supportive social structure (family, community, workplace), and interdisciplinary treatment from medical and mental health providers.

81.     Successful passing as identified gender and achieving gender embodiment goals are important components to alleviate gender dysphoria and reduce stigma, risk of harassment, and enhance safety.

**TRANSGENDER PEOPLE WITH AN IDENTITY DOCUMENT CONSISTENT WITH THEIR GENDER ARE LESS LIKELY TO EXPERIENCE DISCRIMINATION AND ARE MORE LIKELY TO HAVE IMPROVED MENTAL HEALTH.**

82.     Forcing transgender, non-binary, and intersex people to use identity documents that do not align with what they know their sex to be and present themself as, or forcing them to go without identity documents, is inconsistent with medical protocols. It can cause anxiety and distress to individuals who are transgender and result in discrimination and violence against them.  Additionally, for those who have struggled for years with the impact of external invalidation of their identity, the knowledge that one's identification documents label one with the wrong sex can, by itself, cause serious psychological injury.

83.     Although rates of suicide are higher amongst the transgender community than the general population, a 2015 study identified several factors that were associated with large reductions in suicide risk. The study reported that having an identity document with a gender marker notation that matched their lived gender was associated with a large reduction in suicidal ideation and attempts. Based on extrapolation of survey findings the researchers noted that in a hypothetical sample, having one or more concordant identity documents has the potential to prevent 90 cases of suicide ideation per 1,000 transgender people. Further, amongst a sample of

App. 82

transgender people already experiencing suicidal ideation, the risk reduction impact of having congruent identity documents could prevent 230 suicide attempts per 1,000 lives. [26]

84.    A review of 24 studies similarly found that social and legal gender validation was positively related to improved health outcomes.[27]

85.    Recognizing the importance of identification documents, the American Medical Association "supports every individual's right to determine their gender identity and sex designation on government documents" and urges that governments "allow for a sex designation or change of designation on all government IDs to reflect an individual's gender identity, as reported by the individual and without need for verification by a medical professional."[28]

## MY CLINICAL EXPERIENCE AS A PHYSICIAN CONFIRMS THAT TRANSGENDER, NONBINARY AND INTERSEX PEOPLE NEED ACCESS TO USABLE PASSPORTS

86.    Witnessing the dramatic and positive transformation of transgender individuals who are thriving after social transition and starting gender affirming care is among the most rewarding aspects of my career.

87.    After initiation of gender affirming care, transgender individuals express feeling less anxious, with improved symptoms of depression and decreased distress related to gender dysphoria.

---

[26] Bauer GR, Scheim AI, Pyne J, Travers R, Hammond R. Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. BMC Public Health. 2015 Jun 2;15:525. doi: 10.1186/s12889-015-1867-2. PMID: 26032733; PMCID: PMC4450977.
[27] King WM, Gamarel KE. A Scoping Review Examining Social and Legal Gender Affirmation and Health Among Transgender Populations. Transgend Health. 2021 Feb 15;6(1):5-22. doi: 10.1089/trgh.2020.0025. PMID: 33644318; PMCID: PMC7906235.
[28] Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967, Am. Med. Ass'n (2021), https://policysearch.amaassn.org/policyfinder/detail/gender?uri=%2FAMADoc%2FHOD.xml-0-5096.xml (last accessed Feb. 6, 2025).

88.     As an Endocrinologist who specializes in the care of transgender, non-binary, and DSD individuals, I routinely am asked to complete paperwork confirming that a sex marker on legal documents be updated to align with an individuals lived and expressed sex that is consistent with their gender identity.

89.     Based upon my education, training, clinical experience, and available research, obtaining identification documents that align sex marker with gender identity is a safe, effective, and beneficial intervention for transgender, non-binary, and intersex individuals.  It is both life affirming and potentially life-saving.

90.     In summary, denying dignity and safety during travel by limiting access to accurate identifying documents will not cause anyone to stop being transgender, non-binary, or change a DSD diagnosis, it will only exacerbate distress from lack of access to established norms. As a medical provider, it is devastating and goes against my ethical obligations to my patients to be legally prohibited from offering standards of medical care.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/17___, 2025

SARAH D. CORATHERS, MD

App. 84

EXHIBIT A

**Sarah D. Corathers, MD**
3333 Burnet Ave, MLC 7012
Cincinnati, Ohio 45219
P: 513-636-4744; F: 513-803-1174
sarah.corathers@cchmc.org

**Education**

**Bachelor of Arts, Barnard College, Columbia University** (1992-1996)
Art History Major, Departmental honors.
**Doctor of Medicine, Wright State University** (1998-2002)
Passed Step 1 USMLE June 2000; Passed Step 2 September 2001, Passed Step 3 July 2004
**Residency, Internal Medicine and Pediatrics** (2002-2006)
University of Cincinnati and Cincinnati Children's Hospital Medical Center (CCHMC)
**Fellowship, Adult and Pediatric Endocrinology** (2009-2013)
University of Cincinnati and Cincinnati Children's Hospital, Divisions of Endocrinology
**Quality Improvement (QI) Training**
Cincinnati Children's Hospital: Intermediate Improvement Science Series (August 2010-January 2011);
Advanced Improvement Methods (September 2014- May 2015)
Academic Pediatric Association: Advancing Implementation and QI Science (Seminar, 5/2018; 4/2019)
**Leadership Training**
Cincinnati Children's Hospital CORE leadership training program- Class VI (2017-2018)

**Academic Appointments**

Associate Professor, Department of Pediatrics, University of Cincinnati College of Medicine (06/2019-)
Assistant Professor, Department of Pediatrics, University of Cincinnati College of Medicine (07/2013-06/2019)
Secondary appointment, James M. Anderson Center for Health System Excellence, (07/2013--)
Chief Resident, Internal Medicine, University of Cincinnati, College of Medicine (07/2006-06/2007)

**Licensing and certification**

American Board of Pediatrics, Board Certified, 10/2006
American Board of Internal Medicine, Board Certified, 8/2007
Pediatric Endocrinology, Diabetes and Metabolism, Board Certified, 11/2013; MOC in progress
Adult Endocrinology, Diabetes and Metabolism, Board Certified, 10/2013; MOC in progress
State Medical Board of Ohio, License 35.088645, Expiration date 4/1/2025
CITI Program Good Clinical Practice and Research Ethics training, Expiration date 12/25/2026

**Awards and Honors**

Cincinnati Magazine Top Doctor, 2016--2025
Cincy Magazine, Best Doctor, 2016—2024
Type 1 Diabetes Exchange QI Collaborative Outstanding PI award, November 2019
Venue Media and LEAD magazine, Comprehensive Healthcare Leadership Award, August 2016
Service Quality Award 2015, Permanente Journal, "Effective Follow up for Depression and or Suicidal Ideation in Adolescents with Diabetes."
Ohio Patient Safety Institute, Best Practice Award, "Depression Screening in the Diabetes Center", 2013
Alpha Omega Alpha Honor Society Member

**Clinical Service**

<u>Clinical Expertise and Activities:</u> Based on dual training in pediatric and adult endocrinology, my interests and experience are in the care of adolescents and adults with endocrine conditions across the lifespan. Areas of clinical concentration include type 1 diabetes, Turner syndrome, transgender health, and successful transition to adult care.

<u>Clinical Director:</u> Oversee the clinical operations and quality improvement portfolio of the Division of Pediatric Endocrinology. Notable accomplishments in the past year include reducing time for 3rd next available visit from mean of 43 days to 24 days, achieving consistent clinic visits for established patients, expanding to Mobile Care Clinic, launching e-visit for diabetes, recognition as top performing ambulatory division for Patient and Family Experience (2023), USNWR Division ranking tied for #1 in the nation (2023).

<u>Diabetes Transition Program Development:</u> Led development of a transition policy and registry to track transition planning and transfers to adult care (2013-2014). In collaboration with Seattle Children's Hospital, developed and implemented a patient reported readiness assessment tool, READDY (2013-2018) that is translated into 6 languages and used internationally (2021--). Increased transition planning from 10% to > 85% for ages 16-18 and > 90% of over age 19 (2018- ongoing). Expanded depression screening and referral for mental health services to people over age 18 (2019), partner with adult receivership programs.

<u>Leadership in Quality Improvement (QI):</u> Engagement with institution-wide Psychosocial Screening task force, the Health Equity Network at Cincinnati Children's (2021-ongoing) and coordinating Division of Endocrinology initiatives with the Type 1 Diabetes Exchange national collaborative (T1Dx-QI). Cincinnati Children's Diabetes Center was one of the first North American centers to join the International Diabetes Registry SWEET (2019). The Division of Endocrinology at Cincinnati Children's Hospital consistently ranks highly in USNWR, most recently tied for 1st in the nation in 2023 and 2nd in 2024.

<u>Clinical improvement activities include:</u> Implementation of depression screening and appropriate referral for youth with diabetes (2011- present), increasing timely insulin administration in hospitalized patients (2014-2015), decreasing loss to follow of congenital hypothyroid patients (2014-2018), development of diabetes registry with selection of quality metrics and data capture strategies (2015-2016), integration of patient reported outcomes into clinical care (2016- current), population health strategies (2017-current). Current work includes expanding uptake of diabetes technology to reduce health equity gaps. Across all ages and insurance coverage, increasing continuous glucose monitor use rates > 90%, while cutting disparity gaps in half (2019- ongoing). Through ConnecT1D project, mean HbA1c for Healthvine Medicaid cohort with T1D improved from 9.4% to 8.8% (2022- ongoing).

**Research and Scholarly Activities**

<u>Research and Scholarly Activities</u>
The intersection of my research and clinical interests includes psychosocial aspects of diabetes management, mechanisms to promote successful transition between adult and pediatric health care systems, and health system-based interventions to improve care delivery and patient outcomes. As Clinical Director, I lead an interdisciplinary QI team at Cincinnati Children's Division of Endocrinology and directed the Quality Scholars Program in the James M. Anderson Center for Health Systems Excellence for 7 years. Nationally, I serve as a faculty leader for the Type 1 Diabetes Exchange Learning Collaborative (T1DX-QI), a network of 60+ centers throughout the United States. Funded research projects focus on ambulatory safety, diabetes self-management support, use of patient reported outcomes to inform productive clinical interactions, and QI initiatives to achieve excellent and equitable outcomes for youth with type 1 diabetes.

Grants and Contracts

***Current Research Support***

Helmsley Charitable Trust, Corathers (PI)                          02/1/2022-01/31/2026
*ConnecT1D: reinforcing connections between patients, the clinic and community partners to achieve excellent and equitable glycemic and psychosocial outcomes for young people with type 1 diabetes (T1D).*
The objective of this diabetes clinic innovation grant is development of a more efficient, proactive care delivery model for T1D that supports patients and families through access to diabetes technology, more frequent communication between visits, and establishing a unified clinical information system infrastructure for diabetes devices to interface with the electronic medical record.
Role: Principal Investigator, current year effort 20%
Total Direct Costs: $2,334,715
Total Costs: $2,568,185

Unitio /Helmsley Charitable Trust, Corathers/Rioles (co-PIs)            03/2016 – 06/2025
*Type 1 Diabetes Exchange Learning Collaborative*
The primary aim is to develop a multi-site national quality improvement collaborative for type 1 diabetes with a focus on outcomes amongst adolescent and young adult population.
Role: Co-Investigator, Clinical Faculty leader, current year percent effort 5%
Total Direct Costs: $47,727
Total Costs: $52,500

***Completed Research Support***

R01DK121295-01, NIH/NIDDK, Modi/Driscoll (co-PIs)               04/01/19- 03/31/24
*Diabetes Journey: From Systematic Screening to Intervention*
The objective of this study is to use patient reported outcomes (e.g., adherence barriers) to guide the integration of a novel tailored intervention into clinical care to improve adherence, A1C, and HRQOL.
Role: Co-Investigator, effort 8%
Total Direct Costs: $1,469,842
Total Costs: $1,891,719

R18 HS026644-01, DHHS/AHRQ, Walsh (PI)                     09/30/18 - 09/29/23
*Ambulatory Pediatric Safety Learning Lab*
The specific aims of this longitudinal study are to reduce harm due to medication errors and treatment delay in two conditions (diabetes and autism spectrum disorder) through redesign of the processes for medication dose adjustment of insulin and prompt management of serious illness at home.
Role: Site PI, Co-Investigator, effort 13%
Total Direct Costs: $279,736
Total Costs: $444,779

Place Outcomes Award, Cincinnati Children's Hospital              01/2020-12/2022
*AID-T1D (Artificial Intelligence Decision Support in Type 1 Diabetes)*
The aim of this research is to determine feasibility and efficacy of using artificial intelligence software to guide glucose pattern review and insulin dose titration at and between clinical encounters.
Role: Primary Investigator, effort 8%
Total Direct Costs: $200,000
Total Costs: $200,000

Helmsley Charitable Trust, DiMeglio (PI)                                             02/2017 - 06/2019
*Strategies to Enhance New CGM Use in Early Childhood (SENCE)*
The objective of this multi-site study is to compare the efficacy and safety of CGM alone and CGM in combination with a family behavioral intervention with a control group using blood glucose monitoring.
Role: Site PI, Co-Investigator
Total Direct Costs: $138,818
Total Costs: $152,700

R01 DK069486, NIH/NIDDK, Dolan (PI)                                             07/2017 - 06/2019
*Self-Management of Type 1 Diabetes during Adolescence (SMART)*
The aims include 1) test a model of modifiable risk on glycemic control 2) characterize the impact on glycemic control on precursor measures of kidney, eye, and cardiovascular complications.
Role: Co-Investigator, effort 5%
Total Direct Costs: $373,587
Total Costs: $471,605

Unitio /Helmsley Charitable Trust, Anhalt (PI)                                             03/2016 - 06/2018
*Type 1 Diabetes Exchange Learning Collaborative*
The primary aim is to develop a multi-site national quality improvement collaborative for type 1 diabetes.
Role: Co-Investigator, Faculty leader, effort 10%
Total Direct Costs: $27,765
Total Costs: $30,265

Unitio /Helmsley Trust, Margolis/Britto (Co-PIs)                                             08/2014 - 07/2015
*A Collaborative Chronic Care Network for Type-I Diabetes: Design Phase*
Role: Co-Investigator

**Publications**
Original Research Publications (peer-reviewed)
1. Huber, A., Jacobson E., **Corathers, S**., and Tomer, Y. Joint susceptibility to autoimmune diabetes and thyroiditis: from epidemiological observations to gene function. Endocr Rev. 2008; Oct 29(6):697-725. PMID 18776148
2. Hillman JB, **Corathers SD**, Wilson SE. Pediatricians and screening for obesity with body mass index: does level of training matter? Public Health Rep. 2009; Jul-Aug; 124(4):561-7 PMID 19618793
3. Lotstein, D, Seid, M, Klingensmith, G, Case, D, Lawrence, J, Pihoker, C, Dabelea, D, Mayer-Davis, E, Gilliam, L, **Corathers, S**, Imperatore, G, Dolan, L, Anderson, A, Bell, R, Waitzfelder, B for the SEARCH for Diabetes in Youth Study Group. Transition from Childhood to Adult Care for Youth with Type 1 Diabetes in Adolescence. Pediatrics, 2013 Apr;131 (4): e1062-70. PMID 23530167
4. **Corathers, S**, Kichler, J, Jones, N, Houchen, A, Jolly, M, Morwessel, N, Dolan, L, Hood, K. Improving Depression Screening for Adolescents with Diabetes. Pediatrics, 2013. 132(5) PMID 24127480
5. Powell, P., **Corathers, S**., Raymond, J., Streisand, R.  New Approaches to Providing Individualized Diabetes Care in the 21st Century. Curr Diabetes Rev. 2015 Apr 21. PMID 25901504
6. **Corathers, S.**, Schoettker, P., Clements, M., List, B., Mullen, D., Ohmer, A., Shah, A., Lee, J. Health-System-Based Interventions to Improve Care in Pediatric and Adolescent Type 1 Diabetes. Curr Diab Rep 2015 September 15:91. PMID 26374568
7. Dubose SN et al, **collaborating contributor of the Type 1 Diabetes Exchange Clinic Network** (site PI, recruited research subjects, contributed data), Obesity in Youth with Type 1 Diabetes in Germany, Austria and the United States. J Pediatr. 2015 Sep; 167(3):627-32 PMID: 26164381

8. Fair C et al, **collaborating contributor of the International and Interdisciplinary Heath Care Transition Research Consortium** (developed research plan, served as member of writing group). International and Interdisciplinary Identification of Health Care Transition Outcomes. JAMA Pediatr. 2016 Mar; 170(3):205-11. PMID: 26619178

9. Beal, S., Riddle, I., Kichler, J., Duncan, A., Houchen, A., Casnellie, L., Woodward, J., **Corathers, S.** Transition readiness across different clinic populations: The influence of chronic condition and individual characteristics. Acad Pediatr. 2016 Sept-Oct; 16(7):660-7. PMID: 27345693

10. **Corathers, S.** Kichler, J., Fino, N. Lang, W. Lawrence, J., Raymond, J., Yi-Frazier, J., Dabelea, D. MD, PhD, Liese, A. Saydah, S., Seid, M., Dolan, L. High health satisfaction among emerging adults with diabetes: factors predicting resilience. Health Psychology. October 2016. PMID: 27736152

11. Garvey KC, Foster NC, Agarwal S, DiMeglio LA, Anderson BJ, **Corathers SD**, Desimone ME, Libman IM, Lyons SK, Peters AL, Raymond JK, Laffel LM. Health care transition preparation and experiences in a US national sample of young adults with type 1 diabetes. Diabetes Care December 2016. PMID: 2800779

12. Matlock, K., Yayah Jones, N., **Corathers, S.**, Kichler, J. Clinical and psychosocial factors associated with suicidal ideation in adolescents with type 1 diabetes mellitus. J Adolesc Health 2017 Oct; 61(4):4710477 PMID: 28732716

13. Craig et al, **collaborating contributor of the Type 1 Diabetes Exchange** (site PI, recruited research subjects, contributed data), Prevalence of Celiac Disease in 52,721 Youth with Type 1 Diabetes: International Comparison across Three Continents. Diabetes Care. 2017 Aug; 40(8):1034-1040. PMID 28546222

14. Agarwal, S., Raymond, J., Isom, S., Lawrence, J., Klingensmith, G., Pihoker, C, **Corathers, S**, Saydah, S., D'Agostino,R., Dabelea, D. Transition from Pediatric to Adult Care for Young Adults with Type 2 Diabetes: The SEARCH for Diabetes in Youth Study. Diabetic Medicine Vol 35, Issue4, April 2018, Pages 504-512. PMID 29377258.

15. Smego, A., Lawson, S., Jolly, M. Courter, J., Warden, D., **Corathers, S**. Decreasing the Time to Insulin Administration for Hospitalized Patients with Cystic Fibrosis Related Diabetes. Hospital Pediatrics. 2018 May;8 (5):288-292 PMID: 29691278

16. Varni, J, Delatmater, A, Hood, K, Raymond, J, Driscoll, K, Wong, J, Adi, S, Yi-Frazier, J, Grishman, E, Faith, M, **Corathers, S**., Kichler, J, Miller, J, Doskey, E, Aguirre, V, Heffer,R, Wilson, D. Diabetes symptoms predictors of health-related quality of life in adolescents and young adults with type 1 or type 2 diabetes. Qual Life Res, 2018 May 21. PMID: 29785651

17. Varni, JW, Delamater AM, Hood KK, Driscoll KA, Wong JC, Adi S., Yi-Frazier JP, Brishman EK, Faith MA, **Corathers SD**, Kichler JC, Miller JL, Raymond JK, Soskey EM, Aguirre V, Heffer RW, Wilson DP., Diabetes Management Mediating Effects between Diabetes Symptoms and Health-Related Quality of Life in Adolescents and Young Adults with Type 1 Diabetes, Pediatric Diabetes, 2018 June. PMID 29927039

18. Matlock, K., **Corathers, S.,** Yayah Jones, N. Untreated Congenital Hypothyroidism Due to Loss to Follow-Up: Developing Preventative Strategies through Quality Improvement. Journal of Pediatric Endocrinology and Metabolism; July 2018. PMID30030963

19. Varni, JW, Delamater AM, Hood KK, Raymond JK, Chang NT, Driscoll KA, Wong JC, Yi-Frazier JP, Grishman EK, Faith MA, **Corathers SD**, Kichler JC, Miller JL, Doskey EM, Heffer RW, Wilson DP., PedsQL 3.2 Diabetes Module for Children, Adolescents, and Young Adults: Reliability and Validity in Type 1 Diabetes. Diabetes Care, 2018 June. PMID: 30061317

20. Conard, L.A.E., **Corathers, SD** & Trotman, G. Caring for Transgender and Gender Non-Conforming Youth. Curr Pediatr Rep (2018) 6: 139. https://doi.org/10.1007/s40124-018-0173-8

21. **Corathers, S**., Mara CA., Chundi PK., Kichler JC. Depression and Suicide Screening in Adolescents with Type 1 Diabetes: 5-Years of Implementation and Outcomes. J Am Acad Child Adolesc Psychiatry. 2019 Feb 22 PMID: 30802493

App. 90

22. Daley T, Grossoehme D, McGuire JK, **Corathers SD**, Conard LA, Lipstein EA. "I couldn't see a downside": Decision making about gender-affirming hormone therapy. Journal of Adolescent Health. 2019 Jun. PMID: 31196783

23. Kanj, RV, Conard, LAE, **Corathers, S**., Trotman, G. Hormonal contraceptive choices in a clinic-based series of transgender adolescents and young adults. Int J Transgend 2019 Jul. PMID: 32999626.

24. Trief P, Foster NC, Chaytor N, Hilliard ME, Kittelsrud JM, Jaser SS, Majidi S, **Corathers SD**, Bzdick S, Adkins DW, Weinstock RS. Longitudinal changes in depression and glycemia in adults with type 1 diabetes. Diabetes Care. 2019 Jul. PMID: 31221694

25. Miller KM, et al. **collaborating contributor of the Type 1 Diabetes Exchange** (site PI, recruited research subjects, contributed data), Longitudinal Changes in Continuous Glucose Monitoring Use Among Individuals with Type 1 Diabetes: International Comparison in the German and Austrian DPV and U.S. T1D Exchange Registries. Diabetes Care. 2019 Oct. PMID: 31672703

26. Redel, JM, **Corathers SD**, Yao MV, Backeljauw PF. Multi-level quality improvement education for fellowship trainees. Med Educ. 2019 Nov. PMID: 3165059

27. Gutierrez-Colina, A., **Corathers, S**., Beal, S., Baugh, H., Nause, K., Kichler, J. Young Adults with Type 1 Diabetes Preparing to Transition to Adult Care: Psychosocial Functioning and Associations with Self-Management and Health Outcomes. Diabetes Spectr. 2020 Aug. PMID: 32848347

28. **Corathers, SD**, Yi-Frazier JP, Kichler JC, Gilliam LK, Watts G, Houchen A, Beal S. Development and Implementation of the Readiness Assessment of Emerging Adults with Type 1 Diabetes Diagnosed in Youth (READDY) Tool.  Diabetes Spectr. 2020 Feb;33(1):99-103. PMID: 32116461

29. **Corathers, SD**, DeSalvo, DJ., Therapeutic Inertia in Pediatric Diabetes: Challenges and Strategies to Overcome Acceptance of the Status Quo. Diabetes Spectr. 2020 Feb;33(1):22-30. PMID:32116450

30. Malik, F. Stafford, J., Reboussin, B., Klingensmith, G., Dabelea, D., Lawrence, J., Mayer-Davis, B., Saydah, S., **Corathers, S**., Pihoker, C. Receipt of Recommended Complications and Comorbidities Screening in Youth and Young Adults with Type 1 Diabetes: Associations with Metabolic Status and Satisfaction with Care. Pediatr Diabetes. 2020 Mar;21(2):349-357 PMID: 31797506

31. Alonso, G., **Corathers, S**., Shah A, Clements M, Kamboj M, Sonabend R, DeSalvo D, Mehta S, Cabrera A, Rioles N, Ohmer A, Mehta R, Lee J. Establishment of the T1DX Quality Improvement Collaborative. Clin Diabetes. 2020 Apr;38(2):141-151. Clin Diabetes. 2020. PMID: 32327886

32. Mizokami-Stout KR, et al. **Collaborating contributor of the Type 1 Diabetes Exchange** (site PI, recruited research subjects, contributed data) Contemporary Prevalence of Diabetic Neuropathy in Type 1 Diabetes: Findings from the T1D Exchange. Diabetes Care. 2020 Apr;43(4):806-812. Epub 2020 Feb 6. Diabetes Care. 2020. PMID: 32029635

33. Sheanon, Beal, S., Kichler, J., Casnellie, L., Backeljauw, P., **Corathers, S**. Readiness for Transition to Adult Care in Adolescents and Young Adults with Turner Syndrome. J Pediatr Endocrinol Metab. 2020 Aug. PMID: 32866122

34. A Randomized Clinical Trial Assessing Continuous Glucose Monitoring (CGM) Use with Standardized Education with or without a Family Behavioral Intervention Compared with Fingerstick Blood Glucose Monitoring in Very Young Children with Type 1 Diabetes. **Collaborating author and contributor to Strategies to Enhance New CGM Use in Early Childhood (SENCE) Study Group** (site PI, recruited subjects, reviewed manuscript)**.** Diabetes Care 2021 Feb; 44(2):464-472. PMID: 33334807

35. Sarteau, A., Souris, K., Wang, J., Ramadan, A., Addla, A., Bowlby, D., **Corathers, S**., Forsander, G., King, B., Law, J., Liu, W., Malik, F., Pihoker, C., Seid, M., Smart, C., Sundberg, F., Tandon, N., Yao, M., Headley, T., Mayer-Davis, E. Changes to Care Delivery at Nine International Pediatric Diabetes Clinics in Response to the COVID-19 Global Pandemic. Pediatr Diabetes 2021 May;22(3):463-468. PMID: 33470020

36. Cardona-Hernandez, R., Schwandt, A., Alkandari, H., Bratke, H., Chobot, A., Coles, N., **Corathers, S.,** Goksen, D., Goss, P., Imane, Z., Nagl, K., O'Riordan, S., Jeffries, C. for the SWEET study group.

App. 91

Glycemic outcome associated with insulin pump and glucose sensor use in children and adolescents with type 1 diabetes. Data from the international pediatric registry SWEET. Diabetes Care. 2021 May. PMID: 33653821

37. Prahalad, P., Ebekozien, O., Alonso, G., Clements, M., **Corathers, S**., DeSalvo, D., Desimone, M., Lee, J., Lorincz, I., McDonough, R., Majidi, S., Odugbesan, O., Obrynba, K., Rioles, N., Kamboj, M., Jones, N., Maahs, D., Multi-clinic quality improvement initiative increases CGM use among adolescents and young adults with type 1 diabetes. Clin Diabetes 2021 Jul. PMID: 34421201

38. Ginnard, O. ZB, Alonso, G. T., **Corathers, S.**, Demeterco-Berggren, C., Golden, L. H., Miyazaki, B. T., Nelson, G., Ospelt, E., Ebekozien, O., Lee, J. M., Obrynba, K., DeSalvo, D. Quality Improvement in Diabetes Care: A Review of Initiatives and Outcomes in the T1D Exchange QI Collaborative. Clin Diabetes 2021 Jul. PMID: 34421200

39. Lee, J., Carlson, E., Albanese-O'Neil, A., Demeterco, C., **Corathers, S.,** Vendrame, F., Weinstock, R., Prahalad P., Alonso G., Kamboj, M., DeSalvo, D., Malik, F., Izquierdo, R., Ebekozien, O. Adoption of Telemedicine for Type 1 Diabetes Care During the COVID-19 Pandemic. Diabetes Technol Ther. 2021 April 14. PMID: 33851873

40. Maxwell, A., Yayah Jones, N., Taylor, S., **Corathers, S**., Rasnick, E., Brokamp, C., Riley, C., Parsons, A., Kichler, J., Beck, A. Socioeconomic and racial disparities in diabetic ketoacidosis admissions in youth with type 1 diabetes. J Hosp Med. 2021 Aug 18. PMID: 34424192

41. Lee, J., Garrity, A., Hirschfeld, E., Thomas, I., Rioles, N., Ebekozien, O., **Corathers, S.** Feasibility of Electronic Health Record Assessment of 6 Pediatric Type 1 Diabetes Self-management Habits and Their Association with Glycemic Outcomes. JAMA Network Open 2021 Oct 1; 4(10). PMID: 34709387

42. DeSalvo, D., Noor, N., Xie, C., **Corathers, S**., Majidi, McDonough, R., Polsky, S., Izquierdo, R., Rioles, N., Weinstock, R., Obrynba, K., Roberts, A., Vendrame, F., Sanchez, J, Ebekozien, O. Patient Demographics and Clinical Outcomes Among Type 1 Diabetes Patients Using Continuous Glucose Monitors: Data from T1D Exchange Real-World Observational Study. J Diabets Sci Technol. 2021 Oct 9; PMID: 34632823

43. Kamoun, C., Khoury, J., Beal, S., Crimmins, N., **Corathers, S.** Opportunities for Enhanced Transition of care Preparation for Adolescents and Emerging Adults with Type 1 Diabetes: Use of the READDY transition tool. Diabetes Spectrum 2022 Feb 15;35(1):57-65. PMID: 35308159

44. Alexandrou, E., **Corathers, S.,** Gutmark-Little, I., Casnellie, L., Gerstle, M., Tatum, J., Khoury, Backeljauw, P.  Improving Anxiety Screening in Patients with Turner Syndrome. Horm Res Paediatr. 2022;95(1):68-75. PMID: 35313316.

45. Lavik, AR, Ebekozien O., Noor N., Alonso GT, Polsky S., Blackman SM, Chen J., **Corathers SD**, Demeterco-Berggren C., Gallagher MP, Greenfield M., Garrity A., Rompicherla S., Yayah Jones NH. Trends in type 1 diabetic ketoacidosis during COVID-19 surges at seven US centers: highest burden on non-Hispanic Blacks. JCEM, 2022 Jun 16;107(7). PMID 35380700.

46. Van Name MA, Kanapka LG, DiMeglio LA, Albanese-O'Neil A., Commissariat P., **Corathers SD**, Harrington KR, Hilliard ME, Anderson BJ, Kelley JC, Laffel LM, MacLeish SA, Nathan BM, Tamborlane WV, Wadwa RP, Willi SM, Williams KM, Wintergerst KA, Woerner S., Wong JC, DeSalvo DJ. Long-term Continuous Glucose Monitor Use in Very Young Children with Type 1 Diabetes: One- Year Results from the SENCE Study. J Diabetes Sci Technol. 2022 Mar 26. PMID: 35343269.

47. The COVID-19 Pandemic Affects Seasonality, With Increasing Cases of New-Onset Type 1 Diabetes in Children, From the Worldwide SWEET Registry. **Collaborating contributor of the SWEET study group** (site PI, contributed data)**.** Diabetes Care.2022 Sept. PMID 36166593

48. Mungmode, A, Noor, N, Weinstock, R, Izquierdo, R, Indyk, J, DeSalvo, D, **Corathers, S**, Demeterco-Berggren, C, Hsieh, S, Jacobsen, L, Mekhoubad, A, Akturk, H, Wirsch, A, Scott, M, Chao, L, Miyazaki, B, Malik, F, Ebekozien, O, Clements, M, Alonso, G T. Making Diabetes Electronic Medical Record Data Actionable: Promoting Benchmarking and Population Health Improvement Using the T1D

Exchange Quality Improvement Portal Collaborative. Clin Diabetes 2022 Winter; 41(1):45-55. PMID 36714251

49. Nasomyont, N., Meisman, AR, Ecklund, K., Vajapeyam, S., Cecil, KM, Tkach, JA, Alataye, M., **Corathers, SD**, Conard, LA, Kalkwarf, HJ, Dolan LM, Gordon, CM. Changes in Bone Marrow Adipose Tissue in Transgender and Gender Non-Conforming Youth Undergoing Pubertal Suppression: A Pilot Study. J Clin Densitom. Aug 2022. PMID 36064698

50. Yeung, AM, Huang J, Klonoff DC, Seigel RE, Goldman JM, Shah SN, **Corathers, SD**, Vidmar AP, Tut M, Espinoza JC. iCoDE June 22, 2022 Steering Committee Meeting Summary Report. J Diabetes Sci Technol. 2022 Aug. PMID 36036511.

51. The COVID-19 Pandemic Affects Seasonality, With Increasing Cases of New-Onset Type 1 Diabetes in Children, From the Worldwide SWEET Registry. **Collaborating contributor of the SWEET study group** (site PI, contributed data)**.** Diabetes Care.2022 Sept. PMID 36166593

52. Schmidt, M., Lu, J., Luo, W., Cheng, L., Lee, M, Huang, R., Weng, Y., Kichler, J., **Corathers, SD**, Jacobsen, LM, Albanese O'Neil, A., Smith L., Westen S., Gutierrez-Colina A., Heckaman L., Wetter SE., Driscoll K., Modi A. Learning experience design of an mHealth self-management interventions for adolescents with type 1 diabetes. Educ Technol Res Dev. 2022 Oct 19:1-39. PMID 36278247.

53. Tilden DR, French B., Shoemaker AH., **Corathers S**., Jaser SS. Prolonged lapses between pediatric and adult care are associated with rise in HbA1c and inpatient days among patients with type 1 diabetes. Diabetes Res Clin Pract. 2022; Oct:192. PMID: 36208847.

54. **Corathers, S**., Williford, D., Kichler, J., Smith, L., Ospelt, E., Rompicherla, S., Roberts, A., Prahalad, P., Basina, M., Munoz, C., Ebekozien, O. Implementation of Psychosocial Screening into Diabetes Clinics: Experience from the Type 1 Diabetes Exchange Quality Improvement Network. Current Diabetes Reports. Curr Diab Rep. 2023 Feb. PMID: 36538250

55. Kirkendall, E., Brady, P., **Corathers, S**., Ruddy, K., Catherine, F., Hailee, N., Wetterneck, T., Rodgers, I., Walsh, K. Safer Type 1 Diabetes Care at Home: SEIPS-based Process Mapping with Parents and Clinicians. Pediatric Quality and Safety. 2023 May. PMID: 38571735.

56. Chobot, A., Eckert, A., Torben, B., **Corathers, S**., Covinhas, A., De Beaufort, C., Imane, Z., Kim, J., Malatynska, A., Hossein, M., Pokhrel, S., Skinner, T. Psychological Care for Children and Adolescents with Diabtes and Patient Outcomes: Results from the International Pediatric Registry SWEET. Pediatric Diabetes 2023. DOI: 10.1155/2023/8578231

57. Redel, J., Hornung, L., Elder, D., Nathan, J., **Corathers, S**., Rich, K., Abu-El-Haija, M. Diabetes-Related Quality of Life Assessment in Children Following Total Pancreatectomy with Islet Autotransplantation. Pediatric Diabetes 2023 June. https://doi.org/10.1155/2023/2851620

58. Majidi, S., Roberts AJ, Suerken CK, Reboussin BA, Malik FS, Marcovina SM, **Corathers S** Reynolds K., Imperatore G, Wadwa RP, Pihoker C. Health Care Transition to Adult Care in Type 1 Diabetes: Associations with Student and Employment Status- The SEARCH for Diabetes in Youth Study. Clin Diabetes. 2023 Fall; 41(4):510-517. PMID 37849515

59. Twelve-month psychosocial outcomes of continuous glucose monitoring with behavioral support in parents of young children with type 1 diabetes. **Collaborating contributor to Strategies to Enhance New CGM Use in Early Childhood (SENCE) Study Group** (site PI, recruited subjects, reviewed manuscript) Diabet Med. 2023 Aug;40(8). PMID: 37083018.

60. Malik, F., Weaver, K., **Corathers, S.**, White, P. Incorporating the Six Core Elements of Health Care Transition in Type 1 Diabetes Care for Emerging Adults. Endo and Metab Clinics of N. America. 2023 Oct. PMID: 38272598

61. Mathias, P., **Corathers, S**., Carreon S., Hilliard, M., Papadakis, J., Weissberg-Benchell, J., Raymond, J., Pyatak, E., Agarwal, S. Young Adults with Type 1 Diabetes. Endo and Metab Clinics of N. America. 2023 Oct. PMID: 38272597

62. Yayah Jones, N., Cole, I. Hart, K., **Corathers, S**., Agarwal, S., Odugbesan, O., Ebekozien, O., Kamboj, M., Harris, M., Fantasia, K., Mansour. M. Social Determinants of Health Screening in Type 1 Diabetes Management. Endo and Metab Clinics of N. America. 2023 Oct. PMID: 38272601

63. Housni, A., Cianci, R., Shulman,R., Nakhala, M., Cafazzo, JA, **Corathers S.**, Yi-Frazier, J., Cichler, JC., Brazeau, AS. Online educational resources for youth living with type 1 diabetes transitioning to adult care: an environmental scan of Canadian content. Can J Diabetes 2024 Jan. PMID: 38176453

64. Demographic, Clinical, Management, and Outcome Characteristics of 8,004 Young Children with Type 1 Diabetes. **Collaborating contributor of the Type 1 Diabetes Exchange** (site PI, contributed data)**.** Diabetes Care. 2024 Feb. PMID: 38305782.

65. Brady, PW, Ruddy, RM, Ehrhardt, J, **Corathers SD**, Kirkendall ES, Walsh KE. Assessing the Revised Safter Dx Instrument in the understanding of ambulatory system design changes for type 1 diabetes and autism spectrum disorder in pediatrics. Diagnosis, March 2024. PMID: 38517065.

66. Roberge, S, Roberge, T, **Corathers, S**, Nasomyont, N. Determinants of bone mass accrual in transgender and gender diverse youth undergoing pubertal suppression therapy. J Clin Denistom.2024 Jun 13;27(3). PMD: 38936233.

67. Driscoll, K.A., Trojanowski, P.J., Williford, D.N., O'Donnell, H.K., Flynn, E. Mara, C.A., Wetter, S.E., Himelhoch, A., Manis, H., Pardon, A., Reynolds, C., Shaffer, E., Tanner, B., Kichler, J., Smith, L., Westen, S., Albanese-O'Neal, A., **Corathers, S.D**., Jacobsen, L., Poetker, A., Schmidt, M., Modi, A.C. Intervention to reduce self-management barriers in adolescents with type 1 diabetes: Diabetes Journey study design and participant characteristics. Under review in *Contemporary Clinical Trials*.

68. Roberts A, **Corathers S**, Rapaport R, Rompicherla S, Majidi S, Rioles N, Ebekozien O, Malik FS. Depression rates in youth with type 1 diabetes during the Covid-19 Pandemic: Data from the T1D Exchange Quality Improvement Collaborative. Clin Diabetes. 2024 Aug 1;42(4):532-539. PMID: 39429445

69. Driscoll, K.A., Trojanowski, P.J., Williford, D.N., O'Donnell, H.K., Flynn, E. Mara, C.A., Wetter, S.E, Himelhoch, A., Manis, H., Pardon, A., Reynolds, C., Shaffer, E., Tanner, B., Kichler, J., Smith, L., Westen, S., Albanese-O'Neill, A., **Corathers, S.D**., Jacobsen, L., Poetker, A., Schmidt, M., & Modi, A.C.  Intervention to reduce self-management barriers in adolescents with type 1 diabetes: Diabetes Journey study design and participant characteristics. Contemporary Clinical Trials. (In press).

70. **Corathers, S**., Malik, F., Gutierrez-Colina, A., Lowry, S., Yi-Frazier, J., Beal, S., Kichler, J., READDY 2.0: A Multisite Analysis and Update to the Readiness for Emerging Adults Diagnosed with Diabetes in Youth Transition Tool. Clinical Diabetes (Under review).

Book chapters, Reviews, Case Reports, Clinical Guidelines (peer reviewed)

1. **Corathers, S.** Alkaline Phosphatase: nuances of a familiar test. Peds in Review. November 2006. PMID 17012488

2. **Corathers S**., Falciglia, M. The role of hyperglycemia in acute illness: supporting evidence and its limitations, Nutrition 2010; Sept 22. PMID 20869205

3. **Corathers, S**., Peavie, S, Salehi, M. Complications of Diabetes Therapy. Endocrinol Metab Clin North Am, 2013. 42(4): p. 947-70. PMID 24286957

4. Rose, S., Horne, V., Howell, J, Lawson, S., Rutter, M., Trotman, G., **Corathers, S.** Late Endocrine Effects of Childhood Cancers. Nat Rev Endocrinol. 2016 Jun; 12(6):319-36. PMID: 27032982

5. Gravholt et al, **collaborating author of International Turner Syndrome Consensus Group**, (reviewed literature, participated in international consensus meeting, member of writing group for transition and adult care sections), Clinical Practice Guidelines for the care of girls and women with Turner Syndrome: proceedings from the 2016 Cincinnati International Turner Syndrome Meeting. European Journal of Endocrinology 2017 Sep;177(3) PMID 28705803

6. **Corathers, S.,** Kichler, J, Mara, C. Psychosocial Patient-Reported Outcomes in Pediatric and Adolescent Diabetes: A Review and Case Example. Curr Diab Rep. 2017. PMID: 28508255

7. Wakefield, C., Mehta, P., **Corathers, S**., Geller, J., Gelfand, J., Olowukure, O., Marsh, R. A First Report of Secondary Hemophagocytic Lymphohistiocytosis Associated with Papillary Thyroid Cancer. J Pediatr Hematol Oncol. 2018 Mar;40 (2): e97-98. PMID: 29087969

8. Pihoker, C., Forsander, G., Fanthun, B., Virmani, A., **Corathers, S**., Benitez-Aguirre, P., Fu, J., Maahs, D. ISPAD Clinical Practice Consensus Guidelines 2018: The delivery of ambulatory diabetes care to children and adolescents with diabetes. Pediatric Diabetes, 2018 August. PMID: 30144259

9. Remiker, AS, Chuang, J, **Corathers, S**, Rutter MM, Rutter MJ, Meyer CM 4th, Gelfand MJ, Trout AT, Geller JI. Differentiated Thyroid Cancer in the Pediatric/Adolescent Population: Evolution of Treatment. J Pediatri Hematol Oncol. 2019 Apr. PMID 31033789

10. **Corathers, S.,** Gerstle, M., Casnellie, L., Pater, C., Trotman, G. Transitioning from Pediatric to Adult Care in Endocrinology: A Clinical Handbook, chapter, Transition Considerations for Turner Syndrome. Springer Publishing. April 2019.

11. Backeljauw P, **Corathers S**. Chapter: The Turner Syndrome Resource Center - an Interdisciplinary approach to the Care of Girls and Women with Turner Syndrome. Book, Patricia Fechner, Editor. Turner Syndrome Pathophysiology, Diagnosis, and Treatment. Springer Publishing. March, 2020.

12. Alexandrou, E., **Corathers, S.,** Lahoti, A., Redel, J., MD; Tellez, S., Jones, N., Kim, A., Treatment-induced Neuropathy of Diabetes in Children and Young Adults-Rare or Under-reported? J Endocr Soc. 2020 Oct 15;4(12). PMID: 33195956

13. Limbert, C., Tinti, D., Malik, F., Kosteria, I., Messer, L., Jalaludin, Y., Benitez-Aguirre, P., Biester, S., **Corathers, S**., von Sengbusch, S., Marcovecchio, L. ISPAD Clinical Practice Consensus Guidelines 2022: The delivery of ambulatory diabetes care to children and adolescents with diabetes. Pediatric Diabetes 2022; December. PMID: 36537530

14. Gravholt et al, **collaborating author of International Turner Syndrome Consensus Group**, (reviewed literature, participated in international consensus meeting, member of writing group for adult co-morbidities section) Clinical Practice Guidelines for the Care of Girls and Women with Turner syndrome. Eur J Endorcinol. June, 2024; 190(6): G53-G151. PMID 38748847.

Other publications:

**Corathers, S**. Collaboration is Key to Developing Effective Hormonal Treatment Paradigms for Transgender Youth. (Letter to Editor) J Adolesc Health. 2018 Apr; 62 (4):361-362 PMID: 29571433

Research output from Pediatric Patient Safety Learning Lab (R18 HS026644-01) includes an interactive website to guide families in managing type 1 diabetes when a child is sick: psll-t1d.azurewebsites.net

**Quality review of select publications**

1. **Corathers, S**., Kichler, J, Jones, N, Houchen, A, Jolly, M, Morwessel, N, Dolan, L, Hood, K. Improving Depression Screening for Adolescents with Diabetes. Pediatrics, 2013. 132(5): p. e1395-402. PMID 24127480
   - This manuscript reports on reliable implementation of routine depression screening for adolescents with diabetes. I was the first author on the paper and led work to spread depression screening using this model across diabetes centers nationally through the T1Dx-QI learning network and locally across other clinical areas of the institution. Total citations 102: 2024 (7); 2023 (9); 2022 (6); 2021 (19); 2020 (13); < 2019 (48).

2. Lotstein, D, Seid, M, Klingensmith, G, Case, D, Lawrence, J, Pihoker, C, Dabelea, D, Mayer-Davis, E, Gilliam, L, **Corathers, S**, Imperatore, G, Dolan, L, Anderson, A, Bell, R, Waitzfelder, B for the SEARCH

for Diabetes in Youth Study Group. Transition from Childhood to Adult Care for Youth with Type 1 Diabetes in Adolescence. Pediatrics, 2013 Apr;131(4):e1062-70. PMID 23530167
- This multi-site study found increased odds of poor glycemic control among young adults with diabetes who transition to adult care compared to those who remain in pediatric care, highlighting urgency of more robust health care transition strategies. I contributed to interpretation of results and writing the manuscript.  Total citations 224:  2024 (7); 2023 (23); 2022 (23); 2021 (25); 2020 (21); < 2019 (125).

3. **Corathers, S.** Kichler, J., Fino, N. Lang, W. Lawrence, J., Raymond, J., Yi-Frazier, J., Dabelea, D. MD, PhD, Liese, A. Saydah, S., Seid, M., Dolan, L. High health satisfaction among emerging adults with diabetes: factors predicting resilience. Health Psychology. October 2016. PMID: 27736152
- Manuscript reframes the study of emerging adults with diabetes from pre-determined risk factors and morbidity to evaluate features associated with positive health outcomes, to advance scientific dialog around modifiable interventions to enhance transition preparation and post transfer outcomes. I conceived of the research plan and led the writing group. Total citations 15: 2023 (3); 2022 (3); 2020 (5) < 2019 (4).

4. Gravholt et al, **collaborating author of International Turner Syndrome Consensus Group**, Clinical Practice Guidelines for the care of girls and women with Turner Syndrome: proceedings from the 2016 Cincinnati International Turner Syndrome Meeting. European Journal of Endocrinology 2017 Sep;177(3) PMID 28705803
- This guideline represents an international consensus for diagnosis and treatment of Turner syndrome and was the foundation for updated guidelines published in 2024 that reflect the standard of care for our field. I reviewed literature, participated in the guidelines meeting, and served as a member of writing groups for transition and adult care sections. Total citation: 783: 2024 (70); 2023 (137); 2022 (123); 2021 (143); 2020 (127); < 2019 (183).

5. **Corathers, S.,** Kichler, J, Mara, C. Psychosocial Patient-Reported Outcomes in Pediatric and Adolescent Diabetes: A Review and Case Example. Cur Diab Rep.2017 Jul;17(7):45 PMID: 28508255
- This manuscript provides a framework for selection and integration of patient reported outcomes (PRO) into routine diabetes care to promote meaningful clinical interactions in real time. I led the conception of the work and writing of the paper. Total citations: 18; 2023 (3); 2022 (3); 2021 (1); 2020 (4); 2019 (5); 2018 (2)

6. Pihoker, C., Forsander, G., Fantahun, B., Virmani, A., **Corathers, S**., Benitez-Aguirre, P., Fu, J. Maahs, D. ISPAD Clinical Practice Consensus Guidelines 2018: The delivery of ambulatory diabetes care to children and adolescents with diabetes. Pediatric Diabetes. Vol 19, Oct 2018. PMID: 30144259
- This guideline provides international standards of clinical care for youth with diabetes. I was also a co-author of updated guidelines published in 2022. Total citations: 69; 2023 (7); 2022 (16); 2021 (18); 2020 (19); 2019 (8); < 2019 (1).

7. Kanj, RV, Conard, LAE, **Corathers, S**., Trotman, G. Hormonal contraceptive choices in a clinic-based series of transgender adolescents and young adults. Int J Transgend 2019 Jul. PMID: 32999626.
- Study highlights special considerations for hormonal contraceptives for menstrual management and/or pregnancy prevention among cohort of transgender adolescents designated female at birth. I was a member of the research team and co-wrote the manuscript. Total citations 23. 2024 (1); 2023 (11); 2022 (9); 2021 (1); 2020 (1).

8. **Corathers, SD**, Yi-Frazier JP, Kichler JC, Gilliam LK, Watts G, Houchen A, Beal S. Development and Implementation of the Readiness Assessment of Emerging Adults with Type 1 Diabetes Diagnosed in Youth (READDY) Tool. Diabetes Spectr. 2020 Feb;33(1):99-103. PMID: 32116461
   - Study of the development and psychometric properties of a diabetes condition specific transition to adult care readiness tool has since been adopted by over 50 diabetes centers and translated into 6 languages. I led the research team and wrote the manuscript. An updated study for READDY 2.0 is under review for publication. Total citations 14. 2024 (4); 2023 (2); 2022 (4); 2021 (2); 2020 (2).

9. Alonso, G., **Corathers, S**., Shah A, Clements M, Kamboj M, Sonabend R, DeSalvo D, Mehta S, Cabrera A, Rioles N, Ohmer A, Mehta R, Lee J. Establishment of the T1DX Quality Improvement Collaborative. Clin Diabetes. 2020 Apr;38(2):141-151. Clin Diabetes. 2020. PMID: 32327886
   - This manuscript describes a system-based approach to the design and implementation of a learning health network to accelerate improved outcomes for type 1 diabetes. The T1Dx-QI collaborative is the largest network of diabetes centers in the United States, representing nearly 100,000 lives of people with type 1 diabetes. I contributed to the design phase of the network, was a faculty leader, co-led QI interventions and co-wrote the paper. Total citations 56. 2024 (10); 2023 (13); 2022 (19); 2021 (12); 2020 (2).

10. Cardona-Hernandez, R., Schwandt, A., Alkandari, H., Bratke, H., Chobot, A., Coles, N., **Corathers, S.,** Goksen, D., Goss, P., Imane, Z., Nagl, K., O'Riordan, S., Jeffries, C. for the SWEET study group. Glycemic outcome associated with insulin pump and glucose sensor use in children and adolescents with type 1 diabetes. Data from the international pediatric registry SWEET. Diabetes Care. 2021 May. PMID: 33653821
    - This international study demonstrates variation in global clinical practice and association of improved glycemic outcomes with increased access to diabetes technology, highlighting need for equitable access to standard of care tools for management of type 1 diabetes. I was a member of the research team and co-wrote the manuscript. Total citations 81. 2024 (16); 2023 (30); 2022 (26); 2021 (9).

## Abstracts

1. Hillman, J.B., **Corathers, S.D**, Wilson, S.E. The Impact of Provider Level of Training on Screening and Treatment of Pediatric Overweight. Pediatric Academy Society Annual Meeting, Poster Session, May 2007, Boston, MA.
2. **Corathers, S.** Lucky, A. Komlos, M, Tamai, J., Tamura, D., Khan, S., Digiovanna, J., Kraemer, K., Stenger, P. Increased bone mineral density provides clue to elusive diagnosis of trichothiodystrophy. Pediatric Endocrine Society/Pediatric Academic Society, Poster Session, April 2011, Denver, CO.
3. **Corathers, S.,** Salehi, M**.** Virilization and hypertension resolved after oophorectomy: case report of ovarian Leydig cell tumor. Endocrine Society, Poster Session, June 2011, Boston, MA.
4. **Corathers, S.,** Yayah Jones, NH. Crawford, P., Houchen, A., Morwessel, N., Dolan, L., Hood, K**.** Outpatient screening for depression: Feasibility and outcomes in adolescents with type 1 diabetes. American Diabetes Association, Moderated Poster Session, June 2012, Philadelphia, PA.
5. Kudel, I., Kichler, J., Hood, K., **Corathers, S**. Psychometric analysis of the Children's Depression Inventory short form in adolescents with type 1 diabetes. Society for Behavioral Medicine, Poster Session, March 2013, San Francisco, CA.
6. **Corathers, S.** Kichler, J., Beavers, D., Dabelea, D., Lawrence, JM., Liese, A., Raymond, J., Saydah, S., Seid, M., Yi-Frazier, J., Dolan, L. for the SEARCH for Diabetes in Youth Study Group. Improving

App. 97

Health Outcomes in Emerging Adults with Diabetes. American Diabetes Association, Poster Session, June 2013, Chicago, IL.

7. **Corathers, S.**, Houchen, A., Cafasso, M., D'Alessio, D., Hennard, C., Horewitz, D., Klein, D., Dolan, L. Bridging the Gap in Transition from Pediatric to Adult Health Care for Adolescents and Young Adults (AYA): A Diabetes Pilot Program. Fifth Annual Health Care Transition Research Consortium, Poster Session, October 2013, Baylor University, Houston, Tx.

8. **Corathers, S**., Beal, S., Kichler, J., Houchen, A. Readiness for transition to adult care in adolescents and young adults (AYA): a comparison of youth with and without type 1 diabetes (T1D). International Society for Pediatric and Adolescent Diabetes, Moderated Poster Session, September 2014, Toronto, Canada.

9. **Corathers, S.**, Beal, S., Yi-Frazier, J., Kichler, J., Houchen, A., Pihoker, C. Confirmatory factor analysis of a novel transition to adult care readiness assessment tool for adolescents and young adults (AYA) with type 1 diabetes (T1D). International Society for Pediatric and Adolescent Diabetes, Moderated Poster Session, September 2014, Toronto, Canada.

10. Fair,C., Javalkar, K., Betz, C., Okumura, M., Wood, D., LeComte, J., Jan, S., Maslow, G., Bozik, K., Porter, J., **Corathers, S.,** Tolleson-Rinehart, S., Shah, P., Woodward, J., Ferris, T., Ferris, R., Ferris, M. on behalf of the HCTRC. Health Care Transition Outcomes: A Delphi Stage 3 Survey. Sixth Annual Health Care Transition Research Consortium, Poster Session, October 2014, Baylor University, Houston, Tx.

11. Beal, S. J., Riddle, I., Kichler, J., Duncan, A., Houchen, A., Casnellie, L., **Corathers, S**. Transition Readiness among Teens – Differences by Chronic Condition. Sixth Annual Healthcare Transitions Research Consortium, Poster Session, October 2014, Baylor College of Medicine, Houston, TX.

12. Matlock, K., Yayah Jones, N., Kichler, J., **Corathers, S**. Clinical and Psychosocial Factors Associated with Suicidal Ideation in Adolescents with Type 1 Diabetes Mellitus. Pediatric Academic Society, Poster Session, April 2015, San Diego, CA.

13. Smego, A., Lawson, S., Courter, J., Warden, D., **Corathers, S**. Decreasing the Time to Insulin Administration for Hospitalized Patients with Cystic Fibrosis-Related Diabetes. Pediatric Academic Society, Poster Session, April 2015, San Diego, CA.

14. **Corathers, S**., Beal, S., Kichler, J., Casnellie, L., Backeljauw, P. Personal health knowledge and preparation for transition to adult care in adolescents with Turner Syndrome (TS). Pediatric Academic Society, Poster Session, April 2015, San Diego, CA.

15. Alexander, C., Ellsworth, S., Melvin, P., Kichler, J., **Corathers, S**., Yayah Jones, N., Houchen, A., Jolly, M. Effective Screening and Follow up for Depression and Suicidal Ideation in Adolescents with Diabetes Mellitus. The 27th Annual National Forum on Quality Improvement in Healthcare, Poster Session, December 2015, Orlando, Fl.

16. Garvey, K., Foster, N., Laffel, L., DiMeglio, L., Agarwal, S., Desimone, M., Libman, I., Lyons, S., Peters, A., Anderson, B., **Corathers, S**., Miller, K., Beck, R. Health Care Transition Preparation and Experience in a US National Sample of Young Adults with Type 1 Diabetes. International Diabetes Federation, Poster Session, December 2015, Vancouver, CA

17. Conard, L., **Corathers, S**., Lawlis, S. & Restle, H. Improving Standardization of Care in Trans* Clinic. WPATH Symposium, Poster Session, June 2016, Amsterdam, Netherlands.

18. Ikomi, C, Alexander, C, Mallon, D, Dykes, D, Anderson, V, Davis, B, Jolly M, Gahl, J, Ellsworth, S, **Corathers, S**, Crimmins, N. Improving Screening for Celiac Disease in Patients with New-Onset Type 1 Diabetes. International Society for Pediatric and Adolescent Diabetes, Poster Session, October 2016, Valencia, Spain.

19. **Corathers, SD**, Kichler, JC, Mara, C. Implementation of patient reported outcomes (PROs) through quality improvement methods to enhance patient care. International Society for Pediatric and Adolescent Diabetes, Moderated Poster Session, October 2016, Valenica, Spain.

20. Remiker, A., Chuang, J, **Corathers, S**, Rutter, M, Ho, Brian, Rutter, M, Gelfand, M, Trout, A, Geller, J. Differentiated thyroid cancer outcomes in the pediatric/adolescent population: a longitudinal review from a single center.  ASPHO, Poster Session, April 2017, Montreal, Quebec.

21. Malik, F, Stafford, J, Klingensmith, G, Dabelea, D, Lawrence, J, Mayer-Davis, E, Sayday, S, **Corathers, S**, Reboussin, B, Pihoker, C. Receipt of Recommended Clinical Tests for Youth and Young Adults with Type 1 Diabetes: Associations with Glycemic Control and Satisfaction with Care. American Diabetes Association, Poster Session, June 2017, San Diego, California.

22. Boyle, C, Foster, N, Scheer, K, Anhalt, H, Shah, A, Lee, J, **Corathers, S**. Funnel Plots for Statistical Quality Control in a Large, Multi-Site Registry. Society of Clinical Trials, Poster Session, May 2017. Liverpool, UK.

23. Krishnamurthy, M, Blunden, C, **Corathers, S**, Sheanon, N. Diazoxide-responsive Hyperinsulinism in an Infant with Sotos Syndrome. Pediatric Endocrinology Society, Poster Session, April 2017, Orlando, Florida.

24. Warning, A, Rohan, J, McGrady, M, Pendley, Delamater, J, **Corathers, S**., Drotar, D., Dolan, L. Changes in Depressive Symptoms over Time Differ between Males and Females with Type 1 Diabetes. Society of Pediatric Psychology, Poster Session, April 2017, Portland, OR.

25. Mallon, D., Crimmins, N., Ikomi, C., **Corathers, S**., Dykes, D., Gahl, J., Jolly, M. Improving Celiac Screening for Children with Type 1 Diabetes and Lessons from False Positive Serology. National American Society for Pediatric Gastroenterology, Hepatology, and Nutrition, Poster Session, November 2017, Las Vegas, NV.

26. Wood, J, Boyle, C, Quinn, M, Wong, J, Haller, M, Nelson, B, Shatz, D, Tamborlane, W, Fox, L, Prahalad, P, **Corathers, S**, Maahs, D, Alonso, T, DeSalvo, D, Wadwa, P, DiMeglio, L, Impact of Target HbA1c Change in Pediatric Participants in the T1D Exchange Clinic Registry. American Diabetes Association, Poster Session, June 2018, Orlando, FL.

27. Majidi, S, Jolly, M, Alonso, G, Buckingham, D, Cabrera, A, Clements, M, Garrity, A, Gibbs, K, Click, B, ong, K, Kamboj, M, Lambert, K, Lee J, Nadkarni, P, McDonough, R, Ohmer, A, Rioles, N, Stanek, K, Thomas, S, Weinstock R, **Corathers S.** Incorporating Depression Screening into Diabetes Clinics across the T1DX Learning Collaborative. American Diabetes Association, Poster Session, June 2018, Orlando, FL.

28. Shah, A., **Corathers, S.,** Alonso, G, Buckingham, D, Cabrera, A, Clements, M, DeSalvo D, Kamboj, M, Lambert K, Mehta, S, Ohmer, A, Rioles, N, Sonabend, R, Lee, J. Establishment of the Type 1 Diabetes Exchange QI Learning Collaborative (T1DX-LC). American Diabetes Association, Poster Session, June 2018, Orlando, FL.

29. Agarwal, S. Hirshfeld, E., Garrity, A., Shah, A., **Corathers, S**., Weinstock, R., Lambert, K., Bobik, C., Cabrera, A., Rioles, N., Lee, J. Comparison of adult and pediatric resources for type 1 diabetes among T1D exchange centers. American Diabetes Association, Poster Session, June 2018, Orlando, FL.

30. Trief, P., Foster, N., Chaytor, N., Hilliard, M., Kittelsrud, J, Jaser, S., Majidi, S., **Corathers, S.**, Bzdick, S., Adkins, D., Weinstock, R. Longitudinal Changes in Depression and Glycemia in Adults with Type 1 Diabetes. American Diabetes Association, Poster Session, June 2018, Orlando, FL.

31. Kichler, J., Monaghan, M., **Corathers, S**., Hilliard, M. Protective Factors in Emerging Adulthood: Reliability and Validity of a New Measure of Diabetes Strengths and Resilience. Society of Pediatric Psychology Annual Conference, New Orleans, April 2019.

32. Mara, C., Kichler, J., **Corathers, S**., Chundi, P., Daeschner, M., Mulvaney, S. Psychometric Evaluation of the Barriers to Diabetes Adherence Scale.  Society of Pediatric Psychology Annual Conference, New Orleans, April 2019.

33. Hilliard, Monaghan, **Corathers**, Kichler, Protective Factors in Emerging Adulthood: Reliability and Validity of a New Measure of Diabetes Strengths and Resilience, Society of Pediatric Psychology Annual Conference, New Orleans, 2019

App. 99

34. Lipstein, E. **Corathers, S**. I couldn't see a downside: Adolescent and Parent Decision-making about gender-affirming hormone therapy. Pediatric Academic Society, Baltimore, April 2019

35. Kamoun, C., Khoury, J., Crimmins, N., **Corathers, S**. Opportunities for Enhanced Type 1 Diabetes Transition Preparation. Pediatric Academic Society, Baltimore, April 2019.

36. Quinn, M., Bailey, R., Foster, N., Simmons, J., Eyth, E., Rodriguez, H., **Corathers, S**., Levy, C., Sheanon, N., Wasserman, R., Seiple, D., Sparling, D., Adkins, D., Albanese, A., DeSalvo, D. Diabetes Management Supplies in Youth with Type 1 Diabetes: Don't Leave Home Without Them! American Diabetes Association, San Francisco, June 2019

37. Cabrera, A., Alonso, G., **Corathers, S**., Lee, J., Prahalad, P., Rioles, N. Assessing Data Availability and Benchmarking Performance of Quality Measures for the T1D Exchange Improvement Collaborative, American Diabetes Association, San Francisco, June 2019

38. Sutherland, M, Lohmna, M, Reboussin, B, Flory, K, Brown, M, **Corathers, S**, Bellatorre, A, Lawrence, J, Yi-Frazier, J, Pihoker, C., Liese, A. Depressive Symptom Trajectories among Youth and Young Adults with Type 1 Diabetes. American Diabetes Association, San Francisco, June 2019.

39. Alonso, T, Thomas, S, Garey C, Buckingham, DA, Cabrera AB, Clements MA, **Corathers S**, DeSalvo DJ, Garrity A, Lee JM, McDonough R, Mostajabi F, Kamboj MK. Outpatient Diabetes Encounter Visit Frequency in the T1D Exchange Quality Improvement Collaborative (T1Dx-QI). American Diabetes Association, San Francisco, June 2019.

40. Yao, M. Alexandrou, E., Arora, S., Biery, M., Jones, R., Nasomyont, N., Petrovic, E., Seitz, S., Sylvester, A., Chundi, P., Mostajabi, F., Redel, J., **Corathers, S.** Outpatient Quality of Life Screening: Feasibility and outcomes in parents of children 2-7 with T1D. International Society of Adolescent and Pediatric Diabetes (ISPAD), Boston, November 2019.

41. Noor, N., Rioles, N., **Corathers, S**., Majid, S., McDonough, R., Polsky, S., Greenfield, M., Obrynba, K., Ebekozien, O., DeSalvo, D. Patient Demographics and clinical outcomes among type 1 diabetes patients using continuous glucose monitors: real world evidence from a large US Collaborative. American Diabetes Association (ADA), Virtual meeting, June 2020.

42. McDonough, R., Thomas, S., Rioles, N., Ebekozien, O., **Corathers, S**., Jolly, M, Lee, J., Garrity, A., Prahalad, P., Kamboj, M., Buckingham, D., Alonso, T. Reducing lost-to-follow rates in the T1D Exchange Quality Improvement Collaborative (T1DX-QI). American Diabetes Association (ADA), Virtual meeting, June 2020.

43. Ebekozien, O., Rioles, N., DeSalvo D., Gallagher, K., Lee, J.M, McDonough, R., Obrynba, K., Prahalad, P., Thomas, S., Weinstock, R.S., **Corathers, S**. Improving Continuous Glucose Monitoring (CGM) Use across Ten National Centers: Results from the T1D Exchange Quality Improvement Collaborative (T1DX-QI). American Diabetes Association (ADA), Virtual meeting, June 2020.

44. Improving Diabetes Care Through Population Health Studies: Insights from the largest U.S Population Based T1D Cohort. ISPAD virtual conference, October 2020.

45. Patient demographics and clinical outcomes among type 1 diabetes (T1D) patients using Continuous Glucose Monitors (CGMs): real world evidence from a large U.S. collaborative. ISPAD virtual conference, October 2020.

46. Multi-site quality improvement project: improving Continuous Glucose Monitor (CGM) uptake across ten U.S Centers. ISPAD virtual conference, October 2020.

47. Deconstructing Diabetes Strengths: Factor Analysis of the Diabetes Strengths and Resilience Measure for Young Adults (DSTAR-YA). Carreon, S., Iturralde, E., Monaghan, M., Kichler, J., Raymond, J., **Corathers, S**., Hilliard, M. Virtual Society of Pediatric Psychology Annual Conference, April 2021.

48. Bone Marrow Adipose Tissue Assessment in Transgender Youth Undergoing Pubertal Suppression: A Pilot Study. Nasomyont, N., Meisman, A., Ecklund, K., Vajapeyam, S., Cecil, K., Tkach, J., Altaye, M., **Corathers, S**. Conard, L,, Kalkwarf, H., Dolan, L, Gordon, C. Pediatric Endocrine Society virtual meeting April 2021.

49. Challenges to Telemedicine Transition During Covid-19; Insights From 21 Us Diabetes and Endocrinology Clinics, oral presentation at 14th International Conference on Advanced Technologies & Treatments for Diabetes (ATTD 2021) virtual conference June 2-5, 2021.

50. Transition of Care in Type 1 diabetes and Association with Student and Employment Status. Majidi, S., Roberts, A., Suerken, C., Reboussin, B., Malik, F., Marcovina, S., **Corathers, S**., Reynolds, K., Imperatore, G, Wadwa, P., Pihoker, C. American Diabetes Association Virtual Scientific Sessions, June 25-29, 2021.

51. Insulin Pump Use and Glycemic Control Among Patients With Type 1 Diabetes: Trends From The T1Dx-QI Cohort. Noor N, McDonough R, Carlson E, Mekhoubad A, Hsieh S, Demeterco-Berggren C, Majidi S, Desimone M, De-Tutu S, Obrynba K, Ebekozien O, **Corathers S**. Poster at American Diabetes Association Virtual Scientific Sessions; June 25-29, 2021.

52. HbA1c trends in the T1D Exchange Quality Improvement Collaborative (T1DX-QI) 2017-2020. Ebekozien O, Noor N, Jones NH-Y, Alonso GT, Desimone M, Izquierdo R, **Corathers S**, DeSalvo DJ, Gandhi K, Odugbesan O, Prahalad P, Clements M. Poster at American Diabetes Association Virtual Scientific Sessions; June 25-29, 2021.

53. Six Habits: Quality Metrics to Support Glycemic Outcomes in Type 1 Diabetes. Lee, J., Garrity, A., Hirschfeld, E., Thomas, I., Rioles, N., Ebekozien, O., **Corathers, S.** Poster at American Diabetes Association Virtual Scientific Sessions: June 25-29, 2021.

54. Lavik, A.R, Jones, N.H.Y, Rompicherla, S, Greenfield, M, Chen, J, Polsky, S, Alonso G. T, **Corathers, S**, Blackman, S, Gallagher, M. P, Demetero-Berggren, C, Garrity, A, Ebekozien, O. Diabetic ketoacidosis rates rose among patients with type 1 diabetes during U.S. COVID-19 peaks with highest burden on non-Hispanic Blacks. ePoster at the 47th ISPAD 2021 virtual Annual Conference.

55. Muthuvel, G., Brady, P., Daraiseh, N., Khoury, J., Tellez, S., **Corathers, S**., Using Artificial Intelligence Decision Support to Enhance Care for Type 1 Diabetes, ePoster at the 47th ISPAD 2021 virtual Annual Conference.

56. H. Nelson, S.D. Corathers, P.W. Brady, E. Kirkendall, R.M. Ruddy, T.B. Wetterneck, K.E. Walsh. Ambulatory Patient Safety Learning Lab: Failure modes and effects analysis for management of type 1 diabetes during illness, ePoster at the 47th ISPAD 2021 virtual Annual Conference.

57. Tellez, S., Brady, P., Daraiseh, N., Khoury, J., Muthuvel, G., **Corathers, S**., Evaluation of an Enhanced Care Intervention Using an Artificial Intelligence-Guided Decision Tool in Children and Emerging Adults with Type 1 Diabetes. Accepted for ePoster at Advanced Technologies and Treatments for Diabetes annual conference, Barcelona, Spain, April 27-30, 2022.

58. **Corathers, S.** et al. Implementation of Psychosocial Screening in Diabetes Centers. American Diabetes Association, New Orleans, June 2022.

59. Tatum, J., Murray, A., Roberge, S., Thomas, V., Baute, D., Lavik, A., Grant, A., **Corathers, S.** Quality Improvement in Action: Addressing continuity of care in pediatric endocrinology fellowship. T1DX-QI Learning Session, Miami, FL., Journal of Diabetes V.14., November 2022

60. Lavik, A., Rodas, P., Grant, A., Gumz, M., DiMuzio, T., **Corathers, S**., Deisinger, A., Tilton, K., Keppler, K., Patten, G. In sync with diabetes: Increasing remote upload of insulin pump data. T1DX-QI Learning Session, Miami, FL., Journal of Diabetes V.14., November 2022

61. Jones, N., Corathers, S., Grant, A., Kelly, J., Williams, M., Kaplan, K., Hart, K., Mansour, M. Equity in Diabetes Care: Implementation and spread of social determinants of health screening. T1DX-QI Learning Session, Miami, FL., Journal of Diabetes V.14., November 2022

62. Noor, N, Ebekozien, O, Vendrame, F, Jacobsen, L, Weinstock, R, Gallagher, M.P, **Corathers, S**, Accacha, S, Prahalad, P, Rapaport, R. Continuous glucose monitor derived Glycemic Outcomes Among Real-Time CGM vs. Flash CGM users in a Multi-Center EMR Database for People with T1D. ATTD, Berlin, Germany, February, 2023.

63. Williford, D. N., McGrail, M., Flynn, E., Buschhaus, S., Winning, A., Beckmann, E., Burstein, E., Yayah Jones, N-H., **Corathers, S.,** Crosby, L. E., & Modi, A. C. *Toward a deeper understanding of social*

*capital: A family-centered approach to measurement development.* Abstract accepted for presentation at the Society of Pediatric Psychology Annual Conference, Chicago, IL. April, 2023.

64. Samantha Roberge, MD; Sarah **Corathers**, MD; Rula Kanj, MD; Nat Nasomyont, MD. 10-Year Retrospective Chart Review of Ordering Practices of Laboratory and Imaging Surveillance for Gender Diverse Youth During Pubertal Suppression Therapy, Abstract accepted for Pediatric Endocrine Society, San Diego, California, May 2023.

65. Malik, F, Cases, J, Hillard, M, Lyons, S, Jacobsen, L, Roberts, A, Mucci, A, Agarwal, S, Demeterco-Berggren, C, Alonso, T, Ebekozien, O, **Corathers, S.** Health Care Transition Practices in the T1D Exchange Quality Improvement Collaborative. Poster Presentation at the 83rd ADA Scientific Sessions, San Diego, California, June 2023.

66. Murray, A., Hottor, S., Bimpeh, Y., Ojilong, J., Sun, Q., **Corathers, S.**, Yayah-Jones, N. Reduction of Diabetes-Related Hypoglycemia in Children and Adolescents with Type 1 Diabetes in Ghana. ISPAD, Rotterdam, The Netherlands, October 2023.

67. Roberge, S., **Corathers, S.**, Roberge, T., Nasomyont, N., "Determinants of Bone Mass Accrual in Transgender and Gender Diverse Youth undergoing Pubertal Suppression Therapy." Submitted to USPATH, Westminster, Colorado, November 2023.

68. Yayah-Jones, N., Grant, A., **Corathers, S.**, Smith, L., Kelly, J., Riley, A., Wiliford, D., Fazio, C., Kaplan, K., Howell, A. EDICT: Equity in Diabetes Care and Transformation. T1Dx-QI National Meeting, NYC, NY, November 2023.

69. **Corathers, S.**, Desai, R., Deisinger, A., Jones, R., Kaplan, K., Jolly, M., Grant, A., Kichler, J. Sustained QI Implementation of a Transition Preparation Program for Adolescents and Emerging Adults with Type 1 Diabetes. T1Dx-QI National Meeting, NYC, NY, November 2023.

70. **Corathers, S.**, Yayah Jones, N., Smith, L., Brady, P., Grant, A., Howell, A. Tellez, S., Muthuvel, G., Kelly, J., Noh, Y., Riley, A., Town, M. ConnecT1D: Reinforcing connections between patients, clinic, and community partners. T1Dx-QI National Meeting, NYC, NY, November 2023.

71. **Corathers, S.**, Yayah Jones, N., Smith, L., Brady, P., Riley, A., Town, M., Kelly, J., Tellez, S., Noh, Y., Muthuvel, G., Williford, D., Delsart, H., Neely, M., Kaplan, K., Howell, A., Grant, A. ConnecT1D Continued: Quality Improvement (QI) and care model innovations designed to achieve excellent and equitable glycemic and psychosocial outcomes for youth with type 1 diabetes (T1D). ISPAD, Lisbon, Portugal, October 2024.

72. Howell, A., Jones, N., Brady, P., Knopp, M., Grant, A., Smith, L., Riley, A., Town, M., **Corathers, S.**, ConnecT1D data visualization: Informing interventions and equitable improvement in outcomes for patients with T1D. T1Dx-QI Learning Session, Chicago, November 2024. Journal of Diabetes, Vol.16

73. Kelly, J., Noh, Y., Tellez, S., Grant, A., Howell, A., Muthuvel, G., Brady, P., **Corathers, S.** ConnecT1D: Proactive outreach intervention to improve equitable car for youth with type 1 diabetes. T1Dx-QI Learning Session, Chicago, November 2024. Journal of Diabetes, Vol.16

74. Muthuvel, G., Magella, B., Howell, A., Riley, A., Town, M., Taylor, R., Jones, N., Brady, P., Smith, L., **Corathers, S**. Moving on up: Mobile care clinic to enhance access to care for youth with T1D. T1Dx-QI Learning Session, Chicago, November 2024. Journal of Diabetes, Vol.16

75. Smith, L., **Corathers, S.**, Williams, M., Grant. A., Town, M., Riley, A., Howell, A., Jones, N. Implementation of psychosocial support interventions to narrow equity gaps in T1D outcomes. T1Dx-QI Learning Session, Chicago, November 2024. Journal of Diabetes, Vol.16

**Teaching and Mentoring**

Teaching

1. Direct clinical teaching of teaching medical students, residents, fellows on the endocrine inpatient service at Cincinnati Children's Hospital 4 weeks/year and precept residents and fellows in ambulatory clinics on a weekly basis.

2. Local academic courses, lectures, grand rounds, professor rounds, participation in firms:

App. 102

    a. CCHMC, Intermediate Improvement Science Series, Creating a Portfolio: Integrating Improvement into the Daily Work of Pediatric Endocrinology, (Feb 2023, Feb 2024).

    b. CCHMC, Department of Pediatrics Grand Rounds, Innovations and Achievements from Recent Place Outcomes Research Awards, (June 2022).

    c. CCHMC, Division of Endocrinology Grand Rounds, Living with Change, Care Delivery for transgender and Gender Expansive Youth, (Feb 2021).

    d. CCHMC, NRSA Fellowship, Integrating Improvement Methods into Clinical Care and Research, (May 2020).

    e. Virtual lecture for pediatric residents on Endocrinology rotation, "Thyrotoxicosis and Hyperthyroidism in Adolescents" (March 2020).

    f. University of Cincinnati, Diabetes Day Symposium, Childhood into Adolescence with Diabetes, (Nov 2019).

    g. CCHMC, Division of Psychology, Adherence Center Grand Rounds, Division of Behavioral Medicine and Clinical Psychology, Loss to Follow-Up: An Indicator of Health Care Delivery Adherence? (July 2019).

    h. CCHMC, Division of Endocrinology Fellowship Core Curriculum: Hyperglycemic Hyperosmolar Syndrome (July 2013-2023); Hypocalcemia nuts and bolts (July 2013-2016).

    i. Speaker, IHI Open House, Integrating Improvement into Academic Medicine (May 2017)

    j. Speaker at the Ohio Valley Chapter, Society of Adolescent Health, "Cases in Transgender Care; Inter-disciplinary panel discussion", (November 2017)

    k. University of Cincinnati, CCHMC combined endocrinology grand rounds: Glycemic Targets for Individuals and Patient Health (September 2017); Transition Preparation (October 2015); Transition to Transfer: (November 2015).

    l. University of Cincinnati, College of Medicine Intersession Careers in Quality Improvement Panel (Feb 2018).

    m. University of Cincinnati, Child and Adolescent Development, Undergraduate Psychology Course. Type 1 diabetes: Psychosocial considerations for children, adolescents, emerging adults and their families (November 2015).

    n. Speaker at Southwest Ohio Professional Transgender Conference, Endocrine Care for Transgender Adults (November 2015)

    o. Endocrine nurse lecture series: Thyroid cancer (September 2014); Routine screening and prevention of diabetes co-morbidities (January 2011).

    p. Mini-Medical College, University of Cincinnati, "Type 1 diabetes across the lifespan" (October 2014)

    q. Internal Medicine Residency Ambulatory long block curriculum, University of Cincinnati (June 2016, June 2015, June 2014).

    r. Department of Pediatrics Residency noon conference (Cis Puberty and Trans Puberty Blocking September 2017, Hypocalcemia nuts and bolts June 2014).

    s. Ohio Patient Safety Institute Best Practice Webinar (September 2014).

    t. Division of Infectious Diseases University of Cincinnati Grand Rounds: Management of hormone therapy for transgender adults (July 2012).

3. National/International Invited Lectures, Grand Rounds, Symposia, Conferences:

    a. Speaker, Pediatric Endocrine Society, Workshop, How to Start and Sustain QI, San Diego, California, May 2023.

    b. Speaker, International Society for Pediatric and Adolescent Diabetes (ISPAD), ConnecT1D: reinforcing connections between patients, clinic, and community to achieve excellent and equitable outcomes. Rotterdam, The Netherlands, October 2023.

    c. Speaker, ISPAD, Transition Workshop, Secrets of Successful Transition: Readiness and Receivership, Rotterdam, The Netherlands, October 2023.

    d. Participant, Diabetes Expert Panel for the National Committee for Quality Assurance (NCQA), Washington DC, September 2023.

    e. Delegate, International Turner Syndrome Guidelines Committee, Aarhus, Denmark, June 2023.

    f. National Webinar sponsored by USNWR Making a Difference for Kids with Type 1 Diabetes: Advances and Challenges, March 2023.

    g. Guest Speaker (virtual due to Covid-19) University of Colorado Endocrinology Grand Rounds, Applying Lessons from Community Pediatrics in Pursuit of Equity in Type 1 Diabetes, April 2022.

    h. Guest Speaker (virtual due to Covid-19), Vanderbilt University, Diabetes, Research and Training Center (DRTC) Seminar, Patient Reported Outcomes: Using Clinic Based Screening and Intervention to Inform Diabetes Care, Feb 2021.

    i. Speaker, European Society Pediatric Endocrinology, Condition Specific Tools for Transition Care: Lessons from Turner Syndrome Models, Athens, Greece, September 2018.

    j. Type 1 Diabetes Exchange Learning Collaborative national meeting organizer and presenter, Cincinnati, Ohio, May 2018.

    k. Speaker, Pediatric Endocrine Society, "Quality Improvement in Endocrinology", May 2018, Toronto, Canada

    l. Speaker, NIDDK/ADA workshop, "Patient Reported Outcomes that Matter to Providers", Nov 2017, Bethesda, Maryland

    m. Visiting Professor, "Integrating Improvement into Daily work of Pediatric Endocrinology" University of Michigan, September 2017, Ann Arbor, Michigan

    n. Speaker, American Diabetes Association, "Patient Reported Outcomes- Using Clinic Based Screening and Intervention to Inform Diabetes Care", June 2017

    o. Speaker, American Diabetes Association, "Getting to Goal in Pediatric Type 1 Diabetes" June 2016

    p. Speaker, American Diabetes Association, "Design and Validation of Diabetes Transition Preparation Readiness Skills Measure" June 2016

    q. Speaker, Health Care Transition Research Consortium, "One Year Outcomes of Planned Transition of Pediatric to Adult Diabetes Care".  Houston, TX. September 2015

    r. Speaker, Society of Adolescent Health and Medicine, "Transitioning Trans patients".  Los Angeles, California, March 2015

    s. International Turner Syndrome Consensus Guideline Delegate, Cincinnati, Ohio, July 2016

4. Participation in patient and family educational activities

    a. Speaker, Friends for Life Conference, Getting the Most out of your Automated Insulin Delivery System, College Park, MD, (October 2022).

    b. Speaker, PFLAG, Living with Change, Endocrinology Care for Transgender and Gender Expansive Youth and Adults, (December 2021).

    c. Speaker, Children with Diabetes National Conference, Friends for Life, "Transition from Pediatric to Adult Care", (July 2018).

    d. Planning committee member and speaker at JDRF community outreach summits (Nov 2019, Nov 2017, Nov 2016, Nov 2015, March 2015, March 2013).

    e. Speaker at Turner Syndrome community outreach events (May 2017, May 2015, May 2014, May 2012).

    f. Speaker and event coordinator, Building Bridges for a Successful Future with Diabetes, family outreach program (February 2014).

5. Listing of teaching materials developed:
    a. Pediatric Endocrine Society Webinar Series for Fellows on Quality Improvement (3/2021).
    b. American Board of Pediatrics Roadmap project website video resources, Talking About Emotional Health (09/2020). The full set of videos and associated guides are on the Roadmap webpage at: https://www.abp.org/foundation/roadmap
    Direct link to my video on talking to teens with diabetes about depression: https://fast.wistia.net/embed/channel/til9iwsorj?wchannelid=til9iwsorj&wvideoid=3bl9aqh8ur
    c. Content review and editing of American Board of Pediatrics Roadmap materials for maintenance of certification module, Emotional Health and Resilience for Patients and Families with Chronic Pediatric Conditions, (12/2019).
    d. "Demystifying MOC Part 4, Quality Improvement for Endocrinologists" National Webinar for Pediatric Endocrine Society (11/2019).
    e. Type 1 Diabetes Exchange Depression Screening Change Package (2018) Depression Screening on 2019 : Nov Learning Session | Trello
    f. Depression Screening on 2019 : Nov Learning Session | Trello
    g. "Future with Diabetes" transition materials for patients (2014-2015).
    h. Diabetes transition readiness assessment curriculum development for diabetes team (2015-2018)
    i. "Talking T1D" electronic book resource for adolescents and young adults developed in with graduate students at University of Cincinnati professional writing course, published on JDRF website, http://jdrf.org/swo/2016/01/15/talking-t1d-ebook/ (01/2016)

6. Evidence of teaching excellence: Fellow ratings of teaching performance in an anonymous survey in four categories (support/latitude of management; accurate information/fosters problem solving skills; encourages self-learning/provides mentoring; treats with respect/provides feedback) using a seven-point scale (range 1-7, maximum =7). Scores for the last 8 years were:

    2014: 6.55 (Division mean = 6.43, median = 6.45, range = 6.98-5.880)
    2015: 6.56 (Division mean = 6.49, Median = 6.47; range = 6.96-5.89)
    2016: 6.61 (Division mean = 6.46, Median = 6.46; range = 6.96-5.34)
    2017: 6.67 (Division mean = 6.35, median = 6.18, range = 6.83-5.78)
    2019: 6.61 (Division mean = 6.66, median = 6.64, range = 6.93 – 6.41)
    2020: 6.68 (Division mean = 6.72, median = 6.75, range = 7.00 - 6.55)
    2021: 6.79 (Division mean = 6.73, median = 6.77, range = 6.98 - 6.50)
    2022: 6.77 (Division mean = 6.63, median = 6.66, range = 5.50-6.98)
    2023: 6.45 (Division mean = 6.32, median = 6.43, range = 6.84-5.64)

Mentoring

Fellows and Students
As Director of the Quality Scholars Program, I participated in the scholarly oversight committee or career development committee of 19 scholars in the program over 7 years.

Additional mentees:
1. Dr. Alison Smego, (clinical and research mentor, 2014-2017). Dr. Smego was recognized for excellence at national Pediatric Academic and Pediatric Endocrine Society meetings and published her QI project, "Decreasing the Time to Insulin Administration for Hospitalized Patients with Cystic Fibrosis Related

Diabetes" in Journal Hospital Pediatrics 2018. Present position: Assistant Professor, Division of Endocrinology, Department of Pediatric, University of Utah School of Medicine. University of Utah.

2. Dr. Kristal Matlock, (clinical and research mentor, 2015-2018). Dr. Matlock presented nationally and published, "Clinical and psychosocial factors associated with suicidal ideation in adolescents with type 1 diabetes mellitus" and "Untreated Congenital Hypothyroidism Due to Loss to Follow-Up: Developing Preventative Strategies through Quality Improvement". Present position: Assistant Professor, Division of Endocrinology, Department of Pediatric, Vanderbilt University School of Medicine.

3. Dr. Alissa Roberts, visiting Endocrinology Fellow from Seattle Children's for clinical transition medicine elective (March 2017). Dr. Roberts is an emerging leader in transition research and quality improvement. Present position: Assistant Professor (promotion pending), Division of Endocrinology, Department of Pediatrics, University of Washington.

4. Dr. Jacob Redel, (clinical mentor, 2016-2018). Dr. Redel led a Prevnar/Pneumovax immunization QI initiative for patients with diabetes and as chief fellow, Dr. Redel coached a team of first year fellows led by Dr. Michael Yao to address parental worry in parents of young children with diabetes and detailed a method for applying QI training in sub-specialty fellowship setting published in Medical Education in 2019. Present position: Assistant Professor, Division of Endocrinology, Department of Pediatric, University of Kansas School of Medicine.

5. Dr. Eirene Alexandrou, Endocrinology Fellow (clinical mentor, 2017-2020). Dr. Alexandrou completed a QI project on screening for anxiety symptoms among girls and women with Turner Syndrome published in Hormone Research Paediatrics in 2022.  Present position: Assistant Professor, Division of Endocrinology, Department of Pediatric, University of Iowa School of Medicine.

6. Dr. Nat Nasomyont, (clinical and research mentor, 2017--2020). Dr. Nasomyont completed and published a prospective pilot study of bone health outcomes amongst youth with gender dysphoria treated with puberty blockers. Present position: Assistant Professor, Division of Endocrinology, Department of Pediatrics, University of Cincinnati College of Medicine.

7. Dr. Priscilla Rodas, Endocrinology Fellow (clinical mentor, 2019-2022). Dr. Rodas completed a QI project on uploading diabetes devices prior to and between clinic visits. Present Position: Staff Physician, Huntsville, Alabama.

8. Dr. Andrew Lavik, (research mentor, 2019-2022), was a RISE award recipient as a pediatric resident, for project, "Utilization of a condition-specific registry to improve patient-reported and health-related outcomes in children with type 1 diabetes." During fellowship, Dr. Lavik completed research with T1Dx-QI about DKA concurrent with COVID-19 with results published in JCEM 2022. Present Position: Assistant Professor, Division of Endocrinology, Department of Pediatric, Cleveland Clinic, Case Western Reserve School of Medicine.

9. Dr. Samantha Roberge, (research mentor, 2022-2024). Dr. Roberge developed a curriculum for adolescent medicine and endocrinology fellows about transgender health and led a project and published original research on bone health outcomes among youth that receive GnRH agonist treatment. Present position (Sept 2024): Assistant Professor, Division of Endocrinology, Department of Pediatrics, University of Cincinnati College of Medicine.

10. Dr. Alison Murray, (research mentor, 2022-2024). Dr. Murray pursued global health initiative to study outcomes of a new multidisciplinary care model for diabetes in Ghana. Data was presented at ISPAD in 2023 and submitted to Diabetes Care for publication. Present position (July 2024): Assistant Professor, Division of Endocrinology, University of Wisconsin.

11. Dr. Hailee Delsart, (research mentor, 2022--). Dr. Delsart is a member of the Pediatric Ambulatory Safety Learning Lab AHRQ sponsored research team. Dr. Delsart is first author on manuscript describing pilot study developing and testing simulation scenarios for diabetes sick day management. She is a co-author on a publication in Pediatric Quality and Safety on "Safer Type 1 Diabetes Care at Home". Present position: Fellow, Division of Endocrinology, Cincinnati Children's.

12. Dr. Michelle Knopp, (research mentor, 2023-2024). Dr. Knopp joined the ConnecT1D research team during her clinical informatics fellowship to support diabetes device integration into the electronic health record and design a research database, in addition to her own primary research project related to CGM use in primary care. Present position: Research Assistant Professor of Pediatrics, University of Cincinnati College of Medicine.

Division of Endocrinology faculty peer mentorship:

1. Dr. Sarah Lawson (QI mentorship, collaborator). I coached Dr. Lawson on a project to increase timeliness and safety of insulin ordering (2015-2016). Dr. Lawson has since fundamentally restructured care delivery for new onset diabetes from an inpatient to a Day Hospital model (2016-2017) and developed protocols for insulin ordering and administration throughout the institution.
2. Dr. Nancy Crimmins (QI mentorship, collaborator). I assisted Dr. Crimmins and Dr. Daniel Mallon to develop a clinical algorithm for screening for Celiac Disease amongst new onset and established diabetes patients (2015-2017). This work has been presented at national and international meetings and helps support innovative inter-disciplinary clinical care for dual diagnosis patients.
3. Dr. Halley Wasserman (mentorship). I meet with Dr. Wasserman every month to discuss current research and clinical projects, and coach on professional and career development.
4. Dr. Nana Hawa-Yayah Jones (QI mentorship, collaborator). I coached Dr. Jones during an improvement methodology course with Dr. Matlock, (2014-2015) that led to a reliable process to prevent loss to follow up for children with congenital hypothyroidism.  I am a collaborator with Dr. Jones to identify interventions for the population of youth at high risk of diabetes complications (2017-ongoing). Through the Health Equity Network, and ConnecT1D, Dr. Jones leads the screening for social determinants of health in diabetes clinics, and systematically identifying, and addressing, health equity gaps for youth with diabetes including use of CGM and insulin pumps.

**Service and Leadership**

Service:

Professional Organization Memberships
- American Diabetes Association, Member
- Pediatric Endocrine Society, Member and Quality Improvement Committee Member
- International Society of Pediatric and Adolescent Diabetes, Member
- Endocrine Society, Member
- American Academy of Pediatrics, Member, Former Chair of Resident Section

Local Committee Involvement:
- Institutional Psychosocial Screening and Response Taskforce (2022-2024)
- Institutional Ambulatory Access Steering Committee (2022-2023)
- Institutional Adult Care Taskforce (2023--)
- Institutional Digital Care Transformation Taskforce (2023--)
- Institutional Governance Committee for patient reported outcomes (2018-2022)
- Place Outcomes Grant Reviews (2017, 2021, 2024)

Manuscripts Reviewed:
- JAMA Network Open 2022 (1)
- Diabetes Spectrum 2015 (1) 2016 (1)
- Pediatrics 2014 (1) 2015 (1) 2016 (1) 2017 (2)
- Journal of Health Psychology 2014 (1)
- Lancet Journal of Diabetes and Endocrinology 2014 (2)

- Journal of Diabetes Science and Technology 2016 (1)
- Pediatric Diabetes 2016 (2) 2017 (2) 2019 (1) 2020 (5) 2021 (2) 2022 (2)
- Diabetes Care 2018 (1) 2022 (2) 2024 (2)
- The Permanente Journal 2017 (1)
- Journal of Adolescent Health 2017 (1) 2018 (1)
- Endocrine Practice 2017 (1)
- Diabetic Medicine 2020 (2) 2023 (1)
- Journal of American Medical Informatics 2020 (1)
- Diabetes Research and Clinical Practice 2020 (1)
- Journal of Clinical Endocrinology and Metabolism 2020 (1)
- Canadian Journal of Diabetes 2020 (1) 2021 (1)
- Diabetes Technology and Therapeutics 2022 (1)
- Contemporary Clinical Trials 2024 (1)

Professional Activities:
- Data Publications and Presentation Committee (DPPC) member, SWEET international diabetes network (2021-2024)
- Diabetes Expert Panel for the National Committee for Quality Assurance (NCQA) (2020--)
- Data Safety and Monitoring Board Participation
  - 4T Study (PI, David Maahs)
  - ReDUCEe Study (Co-PIs, Shivani Agarwal and Jeffrey Gonzolez)
- Advisory Board Member
  - Rising T1DE Alliance innovation in type 1 diabetes care (2020-2024)
  - Advisory board member, Turner Syndrome clinical centers of excellence (2017-2020)
  - Advisory board member, T1D Outcome Program, JDRF national initiative (2016-2017)
  - Clinical advisory board member, College Diabetes Network (2015-2019)
- Part-time Position: Expert Witness, Reports, Deposition, and Testimony (2024)
  Moe et al. vs. Yost, et al., Court of Common Pleas of Franklin, Ohio, Case Number 24 CV 002481

Recruitment activities:
- Participated in recruitment of endocrinology fellows and faculty candidates annually (2013-2024)
- Participated in interviews for faculty members in divisions of adolescent medicine, behavioral medicine and clinical psychology, hematology and oncology, emergency medicine, gastroenterology, critical care (2017-2024)

Community activities:
- Board member of SW Ohio JDRF chapter (July 2014-2020)
- Team Captain, American Diabetes Association, Step Out to Stop Diabetes Walk (2010-2013)
- Volunteer, Children's International Summer Village, Peace Education Program (2022--)

Leadership:

Associate Chief of Staff, Ambulatory, Cincinnati Children's (March 2024-)
Clinical Director, Division of Pediatric Endocrinology, Cincinnati Children's (January 2022-)
Director, Quality Scholars Program, Cincinnati Children's (September 2017- March 2024)
Co-President, WIMS, (Women in Medicine and Science) with Dr. Jennifer O'Toole (2020-2023)

EXHIBIT B

# BIBLIOGRAPHY

1.   Hembree, W.C., et al., *Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline*. J. Clin. Endocrinol. & Metab., 2017. **102**: 3869–3903, 3875

2.   National Health Statistics Report April 24, 2024, <u>National Health Statistics Reports, Number 202, April 4, 2024</u>

3.   Lee PA, Houk CP, Ahmed SF, Hughes IA., International Consensus Conference on Intersex organized by the Lawson Wilkins Pediatric Endocrine Society and the European Society for Paediatric Endocrinology. Consensus statement on management of intersex disorders. International Consensus Conference on Intersex. Pediatrics. 2006 Aug;118(2):e488-500.

4.   The Biological Reality of Sex and Intersex: A Response to the Executive Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" - Pediatric Endocrine Society

5.   Hughes IA, Nihoul-Fékété C, Thomas B, Cohen-Kettenis PT. Consequences of the ESPE/LWPES guidelines for diagnosis and treatment of disorders of sex development. Best Pract Res Clin Endocrinol Metab. 2007 Sep;21(3):351-65.

6.   Blackless M, Charuvastra A, Derryck A, Fausto-Sterling A, Lauzanne K, Lee E. How sexually dimorphic are we? Review and synthesis. Am J Hum Biol. 2000 Mar;12(2):151-166. doi: 10.1002/(SICI)1520-6300(200003/04)12:2<151::AID-AJHB1>3.0.CO;2-F. PMID: 11534012.

7.   United Nations Free & Equal, "Intersex People," Office of the United Nations High Commissioner for Human Rights 1 (2024), https://www.unfe.org/sites/default/files/download/Intersex%20factsheet%202024%20EN%20-%20CLEARED.pdf (last accessed Feb. 6, 2025)

8.   Ahmed SF, Achermann J, Alderson J, Crouch NS, Elford S, Hughes IA, Krone N, McGowan R, Mushtaq T, O'Toole S, Perry L, Rodie ME, Skae M, Turner HE. Society for Endocrinology UK Guidance on the initial evaluation of a suspected difference or disorder of sex development (Revised 2021). Clin Endocrinol (Oxf). 2021 Dec;95(6):818-840. doi: 10.1111/cen.14528. Epub 2021 Jun 22. PMID: 34031907.

9.   Mehmood KT, Rentea RM. Ambiguous Genitalia and Disorders of Sexual Differentiation. [Updated 2023 Aug 28]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2025 Jan-. Available from: <u>https://www.ncbi.nlm.nih.gov/books/NBK557435/</u>

10.   Cools M, Nordenström A, Robeva R, Hall J, Westerveld P, Flück C, Köhler B, Berra M, Springer A, Schweizer K, Pasterski V; COST Action BM1303 working group 1. Caring for individuals with a difference of sex development (DSD): a Consensus Statement. Nat Rev Endocrinol. 2018 Jul;14(7):415-429. doi: 10.1038/s41574-018-0010-8. PMID: 29769693; PMCID: PMC7136158.

11.   <u>https://d3dkdvqff0zqx.cloudfront.net/groups/apaadvocacy/attachments/USJS-Final-</u>

1

Version.pdf

12.  Jody Herman et al., How Many Adults and Youth Identify as Transgender in the United States?, Williams Institute, UCLA School of Law 1 (2022), https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Trans-Pop-Update-Jun-2022.pdf (last accessed Feb. 6, 2025).

13.  Hembree, W.C., et al., *Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline*. J. Clin. Endocrinol. & Metab.,2017.**102**:3869–3903, 3875.

14.  Jody Herman et al., How Many Adults and Youth Identify as Transgender in the United States?, Williams Institute, UCLA School of Law 1 (2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf (last accessed Feb. 6, 2025).

15.  Bianca D.M. Wilson et al., Nonbinary LGBTQ Adults in the United States, Williams Institute, UCLA School of Law 2 (June 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Nonbinary-LGBTQ-Adults-Jun-2021.pdf (last accessed Feb. 6, 2025).

16.  Carswell, J.M., Lopez, X., and Rosenthal, S.M., *The evolution of adolescent gender-affirming care: An historical perspective*. Horm. Res. Paediatr., 2022. **95**(6): p. 649-656.

17.  Saraswat A, Weinand JD, Safer JD. Evidence supporting the biologic nature of gender identity. Endocr Pract. Feb 2015;21(2):199-204. doi:10.4158/ep14351.ra

18.  Yokota, Y., Kawamura, Y., & Kameya, Y. (2006, January). Callosal shapes at the midsagittal plane: MRI differences of normal males, normal females, and GID. In *2005 IEEE Engineering in Medicine and Biology 27th Annual Conference* (pp. 3055-3058). IEEE

19.  Rosenthal SM. Approach to the patient: transgender youth: endocrine considerations. J Clin Endocrinol Metab. Dec 2014;99(12):4379-89. doi:10.1210/jc.2014-1919

20.  Dessens AB, Slijper FM, Drop SL. Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. Arch Sex Behav. Aug 2005;34(4):389-97. doi:10.1007/s10508-005-4338-5

21.  Heylens G, De Cuypere G, Zucker KJ, et al. Gender identity disorder in twins: a review of the case report literature. J Sex Med. Mar 2012;9(3):751-7. doi:10.1111/j.1743-6109.2011.02567.x

22.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders: DSM5-TR at 512–13 (2022)

23.  Turban JL, Beckwith N, Reisner SL, Keuroghlian AS. Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults. JAMA Psychiatry. Sep 11 2019;77(1):1-9. doi:10.1001/jamapsychiatry.2019.2285

24.  Turban JL, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS One. 2022 Jan 12;17(1):e0261039. doi: 10.1371/journal.pone.0261039. Erratum in: PLoS One. 2023 Jun 12;18(6):e0287283. doi: 10.1371/journal.pone.0287283. PMID: 35020719;

PMCID: PMC8754307.

25. Management of the transgender adolescent, Olson J, Forbes C, Belzer M, Arch Pediatr Adolesc Med. 2011 Feb;165(2):171-6

26. Bauer GR, Scheim AI, Pyne J, Travers R, Hammond R. Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. BMC Public Health. 2015 Jun 2;15:525. doi: 10.1186/s12889-015-1867-2. PMID: 26032733; PMCID: PMC4450977.

27. King WM, Gamarel KE. A Scoping Review Examining Social and Legal Gender Affirmation and Health Among Transgender Populations. Transgend Health. 2021 Feb 15;6(1):5-22. doi: 10.1089/trgh.2020.0025. PMID: 33644318; PMCID: PMC7906235.

28. Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967, Am. Med. Ass'n (2021), https://policysearch.amaassn.org/policyfinder/detail/gender?uri=%2FAMADoc%2FHOD .xml-0-5096.xml (last accessed Feb. 6, 2025).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR, ZAYA PERYSIAN,
SAWYER SOE, CHASTAIN ANDERSON,
DREW HALL, BELLA BOE, and REID
SOLOMON-LANE, on behalf of themselves
and others similarly situated,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary of
State; and UNITED STATES OF AMERICA,

*Defendants*.

Case No. 1-25-cv-10313

Hon. Julia E. Kobick

## EXPERT DECLARATION OF AYDEN SCHEIM, PH.D.

I, Ayden Scheim, Ph.D., state and affirm that the following facts are true and correct:

1.     I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.  Specifically, I have been asked by Plaintiffs' counsel to provide an expert opinion on the harms that may be caused to transgender people by being unable to obtain an accurate and usable passport.

2.     I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and based on my expert opinion.

3.     In preparing this report, I reviewed Plaintiffs' Complaint (ECF 1), and President Trump's Executive Order (ECF 1-1). I also relied on my scientific education and training, my research experience, my knowledge of the scientific literature in the pertinent fields, and my experience providing social services to people with gender dysphoria, as set out in my curriculum vitae, attached hereto as Exhibit A.

4.     The materials I have relied upon in preparing this report are the same types of materials that experts in my field regularly rely upon when forming opinions on these subjects.

These materials are listed in the bibliography accompanying this declaration, attached hereto as Exhibit B.

5.      I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## I.      BACKGROUND AND QUALIFICATIONS

### A.  Qualifications

6.      I am an epidemiologist and received my Ph.D. in Epidemiology and Biostatistics from The University of Western Ontario (Western University) in 2017. I completed postdoctoral training at the University of California, San Diego School of Medicine from 2017 to 2019. Since September 2019, I have been an Assistant Professor of Epidemiology and Biostatistics in the Dornsife School of Public Health at Drexel University in Philadelphia, Pennsylvania. I hold affiliate faculty positions at the Li Ka Shing Knowledge Institute at St. Michael's Hospital in Toronto, Canada and in the Department of Epidemiology and Biostatistics in the Schulich School of Medicine and Dentistry at Western University in London, Canada. My professional experience and publications are detailed in my curriculum vitae, which is attached as Exhibit A to this declaration.

7.      My opinion expressed herein is based on my experience conducting original research on transgender health and well-being since 2005, reviewing research in the field, and additional original analyses conducted at the request of Plaintiffs' counsel. I have led multiple federal research grants on transgender health from the National Institutes of Health and the Canadian Institutes of Health Research. My research draws on observational epidemiologic data (i.e., surveys) to identify social determinants of mental health, physical health, and access to healthcare among transgender persons.

8.      As a professor of epidemiology, I also teach graduate-level courses in quantitative research methodology and survey design.

2

9. I have published 59 peer-reviewed research articles specifically on transgender health, in addition to more than two dozen commentaries, reports, or research briefs. In recognition of my expertise in this field, I was invited to lead a review article on transgender health in the *Annual Review of Public Health*, a leading journal in the field, in 2022.

10. Specific to the issues in this case, I was commissioned by the World Health Organization to conduct a systematic review on legal gender recognition (laws, policies, and administrative procedures that enable transgender and nonbinary people to update their identity documents) for their forthcoming guidelines on transgender health.

11. I have been invited to deliver scientific presentations on transgender health at local, national, and international meetings in the United States, Canada, Europe, Asia, Australia, South America, and Africa. I have served on clinical and research guideline committees for the World Professional Association for Transgender Health (Standards of Care), the National Institutes of Health, the Canadian Institutes of Health Research, and the Williams Institute at the University of California, Los Angeles School of Law.

### B. Compensation

12. I am being compensated at an hourly rate of $400 per hour plus expenses for my time spent communicating with Plaintiffs' counsel, drafting written testimony and reports, being deposed, or testifying, and traveling in connection with this matter. This is the standard rate for this type of work within my profession. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

### C. Previous Testimony

13. I have given expert testimony at trial or by deposition in the following cases:

- I testified as an expert witness on name changes for transgender people in cases before the Court of Common Pleas of Butler County, PA (Case No. 640 WDA 2022), the Court of Common Pleas of Allegheny County (GD No. 21-11804;

GD No. 21-11805), and the Court of Common Pleas of Philadelphia County (Case No. 210901990) in Pennsylvania.

- I also testified as an expert witness on anti-transgender stigma in a trial before the Ontario Superior Court of Justice, Canada (*Her Majesty the Queen. v. Cardle*, 2020 ONSC 7878).

14.     I also provided expert reports on gender marker changes for transgender people in the Thirteenth Judicial District Court, County of Yellowstone (*Marquez v. Montana*, Case No. DV 21-00873) and in the First Judicial District Court, Lewis and Clark Country (*Kalarchik v. Montana*, Case No. DV-25-2024-0000261-CR).

## II.     SUMMARY OF OPINIONS

15.     Gender affirmation, comprising social, legal, medical, and psychological dimensions, is a critical determinant of health and well-being for transgender and nonbinary[1] persons. Being consistently referred to and perceived in a manner consistent with one's self-identification promotes positive mental health.

16.     Conversely, identity documents that display a transgender individual's birth-assigned sex may cause the individual to experience questioning or mistreatment when traveling, nonconsensual disclosure of private medical information, gender non-affirmation (e.g., being addressed as the wrong gender), harassment or ridicule, accusations of fraud, denial of service, or even violence. These experiences, in turn, can contribute to worsened mental health and avoidance of travel and other settings in which official documents or records must be displayed.

17.     Policies that prevent transgender people from updating the gender marker on their passports may limit the utility of identity documents for security screening and identity verification, as evidenced by, for example, the increased airport security questioning experienced by trans people traveling with valid identity documents without an updated gender marker.

---

[1] For brevity, I will use the term "transgender" to include people who identify as transgender and/or nonbinary, unless otherwise specified.

## III. OPINIONS

### A.  Transgender and Intersex People Experience High Rates of Discrimination.

18.     Stigma, discrimination, and violence towards transgender people remain widespread. Transgender people have become increasingly visible in U.S. society, but that visibility does not necessarily equate to increased acceptance. Data from the Pew Research Center indicate that the proportion of U.S. adults who disagree that one's gender can be different than their sex assigned at birth grew from 54% to 60% between 2017 and 2022.[2] Nevertheless, 78% of Americans agree that transgender people experience discrimination in our society. Indeed, transgender people report high levels of discrimination and violence. Initial results from the 2022 United States Transgender Survey, the largest-ever survey of transgender and nonbinary adults in the U.S. with over 92,000 respondents, show that in the previous year alone, 30% of respondents were verbally harassed due to their gender and 9% were denied equal treatment or services.[3] Over their lifetimes, 80% experienced harassment in school and 11% had lost a job due to their gender.

19.     Data specific to intersex people are limited but indicate that they also experience high levels of stigma, discrimination, and violence. In a European survey of lesbian, gay, bisexual, transgender, and intersex people, intersex participants reported much higher levels of discrimination and violence than non-intersex persons,[4] including more discrimination in employment (28% versus 10%) and when showing identity documents (31% versus 5%), and higher levels of violent victimization in the previous five years (49% versus 25%).[5]

---

[2] Parker K, Menasce Horowitz J, Brown A. Americans' Complex Views on Gender Identity and Transgender Issues. Pew Research Center. June 28, 2022. https://www.pewresearch.org/social-trends/2022/06/28/americans-complex-views-on-gender-identity-and-transgender-issues/
[3] James SE, Herman JL, Durso LE, Heng-Lehtinen R. Early Insights: A Report of the 2022 U.S. Transgender Survey. National Center for Transgender Equality, Washington, DC. 2024.
[4] Intersex individuals were compared to all other survey respondents, of whom 86% were cisgender (non-transgender). European Union Agency for Fundamental Rights. A long way to go for LGBTI equality: Technical report. Luxembourg: Publications Office of the European Union; 2020.
[5] ILGA-Europe and OII Europe. Diving Into the FRA LGBTI II Survey Data: Intersex Briefing. 2023. Available from: https://www.ilga-europe.org/report/intersections-intersex-diving-into-the-fra-lgbti-ii-survey-data/

**B. Transgender People Require Identity Documents With a Sex Designation Consistent with Their Gender Identity.**

20.     Recognizing the importance of identity documents, the American Medical Association "supports every individual's right to determine their gender identity and sex designation on government documents" and urges that governments "allow for a sex designation or change of designation on all government IDs to reflect an individual's gender identity, as reported by the individual and without need for verification by a medical professional."

21.     Legal gender recognition is important to transgender people for both reasons of safety and social recognition of their affirmed gender. For some transgender, nonbinary, and intersex people, 'X' markers best align their affirmed gender and/or with how they are socially perceived by security agents (e.g., as neither clearly male nor female). In a synthesis of 31 studies of transgender persons conducted as part of a systematic review for the World Health Organization, we found that it was important for transgender people to be able to choose between 'X', male, and female markers, based primarily on safety considerations.

22.     Transgender persons experience discrimination and poor treatment due specifically to identity documents and records that do not accurately reflect the sex they know themselves to be, as determined by their gender identity. In the 2015 United States Transgender Survey ("2015 U.S. Trans Survey"), a survey of 27,715 transgender adults in the United States,[6] 32% of respondents who had presented an identity document that did not match their gender presentation had at least one negative experience, including verbal harassment (25%), denial of service (16%), being asked to leave a venue (9%), and assault (2%). Further, racial and ethnic minority respondents including Middle Eastern, American Indian, and Black individuals were more likely to report harassment or violence when presenting gender-incongruent identity documents.

23.     Transgender individuals without gender-concordant identity documents are more likely to experience problems with U.S. airport security. Among approximately 4,500 2015 U.S.

---

[6] James SE, Herman JL, Rankin S, et al. The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality; 2016.

Trans Survey respondents who were living in a gender different from their sex assigned at birth and who had passed through airport security in the previous year, those who had corrected the gender marker on their passport were less likely to be questioned about the name or gender on their document (6.0% vs. 17.6% of those without an updated gender marker).[7] Transgender travelers without passports reflecting their gender identity may be at risk of discrimination, criminalization, and violence when traveling internationally. A 2019 analysis identified 13 countries with de jure criminalization of transgender expression and 37 countries with de facto criminalization. Violence against transgender people, including by police and security forces, as well as impunity for perpetrators, is common globally.[8]

24.     In addition to directly experiencing the abovementioned problems, transgender individuals often anticipate stigma and discrimination in interpersonal and institutional interactions and may avoid such situations as a means of self-protection.[9] The vast majority – 84% – of respondents to a 2019 national transgender health survey that I conducted in Canada (n=2,873) reported that, in the past five years, they had avoided public spaces or situations (e.g., travel, restrooms) due to fears of being harassed or "outed" (having their transgender status non-consensually disclosed).[10] Presenting gender-discordant identity documents can "out" individuals as transgender, violating their privacy.[11] In qualitative research, transgender people report anxiety about, and avoidance of, traveling due in part to issues with identity documents.[12]

---

[7] Herman JL, O'Neill K. Gender Marker Changes on State Documents: State-Level Policy Impacts. Los Angeles, CA: Williams Institute, 2021. Available from: https://williamsinstitute.law.ucla.edu/wp-content/uploads/Gender-Markers-Jun-2021.pdf
[8] Madrigal–Borloz V. A/HRC/38/43: Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity. May 2018. Available from: https://docs.un.org/en/A/HRC/38/43
[9] White Hughto JM, Reisner SL, Pachankis JE. Transgender stigma and health: A critical review of stigma determinants, mechanisms, and interventions. Social Science & Medicine. 2015;147:222-231.
[10] The Trans PULSE Canada Team. Health and health care access for trans and non-binary people in Canada. 2020. Available from: https://transpulsecanada.ca/results/report-1/
[11] Scheim AI, Restar AJ, Zubizarreta D, et al. Legal gender recognition and the health of transgender and gender diverse people: A systematic review and meta-analysis. Under review, Social Science & Medicine.
[12] Olson ED, Reddy-Best K. "Pre-top surgery, the body scanning machine would most likely error:" Transgender and gender nonconforming travel and tourism experiences. Tourism Management. 2019;70:250-61.
Quinan CL, Bresser N. Gender at the border: Global responses to gender-diverse subjectivities and nonbinary registration practices. Global Perspectives. 2020;1(1):12553.

**C. Transgender People Experience Lower Rates of Harassment, Discrimination and Violence When Able to Use Identity Documents Consistent With Their Gender Identity.**

25.     Conversely, two recent studies indicate that being able to change the gender designation on one's identity documents is associated with reduced exposure to discrimination among transgender people in the United States.

26.     An econometric study found that employment of transgender men increased by 9 to 20 percentage points after removal of state policies requiring surgery to change the gender marker on a birth certificate.[13] The removal of such policies increases access to gender marker changes on both birth certificates and other legal documents for which birth certificates are foundational. The study compared employment of transgender and cisgender people prior to and following removal of state-level surgical requirements, using data from the Centers for Disease Control's Behavioral Risk Factor Surveillance System (BRFSS) that represent the populations of 39 states that collected information on gender identity in the study's 2014-2019 timeframe. The study's findings held after a range of additional checks including sensitivity analyses accounting for differences in timing of policy changes, alternative policy definitions (including states with unclear policies), and a placebo test examining whether the policies impacted cisgender lesbian, gay, and bisexual people (which they would not be expected to).

27.     An analysis of 1,301 Texas residents who completed the U.S. Trans Survey found that those with their preferred name and gender marker on all identity documents (which would include the birth certificate and driver's license) were less likely to experience eviction, homelessness, or harassment in places of business, government agencies, or public spaces.[14] They were more likely to be comfortable asking police for help, and if they had police contact, were less likely to be perceived as transgender or called the wrong pronoun by the officers. Further, those

---

[13] Mann S. Transgender employment and gender marker laws. Labour Economics. 2021; 73:102072.
[14] Loza O, Beltran O, Perez A, Green J. Impact of name change and gender marker correction on identity documents to structural factors and harassment among transgender and gender diverse people in Texas. Sexuality, Gender, & Policy. 2021;4:76–105.

8

with fully gender-congruent identity documents were more likely to travel by air, and less likely to report negative airport experiences (questioning by airport staff, incorrect pronoun use, being patted down by an officer of the wrong gender) when they did travel.

**D. Transgender People with Identity Documents Consistent with Their Gender Identity Experience Improved Mental Health.**

28.     Transgender people in the United States face a disproportionate burden of poor mental health. For example, in BRFSS data from 2014-2016, 24.2% of transgender women, 31.1% of transgender men, and 38.2% of gender non-conforming transgender persons had ever been diagnosed with depression, as compared to 12.5% of cisgender men and 21.1% of cisgender women.[15] It is estimated that 40% of transgender adults have ever attempted suicide, approximately nine times the rate of the general population in the U.S.[16] A growing body of research seeks to identify modifiable factors that contribute to these mental health disparities.

29.     Commissioned by the World Health Organization, I recently conducted a systematic review and meta-analysis[17] of research on the health effects of legal gender recognition.

30.     In a meta-analysis of three studies from the United States, Canada, and New Zealand with 23,484 participants, possessing gender-concordant identity documents was associated with a 25% reduction in the odds of suicide ideation. In another meta-analysis of three studies from the United States and New Zealand with 23,607 participants, having updated the gender marker on all of one's identity documents was associated with a 47% reduction in the odds of serious psychological distress.[18] In the following (10 through 14), I describe the individual studies that contributed to these meta-analyses.

---

[15] Downing JM, Przedworski JM. Health of transgender adults in the U.S., 2014-2016. American Journal of Preventive Medicine. 2018;55(3):336-344.

[16] James SE, Herman JL, Rankin S, et al. The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality; 2016.

[17] A meta-analysis pools data from multiple studies addressing the same research question and is considered the highest level of evidence in health science.

[18] Scheim AI, Restar AJ, Zubizarreta D, et al. Legal gender recognition and the health of transgender and gender diverse people: A systematic review and meta-analysis. Under review, Social Science & Medicine.

31.     A study from Ontario, Canada, which I co-authored, found that transgender persons possessing at least one legal identity document (including but not limited to passports) with a gender marker congruent with their lived gender were at reduced risk of past-year suicide ideation and attempts.[19] Specifically, adjusting for a wide range of potentially confounding variables, having at least one piece of identification with a gender marker congruent with lived gender was associated with a 44% reduction in the relative risk of seriously considering suicide and, among those who had considered suicide, with an estimated 74% reduction in the risk of attempts. These data were collected using respondent-driven sampling, a data collection and analysis method that uses structured sampling within social networks to generate population-level estimates for populations that cannot be conventionally enumerated.

32.     A study of 503 transgender adults in Massachusetts and Rhode Island who wanted to change the gender on their driver's license or passport found that individuals who had changed the gender marker on both documents had lower odds of clinically significant anxiety, psychological distress, somatization (bodily symptoms resulting from psychological distress, e.g., pain), and emotional upset due to gender-based mistreatment.[20] Underscoring the importance of being able to change all of one's identity documents, the mental health of participants who had only changed one document was largely similar to that of participants who changed no documents. The only significant difference was that those who changed one of the documents had lower odds of emotional upset due to gender-based mistreatment.

33.     A 2018 survey of 818 transgender people in New Zealand found that participants who reported barriers to changing the gender marker on their identity documents (e.g., lack of suitable gender marker options, cost, fear of discrimination) had higher psychological distress and

---

[19] Bauer GR, Scheim AI, Pyne J, et al. Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. BMC Public Health. 2015;15(1):525.

[20] Restar A, Jin H, Breslow A, et al. Legal gender marker and name change is associated with lower negative emotional response to gender-based mistreatment and improve mental health outcomes among trans populations. SSM - Population Health. 2020;11:100595.

10

twice the odds of suicidal ideation as compared to participants who faced no such barriers, adjusting for demographic differences.[21]

34. Drawing on data from the U.S. Trans Survey, in November 2019, I conducted an analysis of data from 22,286 respondents to assess the relationship between gender-concordant identity documents or records and mental health, which was published in *The Lancet Public Health*.[22] Specifically, I examined whether current psychological distress and past-year suicidal ideation, planning, and attempts varied based on whether all, some, or none of a respondent's documents reflected the name or gender marker they preferred to have listed on their documents. I found that as compared to transgender individuals who had no identity documents with the correct gender marker, those who had the correct gender marker on some or all documents were less likely to report psychological distress and suicidality. Indicating the importance of consistently gender-concordant documents, the protective associations with mental health were notably larger for having the correct gender on all documents, including passports. As compared to respondents with the correct gender marker on none of their documents, those with the correct gender marker on all documents were 29% less likely to meet criteria for serious psychological distress (a validated proxy for clinically significant mental illness[23]), 20% less likely to have seriously considered suicide in the past year, and 19% less likely to have made a plan to die by suicide in the past year. These analyses adjusted for a range of potential confounders including demographic characteristics, region, medical gender transition status, length of time since transition, and family support.

35. Research published since I conducted the abovementioned meta-analysis is consistent with its findings. Recently published research from Australia found that having changed

---

[21] Tan KKH, Watson RJ, Byrne JL, Veale JF. Barriers to possessing gender-concordant identity documents are associated with transgender and nonbinary people's mental health in Aotearoa/New Zealand. LGBT Health. 2022;9(6):401-410.

[22] Scheim AI, Perez-Brumer AG, Bauer GR. Gender-concordant identity documents and mental health among transgender adults in the USA: a cross-sectional study. The Lancet Public Health. 2020;5(4):e196-e203.

[23] Kessler RC, Barker PR, Colpe LJ, et al. Screening for serious mental illness in the general population. Archives of General Psychiatry 2003; 60: 184–89.

11

the gender marker on one's identity documents was associated with reduced psychological distress.[24]

36.     A recent study of 158 transgender adults in the United States found that about half of the effect of legal gender recognition on psychological distress was attributable to reduced exposure to discrimination.[25] The psychological impact of being (in)validated in one's gender may further explain this relationship. When participants were asked which of their documents they most urgently needed to update, the most common response was the birth certificate (54%), followed closely by the passport (48%).

37.     At the request of counsel for the Plaintiffs, in February 2025 I conducted a new analysis of the data underlying my article in *The Lancet Public Health*, focusing specifically on the relationship between changing the gender marker on one's passport and mental health outcomes. I used the same coding and statistical analysis subjected to peer review by *The Lancet Public Health*. In this new unpublished analysis (n=19,826), I focus on comparing 2,830 participants who had changed the gender marker on their passport to 2,614 participants who had the correct gender marker on some identity documents but had not changed their passport. The group of participants without any gender-concordant identity documents was included in the overall analysis but because I could not determine whether they held passports, I do not interpret model estimates involving comparisons to that group.[26] After adjusting for confounders, I found that those who had changed the gender marker on their passport were 18% less likely to meet criteria for serious psychological distress, 16% less likely to have seriously considered suicide in the past year, and 34% less likely to have attempted suicide in the past year, as compared to those who had the correct gender on some of their documents but had not corrected their passport.

---

[24] Grant R, Amos N, McNair R, et al. The role of medical and legal gender affirmation in shaping positive mental health outcomes for transgender and gender diverse people in Australia. Transgender Health. 2024 Sept 24.

[25] Puckett JA, Price S, Dunn T, et al. Legal Gender affirmation, psychological distress, and physical health issues: Indirect effects via enacted stigma. Sexuality Research & Social Policy 2024;21(3):1112-1122.

[26] Due a survey programming error, participants who reported that none of their identity documents listed the gender they prefer were not asked a follow-up question about passports, which included a response option to indicate that they did not hold a passport. As approximately half of Americans do not hold a passport, and comparing passport holders to non-holders would be inappropriate, I do not report on or interpret comparisons involving that group.

38.     In April 2024, I had conducted further analyses of the *Lancet Public Health* data at the request of counsel for the transgender Plaintiffs in *Kalarchik v. Montana*, a case challenging the state of Montana's policies preventing transgender people from amending the sex marker on their identity documents. I examined whether participants who had changed the gender marker on all or some of their identity documents were at lower risk of having experienced mistreatment due to presenting identity documents that do not match their gender presentation . Mistreatment included having been verbally harassed, assaulted, denied services, or asked to leave a venue. Participants who had changed the gender marker on all of their documents were 35% less likely to have ever experienced identity document-related mistreatment than those who had not changed the gender marker on any documents; they were also 34% less likely to have experienced such mistreatment than individuals who had the correct gender marker on only some of their documents. As implied by that finding, there was not a statistically or practically significant difference in the experience of mistreatment between participants with some gender-concordant documents and those with no gender-concordant documents (with a prevalence ratio of 0.99, where 1.0 equals no difference). In other words, gender marker changes on identity documents were negatively associated with document-related mistreatment *only* if participants had changed the gender marker on all of their documents. This analysis adjusted for potential confounders including age, race/ethnicity, gender identity, disability, poverty, education, nativity, census region, medical gender transition status, and years since the beginning of gender transition.

39.     In addition to the aforementioned research on gender designations on identity documents, additional research indicates positive health impacts of social and legal gender affirmation.

40.     Among 2,940 transgender Oregon Medicaid beneficiaries, having changed the gender of record with Medicaid (which may or may not coincide with a legal gender marker

App. 125

change) was associated with reduced burden of diagnosed depression, anxiety, or substance use disorder.[27]

41.     In my U.S. Transgender Survey analysis, having one's chosen name on identity documents was also associated with better mental health; however, effects were smaller than for gender marker changes.[28]

42.     Among 157 transgender people surveyed in Quebec, Canada, having changed the name and/or gender on at least one identity document was associated with greater life satisfaction and fewer symptoms of psychological distress.[29]

43.     A survey of 65 primarily low-income transgender women of color compared those who had completed a legal name change at least nine months earlier to those who were preparing to initiate the process.[30] Those who had completed legal name changes were more likely to be employed, to report incomes above $1,000 per month, and to rent or own their own housing. In addition, they were less likely to report postponing needed medical care in the previous six months.

---

[27] Yee K, Lind BK, Downing, J. Change in gender on record and transgender adults' mental or behavioral health. American Journal of Preventive Medicine. 2022; 62(5):696-704.

[28] Scheim AI, Perez-Brumer AG, Bauer GR. Gender-concordant identity documents and mental health among transgender adults in the USA: a cross-sectional study. The Lancet Public Health. 2020;5(4):e196-e203.

[29] Cotton JC, Martin-Storey A, Le Corff Y, et al. En Reponse Au Projet De Loi 2 : Associations Entre Les Demarches Legales D'affirmation Du Genre et Deux Indicateurs De Bien-etre Chez Des Personnes Trans et Non-Binaires Du Quebec. The Canadian Journal of Psychiatry / La Revue Canadienne de Psychiatrie 2022; 67(7): 578-580.

[30] Hill BJ, Crosby R, Bouris A, et al. Exploring transgender legal name change as a potential structural intervention for mitigating social determinants of health among transgender women of color. Sexuality Research & Social Policy. 2018;15(1):25-33.

14

## IV.  CONCLUSION

44.     In summary, legal gender recognition is a critical part of gender affirming treatment for transgender persons and is associated with substantial reductions in the mental health challenges they too often face. Access to gender-concordant identity documents may improve the social and health conditions of transgender individuals by reducing their exposure to discrimination, harassment, and violence related to gender-incongruent identity documents. Conversely, transgender people unable to update the gender marker on their passport may experience health-harming privacy violations, unwarranted scrutiny or questioning, or mistreatment when traveling or using their passport as an identity document. Further, policies prohibiting or restricting access to gender marker changes on passports may be at odds with their primary purpose – identity verification.

I declare under penalty of perjury that the foregoing is true and correct.


 DATED this _____ day of _____, 2025, in Philadelphia, Pennsylvania


_____

Ayden Scheim, PhD

15

App. 127

# EXHIBIT A

**Ayden I. Scheim**

---

## EDUCATION

2017    **Ph.D., Epidemiology and Biostatistics**
        Western University (The University of Western Ontario), London, Canada

2011    **B.A. (Honors), Sociology**
        University of Toronto, Toronto, Canada

## ACADEMIC APPOINTMENTS

2023 –   **Faculty Affiliate,** Urban Health Collaborative, Dornsife School of Public Health, Drexel University.

2023 –   **Visiting Assistant Professor,** Center for AIDS Prevention Studies, University of California, San Francisco, USA.

2019 –   **Assistant Professor**, Department of Epidemiology and Biostatistics, Dornsife School of Public Health, Drexel University, Philadelphia, USA.

2020 –   **Adjunct Assistant Professor,** Department of Epidemiology and Biostatistics, Schulich School of Medicine and Dentistry, Western University, London, Canada.

2019 –   **Affiliate Scientist,** Li Ka Shing Knowledge Institute, St. Michael's Hospital, Toronto, Canada.

2018-2019   **Associate Scientist,** Li Ka Shing Knowledge Institute, St. Michael's Hospital, Toronto, Canada.

2017-2019   **Postdoctoral Fellow,** Division of Infectious Diseases and Global Public Health, Department of Medicine, University of California San Diego.

## CONSULTING

2024    Evaluation of the National HIV Behavioral Surveillance– Trans Cycle. *Division of HIV Health, Philadelphia Department of Public Health.*

2023-2024   Systematic reviews on legal gender recognition and trans-inclusive health policies. *World Health Organization.*

2022-2023   Gender and sexuality-based equity in supervised injection sites. *Health Canada.*

2018-2019   Development of a Global Fund-supported needle and syringe exchange program in Sierra Leone. *National HIV/AIDS Secretariat, Government of Sierra Leone.*

2018    Preparation of application for an exemption to operate mobile supervised injection services. *Middlesex London Health Unit,* Canada.

| 2017-2019 | Monitoring and evaluation. Capacity-building intervention for transgender organizations in low- and middle-income countries. *IRGT: A Global Network of Trans Women and HIV, Global Forum on MSM and HIV.* |
| 2015-2017 | Health care provider transgender education. *Rainbow Health Ontario.* |
| 2015-2016 | Research and writing of technical brief on transgender HIV data collection. *IRGT: A Global Network of Trans Women and HIV, Global Forum on MSM and HIV.* |
| 2013 | Trans-inclusive policy and practice. *Public Service Alliance of Canada Local 610.* |

## EMPLOYMENT HISTORY

| 2017-2018 | **Research Manager**, Centre on Drug Policy Evaluation, Centre for Urban Health Solutions, Li Ka Shing Knowledge Institute, *St. Michael's Hospital*, Toronto, Canada. |
| 2013-2014 | **Research Assistant**, Linking Molecular and Social Cluster Analyses in HIV Transmission, *University of Windsor* (PI: Barry Adam). |
| 2012-2013 | **Research Assistant**, Trans PULSE Project, *Western University* (PI: Greta Bauer). |
| 2011 | **Counselor**, AIDS & Sexual Health Info Line. *Toronto Public Health.* |
| 2011 | **Research Assistant**, Health Systems and Health Equity Research Group, *Centre for Addiction and Mental Health* (PI: Lori Ross), Toronto, Canada. |
| 2009-2010 | **Project Manager**, Trans Men's Pap Testing Campaign. *Sherbourne Health Centre*, Toronto, Canada. |
| 2008-2011 | **Shelter and Housing Worker**, *Fred Victor Centre*, Toronto, Canada. |
| 2006-2009 | **Research Assistant**, Bisexual Mental Health Study, *Sherbourne Health Centre* and *Centre for Addiction and Mental Health* (PI: Lori Ross), Toronto, Canada. |
| 2005-2007 | **Trans Youth Program Coordinator**, Supporting Our Youth. *Sherbourne Health Centre*, Toronto, Canada. |
| 2005-2006 | **Research Assistant**, Queer Youth Speak Project, *Shout Clinic* and *Centre for Addiction and Mental Health,* Toronto, Canada. |
| 2003-2006 | **HIV/AIDS Educator**, *Griffin Centre,* Toronto, Canada. |

## ADDITIONAL TRAINING

### Competitive Workshops

| 2017 | Health Disparities, Health Inequities, and Vulnerable Populations Workshop Inter-University Consortium for Social and Political Research Summer Program, University of Michigan – Ann Arbor, USA |

2015            Summer Institute in LGBT Population Health
                Fenway Institute, Boston, USA

**HONORS & AWARDS**

2023            Dornsife School of Public Health Junior Faculty Research Award
2021            Alumni of Distinction Award – Basic Sciences, Schulich School of Medicine and Dentistry,
                Western University
2018            Canadian Association for HIV Research New Investigator Award, Key Populations ($1,000)
2017-2020       Canadian Institutes of Health Research Postdoctoral Fellowship ($150,000)
2017            World Professional Association for Transgender Health Outstanding Contribution ($500)
2017            Best Oral Presentation, Canadian Society for Epidemiology and Biostatistics ($250)
2014-2017       Pierre Elliott Trudeau Foundation Scholarship ($233,000; partially declined)
2014-2017       Canadian Institutes of Health Research (CIHR) Vanier Scholarship ($150,000)
2014            Western University Vice President of Research Support Grant ($10,000)
2014-2015       Ontario Graduate Scholarship ($15,000; declined)
2014            CIHR Institute of Gender and Health Travel Award ($2,500)
2013-2017       Schulich Dean's MSc-PhD Transfer Award ($20,000; partially declined)
2012            Dr. Carol Buck Graduate Scholarship in Epidemiology ($1,000)
2011-2013       CIHR HIV/AIDS Community-Based Research Master's Award ($35,000)
2011-2012       Ontario Graduate Scholarship ($15,000; declined)
2011-2012       Universities Without Walls, CIHR National HIV Training Fellowship ($17,000)
2011-2016       Western Graduate Research Scholarship ($40,000)

**PUBLICATIONS**

**Peer-reviewed Articles**

97.   Bastos JL, Gebrekristos L, del Río-González AM, Dale SK, Bauer GR, <u>Scheim AI.</u> The inner workings
      of the Intersectional Discrimination Index: (Re)assessing the internal validity of the anticipated, day-to-
      day, and major discrimination measures. *Stigma & Health.* Online ahead of print January 20, 2025.

96.   <u>Scheim AI,</u> Bouck Z, Greenwald ZR, Ling V, Hopkins S, Johnson M, Bayoumi A, Gomes T, Werb D.
      Frequency of supervised consumption service use and acute care utilization in people who inject drugs.
      Drug and Alcohol Dependence 2024; 265:112490.

95.   Chakrapani V, Santos H, Battala M, Gupta S, Sharma S, Batavia A, Siddiqui SJ, Courts KA, <u>Scheim
      AI</u>. Access to transition-related health care among transmasculine people in India: A mixed-methods
      investigation. PLOS Global Public Health 2024; 4(10):e0003506.

94.   Paine EA, Appenroth M, <u>Scheim AI,</u> Goldrich M, Giguere R, Sandfort T. Availability of and interest
      in gender affirming care, PrEP, and HIV prevention services in a global sample of transmasculine
      persons. Journal of Acquired Immune Deficiency Syndromes 2024; 97(5):471-476.

93.   Ghabrial MA, Ferguson T, <u>Scheim AI,</u> Adams NJ, Khatoon M, Bauer GR. Factors associated with
      primary healthcare provider access among trans and non-binary immigrants, refugees, and newcomers
      in Canada. Journal of Migration and Health 2024; 10:100241.

92.   Hallarn J, <u>Scheim AI,</u> Bauer GR. Pre-exposure prophylaxis awareness and use among transgender and
      non-binary individuals in Canada. Journal of Acquired Immune Deficiency Syndromes 2024;
      96(4):341-349.

91. Mitra S, Bouck Z, Larney S, Zolopa C, Hoj S, Minoyan N, Upham K, Rammohan I, Mok WY, Hayashi K, Milloy MJ, DeBeck K, Scheim AI, Werb D. The impact of the COVID-19 pandemic on people who use drugs in three Canadian cities: A cross-sectional analysis. Harm Reduction Journal 2024; 21(1):94.

90. Adams N, Jacobsen K, Li L, Francino M, Rutherford L, Tei C, Scheim AI, Bauer G. Health and health care access of autistic transgender and nonbinary people in Canada: a cross-sectional study. Autism in Adulthood. Online ahead of print April 1, 2024.

89. Greenwald ZR, Werb D, Feld JJ, Austin PC, Fridman D, Bayoumi AM, Gomes T, Kendall CE, Lapointe-Shaw L, Scheim AI, Bartlett SR, Benchimol EI, Bouck Z, Boucher LM, Greenaway C, Janjua NZ, Leece P, Wong WWL, Sander B, Kwong JC. Validation of case-ascertainment algorithms using health administrative data to identify people who inject drugs in Ontario, Canada. Journal of Clinical Epidemiology 2024; 170:111332.

88. Wiegand AA, Zubizarreta D, Kennedy R, Baral S, Scheim AI, Appenroth MN, Radix AE, Cole SW, Reisner SL. Global Human Immunodeficiency Virus prevalence and risk behaviors in transmasculine individuals: a scoping review. Transgender Health. Online ahead of print February 26, 2024.

87. Scheim AI, Rich AJ, Zubizarreta D, Malik M, Baker KE, Restar AJ, van der Merwe LA, Wang J, Beebe B, Ridgeway K, Baral SD, Poteat T, Reisner SL. Health status of transgender people globally: a systematic review of research on disease burden and correlates. PLOS ONE 2024; 19(3): e0299373.

86. Rammohan I, Gaines T, Scheim AI, Bayoumi A, Werb D. Overdose mortality incidence and supervised consumption services in Toronto, Canada: an ecological study and spatial analysis. The Lancet Public Health 2024; 9:e79-e87.

85. Nafeh F, Mbichila T, Bouck Z, Scheim A, Mitra S, Bonn M, Morris F, Atkinson K, Mason K, Eeuwes J, Strike C. A preliminary assessment of short-term social and substance use-related outcomes among clients of integrated safer opioid supply pilot programs in Toronto, Canada. International Journal of Mental Health and Addiction. Online ahead of print December 22, 2023.

84. Jacobsen K, Davis CE, Burchell D, Rutherford L, Lachowsky N, Bauer GR, Scheim AI. Misgendering and the health and wellbeing of nonbinary people in Canada. International Journal of Transgender Health. 2023; 25(4), 816–830.

83. Jones J, Butler G, Woody M, Sheets M, Castel AD, Kulie P, Scheim AI, Reisner SL, Valencia R, Wang M, Stephenson R, Stekler JD, Sullivan PS. Adaptation of a HIV prevention mobile app for transmasculine people: A pilot acceptability and feasibility study. Transgender Health. Online ahead of print August 11, 2023.

82. Ghabrial MA, Scheim AI, Chih C, Santos H, Adams NJ, Bauer GR. Change in finances, peer access, and mental health among trans and nonbinary people during the COVID-19 pandemic. LGBT Health 2023; 10(8):595-607.

81. Jones J, Butler G, Woody M, Castel AD, Kulie P, Sheets M, Scheim AI, Reisner SL, Valencia R, Wang M, Stekler JD, Sullivan PS, Stephenson R. Preferences for and Experiences of an HIV-Prevention Mobile App Designed for Transmasculine People: Pilot Feasibility Trial and Qualitative Investigation. JMIR Formative Research 2023;7:e51055.

App. 132

80. Bowles JM, Kolla G, Smith LR, <u>Scheim AI</u>, Dodd Z, Werb D. Disease-related stigma among people who inject drugs in Toronto amidst the COVID-19 pandemic. Drug and Alcohol Dependence Reports 2023;7:100167.

79. Lacombe-Duncan A, Kattari SK, Kattari L, <u>Scheim AI</u>, Misiolek BA. Sexually transmitted infection testing among transgender and non-binary persons: results of a community-based cross-sectional survey. Sexual Health 2023; 20:87-91.

78. Tran GM, Lachowsky N, Urbanoski KA, <u>Scheim AI</u>, Bauer GR. Correlates of hazardous alcohol drinking among trans and non-binary people in Canada: a community-based cross-sectional study. Drug and Alcohol Dependence 2023; 250:110872.

77. Wiginton JM, Maksut JL, <u>Scheim AI</u>, Zlotorzynska M, Sanchez TH, Baral SD. Intersecting sexual behavior and gender identity stigmas among transgender women in the United States: burden and associations with sexual health. AIDS & Behavior 2023;27(9):3064-3079.

76. <u>Scheim AI</u>, Santos H, Ciavarella S, Vermilion J, Arps FSE, Adams N, Nation K, Bauer GR. Intersecting inequalities in access to justice for trans and non-binary sex workers in Canada. Sexuality Research and Social Policy 2023; 20:1245–1257.

75. Greenwald ZR, Bouck Z, McLean E, Mason K, Lettner B, Broad J, Dodd Z, Nassau T, <u>Scheim AI</u>, Werb D. Integrated supervised consumption services and hepatitis C testing and treatment among people who inject drugs in Toronto, Canada: a cross-sectional analysis. Journal of Viral Hepatitis 2023; 30(2): 160-171.

74. Tran NK, Baker KE, Lett E, <u>Scheim AI</u>. State-level heterogeneity in associations between structural stigma and individual healthcare access: A multilevel analysis of transgender adults in the United States. Journal of Health Services Research & Policy 2023; 28(2): 109-118.

73. Navarro JM, <u>Scheim AI</u>, Bauer GR. Transgender and non-binary people's preferences for virtual health care post-pandemic: A cross-sectional Canadian study. Journal of Medical Internet Research 2022; 24(10):e40989.

72. Tran NK, Martinez O, <u>Scheim AI</u>, Goldstein ND, Welles SL. Perceived barriers and facilitators of long-acting injectable HIV PrEP use among Black, Latino/Hispanic and White gay, bisexual and other men who have sex with men. AIDS Education & Prevention 2022; 34(5):365-378.

71. Coleman E, Radix AE, Bouman WP, et al (116 additional authors). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. International Journal of Transgender Health. 2022;23(sup1):S1-S259.

70. Restar A, Dusic EJ, Garrison-Desany H, Lett E, Everhart A, Baker KE, <u>Scheim AI</u>, Wilson Beckham S, Reisner S, Rose AJ, Mimiaga MJ, Radix A, Operario D, Hughto J. Gender affirming hormone therapy dosing behaviors among transgender and nonbinary adults. Humanities and Social Sciences Communications 2022;9(1):304.

69. Lacombe-Duncan A, Kattari L, Kattari SK, <u>Scheim AI</u>, Alexander F, Yonce S, Misiolek BA. HIV testing among transgender and nonbinary persons in the midwestern United States: Results of a community-based survey. Journal of the International AIDS Society 2022; 25:e25972.

App. 133

68. Kia H, Rutherford L, Jackson R, Grigorovich A, Ricote CL, <u>Scheim AI</u>, Bauer GR. Impacts of COVID-19 on trans and non-binary people in Canada: a qualitative analysis of responses to a national survey. BMC Public Health 2022; 22(1):1284.

67. Rammohan I, Bouck Z, Fusigboye S, Bowles J, McDonald K, Maghsoudi N, <u>Scheim AI</u>, Werb D. Drug checking use and interest among people who inject drugs in Toronto, Canada. International Journal of Drug Policy 2022; 107:103781.

66. Lazor T, Blondal E, <u>Scheim AI</u>, Cubillos P, Werb D, Milloy M-J, Bonato S, Maghsoudi N, Rueda S. Measurement of public health impacts of cannabis legalization in Canada to reflect policy maker priorities: A rapid scoping review of instruments and content domains. Drug and Alcohol Dependence 2022; 236:109463.

65. Ward KM, <u>Scheim AI</u>, Wang J, Cocchiaro B, Singley K, Roth AM. Impact of reduced restrictions on buprenorphine prescribing during COVID-19 among patients in a community-based treatment program. Drug and Alcohol Dependence Reports 2022; 3:100055.

64. Dang M, <u>Scheim AI</u>, Teti M, Quinn KG, Zarwell M, Petroll AE, Horvath KJ, John SA. Barriers and facilitators to HIV pre-exposure prophylaxis (PrEP) uptake, adherence, and persistence among transgender populations in the United States: A systematic review. AIDS Patient Care and STDs 2022; 36(6):236-248.

63. Mitra S, Kolla G, Bardwell G, Wang R, Sniderman R, Mason K, Werb D, <u>Scheim AI</u>. Requiring help injecting among people who inject drugs in Toronto, Canada: Characterizing the need to address sociodemographic disparities and substance-use specific patterns. Drug and Alcohol Review 2022; 41(5):1062-1070.

62. Bouck Z, <u>Scheim AI</u>, Gomes T, Ling V, Caudarella A, Werb D. Evaluating interventions to facilitate opioid agonist treatment access among people who inject drugs in Toronto, Ontario during COVID-19 pandemic restrictions. International Journal of Drug Policy 2022; 104:103680.

61. Tami A, Ferguson T, Bauer GR, <u>Scheim AI</u>. Avoidance of primary healthcare among transgender and non-binary people in Canada during the COVID-19 pandemic. Preventive Medicine Reports 2022; 27:101789.

60. Nassau T, Kolla G, Mason K, Hopkins S, Tookey P, McLean E, Werb D, <u>Scheim AI</u>. Service utilization patterns and characteristics among clients of integrated supervised consumption sites in Toronto, Canada. Harm Reduction Journal 2022; 19:33.

59. Werb D, <u>Scheim AI</u>, Soipe A, Aeby S, Rammohan I, Fischer B, Hadland SE, Marshall BDM. Health harms of non-prescription opioid use: A systematic review. Drug and Alcohol Review 2022; 4(4):941-952.

58. Maghsoudi N, Tanguay J, Scarfone K, Rammohan I, Ziegler C, Werb D, <u>Scheim AI</u>. Drug checking services for people who use drugs: a systematic review. Addiction 2022; 117(3):532-544.

57. Bouck Z, Tricco AC, Rosella LC, Ling V, Gomes T, Tadrous M, Fox MP, <u>Scheim AI</u>, Werb D. Validation of self-reported opioid agonist treatment among people who inject drugs using prescription dispensation records. Epidemiology 2022; 33(2):287-294.

App. 134

56. Everhart AR, Boska H, Sinai-Glazer H, Wilson-Yang JQ, Butler Burke N, LeBlanc G, Persad Y, Ortigoza E, Scheim AI, Marshall Z. 'I'm not interested in research; I'm interested in services': How to better health and social services for transgender women living with and affected by HIV. Social Science and Medicine 2022; 292:114610.

55. Chakrapani V, Scheim AI, Newman PA, Shunmugam M, Rawat S, Baruah D, Bhatter A, Nelson R, Jaya A, Kaur M. Affirming and negotiating gender in family and social spaces: Stigma, mental health and resilience among transmasculine people in India. Culture, Health & Sexuality 2022; 24(7):951-967.

54. Lacombe-Duncan A, Logie CH, Persad Y, Leblanc G, Nation K, Kia H, Scheim AI, Lyons T, Horemans C, Olawale R, Loutfy M. Implementation and evaluation of the 'Transgender Education for Affirmative and Competent HIV and Healthcare (TEACHH)' provider education pilot. BMC Medical Education 2021; 21:561.

53. Scheim AI, Coleman TC, Lachowsky NJ, Bauer GR. Health care access among transgender and non-binary people in Canada, 2019: A cross-sectional survey. Canadian Medical Association Journal Open 2021; 9(4):e1213-e1222.

52. Scheim AI, Bauer GR, Bastos JL, Poteat T. Advancing intersectional discrimination measures for health disparities research: Protocol for a mixed-methods bilingual measurement study. JMIR Research Protocols 2021; 10(8):e30987.

51. Scheim AI, Sniderman R, Wang R, Bouck Z, McLean E, Mason K, Bardwell G, Mitra S, Greenwald ZR, Thavorn K, Garber G, Baral SD, Rourke SB, Werb D. The Ontario Integrated Supervised Injection Services cohort study of people who inject drugs in Toronto, Canada (OiSIS-Toronto): Cohort profile. Journal of Urban Health 2021; 98(4):538-550.

50. Roth AM, Mitchell AK, Mukherjee R, Scheim AI, Ward KM, Lankenau SE. Prevalence and correlates of syringe disposal box use in a Philadelphia neighborhood with high levels of public drug injection. Substance Use & Misuse 2021; 56(5):668-673.

49. Meyers SA, Rafful C, Mittal ML, Tirado-Muñoz J, Smith LR, Jain S, Sun X, Garfein R, Strathdee S, DeBeck K, Hayashi K, McNeil R, Milloy M-J, Olding M, Guise A, Werb D, Scheim AI. Examining the gender composition of drug injecting initiation events: A mixed methods investigation of three North American contexts. International Journal of Drug Policy 2021; 90:103056.

48. Scheim AI, Bouck Z, Tookey P, Hopkins S, Sniderman R, McLean E, Garber G, Baral S, Rourke SB, Werb D. Supervised consumption service use and recent non-fatal overdose among people who inject drugs in Toronto, Canada. International Journal of Drug Policy 2021; 87:102993.

47. Lacombe-Duncan A, Kia H, Logie CH, Todd KP, Persad Y, Leblanc G, Nation K, Scheim AI, Lyons T, Horemans C, Loutfy M. A qualitative exploration of barriers to HIV prevention, treatment, and support: Perspectives of transgender women and service providers. Health and Social Care in the Community 2021, 29(5):e33-e46.

46. Zlotorzynska M, Sanchez T, Scheim AI, Lyons C, Maksut J, Wiginton JM, Baral S. Transgender Women's Internet Survey and Testing (TWIST): Protocol and key indicators report. Transgender Health 2021;6(5): 256-266.

App. 135

45. Rich A, <u>Scheim AI</u>, Koehoorn M, Poteat T. Non-HIV chronic disease burden among transgender populations globally: A systematic review and narrative synthesis. Preventive Medicine Reports 2020; 20:101259.

44. <u>Scheim AI</u>, Kacholia V, Logie CH, Chakrapani V, Ranade K, Gupta S. Health of transgender men in low- and middle-income countries: A scoping review. BMJ Global Health 2020; 5:e003471.

43. Gicquelais RE, Werb D, Marks C, Ziegler C, Mehta SH, Genberg BL, <u>Scheim AI</u>. Prevalence and correlates of providing and receiving assistance with the transition to injection drug use. Epidemiologic Reviews 2020; 42(1):4-18.

42. <u>Scheim AI</u>, Maghsoudi N, Marshall Z, Churchill C, Ziegler C, Werb D. Impact evaluations of drug decriminalisation and legal regulation on drug use, health and social harms: A systematic review. BMJ Open 2020; 10:e035148.

41. Maksut JL, Sanchez TH, Wiginton JM, <u>Scheim AI</u>, Logie CH, Zlotorzynska M, Lyons CE, Baral SD. Gender identity and sexual behavior stigmas, severe psychological distress, and suicidality in an online sample of transgender women in the United States. Annals of Epidemiology 2020; 52:15-22.

40. Ferlatte O, Panwala V, Rich AJ, <u>Scheim AI</u>, Blackwell E, Scott K, Salway T, Knight R. Identifying health differences between transgender and cisgender gay, bisexual and other men who have sex with men using a community-based approach. The Journal of Sex Research 2020; 57(8):1005-1013.

39. Lacombe-Duncan A, Logie CH, Persad Y, Leblanc G, Nation K, Kia H, <u>Scheim AI</u>, Lyons T, Loutfy M. Transgender Education for Affirmative and Competent HIV and Healthcare (TEACHH): Protocol of community- based participatory intervention development and a non-randomized multi-site pilot study with pre- post-test design in Canada. BMJ Open 2020; 10: e034144.

38. <u>Scheim AI</u>, Perez-Brumer AG, Bauer GR. Gender-concordant identity documents and mental health among transgender adults in the United States: A cross-sectional survey. The Lancet Public Health 2020; 5(4): E196-E203.

37. Maghsoudi N, McDonald K, Stefan C, Beriault D, Mason K, Barnaby L, Altenberg J, MacDonald R D, Caldwell J, Nisenbaum R, Leece P, Watson T M, Tupper K W, Kufner L, <u>Scheim AI</u>, Werb D. Evaluating networked drug checking services in Toronto, Ontario: Study protocol and rationale. Harm Reduction Journal 2020; 17:9.

36. Moran A, <u>Scheim AI</u>, Lyons C, Liestman B, Drame F, Ketende S, Diouf D, Ba I, Ezouatchi R, Bamba A, Kouame A, Baral S. Characterizing social cohesion and gender identity as risk determinants of HIV among cisgender men who have sex with men and transgender women in Côte d'Ivoire. Annals of Epidemiology 2020; 42: 25-32.

35. Bardwell G, Strike C, Mitra S, <u>Scheim AI</u>, Barnaby L, Altenberg J, Kerr T. "That's a double-edged sword": Exploring the integration of supervised consumption services within community health centres in Toronto, Canada. Health and Place 2020; 102245.

34. <u>Scheim AI</u>, Knight R, Shulha H, Nosova E, Hayashi K, Milloy M-J, Kerr T, DeBeck K. Characterizing men who have sex with men and use injection drugs in Vancouver, Canada. AIDS & Behavior 2019; 23(12):3324-3330.

33. Dharma C, Scheim AI, Bauer GR. Exploratory factor analysis of two sexual health scales for transgender people: Trans-specific condom/barrier negotiation self-efficacy (T-Barrier) and trans-specific sexual body image worries (T-Worries). Archives of Sexual Behavior 2019; 48(5):1563-1572.

32. Scheim AI, Lyons C, Ezouatchi R, Liestman B, Drame F, Diouf D, Ba I, Bamba A, Kouame A, Baral S. Sexual behavior stigma and depression among transgender women and cisgender men who have sex with men in Côte d'Ivoire. Annals of Epidemiology 2019; 33:79-83.

31. Scheim AI, Bauer GR. The Intersectional Discrimination Index: Development and validation of measures of self-reported enacted and anticipated discrimination for intercategorical analysis. Social Science & Medicine 2019; 226:225-235.

30. Bauer GR, Scheim AI. Methods for analytic intercategorical intersectionality in quantitative research: Discrimination as a mediator of health inequalities. Social Science & Medicine 2019; 226:236-245.

29. Leonardi M, Frecker H, Scheim AI, Kives S. Reproductive health considerations in sexual and/or gender minority adolescents. Journal of Pediatric and Adolescent Gynecology 2019; 32(1):15-20.

28. Scheim AI, Bauer GR. Sexual inactivity among transfeminine persons: A Canadian respondent-driven sampling survey. The Journal of Sex Research 2019; 56(2):264-271.

27. Scheim AI, Adam BD, Marshall Z. Gay, bisexual, and queer trans men navigating sexual fields. Sexualities 2019; 22(4):566-586.

26. Meyers SA, Scheim A, Jain S, Sun X, Milloy MJ, DeBeck K, Hayashi K, Garfein R, Werb D. Gender differences in the provision of injection initiation assistance: A comparison of three North American settings. Harm Reduction Journal 2018; 15:59.

25. Scheim AI, Nosova E, Knight R, Hayashi K, Kerr T. HIV incidence among men who have sex with men and inject drugs in a Canadian setting. AIDS & Behavior 2018; 22(12):3957-3961.

24. Scheim AI, Bardwell G, Rachlis B, Mitra S, Kerr T. Syringe sharing among people who inject drugs in London, Canada. Canadian Journal of Public Health 2018; 109:174-182.

23. Kennedy MC, Scheim AI, Rachlis B, Mitra S, Bardwell G, Rourke S, Kerr T. Willingness to use drug checking within supervised injection services in a mid-sized Canadian city. Drug and Alcohol Dependence 2018; 185:248-252.

22. Poteat T, Malik M, Scheim A, Elliot A. HIV prevention among transgender populations: Knowledge gaps and evidence for action. Current HIV/AIDS Reports 2017; 14(4):141-152.

21. Scheim AI, Zong X, Giblon R, Bauer GR. Disparities in access to family physicians among transgender people in Ontario, Canada. International Journal of Transgenderism 2017; 3:343-352.

20. Mitra S, Rachlis B, Scheim A, Bardwell G, Rourke S, Kerr T. Acceptability and design preferences of supervised injection services among people who inject drugs in a mid-sized Canadian city. Harm Reduction Journal 2017; 14:46.

19. Bardwell G, Scheim AI, Mitra S, Kerr T. Assessing support for supervised injection services among community stakeholders in London, Canada. International Journal of Drug Policy 2017; 48:27-33.

18.  Bauer GR, Braimoh J, <u>Scheim AI</u>, Dharma C. Transgender-inclusive measures of sex/gender for population surveys: Mixed-methods evaluation and recommendations. PLoS ONE 2017; 12(5):e0178043.

17.  <u>Scheim AI</u>, Bauer GR, Shokoohi M. Drug use among transgender people in Ontario, Canada: Disparities and associations with social exclusion. Addictive Behaviors 2017; 72:151-158.

16.  <u>Scheim AI</u>, Rachlis B, Bardwell G, Mitra S, Kerr T. Public drug injecting in London, Ontario: A cross-sectional survey. Canadian Medical Association Journal Open 2017; 5:e290-e294.

15.  <u>Scheim AI</u>, Bauer GR, Travers R. HIV-related sexual risk among transgender men who are gay, bisexual, or have sex with men. Journal of Acquired Immune Deficiency Syndromes 2017; 74:e89-e96.

14.  <u>Scheim AI</u>, Travers R. Barriers and facilitators to HIV and sexually transmitted infections testing for gay, bisexual, and other transgender men who have sex with men. AIDS Care 2017; 8:990-995.

13.  <u>Scheim AI</u>, Bauer GR, Shokoohi M. Heavy episodic drinking among transgender persons: Disparities and predictors. Drug and Alcohol Dependence 2016; 167:156-162.

12.  Poteat T, <u>Scheim AI</u>, Xavier J, Reisner SL, Baral S. Global epidemiology of HIV infection and related syndemics affecting transgender people. Journal of Acquired Immune Deficiency Syndromes 2016; 73(Suppl 3):S210-219.

11.  <u>Scheim AI</u>, Santos G-M, Arreola S, Makofane K, Do TD, Hebert P, Thomann M, Ayala G. Inequities in access to HIV prevention services for transgender men: Results of a global survey of men who have sex with men. Journal of the International AIDS Society 2016; 19(Suppl 2):20779.

10.  Souleymanov R, Kuzmanović D, Marshall Z, <u>Scheim AI</u>, Mikiki M, Worthington C, Millson MP. The ethics of community-based research with people who use drugs: Results of a scoping review. BMC Medical Ethics 2016; 17:25.

9.   <u>Scheim AI</u>, Bauer GR, Coleman T. Socio-demographic differences by survey mode in a respondent-driven sampling study of transgender people in Ontario, Canada. LGBT Health 2016; 3(5):391-395.

8.   Bauer GR, Zong X, <u>Scheim AI</u>, Hammond R, Thind A. Factors impacting transgender patients' discomfort with their family physicians: A respondent-driven sampling survey. PLoS ONE 2015; 10(12):e0145046-16.

7.   Bauer GR, <u>Scheim AI</u>, Pyne J, Travers R, Hammond R. Intervenable factors associated with suicide risk in transgender persons: A respondent-driven sampling study in Ontario, Canada. BMC Public Health 2015; 15:525.

6.   <u>Scheim AI</u>, Bauer GR. Sex and gender diversity among transgender people in Ontario, Canada: Results from a respondent-driven sampling survey. Journal of Sex Research 2015; 52(1):1-14.

5.   Bauer GR, <u>Scheim AI</u>, Deutsch M, Massarella C. Reported emergency department avoidance, utilization and experiences of transgender persons in Ontario, Canada: Results from a respondent-driven sampling survey. Annals of Emergency Medicine 2014; 63(6):713-720.

App. 138

4. <u>Scheim AI</u>, Jackson R, James E, Dopler S, Pyne J, Bauer GR. Barriers to well-being for Aboriginal gender-diverse people: Results from the Trans PULSE Project in Ontario, Canada. Journal of Ethnicity and Inequalities in Health and Social Care 2013; 6(4):108-120.

3. Marcellin RL, Bauer GR, <u>Scheim AI</u>. Intersecting impacts of transphobia and racism on HIV risk among trans persons of colour in Ontario, Canada. Journal of Ethnicity and Inequalities in Health and Social Care 2013; 6(4):97-107.

2. Bauer GR, Redman N, Bradley K, <u>Scheim AI</u>. Sexual health of trans men who are gay, bisexual, or who have sex with men: Results from Ontario, Canada. International Journal of Transgenderism 2013; 14(2):66-74.

1. Li T, Dobinson C, <u>Scheim AI</u>, Ross LE. Unique issues bisexual people face in intimate relationships: A descriptive exploration of lived experience. Journal of Gay and Lesbian Mental Health 2013; 17(1):21-39.

**Invited Articles**

1. <u>Scheim AI</u>, Baker KE, Restar AJ, Sell RL. Health and health care among transgender adults in the United States. Annual Review of Public Health. 2022; 43:503-523.

**Commentaries and Letters**

12. Perez-Brumer A, Valdez N, Scheim AI. The anti-gender threat: An ethical, democratic, and scientific imperative for NIH research/ers. Social Science & Medicine 2024;351:116349.

11. Aghi K, Anderson BM, Castellano BM, Cunningham A, Delano M, Dickinson ES, von Diezmann L, Forslund-Startceva SK, Grijseels DM, Groh SS, Guthman EM, Jayasinghe I, Johnston J, Long S, McLaughlin JF, McLaughlin M, Miyagi M, Rajaraman B, Sanchezrieto F, <u>Scheim AI</u>, Sun SD, Titmuss FD, Walsh RJ, Weinberg ZY. Rigorous science demands support of transgender scientists. Cell 2024; 187(6): 1327-1334.

10. Logie CH, van der Merwe LL, <u>Scheim AI</u>. Measures of sex, gender, and sexual orientation: ideological narratives or empirical evidence?–Authors' reply. The Lancet 2022;400(10368):2046-2047.

9. Logie CH, van der Merwe L, <u>Scheim AI</u>. Measuring sex, gender, and sexual orientation – one step to health equity. The Lancet 2022; 400(10354):715-717.

8. Earnshaw VA, Rendina HJ, Bauer GR, Bonett S, Bowleg L, Carter J, English D, Friedman MR, Hatzenbuehler ML, Johnson MO, McCree DH, Neilands TB, Quinn KG, Robles G, <u>Scheim AI</u>, Smith JC, Smith LR, Sprague L, Taggart T, Tsai AC, Turan B, Yang LH, Bauermeister JA, Kerrigan DL. Methods in HIV-related intersectional stigma research: Core elements and opportunities. American Journal of Public Health 2022; 112(S4):S413–S419.

7. Morgan R, Baker P, Griffith DM, Klein SL, Logie CH, Mwiine AA, <u>Scheim AI</u>, Shapiro JR, Smith J, Wenham C, White A. Beyond a zero-sum game: how does the impact of COVID-19 vary by gender? Frontiers in Sociology 2021:126.

6. Rich AJ, Salway T, Scheim A, Poteat T. Sexual minority stress theory: Remembering and honoring the work of Virginia Brooks. LGBT Health 2020; 7(3):124-127.

5.  <u>Scheim AI</u>, Appenroth MN, Beckham SW, Goldstein Z, Grinspan Cabral M, Keatley JG, Radix A. Transgender HIV research: nothing about us without us. The Lancet HIV 2019; 6(9):e566-e567.

4.  Bauer GR, <u>Scheim AI.</u> Advancing quantitative intersectionality research methods: Intracategorical and intercategorical approaches to shared and differential constructs. Social Science & Medicine 2019; 226:260-262.

3.  <u>Scheim AI,</u> Werb D. Integrating supervised consumption into a continuum of care for people who use drugs: The next generation of research. Canadian Medical Association Journal 2018; 190(31):e921-e922.

2.  Gilbert M, Swenson L, Unger D, <u>Scheim A</u>, Grace D. Need for robust and inclusive public health ethics review of the monitoring of HIV phylogenetic clusters for HIV prevention. The Lancet HIV 2016; 3(10):e641.

1.  Bauer GR, <u>Scheim AI</u>. Sampling bias and transgender HIV studies. The Lancet Infectious Diseases 2013; 13:832.

**Book Chapters**

7.  <u>Scheim AI.</u> Epidemiology. In Goldberg A, Beemyn G, eds., *SAGE Encyclopedia of Trans Studies*; 2021.

6.  <u>Scheim AI.</u> HIV/STIs. In Goldberg A, Beemyn G, eds., *SAGE Encyclopedia of Trans Studies*; 2021.

5.  <u>Scheim AI.</u> Measuring Intersectional Stigma. In Stall R, Dodge B, Bauermeister JA, Poteat T, Beyrer C, eds. *LGBTQ Health Research: Theory, Methods, Practice*. Johns Hopkins University Press; 2020.

4.  Bauer GR, Braimoh J, <u>Scheim AI</u>, Dharma C. New Multidimensional Sex/Gender Measure. In Milhausen R, Fisher T, Davis C, Yarber B, Sakaluk J, eds., *Handbook of Sexuality-Related Measures*, 4th ed. Taylor and Francis; 2015: 351-353.

3.  Dharma C, <u>Scheim AI</u>, Bauer GR. Trans-Specific Sexual Body Image Worries Scale. In Milhausen R, Fisher T, Davis C, Yarber B, Sakaluk J, eds., *Handbook of Sexuality-Related Measures*, 4th ed. Taylor and Francis; 2015: 155-156.

2.  <u>Scheim AI</u>, Winters L, Marshall Z, Jefferies D, Baral S. The prevalence of HIV among transwomen sex workers. In Nuttbrock L, ed., *Transgender Sex Work and Society*. New York: Harrington Park Press; 2015: 118-145.

1.  <u>Scheim AI</u>, Ware SM, Redman N, Marshall Z, Giambrone B. Sexual health on our own terms: The Gay/Bi/Queer Trans Men's Working Group. In Irving D, Raj R, eds., *Trans Activism in Canada: A Reader*. Toronto: Canadian Scholars' Press; 2014: 247-258.

**Research Reports**

26. McNamara M, Baker K, Connelly K, Janssen A, Olson-Kennedy J, Pang KC, <u>Scheim A</u>, Turban J, Alstott A. *An Evidence-Based Critique of "The Cass Review" on Gender-Affirming Care for Adolescent Gender Dysphoria.* July 1, 2024. The Integrity Project, Yale Law School. https://bit.ly/3AYaU4G

25. Navarro J, Hallarn J, Liang B, Adams A, Zaitzow J, Brooks K, Legare-Tremblay E, Johnson T, Pyne J, Mahendran M, Smith M, Churchill S, Lopez C, <u>Scheim A</u>, Bauer G. *Health and well-being among disabled trans and non-binary people.* January 2024. https://bit.ly/48R3P0O

24. The Our Health Matters Research Team. *Our Health Matters: Indian Trans Men and Transmasculine Health Study.* October 2023. https://bit.ly/3FjlnX7

23. Devor A, Forrester R, Grigorovich A, Kia H, Lopez C, Navarro J, Tei C, Tran GM, <u>Scheim A</u>, Bauer G. *Health and well-being among trans and non-binary older adults.* September 2023. https://bit.ly/4998ixx

22. Navarro J, Lachowsky N, Hammond R, Burchell D, Arps FSE, Davis C, Brasseur J, Islam S, Fosbrook B, Jacobsen H, Walker M, Lopez C, <u>Scheim A</u>, Bauer G, on behalf of the Trans PULSE Canada Team. *Health and well-being among non-binary people.* July 2021. https://bit.ly/48NplVs

21. Navarro J, Johnstone F, Temple Newhook J, Smith M, Wallace Skelton j, Prempeh K, S L, Lopez C, <u>Scheim A,</u> Bauer G, on behalf of the Trans PULSE Canada Team. *Health and well-being among trans and non-binary youth.* June 2021. https://bit.ly/48SsTWC

20. Arps FSE, Ciavarella S, Vermilion J, Hammond R, Nation K, Churchill S, Smith M, Navarro J, Thaker P, Bauer G, <u>Scheim A</u>, on behalf of the Trans PULSE Canada Team. *Health and well-being among trans and non-binary people doing sex work.* March 2021. https://bit.ly/3FktLFL

19. Trans PULSE Canada COVID Cohort Working Group on behalf of the Trans PULSE Canada Team. *Social and economic impacts of COVID-19 on transgender and non-binary people in Canada.* December 2020. https://bit.ly/45zkwMw

18. Trans PULSE Canada COVID Cohort Working Group on behalf of the Trans PULSE Canada Team. *COVID-19 testing and diagnosis among transgender and non-binary people in Canada.* December 2020. https://bit.ly/3QkNhZl

17. Trans PULSE Canada COVID Cohort Working Group on behalf of the Trans PULSE Canada Team. *Impact of COVID-19 on health care access for transgender and non-binary people in Canada.* December 2020. https://bit.ly/3FjG3yf

16. Santos H, Chakrapani V, Battala M, Gupta S, Batavia A, <u>Scheim A</u>. *"It felt great when I saw myself": Our Health Matters report on gender-affirming health care for transmasculine people.* 2023. Available in English, Hindi, and Marathi at https://ourhealthmatters.in/reports/

15. Aryal A, Siddiqui SJ, Vee V, Ritwik, Santos H, <u>Scheim A</u>. *"The most important thing is that my parents have accepted me, it does not matter what society says": Our Health Matters Report on family experiences.* 2022. Available in English, Hindi, and Marathi at https://ourhealthmatters.in/reports/

14. Maghsoudi N, Rammohan I, Bowra A, Sniderman R, Tanguay J, Bouck Z, <u>Scheim A</u>, Dan Werb, Owusu-Bempah A. *How diverse is Canada's legal cannabis industry? Examining race and gender of its executives and directors.* October 2020. https://bit.ly/3dHrKVP

13. The Trans PULSE Canada Team. *Health and health care access for trans and non-binary people in Canada.* March 2020. https://bit.ly/3c4gXTu

12. Kerr T, <u>Scheim AI</u>, Bardwell G, Mitra S, Rachlis B, Bacon J, Murray K, Rourke S. *Ontario Integrated Supervised Injection Services Feasibility Study: London report*. Toronto: Ontario HIV Treatment Network; 2017. http://bit.ly/2kIU1Q2

11. <u>Scheim AI</u>, for the IRGT: A Global Network of Trans Women and HIV. *Counting trans people in: Advancing global data collection on transgender communities and HIV*. Oakland, CA: Global Forum on MSM and HIV; 2017. http://tinyurl.com/hejj8vf

10. Bauer GR, <u>Scheim AI</u>, for the Trans PULSE Team. *Transgender people in Ontario, Canada: Statistics from the Trans PULSE Project to inform human rights policy*. London, Ontario; 2015. http://tinyurl.com/zzb266w

9. Bauer G, Bowleg L, Rouhani S, <u>Scheim A</u>, Blot S. *Harnessing the power of intersectionality: Guidelines for quantitative intersectionality health inequities research*. London, Canada; 2014. https://tinyurl.com/yymhrghc

8. <u>Scheim A</u>, Bauer G, Pyne J. *Avoidance of public spaces by trans Ontarians*. Trans PULSE Project; 2013. http://tinyurl.com/hb3dqsp

7. <u>Scheim A</u>, Bauer G. *Cervical and breast cancer screening among trans people in Ontario: A report prepared for the Canadian Cancer Society*. Trans PULSE Project; 2013. http://tinyurl.com/zu8yhpo

6. <u>Scheim A</u>, Cherian M, Bauer G, Zong X. *Joint effort: Prison experiences of Trans PULSE participants and recommendations for change*. Trans PULSE Project; 2013. http://tinyurl.com/hbmso7e

5. Marcellin RL, <u>Scheim A</u>, Bauer G, Redman N. *Experiences of racism and ethnicity-related discrimination among trans people in Ontario*. Trans PULSE Project; 2013. http://tinyurl.com/zchjp9n

4. Marcellin RL, <u>Scheim A</u>, Bauer G, Redman N. *Experiences of transphobia among trans Ontarians*. Trans PULSE Project; 2013. http://tinyurl.com/gmazvm4

3. Marshall Z, Ware S, <u>Scheim A</u>. *The development, challenges and successes of the Gay/Bi/Queer Trans Men's Working Group*. In K. Baker (Ed.), Global Case Study Project: Rights-Based Approaches to Health and Health Care for Transgender People. NY: Open Society Foundations; 2013. http://tinyurl.com/zegy45y

2. <u>Scheim A</u>, Robinson M, Anderson S. *Reproductive options for trans people*: Rainbow Health Ontario; 2012. http://tinyurl.com/oyvyj49

1. Sevelius J, <u>Scheim A</u>, Giambrone B. *What are transgender men's HIV prevention needs?* Center for AIDS Prevention Studies, University of California San Francisco; 2010. https://tinyurl.com/yxdr3p49

**Popular Press**

1. Peirce J, Stoicescu C, Thumath M, <u>Scheim A</u>, Forrest J. How to heal the scars of Canada's war on drugs (Opinion). *Ottawa Citizen*, 1 September 2017. http://bit.ly/2gmx5EB

**RESEARCH FUNDING**

*Note: Direct costs only. Canadian grants do not include investigator salaries.

**Active Grants**

Measures of structural stigmatization and discrimination for HIV research with Latine sexual and gender minorities. (MPIs: Scheim AI, del Río-González AM). NIH/NIMHD R01MD020284: $2,440,820 USD, 2024-2027. Effort: 40%.

Diversity in discrimination research: Bringing the experiences of multiply marginalized Canadian populations to the fore (PI: Bastos JL). Social Science and Humanities Research Council (Canada): $163,115 CDN, 2024-2026. Role: Co-investigator.

The Collaborative Center for Legal Epidemiology: Evaluating law as an intervention to improve health outcomes and reduce disparities related to HIV, Viral Hepatitis, STDs, and Tuberculosis (PI: Schnake-Mahl A). Centers for Disease Control and Prevention: $1,810,598 USD, 2023-2028. Role: Co-investigator. Effort: 5%.

Strategies to Prevent HIV Acquisition Among Transgender MSM in the US (PI: Reisner S). NIH/NIMH R01MH129175, 2024-2027. Role: Co-investigator. Effort: 10%.

Intimate partner violence and HIV prevention continuum engagement among transgender and nonbinary populations (PI: Storholm E). NIH/NIMH R01MH133484, 2023-2028. Role: Consultant.

Developing and validating a quantitative measure of daily intersectional stigma experiences for Black people with disabilities (PI: Wang P). NIH/NIMHD R01MD018984, 2023-2026. Role: Consultant.

Examining associations between structural stigmatization and discrimination and HIV-related outcomes among Latines (Subaward PI: Scheim AI). NIH/NIAID R25 AI154589-03: $18,514 USD, 2023-2024.

The Toronto Disparities, Overdose, and Treatment (T-DOT) Study: Investigating clinical outcomes among people who inject drugs during a period of rapid programmatic and policy change (PI: Werb D). Canadian Institutes of Health Research: $1,560,600 CDN, 2022-2027. Role: Co-investigator.

Effectiveness of relationship education for reducing HIV incidence in men who have sex with men (PI: Newcomb M). NIH/NIAID U01AI156874: 2021-2026. Role: Consultant.

Preventing Injecting and Overdose by Disrupting Injection Drug Use Transitions: The PRIMER II Study (PI: Werb D). Canadian Institutes of Health Research: $761,175 CDN, 2021-2026. Role: Co-Investigator.

Trans PULSE Canada: A national study of transgender health (MPIs: Bauer G, Scheim AI). Canadian Institutes of Health Research: $1,298,801 CDN, 2018-2025.

**Completed Grants**

Advancing intersectional discrimination measures for HIV-related health disparities research (PI: Scheim AI). NIH/NIMHD R21 MD016177-01S1: $250,648 USD, 2021-2023.

Advancing intersectional discrimination measures for health disparities research (PI: Scheim AI). NIH/NIMHD R21 MD016177: $275,000 USD, 2021-2023.

Gendered situated vulnerabilities and mental health among transgender men in India (PI: Scheim AI). NIH/NIMH R21 MH125263: $275,000 USD, 2021-2023.

Queer Inclusion, Equality, Health, & Rights Working Group (PIs: Scheim AI, Sell R, Voyles C). Urban Health Collaborative, Drexel Dornsife School of Public Health: $15,000 USD, 2022-2023.

Gender-based differences in non-HIV STI testing among sexually active transgender and nonbinary persons: Bridging gaps in STI research (PI: Lacombe-Duncan A). NIH/NIAID R03AI159298-01: $100,000 USD, 2021-2022. Role: Consultant.

Canadian Research Initiative in Substance Misuse Implementation Science Program on Opioid Interventions and Services – Prairies (PI: Wild C). Canadian Institutes of Health Research: $1,875,000 CDN, 2018-2022. Role: Co-Investigator.

CIHR HIV/AIDS Community-Based Research Collaborative (PI: Rourke S). Canadian Institutes of Health Research: $1,500,000 CDN, 2017-2022. Role: Co-Investigator.

A cross-sectional survey of PrEP awareness, barriers and facilitators for PrEP uptake, and the impact of dosing mechanisms on willingness to take PrEP among MSM indicated for PrEP use in Philadelphia (PI: Wells S). Merck & Co.: $200,857 USD, 2020-2021. Role: Co-Investigator.

Rapidly assessing the impact of the COVID-19 pandemic and response on clinical and social outcomes, service utilization, and the unregulated drug supply experienced by people who use drugs in Toronto (PI: Werb D). Canadian Institutes of Health Research: $206,760 CDN, 2020-2021. Role: Co-Investigator.

Comparing treatment outcomes opioid use disorder before and after the COVID-19 outbreak in Philadelphia: A natural experiment (PI: Roth A). Fordham University HIV and Drug Abuse Prevention Research Ethics Training Institute: $30,000 USD, 2020-2021. Role: Co-Investigator.

Securing safe supply during COVID-19 and beyond: Scoping review and knowledge mobilization (PI: Herder M). Canadian Institutes of Health Research: $49,952 CDN, 2020. Role: Co-Investigator.

The Ontario Integrated Supervised Injection Services Research Program: Examining uptake and impacts in different community settings and models of care (MPIs: Rourke S, Scheim AI, Leonard L, Baral S, Garber G). Canadian Institutes of Health Research: $646,424 CDN, 2017-2021.

A community-based cohort study of HIV pre-exposure prophylaxis in Ontario (PI: Tan D). Canadian Institutes of Health Research: $450,000 CDN, 2017-2020. Role: Co-Investigator.

Developing a community-based study of transgender men's health and human rights in India (PI: Scheim AI). Canadian Institutes of Health Research Planning and Dissemination Grant: $19,130 CDN, 2018-2019.

Adaptation of a theoretically based mobile app to increase PrEP uptake among MSM (PI: Sullivan P). NIH R01DA045612-02S1: 2018-2019. Role: Consultant.

Leveraging psychometric strategies and biovalidation to characterize optimal metrics of stigma for transgender women (PI: Baral S). NIH R01MH110358-02S1: 2018-2019. Role: Consultant.

Transgender women removing healthcare barriers to engagement in the HIV prevention and care cascades (PI: Logie C). Canadian Institutes of Health Research: $40,000 CDN, 2018-2019. Role: Co-Investigator.

HIV prevention for gay and bisexual men: A multisite study and development of new HIV prevention interventions (PI: Hart T). Canadian Institutes of Health Research: $1,500,000 CDN, 2014-2019. Role: Co-Investigator.

App. 144

Health and social experiences of transgender men in India (PI: <u>Scheim AI</u>). UC San Diego Global Health Institute Faculty/Postdoc Research Grant: $1,500 USD, 2017.

Ontario Integrated Supervised Injection Site Feasibility Study (MPIs: Kerr T, <u>Scheim AI</u>, Marshall Z, Rourke S). Canadian Institutes of Health Research Centre for REACH in HIV/AIDS: $89,150 CDN, 2015-2017.

Trans Priorities: Cross-country trans women and HIV research priority setting (PI: Marshall Z). Canadian Institutes of Health Research Centre for REACH in HIV/AIDS: $69,821 CDN, 2015-2017. Role: Co-Investigator.

Planning Trans PULSE Canada: A national survey of transgender health (MPIs: Bauer G, <u>Scheim AI</u>, Hammond R, Travers R). Canadian Institutes of Health Research Planning and Dissemination Grant: $9,972 CDN, 2015-2016.

Improving quantitative research methods in gender, sex and population health: Theory, evidence and applications for multi-dimensionality and intersectionality (PI: Bauer G). Canadian Institutes of Health Research: $296,749 CDN, 2013-2018. Role: Co-Investigator.

Community-based research and research ethics: Creating community products to promote ethical research practices with people who use drugs (PI: Milson P). Canadian Institutes of Health Research Social Research Centre in HIV Prevention: $24,000 CDN, 2013-2015. Role: Co-Investigator.

Trans Men Who Have Sex with Men Sexual Health Study (MPIs: Adam B, <u>Scheim AI</u>, Marshall Z, Travers R, Ware S). Canadian Institutes of Health Research: $99,552 CDN, 2012-2015.

**PRESENTATIONS**

**Presentations at Scientific Meetings**

<u>Scheim AI</u>, Our Health Matters: Key findings and lessons learned from a national survey of transmasculine health in India. *World Professional Association for Transgender Health Symposium* [Oral], Lisbon, Portugal. September 30, 2024.

<u>Scheim AI</u>. Incorporating intersectionality in quantitative trans health research. *2ⁿᵈ International Trans Studies Conference* [Oral]. Chicago, IL. September 5, 2024.

<u>Scheim AI</u>, Bouck Z, Greenwald Z, Ling V, Hopkins S, Johnson M, Bayoumi A, Gomes T, Werb D. Frequency of supervised consumption service use and acute care utilization in people who inject drugs. *Society for Epidemiologic Research Annual Meeting* [Oral]. Austin, TX. June 20, 2024.

<u>Scheim AI</u>. Intersectionality across the survey research lifecycle. *Society for Epidemiologic Research Annual Meeting* [Symposium Presentation]. Austin, TX. June 20, 2024.

<u>Scheim AI</u>, Battala M, Logie C, Batavia A, Vee V. Suicide risk among transmasculine people in India: Results of a community-based survey**.** *National Institute of Mental Health 12th Global Mental Health Research without Borders Conference*. Bethesda, MD. October 31, 2023.

<u>Scheim AI</u>, Chakrapani V, Santos H, Siddiqui SJ, Aryal A, Battala M. Access to gender-affirming care among trans men and transmasculine people: Findings from the "Our Health Matters" study. *Association for Transgender Health in India – IPATHCON 2022* [Oral]. New Delhi, India. October 29, 2022.

Scheim AI, Allen B, Arredondo Sanchez Lira J, Kral A, Roth A. Evaluating supervised consumption sites across diverse North American contexts: Challenges, opportunities, and strategies. *National Harm Reduction Conference*. San Juan, Puerto Rico. October 15, 2022.

Scheim AI, Chakrapani V, Santos H, Siddiqui SJ, Aryal A, Battala M. Access to gender-affirming health care among trans men and transmasculine people in India. *World Professional Association for Transgender Health Symposium* [Oral], Montreal, Canada. September 19, 2022.

Scheim AI, Ciavarella C, Vermilion J, Arps FSE, Santos H, Adams N, Nation K, Bauer GR. Access to Justice for Trans and Non-Binary Sex Workers in Canada: An Intersectional Analysis of Trans PULSE Canada. *World Professional Association for Transgender Health Symposium* [Oral], Montreal, Canada. September 18, 2022.

Scheim AI, Ciavarella C, Vermilion J, Arps FSE, Santos H, Adams N, Nation K, Bauer GR. Intersecting inequities in access to justice for trans and non-binary sex workers in Canada [Poster]. *International AIDS Conference*. Montreal, Canada and online. July 29-August 2, 2022.

Scheim AI, Bouck Z, Tookey P, Hopkins S, Sniderman R, Garber G, Baral S, Kerr T, Rourke S, Werb D. Supervised consumption service use and non-fatal overdose among people who inject drugs in Toronto, Canada [Poster]. *Society for Epidemiologic Research Annual Meeting*. Online. December 16-18, 2020.

Scheim AI, Kamara HT, Mansaray K, Thumath M. Sierra Leone's first needle and syringe program: Lessons learned [Poster]. *International AIDS Conference: Virtual*. July 6-10, 2020.

Scheim AI, Perez-Brumer A, Bauer G. Legal gender recognition, psychological distress, and suicide risk among trans adults in the United States [Oral]. *U.S. Professional Association for Transgender Health Conference*, Washington, D.C. September 6, 2019.

Scheim AI, Twahirwa Rwema JO, Liestman B, Nyombayire J, Ketende S, Mazzei A, Mbayiha A, Malamba S, Lyons CE, Olawore O, Mugwaneza P, Kagaba A, Sullivan P, Allen S, Karita E, Baral S. Characterizing the HIV treatment cascade among transgender women in Kigali, Rwanda [Poster]. *International AIDS Society Meeting*, Mexico City. July 22, 2019.

Scheim AI, Maghsoudi N, Churchill S, Ghaderi G, Marshall Z, Werb D. What matters and what has been measured? A systematic review of research on the impacts of implementing drug decriminalization or regulation [Oral]. *International Society for the Study of Drug Policy Conference*, Paris, France. May 22, 2019.

Scheim AI, Maghsoudi N, Churchhill C, Marshall Z, Werb D. Health and social impacts of implementing drug decriminalization or regulation: A systematic review [Poster]. *Harm Reduction International Conference*, Porto, Portugal. April 29, 2019.

Scheim AI, Bauer GR. Gender-affirming genital surgery associated with reduced HIV sexual risk among transgender women: A respondent driven-sampling survey [Poster]. *International AIDS Conference*, Amsterdam, NL. July 24, 2018.

Scheim AI, Knight R, Shulha H, Nosova E, Hayashi K, Milloy M-J, Kerr T, DeBeck K. Men who have sex with men and inject drugs in a Canadian setting [Poster]. *The College on Problems of Drug Dependence Annual Meeting*, San Diego, CA. June 10, 2018.

Scheim AI, Nosova E, Knight R, Hayashi K, Kerr T. HIV incidence among men who have sex with men and inject drugs in Vancouver, Canada [Oral]. *Canadian Association for HIV/AIDS Research Conference*. Vancouver, Canada. April 28, 2018.

Scheim AI, Bauer GR. The intersectional discrimination index: Validity and reliability of a new measure for population health research [Oral]. *Canadian Society for Epidemiology and Biostatistics Conference*. Banff, Canada. May 31, 2017.

Scheim AI, Bardwell G, Mitra S, Rachlis B, Kerr T. Public injecting in London, Canada: A role for supervised injection services? [Poster] *International Harm Reduction Conference*, Montreal, Canada. May 16, 2017.

Scheim AI, Bardwell G, Rachlis B, Mitra S, Kerr T. Syringe sharing among people who inject drugs in London, Ontario [Poster]. *Canadian Association for HIV/AIDS Research Conference*, Montreal, Canada. April 6-9, 2017.

Scheim AI, Bauer GR, Shokoohi M. Impacts of social exclusion on problematic substance use among transgender people: A respondent-driven sampling survey in Canada's most populous province [Oral]. *Annual Meeting of the American Public Health Association*. Denver, USA. October 31, 2016.

Scheim AI, Adam B, Marshall Z, Murray J. Accounting for high vulnerability and low risk for HIV among transgender men: a sexual fields analysis [Poster]. *International AIDS Conference*. Durban, South Africa. July 20, 2016.

Scheim AI, Santos G-M, Arreola S, Makofane K, Do TD, Hebert P, Thomann M, Ayala G. Transgender men who have sex with men report lower access to basic HIV prevention services than their non-transgender counterparts [Oral]. *Action + Access: The Rights and Demands of Gay and Bisexual Men in the Global Response to HIV*. Durban, South Africa. July 16, 2016.

Scheim AI, Bauer GR, Hammond R, Shokoohi M. Substance use among transgender people in Canada's most populous province: A respondent-driven sampling survey [Oral]. *World Professional Association for Transgender Health Symposium*, Amsterdam, Netherlands. June 20, 2016.

Scheim AI, Bauer GR, Travers R. HIV/STI sexual risk among transgender men who are gay, bisexual, or have sex with men: Trans PULSE Project [Oral]. *Canadian Association for HIV/AIDS Research Conference*, Winnipeg, Canada. May 13, 2016.

Scheim AI, Souleymanov R, Kuzmanovic D, Marshall Z, Worthington C, Mikiki, Millson P. Ethics in community-based research with people who use drugs [Poster]. *International Harm Reduction Conference*, Kuala Lumpur, Malaysia. October 21, 2015.

Scheim AI, Adam BD, Marshall Z. Gay, bi, and queer trans men navigating sexual fields [Oral]. *Annual Meeting of the American Sociological Association*, Chicago, USA. August 25, 2015.

Scheim AI, Bauer GR, Travers R, Redman N. Factors associated with HIV risk in Ontario's broad transfeminine population [Poster]. *Canadian Association for HIV/AIDS Research Conference*, Toronto, Canada. May 1-4, 2015.

Scheim AI, Souleymanov R, Kuzmanovic D, Marshall Z, Worthington C, Mikiki, Millson P. Ethics in community-based research with people who use drugs: A scoping review and community resource [Poster]. *Canadian Association for HIV/AIDS Research Conference*, Toronto, Canada. May 1-4, 2015.

Scheim AI, Bauer GR, Zong X, Hammond R. Discomfort discussing trans issues with family physicians: Correlates and implications for clinical practice [Poster]. *European Professional Association for Transgender Health*, Ghent, Belgium. March 12-14, 2015.

Scheim AI, Adam BD, Nault C, Marshall Z. "I didn't get the feeling that they knew what they were doing": HIV/STI testing experiences of trans men who have sex with men in Ontario [Poster]. *Canadian Association for HIV/AIDS Research Conference*, St. John's, Canada. May 1, 2014.

Scheim AI, Bauer GR. Practice and policy implications of sex and gender diversity within trans communities [Oral]. *World Professional Association for Transgender Health Symposium*, Bangkok, Thailand. February 17, 2014.

Scheim AI, Jackson R, James E, Dopler TS, Pyne J, Bauer GR. Well-being of Aboriginal gender-diverse people in Ontario, Canada [Oral]. *World Professional Association for Transgender Health Symposium*, Bangkok, Thailand. February 17, 2014.

Scheim AI, Adam BD, Marshall Z, Travers R, Ware SM. Safer sex decision-making and negotiation among trans men who have sex with men: Results from a qualitative study in Ontario, Canada [Oral]. *World Professional Association for Transgender Health Symposium*, Bangkok, Thailand. February 16, 2014.

Scheim AI, Cherian M, Bauer GR, Zong X. Characteristics and experiences of trans people in Ontario, Canada who have been in prison [Oral]. *World Professional Association for Transgender Health Symposium*, Bangkok, Thailand. February 14, 2014.

Scheim AI. A third checkbox is not enough: Implications of sex and gender diversity among trans Ontarians [Oral]. *London Health Research Day*, London, Canada. March 19, 2013.

Scheim A. Promoting and providing Pap tests for trans men [Oral]. *National Transgender Health Summit*, University of California San Francisco, USA. April 9, 2011.

**Invited Conference or Academic Presentations**

Intersectional approaches to measurement for social and behavioral HIV research. Grand Rounds, *HIV Center for Clinical and Behavioral Studies at the New York State Psychiatric Institute and Columbia University*. January 16, 2025.
Intersectionality at any sample size. *Interdisciplinary Research Center on Intimate Relationship Problems and Sexual Abuse, Université de Montréal*. December 11, 2024.

Strategies for measuring intersecting forms of stigma and discrimination in HIV research. *UCSF Center for AIDS Research*. April 18, 2024.

Undoing erasure to promote trans, non-binary, and intersex people's health. *Anatomy Connected 2024 (Annual meeting of the American Anatomy Association)*. Toronto, Canada. March 24, 2024.

Upstream and up close: Community-engaged social epidemiology to advance LGBTQ+ health equity. *Stanford University School of Medicine LGBTQ+ Health Seminar Series*. March 11, 2024.

Structural and intersectional approaches to trans population health. *Epidemiology and Biostatistics Seminar Series, Western University*. March 1, 2024.

Intersectionality in substance use research. *Center for Drug Use and HIV Research, New York University.* April 24, 2023.

Intersectional approaches to measuring stigma and discrimination for trans and nonbinary health research. *SHINE Strong R25 Seminar, University of California Irvine.* April 21, 2023.

Development and evaluation of intersectional discrimination measures for people living with HIV. *Culturally focused HIV Advancements through the Next Generation for Equity (CHANGE) T32 Training Program Seminar, University of Miami.* April 8, 2023.

Intersectionality and survey measures. *Intersectionality Training Institute.* March 8, 2023.

Global insights on transgender health. *Taylor and Francis Group.* October 4, 2022.

Plenary presentation: Social determinants of mental health among transmasculine people in India. *8th National LGBTQ Health Conference.* Chicago, IL. July 29, 2022.

Transmasculine people's health and human rights in India. *Centre for Gender and Sexual Health Equity (University of British Columbia) Speaker Series.* June 16, 2022.

Our Health Matters: A community-based mixed-methods study of transmasculine mental health in India. *Social and Behavioural Health Sciences Seminar Series, University of Toronto.* June 14, 2022.

Putting community and intersectionality at the center: Social epidemiology to advance global LGBTQ+ health equity. *Department of Health, Behavior, and Society, Johns Hopkins University.* June 7, 2022.

Keynote: Strategies for measuring intersecting forms of stigma and discrimination in population health research. *U.S. Department of Health and Human Services Stigma Working Group.* April 14, 2022.

Research on transmasculine health globally and in India: Gaps and opportunities. *2nd National LGBTQI+ Health Symposium.* New Delhi, India. December 10, 2021.

Health disparities and health equity for transgender populations. *Drexel – Tower Health LGBTQ+ Health Symposium.* June 30, 2021.

Keynote: Epidemiology of HIV among transgender populations globally. *International Workshop on HIV and Transgender People.* Mexico City. July 20, 2019.

How transgender people experience Canada's health care system. Canadian Health Coalition Research Roundtable, *Talking Across Silos in Canada's Health Movements.* Ottawa, Canada. December 1, 2018.

Approaches to measuring intersectional stigma. Johns Hopkins University and Population Council Satellite Session on Intersectional Stigma, *International AIDS Conference.* Amsterdam, Netherlands. July 25, 2018.

Barriers to care and strategies to overcome for trans men. TRANS action: Building Bridges to Safety, Pre-Conference to the *International AIDS Conference.* Amsterdam, Netherlands. July 21, 2018.

Keynote: Transgender health and HIV. *Israeli LGBT Centre* and *Israel AIDS Task Force.* Tel Aviv, Israel. May 10, 2018.

HIV vulnerabilities among transgender women in sex work. *Johns Hopkins University Center for Public Health and Human Rights Symposium*. April 13, 2018.

Stigma, discrimination, and transgender health disparities. *Department of Social Medicine, University of North Carolina – Chapel Hill*. November 13, 2017.

Keynote: Transgender health and HIV: The view from Canada. *Australasian HIV & AIDS Conference*. Canberra, Australia. November 6, 2017.

Keynote: From washrooms to classrooms and beyond: Transgender rights and social inclusion. *University of Waterloo*. Waterloo, Canada. October 20, 2016.

Trans health and workplace inclusion. *Bluewater Health* [hospital]. Sarnia, Canada. September-December, 2016.

Understanding health care and transition for Ontario's transgender population. *London Health Sciences Centre Endocrinology Grand Rounds*. April 6, 2016.

Improving LGTB health data: assessing survey measures of sex, gender and sexual orientation. *Rainbow Health Ontario Conference*. London, Canada. March 10, 2016.

Plenary presentation: Trans men and stigma: A research snapshot. *British Columbia Gay Men's Health Summit*. Vancouver, Canada. November 6, 2015.

Plenary presentation: Access to health care for transgender men. *8th International AIDS Society Conference on HIV Pathogenesis, Treatment, & Prevention*. Vancouver, Canada. July 20, 2015.

Plenary presentation: Improving access to HIV/STI testing for trans communities: Learning from the experiences of trans MSM in Ontario. *Ontario AIDS Bureau HIV Testing Conference*. Toronto, Canada. March 25, 2015.

Community-led participatory research with trans communities: Case studies from Ontario, Canada. *Global Forum on MSM and HIV Pre-Conference to the International AIDS Conference*. Melbourne, Australia. July 20, 2014.

Is it time for HIV home testing? Presentation at the *Ontario HIV Treatment Network Research Conference*, Toronto, Canada. November 12, 2012.

The flipside of democratization in global Taiwan: Global civil society, the Taiwanese state, and challenges to gay rights and sexual freedom. Invited oral presentation: *Ministry of Foreign Affairs, Republic of China (Taiwan)*, Taipei, Taiwan. December 9, 2010.

Check It Out: Women who have sex with women, trans men, and Pap tests. *Guelph Sexuality Conference*, University of Guelph. June 23, 2010.

Getting Primed: Informing HIV prevention with gay, bi, queer trans men. *Europride Pride House*, Stockholm, Sweden. July 30, 2008.

Sexual health and trans communities. *Toronto Public Health Sexual Health Unit*. September 18, 2007.

Trans generation: Developments in transgender youth activism, services, and culture. Invited faculty, *National Gay and Lesbian Taskforce Creating Change Conference*, Kansas City, MS. November 8, 2006.

## TEACHING

### Instructor

| | |
|---|---|
| Fall 2024 | Epidemiology EPI749: Research and Practice in Epidemiology, Drexel University |
| Fall 2023 | Epidemiology EPI749: Research and Practice in Epidemiology, Drexel University |
| Winter 2023 | Epidemiology EPI550: Applied Survey Research in Epidemiology, Drexel University |
| Fall 2021 | Epidemiology EPI750: Integrative Learning Experience in Epidemiology, Drexel University |
| Winter 2021 | Epidemiology EPI550: Applied Survey Research in Epidemiology, Drexel University |
| Fall 2018 | Health, Aging, and Society 3R03: Health Inequalities (undergraduate), McMaster University |

### Guest Lectures

| | |
|---|---|
| 2024 | *Transgender Health.* Social Epidemiology, Drexel University. |
| 2023 | *Transmasculine Health and Human Rights. Reproductive Justice & the Law.* Jindal Global University (India). |
| 2021 | *Developing a community-based participatory research program.* Community Health and Prevention Doctoral Seminar, Drexel University. |
| 2019 | *Epidemiology of Transgender Health*, Bloomberg School of Public Health, Johns Hopkins University. |
| 2019 | *Sex and Gender.* Social Epidemiology, Drexel University. |
| 2017 | *Discrimination & Transgender Health Disparities.* HIV and Substance Use Seminar, UC San Diego. |
| 2017 | *Transgender Mental Health.* Transgender Studies, Smith College School of Social Work. |
| 2016, 2018, 2019, 2020, 2021 *Drug Use and Policy.* Public Health, Western University. |
| 2016 | *Transgender Health.* Endocrinology, Medicine Year 2, Western University. |
| 2015-2017 *Epidemiology of HIV.* Epidemiology of Major Diseases, Western University. |
| 2015, 2016 *Sex and Gender in Survey Research.* Survey Research Methods, Western University. |
| 2015 | *Gender and Health.* Social Determinants of Health, University of Waterloo. |

## MENTORSHIP

### Doctoral advisor

| Dates | Name | Program or School | Thesis | Role | Current Position |
|---|---|---|---|---|---|
| 2022-now | Victoria Ryan | PhD, Epidemiology, Drexel University | Longitudinal Population Size Estimation and Drug Use Patterns Associated with Overdose Prevalence Among People Who Inject Drugs in Philadelphia | Advisor | PhD Candidate |
| 2022-now | Heather Santos | PhD, Epidemiology, Drexel University | Suicide risk among transgender and non-binary people in Canada | Advisor | PhD Candidate |
| 2020-2022 | Tanner Nassau | PhD, Epidemiology, Drexel University | Supervised injection sites and infectious disease risk among people who inject drugs | Co-advisor | Epidemiologist, Philadelphia Department of Public Health |

### Thesis committee member

| Dates | Name | Program or School | Thesis | Current Position |
|---|---|---|---|---|

| 2024-now | Justin Jones | PhD, Epidemiology, Drexel University | Advancing HIV surveillance: The Role of molecular sequencing and enhanced HIV services in diagnoses and risk reduction | PhD Candidate |
|---|---|---|---|---|
| 2022-now | Mannat Malik | PhD Candidate, Health Behavior, University of North Carolina – Chapel Hill | Resistance to intersectional stigma among transgender women | PhD Candidate |
| 2022-now | Jason Hallarn | PhD, Epidemiology and Biostatistics, Western University | Sexual health among transgender and non-binary persons living in Canada | PhD Candidate |
| 2022-2024 | Lux Li, PhD | MSc, Epidemiology and Biostatistics, Western University | Gender positivity and gender distress in transgender and non-binary communities: Predictive factors and impact on health | Clinical Research Project Assistant, Sick Kids Hospital |
| 2022-2023 | Bisola Hamzat | MSc, Epidemiology and Biostatistics, Western University | Intersectional analysis of intimate partner violence among transgender and non-binary people in Canada | Epidemiologist/Research Coordinator, Ontario Drug Policy Research Network |
| 2021-2022 | Emily Sanders | MSc, Epidemiology and Biostatistics, Western University | Fertility preservation discussions among transgender youth and adults beginning gender-affirming care in Canada | MD candidate, University of Limerick |
| 2020-2021 | Sara Todorovic | MSc, Epidemiology and Biostatistics, Western University | Impact of delays to gender-affirming medical care during COVID-19 on anxiety and depression among trans and non-binary people | Epidemiologist, IPRO |
| 2020-2024 | Gioi Tran Minh | PhD, Social Dimensions of Health, University of Victoria | Substance use among transgender people in Canada | |
| 2019-2024 | Leo Rutherford | PhD, Social Dimensions of Health, University of Victoria | A Community-based survey of trans men's sexual health and wellness after metoidioplasty or phalloplasty | Postdoctoral Fellow |
| 2017-2019 | Emily Nunez | MSc, Epidemiology and Biostatistics, Western University | Impacts of identity versus targetability on the relationship between discrimination and health | Epidemiologist/ Biostatistician, Public Health Agency of Canada |

## SERVICE

## Academic Service

| 2024 – | Chair, Dornsife School of Public Health Executive Committee of the Faculty |
|---|---|
| 2024 – | Member, Department of Epidemiology and Biostatistics Graduate Program Committee |
| 2023 – 2024 | Chair, Department of Epidemiology and Biostatistics Social Committee |
| 2022 – | Queer Inclusion, Equality, Health, & Rights Working Group (Co-Chair, 2022-2023) |
| 2022 – | Guiding Team, Robert Wood Johnson Foundation Transforming Academia for Equity |
| 2022 – | Department of Epidemiology and Biostatistics Chair's Advisory Committee |
| 2022 - 2024 | Member, Dornsife School of Public Health Executive Committee of the Faculty |
| 2021 - 2023 | Department of Epidemiology and Biostatistics Seminar Committee |
| 2021 - 2023 | Drexel University Senate Committee on Student Life |
| 2021 | Epidemiology PhD Admissions Committee |

2020           Epidemiology PhD Comprehensive Exam Committee

**Editorial and Peer Review Activities**

*Editorial Roles*
2025 –         Consulting Editor, *Stigma & Health*
2023 –         Associate Editor, *LGBT Health*
2020 - 2021    Guest Editor, *PLOS ONE*: Health and Health Care in Gender Diverse Communities
2019 –         Editorial Board Member, *International Journal of Transgender Health*
2018 - 2022    Associate Editor, *BMC Infectious Diseases*
2017 –         Editorial Board Member, *Psychology & Sexuality*

*Ad Hoc Reviewer*
Addictive Behaviors, AIDS & Behavior, American Journal of Epidemiology, American Journal of Public Health, BMC Infectious Diseases, BMC International Health and Human Rights, BMJ Open, Canadian Journal of Public Health, Canadian Medical Association Journal, Culture, Health, and Sexuality, Epidemiology, Harm Reduction Journal, Health & Human Rights Journal, HIV Medicine, International Journal of Drug Policy, International Journal of STDs and AIDS, JAMA Network Open, Journal of Acquired Immune Deficiency Syndromes, Journal of Homosexuality, Journal of the International AIDS Society, Journal of Sex Research, The Lancet HIV, The Lancet Public Health, LGBT Health, PLOS ONE, Sexually Transmitted Infections, Social Psychology and Psychiatric Epidemiology, Social Science & Medicine, Transgender Health

*Leadership in Scientific Meetings*
2024           Panel organizer, A trans studies that counts: Critical quantitative approaches in applied trans studies. *2nd International Trans Studies Conference*
2023           Symposium co-organizer, Measuring sex, gender, and sexual orientation in epidemiologic research. *Society for Epidemiologic Research Annual Meeting*
2021           Track C (Prevention Science) Scientific Committee, *IAS Conference on HIV Science*
2019 - 2021    Organizing Committee, *International Workshop on HIV and Transgender People*
2019 - 2020    Track C (Epidemiology and Prevention) Scientific Committee, *AIDS 2020*
2019           Scientific Committee, U.S. Professional Association for Transgender Health Conference
2019           Organizing Committee, *Community-Based Research Centre Gay Men's Health Summit*
2018           Invited Rapporteur (Epidemiology and Prevention), *AIDS 2018*
2017           Organizing Committee, *Canada's Drug Futures Forum*
2016           Invited moderator, Briefing on HIV indicator for transgender persons, *White House Office of National AIDS Policy*
2016           Organizing Committee, *Transgender Pre-Conference to AIDS 2016*
2016           Organizer, Improving methods for transgender population health and epidemiologic research, *World Professional Association for Transgender Health Symposium*

*Abstract Review for Scientific Meetings*
2019           National LGBTQ Health Conference (Emory University)
2018           Annual Meeting of the Society for Epidemiologic Research
2015-2018      Canadian Conference on HIV/AIDS Research

*Funding Peer Review*
2021           *National Institutes of Health* - Transformative Research to Address Health Disparities and Advance Health Equity (U01)
2020           *Canada Research Coordinating Committee* - New Frontiers in Research Fund
2020           *Canadian Institutes of Health Research* - COVID-19 Mental Health & Substance Use

2019        *UC San Diego Center for AIDS Research* - International Pilot Grants
2017        *Canadian Institutes of Health Research* - Global Health Planning and Dissemination Grants

## Professional Service

2024 –      Research Advisor, A qualitative inquiry into suicidality among Transgender and Gender Diverse communities in India, *The Unsound Project*.
2024 –      Institute Advisory Board, *Institute of Gender and Health, Canadian Institutes of Health Research*.
2023        Invited panelist, Expanding the Evidence Base in Gender-Affirming Care for Transgender and Gender Diverse Populations, *NIH Sexual & Gender Minority Research Office*.
2020        Invited participant, HIV-Related Intersectional Stigma Research Advances and Opportunities Workshop. *NIH Office of AIDS Research and NIMH*.
2019        Expert participant [nominated by the Government of Canada], 2nd Expert Working Group on improving drug statistics and strengthening the Annual Report Questionnaire (ARQ). *United Nations Office on Drugs and Crime*. Vienna.
2018 - 2022  Leadership Group, Supervised Consumption Services, *Canadian Research Initiative in Substance Misuse*.
2018 - 2022  Revision Committee, *World Professional Association for Transgender Health* Standards of Care Version 8 (Chapter 8: Sexual Health Across the Lifespan).
2018        Invited participant, Methods and Measurement in Sexual and Gender Minority (SGM) Health Research workshop, *National Institutes of Health*.
2018, 2016   Invited meeting participant, Exploring International Priorities and Best Practices for the Collection of Data About Gender Minorities, *The Williams Institute*. (Buenos Aires, Argentina and Amsterdam, Netherlands)
2014        Writing Group member, Implementation Tool on Men who have Sex with Men and Transgender People in Low- and Middle-Income Countries, *United Nations Population Fund*.

## Community Service

2024 –      Secretary, Board of Directors, Global Action for Trans Equality
2020 –      ViiV Positive Action Technical Review Committee
2019 –      International Working Group on Trans Men and HIV, *Global Action for Trans Equality*
2016-2019    Co-chair, Trans Working Group, *Canadian HIV Trials Network*
2015-2019    Advisory Committee, *Ontario HIV Epidemiology and Surveillance Initiative*
2013-2016    Research Group, *Global Forum on MSM and HIV*
2007-2015    Provincial Advisory Body, *Ontario Gay Men's Sexual Health Alliance*
2007-2011    Co-Chair, Board of Directors, *LGBT Youth Line* (Ontario)
2006-2016    Chair, Trans Men's Working Group, *Ontario Gay Men's Sexual Health Alliance*
2006-2009    Trans Men's HIV Prevention Needs Assessment Steering Committee, *AIDS Bureau, Ontario Ministry of Health and Long-Term Care*

## Expert Witness

2024        Gender marker changes (Kalarchik v. Montana), *American Civil Liberties Union*
2023        Transgender health research methodology, *British Columbia College of Nurses and Midwives*
2023        Name changes for transgender people, Court of Common Pleas of Butler County, PA, *Transgender Legal Defense and Education Fund*
2022        Gender marker changes for transgender people (Marquez v. Montana), *American Civil Liberties Union*
2021        Name changes for transgender people, Courts of Common Pleas of Allegheny County, PA, *Transgender Legal Defense and Education Fund*

App. 154

| 2021 | Name changes for transgender people, Courts of Common Pleas of Philadelphia, PA, *Transgender Legal Defense and Education Fund* |
| 2020 | Anti-transgender stigma (Cardle v. Her Majesty the Queen), *Legal Aid Ontario* |

**Memberships**

International AIDS Society, Society for Epidemiologic Research, World Professional Association for Transgender Health, US Professional Association for Transgender Health

EXHIBIT B

# BIBLIOGRAPHY

Bauer GR, Scheim AI, Pyne J, Travers R, Hammond R. Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. BMC Public Health. 2015;15(1):525. Doi:10.1186/s12889-015-1867-2.

Cotton JC, Martin-Storey A, Le Corff Y, Beauchesne Lévesque SG, Sansfaçon AP. En Reponse Au Projet De Loi 2 : Associations Entre Les Demarches Legales D'affirmation Du Genre et Deux Indicateurs De Bien-etre Chez Des Personnes Trans et Non-Binaires Du Quebec. The Canadian Journal of Psychiatry / La Revue Canadienne de Psychiatrie 2022; 67(7): 578-580. Doi: 10.1177/07067437221090088.

DeChants JP, Price MN, Green AE, Davis CK, Pick CJ. Association of updating identification documents with suicidal ideation and attempts among transgender and nonbinary youth. International Journal of Environmental Research and Public Health. 2022; 19:5016. Doi:10.3390/ijerph19095016.

Downing JM, Przedworski JM. Health of transgender adults in the U.S., 2014-2016. American Journal of Preventive Medicine. 2018;55(3):336-344. Doi:10.1016/j.amepre.2018.04.045.

Grant R, Amos N, McNair R, Lin A, Hill A, Cook T, Carman M, Bourne A. The role of medical and legal gender affirmation in shaping positive mental health outcomes for transgender and gender diverse people in Australia. Transgender Health. 2024 Sept 24. Doi: 10.1089/trgh.2024.0007.

Herman JL, O'Neill K. Gender Marker Changes on State Documents: State-Level Policy Impacts. Los Angeles, CA: Williams Institute, 2021. Available from: https://williamsinstitute.law.ucla.edu/wp-content/uploads/Gender-Markers-Jun-2021.pdf

Hill BJ, Crosby R, Bouris A, Brown R, Bak T, Rosentel K, VandeVusse A, Silverman M, Salazar L. Exploring transgender legal name change as a potential structural intervention for mitigating social determinants of health among transgender women of color. Sexuality Research & Social Policy. 2018;15(1):25-33. Doi:10.1007/s13178-017-0289-6.

ILGA-Europe and OII Europe. Diving Into the FRA LGBTI II Survey Data: Intersex Briefing. 2023. Available from: https://www.ilga-europe.org/report/intersections-intersex-diving-into-the-fra-lgbti-ii-survey-data/ (last accessed February 10, 2025)

James SE, Herman JL, Rankin 5, Keisling M, Mottet L, Anafi M. The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality; 2016:1-302. Available from: https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

James SE, Herman JL, Durso LE, Heng-Lehtinen R. Early Insights: A Report of the 2022 U.S. Transgender Survey. National Center for Transgender Equality, Washington, DC. 2024. Available from: https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf

1

Kessler RC, Barker PR, Colpe LJ, et al. Screening for serious mental illness in the general population. Archives of General Psychiatry 2003; 60: 184–89.

Lee EJ, Gurr D, Wye GV. An evaluation of New York City's 2015 birth certificate gender marker regulation. LGBT Health. 2017; 4(5):320-327. Doi: 10.1089/lgbt.2017.0087.

Loza O, Beltran O, Perez A, Green J. Impact of name change and gender marker correction on identity documents to structural factors and harassment among transgender and gender diverse people in Texas. Sexuality, Gender, & Policy. 2021;4:76–105. Doi: 10.1002/sgp2.12035.

Madrigal–Borloz V. A/HRC/38/43: Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity. May 2018. Available from: https://docs.un.org/en/A/HRC/38/43 (last accessed February 10, 2025)

Mann S. Transgender employment and gender marker laws. Labour Economics. 2021; 73:102072. Doi:10.1016/j.labeco.2021.102072.

Olson ED, Reddy-Best K. "Pre-top surgery, the body scanning machine would most likely error:" Transgender and gender nonconforming travel and tourism experiences. Tourism Management. 2019;70:250-61. Doi: 10.1016/j.tourman.2018.08.024.

Parker K, Menasce Horowitz J, Brown A. Americans' Complex Views on Gender Identity and Transgender Issues. Pew Research Center. June 28, 2022. https://www.pewresearch.org/social-trends/2022/06/28/americans-complex-views-on-gender-identity-and-transgender-issues/ (last accessed February 10, 2025)

Puckett JA, Price S, Dunn T, Kuehn K, Kimball D, Hope DA, Mocarski R, Juster R-P, DuBois LZ. Legal Gender affirmation, psychological distress, and physical health issues: Indirect effects via enacted stigma. Sexuality Research & Social Policy 2024;21(3):1112-1122. Doi: 10.1007/s13178-024-00971-y.

Quinan CL, Bresser N. Gender at the border: Global responses to gender-diverse subjectivities and nonbinary registration practices. Global Perspectives. 2020;1(1):12553. Doi: 10.1525/gp.2020.12553.

Restar A, Jin H, Breslow A, Reisner SL, Mimiaga M, Cahill S, Hughto JMW. Legal gender marker and name change is associated with lower negative emotional response to gender-based mistreatment and improve mental health outcomes among trans populations. SSM - Population Health. 2020;11:100595. Doi:10.1016/j.ssmph.2020.100595.

Russell ST, Pollitt AM, Li G, Grossman AH. Chosen name use is linked to reduced depressive symptoms, suicidal ideation, and suicidal behavior among transgender youth. Journal of Adolescent Health. 2018;63(4):503-505.

Scheim AI, Perez-Brumer AG, Bauer GR. Gender-concordant identity documents and mental health among transgender adults in the USA: a cross-sectional study. The Lancet Public Health. 2020;5(4):e196-e203. Doi:10.1016/S2468-2667(20)30032-3.

2

Scheim AI, Restar AJ, Zubizarreta D, Lucas R, Wilson Cole S, Everhart A, Baker KE, Rodriguez MI. Legal gender recognition and the health of transgender and gender diverse people: A systematic review and meta-analysis. Under review, Social Science & Medicine.

Tan KKH, Watson RJ, Byrne JL, Veale JF. Barriers to possessing gender-concordant identity documents are associated with transgender and nonbinary people's mental health in Aotearoa/New Zealand. LGBT Health. 2022;9(6):401-410. Doi:10.1089/lgbt.2021.0240.

The Trans PULSE Canada Team. Health and health care access for trans and non-binary people in Canada. 2020- 03-10. Available from: https://transpulsecanada.ca/results/report-1/ (last accessed February 11, 2025)

White Hughto JM, Reisner SL, Pachankis JE. Transgender stigma and health: A critical review of stigma determinants, mechanisms, and interventions. Soc Sci Med. 2015;147:222-231. Doi:10.1016/j.socscimed.2015.11.010.

Yee K, Lind BK, Downing, J. Change in gender on record and transgender adults' mental or behavioral health. American Journal of Preventive Medicine. 2022; 62(5):696-704. Doi:.1016/j.amepre.2021.10.016.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ASHTON ORR, et al., | |
| *Plaintiffs*, | Case No. 1:25-cv-10313-JEK |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants*. | |

**DECLARATION OF ZAYA PERYSIAN**

I, Zaya Perysian, hereby declare and state as follows:

1.      My name is Zaya Perysian. I am a plaintiff in the above-captioned action and submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify competently to those facts if called to do so.

3.      I am a United States Citizen and a resident of Santa Clarita, California.  I am twenty-two years old, and I use "she" and "her" pronouns.  I have lived in California since October of 2023, when I moved here from New Jersey.  I was born in Michigan and left when I was 20 years old.

4.      I am a transgender woman. My sex assigned at birth was male, but I have a female gender identity.

5.      I was diagnosed with gender dysphoria in 2020.

6.      I have lived as a female in all aspects of my life since 2020, and I am known only
as female to my family, friends, my community in California, and my social media followers
online.  Today, I feel more like myself than ever.  It has been a long road to feel safe and
authentic in my body, and I am so grateful to be living my truth in all aspects of my life.

7.      I am a social media content creator, and my content focuses mainly on my life as
a proud transgender woman. I have documented my whole journey and have been able to
connect with a community of LGBTQ+ individuals across the globe. My content has also
allowed me to connect with millions of people who are not LGBTQ+ and has helped educate
them on what it actually means to be transgender in today's society.

8.      Having accurate identification is extremely important to my safety and my ability
to navigate this world.  During the first year or two after coming out as transgender, before my
identification documents were updated, I faced significant harassment and was often put in
uncomfortable situations while traveling.  I was subjected to intolerant gazes by airport personnel
when they viewed my identification with an inaccurate, male gender marker, but observed my
female gender expression.  I have been patted down by agents expressing their interest in
confirming my gender based on my physical body, and I have had TSA agents say that I was the
"prettiest boy" they had ever seen.  It was devastating for me to endure experiences like this, and
it wasn't until I was able to update my driver's license that these occurrences were less frequent.

9.      I updated my Michigan driver's license to my accurate female sex designation in
June of 2021 and my accurate name in February of 2022.  I am in the process of getting a
California driver's license which will also reflect my accurate name and female sex designation.
I have also been able to update my social security card in the same manner.  Given that the
passport I had in my possession had an inaccurate male sex designation, I knew that I needed to

2

update my passport in order to be able to travel for work opportunities abroad. On January 20th, I was filled with anxiety when I saw the Executive Order regarding passports issued by the White House.

10.     I had planned to travel outside of the United States in early February 2025, and I submitted an expedited application to update the sex designation on my passport to female on January 23rd of this year.

11.     On January 24th, I received notice via email that my passport application was being processed. On January 28th, my passport was returned to me through the mail with a notice stating: "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. The stated reason was "to match our records." That notice is attached hereto as Exhibit A.

12.     I was so upset by this notice, that I posted about it on social media. A representative from CNN who heard about my situation called the office on my behalf to understand why this had been done, and they were told that the sex designation on my passport must be male in accordance with the new passport policy issued by the White House and implemented by the Department of State. My passport has a male sex designation, and the new expiry date is set for January 24, 2035. I am only perceived as female by those who see me, and using this passport will out me as transgender to people who would not otherwise have known.

13.     This is particularly harmful to me as I have been invited to many opportunities to connect with other influencers abroad. Without accurate identification, I will not be able to engage in income-generating opportunities outside of the United States.

14.     I do not want to travel with my current passport that does not reflect who I am, and there are some countries I would not even consider traveling to without an accurate passport

3

App. 162

given their open hostility towards transgender people.  When I interface with government officials, they perceive me as female.  This is how I want to be perceived, and that perception affirms me and the journey it took for me to feel authentic.  If I were to present a passport with a male sex designation, as I currently have in my possession, it would raise alarm bells for TSA agents and CBP officers alike.  I am even more afraid of encounters with officers in countries outside of the United States, where my passport would be the only identity document that would be accepted by international officials, and where there is increased hostility towards the transgender community.

15.     I am devastated that my government would target my community with a policy that takes away my ability to move around this world safely.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on ___2/17___, 2025

Zaya Perysian

EXHIBIT A



**U.S. Department of State**
**Bureau of Consular Affairs**
**Passport Services**

### Information Changed on Application

The date of birth, place of birth, name, or sex was corrected on your passport application.

The changes were made for one of the following reasons:

- To match the documents you submitted.
- To match our records.
- To show the country of birth as it is currently known.
- To use only letters.

Last Updated: October 2024 *(CA/PPT/S/A)*                              IN 941-24

App. 165

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ASHTON ORR, et al., | |
| *Plaintiffs*, | Case No. 1:25-cv-10313-JEK |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants*. | |

## DECLARATION OF ASHTON ORR

I, Ashton Orr, hereby declare and state as follows:

1.      My name is Ashton Orr. I am a plaintiff in the above-captioned action and submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify competently to those facts if called to do so.

3.      I am a United States Citizen and resident of Morgantown, West Virginia.  I have lived in West Virginia my entire life, and I am now thirty-five years old.  I use "he" or "they" pronouns.

4.      I am the Press Relations Manager for a national LGBTQ+ organization, advocating for transgender rights and equality.

5.      I am a transgender man.  My sex assigned at birth was female, but I have a male gender identity.

1

App. 166

6.      I was diagnosed with gender dysphoria in 2015, when I was twenty-five years old.

7.      I have lived as a male in all aspects of my life since 2020.  I am known only as a man to my family, my workplace, and in my community in West Virginia.  It has not always been easy to be myself in public spaces, and I have experienced a lot of discrimination and harassment as a result of being open about my transgender identity.  Having accurate identification documents helps me navigate this world safely, as I am perceived as male by those who see me, and a male sex designation affirms my gender identity.

8.      I am glad that I was able to update my West Virginia driver's license in 2023 and my Social Security Administration record in 2024 to reflect an accurate name and male sex designation.  I typically travel by plane with multiple forms of identification just to ensure that I have identification should I misplace or lose either my passport or my driver's license. However, this has presented problems as the information on my passport does not match my updated and accurate driver's license.

9.      For example, approximately two years ago, I traveled to Iceland and upon arrival I went to pick up a rental car I had reserved. I was required to provide the car rental employee with my passport, which lists my sex as female, and my driver's license, which lists my sex as male. The employee noted the difference in the sex designations and told me I would not be able to rent the vehicle because of the inconsistency. I eventually asked my spouse to send me a copy of my marriage certificate in order to further confirm my identity. After nearly two hours. I was finally able to obtain the vehicle, but the entire incident was humiliating, and I was afraid that, without a rental car, I would have to return to the U.S.

10.     My passport's inconsistency with my other identity documents has also caused problems here in the U.S.  Just a few weeks ago during the first week of January 2025, I was

App. 167

flying from West Virginia to NYC. Given that my REAL ID has a male sex designation, and my passport had a female sex designation, I was flagged by TSA and accused of presenting a fake identification document. When TSA screened my REAL ID, they claimed it didn't match the documents they had on record. I offered my passport to confirm my identity, but because my sex designation didn't match, they accused me of presenting a fake identity document. They repeatedly scanned my ID and took my photo multiple times before pulling me aside for further questioning. It wasn't until I was forced to explain in great detail that I'm a transgender man that they finally allowed me through.

11.     I had never experienced this before, and it prompted me to take steps to update my passport as well.

12.     On January 16, 2025, I sent my passport, application, birth certificate, and marriage license to be updated with an accurate, male sex designation and paid for expedited shipping and servicing given that I had imminent travel plans. I was informed that my application arrived on January 18, and began processing on January 22. The passport that I sent with my application had a female sex designation, and my application requested an updated name and sex designation. After the Complaint was filed in this case on Friday, February 7, 2025, I received a phone call on Tuesday, February 11 from an individual working at a passport agency in San Francisco, where my passport is being processed. He said that due to the Executive Order, the agency needed to "investigate my sex assigned at birth," and given that my sex assigned at birth is female, they can only issue my passport with an "F" Marker. They also gave me the option to withdraw my passport application and have the passport I sent in (also with an "F" marker) returned. That phone call was followed up by an email from the State

App. 168

Department stating that my "application is now on hold and is no longer 'In Process,'" and that my "processing times may be delayed." That communication is attached hereto as Exhibit A.

13.     Most urgently, I have a flight to Ireland scheduled for departure on March 13, 2025. I am traveling for a medical purpose, and I am terrified that I will not be able to keep my appointment without an accurate passport, which could delay my ability to access medically indicated care.

14.     I am terrified that having an inaccurate sex designation on my passport will cause: TSA agents, border officials, or airline staff to single me out for invasive questioning, scrutiny, or mistreatment. My past experiences of having my identity challenged, my passport refused, and being subjected to additional security screenings has led to extremely uncomfortable circumstances, and could potentially even cause travel delays, missed flights, or even denial of entry to certain countries. Being forced to explain discrepancies in my documentation could out me as transgender in unsafe situations, as transgender people are disproportionately targeted for violence, and an incongruent passport could escalate tensions with international government officials, placing me in danger.

15.     I am devastated that my country is trying to erase me and remove my ability to access accurate identification documents. Without an accurate passport, I will not be able to travel outside of the United States for any reason, let alone to make my medical appointment in March. The constant fear and anxiety of potential confrontations or being denied my basic rights are emotionally exhausting and traumatic. I do not feel safe carrying inaccurate documents when I walk the world as the man that I am as I am afraid it will expose me to even more harassment than I have had to endure as an openly transgender person in West Virginia.

App. 169

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __2/17__, 2025
Ashton Orr

EXHIBIT A

| From: | Malita Picasso |
|---|---|
| To: | Malita Picasso |
| Subject: | FW: Passport Application Status |
| Date: | Tuesday, February 18, 2025 9:59:35 AM |

---------- Forwarded message ---------

From: <DoNotReply@state.gov>

Date: Tue, Feb 11, 2025 at 7:07 PM

Subject: Passport Application Status

To: ███████████████████

## Application Status: Additional Information Needed

**We sent you a letter and/or email on 02/11/2025 requesting you provide additional information to complete your passport application. Your application is now on hold and is no longer "In Process." Please note that your processing times may be delayed.**

**Please respond as soon as possible so we can continue processing your application. You must respond to the letter or email within 90 days of the date we sent it.**

**Follow the instructions in the letter and email. If we asked you to provide a physical document, mail the document to the mailing address on the letter. We have tips and reminders on our How to Respond to a Letter or Email webpage.**

**When we start reviewing the information you return to us, your application status update will change to "Additional Information Received, In Process Again". Please note it may take several days for us to receive information when you mail it.**

**Contacting Us:**
**If you did not receive the letter and/or email within one week of 02/11/2025, you may contact us at 1-877-487-2778 and reference your application locator number which is ███████.**

**Check the junk or spam folder of your email account before contacting us. When you contact us, we can send a request to the agency processing your application and ask them to resend the letter and email to you.**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ASHTON ORR, et al., *Plaintiffs*, v. DONALD J. TRUMP, in his official capacity as President of the United States, et al., *Defendants*. | Case No. 1:25-cv-10313-JEK |

**DECLARATION OF BELLA BOE**

I, Bella Boe, herby declare and state as follows:

1.      My name is Bella Boe.[1] I am a plaintiff in the above-captioned action and submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify competently to those facts if called to do so.

3.      I am a United States citizen and a current resident of Cambridge, Massachusetts.  I have lived in Cambridge since 2024, when I moved here from New Jersey.  I am 18 years old, and I use "she" and "her" pronouns.

4.      I am a freshman in college studying government.

5.      I am a transgender woman.

---

[1] Bella Boe is a pseudonym. I am proceeding under pseudonym to protect my right to privacy and to be free from discrimination, harassment, and violence, as well as retaliation for seeking to protect my rights.

1

App. 173

6.        I was diagnosed with gender dysphoria in 2017.

7.        I have lived as female in all aspects of my life since I was eleven years old, and today, I feel fully myself.  I am known only as female to my family, to staff and peers at my school, and in my communities in New Jersey and Cambridge. I have also amended the sex designation to female on my New Jersey driver's license and birth certificate.

8.        Early in my transition, I experienced significant distress when others discovered that I am transgender, including my classmates in high school, and it led to several years of uncomfortable interactions with those around me.  I am thankful that I was able to get support from a therapist during that time, and I am grateful that today I do not have that same worry of being outed as I am perceived as female by those around me, and I rarely am required to disclose that I am transgender.  This is especially important given the rise in anti-transgender violence and sentiment in this country today, and I am only comfortable raising claims in this lawsuit due to my pseudonymous identity because I fear that it would otherwise disrupt my ability to focus on school.

9.        I am an active student on campus.  I am passionate about theater and the arts, and my school offers many opportunities for students like me to take part in international programs and theater productions.  I am the stage manager for my theater group at school, which means I manage and run entire productions.  I love being a stage manager because it provides me with an opportunity to build leadership skills, and it allows me to be fully immersed in an art that I have loved and engaged in since I was six years old.  My theater group travels around the world to put on shows for a range of audiences.  For example, my theatrical association has a production in Bermuda the week of March 16th that I am so excited to serve as stage manager for. I currently

App. 174

have a flight booked to participate in this trip, and I would absolutely attend if I am able to obtain a passport with an "F" sex designation.

10.     I similarly hope to study abroad while obtaining my undergraduate degree, and I would really like to do so in England.

11.     I am only able to partake in these opportunities because I have travel documents, like my passport, that accurately reflect who I am.  That safety allows me to fulfill my educational dreams and goals.

12.     When I travel and interface with government officials, they perceive me as a female. This is not only affirming for me, but it keeps me safe.

13.     My most recent passport, which I received in 2021, has a female sex designation. I sent my passport in for renewal on January 23, 2025 to ensure that my current passport would remain usable for as long as possible.  On February 13, 2025, I received an email notice from the State Department communicating that my application has been processed and that my passport has been shipped to me. That notice is attached hereto as Exhibit A.  Having a female sex designation on my passport affords me safety and comfort while traveling.  With the new policy adopted by the United States, I am extremely terrified that I will no longer have that safety.

14.     I would feel very uncomfortable traveling with a passport that inaccurately stated a male sex designation.  Not only would it erase who I am, it would be confusing for government officials who would otherwise identify me as female based on my gender expression and invite additional, stressful scrutiny.  I do not want my passport to out me as transgender every time I use it, especially when traveling outside of the United States in countries that are less accepting of transgender people.

App. 175

advance my own passions, education, and future career. Without an accurate passport, I am

fearful that I will not be able to leave the United States in a safe and comfortable manner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2025

Bella Boe

Bella Boe

EXHIBIT A

| From: | Malita Picasso |
|---|---|
| To: | Malita Picasso |
| Subject: | FW: Passport Application Status |
| Date: | Monday, February 17, 2025 1:06:43 PM |

---------- Forwarded message ---------

From: <DoNotReply@state.gov>

Date: Thu, Feb 13, 2025 at 1:18 AM

Subject: Passport Application Status

To: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

# Application Status: Shipped

**The U.S. Department of State has shipped your passport book on 02/12/2025.**

**We sent your passport book to you using USPS Express Mail.**

**Your tracking number is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Click the tracking number to check delivery status. You should receive your passport on or around 02/15/2025. ** Save or write down this tracking number now. Future status updates will not display your tracking number.**

**Your new passport and supporting documents are mailed in separate packages at different times. You should expect two separate mailings: one with your new passport and one with your supporting documents. We will provide another status update on the date we mail your supporting documents. This update will not include the tracking number for your passport.**

**Your application locator number is ▓▓▓▓▓▓.**

**Please allow two weeks for your U.S. passport to arrive at the mailing address you provided on your application. If you have not received your passport after two weeks, contact the National Passport Information Center at 1-877-487-2778 (or TDD/TTY 1-888-874-7793) with your application locator number. We will return your supporting documents (such as your birth certificate, previous passport, or naturalization certificate) in a separate mailing that may not arrive for four weeks. You have 120 days from the date the passport was issued to report that you never received your passport. If you do not tell us within 120 days, you will have to reapply and pay the full passport fee.**

**\*\*If you submitted your passport at a U.S. embassy or consulate, the mailing date in this status update is the date we mailed your passport to the embassy or consulate not the date we mailed the passport to you. Your passport may take two weeks to arrive at the embassy or consulate. Mailing times are different for each country. Once the embassy or consulate receives the passport, they will deliver it to you based on local procedures.**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ASHTON ORR, et al., | |
| *Plaintiffs*, | Case No. 1:25-cv-10313-JEK |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants*. | |

**DECLARATION OF CHASTAIN ANDERSON**

I, Chastain Anderson, hereby declare and state as follows:

1.      My name is Chastain Anderson.  I am a plaintiff in the above-captioned action and submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I am over the age of 18, of sound mind, and in all respects competent to testify.  I have personal knowledge of the information contained in this Declaration and would testify competently to those facts if called to do so.

3.      I am United States citizen and live near Richmond, Virginia.  I have lived in the Richmond area since 2018, when I moved here from Louisiana.  I use "she" and "they" pronouns.

4.      I hold a PhD in Cell and Molecular Biology and am a board-certified toxicologist. I work as a Principal Scientist with a global consumer product company, where I have been employed for six years.  I love my job, and I love working in the consumer toxicology space, specifically on applying new and emerging technologies to issues impacting human health.

1

5.      I am a transgender woman. My sex assigned at birth was male, but I have a female gender identity.

6.      I was diagnosed with gender dysphoria in 2015.

7.      I have lived as a female in all aspects of my life since 2015.  I am known only as a female to my family, to my workplace, and in my community.  I legally changed my name in September of 2016 via court order in Louisiana and updated my identity documents to reflect this change.

8.      When I interface with coworkers, restaurant servers, and government officials alike, they perceive me as a female. This is not only affirming for me, but it keeps me safe.

9.      As my career has progressed, I now need to travel internationally for work with increasing frequency. I have a work conference in France in October that is sponsored by CORESTA, an organization whose mission is to promote and facilitate international cooperation and best practices in scientific research related to tobacco.  It is important for my career and for my company that I attend this conference, as I am the only person at my company who has the requisite subject matter expertise to represent my company globally among scientists in my field of work.

10.      I was able to update my Virginia driver's license in 2019 to reflect my accurate, female sex designation, but my passport has a male sex designation.  I sent my passport in for expedited processing on December 27, 2024, to a passport agency in Philadelphia to receive an accurate, female sex designation. After the Complaint was filed in this case on February 7, 2025, I received a communication by email from the State Department on February 12 stating that my application has been processed and that my passport has been mailed to me.

App. 180

11.     On February 14th, my passport was returned to me through the mail with the sex designated as an M, rather than the F that I had requested.

12.     Having a female sex designation on my driver's license has been very important to me, as I am rarely misgendered when presenting my driver's license, which ensures my safety as I navigate local and domestic travel and venues.  Before having an accurate driver's license, I would run into issues carrying out everyday tasks.  For example, providing a driver's license with an inaccurate sex designation outed me as transgender when trying to attend concerts, order a drink, open a bank account, and lease an apartment.

13.     I am terrified that having an inaccurate sex designation on my passport will place me in uncomfortable and unsafe circumstances.  In 2017, prior to updating my driver's license to my accurate sex designation, I had a terrible experience going through a TSA security checkpoint at the Richmond Airport.  Two agents isolated me into a cubicle, where I was left alone for thirty minutes, until a manager entered and conducted strip search of my body, and I felt that it was direct result of the fact that my body did not match my sex designation on my license.  I am no stranger to these experiences, but I have not had to confront them since having accurate identification.

14.     I am reaching a part of my career where I will be required to do more international travel as an important part of my job, and there is travel that I am unwilling to do with an inaccurate passport. As part of my career, it is possible that my work will ask that I travel to destinations that are openly hostile towards transgender people, and I would be unable to do so. And even for jurisdictions that are not so openly and aggressively hostile towards transgender people, it remains deeply disturbing and dangerous to travel with an inaccurate passport.  I am terrified to experience harassment in other countries resulting from showing a passport that does

3

App. 181

not reflect who I am and outs me as transgender. I am suffering from personal anxiety knowing that a document that is supposed to help identify me will now not only make it *harder* to identify me, but also put me at harm at every use. And such harm may also occur during my return to the United States from international travel.

15.     I am further concerned that increasing confusion and processing times by showing an inaccurate passport when traveling internationally may result in missed calls, meetings, or flights and may result in lost opportunities or create a financial burden. I am also disheartened that I will potentially lose out on advancement potential at my company given the fact that my cisgender colleagues will be able to attend important international meetings and conferences that I cannot.

16.     I am a woman, and I am recognized as such in every aspect of navigating this world. If I had a passport that would out me as transgender to strangers, domestic and international, I would have many concerns, including for my safety and my ability to protect my transgender status and be accepted for who I am.

17.     I cannot stay silent about the very real harms that this policy inflicts on transgender women like me.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on *February 17th*, 2025

_____
Chastain Anderson

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR, et al.,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
et al.,

        *Defendants*.

Case No. 1:25-cv-10313-JEK

## DECLARATION OF DREW HALL

I, Drew Hall, hereby declare and state as follows:

1.      My name is Drew Hall. I am a plaintiff in the above-captioned action and submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify competently to those facts if called to do so.

3.      I am a United States Citizen and a permanent resident of Wisconsin. I am twenty-five years old and I use "they" and "them" pronouns.

4.      I am currently a PhD student in Botany at the University of British Columbia ("UBC"), and thus currently reside in Vancouver, British Columbia in Canada. I have lived in Vancouver since August 2022 when my program began, and I will live here for another two to three years (approximately 2027-2028) until my program concludes. In addition to studying at UBC, I work as a Research Assistant and Teaching Assistant at my university.

1

5.      My sex assigned at birth was male, but I do not have a male gender identity.

6.      I was diagnosed with gender dysphoria in August of 2024.

7.      I am a nonbinary femme person, which means that even though my sex assigned at birth was male, I do not live as or identify as male and instead express myself in a feminine manner.

8.      I have lived as a nonbinary person in all aspects of my life since 2024, but I have known that my gender identity was different than my sex assigned at birth since 2022.  I am known as a non-binary person to my family, to my fellow classmates and professors, and in my community.  I finally feel like myself, and I finally feel like those around me see me for who I am.

9.      I am frequently required to travel internationally given that I have been studying and living full time in Canada for over two years and will be here for another few years. My family continues to reside in Wisconsin, and I travel back to the United States at least four to five times a year.  Two to three of those visits are typically to see my family in Wisconsin, and the other visits are to see close friends in Washington and Oregon given my proximity to those two states.  For example, this May, I need to travel to Wisconsin for a family wedding, and I will be returning to Wisconsin for a Botany conference in July of this year.

10.      I legally changed my name by court order in Wisconsin in December of 2024, and have updated my social security card and driver's license, which now both accurately reflect my name and an "F" for my sex designation.  My birth certificate has my name updated but not my sex designation, as Wisconsin requires a proof of sex change, and at this time, I cannot provide that.

App. 184

11.     When I interface with government officials, they do not perceive me as male. Instead, I am perceived as a femme person. This is not only affirming for me, but it keeps me safe.

12.     My United States passport (which is my only passport), however, still reflects an inaccurate name and a male sex designation.  I mailed it to the Department of State's national processing center on January 9, 2025, and I was notified by e-mail that it arrived at the center on January 17. After the Complaint was filed in this case on Friday, February 7, 2025, I received an email from the State Department on February 11 stating that my application was approved for my passport book and that I should receive it in the mail around February 17, 2025.  That email notice is attached hereto as Exhibit A.  I do not know whether the agency will accurately issue my passport to match my other identity documents.  I currently do not have access to my passport, and I am unable to leave Canada.

13.     I rely on my passport frequently to travel back to the U.S. to see my family and friends.  However, there are many other reasons I utilize my passport while living in Canada.  To open a bank account in Vancouver, I am required to present my U.S. passport.  My employer (UBC) requires my passport to employ me at the university.  Any time I interact with the Canadian government, I need to present my U.S. passport, as it is the only form of identification that Canada recognizes as a non-citizen and non-permanent resident.  Without my passport, I am facing many struggles in residing in Vancouver.

14.     I am deeply concerned that having a male sex designation on my passport will lead to extremely uncomfortable interactions with border agents and TSA.  Given that my other identity documents have been updated, I am also worried that carrying a passport with a name and sex designation that does not match my other identity documents will cause even more

App. 185

confusion and distress each time I must present my passport. I currently am able to be in Canada as I have a study permit, but that permit needs to match the identification number associated with my passport. Any time I update my passport, I will be required to reapply for the study permit and pay the associated fee. Additionally, non-matching documents may present administrative challenges for me, including with respect to my temporary status documents in Canada, and when I visit places where multiple forms of identification are required.

15.     If I were to carry a passport with a male sex designation, I am afraid I will encounter additional, invasive scrutiny and harassment every time I use it. I am not read as male given my feminine expression, and I would not feel safe while traveling, especially internationally, with documentation that inaccurately indicated a male sex designation. Given my presentation and the way that I am perceived by other people, a male sex designation would immediately indicate to any person who looks at my ID that I am transgender, which opens the door to further anti-transgender sentiment. This gives me a lot of anxiety, especially given the recent increase in ant-transgender rhetoric and violence.

16.     Today, I am so much more myself, and a large part of that is due to having documents that reflect who I am and how others see me. I am so lucky to be supported and affirmed by so many wonderful people who accept me for who I am, and I am disappointed that my own federal government is not one of them.

17.     It feels alienating to know that the U.S. government does not want to recognize me for who I am. It makes me not want to return, knowing that I will confront suspicious looks when I present my passport solely based on the fact that I am nonbinary and do not live in accordance with my sex assigned at birth. I am devastated that my country has implemented a policy that interferes with my ability to have an accurate and usable passport.

4

I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>February 17</u>, 2025

Drew Hall

EXHIBIT A

| From: | Malita Picasso |
| --- | --- |
| To: | Malita Picasso |
| Subject: | FW: Passport Application Status |
| Date: | Monday, February 17, 2025 5:55:01 PM |

**From:** DoNotReply@state.gov
**Date:** February 12, 2025 at 08:05:21 PST
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮
**Subject: Passport Application Status**

## Application Status: Mailed

The U.S. Department of State has mailed your passport book on 02/12/2025.

We sent your passport book to you using First Class Mail.

Your new passport and supporting documents are mailed in separate packages at different times. You should expect two separate mailings: one with your new passport and one with your supporting documents. We will provide another status update on the date we mail your supporting documents. This update will not include the tracking number for your passport.

Your application locator number is ▮▮▮▮▮▮ .

Please allow two weeks for your U.S. passport to arrive at the mailing address you provided on your application. If you have not received your passport after two weeks, contact the National Passport Information Center at 1-877-487-2778 (or TDD/TTY 1-888-874-7793) with your application locator number. We will return your supporting documents (such as your birth certificate, previous passport, or naturalization certificate) in a separate mailing that may not arrive for four weeks.

You have 120 days from the date the passport was issued to report that you never received your passport. If you do not tell us within 120 days, you will have to reapply and pay the full passport fee.

**If you submitted your passport at a U.S. embassy or consulate, the mailing date in this status update is the date we mailed your passport to the embassy or consulate not the date we mailed the passport to you. Your

passport may take two weeks to arrive at the embassy or consulate. Mailing times are different for each country. Once the embassy or consulate receives the passport, they will deliver it to you based on local procedures.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR, et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants*.

Case No. 1:25-cv-10313-JEK

## DECLARATION OF REID SOLOMON-LANE

I, Reid Solomon-Lane, hereby declare and state as follows:

1. My name is Reid Solomon-Lane. I am a plaintiff in the above-captioned action and submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2. I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify competently to those facts if called to do so.

3. I am United States Citizen and resident of North Adams, Massachusetts. I am thirty-six years old and use "he" and "him" pronouns. I have lived in Massachusetts since July of 2022, when I moved here from Austin, Texas. I live here with my wife and three young children.

4. I was a flight attendant for more than eight years and now serve as a flight coordinator for a volunteer pilot organization.

5.　　　I am a transgender man. My sex assigned at birth was female, but I have a male gender identity.

6.　　　I was diagnosed with gender dysphoria in 2007.

7.　　　I have lived as a man in all aspects of my life since 2007. I am known only as male to my family, my workplace, and in my community in Massachusetts, and I am only perceived as male by people who see me. This allows me to feel safe in interactions with new people and prevents me from having to come out as transgender with each encounter.

8.　　　This safety is especially essential when I am traveling.

9.　　　I am frequently required to travel internationally because my mother-in-law purchased a home in Ireland three years ago and spends a lot of her time there. In order for her to be able to see her grandchildren, my family and I travel to Ireland for vacations. We also visited Montreal in 2022 and have plans to return to Montreal with friends in the next year given that we are just across the border from Canada.

10.　　　I am grateful that I have been able to obtain identity documents that accurately reflect who I am. I legally changed my name in 2007 via court order in Texas. My social security card and driver's license both accurately reflect my name and male sex designation.

11.　　　My United States passport, which is the only passport I possess, also reflects an accurate name and male sex designation, and expires in 2028. Having an accurate passport provides me comfort, especially when traveling with three small children outside of the United States. If I did not have a passport that reflects who I am, it would dramatically impact the way I travel. I would feel much less secure leaving the country with my children, as having a sex designation that so flagrantly does not match my outward gender expression would potentially put me and my children at risk. Because my passport serves as an identity and citizenship

document that accurately reflects my gender identity and presentation, it is my preferred method

of identification and citizenship verification in administrative situations.  Removing access to an

accurate passport will cause me repeated stress in having to out myself unnecessarily in routine

bureaucratic situations.

12.      I thought I was at the point in my life where I could live my life with safety and

ease, as an adult, as a husband, and as a parent.  If my passport were to reflect a sex designation

that is inconsistent with who I am, that safety and ease will be taken away from me.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on February 17 , 2025

Reid Solomon-Lane

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ASHTON ORR, et al.,

              *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

              *Defendants*.

Case No. 1:25-cv-10313-JEK

### DECLARATION OF SAWYER SOE

I, Sawyer Soe, hereby declare and state as follows:

1.      My name is Sawyer Soe[1]. I am a plaintiff in the above-captioned action and submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify competently to those facts if called to do so.

3.      I am United States Citizen and resident of Salem, Massachusetts. I am thirty-five years old. I grew up in New Hampshire, so New England has always been home to me. I use "they" and "them" pronouns, but any pronouns are fine with me.

4.      I work for a company that is a leader in video game development. I design games and lead a creative team. I love what I do for work, as it allows me to express myself creatively

---

[1] Sawyer Soe is a pseudonym. I am proceeding under pseudonym to protect my right to privacy and to be free from discrimination, harassment, and violence, as well as retaliation for seeking to protect my rights.

1

and build experiences that engage people of all ages.  My company has a global presence, and my colleagues are based in the United States and Canada, as well as in South America and Europe.

5.      I am a nonbinary person.  My sex assigned at birth was female, but I do not identify with a binary sex, and the term "nonbinary" accurately captures my gender as it encompasses both masculine and feminine expression.

6.      I have lived as a nonbinary person in all aspects of my life since 2019.  I have always known who I am to some degree when it comes to my gender identity, as I am a naturally androgynous person, and that is typically how others perceive me as well.  As I have grown older, there has been more terminology and better shared social consciousness about language.  I am fully myself at work, and amongst friends and family within my generation.  But I do not share this aspect of my identity unless asked directly in order to protect my privacy and safety.

7.      During my time in this industry, there has been targeted harassment of transgender and nonbinary game developers, including through doxxing and threats of physical violence.  I am grateful that I am able to seek relief through this lawsuit through proceeding by pseudonym – otherwise, I would not be able to participate due to fear for my physical safety, my online safety, and my ability to continue working as a game developer.

8.      I was able to obtain a Massachusetts driver's license with an X sex designation in July of 2023, and this has allowed me to navigate travel and daily interactions safely and comfortably.  Having an "X" sex designation on my identity documents allows me to escape the arbitrary enforcement of a gender projected on me solely based on my sex assigned at birth.  The "X" designation provides me with freedom and privacy that allows me to exist in a way that is free of a label I did not choose for myself and is inconsistent with how I live.

2

App. 195

9.      I have not been able to update my United States passport in a similar manner. This has not been a huge problem for during the last few years, as my previous passport with a female sex designation had expired in August of 2019, right before the COVID-19 pandemic. When the pandemic began in 2020, I did not feel safe traveling by plane for fear of contracting COVID and other illnesses.

10.      Recently, I am beginning to travel more.  My team is planning an on-site collaboration with our colleagues in Canada, and I will be required to travel internationally within the next three months, and potentially several more times in the coming year.

11.      I would feel safer if I had an "X" sex designation on my passport because it would be more consistent with my identity, it would protect my privacy as it would prevent disclosure of my sex assigned at birth to strangers, and it would match other identity documents that I currently carry.  Due to the new passport policy issued by the federal government, I will no longer be able to obtain a sex designation on my passport that accurately reflects who I am and how others perceive me.

12.      I am disappointed that the federal government seeks to invalidate my existence and the existence of many nonbinary individuals like me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __February 17__, 2025

_____
Sawyer Soe

3