No. 25-1579

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————————

ASHTON ORR; ZAYA PERYSIAN; SAWYER SOE; CHASTAIN ANDERSON; DREW HALL; BELLA BOE; REID SOLOMON-LANE; VIKTOR AGATHA; DAVID DOE; AC GOLDBERG; RAY GORLIN; CHELLE LEBLANC, on behalf of themselves and others similarly situated,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in the official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES OF AMERICA,

Defendants-Appellants.

————————————————

On Appeal from the United States District Court
For the District of Massachusetts

————————————————

## JOINT APPENDIX, VOL. III (pages 576-932)

————————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH
LEWIS S. YELIN
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave. NW, Rm. 7239*
  *Washington, D.C. 20530*
  *(202) 514-3425*
  *lewis.yelin@usdoj.gov*

# TABLE OF CONTENTS

**Page**

ECF 32-1, Skylar Davidson, *Gender Inequality: Nonbinary Transgender People in the Workplace,* 2 Cogent Social Sciences 1 (2016) ............................................................ 576

ECF 32-2, The Mental Health and Well-being of LGBTQ Youth who are Intersex (Dec. 3, 2021) .................................................................................................................. 590

ECF 32-3, OII Europe, *Intersections* ............................................................................ 636

ECF 32-4, Travel.State.Gov, *Passport Help* ................................................................. 660

ECF 32-5, Travel.State.Gov, *Sex Markers in Passports* ............................................... 663

ECF 32-6, Ken Lippenstein, Substack.com post ........................................................... 665

ECF 32-7, Jamie Wareham, *Beaten, Stabbed and Shot: 320 Trans People Killed in 2023*, Forbes.com (Nov. 13, 2023) ......................................................................................... 669

ECF 32-8, ilgaworld database*, Legal Frameworks, Legal Gender Recognition* .................. 676

ECF 33-1, Gender Change, 8 F.A.M. 403.3 (June 27, 2018) ....................................... 683

ECF 33-2, DS-11, Application for a U.S. Passport (Apr. 2022) ................................... 692

ECF 33-3, DS-82, U.S. Passport Renewal Application for Eligible Individuals (Apr. 2022) ............................................................................................................................ 699

ECF 33-4, DS-5504, Application for a U.S. Passport for Eligible Individuals (Apr. 2022) ............................................................................................................................ 706

ECF 33-5, DS-11, Application for a U.S. Passport (Dec. 2020) .................................. 713

ECF 33-6, DS-82, Passport Renewal Application for Eligible Individuals (Mar. 2020) ....................................................................................................................................... 720

ECF 33-7, DS-5504, Application for a U.S. Passport for Eligible Individuals (Nov. 2019) ............................................................................................................................ 727

ECF 33-8, Ernesto Londoño, *Transgender Americans Challenge Trump's Passport Policy in Court*, New York Times (Feb. 7, 2025) ........................................................................ 734

ECF 33-9, Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 Michigan J. of Gender & L. 373 (2013)................ 740

ECF 53-1, Declaration of Matthew Pierce (Mar. 12, 2025) ......................................... 840

ECF 62-1, Rebuttal Declaration of Sarah D. Corathers, MD (Mar. 18, 2025)........... 850

ECF 76, Amended Class Action Complaint For Declaratory And Injunctive Relief........................................................................................................................ 856

ECF 76-1, Executive Order 14168 of January 20, 2025................................................. 927

ECF 89-1, Second Declaration of Matthew Pierce (May 14, 2025) ........................... 932

# EXHIBIT D



## Cogent Social Sciences

ISSN: (Print) 2331-1886 (Online) Journal homepage: www.tandfonline.com/journals/oass20

# Gender inequality: Nonbinary transgender people in the workplace

**Skylar Davidson |**

**To cite this article:** Skylar Davidson | (2016) Gender inequality: Nonbinary transgender people in the workplace, Cogent Social Sciences, 2:1, 1236511, DOI: 10.1080/23311886.2016.1236511

**To link to this article:** https://doi.org/10.1080/23311886.2016.1236511

© 2016 The Author(s). This open access article is distributed under a Creative Commons Attribution (CC-BY) 4.0 license

Published online: 22 Sep 2016.

Submit your article to this journal ⬚

Article views: 47660

View related articles ⬚

View Crossmark data ⬚

Citing articles: 38 View citing articles ⬚

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511



 

SOCIOLOGY | RESEARCH ARTICLE

# Gender inequality: Nonbinary transgender people in the workplace

Skylar Davidson[1]*

Received: 16 August 2016
Accepted: 08 September 2016
Published: 22 September 2016

*Corresponding author: Skylar Davidson, Department of Sociology, University of Massachusetts Amherst, Amherst, MA, USA
E-mail: sdavidson@soc.umass.edu

Reviewing editor:
Halsall Jamie, University of Huddersfield, UK

Additional information is available at the end of the article

**Abstract:** This study uses the National Transgender Discrimination Survey to evaluate the employment outcomes of nonbinary transgender people (those who identify as a gender other than man or woman). Regression analyses indicate that being out as a nonbinary transgender person has different effects on nonbinary transgender people based on sex assigned at birth, with those assigned male at birth tending to be discriminated against in hiring but those assigned female at birth more likely to experience differential treatment once hired. Transgender women tend to have worse employment experiences than nonbinary transgender people and transgender men, the latter two tending to have similar outcomes.

Subjects: Social Class; Sociology & Social Policy; Sociology of Work & Industry

Keywords: economic inequality; workplace; transgender; nonbinary gender; discrimination

## 1. Introduction

Most research on employment gender inequality focuses on the distinctions between men and women, reinforcing a binary conception of gender. Even the United States Equal Employment Opportunity Commission (EEOC) includes only male and female as gender options, meaning that the EEOC cannot identify who is transgender and that nonbinary transgender people (those whose gender identity is something other than only man or only woman) are not acknowledged and

ABOUT THE AUTHOR

Skylar Davidson is a sociology PhD student at the University of Massachusetts Amherst whose research and teaching interests include economic inequality, education, and futurology.

PUBLIC INTEREST STATEMENT

Recently, there has been increased coverage of transgender people in the mainstream media. However, mainstream media sources sometimes provide narrow or inaccurate information about transgender people, sometimes ignoring the existence of nonbinary transgender people (those who identify as a gender other than man or woman) entirely. This study uses information from the National Transgender Discrimination Survey to explore the employment outcomes of nonbinary transgender people. This study finds that being out as a nonbinary transgender person has different effects on nonbinary transgender people based on sex assigned at birth, with those assigned male at birth tending to be discriminated against during the hiring process but those assigned female at birth more likely to experience differential treatment once hired. Transgender women tend to have worse employment experiences than nonbinary transgender people and transgender men, the latter two tending to have similar outcomes.

  

© 2016 The Author(s). This open access article is distributed under a Creative Commons Attribution (CC-BY) 4.0 license.

Page 1 of 12

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511

counted. This study compares employment outcomes among a variety of transgender people: Transgender men, transgender women, and nonbinary transgender people (whom I will call "nonbinaries"). Thus this study contributes to employment research by providing information on how nonbinaries, a profoundly understudied group, fare in the workplace.

This study uses the National Transgender Discrimination Survey, which was conducted by the National Center for Transgender Equality and the National Gay and Lesbian Task Force in 2008. This survey provided a final sample of 1,389 nonbinaries, 2,906 transgender women, and 1,347 transgender men. Using a survey of this size allows this study to greatly expand upon prior research on transgender people, much of which has been based on small samples and has not recognized the possibility of nonbinary genders (Kuper, Nussbaum, & Mustanski, 2012).

Recently, there has been attention to transgender people in the mainstream media, but this attention generally does not include accurate and comprehensive information about transgender people (Koch & Bales, 2008; Smyak, 2016). Further academic research is needed to both advance scholarly understanding of transgender people and to provide material that increases the public's understanding of transgender people. This study increases knowledge about transgender people's experiences through exploring how nonbinaries' outness influences their experiences in the workplace.

## 2. Literature review

### 2.1. Gender inequality

A variety of theories about inequality between men and women posit that categorical distinctions allow for the generation of inequality (e.g. Ridgeway, 2011; Tilly, 1998). Nonbinaries, however, do not inhabit a widely known and understood category, and transgender men and transgender women transition between categories. Because the norm in Western society is to view gender as a binary biological construct, transgender and gender nonconforming people challenge the categorical norms about gender and sexuality (Monro, 2003). This study builds upon research about gender categorization and inequality by exploring what happens to people in a group that is likely to be miscategorized or not categorized.

### 2.2. What is a transgender person? What are nonbinary genders?

Because transgender terminology is complex and rapidly changing, this section begins with definitions of important terms. "Transgender" is an umbrella term that refers to people whose gender identity differs from the sex they were assigned at birth at least some of the time, and the term "cisgender" refers to people whose gender identity corresponds to the sex they were assigned at birth. Thus someone who is not transgender is cisgender. Sex is a biological category: designations of male, female, or intersex are based on a number of factors, including chromosomes, hormones, and genitalia. Though it is typical to view sex as a binary of male and female, the way in which this is done has varied across time and place (Fausto-Sterling, 2000). Gender is distinct from sex, but related: it is the translation of biological realities into social expectations for "men" and "women" (Beemyn & Rankin, 2011; Sausa, 2002). As with sex, it is common to view gender as a binary and marginalize expression that does not fit within this binary.

Gender identity refers to individual people's sense of their own sex and/or gender, which may differ from their gender expression and from the way other people perceive their sex and/or gender (Beemyn & Rankin, 2011). People may consider themselves transgender because of their feelings about their biological sex, because of their feelings about gender roles, or both. Gender identity is distinct from sexual orientation, which is the pattern of a person's attraction to others (Sausa, 2002). Both transgender and cisgender people may identify with any sexual orientation, including but not limited to heterosexual, gay, lesbian, bisexual, queer, or asexual (Beemyn & Rankin, 2011). Gender identity is also distinct from gender expression, which is the degree to which someone expresses masculinity, femininity, both, or neither.

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511

✺ cogent ⋅⋅ social sciences

People's gender identity may be man or woman, or it may be something else, such as both man and woman, neither man nor woman, or a unique identity. For example, Beemyn and Rankin (2011) conducted a survey in 2005 and 2006, which was open to anyone who considered themselves part of the umbrella term "transgender." As in the National Transgender Discrimination Survey, there were varied written responses, some of which were unique (2011). Some gender identities that fall under the umbrella term "nonbinary gender" are genderqueer, agender, androgynous, Two-Spirit, gender nonconforming, gender variant, third gender, genderfluid, and bigender.

Gender dysphoria refers to transgender people's feelings of distress because of the mismatch between their sex assigned at birth and their gender identity. Gender dysphoria can take the form of physical dysphoria, which is distress regarding sex characteristics such as genitals, breasts and facial hair; social dysphoria, which is distress regarding social interactions such as being perceived as the incorrect gender or being forced to wear clothing associated with the incorrect gender; or both physical and social dysphoria. All three transgender groups (transgender men, transgender women, and nonbinaries) can experience gender dysphoria. In other words, in contrast with some misleading information in the mass media, nonbinary genders are identities comparable to those of "man" and "woman" rather than fashion choices.

### 2.3. Transgender people in employment settings

#### 2.3.1. Overview of workplace inequality for transgender people
Transgender people have reported difficulty securing and maintaining employment as a result of their gender identity and expression. Unemployment rates for transgender people are approximately twice as high as those for cisgender people (Grant et al., 2011), about the same difference as between whites and blacks (Bureau of Labor Statistics, 2015). About half of transgender people have reported adverse job outcomes, such as being fired, not hired, or denied a promotion as a result of their gender identity or expression (Grant et al., 2011). This is higher than the rates for cisgender people; for example, 5.6% of cisgender people report being fired because of discrimination, 16.0% report not being hired because of discrimination, and 12.7% report being refused a promotion because of discrimination (Kessler, Mickelson, & Williams, 1999). Being transgender can also influence someone's salary; Schilt and Wiswall (2008) found that while transgender women on average lose approximately a third of their salary after transitioning, transgender men on average see no change in their salary or a slight increase. This finding relates to the wage gap between men and women more generally. Transgender people of color, particularly African Americans, report poorer employment outcomes than white transgender people (Grant et al., 2011). The literature has established evidence of employment difficulty for transgender people. However, most studies on transgender people have used small qualitative samples without comparison baselines, so the literature has not established the scope of the problem or made comparisons of inequality between different categories of transgender people.

#### 2.3.2. Varieties of discrimination in the workplace
Transgender people have identified a number of issues in their workplaces that influence their ability to feel comfortable in their work environment, demonstrating the variety of experiences transgender people have. For transgender people who are transitioning, one issue is workplaces' lack of procedures for ensuring that others in the workplace are aware of how to treat a transgender person who is transitioning (Whittle, Turner, & Al-Alami, 2007). Hierarchical workplaces can exacerbate this issue, because transgender people must carefully determine the degree to which they can be out at the workplace to avoid harassment or job loss (Dietert & Dentice, 2009). They may only be able to be out to some people—possibly only authority figures, and possibly never authority figures (Dietert & Dentice, 2009). Some transgender people who have already completed their transition attempt to avoid disclosing their transgender status (Dietert & Dentice, 2009).

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511

cogent ·· social sciences

Bathrooms are a common source of difficulty for transgender people in the workplace. Many report being refused access to bathrooms or being verbally or physically attacked in bathrooms (Herman, 2013; Nadal, Skolnik, & Wong, 2012). Another problem transgender people experience in a variety of settings is verbal harassment. People may call a transgender or gender nonconforming person by incorrectly gendered terminology, whether intentionally or not, and possibly in a public setting that causes embarrassment (Nadal et al., 2012). This is especially a problem for transgender women, who may be stereotyped as sexual deviants (Nadal et al., 2012).

Transgender and gender non-conforming people report that gender-specific dress codes cause them difficulty, because they require them to dress in a manner inconsistent with their identity (Levi, 2007). People may lose their jobs for disregarding dress code rules (Levi, 2007). In addition, conflicts between someone's gender identity or expression and official identity documentation can lead to confusion or unintended outing. Changing one's name and gender on official identity documents can be difficult, because changing one document is sometimes dependent on changing another, which is in turn dependent on another (Nadal et al., 2012). In most places, it is impossible to obtain official identity documents listing a nonbinary gender. Governments may not have explicit procedures for changing official identity documents (Whittle et al., 2007), and some transgender people are not interested in obtaining surgery, which may be necessary to change official documents. Employers who are unfamiliar with difficulties involved in changing identity documents may be confused and not know how to react (Whittle et al., 2007).

## 2.4. Hypotheses

There is a lack of data on nonbinary transgender people in the workplace; however, prior research regarding transgender and gender-nonconforming people in general has demonstrated that they tend to encounter hostile or confused reactions from people in everyday situations. Employment policies acknowledging and protecting transgender people are often lacking, and when they do exist, they may elicit confusion and negative reactions. In many situations, nonbinaries' identities are not acknowledged, and nonbinaries are forced to affiliate with a binary gender option. Thus in many employment situations, nonbinaries find it difficult to fit in, to be acknowledged and accepted by coworkers. This study explores differences in outcomes that can occur as a result of hostile treatment on the part of employers or coworkers.

Hypothesis 1: Nonbinaries who are out about their gender identity will encounter more negative employment outcomes compared to nonbinaries who are not out about their gender identity.

Hypothesis 2: Nonbinaries who were assigned male at birth will encounter more negative employment outcomes than nonbinaries who were assigned female at birth.

As described in the literature, transgender women (assigned male at birth) tend to experience worse outcomes than transgender men (assigned female at birth). Prior research suggests that people assigned male at birth who deviate from masculinity (a valued characteristic) will encounter negative outcomes for doing so, and people assigned female at birth who deviate from femininity (a less valued characteristic) will encounter less hostility for doing so.

Hypothesis 3: Nonbinaries of color will encounter more negative employment outcomes than white nonbinaries.

Gender identity intersects with race to create additional challenges for people of color.

Hypothesis 4: Transgender women will encounter more negative employment outcomes than nonbinaries. Transgender men will encounter better employment outcomes than nonbinaries.

App. 581

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511



Prior research on transgender women describes them as overwhelmingly experiencing negative outcomes. In contrast, there are sometimes benefits for transgender men, such as an increase in salary. Employers, customers, and coworkers may be more likely to react to nonbinaries with confusion rather than either hostility directed toward a highly devalued category (that of transgender woman) or the respect that is often granted to men.

## 2.5. Data and methods

### 2.5.1. Overview of the NTDS

This study uses data from the National Transgender Discrimination Survey (NTDS). The NTDS met the ethical standards of the Pennsylvania State University Institutional Review Board with regard to confidentiality and humane treatment of research participants. The researchers obtained participants through about 800 transgender organizations and about 150 online listserves, and the total number of respondents in this survey was 6,456. The NTDS follows the precedent of Blumstein and Schwartz's (1983) American Couples study in size and methods. For that study, they surveyed about 6,000 couples in order to investigate experiences of marriage and cohabitation across sexual orientation, demonstrating the value of large-sample non-random surveys for studying LGBT people.

In contrast to much prior research on transgender people, based on small samples, often from clinical settings (Kuper et al., 2012), the NTDS was designed to be large and as representative as possible of the transgender and gender nonconforming population of the United States. Though it is not a random sample and probably has some representational bias, perhaps underrepresenting racial and ethnic minorities and overrrepresenting highly educated people (Harris, 2015), it does represent a demographically diverse population, including substantial variation along the lines of race, education, and age.

### 2.5.2. Coding decisions

The question about sex assigned at birth had two responses, "male" and "female." The question about gender had four responses, "male/man," "female/woman," "part time one gender, part time another," and "other." The NTDS also had questions in which respondents could express the degree to which they identify "not at all," "somewhat," or "strongly" with certain transgender terms.

Write-in responses were coded as nonbinaries, regardless of whether they were assigned male or female at birth, for a total of 859. Added to the respondents who wrote in their gender are the 695 respondents who chose "part time as one gender, part time as another" who identified strongly with the terms gender nonconforming or gender variant, genderqueer, androgynous, third gender, Two-Spirit, and other, which are all terms that fall under the umbrella category of "nonbinary gender." Thus there is a total of 1,554 nonbinaries.

The category of transgender women includes those people who chose "female/woman" as their gender identity but did not choose "female" as their sex assigned at birth (2,273 people). In addition, the category of transgender women is composed of those people who chose "part time as one gender, part time as another" and also stated that they identified strongly with the term "male to female" (679 people), for a total of 2,952 transgender women. Similarly, the category of transgender men contains those people who chose "male/man" as their gender identity but did not choose "male" as their sex assigned at birth (1,319 people). In addition, this category includes those people who chose "part time as one gender, part time as another" and also stated that they identified strongly with the term "female to male" (119 people), for a total of 1,438 transgender men. Respondents who fit none of these criteria, including cross-dressers and drag queens (1,214), were dropped.

### 2.6. Variables

The employment outcome dependent variables are whether the respondent is currently unemployed and whether as a result of being transgender the respondent has been underemployed, lost a job, been denied a promotion, and been removed from direct contact with clients, customers, or

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511



patients. Both those respondents who are currently looking for a job and those who have stopped looking count as unemployed. The other four dependent variables are yes/no questions.

The outness and transgender appearance variables are ordinal. The question regarding outness ("How many people know or believe you are transgender/gender nonconforming on the job?") has these responses: none, a few, some, most, and all. For simplicity, these responses were collapsed into three categories: none, some (composed of "a few" and "some" from the previous question), and most/all (composed of "most" and "all" from the previous question). The three transgender groups are out at similar rates in the workplace (34% of nonbinaries, 34% of transgender men, and 44% of transgender women report being out to most or all people). Outness may reflect different choices for nonbinaries compared to the other two transgender groups, however, because nonbinary genders are not mainstream categories. It is possible for a transgender man or a transgender woman to appear cisgender, so some transgender men and transgender women are able to present themselves as their gender identity without calling attention to their transgender status. In contrast, a nonbinary transgender person must identify themselves as transgender in order for their gender identity to be recognized.

The question about transgender appearance ("People can tell I'm transgender/gender non-conforming even if I don't tell them") has these responses: always, most of the time, sometimes, occasionally, and never. This question was collapsed into three responses: always/most of the time (composed of "always" and "most of the time" from the previous question), sometimes (composed of "sometimes" and "occasionally" from the previous question), and never. The survey did not have the means to compare nuances of appearance, such as whether people know whether someone is transgender based on clothing, secondary sex characteristics, mannerisms, a combination of these, or something else.

### 2.6.1. Baseline comparisons

Table 1 descriptively compares nonbinaries, transgender women, and transgender men in terms of labor market outcomes. Compared to nonbinaries, transgender women have a higher unemployment rate and experience more underemployment, job loss, denial of promotions, and removal from contact with clients, customers, or patients. Nonbinaries are more likely to have experienced underemployment, been denied a promotion or been removed from direct contact with clients or customers than transgender men. Like transgender men, nonbinaries have better outcomes than transgender women on all measures. All groups of transgender people have a higher unemployment rate than the general population. (The unemployment rate, including discouraged workers, for the United States as a whole in 2008 was 10.5% Bureau of Labor Statistics, 2011). The following regression analyses explore the magnitude of these differences, controlling for relevant demographic and human capital factors.

| Table 1. Labor market outcomes of nonbinaries, transgender men, and transgender women | | | |
|---|---|---|---|
| | Nonbinaries (%) | Transgender men (%) | Transgender women (%) |
| Unemployed | 12.53 | 13.59 | 15.84 |
| Experienced Underemployment | 43.87 | 41.44 | 49.05 |
| Lost job | 18.98 | 19.15 | 36.67 |
| Denied promotion | 20.53 | 16.99 | 29.50 |
| Removed from contact | 18.58 | 13.19 | 26.45 |

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511



### 2.6.2. Regression models

Models for all dependent variables use logistic regression. This study reports odds ratios (a measure of the likelihood of an event occurring). Each model includes outness, appearance (appearing transgender or gender nonconforming), and sex assigned at birth. For sex assigned at birth, 0 stands for male and 1 stands for female; for outness, "not out" is the reference group, and for appearance, "not visibly transgender" is the reference group. There is only a moderate correlation (0.38) between outness and appearance. In addition to these variables, each model also contains several demographic and human capital variables available in the NTDS data-set that typically influence employment outcomes: education (an ordinal measure including below high school, high school, associate's degree/technical school/some college, bachelor's degree, and graduate or professional degree), race (including white, black, Latino, Asian, and other/mixed, with white as the reference group), age, and disability (yes/no). There are also models for nonbinaries that add an interaction effects between sex assigned at birth and outness.

### 3. Results and discussion

This section proceeds in the order of the hypotheses. All significance values are for two-tailed tests.

### 3.1. Hypothesis 1

Hypothesis 1 was: nonbinaries who are out about their gender identity will encounter more negative employment outcomes compared to nonbinaries who are not out about their gender identity. There is some evidence that nonbinaries' outness influences their employment outcomes, although not all of it supports Hypothesis 1. As Table 2 shows, on average, the odds ratio of being unemployed is 0.64 (corresponding to a log odds of −0.44) for each increase of one value on the three-value scale of outness, but the odds ratio of being denied a promotion is 1.27 (corresponding to a log odds of 0.24) for each increase of one value on the three-value scale of outness. This may mean that when employers recognize nonbinaries as a category, they are willing to employ them, though they may discriminate against them in job assignment. It may also mean that nonbinaries conceal their gender identity when applying for jobs and are penalized if they come out later on. This would concur with the fact that there was no statistically significant relationship between outness and underemployment or job loss, and with Dietert and Dentice's (2009) explanation of how transgender people carefully determine when and how to come out in the workplace.

**Table 2. Regression models for nonbinaries only**

|  | Currently unemployed | Have been underemployed | Lost job | Denied promotion | Removed from contact |
|---|---|---|---|---|---|
| Birth female | 0.06 (0.24) | −0.12 (0.17) | −0.18 (0.22) | −0.26 (0.22) | −0.41* (0.23) |
| Outness | −0.44*** (0.14) | 0.10 (0.10) | 0.01 (0.13) | 0.24* (0.13) | 0.19 (0.13) |
| Transgender Appearance | 0.22 (0.18) | 0.19 (0.12) | 0.21 (0.16) | 0.27* (0.15) | 0.62**** (0.17) |
| Education | −0.47**** (0.11) | 0.04 (0.08) | −0.17* (0.10) | −0.18* (0.10) | −0.10 (0.10) |
| Black | 0.69* (0.39) | 0.30 (0.31) | 0.78** (0.37) | 0.52 (0.38) | 0.92**** (0.37) |
| Latino | 0.49 (0.38) | 0.30 (0.30) | −0.78 (0.54) | 0.10 (0.37) | 0.37 (0.36) |
| Asian | 0.43 (0.51) | −0.28 (0.41) | 0.10 (0.51) | −0.35 (0.56) | −0.23 (0.57) |
| Other | 0.55 (0.36) | 0.53** (0.26) | 1.27**** (0.27) | 1.36**** (0.27) | 1.05**** (0.29) |
| Age | −0.01 (0.01) | 0.00 (0.01) | 0.01 (0.01) | −0.01 (0.01) | 0.00 (0.01) |
| Disability | 0.70**** (0.21) | 0.56**** (0.15) | 0.69**** (0.19) | 0.34* (0.19) | 0.51 (0.19) |
| N | 1,071 | 910 | 921 | 860 | 876 |

Notes: All coefficients were derived from logistic regression; the columns display log odds. Standard errors are in parentheses.
*p < 0.1.
**p < 0.05.
***p < 0.01.
****p < 0.001.

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511



❈ cogent ·· social sciences

| Table 3. Regression models for nonbinaries only, including interactions | | | | | |
|---|---|---|---|---|---|
| | **Currently unemployed** | **Have been underemployed** | **Lost job** | **Denied promotion** | **Removed from contact** |
| Birth female | 0.55 (0.34) | −0.56*** (0.27) | −0.73** (0.36) | −0.86** (0.37) | −1.06**** (0.40) |
| Outness | −0.12 (0.21) | −0.15 (0.15) | −0.27 (0.19) | −0.06 (0.19) | −0.11 (0.20) |
| Female¨ outness | −0.55** (0.27) | 0.42** (0.19) | 0.50* (0.26) | 0.52** (0.26) | 0.53** (0.27) |
| Transgender appearance | 0.20 (0.18) | 0.21* (0.12) | 0.23 (0.16) | 0.29* (0.16) | 0.64**** (0.17) |
| Education | −0.43 (0.11) | 0.02 (0.08) | −0.19* (0.10) | −0.21** (0.10) | −0.13 (0.10) |
| Black | 0.67* (0.39) | 0.32 (0.32) | 0.83** (0.37) | 0.58 (0.38) | 0.94 (0.37) |
| Latino | 0.50 (0.38) | 0.28 (0.30) | −0.81 (0.54) | 0.08 (0.36) | 0.34 (0.36) |
| Asian | 0.39 (0.51) | −0.25 (0.41) | 0.14 (0.51) | −0.28 (0.56) | −0.15 (0.57) |
| Other | 0.53 (0.36) | 0.55** (0.26) | 1.29**** (0.28) | 1.37**** (0.27) | 1.06**** (0.29) |
| Age | −0.00 (0.01) | 0.00 (0.00) | 0.01 (0.01) | −0.01 (0.01) | 0.00 (0.00) |
| Disability | 0.70**** (0.21) | 0.56**** (0.15) | 0.69**** (0.19) | 0.33* (0.19) | 0.51*** (0.19) |
| *N* | 1,071 | 910 | 921 | 860 | 876 |

Notes: All coefficients were derived from logistic regression; the columns display log odds. Standard errors are in parentheses.

*$p < 0.1$.

**$p < 0.05$.

***$p < 0.01$.

****$p < 0.001$.

### 3.2. Hypothesis 2

Hypothesis 2 was: nonbinaries who were assigned male at birth will encounter more negative employment outcomes than nonbinaries who were assigned female at birth. There is conflicting evidence for this hypothesis. As Table 2 shows, the odds ratio of being removed from direct contact with clients, customers, or patients for those assigned female at birth, compared to those assigned male at birth, is 0.66 (corresponding to a log odds of −0.41). In an attempt to further explore the impact of outness, one model investigates the interaction between sex assigned at birth and outness, as shown in Table 3. Employers' reactions to nonbinaries are highly conditioned by sex assigned at birth. Outness does not increase the odds of unemployment for nonbinaries assigned male at birth, but it is associated with substantially lower unemployment among those who were assigned female at birth. In contrast, outness does not increase the odds of underemployment, job loss, denial of promotion, or removal from contact with clients, customers, or patients for nonbinaries assigned male at birth but is associated with higher levels of those four negative employment outcomes for nonbinaries assigned female at birth. Thus outness appears to primarily contribute to discrimination in hiring for nonbinaries assigned male at birth and to discrimination while on the job for nonbinaries assigned female at birth. Specifically, the odds ratio for female*outness for unemployment is 0.58 (corresponding to a log odds of −0.55); for underemployment, 1.52 (corresponding to a log odds of 0.42); for job loss, 1.65 (corresponding to a log odds of 0.50); for denial of promotion, 1.68 (corresponding to a log odds of 0.52); and for removal from contact, 1.70 (corresponding to a log odds of 0.53).

These interactions may mean that while employers are inclined to resist employing nonbinaries assigned male at birth outright, employers are inclined to police what they perceive as a rejection of femininity in a person assigned female at birth among people currently in their employment. This would be consistent with Schilt and Connell's (2007) analysis of how people police gender expression in the workplace. Though Schilt and Connell focused on transgender men and women, their analyses of masculinity and femininity parallel nonbinaries' experiences. They provided examples of transgender women whose coworkers perceived them as losing competence in their work upon their transition to female, which parallels the experiences of unemployed nonbinaries assigned male at birth.

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511



### 3.3. Hypothesis 3

Hypothesis 3 was: nonbinaries of color will encounter more negative employment outcomes than white nonbinaries. Consistent with prior research on transgender men and women and providing support for Hypothesis 3, nonbinaries of color sometimes experience worse outcomes compared to white nonbinaries. As Table 2 shows, on average, the odds ratio of being unemployed for blacks compared to whites is 1.99, corresponding to a log odds of 0.69; for having lost a job, 2.18, corresponding to a log odds of 0.78; and for having been removed from direct contact with customers, clients, or patients, 2.51, corresponding to a log odds of 0.92. On average, the odds ratio for having been underemployed for people of mixed race or ethnicity or people of a race or ethnicity other than white, black, Latino, or Asian compared to whites is 1.70, corresponding to a log odds of 0.53; for having lost a job, 3.56, corresponding to a log odds of 1.27; for having been denied a promotion, 3.90, corresponding to a log odds of 1.36; and for having been removed from direct contact with customers, clients, or patients, 2.86, corresponding to a log odds of 1.05. These coefficients suggest that black and mixed race nonbinaries experience racial bias. Gender may intersect with race to emphasize the stereotypes of people of color, particularly African Americans, as threatening, angry, or violent (Schilt, 2010).

### 3.4. Hypothesis 4

Hypothesis 4 was: Transgender women will encounter more negative employment outcomes than nonbinaries. Transgender men will encounter better employment outcomes than nonbinaries. There is evidence that some outcomes are worse for transgender women. Specifically, as shown in Table 4, on average, the odds ratio for having lost a job for transgender women compared to nonbinaries is 2.16, corresponding to a log odds of 0.77, and the odds ratio for having been removed from direct contact with clients, customers, or patients for transgender women compared to nonbinaries is 1.43,

| Table 4. Regression models including all three transgender groups | | | | | |
|---|---|---|---|---|---|
| | **Currently unemployed** | **Have been underemployed** | **Lost job** | **Denied promotion** | **Removed From contact** |
| Transgender men | 0.16 (0.17) | 0.00 (0.12) | 0.23 (0.15) | −0.08 (0.15) | −0.21 (0.15) |
| Transgender women | 0.22 (0.21) | 0.06 (0.16) | 0.77**** (0.19) | 0.31 (0.19) | 0.36* (0.20) |
| Birth female | −0.18 (0.23) | −0.19 (0.17) | −0.28 (0.21) | −0.38* (0.21) | −0.28 (0.22) |
| Outness | −0.18*** (0.07) | 0.03** (0.05) | −0.04 (0.06) | 0.09 (0.06) | 0.15** (0.06) |
| Transgender appearance | 0.15* (0.09) | 0.18*** (0.06) | 0.06 (0.07) | 0.17** (0.07) | 0.20*** (0.08) |
| Education | −0.30**** (0.05) | 0.06 (0.04) | −0.07 (0.04) | −0.03 (0.05) | −0.02 (0.05) |
| Black | 0.45** (0.20) | 0.07 (0.16) | 0.13 (0.19) | 0.07 (0.20) | 0.12 (0.21) |
| Latino | 0.37* (0.20) | 0.27* (0.15) | 0.07 (0.18) | 0.30* (0.18) | 0.26 (0.19) |
| Asian | 0.03 (0.27) | −0.37* (0.24) | −0.13 (0.24) | −0.41 (0.27) | −0.32 (0.28) |
| Other | 0.24 (0.22) | 0.31* (0.16) | 0.69**** (0.17) | 0.57*** (0.18) | 0.58*** (0.18) |
| Age | −0.01 (0.00) | 0.00 (0.00) | 0.00 (0.00) | −0.01*** (0.00) | 0.00 (0.00) |
| Disability | 0.63**** (0.11) | 0.54**** (0.08) | 0.57**** (0.09) | 0.49**** (0.09) | 0.39**** (0.10) |
| N | 3,837 | 3,362 | 3,488 | 3,259 | 3,316 |

Notes: All coefficients were derived from logistic regression; the columns display log odds. Standard errors are in parentheses.
*p < 0.1.
**p < 0.05.
***p < 0.01.
****p < 0.001.

App. 586

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511



corresponding to a log odds of 0.36. There are no statistically significant differences between the outcomes of transgender men and nonbinaries, suggesting again that being a woman intersects with being transgender to lead to negative outcomes. This result corroborates prior research on transgender women's experiences, such as Westbrook and Schilt's (2013) evaluation that women's spaces are highly policed and thus potentially hostile to transgender women.

## 4. Conclusion

The results from this study suggest that being out at the workplace has negative effects for nonbinaries. Nonbinaries who are more out at the workplace are less likely to be unemployed but more likely to have been denied a promotion, indicating that although employers may be willing to work with nonbinaries, some are inclined to discriminate against them in access to authority. While employers appear more inclined to avoid hiring nonbinaries assigned male at birth compared to those assigned female at birth, they appear more inclined to discriminate against nonbinaries assigned female at birth than those assigned male at birth once hired, suggesting that employers are inclined to police perceived femininity. The results also indicate that nonbinaries of color, particularly African Americans, tend to face major challenges. The fact that nonbinaries of color have the worst outcomes confirms that an intersectional analysis of transgender issues is necessary in order to understand how transgender people are treated.

The fact that the three transgender groups sometimes experience the same challenges, particularly if they are people of color, indicates that some similar interventions may improve their workplace outcomes. Broader education about and recognition of nonbinaries could help put into practice effective transgender-inclusive policies. Following from Dietert and Dentice's (2009) emphasis on the importance of upper management in protecting transgender people, businesses can do a variety of things to improve transgender people's experiences in the workplace.

Businesses can be inclusive of transgender people by evaluating their methods of recording gender, choosing to record it only when necessary and permitting people to respond with gender identity (including the option to write in a response) rather than sex when possible (Grant et al., 2011; Miller & Weingarten, 2005; Sausa, 2002). In the case of businesses with more than 100 employees (50 if federal contractors), the EEOC currently mandates that they report employees' gender, but the EEOC only permits the options of male and female. If this were changed to provide transgender-inclusive options (adding transgender men, transgender women, and nonbinaries), researchers would be able to investigate transgender employment inequality with more precision. If the EEOC did provide this option, it would educate employers that the category exists and is protected. Businesses could permit transgender people to change their name and gender on that institution's documentation, even if they have not done so legally (Beemyn, 2005). Because the number of people who are likely to use transgender-specific options is small, the inclusion of these options should not pose a burden for data collection (Miller & Weingarten, 2005). Businesses can include gender identity and expression on antidiscrimination policies and implement standards for reporting transphobic incidents (Sausa, 2002).

Finally, there are some things researchers can do in the future to improve our understanding of transgender people's employment outcomes. Though the NTDS was intended to provide comprehensive information on transgender people, it was not derived from a random sample. Institutions that have the resources for large-scale or random sampling could include transgender-inclusive questions about gender (Grant et al., 2011). The size of the transgender population has been estimated at 0.3% of people (Gates, 2011), so a large-scale survey with transgender-inclusive questions would be needed to provide an adequate sample size of transgender men, transgender women, and nonbinaries. Although coefficients for most control variables in my analyses were nonsignificant, the intersections between transgender status and education or disability would be useful topics for future research. Because transgender people with disabilities are at a high risk of developing psychological difficulties as a result of the multiple types of discrimination and oppression they experience, it is essential for social scientists to understand their needs better (Ballan, Romanelli, & Harper, 2011).

App. 587

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
http://dx.doi.org/10.1080/23311886.2016.1236511



The NTDS had only one question about the degree to which others can tell whether the respondent was transgender or gender nonconforming. Because the NTDS is unable to determine nuances of appearance, researchers should also investigate how different types of gender presentation, such as masculine, feminine, mixed, and neutral, influence how transgender people are treated. Future studies should explain nuances of appearance, such as perceptions of transgender people's clothes, mannerisms, and sex assigned at birth. Researchers could also investigate how transgender people alter their gender expression for work environments. Finally, surveys regarding transgender people in the workplace should ask for information on the industry, occupation, and characteristics of employers and workplaces, such as transphobic employers or the existence of an antidiscrimination statement. This would allow us to understand the degree to which transgender people attempt to sort themselves into more supportive work environments.

## Funding
The author received no direct funding for this research.

## Author details
Skylar Davidson[1]
E-mail: sdavidson@soc.umass.edu
[1] Department of Sociology, University of Massachusetts Amherst, Amherst, MA, USA.

## Citation information
Cite this article as: Gender inequality: Nonbinary transgender people in the workplace, Skylar Davidson, *Cogent Social Sciences* (2016), 2: 1236511.

## References
Ballan, M. S., Romanelli, M., & Harper, J. N. (2011). The social model: A lens for counseling transgender individuals with disabilities. *Journal of Gay and Lesbian Mental Health, 15,* 260–280.
http://dx.doi.org/10.1080/19359705.2011.582073
Beemyn, B. G. (2005). Making campuses more inclusive of transgender students. *Journal of Gay & Lesbian Issues in Education, 3,* 77–87.
http://dx.doi.org/10.1300/J367v03n01_08
Beemyn, G., & Rankin, S. (2011). *The lives of transgender people.* New York, NY: Columbia University Press.
Blumstein, P., & Schwartz, P. (1983). *American couples: Money, work, sex.* New York, NY: William Morrow.
Bureau of Labor Statistics. (2011). *Alternative measures of labor underutilization for states, 2008.* Retrieved April 24, 2015 from http://www.bls.gov/lau/stalt08.htm.
Bureau of Labor Statistics. (2015). *Economic news release: Employment status of the civilian population by race, sex, and age.* Retrieved March 18, 2015 from http://www.bls.gov/news.release/empsit.t02.htm
Dietert, M., & Dentice, D. (2009). Gender identity issues and workplace discrimination: The transgender experience. *Journal of Workplace Rights, 14,* 121–140.
http://dx.doi.org/10.2190/WR.14.1.g
Fausto-Sterling, A. (2000). *Sexing the body: Gender politics and the construction of sexuality.* New York, NY: Basic Books.
Gates, G. J. (2011). *How many people are lesbian, gay, bisexual, and transgender?* Los Angeles, CA: Williams Institute.
Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at every turn: A report of the national transgender discrimination survey.* National Center for Transgender Equality and National Gay and Lesbian Taskforce.
Harris, B. C. (2015). *Likely transgender individuals in U.S. federal administrative records and the 2010 Census.* U.S. Census Bureau Center for Administrative Records Research and Applications Working Paper 2015-03. US Census Bureau.
Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management and Social Policy, 19,* 65–80.

Kessler, R. C., Mickelson, K. D., & Williams, D. R. (1999). The prevalence, distribution, and mental health correlates of perceived discrimination in the United States. *Journal of Health and Social Behavior, 40,* 208–230.
http://dx.doi.org/10.2307/2676349
Koch, K., & Bales, R. (2008). Transgender employment discrimination. *Women's Law Journal, 17,* 243–267.
Kuper, L. E., Nussbaum, R., & Mustanski, B. (2012). Exploring the diversity of gender and sexual orientation identities in an online sample of transgender individuals. *Journal of Sex Research, 49,* 244–254.
http://dx.doi.org/10.1080/00224499.2011.596594
Levi, J. L. (2007). Some modest proposals for challenging established dress code jurisprudence. *Duke Journal of Gender Law and Policy, 14,* 243–255.
Miller, N., & Weingarten, L. (2005). *Creating LGBTQIA-inclusive forms: Suggestions for policy and implementation.* Safe Zones.
Monro, S. (2003). Transgender politics in the UK. *Critical Social Policy, 23,* 433–452. http://dx.doi.org/10.1177/02610183030234001
Nadal, K. L., Skolnik, A., & Wong, Y. (2012). Interpersonal and systemic microaggressions toward transgender people: Implications for counseling. *Journal of LGBT Issues in Counseling, 6,* 55–82.
http://dx.doi.org/10.1080/15538605.2012.648583
Ridgeway, C. (2011). *Framed by gender.* New York, NY: Oxford University Press. http://dx.doi.org/10.1093/acprof:oso/9780199755776.001.0001
Sausa, L. A. (2002). Updating college and university campus policies. *Journal of Lesbian Studies, 6,* 43–55.
http://dx.doi.org/10.1300/J155v06n03_05
Schilt, K. (2010). *Just one of the guys?.* Chicago, IL: University of Chicago Press. http://dx.doi.org/10.7208/chicago/9780226738086.001.0001
Schilt, K., & Connell, C. (2007). Do workplace gender transitions make gender trouble? *Gender, Work, and Organization, 14,* 596–618. http://dx.doi.org/10.1111/gwao.2007.14.issue-6
Schilt, K., & Wiswall, M. (2008). Before and after: Gender transitions, human capital, and workplace experiences. *The B.E. Journal of Economic Analysis and Policy, 8*(1). 1–28.
Smoyak, S. A. (2016). What's in a name? How conversant are you with the new alphabet soup? *Journal of Psychosocial Nursing and Mental Health Services, 54,* 13–15.
Tilly, C. (1998). *Durable inequality.* Berkeley: University of California Press.
Westbrook, L., & Schilt, K. (2013). Doing gender, determining gender: Transgender people, gender panics, and maintenance of the sex/gender/sexuality system. *Gender & Society, 28,* 32–57.
Whittle, S., Turner, L., & Al-Alami, M. (2007). *Engendered penalties: Transgender and transsexual people's experiences of inequality and discrimination.* Equalities Review.

Davidson, *Cogent Social Sciences* (2016), 2: 1236511
**http://dx.doi.org/10.1080/23311886.2016.1236511**





© 2016 The Author(s). This open access article is distributed under a Creative Commons Attribution (CC-BY) 4.0 license.

You are free to:
Share — copy and redistribute the material in any medium or format
Adapt — remix, transform, and build upon the material for any purpose, even commercially.
The licensor cannot revoke these freedoms as long as you follow the license terms.

Under the following terms:
Attribution — You must give appropriate credit, provide a link to the license, and indicate if changes were made.
You may do so in any reasonable manner, but not in any way that suggests the licensor endorses you or your use.
No additional restrictions
You may not apply legal terms or technological measures that legally restrict others from doing anything the license permits.

---

*Cogent Social Sciences* (ISSN: 2331-1886) is published by Cogent OA, part of Taylor & Francis Group.

**Publishing with Cogent OA ensures:**

· Immediate, universal access to your article on publication

· High visibility and discoverability via the Cogent OA website as well as Taylor & Francis Online

· Download and citation statistics for your article

· Rapid online publication

· Input from, and dialog with, expert editors and editorial boards

· Retention of full copyright of your article

· Guaranteed legacy preservation of your article

· Discounts and waivers for authors in developing regions

**Submit your manuscript to a Cogent OA journal at www.CogentOA.com**



App. 589

# EXHIBIT E



# The Mental Health and Well-being of LGBTQ Youth who are Intersex

Much of the current research on intersex communities focuses on medical treatment — and lumps all intersex youth in with trans, nonbinary, and other gender variant youth — leaving findings specific to intersex young people, and their mental health, largely unknown. This report uses data from a national sample of over 1,000 intersex youth ages 13-24 and grows our understanding of the mental health and well-being of this often overlooked group.

DEC. 3, 2021

## Your Support Saves LGBTQ+ Youth's Lives Every Day

Donate

---

## EXECUTIVE SUMMARY

Intersex is an umbrella term meant to describe variations in physical sex traits or reproductive anatomy that are present at birth or emerge spontaneously later in life. Due to a

lack of systematic data collection as well as a history of medical erasure, the prevalence of intersex traits is not concluvsively known, but experts have estimated that intersex people are make up about 2% of live births. The medicalization, pathologization, and medical (mis)treatment of intersex variations has left many individuals with negative physical and emotional consequences of procedures done without individual informed consent. Presently, much of the research on intersex communities remains focused on medical treatment and centers very little on the mental health and well-being of intersex individuals. Furthermore, when intersex youth are included in this type of research, they are often combined into a larger sample including transgender, nonbinary, and other gender variant youth, leaving findings specific to intersex youth largely unknown. This report grows our understanding of the mental health of LGBTQ youth who are intersex by using data from a national sample of more than 1,000 intersex youth ages 13–24 who participated in The Trevor Project's 2021 National Survey on LGBTQ Youth Mental Health.

Download the Research Report

## Key Findings

**Intersex youth are diverse across many identities and experiences**

App. 592

- Nearly half of intersex youth in our sample were people of color (Asian/Pacific Islander, Black, Hispanic/Latinx, Native/Indigenous, or multiracial), similar to our overall sample

- 69% of intersex youth endorsed a multisexual identity (i.e., those who are attracted to more than one sex and/or gender such as bisexual or pansexual)

- 58% of intersex youth identified as transgender or nonbinary or were questioning their gender identity

**The rates of mental health challenges among intersex youth are disproportionately high compared to LGBTQ youth who are not intersex**

- 48% of intersex youth seriously considered suicide in the past 12 months, compared to 41% of LGBTQ youth who are not intersex

- 19% of intersex youth attempted suicide in the past 12 months, compared to 14% of LGBTQ youth who are not intersex

- 2 out of 3 intersex youth reported symptoms of major depressive disorder in the past two weeks

**LGBTQ youth who are intersex are exposed to a number of harmful experiences that relate to suicide risk**

- 18% of intersex youth reported being subjected to conversion therapy, with 12% reporting the efforts were aimed at changing their gender identity

- 2 out of 3 intersex youth reported that someone tried to convince them to change their sexual orientation or gender identity

- Intersex youth reported twice the rate of having had a mental or physical healthcare provider attempt to convince them to change their sexual orientation or gender identity compared to LGBTQ youth who are not intersex

- 1 in 4 intersex youth reported having experienced physical harm based on their sexual orientation or gender identity in the past year, including 32% of transgender and nonbinary intersex youth

**Acceptance is a strong protective factor for reducing suicide risk for intersex youth**

- Intersex youth with at least one parent who was accepting of their sexual orientation had 55% lower odds of attempting suicide in the past year

- Intersex youth with at least one parent who was accepting of their gender identity had 46% lower odds of attempting suicide in the past year

- Intersex youth who have supportive friends report lower

App. 594

rates of attempting suicide in the past year

- Transgender and nonbinary intersex youth whose pronouns were respected by all of the people they live with had 64% lower odds of reporting a suicide attempt

## Methodology Summary

A quantitative cross-sectional design was used to collect data using an online survey platform between October and December 2020. An analytic sample of nearly 35,000 youth ages 13–24 who resided in the United States was recruited via targeted ads on social media. All youth were asked, "Some people are assigned male or female at birth but are born with sexual anatomy, reproductive organs, and/or chromosome patterns that do not fit the typical definition of male or female. This physical condition is known as intersex. Are you intersex?" with options: no, yes, and decline to answer. The current analyses include the 1,132 youth who responded they were intersex.

## Recommendations

While historical medicalization and marginalization suggests that youth who are intersex might be at greater risk for poor mental health outcomes, intersex youth are often left out of important mental health research. Our findings show that intersex youth report rates of

mental health challenges that are often higher than those reported by LGBTQ youth who are not intersex. Intersex youth also experience higher rates of suicide risk factors, such as increased rates of being exposed to conversion therapy and attempts to change their sexual orientation or gender identity. Not surprisingly, given the impact of holding multiple marginalized identities, intersex youth who are transgender, nonbinary, and/or multisexual often report higher rates of poor mental health and suicide risk. We must specifically address intersex youth in mental health research to better understand the specific risks and protective factors related to their lived experience, with harm prevention and affirming intervention in mind. With our findings showing just how important acceptance is for intersex youth, inclusion and policy efforts must consider intersex youth and their unique needs and must refrain from relying on assumptions of binary sex or the relationship between bodily traits and gender.

## BACKGROUND

**Intersex (sometimes referred to as variations in sex characteristics[1]) is an umbrella term meant to describe a wide range of variations in physical sex traits or reproductive anatomy that may cause bodies to differ from normative expectations for "male" or "female."** When people are born, they are usually immediately

categorized as either a "boy" or a "girl," typically based only on a visual inspection of external genitalia. This categorization is problematic as it inaccurately assumes that sex and gender are binary characteristics and are visually apparent at birth. It is even more problematic when it comes to people who are born with intersex traits.

**Human bodies are naturally varied, and intersex traits reflect natural variations in the development, appearance, and/or function of physical characteristics that we associate with someone's sex.** The tissues that make up genitals are homologous, meaning they are in the same place on the body and have the same tissue structure, and only with certain signals (such as from genes and hormones) do they become different. Beginning around the 6th week of pregnancy, a gonad will develop into a testis or ovary (or an ovotestis, or undifferentiated "streak" gonad), while the genital tubercle develops into a penis or a clitoris (or a size between that of a typical penis or clitoris) beginning around nine weeks of pregnancy, depending in part on the presence, or lack, of testosterone. The absence of these cues, insensitivity to some of them, or differences in the XY chromosomes may all result in intersex traits. This could be someone who is born appearing to be female, but having internal testes and XY chromosomes. It may also be someone who is born with genitals that are somewhat in-between normative expectations, for example a noticeably large

clitoris or small penis. When someone is born with "ambiguous" external genitalia, the intersex trait is typically diagnosed at birth. However, sometimes a person is not found to be intersex until they reach the age of puberty and fail to menstruate or develop normative male genitalia, or when they are unable to conceive. It is also true that an intersex condition may not be discovered until an autopsy, and some people live and die never knowing they are intersex. According to interACT: Advocates for Intersex Youth, medical professionals have identified over 40 different medical terms for the different ways sex anatomy might develop (interACT, 2021b). Human body parts are naturally varied and as the Intersex Society of North America wrote, "Nature doesn't decide where the category of 'male' ends and the category of 'intersex' begins, or where the category of 'intersex' ends and the category of 'female' begins. Humans decide. (Intersex Society of North America, 2008)." In other words, it is people, usually doctors, who determine how small a penis has to be or how large a clitoris has to be or how uncommon the combinations must be before a person is considered intersex.

*Nature doesn't decide where the category of 'male' ends and the category of 'intersex'*

begins, or where the
category of 'intersex'
ends and the
category of 'female'
begins. Humans
decide

*Intersex Society of North
America*

---

[1] Despite the use of the terms
"disorder of sexual development"
and "difference in sex development"
(both abbreviated "DSD") by many
medical professionals, intersex is
the preferred term among intersex
advocates and, as such, will be used
throughout this report. The phrases
"intersex traits," "intersex
variations," and "variations in sex
characteristics" are considered
interchangeable.

**Given the lack of standardized data
collection efforts and the lack of
consensus regarding which
variations to classify as intersex
traits, estimates of the prevalence
of intersex people vary widely, and
definitive figures are difficult to
come by.** As mentioned, not only are
people generally assigned male or
female based solely on external
genitalia, but intersex conditions
may not present until puberty or
attempts to conceive. One of the
most commonly cited estimates
comes from a review of medical
literature between 1955 to 1997
using data from multiple countries,
which found that intersex variations
were present in as many as 2% of
live births (Blackless, et al, 2000).

This compares to 3% of live births that are twins in the United States (Martin, 2021). This estimate, despite its limitations, suggests that intersex traits are not that uncommon worldwide. Moreover, many advocates believe that the true incidence of intersex variations is likely much higher.

**The medical treatment of intersex people has a sordid past that has left an indelible impact on the community of individuals with these variations.** Until recently, it was common practice in the Western world to withhold an intersex diagnosis from patients, purportedly because it would have an impact on their gender identity formation. Specifically, psychologist and sexologist John Money at Johns Hopkins University developed a system for treating children who were intersex called the "optimum gender of rearing" model in the 1950s that was endorsed by the American Academy of Pediatrics (American Academy of Pediatrics, 1996; Fausto-Sterling, 1997). The belief was that gender identity was a "blank slate" at birth and developed entirely based on a child's environment. It furthered that, if done early enough, the child could be assigned any gender through a combination of surgical interventions to create "normative"-looking genitals and parental commitment to raising the child firmly in that gender category. The Johns Hopkins team, and others, reported alleged success of this particular sex reassignment in attempts to prove that physicians could create any gender out of an

App. 600

intersex child. However, it was clear from the adult testimony of former child patients who received these treatments that this was not the case. Intersex people, who have had their bodies surgically or hormonally modified as children, whether in the John Money era or more recently, have been left with physical and emotional consequences from medically unnecessary and irreversible procedures (Human Rights Watch, 2017; interACT, 2021b). This theory formed the basis of intersex medical "care" until at least the 1990s. Today, few practitioners will argue in favor of concealing medical information from their patients, but unnecessary surgery continues to be performed on intersex infants in hospitals around the country.

**While it is now understood that gender identity is influenced by biology, environmental factors, and a person's self-identification, there remains controversy around the treatment of intersex conditions by medical professionals.** Presently, the treatment of intersex conditions remains problematic because treatment often hinges on acceptance of an anatomically strict theory of treatment: someone with a Y chromosome must have an "adequate" penis if they are to be assigned the male gender, and someone without a Y chromosome is declared a girl no matter their genitalia (Dreger, 1998). Advocacy efforts led by intersex individuals have resulted in several countries, organizations, and medical groups, including Human Rights Watch, the

World Health Organization, and Amnesty International, recommending that choices about surgeries that are not medically urgent for the intersex child's health be delayed for intersex people until they can make an informed decision for themselves (Commonwealth of Australia, 2013; World Health Organization, 2014; Human Rights Campaign, 2015; Amnesty International, 2017; Human Rights Watch, 2017). In the United States, some scholars and advocates have questioned whether early surgeries on intersex youth may fall afoul of laws regulating informed consent, sterilization of minors, and female genital cutting (Fraser, 2016; Tamar-Mattis, 2012).That said,, there are currently no state or federal laws that explicitly regulate intersex surgeries (interACT, 2021b).

**The mental health and well-being of intersex individuals have largely been ignored.** There is a presumption when treating intersex individuals that a psychosocial problem can be addressed medically or surgically. Although gender-affirming medical care, including surgery, is medically necessary treatment to alleviate gender dysphoria and distress among many transgender and nonbinary people (Almazan & Keuroghlian, 2021; Hughto, et al., 2020), medical interventions on intersex children are often performed because of parental distress and not because of the intersex person's own gender dysphoria or other medical necessity. Because of this, the majority of research on intersex populations centers on outcomes

App. 602

and recommendations for surgery and hormone therapy (Cohen-Kettenis, 2005; Slijper & Drop, 1998). The little research on the mental health of intersex people that exists suggests that intersex adults may disproportionately experience negative mental health outcomes. Much of our understanding related to the mental health of intersex individuals has come out of research in Europe and Australia (Falhammer, et al., 2018), with an online Australian study of adults with intersex variations finding that 26% reported self-harm on the basis of having an in intersex variation, 60% had thought about suicide, and 19% had attempted suicide (Jones, 2016). The first national study of intersex adults in the U.S. found that more than half of the participants described their mental health as fair or poor (Rosenwohl-Marck, et al., 2020). Additionally, 61% reported having ever been diagnosed with a depressive disorder, 63% with an anxiety disorder, and 41% with post-traumatic stress disorder (PTSD). Even less research focuses on the mental health and well-being of intersex youth specifically. Reports often combine transgender and intersex youth into one gender variant sample despite the reality that being intersex may not necessarily impact youth's experience of their gender (Smith, et al., 2015). Ultimately, mental health findings specific to intersex youth are not readily available.

This report contributes to our understanding of intersex youth by detailing the characteristics and

mental health and well-being of a national U.S. sample of 1,132 intersex youth ages 13–24 who participated in our National Survey on LGBTQ Youth Mental Health.

**Parental acceptance and family support are powerful protective factors for intersex youth.** Intersex youth with high social support from their families reported half the rate of suicide attempts in the past year. Our findings also show that intersex youth who reported sexual orientation acceptance from at least one parent were 54% less likely to attempt suicide in the past year. Additionally, those who reported gender identity acceptance from at least one parent were 42% less likely to attempt suicide in the past year. Family support and acceptance is an important protective factor for LGBTQ youth well-being; however, for intersex youth, who may often find their family and parents to be the source of attempts to change their identity, support from them may be more meaningful and important.

## METHODOLOGY

A quantitative cross-sectional design was used to collect data through an online survey platform between October and December 2020. A sample of LGBTQ youth ages 13–24 who resided in the United States was recruited via targeted ads on social media. The final analytic sample consisted of 34,759 LGBTQ youth. In the survey,

participants were asked "Some people are assigned male or female at birth but are born with sexual anatomy, reproductive organs, and/or chromosome patterns that do not fit the typical definition of male or female. This physical condition is known as intersex. Are you intersex?" with options: no, yes, and decline to answer. This question was a recommended item for determining intersex identity as described in the Williams Institute's Gender Identity in U.S. Surveillance (GenIUSS) report (GenIUSS Group, 2014). It was also selected because it aligns with best practices identified by interACT, including the provision of a definition to survey participants (interAct, 2021a). The current analyses include the 1,132 youth (3%) who identified as intersex. The overall survey included a maximum of 150 questions, including questions on considering and attempting suicide in the past 12 months taken from the Centers for Disease Control and Prevention's Youth Risk Behavior Survey (Johns et al., 2020) and measures of anxiety and depression based on the GAD-2 and PHQ-2, respectively (Plummer et al., 2016; Richardson et al., 2010).

## RESULTS

## Intersex as a Diverse Community

### Race and Ethnicity

App. 605

In our national sample of LGBTQ youth, 3% reported that they were intersex. While the term intersex suggests a sense of community around a shared lived experience around sex traits, intersex people are diverse across additional identities and experiences. Within our sample of intersex youth, 51% were White, 20% were multiracial, 15% were Hispanic/Latinx, 7% were Asian/Pacific Islander, 6% were Black/African American, and 2% were Native/Indigenous, highlighting the fact that these findings reflect a diverse racial/ethnic experience. Furthermore, between 3–4% of respondents across all race/ethnicities were intersex. Additionally, 12% of intersex youth spoke a language other than English at home including Spanish, Portuguese, Farsi, and Russian. This compares to 10% of LGBTQ youth who are not intersex who spoke a language other than English at home. Also, 7% of intersex youth reported that they were born outside of the U.S. and 32% reported that at least one parent or caregiver was born outside of the U.S. LGBTQ youth who are not intersex reported being born outside of the U.S. and/or having a parent or caregiver who was born outside the U.S. at comparable rates to LGBTQ youth who are intersex.



**Percentage of Intersex Youth Among Racial/Ethnic Groups**

### Sexual Orientation

A little over 1 in 3 intersex youth in our sample of LGBTQ youth identified as bisexual (35%) and 28% identified as gay or lesbian. Another 20% identified as pansexual, 12% as queer, 2% as straight and 3% responded that they were unsure of their sexual orientation. Most intersex youth also selected another sexual identity such as asexual, polyamorous, biromantic, sapphic, panromantic, and demisexual. The rates of identification with various sexual orientation labels among intersex youth is similar to that of the overall LGBTQ youth sample. Overall, 69% of intersex youth endorsed a multisexual identity (i.e., those who are attracted to more than one sex and/or gender, such bisexual or pansexual) and 31% of intersex youth reported a monosexual identity (i.e., attractions to one sex and/or gender, such as straight or lesbian).

### Sexual Identity Among Intersex Youth



**Gender Identity and Expression**

Overall, 58% of intersex youth in our sample identified as transgender, nonbinary or questioning compared to 47% of LGBTQ youth who are not intersex. Specifically, 32% of intersex youth identified as nonbinary, 29% as a cisgender woman, 13% as a cisgender man, 12% as a transgender man, and 5% as a transgender woman, with 9% questioning their gender identity. Comparatively, 1 in 3 intersex youth identified as nonbinary compared to 1 in 4 LGBTQ youth who are not intersex. Almost every intersex youth opted to use a gender identity label, with only one youth providing context for their choice by writing "I am intersex, incorrectly assigned female at birth." Pronouns that were not exclusively binary (e.g., using they/them or she/they) were endorsed by 51% of intersex youth, a rate significantly higher than youth who were not intersex (42%). Finally, given the specific context of assigning sex at birth for intersex youth, 74% of our sample was assigned female at birth and 26% were assigned male. It is important to note that 3% of intersex youth

declined to respond to the question asking sex assigned at birth, double the rate of the overall sample of LGBTQ youth.



### Gender Identity Among Intersex Youth

- Nonbinary
- Cisgender Woman
- Cisgender Man
- Trasgender Man
- Questioning
- Trangender Woman



### Pronouns for Intersex Youth

- He/Him or She/Her Only
- Pronouns Outside of the Binary

# Mental Health and Well-being Among Intersex Youth

### Anxiety, Depression, and Self-Harm

Overall, 73% of intersex youth reported symptoms of generalized anxiety disorder in the past two weeks. These overall rates of generalized anxiety were similar to

LGBTQ youth who are not intersex (71%). However, intersex youth who were 13–17 years old reported significantly higher rates of anxiety (75%) compared to intersex youth 18–24 years old (71%), as did transgender and nonbinary intersex youth (70%) compared to cisgender intersex youth (64%). Additionally, intersex youth who endorsed a multisexual identity reported higher rates of anxiety (75%) compared to intersex youth who were monosexual (69%).



**Mental Health and Self-Harm Among Intersex Youth**

Nearly 2 out of 3 intersex youth reported symptoms of major depressive disorder in the past two weeks (66%), a rate significantly higher than LGBTQ youth who are not intersex (62%). Furthermore, we see similar patterns here as with generalized anxiety symptomatology with younger (13–17) intersex youth reporting higher rates of depression (70%) compared to older (18–24) intersex youth (62%) and transgender and nonbinary intersex youth (73%) reporting higher rates compared to cisgender intersex youth (56%). Furthermore, intersex youth who were multisexual reported higher rates of depression (69%) compared to monosexual intersex youth (58%). Rates of anxiety and depression did not differ between

App. 610

intersex youth of color and White intersex youth.

Almost 3 in 5 intersex youth reported intentionally harming themselves, or self-harm, in the past 12 months (59%). This rate of past-year self-harm was significantly higher for intersex youth than among youth who were not intersex (54%). Similar to previous findings, younger intersex youth (13–17) reported higher rates of self-harm (68%) compared to older (18–24) intersex youth (49%), as did transgender and nonbinary intersex youth (66%) compared to cisgender intersex youth (48%) and multisexual intersex youth (62%) compared to monosexual intersex youth (50%).

### Suicide Risk

Almost half (48%) of intersex youth seriously considered attempting suicide in the past year, compared to 41% of LGBTQ youth who are not intersex. This rate includes more than half of intersex youth ages 13–17 (51%) and more than half of transgender and nonbinary intersex youth (55%). Intersex youth who are 18–24 years old or cisgender reported considering suicide at significantly lower rates (44% and 36%, respectively) compared to these groups. Furthermore, intersex youth who were multisexual reported higher rates of considering suicide in the past year (52%) compared to monosexual intersex youth (40%).

*48% of intersex youth seriously considered attempting suicide in the past year.*



**Suicide Risk Among Intersex Youth: Age**

Nearly 1 in 5 intersex youth (19%) attempted suicide in the past 12 months. This compares to 14% of LGBTQ youth who are not intersex. Intersex youth who were 13–17 years old reported higher rates of attempting suicide in the past 12 months (24%) compared to intersex youth aged 18–24 (14%). Furthermore, transgender and nonbinary intersex youth reported higher rates of attempting suicide in the past 12 months (23%) compared to cisgender intersex youth (13%). Overall, 40% of intersex youth in our sample reported ever having attempted suicide in their lifetime, compared to 32% of LGBTQ youth who are not intersex who reported ever having attempted suicide in their lifetime.



# Risk Factors for Poor Mental Health Among Intersex Youth

### Change Attempts and Conversion Therapy Among Intersex Youth

For many intersex individuals, a large part of their lived experience is an attempt by others to define their sex and gender identity for them. Consistent with this, we found that nearly 2 out of 3 (66%) intersex youth reported that someone attempted to convince them to change their sexual orientation or gender identity. This is compared to 59% of LGBTQ youth who are not intersex. While 35% of LGBTQ youth who are not intersex reported that a parent or caregiver attempted to convince them to change their sexual orientation or gender identity, 42% of intersex youth reported this. Furthermore, intersex youth reported twice the rate of having had a healthcare provider, both mental healthcare (9%) and physical healthcare (6%), attempt to convince them to change their sexual orientation or gender identity compared to LGBTQ youth who are not intersex (4% and 3%,

respectively). Intersex youth who reported that someone attempted to convince them to change their sexual orientation or gender identity reported more than twice the rate of past-year suicide attempts (22%) compared to intersex youth who did not (9%).



Change Attempts Among Intersex Youth and Non-Intersex Youth

Historically, the recommended "treatment" for intersex individuals has often amounted to conversion therapy, a dangerous and discredited practice which includes any treatment by licensed professionals (e.g., psychologists or doctors) or unlicensed, often religious, counselors that attempts to change an individual's sexual attractions and behaviors, gender expression, or gender identity. However, for intersex people this may happen in such a systemic way, involving every person in the youth's life, and starting from birth, that intersex youth may not even be aware that it is happening. This may lead intersex youth to under-report their experiences with conversion therapy and other change efforts by adults in their lives. That said, 18% of intersex youth report having been subjected to conversion therapy, and those who did reported twice the rate of attempting suicide in the

past year (28%) compared those who did not (14%). Importantly, intersex youth also reported more than twice the rate of having been subjected to conversion efforts by a healthcare professional (9%) compared to LGBTQ youth who are not intersex (4%). Intersex youth also reported having higher rates of being subjected to change efforts by a religious leader (21%) compared to LGBTQ youth who are not intersex (13%). Furthermore, half of intersex youth (50%) reported that the change efforts were directed at both their sexual orientation and gender identity compared to 32% of LGBTQ youth who are not intersex. Additionally, twice as many intersex youth reported the conversion therapy was meant to change just their gender identity (12%) compared to LGBTQ youth who are not intersex (6%).



**Discrimination and Victimization Among Intersex Youth**

More than 3 in 5 (64%) intersex youth reported having experienced discrimination based on their sexual orientation or gender identity in the past year compared to 59% of LGBTQ youth who are not intersex. Intersex youth who experienced sexual orientation- or gender

identity-based discrimination reported twice the rate of attempting suicide (22%) compared to intersex youth who had not experienced it (11%). Furthermore, 64% of intersex youth reported having specifically experienced discrimination based on their gender identity, including 26% of whom experienced gender identity-based discrimination in a doctor's office, 45% from teachers or administrators at schools, and 19% in the hiring process. Additionally, half (50%) of intersex youth reported having ever been prevented or discouraged from using a bathroom that corresponds with their gender identity. Intersex youth who were 13–17 years old (68%) or identified as transgender or nonbinary (73%) reported higher rates of discrimination based on their sexual orientation or gender identity compared to intersex youth who were 18–24 (61%) or cisgender (50%). There were no differences based on race/ethnicity or sexual orientation.



Overall, 1 in 4 (25%) intersex youth reported having experienced physical harm based on their sexual orientation or gender identity in the past year. This is in comparison to 19% of LGBTQ youth who are not intersex. Intersex youth who

App. 616

experienced physical harm based on their sexual orientation or gender identity reported more than three times the rate of attempting suicide (37%) than intersex youth who did not experience physical harm based on their sexual orientation or gender identity (12%). Intersex youth who were under age 18 (28%) or transgender and nonbinary (32%) reported higher rates of physical harm based on their sexual orientation or gender identity compared to intersex youth who were ages 18–24 (23%) and cisgender (14%), respectively. There were no within-group differences in experiencing physical harm based on one's sexual orientation or gender identity by race/ethnicity or sexual orientation.

*Intersex youth who experienced dating violence reported **3X** the rate of attempting suicide.*

Dating violence was defined as being physically hurt on purpose by someone who youth were dating or going out with. Among intersex youth who had reported dating someone in the past year, 18% reported experiencing dating violence, which is nearly twice the rate reported by LGBTQ youth who are not intersex (10%). Intersex youth who experienced dating violence in the past year reported three times the rate of attempting suicide in the past year (36%) compared to intersex youth who did

not experience past-year dating violence (12%). Rates of dating violence were higher among intersex youth of color (24%) compared to White intersex youth (13%) and among transgender and nonbinary intersex youth (21%) compared to cisgender intersex youth (14%). There were no differences in rates of dating violence for intersex youth by age or sexual orientation.

### Housing Instability and Food Insecurities Among Intersex Youth

Overall, 38% of intersex youth reported food insecurities in the past month compared to 30% of LGBTQ youth who are not intersex. This rate included 40% of multisexual intersex youth, 42% of intersex youth of color, and 45% of transgender and nonbinary intersex youth. Intersex youth who reported food insecurities in the past month reported nearly three times the rate of a past-year suicide attempt (30%) as those who did not experience food insecurities (12%).



Suicide Attempts Among Intersex Youth Based on Food and Shelter

Nearly 2 out of 5 (39%) intersex youth reported ever having experienced homelessness, been kicked out, or run away. This compares to nearly 1 out of 3 LGBTQ youth who are not intersex (29%).

App. 618

Intersex youth who were 18–24 reported higher rates of housing instability (44%) compared to intersex youth ages 13–17 (33%). Furthermore, transgender and nonbinary intersex youth experienced higher rates of housing instability (46%) compared to cisgender intersex youth (26%). Intersex youth who had experienced housing instability reported over three times the rates of attempting suicide attempt in the past year (34%) compared to intersex youth who had not experienced housing instability (10%).

## Protective Factors for Intersex Youth

### Supportive People

While it is important to understand the things that put intersex youth at risk for mental health challenges, it is also just as important to understand things that can help them thrive. For many youth, acceptance of their identities is a powerful protective factor, and that is no different for intersex youth. Overall, 75% of intersex youth reported that at least one parent accepted their sexual orientation. There were no differences in parental acceptance of sexual orientation by age, race/ethnicity, gender identity, or sexual orientation. Intersex youth who reported that at least one of their parents was accepting of their sexual orientation reported lower rates of attempting suicide in the

past year (18%) compared to intersex youth who did not have this acceptance (33%). Indeed, intersex youth with at least one parent who was accepting of their sexual orientation were 55% less likely to attempt suicide in the past year, after controlling for the effects of gender identity, race/ethnicity, and age.

*Intersex youth with at least one parent supportive of their sexual orientation were 55% less likely to attempt suicide in the past year.*



**Suicide Attempts Based on Parental Acceptance Among Intersex Youth**

Relatedly, 60% of intersex youth reported that at least one parent accepted their gender identity. There were no significant differences by age, race/ethnicity, or sexual orientation. Intersex youth who had at least one parent who was accepting of their gender identity reported just over half the rate of attempting suicide in the past year (17%) compared to intersex youth who did not have a parent who was accepting of their

gender identity (30%). Similarly, intersex youth with at least one parent who is accepting of their gender identity were 46% less likely to attempt suicide in the past year, after controlling for the effects of sex assigned at birth, age, race/ethnicity, and sexual orientation.



Supportive relationships in general, not just specific to one's sexual orientation or gender identity, were also protective for intersex youth. Intersex youth who reported high levels of family support reported half the rate of attempting suicide in the past year (9%) compared to intersex youth who did not (20%). Intersex youth with supportive friends also reported lower rates of attempting suicide in the past year (15%) compared to intersex youth without a high level of support from friends (24%).

### Affirming Spaces

LGBTQ-affirming spaces were also protective for intersex youth. Specifically, intersex youth who reported having access to LGBTQ-affirming online spaces reported lower rates of attempting suicide in the past year (16%) compared to intersex youth who did not have access to affirming online spaces

(22%). The same was found for intersex youth who had LGBTQ-affirming schools and LGBTQ-affirming homes both reporting lower rates of attempting suicide in the past year (16% and 13%, respectively) compared to intersex youth without LGBTQ-affirming schools (23%) or LGBTQ-affirming homes (21%).



Despite their association with lower rates of suicide attempts, intersex youth do not necessarily have access to these spaces. While the majority of intersex youth reported they had access to an LGBTQ-affirming online space (70%), only half of intersex youth reported an LGBTQ-affirming school environment, and even less, a little over 1 in 3, reported an LGBTQ-affirming home environment.



### Respect for Pronouns

Respecting one's pronouns is an important indicator of support for

their gender identity. Among intersex youth who are transgender or nonbinary, 31% reported that all or most of the people with whom they live respect their pronouns. Transgender and nonbinary intersex youth who reported having their pronouns respected by all or most of the people they live with attempted suicide at half the rate (13%) of transgender and nonbinary intersex youth who reported that none of the people they live with respect their pronouns (32%). Transgender and nonbinary intersex youth whose pronouns were respected by all of the people they lived with were 64% less likely to report a suicide attempt in the past year when compared to transgender and nonbinary intersex youth whose pronouns were respected by none of the people with whom they live, after controlling for the effects of sex assigned at birth, age, race/ethnicity, and sexual orientation.



**Suicide Attempts Based on Respect for Pronouns Among Transgender and Nonbinary Intersex Youth**

## RECOMMENDATIONS

**The experiences of intersex youth need to be considered in suicide prevention efforts.** In our sample of LGBTQ youth, 3% identified as intersex. Intersex youth in our

sample are diverse in their sexual orientation and gender identity, and are from all racial and ethnic backgrounds. The current findings suggest that intersex youth report disproportionately higher rates of depression, self-harm, suicidal thoughts, and attempted suicide compared to LGBTQ youth who are not intersex. Intersex youth are also exposed to many risk factors for poor mental health, such as attempts to change their gender identity or sexual orientation, discrimination, and victimization, at higher rates than LGBTQ youth who are not intersex. These rates are particularly concerning given that LGBTQ youth already report much higher rates of mental health challenges and suicide risk than their straight, cisgender peers. Overall, these findings support increased efforts to specifically address intersex youth in initiatives and programs that aim to improve youth mental health and prevent suicide. As is the case across most examinations of mental health and well-being, our findings show that intersex youth who hold multiple marginalized identities often reported greater exposure to risk factors and higher rates of mental health challenges, emphasizing the need to take an intersectional approach to this work.

**Intersex youth have unique stressors that must be addressed in prevention and intervention programs.** Though often conflated with gender identity and sexual orientation, intersex status comes with a distinct set of inequities and stressors, both socially and

medically. Intersex youth were subjected to conversion therapy from a healthcare professional at more than twice the rate of LGBTQ youth who are not intersex. Furthermore, intersex youth reported twice the rate of a mental or physical healthcare provider attempting to convince them to change their sexual orientation or gender identity. As noted, these self-reported rates may not reflect all of the intersex youth confronted with attempts to change their identity within the medical community because such change efforts often start in infancy, with genital or gonadal surgery, making this a pervasive and particularly insidious issue for many intersex individuals. Regardless, our findings confirm that converversion therapy and other change efforts remain a large part of lived experiences among intersex youth. Given that these experiences are associated with increased risk for a past-year suicide attempts, it is imperative that more be done to address them.

**Parental acceptance and family support are powerful protective factors for intersex youth.** Intersex youth with high social support from their families reported half the rate of suicide attempts in the past year. Our findings also show that intersex youth who reported sexual orientation acceptance from at least one parent were 54% less likely to attempt suicide in the past year. Additionally, those who reported gender identity acceptance from at least one parent were 42% less likely to attempt suicide in the past year. Family

support and acceptance is an important protective factor for LGBTQ youth well-being; however, for intersex youth, who may often find their family and parents to be the source of attempts to change their identity, support from them may be more meaningful and important.

**Research efforts must do more to consider the psychological well-being of intersex youth.** Being transgender or nonbinary comes with similar experiences in bias and stigma related to cisnormativity; however, being intersex has unique stressors that are not adequately addressed when intersex youth are simply included within a sample of "gender variant" or "gender nonconforming" individuals. The current report was inclusive of intersex youth and specifically assessed intersex status; however, given this was not a study exclusively designed for intersex youth, many questions remain unanswered. It is not clear, for example, how many intersex youth in our study experienced issues unique to being intersex such as childhood genital surgery or hormone administration. Furthermore, because our study was specific to LGBTQ youth, the mental health of intersex youth who do not identify as part of the LGBTQ community is unclear. Intersex-specific research is needed to not only examine the risks for poor mental health among intersex youth, but also the protective factors that are unique to them.

**Policies built around the assumption of a sex or gender binary are inherently problematic for intersex youth.** The forced categorization of people into groupings of either male or female on the basis of observable physical characteristics is problematic for youth who do not neatly fit into them. This not only applies to youth who are transgender and nonbinary, but also youth who are intersex — for whom a binary never existed. As we begin to consider ways to be more inclusive in our policies and practices, we must also ensure that the rights of intersex youth are considered. Gendered bathrooms and locker rooms, binary gendered sports participation, forms and documents that only allow male or female sex markers, excluding intersex realities from health and sex education, and many other examples in which aspects of everday life are gendered according to a binary represent stressors for intersex youth and signal that they are not permitted to be who they are. These can be addressed with inclusive policy changes that directly consider intersex individuals and their needs.

**The Trevor Project is dedicated to the increased visibility of intersex youth and finding ways to improve their mental health.** The Trevor Project strives to raise awareness and increase the visibility of intersex youth not only through research reports such as this one, but also through public training of youth-serving adults and organizations and strategic marketing campaigns and

partnerships. Our research team will continue to release findings specific to intersex youth to support efforts to understand their unique challenges and strengths. Our Crisis Services team has a goal of providing all LGBTQ youth with high-quality crisis intervention, including those who are intersex. We recognize that prevention efforts cannot be one-size-fits-all and must address the specific needs of youth we wish to help in our continued efforts to end suicide among all LGBTQ young people.

> The authors of this report acknowledge and extend our deepest thanks to Sylvan Fraser and interACT for providing feedback and guidance on the creation of this report.

Download the Research Report

## ABOUT THE TREVOR PROJECT

The Trevor Project is the world's largest suicide prevention and crisis intervention organization for lesbian, gay, bisexual, transgender, queer & questioning (LGBTQ) young people. The Trevor Project offers a suite of 24/7 crisis intervention and suicide prevention programs, including TrevorLifeline, TrevorText, and TrevorChat as well as the world's largest safe space social networking site for LGBTQ youth, TrevorSpace. Trevor also operates an education program with

resources for youth-serving adults and organizations, an advocacy department fighting for pro-LGBTQ legislation and against anti-LGBTQ rhetoric/policy positions, and a research team to discover the most effective means to help young LGBTQ people in crisis and end suicide. If you or someone you know is feeling hopeless or suicidal, our trained crisis counselors are available 24/7 at 1-866-488-7386 via chat www.TheTrevorProject.org/Get-Help, or by texting START to 678-678.

This report is a collaborative effort from the following individuals at The Trevor Project:

**Myeshia N. Price, PhD**
Senior Research Scientist

**Amy E. Green, PhD**
Vice President of Research

**Jonah DeChants, PhD**
Research Scientist

**Carrie Davis, MSW**
Chief Community Officer

**Recommended Citation**: Price, M.N., Green, A.E, DeChants, J.P, & Davis, C.K. (2021).The mental health and well-being of LGBTQ youth who are intersex. New York, New York: The Trevor Project.

# Media inquiries:

Press@TheTrevorProject.org

## Research-related inquiries:

Research@TheTrevorProject.org

## REFERENCES

Almazan, A.N & Keuroghlian, A.S. (2021). Association between gender-affirming surgeries and mental health outcomes. *JAMA Surgeries, 156*(7), 611-618.

American Academy of Pediatrics (1996). Timing of elective surgery on the genitalia of male children with particular reference to the risks, benefits, and psychological effects of surgery and anesthesia. *Pediatrics, 97*(4), 590-94.

Amnesty International (2017). First, do no harm: Ensuring the rights of children born intersex. https://www.amnesty.org/en/latest/campaigns/2017/05/intersex-rights/.

Blackless, M., Charuvastra, A., Derryck, A., Fausto-Sterling, A., Lausanne, K., & Lee, E. (2000). How sexually dimorphic are we? Review and synthesis. *American Journal of Human Biology, 12*, 151-166.

Cohen-Kettenis, P. (2005). Psychological long0term outcome in intersex conditions. *Hormone Research in Paediatrics, 64*(2), 27-30.

Commonwealth of Australia (2013). Involuntary or coerced sterilisation of intersex people in Australia. Canberra, Australia. Senate

Community Affairs References Committee.

Dreger, A.M. (1998) "Ambiguous sex"—or ambivalent medicine?: Ethical issues in the treatment of intersexuality. *The Hastings Center Report, 23*(3), 24-35.

Falhammar, H., Claahsen-van der Grinten, H., Reisch, N., Slowikowska-Hilczer, J., Nordenström, A., Roehle R, et al.(2018). Health status in 1040 adults with disorders of sex development (DSD): A European multicenter study. *Endocrine Connections, 7*(3), 466–78. pmid:29490934

Fausto-Sterling, A. (1997). How to build a man. In V. A. Rosario (ed.), S*cience and Homosexualities* (pp. 219-225). Routledge.

Fraser, S. (2016). Constructing the female body: using female genital mutilation law to address genital-normalizing surgery on intersex children in the United States. *International Journal of Human Rights in Healthcare, 9*:1, 62 – 72.

Hughto, J., Gunn, H. A., Rood, B. A., & Pantalone, D. W. (2020). Social and medical gender affirmation experiences are inversely associated with mental health problems in a U.S. non-probability sample of transgender adults. *Archives of Sexual Behavior, 49*(7), 2635–2647.

Human Rights Watch (2017). "I want to be like nature made me": Medically unnecessary surgeries on intersex children in the US. New York, New York. Human Rights

Watch.
https://www.hrw.org/sites/default/files/report_pdf/lgbtintersex0717_v

interACT: Advocates for Intersex Youth (2021, January 26). *Intersex Data Collection: Your Guide to Question Design.*
https://interactadvocates.org/intersex-data-collection/

interACT: Advocates for Intersex Youth (2021, January 26). *Intersex FAQ.* https://interactadvocates.org/

Intersex Society of North America (2008). https://isna.org/

Johns, M. M., Lowry, R. R., Haderxhanaj, L. T., Rasberry, C., Robin, L., Scales, L., Stone, D., Suarez, N., & Underwood, J. M. (2020). Trends in violence victimization and suicide risk by sexual identity among high school students—Youth risk behavior survey, United States, 2015–2019. *MMWR Morbidity Mortality Weekly Report, 79*(Suppl-1), 19–27.

Jones, T. (2016). The needs of students with intersex variations. *Sex Education*, 1-17.

Martin, J.A., Hamilton, B.E., Osterman, M.J.K., & Driscoll, A.K. (2021) Births: Final Data for 2019. *National Vital Statistics Reports, 70*(2), 1-51.

Plummer, F., Manea, L., Trepel, D., & McMillan, D. (2016). Screening for anxiety disorders with the GAD-7 and GAD-2: A systematic review and diagnostic metaanalysis. *General Hospital Psychiatry, 39*, 24–31.

Richardson, L. P., Rockhill, C., Russo, J. E., Grossman, D. C., Richards, J., McCarty, C., McCauley, E., & Katon, W. (2010). Evaluation of the PHQ-2 as a brief screen for detecting major depression among adolescents. *Pediatrics, 125*(5), e1097–e1103.

Rosenwohl-Mack, A., Tamar-Mattis, S., Baratz, A.B., Dalke, K.B., Ittelson, A., Zieselman, K., Flatt, J.D. (2020). A national study on the physical and mental health of intersex adults in the U.S. *PLoS ONE, 15*(10): e0240088.

Slijper, F.M.E., & Drop, S.L.S. (1999) Long-term psychological evaluation of intersex children. *Archives of Sexual Behavior, 27*, 125–144.

Smith, E. Jones, T. Ward, R., Dixon. J., Mitchell, A., Hillier, L. (2014). From blues to rainbows: The mental health and well-being of gender diverse and transgender young people in Australia. Melbourne: The Australian Research Centre in Sex, Health, and Society.

Tamar-Mattis, A. (2012). Sterilization and minors with intersex conditions in California law. *California Law Review Circuit, 3*(1):126-135.

The GenIUSS Group. (2014). Best practices for asking questions to identify transgender and other gender minority respondents on population-based surveys. J.L. Herman (Ed.). Los Angeles, CA: The Williams Institute.

The Trevor Project. (2021). 2021 National Survey on LGBTQ Youth

Mental Health. New York, New York:
The Trevor Project.

World Health Organization (2014).
Eliminating forced, coercive and
otherwise involuntary sterilization:
An interagency statement, OHCHR,
UN Women, UNAIDS, UNDP, UNFPA,
UNICEF and WHO. Geneva,
Switzerland: World Health
Organization.
https://iris.who.int/bitstream/handle/10665/112848/9789241507325_e
sequence=1

© The Trevor Project 2021

### Table 1: Intersex Youth Charact

| Age (n =1,132) | | Race and Ethnicity (n = 1,094) |
| --- | --- | --- |
| Under 18 | 53% | White |
| 18 and over | 47% | More than one race |
| Sex Assigned at Birth (n=1,132) | | Latinx |
| Female | 74% | Asian/Pacific Islander |
| Male | | ican American |

Reach a Counselor

The Trevor Project's mission is to end suicide among LGBTQ+ young people.

SIGN UP FOR OUR NEWSLETTER

Email Address

**Subscribe**

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

DONATE

CONTACT US

BLOG

PRESS

CAREERS

TERMS OF SERVICE

PRIVACY POLICY

      

| | | |
|---|---|---|
| man | | |
| Transgender man | 12% | Midwest |
| Questioning | 9% | West |
| Transgender woman | 5% | Northeast |

# EXHIBIT F



# INTERSECTIONS

## DIVING INTO THE FRA LGBTI II SURVEY DATA

## INTERSEX BRIEFING

Prepared By :

Cianán B. Russell, Ph.D.
Senior Policy Officer, ILGA-Europe

Irene Amoroso, Policy Officer, OII Europe

Jana Hugo, Policy Officer, OII Europe

Ins A Kromminga, Awareness Raising and Campaigns Officer, OII Europe



**Co-funded by the European Union**

*Intersectional analysis from findings of the European Union Agency for Fundamental Rights (FRA) 2nd LGBTI survey on LGBTI people in the EU and North Macedonia and Serbia (2019)*

App. 637

# Introduction

A significant number of EU citizens continue to experience discrimination, inequalities and violence based on their sexual orientation, gender identity, gender expression or sex characteristics (SOGIESC). These problems undermine fundamental EU values and show how some Member States have failed to effectively protect the rights of all citizens.

In 2019, the European Union Agency for Fundamental Rights (FRA) conducted the second round of the LGBTI Survey which shows how LGBTI people experience their fundamental rights in daily life across Europe. [1] For the first time, the survey included the experiences of intersex people, and determined that intersex people experience some of the highest levels of discrimination across all groups included in the study.

This briefing, and other briefings in the Intersections [2] series, seeks to elaborate on existing analysis of the FRA LGBTI Survey II, and summarises the most relevant data about the experiences of intersex people in Europe.

The methodology and background information on the survey are available in Annex 1.

1. FRA (European Union Agency for Fundamental Rights) (2020), *A long way to go for LGBTI equality, Luxembourg, Publications Office. Available at: https://fra.europa.eu/en/publication/2020/eu-lgbti-survey-results*
2. *. Available from https://www.ilga-europe.org/report/fra-lgbti-report-2019-intersections/*

## Recommendations

- Based on this analysis, ILGA-Europe and OII Europe recommend that States and institutions:

- Improve the visibility and understanding of intersex persons' lived experiences by strengthening data collection efforts that better reflect their intersectional experiences.

- Establish and implement laws and policies that prohibit non-vital medical interventions and/or treatments on intersex persons without their prior, free and informed consent, along with comprehensive action to ensure the protection of the intersex person's right to health, including:

  - Enforcing the obligation for medical doctors to provide full, up to date information about the treatment options and their consequences,

  - Guaranteeing the right to expert-sensitive and individually tailored psychological and psycho-social counselling and support for all intersex people and their families, and

  - Establishing obligatory training for all medical professionals, such as doctors, midwives, psychologists and other professionals working in the health sector.

- Ensure that intersex people are explicitly protected by hate crime/speech and anti-discrimination laws, policies, and action plans by specifically including the ground or bias motive of "sex characteristics".

- Adopt comprehensive measures to prevent discrimination and exclusion in all areas of life, through awareness raising towards society at large about intersex human rights; implement education and training programmes addressed to professionals and service providers in all areas of life.



App. 639

# Results and Discussion

Respondents to the FRA LGBTI II Survey were asked questions about their identities and demographic information, intersex-specific issues, socioeconomic status, experiences with discrimination, violence, and harassment, and life satisfaction. In this briefing, we highlight key findings from the cross tabulation regarding the lived experiences of intersex people.

The full disaggregated data analysis is available in table form at this link.

## Demographic Information

The total number of respondents of the FRA LGBTI II Survey was 139,799. From those responses, 877 people are included in the intersex respondents in this briefing (0.63%). [3]

Slightly more than half of the intersex people (56.83%) identified as being trans [4] (trans men, trans women, non-binary, genderqueer, gender-fluid, agender, polygender, or other); this represents a much higher percentage of trans intersex people than among the entire respondent population (14.51%). Further, intersex people were much less likely to identify as men and much more likely to identify as non-binary or to indicate that they did not identify with any of the options than the overall LGBTI population (Table 1).

Table 1. Answers to the question "How would you describe yourself today?" [5]

|  | All respondents | Intersex respondents |
|---|---|---|
| Woman/girl | 37.81% | 28.59% |
| Man/boy | 51.36% | 27.43% |
| Trans woman/girl | 1.84% | 8.50% |
| Trans man/boy | 1.90% | 7.20% |
| Non-binary | 6.22% | 23.03% |
| Do not identify with any of these | 0.86% | 5.24% |

Page 3

3. See Annex 1 for details on the composition of the cohort for this briefing.
4. The survey asked respondents if they were a trans person, and stated that "the term trans is used in this survey as a broad umbrella term that includes all those who are transgender, non-binary, gender variant, polygender, agender, gender-fluid, cross dressers, transsexual, or men and women with a transsexual past, and other terms".
5. Note that not all trans women and girls or men and boys selected "trans woman or girl" or "trans man or boy" for their identities; the majority selected "woman or girl" or "man or boy", respectively, from the options available on this question.

App. 640

When asked about their sexual orientation, respondents could describe it as "gay", "lesbian", "bisexual", "heterosexual/straight", "other", or "unknown". While many intersex respondents indicated that they were heterosexual or straight, the percentage is still quite low and may indicate that straight intersex people were not reached as effectively as LGBQ intersex people in the survey dissemination (Table 2).

Table 2.  Answers to the question "In terms of sexual orientation, we can only use a limited number of categories for our analysis. So we would like to ask you which group best matches your sexual orientation. Select the answer that best matches your sexual orientation."

|  | All respondents | Intersex respondents |
|---|---|---|
| Don't know | 0.06% | 0.96% |
| Lesbian | 19.86% | 17.95% |
| Gay | 36.96% | 26.11% |
| Bisexual | 38.90% | 31.74% |
| Heterosexual/straight | 1.59% | 8.99% |
| Other | 2.63% | 14.24% |

Out of all intersex respondents, 14.47% said they considered themselves as being part of an ethnic minority (including of a migrant background), compared to 7.71% of all LGBTI respondents. Likewise, 20.29% said they considered themselves as a "minority in terms of disability", compared to 5.18% of all LGBTI respondents. In this briefing, we have used these variables to show differences in some results.

## Openness

Overall, intersex people are much less open about their SOGIESC than their endosex [6] counterparts (Figure 1). While less than a quarter of all respondents say that they are very open about being LGBTI (22.94%), only 12.11% of intersex respondents are very open about being intersex. By contrast, 44.39% of intersex respondents are never open, compared with the 30.84% of all LGBTI respondents.

Page 4 ————————————————————●

6. "Endosex" refers to people who are born with sex characteristics that fit into the socially defined expectations for men's or women's bodies



## Health status

Respondents were asked two questions related to their health status. Firstly, respondents ranked their health in general; in this question, intersex respondents assessed their health to be much poorer than the overall LGBTI respondents (Figure 2).



Respondents also were asked to indicate if they had a long-term health problem or illness; 55.17% of intersex people indicated that they did, compared to 33.66% of all LGBTI respondents.

App. 642

## Intersex-specific issues

In addition to the demographic questions asked of all respondents, intersex respondents were presented with a set of questions that probed experiences specific to being intersex. Some of these questions were also used to disaggregate data in other sections of the survey.

The first question was about the type of variation of sex characteristics that the person had; respondents were able to select more than one option. After dropping those who selected "None of these" (see Annex 1 for methodology), 29.52% of respondents had variations of sexual anatomy and/or reproductive organs, 41.57% had variations of chromosomes and/or hormonal patterns, and 55.70% had variations of secondary sex characteristics and anatomical features, such as hair growth; 7.97% indicated that they had another type of variation.

Participants were also asked how old they were when they realised that they had a variation of sex characteristics; respondents could enter any number. Figure 3 shows the distribution of responses.



Figure 3. Grouped responses to "How old were you when you first realised that you have a variation in your sex characteristics?"

Respondents were also asked about how old they were when having their first medical treatment or intervention to modify their sex characteristics; 12.80% of respondents indicated this happened at birth, 22.08% by the age of 5 (including at birth), 33.91% by the age of 14, and 53.72% were 18 or older.

The survey also provides data about who gave consent to the first interventions or treatments by asking whether the respondents themselves, both the respondents and their parents, just their parents, or someone else or no one, provided consent.

Table 3 is a cross tabulation of A) the responses to the question related to consent provided to the first treatment or intervention with B) the responses to the question about the types of interventions undergone, where respondents could select all the options that applied to their situation, including "Surgery related to being intersex", "Hormonal treatment" and "Other treatment" (note that these refer to potentially different interventions - consent was related to only the first intervention while types of interventions refers to all interventions, including but not limited to the first).

This reveals that among intersex respondents who had "surgeries related to being intersex", 60.87% stated that their "parents or someone else" or "no one" gave consent to their first treatment or intervention, which indicates that these respondents experienced at least one intervention in which they did not provide personal consent. It is particularly important here to note the distinction, in bioethical terms, between "consent" and "authorisation". Only the individual concerned has the capacity to provide "consent"; when parents or another third party make a decision, this is "authorisation". [7]

Table 3. Answers to "Who gave consent before your first medical treatment or intervention to modify your sex characteristics?", cross-tabulated with answers to "Which of the following treatments have you undergone? Read all options and select all that apply"

|  | Intersex respondents who had treatments | Intersex people who had surgeries related to being intersex | Intersex people who had hormonal treatment | Intersex people who had other treatments |
|---|---|---|---|---|
| I gave consent | 49.49% | 26.77% | 52.86% | 59.02% |
| My parents gave consent | 27.88% | 45.12% | 23.42% | 19.76% |
| Both me and my parents did | 11.89% | 12.36% | 12.63% | 7.50% |
| Someone else/ no one | 10.74% | 15.75% | 11.09% | 13.71% |

7. Separating these two distinct categorical kinds of approval allows for a more precise evaluation of whether the right of a person to bodily autonomy and self-determination is protected in practice. See https://rm.coe.int/proceedings-minsk-8-dec-2017-e/16807b4e41 for more discussion. See also Council of Europe BIO/ENF-CP, Draft guide for the participation of children in decision-making process regarding their health (10 October 2022), pages 25 and 29, available from https://rm.coe.int/bio-enfcp-2022-1-rev2-draft-guide-children-participation-e/1680a8a4c7 and the Convention on Human Rights and Biomedicine (Oviedo Convention), Articles 5 and 6. Available from: https://www.coe.int/en/web/conventions/full-list?module=treaty-detail&treatynum=164

## Non-vital medical interventions on intersex people

More detailed national statistics on the number of interventions are still scarce. However, two full case studies on the frequency of so-called "feminising" and "masculinising" operations, in relation to the number of diagnoses of so-called "variants of sex development", on intersex children aged 0-10 exist for Germany. [8],[9] The first of these, by Hoenes et al., investigated "whether there has been a decline in surgical "corrections" of "ambiguous" genitalia in children in Germany between 2005 and 2016". [10] The study concluded that the number of interventions on children under 10 years of age had "remained relatively constant in relation to the number of diagnoses between 2005 and 2016". [11] The study found 1871 annual cases on average, amounting to 21% relative frequency, with no notable decline year on year. As the study focused on operations performed on children under the age of 10, it is reasonable to assume that none of the children were able to provide consent, given their age and capacities (legal and otherwise).

Further investigation of this question involved creating cross-tabulation with a question about whether those giving consent or authorisation received sufficient detailed information, including about the possible positive and negative consequences of a given intervention. Figure 4 (next page) shows this distribution; and shows clearly that involvement of intersex people themselves means that it is more likely for sufficient information to have been given. Even in those cases where personal consent was given, though, a lack of detailed information was quite common (26.74% of those who consented themselves and 40.60% of those who consented together with their parents did not receive sufficient detailed information).

8. Josch Hoenes, Eugen Januschke, Ulrike Klöppel, Häufigkeit normangleichender Operationen "uneindeutiger" Genitalien im Kindesalter. Follow Up-Studie (Bochum, 2019), Available from: https://www.gender.hu-berlin.de/de/publikationen/gender-bulletin-broschueren/bulletin-texte-44-3/bulletin44-entwurf-final.pdf

9. Ulrike Klöppel, Zur Aktualität kosmetischer Operationen 'un-eindeutig' Genitalien im Kindesalter. Hg. von der Geschäftsstelle des Zentrums für transdisziplinäre Geschlechterstudien der Humboldt-Universität zu Berlin (Berlin, 2016), Available from: https://www.gender.hu-berlin.de/de/publikationen/gender-bulletins/bulletin-texte/texte-42/kloeppel-2016_zur-aktualitaet-kosmetischer-genitaloperationen

10. Josch Hoenes, Eugen Januschke, Ulrike Klöppel, Häufigkeit normangleichender Operationen "uneindeutiger" Genitalien im Kindesalter. Follow Up-Studie (Bochum, 2019), p.6, Available from: https://www.gender.hu-berlin.de/de/publikationen/gender-bulletin-broschueren/bulletin-texte-44-3/bulletin44-entwurf-final.pdf

11. Ibid, p. 19

App. 645



Figure 4. Amount of information received prior to intervention, disaggregated by who gave consent or authorisation

Another cross-tabulation of two questions looks at how old an intersex respondent was when they first realised that they had a variation of sex characteristics compared with whether the person has had medical interventions to modify their sex characteristics; Figure 5 shows this relationship.



Figure 5. Percentage of respondents who selected "yes" for "Have you undergone any medical treatment or intervention, to modify your sex characteristics?", disaggregated by age when they first realised they had a variation of sex characteristics

A further look into the survey results reveals that of the intersex respondents who underwent an intervention or treatment - whether surgical, hormonal or other - 43.21% reported having difficulties in registering their gender marker. This may indicate that a large percentage of intersex persons wish to change their gender markers from the one assigned to them at birth. Given that 23.03% of intersex respondents identified as non-binary, this could indicate that the absence of non-binary or third gender markers in much of Europe presents a key obstacle to registration for intersex people. However, many intersex people do identify as men or women: including those of them who want to change their gender marker to one that falls within the binary.

## Provision of information to parents prior to non-vital interventions

The survey data indicate that 68.24% of the parents who gave consent did not receive detailed information prior to the intervention. These data are better understood when read together with results from a study [12] showing that a lack of provision of psycho-social counselling options for parents of intersex children can be extremely harmful or even fatal for the child. Most notably, it showed that parents of intersex children who are provided with medicalised information by medical practitioners are almost three times more likely to consent to surgery than those who receive de-medicalised information. In the absence of conclusive data proving the "benefits" of early surgery and rather in the presence of robust evidence as to its harmful consequences [13], there is a danger of medicalised information provided to parents resulting in irreversible and inadequately-grounded decisions taken on behalf of their child, often in the belief that this decision is in their child's future best interest.

According to another study, parents very often - including even those who are medical practitioners themselves - are immediately confronted with complex medical explanations about the so-called "condition" of their new-born child, which they are reportedly unable to follow. [14] These are often further accompanied by offers or pressure by doctors to proceed with medical treatments that will allegedly "fix" the intersex child. The 2017 Resolution of the Parliamentary Assembly of the Council of Europe emphasises that this kind of medicalised counselling puts parents under immense pressure to make "life-changing decisions on behalf of their child, without having a full and genuine understanding of the long-term consequences for their children".[15]

Page 10

12. J. C. Streuli, E. Vayena, Y. Cavicchia-Balmer & J. Huber (2013), Shaping parents: impact of contrasting professional counselling on parents' decision making for children with disorders of sex development, Journal of Sexual Medicine, Vol. 8 No. 3, pp. 1953–1960, Available from: http://www.ncbi.nlm.nih.gov/pubmed/23742202.
13. Kavot Zillén, Jameson Garland and Santa Slokenberga, The Rights of Children in Biomedicine: Challenges posed by scientific advances and uncertainties, Commissioned by the Committee on Bioethics for the Council of Europe (January 2017), p. 43. Available from: https://rm.coe.int/16806d8e2f
14. A. Krämer, K. Sabisch (2017), Inter*: Geschichte, Diskurs und soziale Praxis aus Sicht der Geschlechterforschung. In: Kortendiek, B., Riegraf, B., Sabisch, K. (eds) Handbuch Interdisziplinäre Geschlechterforschung. Geschlecht und Gesellschaft, vol 65. Springer VS, Wiesbaden. p. 31-34, Available from: https://link.springer.com/referenceworkentry/10.1007/978-3-658-12500-4_78-1
15. Parliamentary Assembly of the Council of Europe (PACE) (2017): Resolution 2191 (2017). Promoting the human rights of and eliminating discrimination against intersex people. Doc. 14404 Report, Part C Articles 29, 49, 61, 68, 69. Available from: https://bit.ly/2gfohnV

## Obstacles in accessing legal gender recognition procedures

Along with the difficulties that trans and intersex people face when trying to access legal gender recognition procedures that are not based on self-determination, intersex people may also face unique difficulties that impact them specifically.

In Member States that still require such prerequisites, "[s]urgical requirements are particularly harmful where an inappropriate initial sex assignment was itself imposed through unwanted and irreversible changes to sex characteristics" [16]. In other Member States, a "medical-orientated precondition for legal gender recognition is the requirement that applicants obtain a diagnosis of gender dysphoria, gender identity disorder or transsexualism" [17]. This disregards the reality of intersex people whose experience of what medical doctors refer to as "gender dysphoria" or similar diagnoses is in fact a result of unwanted and unconsented changes to their sex characteristics in order to align their physical appearance to the "typical" male or female one.

However, any legal gender recognition procedures that are not solely based on self-determination are potentially harmful for both trans and intersex people, as they assume that "physical interventions are an inherent part of gender transition processes and that Europe's trans [or intersex, or intersex trans] people inevitably desire to change their bodies, particularly their sex characteristics" [18], and therefore violate the person's fundamental rights.

In relation to the importance of accessing legal gender recognition procedures, research has shown that denial of access to such procedures is directly linked to experiences of inequality and ultimately becomes a gateway for future social and legal discrimination. [19],[20]

Page 11 ●

16. see Background Note on Human Rights Violations against Intersex People, p.35. Available from: https://www.ohchr.org/sites/default/files/Documents/Issues/Discrimination/LGBT/BackgroundNoteHumanRightsViolationsagainstIntersexPeople.pdf
17. see Dunne, P. & van den Brink, M. (2018). Trans and intersex equality rights in Europe – a comparative analysis. European network of legal experts in gender equality and non-discrimination, p.63. Available from: https://ec.europa.eu/newsroom/just/items/638586
18. See Dunne, P. & van den Brink, M. (2018). Trans and intersex equality rights in Europe – a comparative analysis. European network of legal experts in gender equality and non-discrimination, p.63. Available from: https://ec.europa.eu/newsroom/just/items/638586
19. See Dunne, P. & van den Brink, M. (2018), p.60.
20. It is also important that legal gender recognition procedures are properly implemented in a way that prevents loopholes and further obstacles. For example, in 2020 it was reported to OII Europe that, in Denmark, intersex persons when changing their civil registration number may face losing access to some of their medical history as well as being temporarily blocked from having access to payments or cash withdrawals from their bank.

## Socio economic status

The survey asked respondents several questions pertaining to their socioeconomic status. When asked if their household total income met their needs, more than 1 in 5 intersex respondents said they had "difficulty" or "great difficulty" (25.06%, compared to 13.91% of all LGBTI respondents). This share was higher for intersex respondents from an ethnic minority (including of migrant background) (31.93%) and intersex respondents with disabilities (31.22%). Additionally, 36.20% intersex people who had experienced any intersex-related interventions [21] and 34.16% of intersex respondents who had had obstacles with their identity registration [22] selected one of these options.

When asked about their experiences of homelessness, 34.03% of intersex people reported having experienced housing difficulties (Figure 6). This number is higher for intersex respondents with disabilities (49.55%) and intersex respondents from ethnic minorities and/or migrant backgrounds (53.42%). The number was also higher for trans intersex respondents (39.02%), those who have had medical interventions (41.89%) and those who have experienced obstacles registering their gender marker (50.58%). Most intersex people who had experiences of homelessness (70.27%) had to stay with friends or relatives, although a much higher percentage needed to stay in an emergency shelter (32.09%) or sleep outside (20.72%) than among all LGBTI respondents (19.19% and 8.41%, respectively).



Figure 6. Intersex repondents who have experienced housing difficulties, disaggregated

21. Disaggregation based on question IX6.
22. Disaggregation based on question IX8.

App. 649

## Obstacles to employment

The survey results clearly show us that intersex people face especially significant barriers in employment. Their income-related difficulties can be contextualised because of the reportedly higher risk of poverty that intersex people face, due to lack of education as a result of pathologisation and related trauma experienced from an early age. Furthermore, the strain of discrimination and stigmatisation may lead to higher absence rates at work, increasing the risk of intersex people losing their jobs. Research shows that intersex persons may also face difficulties in explaining or accounting for gaps in their education or employment history, resulting from times when they were hospitalised or when they were not able to work due to trauma [23] as a result of non-consensual non-vital interventions or bias-motivated crimes committed against them.

Such struggles with employment concur with the relatively high rates of homelessness among intersex people. Additionally, relationship/family problems and instances of domestic violence also affect intersex persons' housing situations. A 2021 study highlighted this link: of the 72 participating organisations, representing 32 countries across Europe, over half (52%) stated that they work specifically with intersex youth. According to this research, the most common reason for homelessness among LGBTI youth is reported to be identity related family conflict (72%), including young people's choice to flee from violence in the family home. [24]

## Life satisfaction

Respondents were asked to rank their life satisfaction on a scale from 0 to 10, with 10 being the most satisfied and 0 the least. Intersex people were less satisfied than the total population of survey respondents (5.53 and 6.41, respectively), and those experiencing intersectional exclusion even less so: intersex trans women at 5.47, non-binary intersex people at 5.16, and intersex people with disabilities at 4.73.

23. M. Carpenter, D. Hough (2014): Employers' Guide to Intersex Inclusion. Sydney: Pride in Diversity and Organisation Intersex International Australia, p. 20, Available from: *https://ihra.org.au/wp-content/uploads/key/Employer-Guide-Intersex-Inclusion.pdf*
24. Shelton, J., Ritosa, A., Van Roozendaal, B., Hugendubel, K. & Dodd, S.J. (2021). Perceptions: Addressing LGBTI Youth Homelessness in Europe and Central Asia - Findings from a Survey of LGBTI Organisations. ILGA-Europe, True Colors United, and the Silberman Center for Sexuality and Gender at Hunter College, p. 3, 14, 15, Available from: *https://www.feantsa.org/public/user/Activities/events/2021/Perceptions_-_ILGA_Europe_Compressed.pdf*; in total, 71 organisations participated in the survey, representing 32 countries' estimates of the in-country prevalence rate of LGBTI youth homelessness.

## COVID-19 impacts

In 2020, OII Europe conducted its first COVID-19 survey [25] on the impact of the pandemic on intersex persons' health and wellbeing. The survey revealed that a high percentage of intersex respondents experienced increased mental health issues as a result of the pandemic. Of all respondents, 62% reported a worsening of their mental health, and 21% are experiencing a relapse of their previous mental health issues. These findings represent another worrying, though not surprising, finding: the COVID-19 pandemic exacerbated the mental health issues experienced by intersex people through the violations of their physical and psychological integrity and through the stress of living invisible, isolated lives, with stigma and taboo making intersex individuals especially vulnerable to struggling with their mental health.

## Experiences of discrimination

The survey asked respondents if they felt discriminated against for being LGBTI in several areas of life, during the last 12 months. The share of intersex respondents that felt discriminated against by **healthcare or social services personnel** (Figure 7) is 43.34%. This share is much higher for intersex people with disabilities (51.95%), trans intersex people from an ethnic minority (including migrants) (60.03%), trans intersex women (54.80%) and non-binary intersex people (53.54%).



Figure 7. Percentage of respondents stating they felt discriminated against in healthcare or social services in the last 12 months

25. Dan Christian Ghattas, Covid-19. A report on the situation of intersex people in Europe and Central Asia, OII Europe, 9 December 2020, p.16 - 17. Available from: **https://www.oiieurope.org/covid-19-survey-report**

App. 651

Over a quarter (36.13%) of young respondents felt discriminated against by **school or university personnel**, compared to 19.51% of all LGBTI respondents. Within this age group, the share is higher for intersex people with disabilities (40.41%) and non-binary intersex respondents (43.74%).

The survey asked respondents if they felt discriminated against **when looking for work and when at work**. The share of intersex respondents that felt discriminated against when looking for a job is 27.98% (compared to 10.17% of all LGBTI respondents). This share is much higher for intersex trans women (43.55%).

Nearly a third of intersex people people felt discriminated against **when showing their ID** (30.64%, compared to 4.66% of all LGBTI respondents), and the share is highest among intersex trans people from ethnic minorities (including migrants) (48.85%) and intersex trans men (45.80%).

Even with this high prevalence of experiences of discrimination, intersex people were much less likely to report discrimination to their equality bodies than the overall LGBTI population: while 10.81% of all LGBTI respondents reported to an equality body, only 2.73% of intersex respondents did. Intersex people were, however, more likely to report to politicians, with 10.24% of intersex respondents (and 24.46% of intersex people with disabilities) doing so, compared to 2.11% of all LGBTI respondents. Intersex people were much more likely to indicate that they did not know how to report discrimination (19.65% of intersex respondents compared to 3.03% of all LGBTI respondents), did not trust authorities (29.96% and 7.88%, respectively), and believed that nothing would happen (45.01% and 2.92%, respectively).

Specifically in the context of healthcare, intersex people experienced much higher obstacles to health compared to LGBTI respondents, including difficulty gaining access, having their specific needs ignored, inappropriate curiosity or comments (28.99%), pressure to undergo treatment (19.22%), and avoidance of services (17.06%) (Figure 8).



## Exposure to mistreatment in healthcare settings

Intersex people regularly speak in self-help groups and report to national intersex NGOs or to OII Europe that they are at risk of sexual harassment in medical settings, including in some cases rape, and are exposed to degrading examinations, verbal violence and derogatory comments. [26] In addition, a severe lack of knowledge about intersex people, the fundamental rights violations they face and the specific needs that follow from these experiences still exists among medical practitioners. [27] It is often matched with personal bias that can result in disbelief and insults, the refusal to perform needed examinations, and examinations being carried out in violent ways or without the intersex person's consent. When seeking medical help for issues directly related to their sex characteristics, diagnosis or sexuality, intersex people often face highly insensitive and violent behaviour. For example, a 2014 Dutch study on the experience of intersex people in different areas of life emphasised that six out of seven respondents spoke "with a great deal of emotion about poor information, insensitive communication and discourteous treatment", echoing the FRA 2019 survey results about how many intersex respondents have experienced inappropriate curiosity or comments about their body.

Additionally, specific subgroups of intersex people were at a heightened exposure to such barriers in healthcare settings (Figure 9). Among others, 40.04% of intersex respondents from an ethnic minority or migrant background, and 25.77% of intersex respondents who identify as genderqueer or non-binary avoided healthcare services (i.e., more than a quarter). Furthermore, 42.11% of intersex respondents with disabilities felt their needs were ignored by healthcare staff when seeking to access healthcare services. The data also reveals that 31.03% of trans intersex women - nearly a third - experienced pressure to undergo treatments (compared to only 3.18 % of all LGBTI respondents).

Page 16

26. See the Shadow Report submitted to the Group of Experts on Action against Violence against Women and Domestic Violence (GREVIO) by Intersex Greece on 6 May 2022, p. 3-4 and 7, Available from: https://rm.coe.int/greece-2022-shadow-report-grevio-cbr/1680a675f7?fbclid=IwAR1OiUovdT-NvgMG7R63_VX8Q5N9gYAPSIfT0a6nQTdV8J6YAHKvEJ-g8iU, See also OII Germany: CEDAW Shadow Report. (20th of January 2017), Available from: https://tbinternet.ohchr.org/Treaties/CEDAW/Shared%20Documents/DEU/INT_CEDAW_NGO_DEU_26315_E.pdf.
27. Parliamentary Assembly, Promoting the human rights of and eliminating discrimination against intersex people. Report. Doc. 14404 (25 September 2017), part C, paras. 49-50, Available from: https://pace.coe.int/en/files/24027/html#_TOC_d19e146

App. 653



Figure 9. Exposure to specific barriers in access to healthcare, disaggregated intersex groups

# Experiences of hate-motivated violence and harassment

The survey asked respondents whether they had been physically or sexually attacked in the last 5 years. Almost half of intersex respondents (49.40%) indicate that they had been physically or sexually attacked in that period, compared to 24.55% of all LGBTI respondents. Furthermore, intersex people, and particularly intersex trans men, were much more likely to describe being physically or sexually attacked "all the time" (Figure 10). Among those intersex people who were attacked at least once for any reason, almost half of respondents (49.21%) indicated that they were attacked for being intersex; this amounts to 24.06% of all intersex respondents. [28]



Figure 10. Number of times exposed to physical or sexual attack in the last 5 years, disaggregated

28. *The percentage of all intersex respondents attacked specifically for being intersex was calculated using responses to survey questions E1 (exposure to attack for any reason) and E2 (among those attacked, whether the attack was due to being [respondent category] (e.g. intersex)).*

App. 654

Within this exposure to attack, 42.66% of attacks experienced by intersex people involved a specifically sexual component (either being a "sexual attack" or a "physical and sexual attack"), compared to 28.42% of all LGBTI respondents, oncemore revealing that the exposure to sexual violence is higher for intersex people than for LGBTI populations. This is further exacerbated for intersex trans people, being reported by 52.91% of intersex trans men and 54.96% of intersex trans women.

When asked who attacked them, many intersex respondents said that the attacker was a family member (11.21% of intersex people and 13.01% of intersex people with disabilities). More than 1 in 5 intersex trans women (22.44%) said the attack happened at home, more than double any other group of intersex people. Sexual and physical violence inside families or by relatives can be exerted as a form of "punishment", in particular in families where the existence of the intersex family member is considered to be shameful for the family. In the case of intersex children, perpetrators of such violence abuse the specifically vulnerable situation of the intersex child, who is not considered by the family to be of the same value as their non-intersex siblings.

Again looking at the data on circumstances in which such violence is perpetrated through an intersectional lens, it is clear that intersex trans men were most likely to be attacked by an acquaintance or friend (21.55%) or someone from school (22.40%); intersex people from an ethnic minority (including migrants) were highly exposed to attack from a member of an extremist or racist group (13.30%) and non-binary intersex people to attacks from a group of teenagers (32.85%). In most cases, the attack happened either in a public space such as a cafe, public transportation, or a street or park (62.18%).

When asked if they had reported the attack, intersex people were somewhat more likely to have reported the attack than the all LGBTI respondents (29.57% and 20.79%, respectively), though 43.81% of intersex people with disabilities and 41.07% of intersex trans women did report to someone.

In addition to questions about attacks, respondents were also asked about experiences of harassment. Intersex people were more likely to have experienced some kind of harassment than all LGBTI respondents (72.81% compared to 56.06%, respectively), with more than 4 out of 5 intersex people with disabilities having this experience (87.95%). (Figure 11)



App. 655

The survey also shows that intersex respondents experienced double the amounts of the following kinds of harassment than all LGBTI respondents together: 27.75% of intersex respondents reported experiencing threats of violence in person (compared to 12.98% of all LGBTI respondents), 22.52% of intersex respondents reported being loitered, waited or followed (compared to 10.57% of all LGBTI respondents), 18.80% of intersex respondents experienced receiving emails or texts (compared to 9.96% of all LGBTI respondents), and 27.73% of intersex respondents reported receiving threatening comments online (compared to 10.07% of all LGBTI respondents).

## Intersexphobic attacks

Because being intersex is still not widely known in society, and protection is still not available to intersex persons, perpetrators have a specific advantage over their intersex victim, which they exploit. Thus intersex persons - specifically those with intersectional identities - are specifically vulnerable to experiencing physical and sexual violence, and they are frequently specifically targeted by perpetrators because of being intersex.

*The following section directly quotes intersexphobic online speech.*

In addition, intersex people are exposed to intersexphobic verbal attacks, including threatening and hateful comments online. OII Europe member organisations have been collecting data on online hate speech against intersex people, and their reports show that hate speech is widespread and getting worse, as per the following examples:

- "Two sexes that's all. Any variation from that are deformities. They are infertile right? So, on a species level they are not viable". Twitter user, 22/11/2018;
- "We the dyadics don't have a disgusting alien between our legs. You are f*cking human errors and we won't stop talking like we do to include your atrocity into our normality." Curiouscat user, 2018;
- "They champion negroes, illegal aliens, Muslims, sexual deviants, and Intersex (a new word I just learned), which means freaks who are born with a genital problem, such as hermaphrodites, and congenital eunuchs, all horrible genetic mistakes of nature [...] I like how the ancient Spartans took their sickly, weak, and/or deformed babies and threw them off a cliff. That's what all the white nations should be doing now". Stormfront user, 2020.

Many additional examples are available in OII Europe's Submission "Towards an extension of the list of EU crimes to hate speech and hate crime". [29]

29. See OII Europe's Submission "Towards an extension of the list of EU crimes to hate speech and hate crime", published 20.04.2021. Available from: **https://www.oiieurope.org/wp-content/uploads/2021/05/OII-Europe-Submission_Extension-Hate-Speech-and-Crime_FINAL.pdf**

App. 656

## Importance of including "sex characteristics" as a specific protection ground in legislation

As the data reveal, intersex persons are often targeted by perpetrators of violent acts specifically because of being intersex, or because of being intersex in combination with other personal characteristics. While some EU Member States have implemented laws and action plans that specifically protect intersex persons from discrimination and violence on the basis of sex characteristics, [30] gaps in protection still remain, especially where disaggregated data on the specific bias-motive or protected ground (in this case the sex characteristics of the victim) are still not being collected. Only if they systematically record, collect and publish annual data on anti-LGBTI hate crime, disaggregated by the specific ground, will Member States be in the position to develop effective, evidence-based legal and policy responses to this phenomenon.[31]

Member States must also be aware that no measure designed to tackle discrimination and bias-motivated violence would be sufficient until intersex genital mutilation (IGM) is also legally prohibited and such prohibition effectively implemented. IGM is one the most egregious forms of discrimination and violence motivated by prejudice towards a person because of their variation of sex characteristics. It includes non-vital surgical, hormonal and other medical interventions and practices that aim at altering a person's sex characteristics without their personal, prior, free and fully informed consent. See the box, above, on "Non-vital medical interventions on intersex people" for further details.

Page 20

30. Malta and Finland, Bosnia and Herzegovina and Montenegro, The Netherlands, Serbia, Belgium and Denmark all offer comprehensive legal protection against discrimination on the grounds of sex characteristics. Greece and Portugal offer partial legal protection against discrimination. All offer comprehensive protection from hate crime by explicitly mentioning the ground of sex characteristics: Belgium, Denmark, Greece and Malta, as well as in some regions of Spain and Sweden. For further reading, see OII Europe's yearly publication of good practice maps: https://www.oiieurope.org/library-en/map/ . See also ILGA Europe's Rainbow Map: https://rainbow-europe.org
31. European Union Agency for Fundamental Rights (2018). Hate crime recording and data collection practice across the EU, p. 23, Available from: https://fra.europa.eu/sites/default/files/fra_uploads/fra-2018-hate-crime-recording_en.pdf

# Conclusion

The objective of this briefing was to provide an in-depth overview of the specific challenges and obstacles faced by intersex persons, by conducting an intersectional analysis of the data from the 2019 FRA LGBTI II survey. This process has allowed for detecting the following main points:

**1. Intersex people are among the most vulnerable groups among the LGBTI population**
Compared to all the LGBTI respondents to the survey, intersex respondents reported lower levels of life satisfaction, much higher difficulties in making ends meet and housing difficulties, higher prevalence of discrimination coupled with a much greater likelihood to indicate that they did not know how to report discrimination, did not trust authorities, and believed that nothing would happen. They also accounted for experiencing much higher obstacles to healthcare. Intersex people reported much higher exposure to physical and, especially, sexual attacks - in half cases the attacks were specifically based on the victim being intersex - and greater exposure to harassment.

**2. Intersex people from marginalised groups are at an increased vulnerability**
An intersectional analysis was necessary to spot the link between the diverse experiences and identities of intersex people and their respective exposure to several forms of fundamental rights' violations: intersex respondents from ethnic minorities and/or migrant backgrounds were more likely to experience homelessness and to avoid healthcare services; intersex people with disabilities reported lower levels of life satisfaction, were more exposed to having their needs ignored by healthcare staff when seeking to access healthcare services, and reported a dramatically high incidence of harassment; trans intersex women were disproportionately exposed to discrimination by healthcare or social services personnel and when looking for work and when at work; young intersex respondents and non-binary intersex respondents were more likely to feel discriminated against by school or university personnel; experiences of physical and/or sexual attacks were particularly prevalent among intersex trans people.

**3. Intersex people are subjected to non-vital non-consensual interventions and face severe obstacles in healthcare**
The majority of intersex people have faced, and still continue to face, systematic violations of their fundamental rights to self-determination and bodily integrity: A vast number of intersex respondents who were subjected to surgeries did not personally consent to the first decisions about their own bodies, as the majority of them stated that their "parents or someone else" or "no one" gave consent to their first treatment or intervention. In combination with a frequent lack of personal consent, the survey also points to the very low likelihood that the intersex person received detailed information. We can also infer from further responses to the survey that poor education and training on intersex people's needs and rights is a recurring issue. This does not only impact on the exposure to non-vital non-consensual interventions but also affects the intersex person throughout their life.

# Annex 1: Methodology and survey background information

**Background: FRA LGBTI II Survey 2019**

The statistics used to write this brief come from the 2019 EU LGBTI II Survey conducted by the European Union Agency for Fundamental Rights. The survey was open to individuals who were 15 years of age or older who self-identified as lesbian, gay, bisexual, trans and/or intersex. The survey was conducted online in 27 EU Member States, the UK, Serbia and North Macedonia between May and July of 2019. The respondents were asked a series of questions about their lived experiences, including information about their experiences of discrimination, harassment, violence, openness about their sexual orientation, gender identity, and sex characteristics, experiences in education and at work, their relationships and parenting, health, housing difficulties, living conditions and socio-economic status.

**Representativeness of the results used in the report**

The survey was available to LGBTI people who had access to the internet. As such, the survey did not provide a random sampling of LGBTI people, which would have made it representative of the LGBTI community in Europe. However, the weighting scheme developed by FRA (2019) [32], which adjusts the response numbers to better represent the LGBTI population as a whole across participating Member States, was applied to the data in this analysis so the results presented in the report are as representative of the population as possible.

**Sample**

This briefing provides information on intersex people. Respondents to the survey were able to indicate if they were intersex directly in question A5 [33]; respondents who indicated "yes" on this question were asked the intersex-specific questions in section IX. For the purpose of this briefing, this group was further narrowed based on answers to question IX1, which asked respondents about the nature of their variation in sex characteristics, as follows:

*IX1. What type of variation of your sex characteristics do you have (or were you treated for)? Read all options and select all that apply*

    A. Variation of sexual anatomy and/or reproductive organs
    B. Variation of chromosomes and/or hormonal patterns
    C. Variation of secondary characteristics and anatomical features such as muscle mass, hair distribution, breasts and other body features
    D. Other [IF SELECTED INSERT OPEN TEXT RESPONSE FIELD – MAX 70 CHARACTERS]
    E.  None of these
    F.  Prefer not to say

This briefing dropped all respondents who selected "E. None of these" or "F. Prefer not to say" from the analysis, because it was not possible to determine if they had described themselves as intersex in error. As such, this analysis focuses on a sample size of 877 respondents (0.63% of the total population of 139,799 respondents).

**Statistical methods**

The report is based on descriptive statistics extracted from the survey. The primary method used is cross tabulations, which is used to quantitatively analyse the relationship between multiple variables.

*32. FRA (European Union Agency for Fundamental Rights) (2020), A long way to go for LGBTI equality – Technical Report, Luxembourg, Publications Office. Available from: https://fra.europa.eu/sites/default/files/fra_uploads/fra-2020-lgbti-equality-technical-report_en.pdf*
*33.  FRA (European Union Agency for Fundamental Rights) (2020), A long way to go for LGBTI equality – Questionnaire, Luxembourg, Publications Office. Available from: https://fra.europa.eu/sites/default/files/fra_uploads/fra-2020-questionnaire-eu-lgbti-ii-survey_en.pdf*

App. 659

EXHIBIT



https://travel.state.gov/content/travel/en/passports/passport-help.html    Go

DEC **FEB** MAR
◀ **07** ▶
2024 **2025** 2026

118 captures
14 Nov 2019 - 12 Feb 2025

   

Home | Travel Advisories | Newsroom | About Us | Contact Us | Careers | 🔓 MyTravelGov | 🇺🇸 Find U.S. Embassies & Consulates

# Travel.State.Gov
## U.S. DEPARTMENT of STATE — BUREAU of CONSULAR AFFAIRS

Search 🔍

U.S. Passports | International Travel | U.S. Visas | Intercountry Adoption | International Parental Child Abduction | Replace or Certify Documents

Get a Passport | Renew or Replace a Passport | Get My Passport Fast | Prepare to Apply | Passport Help | Legal Matters

Travel.State.Gov > U.S. Passports > Passport Help

Share this page: 🖨 ✉ f X

### Frequently Asked Questions

### Passport Resources

### Next Generation Passport

### Passport Videos

### After You Get Your New Passport

## Passport Help

**Contacting Us If You Have Urgent Travel**

Check your application status online and sign up for updates via email. How our contact center can help you depends on your travel date, and if you have applied or not yet applied...

[READ MORE]

Find answers to your questions about U.S. passports, watch short videos on how to apply, and download handouts and resources about applying for a passport.



Find Answers to your Questions

FAQ

Watch our Passport Videos



INFORMACIÓN EN ESPAÑOL

CONTACT US

## Travel.State.Gov

Travel.State.Gov
U.S. Passports
International Travel
U.S. Visas
Intercountry Adoption
International Parental Child Abduction

## Popular Links

Home
Travel Advisories
Newsroom
About Us
Contact Us
Careers

## Stay Connected

💬 f 📷 X ▶ 🔊

## Legal Resources

Records and Authentications

MyTravelGov
Find U.S. Embassies & Consulates

Legal Information
Info for U.S. Law Enforcement

Privacy | Accessibility | Copyright & Disclaimer | FOIA | GSA[cf] | No FEAR Act Data | Office of the Inspector General | USA.gov | USA.gov/espanol[cf] |
This site is managed by the U.S. Department of State. External links to other Internet sites and listings of private entities on this page are provided as a convenience and should not be
construed as the U.S. Department of State or U.S. government endorsement of the entity, its views, the products or services it provides, or the accuracy of information contained therein. The order
in which names appear has no significance, and the listings or links may be removed at any time at the discretion of the Department.

# EXHIBIT H



Home    Travel Advisories    Newsroom    About Us    Contact Us    Careers    MyTravelGov    Find U.S. Embassies & Consulates

## Travel.State.Gov
U.S. DEPARTMENT of STATE — BUREAU of CONSULAR AFFAIRS

| U.S. Passports | International Travel | U.S. Visas | Intercountry Adoption | International Parental Child Abduction | Replace or Certify Documents |

Get a Passport    Renew or Replace a Passport    Get My Passport Fast    Prepare to Apply    Passport Help    Legal Matters

Travel.State.Gov > U.S. Passports > Passport Help > Sex Marker in Passports

Share this page:

### Sex Marker in Passports

- Frequently Asked Questions
- Passport Resources
- Next Generation Passport
- Passport Videos
- After You Get Your New Passport
- Sex Marker in Passports

The White House issued Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" on January 20, 2025.

Under the executive order, we will no longer issue U.S. passports or Consular Reports of Birth Abroad (CRBAs) with an X marker. We will only issue passports with an M or F sex marker that match the customer's biological sex at birth.

If you submit a passport application requesting an X marker or requesting a sex marker that differs from the sex marker at your birth, you may experience delays getting your passport. You may receive a letter or email requesting more information. We will issue you a new passport that matches your biological sex at birth, based on your supporting documents and our records about your previous passports.

- All passports - including those with an X marker or those listing a sex different from your sex at birth - will remain valid for travel until their expiration date, under International Civil Aviation Organization (ICAO) policy.
- Use our online form filler to fill out and print a passport form which lists "Sex." You may use all forms available on our site, including ones that expired before 2025. We are currently working to update our forms and will post the new versions as soon as they are available.

ALL +/−

Frequently asked questions



Is my passport still valid if I have an X marker on it, or if it lists a sex other than my sex at birth?

Can I travel outside of the United States using a passport with an X marker, or using a passport that lists a sex other than my sex at birth?

How do I replace my passport?

My birth documentation does not have any information about sex on it. What should I do?

I have urgent travel. How do I get a passport?

You printed the wrong sex on my passport by mistake. What should I do?

Last Updated: February 11, 2025

### Travel.State.Gov
Travel.State.Gov
U.S. Passports
International Travel
U.S. Visas
Intercountry Adoption
International Parental Child Abduction
Records and Authentications

### Popular Links
Home
Travel Advisories
Newsroom
About Us
Contact Us
Careers
MyTravelGov
Find U.S. Embassies & Consulates

### Stay Connected

### Legal Resources
Legal Information
Info for U.S. Law Enforcement

Privacy | Accessibility | Copyright & Disclaimer | FOIA | GSA | No FEAR Act Data | Office of the Inspector General | USA.gov | USA.gov/espanol
This site is managed by the U.S. Department of State. External links to other Internet sites and listings of private entities on this page are provided as a convenience and should not be construed as the U.S. Department of State or U.S. government endorsement of the entity, its views, the products or services it provides, or the accuracy of information contained therein. The order in which names appear has no significance, and the listings or links may be removed at any time at the discretion of the Department.

# EXHIBIT I



**Ken Klippenstein**
Ken Klippenstein



Internal State Department guidance says U.S. passports must reflect gender based on "sufficient evidence of biological sex at birth" — or absent that, "all available evidence establishing biological sex at birth by a preponderance of evidence."



UNCLASSIFIED
SBU

| | |
|---|---|
| MRN: | 25 STATE 11610 |
| Date/DTG: | Feb 06, 2025 / 061726Z FEB 25 |
| From: | SECSTATE WASHDC |
| Action: | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE Immediate |
| E.O: | 13526 |
| TAGS: | CASC, CPAS, CMGT, KFRO |
| Captions: | SENSITIVE |
| Subject: | Adjudicating X Markers and Binary Sex Markers in U.S. Passports and Consular Reports of Birth Abroad (CRBAs) |

1. (U) The President signed an executive order titled "Defending Women from Gender Ideology Extremism a executive order provides that the Executive Branch shall "recognize women are biologically female, and me female," that "are not changeable," and defines the term "sex" referring to "an individual's immutable biolog of "sex" and other terms set forth in the executive order when interpreting or applying statutes, regulations, c and use "sex," not "gender," when administering or enforcing sex-based distinctions. The executive order di definitions set forth in the order within 30 days.

2. (U) In accordance with the executive order, the Department no longer issues U.S. passports or CRBAs con sex marker from their biological sex at birth as defined in the executive order. This cable addresses the validi of sex markers.

3. (SBU) A passport or CRBA application requesting an X marker must be changed to a male or female sex r not exist, a review of all available evidence establishing biological sex at birth by a preponderance of eviden "Sex (M or F) per Birth Certificate." Information Notice (IN) 941-24 should

4. (SBU) If the citizenship and identity evidence submitted with the application does not sufficiently establis applicant's biological sex at birth might not be established if, among other things, documentation does not ind of interest, or there is conflicting information regarding their biological sex at birth. In such a situation, the e to request citizenship evidence or identification that indicates their biological sex at birth. If their response to conflicting information, adjudicators must suspend the application with IRL 708-22. Conflicting information determine the applicant's biological sex at birth. Issuance dates of vital records and/or amendments are impc

e of a sex marker, or the presence of a marker listing anything other than male or female, is not conflicting sex marker n (e.g., ID or prior passport record) of a binary sex marker can be used to establish the appropriate biological sex at

in valid until replaced or expired. If the passport with an X marker was issued less than one year ago, these passport marker by submitting Form DS-5504, Application for a U.S. Passport Replacement. The replacement passport will led and returned to the applicant.

ndments from X to a binary sex marker may be completed on Form DS-5542, Request for Overseas U.S. Citizen

rs will review all available evidence and apply a preponderance of evidence to determine the applicant's biological

from their citizenship evidence, identification, and/or prior passport record, the documentation issued closest to an mation Notice (IN) 941-24 should be included with the passport to inform applicants of any change in biographical

s the Department's possession and any future applications received as of February 7, 2025.

ns not covered by this guidance or have an applicant with urgent travel and are unable to determine their biological

rs to CA-Press@state.gov, and congressional inquiries regarding the executive order to onal media regarding executive orders using CA's cleared press guidance located on CA Web (linked here), copying

FEB 10, 2025

SUBSTACK.COM/@KENKLIPPENSTEIN



**UNCLASSIFIED**
SBU

| | |
|---|---|
| MRN: | 25 STATE 11610 |
| Date/DTG: | Feb 08, 2025 / 081724Z FEB 25 |
| From: | SECSTATE WASHDC |
| Action: | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| E.O.: | 13526 |
| TAGS: | CASC, CPAS, CMGT, KFRD |
| Captions: | SENSITIVE |
| Subject: | Adjudicating X Markers and Binary Sex Markers in U.S. Passports and Consular Reports of Birth Abroad (CRBAs). |

1. (U) The President signed an executive order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" on January 20. The executive order provides that the Executive Branch shall "recognize women are biologically female, and men are biologically male." It establishes a policy to "recognize two sexes, male and female," that "are not changeable," and defines the term "sex" referring to "an individual's immutable biological classification as either male or female." Federal agencies must use the definitions of "sex" and other terms set forth in the executive order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications and use "sex," not "gender," when administering or enforcing sex-based distinctions. The executive order directs the Department of Health and Human Services to provide guidance regarding the definitions set forth in the order within 30 days.

2. (U) In accordance with the executive order, the Department no longer issues U.S. passports or CRBAs containing an X marker and has suspended applications seeking to change an individual's sex marker from their biological sex at birth as defined in the executive order  This cable addresses the validity of existing U.S. passports and CRBAs with an X marker as well as the adjudication of sex markers.

3. (SBU) A passport or CRBA application requesting an X marker must be changed to a male or female sex marker when sufficient evidence of biological sex at birth is provided or, if that does not exist, a review of all available evidence establishing biological sex at birth by a preponderance of evidence. This change may be annotated in the For Issuance Office Only (FIOO) box as "Sex (M or F) per (Document)," e.g., "Sex M per Birth Certificate." Information Notice (IN) 941-24 should be included with the passport to inform applicants of the change in biographical data.

4. (SBU) If the citizenship and identity evidence submitted with the application does not sufficiently establish the applicant's biological sex at birth, the application must be suspended. The applicant's biological sex at birth might not be established if, among other things, documentation does not indicate their binary biological sex at birth, only lists an X marker or lists a designation of intersex, or there is conflicting information regarding their biological sex at birth. In such a situation, the office will suspend the application and send Information Request Letter (IRL) 708-21 to request citizenship evidence or identification that indicates their biological sex at birth. If their response to the 708-21 letter does not clarify whether the applicant is male or female, or provides conflicting information, adjudicators must suspend the application with IRL 708-22. Conflicting information and relevant Department databases should be carefully reviewed in order to best determine the applicant's biological sex at birth. Issuance dates of vital records and/or amendments are important indicators to consider.

5. (SBU) Many jurisdictions do not list a marker on birth certificates. Absence of a sex marker, or the presence of a marker listing anything other than male or female, is not conflicting sex marker information. Indication on the application, a statement, or other documentation (e.g., ID or prior passport record) of a binary sex marker can be used to establish the appropriate biological sex at birth when there is no conflicting sex marker information.

6. (SBU) U.S. passports that have already been issued with the X marker remain valid until replaced or expired. If the passport with an X marker was issued less than one year ago, these passport holders may obtain a replacement passport containing a binary biological sex marker by submitting Form DS-5504, Application for a U.S. Passport Replacement. The replacement passport will be issued with no fee. The original passport with the X marker may be cancelled and returned to the applicant.

7. (U) CRBAs issued with X marker remain valid until amended. CRBA amendments from X to a binary sex marker may be completed on Form DS-5542, Request for Overseas U.S. Citizen Vital Records Services.

8. (SBU) When an applicant requests a change in their sex marker, adjudicators will review all available evidence and apply a preponderance of evidence to determine the applicant's biological sex at birth.

9. (SBU) If a passport or CRBA application requests a sex marker that differs from their citizenship evidence, identification, and/or prior passport record, the documentation issued closest to an individual's birth should be used to establish the biological sex at birth. Information Notice (IN) 941-24 should be included with the passport to inform applicants of any change in biographical data in the issued document.

10. (SBU) This guidance is in effect for all in-progress passport applications in the Department's possession and any future applications received as of February 7, 2025.

11. (SBU) Please contact AskPPTAdjudication@state.gov if you have questions not covered by this guidance or have an applicant with urgent travel and are unable to determine their biological sex marker.

12. (SBU) Posts must refer any U.S. media inquiries regarding executive orders to CA-Press@state.gov, and congressional inquiries regarding the executive order to ConsularOnTheHill@state.gov. Posts may respond to requests from international media regarding executive orders using CA's cleared press guidance located on CA Web (linked here), copying CA-Press@state.gov.), copying CA-Press@state.gov.

13. Minimize considered.

**MINIMIZE CONSIDERED**

| Signature: | RUBIO |
| --- | --- |
| Cleared By: | P:Iyer, Ritika |
| | M:Inzerillo, Suzanne |
| | C:Olowski, Lew |
| | D:Shepherd, Nadia |
| | S/P:Thornton, Marcus |
| | L/CA:McLean, Christine |
| Approved By: | CA:Stufft, Julie |

# EXHIBIT

Case 2:25-1579 Case 1:25-cv-10139 Document 32-7 Filed 02/18/2025 2:5v7 ID: 6774450





MORE FROM FORBES

Feb 18, 2025, 03:29pm EST
**8 Steps To Prevent Perfectionism From Short-Circuiting Your Career**

Feb 18, 2025, 03:18pm EST
**10 Things To Do In Online Presentations That Prove You Are A Leader**

Feb 18, 2025, 02:09pm
**How David Gu...
Years Of Serva...**

ADVERTISEMENT

LEADERSHIP > CAREERS

# Beaten, Stabbed And Shot: 320 Trans People Killed In 2023 - New Monitoring Report

By <u>Jamie Wareham</u>, Contributor. Jamie Wareham is the founder of QueerAF, he... ⌄    Follow Author

Nov 13, 2023, 03:00am EST

 Save Article     💬 Comment 1



Subscribe    Sign In



GLASGOW, SCOTLAND - FEBRUARY 16: A sign reading Rest In Peace Brianna is seen among candles at a ... [+]  GETTY IMAGES

Three hundred twenty trans and gender-diverse people were killed this year, says a new report.

The Trans Murder Monitoring report tracks murders reported in the media each year, this year's report includes deaths between Oct 1 2022 and September 30 2023.

The vast majority of those killed (94%) were trans women or trans-feminine people.

Most were Black, and many were sex workers too. 80% of those killed were of trans people affected by racism, an increase of 15% from last year.

Many of the victims were young. The age group with the most victims was 19 to 25 years old. Overall, those between 19 and 40 years old made up three-quarters (77%) of those reported killed.

Almost three-quarters (73%) of those tracked happened in Latin America and the Caribbean, with the epicentre of the problem being in Brazil, where nearly one-third (31%) occurred.



A global map of all murders tracked by the project since 2008, with heat signatures showing where ... [+]   TGEU'S TRANS MURDER MONITORING

There were also murders in Armenia, Belgium, and Slovakia reported for the first time.

In the U.K., the high-profile murder of young 16-year-old teenager Brianna Ghey is included. She would have turned 17 last week.

MORE FROM FORBES ADVISOR


### Best High-Yield Savings Accounts Of 2024
By Kevin Payne, Contributor


### Best 5% Interest Savings Accounts of 2024
By Cassidy Horton, Contributor

This year, the number of deaths is down from 2021's peak of 375 murders.

However, the report's authors say their analysis of the data continues to indicate concerning trends prevalent in previous years too. This is particularly acute when trans people live and are attacked because of the intersections of misogyny, racism, xenophobia, and whorephobia.

Case 2:25-cv-01579 Document 82-7 Filed 02/13/25 Page 4 of 7
Case 2:25-cv-01235 Document 12-3 Filed 02/23/25 Page 4 of 7
2/18/24, 4:21 PM    Beaten, Stabbed And Shot: 320 Trans People Killed In 2023, New Monitoring Report    Registry ID: 6774450

**CEO: C-suite news, analysis, and advice for top decision makers right to your inbox.**

| Email address | | Sign Up |

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

Reading the data and name list, the violence against the victims is stark. Though almost half (46%) of victims were shot, many were beaten, stabbed and burned after.

The annual report released to mark the International Trans Day of Remembrance held annually on November 20, is compiled by Transrespect versus Transphobia Worldwide. Its release today marks the beginning of Trans Awareness Week.



Read More

00:00                                                                                     03:12

Case 2:25-cv-01579   Case 2:25-cv-10338   Document 32-7   File 02/18/25   Page 5 of 7   ry ID: 6774450



LIVERPOOL, UNITED KINGDOM – FEBRUARY 14: People attend a candlelit vigil in memory of 16-year-old ... [+] GETTY IMAGES

## The report tracks how many trans people get murdered each year

The Trans Murder Monitoring report has been released every year since 2008. Since the project began 15 years ago, they have recorded more than 4600 deaths.

The report monitors homicides that happen every year between the dates of between October 1 and September 30.

However, it is only able to track those reported in the media, meaning the figures likely represent only a tiny glimpse into the reality on the ground.

Many hate crimes and murders go unreported or, crucially, misreported in the media – meaning the actual number of deaths could be far higher.

The list is compiled by Transrespect versus Transphobia Worldwide (TvT), a TGEU project, by sourcing local and national news stories covering the deaths and murders.

The violence, horror and murders are catalogued by TvT, which has a complete list of all those killed this year.

Case: 25-1579     Case: 1:25-cv-10313-FDS     Document 82-7     Filed 02/18/25     Page 6 of 7     Entry ID: 6774450



Members of the transgender and LGBTQ community hold candles as they take part in the vigil of the ... [+]  AFP VIA GETTY IMAGES

### Transgender Day of Remembrance 2023: The report is released annually to mark the event

Trans Day Of Remembrance (TDoR) is a day that remembers those trans and gender-diverse people who have been victims of homicide.

It was started in 1999 by transgender advocate Gwendolyn Ann Smith as a vigil to honor the memory of Rita Hester, a transgender woman who was killed in 1998.

The vigil commemorated all the transgender people lost to violence since Rita Hester's death and began the annual tradition.

Though the event began in the US, TDoR now happens in many parts of the world.

The International Transgender Day Of Remembrance is held on November 20, 2023.

*Want to understand what the ever-changing LGBTQIA+ world means for your work or business? You're not alone. Join 2200+ people who skip the doomscrolling but keep across the latest queer headlines, content and perspectives with my newsletter* **QueerAF** *– try it now*

*Follow me on Twitter or LinkedIn. Check out my website.*

Editorial Standards          Forbes Accolades

## Join The Conversation

**Comments** 1

One Community. Many Voices. Create a free account to share your thoughts. Read our community guidelines here.

See All Comments (1)

ADVERTISEMENT

**SEARCH FOR**

**SEARCH FOR**

# Forbes

© 2025 Forbes Media LLC. All Rights Reserved.

AdChoices    Privacy Statement    Do Not Sell or Share My Personal Information    Limit the Use of My Sensitive Personal Information
Privacy Preferences    Digital Terms of Sale    Terms of Service    Contact Us    Send Us Feedback    Report a Security Issue    Jobs At Forbes
Reprints & Permissions    Forbes Press Room    Advertise

App. 675

# EXHIBIT

EN | ES

 

**ilga** database

## AREA 1
**Legal Frameworks** | Legal Gender Recognition

Requirements                    Age Restrictions                    NB Gender Marker



Self-ID                                    Varies

Unclear                                    Other reqs. (+)

Non-surgical medical                       Surgery and/or
reqs.                                      sterilisation req.

Not possible

  

# Legal gender recognition

UN MEMBER STATES

## 24

**LGR Based on Self-ID**



## 18

**where non-binary gender markers are avaliable**



AT LEAST

## 18

**where surgery or sterilisation is required**

AT LEAST

## 21

**where a diagnosis is required**

## About this section

This section tracks laws and regulations that provide for legal procedures to amend a person's name and gender marker in identity documents. These two procedures grant trans and gender diverse people the ability to hold IDs that match their identity and expression, which in turn assists them to access other rights and services in their everyday lives.

Name change processes are especially relevant for countries where gender marker change is not possible or is otherwise onerous, medicalised, pathologised and, therefore, restrictive.

The chart for gender marker change disaggregates the requirements imposed by local legal frameworks on people who wish to have their gender markers amended, including gender affirming surgery, forced sterilisation, diagnosis, hormone treatment, real life test, expert testimony, witnesses, forced divorce or having no children.

Additionally, information is provided where jurisdictions provide for gender marker change for children and the possibility of opting for a non-binary gender marker.

Methodology ⬚

## Latest Updates ⓘ

**✚ Georgia**

The Bill on Family Values and Protection of Minors, which bans legal gender recognition, has been adopted by Parliament after the President refused to sign it into law.

October 2024

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**▮▮ Romania**

The Court of Justice of the European Union ruled in a case involving Romania that the refusal of a EU Member State to recognise the change of name and gender legally acquired by a EU citizen in a different EU Member state is contrary to EU Law.

October 2024

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

More



AREA1

App. 679

# Legal Frameworks | Legal Gender Recognition

## 18 A. Name Change

⛶ Fullscreen

| JURISDICTION | NAME CHANGE | MECHANISM | EXPLANATIO |
|---|---|---|---|
| 🇦🇫 Afghanistan | **No data** | | |
| 🇦🇱 Albania | Not Possible | | |
| 🇩🇿 Algeria | Not Possible | | While any person over the age a local Superior Court or subm request to the Ministry of Just change, it is unknown whether grant requests on the basis of or gender-diverse status giver documented targeting of pers gender expressions in the cou |
| 🏴 American Samoa (USA) | **Nominally Possible** | Judicial | Based on the case Mase CA N name changes are allowed wh been made. Although America have legislative provisions for trans people, this judicial case interpreted in a way that gran trans petitioners. |
| 🇦🇩 Andorra | Possible | Legislative | Previously, Article 68 of the C (2016) established that the na changed by an administrative |
| | | | Section 78 of the Código do R does not allow alterations of d |

**239** results ⓘ    Display SUBJUR as independent entries ⓘ    UN Members Only

App. 680

# 18 B. Gender Marker Change

⤢ Fullscreen

| JURISDICTION | GENDER MARKER CHANGE | ESTABLISHED PROCEDURE | CRITICAL DATE | MECHANISM | |
|---|---|---|---|---|---|
| 🇦🇫 Afghanistan | **No data** | | - | | |
| 🇦🇱 Albania | Not Possible | No | - | | A local orga... with other ... presented t... |
| 🇩🇿 Algeria | Not Possible | No | - | | |
| 🇦🇸 American Samoa (USA) | **Nominally Possible** | No | - | | The Nation... changed or... established... |
| 🇲🇩 Andorra | Possible | Yes | 2018 | Judicial | Previously,... reflected "a... indicated th... |
| 🇦🇴 Angola | **Nominally Possible** | No | - | | Section 78 ... in the regis... including "c... status of th... |
| 🇦🇮 Anguilla (UK) | **No data** | | - | | |

**239** results ⓘ    UN Members Only    Display requirements

Display SUBJUR as independent entries ⓘ

## AREAS

Area 1 | Legal Frameworks

Area 2 | International Human Rights Treaties

Area 3 | UN Treaty Bodies

Area 4 | UN Special Procedures

Area 5 | Universal Periodic Review (UPR)

## JURISDICTIONS

Search by jurisdiction

## TOOLS

Compare tool

Advanced search

LATEST UPDATES                    UPCOMING DEADLINES                          CONTACT US

ILGA World Website

ILGA World Monitor

Credits

© Copyright 2017-2025        ILGA World - The International Lesbian, Gay, Bisexual, Trans and Intersex Association

Case 1:25-cv-10338-EK    Document 133-1    Filed 02/18/25    Page 1 of 9    Entry ID: 6774450

# EXHIBIT

Case: 25-1579   Case: 1:25-cv-10313-BEK   Document 33-1   Filed 02/18/25   Page 2 of 9   Entry ID: 6774450



**UNCLASSIFIED (U)**

# 8 FAM 403.3

# GENDER CHANGE

*(CT:CITZ-1;   06-27-2018)*
*(Office of Origin: CA/PPT/S/A)*

## 8 FAM 403.3-1  SUMMARY

*(CT:CITZ-1;   06-27-2018)*

a. This subchapter provides policy and procedures that passport specialists and consular officers ("you") must follow when an applicant indicates a gender on the "sex" line on the passport application with information different from the one reflected on some or all of the submitted citizenship and/or identity evidence, including a prior passport.

b. This policy explains the need for medical certification from a licensed physician who has treated the applicant or reviewed and evaluated the medical history of the applicant regarding the change in gender, as well as the need for accurate identification and a photograph reflecting the applicant's current appearance.  It is based on standards and recommendations of the World Professional Association for Transgender Health (WPATH), recognized as the authority in this field by the American Medical Association (AMA).

c. A passport is defined by INA 101(a)(30) (Immigration and Nationality Act) (8 U.S.C. 1101(a)(30)) as "any travel document issued by competent authority showing the bearer's origin, identity, and nationality if any, which is valid for the entry of the bearer into a foreign country."  An individual's gender is an integral part of that person's identity.

d. Sex reassignment surgery is not a prerequisite for passport issuance based on gender change.

e. Medical certification of gender transition from a licensed physician as described in 8 FAM 403.3-2 is the **only** documentation of gender change required.  Other medical records must not be requested.

f. A form DS-11 "Application for U.S. Passport" must be used the first time an applicant applies for a passport in reassigned gender, as personal appearance for execution is required, even if the applicant has a previous passport.  A change in gender is a change in the identity of the applicant, and evidence of identity in the new name (if applicable) and gender must be presented.  Subsequent applications in the same gender may be submitted on a form DS-82 if the applicant is eligible (see 8 FAM 702.2 regarding eligibility to apply on a form DS-82 and 8 FAM 403.3-3(D) regarding resumption of the birth gender).

# 8 FAM 403.3-2  DOCUMENTATION REQUIREMENTS

## 8 FAM 403.3-2(A)  Documents to be Submitted with the Form DS-11

*(CT:CITZ-1;   06-27-2018)*

a. **Evidence of U.S. citizenship/non-citizen U.S. nationality**.  The applicant must submit acceptable evidence of U.S. citizenship or non-citizen U.S. nationality.  The applicant is not required to obtain an amended birth record, amended Consular Report of Birth (CRBA), or to request that the U.S. Citizenship and Immigration Services (USCIS) issue a replacement Certificate of Naturalization/Citizenship reflecting the change of gender.  State law in the United States and the laws of other countries vary on whether an amended birth certificate may be issued reflecting a gender change;

> **NOTE**:  An amended birth certificate in the new gender is not acceptable evidence of gender change (as opposed to amending a birth certificate to correct a typographical error--see 8 FAM 403.3-7).  See also 8 FAM 403.3-5 regarding form FS-240, "Consular Report of Birth of a U.S. Citizen Abroad."

b. **Evidence of identity**.  As with all applications, the applicant must be asked to submit acceptable Identification Document(s) (IDs) in the new gender, and name, if applicable (see 8 FAM 401.3).  However, state law and foreign laws vary as to whether a driver's license or other State or foreign government ID may be issued reflecting a gender change.  So, the applicant may document her/his identity by submitting any of the following ID documents:

(1)  Primary ID in the new gender;

(2)  Secondary ID in the new gender; or

(3)  Acceptable primary ID in the birth gender if it readily identifies the applicant.

> **NOTE**:  Some form of photographic ID must be presented; You cannot use the doctor's certification as the only evidence to identify an applicant.

c. **Photograph**.  A recent photograph that is a good likeness of the applicant, and satisfactorily identifies the applicant must be submitted.  The photograph must agree with the submitted ID and reflect the applicant's current and true appearance (see also 8 FAM 402.1 "Passport Photographs");

d. **Passport Fee**.  All necessary passport fees must be submitted (see 8 FAM 602.2 "Passport Fees"); and

e. Name Change**.**  If the applicant's name has been changed, either by court order or by customary usage, she/he must present satisfactory evidence of the material name change (see 8 FAM 403.1 "Names and Name Usage").  Both names must be cleared (see 8 FAM 501.3).

## 8 FAM 403.3-2(B)  Medical Certification for Gender Change/Transition

*(CT:CITZ-1;   06-27-2018)*

a. A full validity U.S. passport will be issued reflecting a new gender upon presentation of a signed, original certification or statement, **on office letterhead**, from a licensed physician who has treated the applicant for her/his gender-related care or reviewed and evaluated the gender-related medical history of the applicant.

 b. Licensed physicians include:

  (1) A doctor of osteopathy (D.O.) (not to be confused with a doctor of optometry (O.D.), whose certification is not acceptable); or

  (2) A medical doctor (M.D.).  M.D.s may specialize in various medical fields including, but not limited to, internists, endocrinologists, gynecologists, urologists, surgeons, psychiatrists, pediatricians, and family practitioners.

 c. Medical certifications from persons who are not licensed physicians are **not** acceptable.  They include, but are not limited to:

  (1) Psychologists;

  (2) Physician Assistants;

  (3) Nurse practitioners;

  (4) Health practitioners;

  (5) Licensed vocational nurses;

  (6) Registered nurses;

  (7) Chiropractors; or

  (8) Pharmacists.

 d. The medical certification **must** include the following information (see 8 FAM 403.3-8):

  (1) Licensed physician's full name;

  (2) Medical license or certificate number;

   (a) Licensed physicians in foreign countries must have a comparable foreign license or certificate registration number;

   (b) For all foreign licensed physician gender change requests, passport agencies/centers must scan copies of the form DS-11 and attach all submitted documents to Passport Services' Adjudication Policy Division (CA/PPT/S/A/AP) at AskPPTAdjudication@state.gov.  CA/PPT/S/A/AP works with post to verify the bona fides of the foreign-based licensed physician with the applicable post abroad.  CA/PPT/S/A/AP will advise the passport agency/center of the outcome of post's verification as soon as possible; and

   (c) Posts must verify their own foreign-based licensed physicians or, if the statement is from a physician in another country, contact the post which covers that country for verification.

  (3) Address and telephone number of the licensed physician;

  (4) Language stating that she/he has treated the applicant or has reviewed and evaluated the medical history of the applicant and that she/he has a doctor/patient relationship with the applicant;

  (5) Language stating the applicant has had appropriate clinical treatment for gender transition to the new gender of either male or female; and

  (6) Language stating "I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct."

 e. If the applicant has not submitted the requested medical certification, use the appropriate letter (or similar language for overseas posts) available in information request letter (IRL) 706 in corresponding with the passport applicant.  (See 8 FAM 801.2 "Information Request Letters and Information Notices.")

f. For applicants who have just begun and may be in the initial stages of the gender transition process, a two year limited validity passport using endorsement 46 (see 8 FAM 505.2) reflecting the new gender will be issued upon presentation of a medical certification described in paragraph a above that includes the following:

(1) Information listed in above;

(2) Language stating the applicant is in the process of gender transition to the new gender of either male or female; and

(3) Language stating "I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct."

g. Faxed, e-mailed, or scanned photocopies of medical certifications are not acceptable for full validity U.S. passports.  In emergency circumstances, you may issue a limited validity passport in the new gender using endorsement 46.

# 8 FAM 403.3-3  ADJUDICATING GENDER CHANGE OR TRANSITION

## 8 FAM 403.3-3(A)  Adjudicating Gender Change Cases

*(CT:CITZ-1;   06-27-2018)*

a. You must annotate the reason for issuing the full validity passport in the new gender in the "For Issuing Office Only" block of the form DS-11:



b. You must annotate and attach the medical certification to the form DS-11:



> **NOTE**:  You must not ask for additional specific clinical details regarding the gender change from the applicant.
>
> **NOTE:  If the applicant requests that the original medical certification be returned, you may attach a clear photocopy of the medical certification, clearly annotate that the original medical certification was seen and returned, and return the original medical certification to the applicant.**

# 8 FAM 403.3-3(B)  Adjudicating Gender Transition Cases

*(CT:CITZ-1;  06-27-2018)*

a. You must annotate the reason for issuing the limited validity passport in the new gender in the "For Issuing Office Only" block of the form DS-11:



b. You must annotate and attach the medical certification to the form DS-11:



c.  You must add an appropriate endorsement to limit the validity period of the passport:

    (1)  Use endorsement code 46 domestically and for Overseas Photo-Digitized Passports (OPDPs) (see also 8 FAM 706.2 regarding OPDPs and 8 FAM 505.2, "Passport Endorsements"); and

    (2)  Use endorsement code 109 in emergency photo-digitized passports for urgent overseas cases where the applicant must travel immediately (see also 8 FAM 505.2)

# 8 FAM 403.3-3(C)  Replacement of Passport Limited Because of Gender Transition

*(CT:CITZ-1;  06-27-2018)*

a.  An applicant who received a limited passport book because of a gender transition will receive a replacement, fully-valid passport without further fee (except for expedited service, if requested), if she/he:

    (1)  Applies for the new passport within two years of issuance using form DS-5504, "Application for a U.S. Passport: Name Change, Data Correction, and Limited Passport Book Replacement;"

    (2)  Meets the requirements of 8 FAM 403.3-2; and

    (3)  Presents a new medical certification that meets the requirements for a fully-valid passport in 8 FAM 403.3-2(B).

b.  If, after two years, the applicant applies for a new passport and her/his gender transition has not been completed, the applicant must submit a new physician's statement, following the same information and licensure requirements in 8 FAM

403.3-2, reflecting that the applicant still is in the process of gender transition.  The applicant must also submit a new form DS-11, with appropriate identity, citizenship, and passport fees submitted (see 8 FAM 403.3-2(A)).  Another two-year limited validity passport will be issued.

## 8 FAM 403.3-3(D)  Resumption of the Birth Gender

*(CT:CITZ-1;   06-27-2018)*

If an applicant who already has been issued a passport in a new gender requests issuance of a passport in the birth gender, a medical certification of the transition back to the birth gender is required (see 8 FAM 403.3-2(B) regarding medical certifications).  The same procedures for adjudication and issuance of full validity (gender change) or limited validity (gender transition) passports apply if the applicant is returning to the birth gender (see also 8 FAM 403.3-3(A) and 8 FAM 403.3-3(B)).

# 8 FAM 403.3-4  CONVERSATIONS WITH PASSPORT APPLICANTS SEEKING TO DOCUMENT GENDER CHANGE/TRANSITION

*(CT:CITZ-1;   06-27-2018)*

a. As with all passport applicants, you must be sensitive and respectful at all times.

b. Refer to the applicant by the pronoun appropriate to her/his new gender even if the transition is not complete.

c.  Ask only appropriate questions regarding information necessary to determine citizenship and identity of the applicant.

# 8 FAM 403.3-5  AMENDING GENDER IN CONSULAR REPORTS OF BIRTH ABROAD

*(CT:CITZ-1;   06-27-2018)*

a. The form FS-240, "Consular Report of Birth Abroad of Citizen of the United States of America," can be amended by Passport Services' Office of Technical Operations, Record Services division (CA/PPT/S/TO/RS) to reflect the change in gender.  The documentary requirements specified in this Appendix for passport services are the same for amending gender on a form FS-240.  See Bureau of Consular Affairs Internet Information on amending a form FS-240.  Inquirers are directed to contact Passport Services' Record Services Division, using the below dual addresses, both physical and P.O. box address, and the nine-digit zip code.

```
U.S. Department of State
Record Services Division
CA/PPT/S/TO/RS
44132 Mercure Cir
PO Box 1213
Sterling, VA 20166-1213
Telephone (public): 202-485-8300
Fax: 202-485-8302
```

b. An amended form FS-240 is acceptable evidence of a gender change for a subsequent

passport application.

# 8 FAM 403.3-6  INTERSEX CONDITIONS (DISORDERS OF SEX DEVELOPMENT)

*(CT:CITZ-1;   06-27-2018)*

a. "Intersex" is a condition in which a person is born with a reproductive or sexual anatomy and/or chromosomal pattern that does not fit typical definitions of male or female.

b. Birth documentation is often not updated to reflect corrected gender.  When the passport application indicates a sex different from the one reflected on the birth documentation, the applicant, or her/his applying parents in the case of a minor child, must provide medical certification that meets the requirements in 8 FAM 403.3-2(B), adjusting the language to reflect the intersex condition and specify the gender correction to either male or female.  In the case of a minor child, the applying parent(s) also must submit a signed statement confirming the gender correction to either male or female.  These statements must be attached to the passport application.

c. Unless the applicant, or her/his applying parent, provides the statements described above, the gender listed on her/his birth documentation will determine the gender to be listed in the passport.

# 8 FAM 403.3-7  GENDER ERRORS IN ORIGINAL BIRTH CERTIFICATE

*(CT:CITZ-1;   06-27-2018)*

a. If an applicant advises that the gender on her/his birth document mistakenly lists the wrong gender due to typographical error, and there is sufficient time before the listed departure date, refer the applicant to the appropriate issuing vital records office to have the error corrected (IRL 875-33).

b. If the departure date is imminent, you may issue a limited one year validity passport, listing the applicant's requested gender, using endorsement code 46 (see 8 FAM 505.2.)  A corrected certified copy of the amended birth document will be required before issuance of a full validity passport in the requested gender.

# 8 FAM 403.3-8  MODEL LETTER FOR LICENSED PHYSICIAN CERTIFYING TO THE APPLICANT'S GENDER CHANGE/TRANSITION

*(CT:CITZ-1;   06-27-2018)*

**Licensed Physician's Letterhead
(Physician's Address and Telephone Number)**

I, (physician's full name), (physician's medical license or certificate number), (issuing U.S. State/Foreign Country of medical license/certificate), am the physician of (name of patient), with whom I have a doctor/patient relationship and whom I have treated (or

with whom I have a doctor/patient relationship and whose medical history I have reviewed and evaluated).

(Name of patient) has had appropriate clinical treatment for gender change to the new gender (specify new gender male or female).

Or

(Name of patient) is in the process of gender transition to the new gender (specify new gender male or female).  (**NOTE TO PHYSICIAN ONLY:** Use this sentence **only** when the patient has just begun or is in the early stages of his or her gender transition.)

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.


Signature of Physician


Typed Name of Physician


Date

***UNCLASSIFIED (U)***

Case: 1:25-cv-10313-JEK    Document: 33-2    Filed: 02/18/25    Page 1 of 7

# EXHIBIT M



U.S. Department of State

OMB Control No. 1405-0004
Expiration Date: 04-30-2025
Estimated Burden: 85 Minutes

# APPLICATION FOR A U.S. PASSPORT

**Please read all instructions first and type or print in black ink to complete this form.**
For information or questions, visit travel.state.gov or contact the National Passport Information Center (NPIC) at
1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov.

## SECTION A. ELIGIBILITY TO USE THIS FORM

This form is used to apply for a U.S. passport book and/or card **in person** at an acceptance facility, a passport agency (by appointment only), or a U.S. embassy, consulate, or consular agency (if abroad). The U.S. passport is a travel document attesting to one's identity and issued to U.S. citizens or non-citizen U.S. nationals. To be eligible to use this form you must **apply in person** if at least one of the following is true:

✓ I am applying for my first U.S. passport
✓ I am under age 16

✓ My previous U.S. passport was either: a) issued under age 16;
b) issued more than 15 years ago; c) lost, stolen, or damaged

**If none of the above statements apply to you, then you may be eligible to apply using form DS-82 or DS-5504 depending on your circumstances. Visit travel.state.gov for more information.**

- **Notice to Applicants Under Age 16:** You must appear in person to apply for a U.S. passport with your parent(s) or legal guardian(s). See Section D of these instructions or travel.state.gov for more details.
- **Notice to Applicants Ages 16 and 17:** At least one of your parent(s) or legal guardian(s) must know that you are applying for a U.S. passport. See Section D of these instructions or travel.state.gov for more details.
- **Notice to Applicants for No-Fee Regular, Service, Official, or Diplomatic Passports:** You may use this application if you meet all provisions listed; however, you must consult your sponsoring agency for instructions on proper routing procedures before forwarding this application. Your completed passport will be released to your sponsoring agency and forwarded to you.

## SECTION B. STEPS TO APPLY FOR A U.S. PASSPORT

1. Complete this form (Do not sign until requested to do so by an authorized agent).
2. Attach one color photograph 2x2 inches in size and supporting documents (See Section D of these instructions).
3. Schedule appointment to apply in person by visiting our website or calling NPIC (see contact info at the top page).
4. Arrive for appointment and present completed form and attachments to the authorized agent who will administer the oath, witness you signing your form, and collect your passport fee.
5. Track application status online at Passportstatus.state.gov.
6. Receive new passport and original supporting documents (that you submitted with your application).

## SECTION C. HOW TO COMPLETE THIS FORM

Please see the instructions below for items on the form that are not self-explanatory. The numbers match the numbered items of the form.

1. **Name (Last, First, Middle)**: Enter the name to appear in the passport. The name to appear in the passport should be consistent with your proof of citizenship and identification. If you have changed your name and are not eligible to use a DS-82 or DS-5504, you must use this form. Visit travel.state.gov/namechange for more information.

2. **Date of Birth**: Use the following format: Month, Date, and Year (MM/DD/YYYY).

3. **Gender**: The gender markers used are "M" (male), "F" (female) and "X" (unspecified or another gender identity). The gender marker that you check on this form will appear in your passport regardless of the gender marker(s) on your previous passport and/or your supporting evidence of citizenship and identity. If changing your gender marker from what was printed on your previous passport, select "Yes" in this field on Application Page 1. If no gender marker is selected, we may print the gender as listed on your supporting evidence or contact you for more information. **Please Note:** We cannot guarantee that other countries you visit or travel through will recognize the gender marker on your passport. Visit travel.state.gov/gender for more information.

4. **Place of Birth**: Enter the name of the city and state if in the U.S. or city and country as presently known.

5. **Social Security Number**: You must provide a Social Security number (SSN), if you have been issued one, in accordance with Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C 2714a(f). If you do not have a Social Security number, you must enter zeros in this field and submit a statement, signed, and dated, that includes the phrase, "*I declare under penalty of perjury under the laws of the United States of America that the following is true and correct: I have never been issued a Social Security Number by the Social Security Administration.*" If you reside abroad, you must also provide the name of the foreign country where you reside. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of the Treasury which will use it in connection with debt collection and check against lists of persons ineligible or potentially ineligible to receive a U.S. passport, among other authorized uses. If you fail to provide the information, we may deny your application and the Internal Revenue Service (IRS) may enforce a penalty. Refer all questions on this matter to the nearest IRS office.

| | |
|---|---|
| 6. **Email:** By providing your email you are consenting to us communicating with you by email about your application. | 7. **Primary Contact Phone Number:** If providing a mobile/cell phone number you are consenting to receive calls and/or text messaging about your application. |

8. **Mailing Address Line 1 and 2 "In Care Of"**: For line 1 enter applicant's Street/RFD #, **or** P.O. Box **or** URB. For line 2, if you do not live at the address listed in this field, put the name of the person who lives at this address and mark it "In Care Of". **If the applicant is a minor child, you must include the "In Care Of" name of the parent or adult registered to receive mail at this address.**

9. List all other names you have used: Enter all legal names previously used to include maiden name, name changes, and previous married names. You can enter up to two names one in item A and one in item B. If only your last name has changed just enter your last name. If you need more space to write additional names, please use a separate piece of paper and attach it to this form.

⚠️ **Blue Section Application Page 1 - Identifying Documents and Signature Blocks: Skip this section and complete Application Page 2. Do not sign this form until requested to do so by the authorized agent who will administer the oath to you.**

# APPLICATION FOR A U.S. PASSPORT

| SECTION D. ATTACHMENTS TO SUBMIT WITH THIS FORM |
|---|
| Once you have completed Application Pages 1 and 2, attach the supporting documents as outlined in this section. |

1. **PROOF OF U.S. CITIZENSHIP** Information can be found on travel.state.gov/citizenship.

### Applicants Born in the United States

Your evidence will be returned to you if it is not damaged, altered, or forged. Submit an original or certified copy and a photocopy of the front and back if there is printed information on the back, of one of the following documents:

- U.S. Birth Certificate that meets all the following requirements:
  - o Issued by the city, county, or state of birth
  - o Lists your full name, birthdate, and birthplace
  - o Lists your parent(s)' full names
  - o Lists date filed with registrar's office (must be within one year of birth)
  - o Shows registrar's signature and the seal of the issuing authority
- Fully valid, undamaged U.S. passport (may be expired)
- Consular Report of Birth Abroad or Certification of Birth Abroad
- Certificate of Naturalization or Citizenship

- Secondary documents may be submitted if the U.S. birth certificate was filed more than one year after your birth *or* if no birth record exists. For no birth record on file, submit a registrar's letter to that effect. For both scenarios, submit a combination of the evidence listed below, with your first and last name, birthdate and/or birthplace, the seal or other certification of the office (if customary), and the signature of the issuing official.
  - o A hospital birth record
  - o An early baptismal or circumcision certificate
  - o Early census, school, medical, or family Bible records
  - o Insurance files or published birth announcements (such as a newspaper article)
  - o Notarized affidavits (or DS-10, Birth Affidavit) of older blood relatives having knowledge of your birth may be submitted in addition to some of the records listed above.

### Applicants Born Outside the United States

If we determine that you are a U.S. citizen, your lawful permanent resident card submitted with this application will be forwarded to U.S. Citizenship and Immigration Services.

- Claiming Citizenship through Naturalization of One or Both Parent(s), submit all the following:
  - o Your parent(s) Certificate(s) of Naturalization
  - o Your parents' marriage certificate and/or evidence that you were in the legal and physical custody of your U.S. citizen parent, if applicable
  - o Your foreign birth certificate (and official translation if the document is not in English)
  - o Your evidence of admission to the United States for legal permanent residence and proof you subsequently resided in the United States

- Claiming Citizenship through Birth Abroad to At Least One U.S. Citizen Parent, submit all the following:
  - o Your Consular Report of Birth Abroad (Form FS-240), Certification of Birth (Form DS-1350 or FS-545), or your foreign birth certificate (and official translation if the document is not in English)
  - o Your parent's proof of U.S. citizenship
  - o Your parents' marriage certificate
  - o Affidavit showing all your U.S. citizen parents' periods and places of residence and physical presence before your birth (DS-5507)

- Claiming Citizenship Through Adoption by a U.S. Citizen Parent(s), *if your birthdate is on or after October 5, 1978*, submit evidence of all the following:
  - o Your permanent residence status
  - o Your full and final adoption
  - o You were in the legal and physical custody of your U.S. citizen parent(s)
  - o You have resided in the United States

2. **PROOF OF IDENTITY** Information can be found at travel.state.gov/identification.

Present your original identification and submit a front and back photocopy with this form. It must show a photograph that is a good likeness of you. Examples include:

- Driver's license (not temporary or learner's permit)
- Previous or current U.S. passport book/card
- Military identification

- Federal, state, or city government employee identification
- Certificate of Naturalization or Citizenship

3. **A RECENT COLOR PHOTOGRAPH** See the full list of photo requirements on travel.state.gov/photos.

Attach one photo, 2x2 inches in size. U.S. passport photo requirements may differ from photo requirements of other countries. To avoid processing delays, be sure your photo meets all the following requirements (Refer to the photo template on Application Page 1):

- Taken less than six months ago
- Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
- Head must face the camera directly with full face in view

- No eyeglasses and head covering and no uniforms*
- Printed on matte or glossy photo quality paper
- Use a plain white or off-white background

*Head coverings are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public or a signed doctor's statement verifying its daily use for medical purposes. Glasses or other eyewear are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery). Photos are to be taken in clothing normally worn on a daily basis. You cannot wear a uniform, clothing that looks like a uniform, or camouflage attire.



U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT

**4. PROOF OF PARENTAL RELATIONSHIP** *(FOR APPLICANTS UNDER AGE 16)*
Parents/guardians must appear in person with the child and submit the following:

- Evidence of the child's relationship to parents/guardian(s) (Example: a birth certificate or Consular Report of Birth Abroad listing the names of the parent(s)/guardian(s) and child)
- Original parental/guardian government-issued photo identification and a photocopy of the front and back (to satisfy proof of identity)

If only one parent/guardian can appear in person with the child, you must also submit one of the following:

- The second parent's notarized written statement or DS-3053 (including the child's full name and date of birth) consenting to the passport issuance for the child. The notarized statement <u>cannot</u> be more than three months old, <u>must</u> be signed and notarized on the same day, and <u>must</u> come with a front and back photocopy of the second parent's government-issued photo identification.
- The second parent's death certificate (if second parent is deceased)
- Evidence of sole authority to apply (Example: a court order granting sole legal custody or a birth certificate listing only one parent)
- A written statement (made under penalty of perjury) or DS-5525 explaining, in detail, why the second parent cannot be reached

***OR***

**PROOF OF PARENTAL AWARENESS** *(FOR APPLICANTS AGES 16 AND 17)*
We may request the consent of one legal parent/legal guardian to issue a U.S. passport to you. In many cases, the passport authorizing officer may be able to ascertain parental awareness of the application by virtue of the parent's presence when the minor submits the application or a signed note from the parent or proof the parent is paying the application fees. However, the passport authorizing officer retains discretion to request the legal parent's/legal guardian's notarized statement of consent to issuance (e.g., on Form DS-3053).

**5. FEES** Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R. 22.1, and 22 C.F.R. 51.50-56) and are collected at the time you apply for the passport service. By law, the passport fees are **non-refundable**. Visit travel.state.gov/passportfees for current fees and how fees are used and processed. Payment methods are as follows:

| **Applicant Applying in the United States At an Acceptance Facility** | **Applicant Applying at a Passport Agency or Outside the United States** |
|---|---|
| • Passport fees must be made by check (personal, certified, cashier's, travelers) or money order (U.S. Postal, international, currency exchange) with the applicant's full name and date of birth printed on the front and payable to "U.S. Department of State." | • We accept checks (personal, certified, cashier's, travelers); major credit cards (Visa, Master Card, American Express, Discover); money orders (U.S. Postal, international, currency exchange); or exact cash (no change provided). Make all fees payable to the "U.S. Department of State." |
| • The execution fee **must be paid separately** and made payable to the acceptance facility in the form that they accept. | • <u>If applying outside the United States</u>: Please see the website of your embassy, consulate, or consular agency for acceptable payment methods. |

**Other Services Requiring Additional Fee** (Visit travel.state.gov for more details)**:**
- **Expedite Service:** Only available for passports mailed in the United States and Canada.
- **1-2 Day Delivery:** Only available for passport book (and not passport card) mailings in the United States.
- **Verification of a previous U.S. Passport or Consular Report of Birth Abroad:** Upon your request, we verify previously issued U.S. passport or Consular Report of Birth Abroad if you are unable to submit evidence of U.S. citizenship.
- **Special Issuance Passports:** If you apply for a no-fee regular, service, official, or diplomatic passport at a designated acceptance facility, you must pay the execution fee. No other fees are charged when you apply.

## SECTION E. HOW TO SUBMIT THIS FORM
Submitting your form depends on your location and how soon you need your passport.

- **Applicant Located Inside the United States:** For the latest information regarding processing times, scheduling appointments, and nearest designated acceptance facilities visit travel.state.gov or contact NPIC.

- **Applicant Located Outside the United States:** In most countries, you must apply in person at a U.S. embassy or consulate for all passport services. Each U.S. embassy and consulate has different procedures for submitting and processing your application. Visit travel.state.gov to check the U.S. embassy or consulate webpage for more information.

## SECTION F. RECEIVING YOUR PASSPORT AND SUPPORTING DOCUMENTS
- **Difference Between U.S. Passport Book and Card:** The book is valid for international travel by air, land, and sea. The card is not valid for international air travel, only for entry at land border crossings and seaports of entry when traveling from Canada, Mexico, Bermuda, and the Caribbean. The maximum number of letters provided for your given name (first and middle) on the card is 24 characters. If both your given names are more than 24 characters, you must shorten one of your given names you list on item #1 of Application Page 1.
- **Separate mailings:** You may receive your newly issued U.S. passport book and/or card and your citizenship evidence <u>in two separate mailings</u>. If you are applying for both a book and card, <u>you may receive three separate mailings</u>: one with your returned evidence, one with your newly issued book, and one with your newly issued card. **All documentary evidence that is not damaged, altered, or forged will be returned to you.** Photocopies will not be returned.
- **Passport numbers:** Each newly issued passport book or card will have a different passport number than your previous one.
- **Shipping and Delivery Changes:** If your mailing address changes prior to receipt of your new passport, please contact NPIC. **NOTE:** We will not mail a U.S. passport to a private address outside the United States or Canada.
- **Passport Corrections, Non-Receipt/Undeliverable Passports, and Lost/Stolen Passport:** For more information visit travel.state.gov or contact NPIC.



U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT

## WARNING

False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.

**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.**

## ACTS OR CONDITIONS

If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.

*I have not been convicted of a federal or state drug offense or convicted of a statutory "sex tourism" crime, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.*

## PRIVACY ACT STATEMENT

**AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211 a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.

**PURPOSE:** We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.

**ROUTINE USES:** This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. Your Social Security number will be provided to the U.S. Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section. More information on the routine uses for the system can be found in System of Records Notices State-05, Overseas Citizen Services Records and Other Overseas Records and State-26, Passport Records.

**DISCLOSURE:** Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could also result in the refusal or denial of your application. Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law on Instruction Page 1 (Section C) to this form.

## PAPERWORK REDUCTION ACT STATEMENT

Public reporting burden for this collection of information is estimated to average 85 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Bureau of Consular Affairs, Passport Services, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 1199, Sterling, Virginia 20166-1199.

# For more information about your application status, online tools, current fees, and processing times, please visit <u>travel.state.gov</u>.

# APPLICATION FOR A U.S. PASSPORT

### *Use black ink only. If you make an error, complete a new form. Do not correct.*

**Select document(s) for which you are submitting fees:**

☐ U.S. Passport Book  ☐ U.S. Passport Card  ☐ Both
The U.S. passport card is **not** valid for international air travel. See Instruction Page 3
☐ Regular Book (Standard)  ☐ Large Book (Non-Standard)
The large book is for frequent international travelers who need more visa pages.

**1. Name** Last

☐ D ☐ O ☐ S ☐ NFR
End. # _____ Exp. _____

First                    Middle

**2. Date of Birth** *(mm/dd/yyyy)*   **3. Gender (Read Instruction Page 1)** M F X Changing gender marker? Yes ☐   **4. Place of Birth** *(City & State if in the U.S. or City & Country as it is presently known.)*

**5. Social Security Number**   **6. Email** *(See application status at passportstatus.state.gov)*   **7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** Street/RFD#, P.O. Box, or URB

**Address Line 2:** *(Include Apartment, Suite, etc. If applicant is a child, write "In Care Of" of the parent. Example: In Care Of - Jane Doe)*

**City**   **State**   **Zip Code**   **Country,** *(if outside the United States)*

**9. List all other names you have used.** *(Examples: Birth Name, Maiden, Previous Marriage, Legal Name Change. Attach additional pages if needed.)*
A.                    B.

## STOP! CONTINUE TO PAGE 2 ➡
### DO NOT SIGN APPLICATION UNTIL REQUESTED TO DO SO BY AUTHORIZED AGENT

STAPLE  STAPLE  2" X 2"  FROM 1" TO 1 3/8"  2" X 2"  STAPLE  STAPLE

Attach a color photograph taken within the last six months

☐ Acceptance Agent  ☐ (Vice) Consul USA
☐ Passport Staff Agent

(Seal)

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Second Signature Line (if identifying minor)**
☐ Driver's License  ☐ State Issued ID Card  ☐ Passport  ☐ Military  ☐ Other
Name
Issue Date *(mm/dd/yyyy)*        Exp. Date *(mm/dd/yyyy)*        State of Issuance
ID No                    Country of Issuance

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Third Signature Line (if identifying minor)**
☐ Driver's License  ☐ State Issued ID Card  ☐ Passport  ☐ Military  ☐ Other
Name
Issue Date *(mm/dd/yyyy)*        Exp. Date *(mm/dd/yyyy)*        State of Issuance
ID No                    Country of Issuance

I declare under penalty of perjury all of the following: 1) I am a citizen or non-citizen national of the United States and have not performed any of the acts listed under "Acts or Conditions" on page 4 of the instructions of this application (unless explanatory statement is attached); 2) the statements made on the application are true and correct; 3) I have not knowingly and willfully made false statements or included false documents in support of this application; 4) the photograph attached to this application is a genuine, current photograph of me; and 5) I have read and understood the warning on page 4 of the instructions to the application form.

_____
Signature of person authorized to accept applications

*By signing this form, I certify that I have provided the verbal oath and witnessed the applicant's/legal guardian's signature.*

_____
Print Facility Name/Location

_____
Name of courier company *(if applicable)*

Date _____
Agent ID Number _____
Facility ID Number _____

X _____
**Applicant's Legal Signature - age 16 and older**

X _____
**Mother/Father/Parent/Legal Guardian's Signature** *(if identifying minor)*

X _____
**Mother/Father/Parent/Legal Guardian's Signature** *(if identifying minor)*

App. 697

For Issuing Office Only — Bk _____ Card _____ EF _____ Postage _____ Execution _____ Other _____

DS 11 C 03 2022 1

**Name of Applicant** (Last, First, & Middle)

**Date of Birth** (mm/dd/yyyy)

**10. Parental Information**

Mother/Father/Parent - First & Middle Name (at Parent's Birth)

Last Name (at Parent's Birth)

Date of Birth (mm/dd/yyyy)

Place of Birth (City & State if in the U.S. or City & Country as it is presently known)

Gender
☐ M
☐ F
☒ X

U.S. Citizen?
☐ Yes
☐ No

Mother/Father/Parent - First & Middle Name (at Parent's Birth)

Last Name (at Parent's Birth)

Date of Birth (mm/dd/yyyy)

Place of Birth (City & State if in the U.S. or City & Country as it is presently known)

Gender
☐ M
☐ F
☐ X

U.S. Citizen?
☐ Yes
☐ No

**11. Have you ever been married?** ☐ Yes ☐ No   *If yes, complete the remaining items in #11.*

Full Name of Current Spouse or Most Recent Spouse (Last, First & Middle)

Date of Birth (mm/dd/yyyy)

Place of Birth

U.S. Citizen?
☐ Yes ☐ No

Date of Marriage (mm/dd/yyyy)

Have you ever been widowed or divorced?
☐ Yes ☐ No

Widow/Divorce Date (mm/dd/yyyy)

**12. Additional Contact Phone Number**
☐ Home ☐ Cell
☐ Work

**13. Occupation** (if age 16 or older)

**14. Employer or School** (if applicable)

**15. Height**   **16. Hair Color**   **17. Eye Color**

**18. Travel Plans** (If no travel plans, please write "none")
Departure Date (mm/dd/yyyy)   Return Date (mm/dd/yyyy)

Countries to be Visited

**19. Permanent Address** (Complete if P.O. Box is listed under Mailing Address *or* if residence is different from Mailing Address. **Do not list a P.O. Box.**)
Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**20. Your Emergency Contact** (Provide the information of a person not traveling with you to be contacted in the event of an emergency.)
Name

Address: Street/RFD # or P.O. Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship

**21. Have you ever applied for or been issued a U.S. Passport Book or Passport Card?** ☐ Yes ☐ No   *If yes, complete the remaining items in #21.*

Name as printed on your most recent passport book

Most recent passport book number

Most recent passport book issue date (mm/dd/yyyy)

Status of your most recent passport book: ☐ Submitting with application   ☐ Stolen ☐ Lost ☐ In my possession (if expired)

Name as printed on your most recent passport card

Most recent passport card number

Most recent passport card issue date (mm/dd/yyyy)

Status of your most recent passport card: ☐ Submitting with application   ☐ Stolen ☐ Lost ☐ In my possession (if expired)

## PLEASE DO NOT WRITE BELOW THIS LINE - FOR ISSUING OFFICE ONLY

Name as it appears on citizenship evidence

☐ Birth Certificate   SR   CR   City   Filed:                   Issued:                   ☐ Sole Parent

☐ Nat. / Citz. Cert.   USCIS   USDC   Date/Place Acquired:           A#

☐ Report of Birth   Filed/Place:

☐ Passport   C/R   S/R   See #21   #/DOI:

☐ Other:

☐ Attached:

☐ P/C of Citz   ☐ P/C of ID   ☐ DS-71   ☐ DS-3053   ☐ DS-64   ☐ DS-5520   ☐ DS-5525   ☐ POW   ☐ NPIC   ☐ IRL   ☐ Citz W/S

App. 698

Clear Form

DS-11 04-2022

DS 11 C 03 2022 2

Case 1:25-cv-10313-BEK    Document 33    Filed 02/18/25    Page 1 of 7

# EXHIBIT



U.S. Department of State

OMB Control No. 1405-0020
Expiration Date: 04/30/2025
Estimated Burden: 40 Minutes

# U.S. PASSPORT RENEWAL APPLICATION
# FOR ELIGIBLE INDIVIDUALS

**Please read all instructions first and type or print in black ink to complete this form.**
For information or questions, visit travel.state.gov or contact the National Passport Information Center (NPIC) at
1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov**.**

## SECTION A. ELIGIBILITY TO USE THIS FORM

This form is used by U.S. passport holders to renew their current or recently expired U.S. passport book and/or card (a travel document attesting to one's identity and issued to U.S. citizens or non-citizen U.S. nationals). This form can be submitted by mail. You are eligible to use this form if you can answer "Yes" to <u>ALL</u> statements below about your passport:

☐ **YES**  ☐ **NO**  I can submit my most recent U.S. passport book and/or card with this application.

☐ **YES**  ☐ **NO**  I was at least 16 years old when my most recent U.S. passport book and/or card was issued.

☐ **YES**  ☐ **NO**  I was issued my most recent U.S passport book and/or card less than 15 years ago.

☐ **YES**  ☐ **NO**  The U.S. passport book and/or card that I am renewing has not been mutilated, damaged, or reported lost or stolen.

☐ **YES**  ☐ **NO**  My U.S. passport was not limited to less than the normal ten-year validity period due to passport damage/mutilation, multiple passport thefts/losses, or non-compliance with 22 C.F.R. 51.41. (Refer to the last page of your U.S. passport book for endorsement information.)

My name has not changed since my most recent U.S. passport book and/or card was issued.
**-- OR --**
☐ **YES**  ☐ **NO**  My name has changed by marriage or court order, and I can submit proper certified documentation to reflect my name change (such as a certified copy of a marriage certificate, or court order). Visit travel.state.gov/namechange for a complete description of accepted documents.

**If you answered "NO" to any of the statements above, STOP. <u>You cannot use this form.</u>**

**You may be eligible to apply on form DS-11 or DS-5504 depending on your circumstances. Visit travel.state.gov for more information.**

**Notice to Applicants for No-Fee Regular, Service, Official, or Diplomatic Passports:** You may use this application if you meet all provisions listed; however, you must <u>consult your sponsoring agency for instructions on proper routing procedures</u> before forwarding this application. Your completed passport will be released to your sponsoring agency and forwarded to you.

**Replacing a Lost, Stolen, or Damaged Passport:** A United States citizen or non-citizen national may not normally have more than one valid or potentially valid U.S. passport book or more than one valid or potentially valid U.S. passport card at a time. Therefore, when a valid or potentially valid U.S. passport book or card cannot be presented with a new application, you must apply using form DS-11, Application for a U.S. Passport and submit form DS-64, Statement Regarding a Lost or Stolen Valid U.S. Passport.

The information you provide regarding your lost or stolen valid U.S. passport book or card will be placed into our Consular Lost or Stolen Passport System. This system is designed to prevent the misuse of your lost or stolen U.S. passport book or card. Anyone using the passport book or card that was reported lost or stolen may be detained upon entry into the United States. **If you find the U.S. passport book or card that was reported lost or stolen, immediately report it as found and submit it for cancellation. It has been invalidated. You cannot use that passport book or card for travel.**

## SECTION B. STEPS TO RENEW A U.S. PASSPORT

1. Complete and sign this form.
2. Attach one color photograph 2x2 inches in size, your previously issued U.S. passport, and supporting documents (See Section D of these instructions).
3. Mail us your application and attachments (See Section E of these instructions) .
4. Track application status online at Passportstatus.state.gov.
5. Receive new passport and original supporting documents (that you submitted with your application).



# U.S. PASSPORT RENEWAL APPLICATION
# FOR ELIGIBLE INDIVIDUALS

## SECTION C. HOW TO COMPLETE THIS FORM
Please see the instructions below for items on the form that are not self-explanatory. The numbers match the numbered items of the form.

| | |
|---|---|
| **1.** | **Name (Last, First, Middle)**: Enter the name to appear in the passport. The name to appear in the passport should be consistent with your previous U.S. passport. If you are requesting a passport in a name different from the name that appears on your previous U.S. passport, submit proof of name change if resulting from marriage or legal name change such as a marriage certificate, divorce decree, or court order of name change (if applicable). Information can be found at travel.state.gov/namechange. |
| **2.** | **Date of Birth**: Use the following format: Month, Date, and Year (MM/DD/YYYY). |
| **3.** | **Gender**: The gender markers used are "M" (male), "F" (female) and "X" (unspecified or another gender identity). The gender marker that you check on this form will appear in your passport regardless of the gender marker(s) on your previous passport and/or your supporting evidence of citizenship and identity. If changing your gender marker from what was printed on your previous passport, select "Yes" in this field on Application Page 1. If no gender marker is selected, we may print the gender as listed on your supporting evidence or contact you for more information. **Please Note**: We cannot guarantee that other countries you visit or travel through will recognize the gender marker on your passport. Visit travel.state.gov/gender for more information. |
| **4.** | **Place of Birth**: Enter the name of the city and state if in the U.S. or city and country as presently known. |
| **5.** | **Social Security Number**: You must provide a Social Security number (SSN), if you have been issued one, in accordance with Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C 2714a(f). If you do not have a Social Security number, you must enter zeros in this field and submit a statement, signed and dated, that includes the phrase, "*I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:  I have never been issued a Social Security Number by the Social Security Administration.*" If you reside abroad, you must also provide the name of the foreign country where you reside. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of the Treasury which will use it in connection with debt collection and check against lists of persons ineligible or potentially ineligible to receive a U.S. passport, among other authorized uses. If you fail to provide the information, we may deny your application and the Internal Revenue Service (IRS) may enforce a penalty. Refer all questions on this matter to the nearest IRS office. |

| | | | |
|---|---|---|---|
| **6.** | **Email:** By providing your email you are consenting to us communicating with you by email about your application. | **7.** | **Primary Contact Phone Number:** If providing a mobile/cell phone number you are consenting to receive calls and/or text messaging about your application. |

| | |
|---|---|
| **8.** | **Mailing Address Line 1 and 2 "In Care Of"**: <u>For line 1</u> enter applicant's Street/RFD #, <u>or</u> P.O. Box <u>or</u> URB. <u>For line 2</u>, if you do not live at the address listed in this field, put the name of the person who lives at this address and mark it "In Care Of". |
| **9.** | **List all other names you have used:** Enter all legal names previously used to include maiden name, name changes, and previous married names. You can enter up to two names: one in item A and one in item B. If only your last name has changed just enter the last name. If you need more space to write additional names, please use a separate sheet of paper and attach it to this form. |

⚠️ **Blue Section Application Page 1 - Signature Block: Remember to sign this page then complete Application Page 2.**

## SECTION D. ATTACHMENTS TO SUBMIT WITH THIS FORM
Once you have completed Application Pages 1 and 2, attach the supporting documents as outlined in this section.

1.    **YOUR MOST RECENTLY ISSUED U.S. PASSPORT BOOK AND/OR CARD**

When submitting a U.S. passport book and/or card with this form, please verify that the document was issued at age 16 or older in your current name and issued within the past 15 years. Please submit any valid passport product you have with this application. If your U.S. passport book and/or card has been mutilated, damaged, or reported lost or stolen, you must apply on form DS-11.

2.    **A RECENT COLOR PHOTOGRAPH** See the full list of photo requirements on travel.state.gov/photos.

Attach one photo, 2x2 inches in size. U.S. passport photo requirements may differ from photo requirements of other countries. To avoid processing delays, be sure your photo meets all the following requirements (Refer to the photo template on Application Page 1):

- Taken less than six months ago
- Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
- Head must face the camera directly with full face in view

- No eyeglasses and head covering and no uniforms*
- Printed on matte or glossy photo quality paper
- Use a plain white or off-white background

*<u>Head coverings</u> are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public or a signed doctor's statement verifying its daily use for medical purposes. <u>Glasses or other eyewear</u> are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery). Photos are to be taken in clothing normally worn on a daily basis.  You cannot wear a uniform, clothing that looks like a uniform, or camouflage attire.

**USE CAUTION WHEN STAPLING YOUR PHOTO**: Use 4 staples vertically in the corners as close to the outer edges as possible. Do not bend the photo. Follow the photo template on Application Page 1.



# U.S. PASSPORT RENEWAL APPLICATION
# FOR ELIGIBLE INDIVIDUALS

**3. PROOF OF NAME CHANGE:** If the name you are currently using is different from the name on your most recent U.S. passport, you must submit a copy of your certified marriage certificate, divorce decree, or original court order showing the change of name. Please make sure all documents are clear and legible. All original documents will be returned to you by mail. If you are unable to document your name change in this manner, you must apply on form DS-11, Application for a U.S. Passport.

**4. FEES:** Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R. 22.1, and 22 C.F.R. 51.50-56). Do not send cash. The Department cannot be responsible for cash sent through the mail. By law, the passport fees are <u>**non-refundable**</u>. There is no execution fee to use this form. <u>Newly issued passport cards are delivered via first class mail only.</u> Visit <u>travel.state.gov/passportfees</u> for current fees and how fees are used and processed.

Payment methods are as follows:

| Applicant Applying in the United States | Applicant Applying Outside the United States |
|---|---|
| • Passport fees must be made by check (personal, certified, cashier's, travelers) or money order (U.S. Postal, international, currency exchange) with the applicant's full name and date of birth printed on the front and payable to "U.S. Department of State." | • We accept checks (personal, certified, cashier's, travelers); major credit cards (Visa, Master Card, American Express, Discover); money orders (U.S. Postal, international, currency exchange); or exact cash (no change provided, if applying in person). Make all fees payable to the "U.S. Department of State."<br>• Please see the website of your embassy, consulate, or consular agency for acceptable payment methods. |

**Other Services Requiring Additional Fee** (Visit travel.state.gov for more details):
- **Expedited Service:** Available for an additional fee. Expedited service is only available for passports mailed in the United States and Canada. Please include the appropriate fee with your payment. Please write "Expedite" on the outer envelope when mailing. Visit travel.state.gov for the current fees and processing times for expedited service.
- **1-2 Day Delivery:** Available for an additional fee. This service is only available for passport book (and not passport card) mailings in the United States. Please include the appropriate fee with your payment.
- **NOTE:** To ensure minimal processing time for expedited applications, the Department recommends using 1 – 2 day delivery service to submit the application and to include the appropriate postage fee for 1-2 day return delivery for the newly issued passport book. Please visit travel.state.gov for updated information regarding fees, processing times, or to check the status of your passport application online.

## SECTION E. HOW TO SUBMIT THIS FORM
The Department recommends using a trackable mailing service when submitting your application.

Submitting your form depends on your location and how soon you need your passport. Print page one and page two of your application on separate pieces of paper. You do not need to submit instruction pages. Mail this form and attachments to one of the addresses below:

| **FOR ROUTINE SERVICE** (If you live in CA, FL, IL, MN, NY, or TX):<br>National Passport Processing Center<br>PO Box 640155<br>Irving, TX 75064-0155 | **FOR ROUTINE SERVICE** (If you live in any other state or Canada):<br>National Passport Processing Center<br>PO Box 90155<br>Philadelphia, PA 19190-0155 | **FOR EXPEDITED SERVICE** (**Additional Fee**, from any state or Canada):<br>National Passport Processing Center<br>PO Box 90955<br>Philadelphia, PA 19190-0955 |
|---|---|---|

**Notice to Applicants Located Outside the United States:** U.S. citizens residing outside the United States and Canada cannot submit this form to the domestic addresses listed above. Each U.S. embassy and consulate has different procedures for submitting and processing your application. Visit travel.state.gov to check the U.S. embassy or consulate webpage for more information.

## SECTION F. RECEIVING YOUR PASSPORT AND SUPPORTING DOCUMENTS
- **Difference Between U.S. Passport Book and Card:** The book is valid for international travel by air, land, and sea. The card is not valid for international air travel, only for entry at land border crossings and seaports of entry when traveling from Canada, Mexico, Bermuda, and the Caribbean. The maximum number of letters provided for your given name (first and middle) on the card is 24 characters. If both your given names are more than 24 characters, you must shorten one of your given names you list on item #1 of Application Page 1.
- **Separate mailings:** <u>You may receive your newly issued U.S. passport book and/or card and your citizenship evidence in two separate mailings.</u> If you are applying for both a book and card, you may receive three separate mailings: one with your returned evidence, one with your newly issued book, and one with your newly issued card. **All documentary evidence that is not damaged, altered, or forged will be returned to you.** Photocopies will not be returned.
- **Passport numbers:** Each newly issued passport book or card will have a different passport number than your previous one.
- **Shipping and Delivery Changes:** If your mailing address changes prior to receipt of your new passport, please contact NPIC. **NOTE:** We will not mail a U.S. passport to a private address outside the United States or Canada.
- **Passport Corrections, Non-Receipt/Undeliverable Passports, and Lost/Stolen Passport:** For more information visit travel.state.gov or contact NPIC.



# U.S. PASSPORT RENEWAL APPLICATION
# FOR ELIGIBLE INDIVIDUALS

## WARNING

False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.

**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.**

## ACTS OR CONDITIONS

If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.

*I have not been convicted of a federal or state drug offense or convicted of statutory "sex tourism" crimes, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.*

## PRIVACY ACT STATEMENT

**AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211 a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.

**PURPOSE:** We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.

**ROUTINE USES:** This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. Your Social Security number will be provided to the U.S. Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section. More information on the routine uses for the system can be found in System of Records Notices State-05, Overseas Citizen Services Records and Other Overseas Records and State-26, Passport Records.

**DISCLOSURE:** Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could also result in the refusal or denial of your application. Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law on Instruction Page 2 (Section C) to this form.

## PAPERWORK REDUCTION ACT STATEMENT

Public reporting burden for this collection of information is estimated to average 40 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Bureau of Consular Affairs, Passport Services, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 1199, Sterling, Virginia 20166-1199.

**For more information about your application status, online tools, current fees, and processing times, please visit <u>travel.state.gov</u>.**

**U. S. Department of State**

OMB Control No. 1405-0020

Expiration Date: 04/30/2025

## U.S. PASSPORT RENEWAL APPLICATION FOR ELIGIBLE INDIVIDUALS

Estimated Burden: 40 Minutes

*Use __black ink__ only. If you make an error, complete a new form. Do not correct.*

Select document(s) for which you are applying:

☐ U.S. Passport Book  ☐ U.S. Passport Card  ☐ Both

The U.S. passport card is **not** valid for international air travel. (See instruction page 3)

☐ Regular Book (Standard)  ☐ Large Book (Non-Standard)

The large book is for frequent international travelers who need more visa pages.

**1. Name** Last *(Your name must match previous passport or name change document)*

☐ D  ☐ O  ☐ S  ☐ NFR

End. #_____  Exp. _____

First

Middle

**2. Date of Birth** *(mm/dd/yyyy)*

**3. Gender (Read Instruction Page 2)**
M  F  X  Changing gender marker?  Yes ☐

**4. Place of Birth** *(City & State if in the U.S., or City & Country as it is presently known)*

**5. Social Security Number**

**6. Email** *(See application status at passportstatus.state.gov)*

**7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** *(Street/RFD#, P.O. Box, or URB)*

**Address Line 2:** *(Include Apartment, Suite, In Care Of or Attention if applicable.)*

City

State

Zip Code

Country *(if outside the United States)*

**9. List all other names you have used.** *(Example: Birth Name, Maiden, Previous Marriage, Legal Name Change.  Attach additional pages if needed.)*

A.

B.

STAPLE  STAPLE

2" X 2"  FROM 1" TO 1 3/8"  2" X 2"

STAPLE  STAPLE

Attach a color photograph taken within the last six months

**10. U.S. Passport Information**
Your name as printed on your most recent U.S. passport book and/or passport card

Most recent U.S. passport book number

Book Issue date *(mm/dd/yyyy)*

Most recent U.S. passport card number

Card Issue date *(mm/dd/yyyy)*

**11. Name Change Information** *Complete if name is different than last U.S. passport book or passport card*

☐ Changed by Marriage

☐ Changed by Court Order

Place of Name Change *(City/State)*

Date *(mm/dd/yyyy)*

Please submit a certified copy.

## YOU MUST SIGN AND DATE THE APPLICATION IN THE DESIGNATED AREA BELOW

### THEN COMPLETE PAGE 2

I declare under penalty of perjury all of the following: 1) I am a citizen or non-citizen national of the United States and have not performed any of the acts listed under "Acts or Conditions" on page 4 of the instructions of this application (unless explanatory statement is attached); 2) the statements made on the application are true and correct; 3) I have not knowingly and willfully made false statements or included false documents in support of this application; 4) the photograph submitted with this application is a genuine, current photograph of me; and 5) I have read and understood the warning on page 4 of the instructions to the application form.

x

**Applicant's Legal Signature**

**Date**

**FOR ISSUING OFFICE ONLY**

☐ PPT BK C/R  ☐ PPT BK S/R  ☐ PPT CD C/R  ☐ PPT CD S/R

☐ Marriage Certificate  Date of Marriage/Place Issued:

☐ Court Order  Date Filed/Court:

From

To:

☐ Other:

☐ Attached:

For Issuing Office Only ➤ Bk Fee_____ Cd Fee_____ EF_____ App. 704 Exp_____ Other_____

DS 82 C 03 2022 1

**Name of Applicant** *(Last, First & Middle)*

**Date of Birth** *(mm/dd/yyyy)*

| 12. Height | 13. Hair Color | 14. Eye Color | 15. Occupation | 16. Employer or School *(if applicable)* |
|---|---|---|---|---|

**17. Additional Contact Phone Numbers**

☐ Home ☐ Cell
☐ Work ☐ _____

☐ Home ☐ Cell
☐ Work ☐ _____

**18. Permanent Address:** *(Complete if PO Box is listed in Mailing Address __or__ if residence is different from Mailing Address. **Do not list a PO Box**.)*

Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**19. Your Emergency Contact** *(Provide the information of a person not traveling with you to be contacted in the event of an emergency.)*

Name

Address: Street/RFD # or PO Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship to Applicant

**20. Travel Plans** *(If no travel plans, please write "none")*

Departure Date *(mm/dd/yyyy)*

Return Date *(mm/dd/yyyy)*

Countries to be visited

# STOP!

# PLEASE BE SURE TO:

**1. Print form on two separate pages**

**2. Sign and date on Application Page 1**

**3. Submit both pages (see Instruction Page 3)**

App. 705

# EXHIBIT

OMB Control No. 1405-0180
Expiration Date: 04-30-2025
Estimated Burden: 40 Minutes



# APPLICATION FOR A U.S. PASSPORT FOR ELIGIBLE INDIVIDUALS

### CORRECTION, NAME CHANGE TO PASSPORT ISSUED 1 YEAR AGO OR LESS, AND LIMITED PASSPORT REPLACEMENT

**Please read all instructions first and type or print in black ink to complete this form.**
For information or questions, visit travel.state.gov or contact the National Passport Information Center (NPIC) at
1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov**.**

## SECTION A. ELIGIBILITY TO USE THIS FORM

This form is used by U.S. passport holders who are eligible to re-apply for a U.S. passport book and/or card (a travel document attesting to one's identity and issued to U.S. citizens or non-citizen U.S. nationals) at no cost (unless expedited service is requested for a name change or limited passport replacement). This form can be submitted by mail. You are eligible to use this form if you can answer "Yes" to any of the statements below about your passport:

☐ **YES**    ☐ **NO**    I changed my name, by marriage or court order, less than one year after my most recent U.S. passport book and/or card was issued and my U.S. passport book and/or card was issued less than one year ago.

**-- OR --**

☐ **YES**    ☐ **NO**    My identifying information in my most recent U.S. passport book and/or card was printed incorrectly.

**-- OR --**

☐ **YES**    ☐ **NO**    My most recent U.S. passport book was obtained at the full passport fee and limited to two years or less for a reason other than multiple losses or serious damage/mutilation of previous passports.

## If you answered "NO" to __ALL__ the statements above, STOP. __You cannot use this form.__

## You may be eligible to apply on form DS-11 or DS-82 depending on your circumstances. Visit travel.state.gov for more information.

**Notice to Applicants for No-Fee Regular, Service, Official, or Diplomatic Passports:** You may use this application if you meet all provisions listed; however, you must consult your sponsoring agency for instructions on proper routing procedures before forwarding this application. Your completed passport will be released to your sponsoring agency and forwarded to you.

**Replacing a Lost, Stolen, or Damaged Passport:** A United States citizen or non-citizen national may not normally have more than one valid or potentially valid U.S. passport book or more than one valid or potentially valid U.S. passport card at a time. Therefore, when a valid or potentially valid U.S. passport book or card cannot be presented with a new application, you must apply using form DS-11, Application for a U.S. Passport and submit form DS-64, Statement Regarding a Lost or Stolen Valid U.S. Passport.

The information you provide regarding your lost or stolen valid U.S. passport book or card will be placed into our Consular Lost or Stolen Passport System. This system is designed to prevent the misuse of your lost or stolen U.S. passport book or card. Anyone using the passport book or card that was reported lost or stolen may be detained upon entry into the United States. **If you find the U.S. passport book or card that was reported lost or stolen, immediately report it as found and submit it for cancellation. It has been invalidated. You cannot use that passport book or card for travel.**

## SECTION B. STEPS TO REAPPLY FOR A U.S. PASSPORT

1. Complete and sign this form.
2. Attach one color photograph 2x2 inches in size and your issued U.S. passport and supporting documents (See Section D of these instructions).
3. Mail us your application and attachments (See Section E of these instructions).
4. Track application status online at Passportstatus.state.gov.
5. Receive new passport and original supporting documents (that you submitted with your application).


# APPLICATION FOR A U.S. PASSPORT FOR ELIGIBLE INDIVIDUALS

### CORRECTION, NAME CHANGE TO PASSPORT ISSUED 1 YEAR AGO OR LESS, AND LIMITED PASSPORT REPLACEMENT

| SECTION C. HOW TO COMPLETE THIS FORM |
|---|
| Please see the instructions below for items on the form that are not self-explanatory. The numbers match the numbered items of the form. |

| | |
|---|---|
| **1.** | **Name (Last, First, Middle)**: Enter the name to appear in the passport. If you are requesting a passport in a name different from the name that appears on your previous U.S. passport, submit proof of name change if resulting from marriage or legal name change such as a marriage certificate, divorce decree, or court order of name change (if applicable). Information can be found at travel.state.gov/namechange. |
| **2.** | **Date of Birth**: Use the following format: Month, Date, and Year (MM/DD/YYYY). |
| **3.** | **Gender**: The gender markers used are "M" (male), "F" (female) and "X" (unspecified or another gender identity). The gender marker that you check on this form will appear in your passport regardless of the gender marker(s) on your previous passport and/or your supporting evidence of citizenship and identity. If changing your gender marker from what is printed on your previous passport, select "Yes" in this field on Application Page 1. If no gender marker is selected, we may print the gender as listed on your supporting evidence or contact you for more information. **Please Note**: We cannot guarantee that other countries you visit or travel through will recognize the gender marker on your passport. Visit travel.state.gov/gender for more information. |
| **4.** | **Place of Birth**: Enter the name of the city and state if in the U.S. or city and country as presently known. |
| **5.** | **Social Security Number**: You must provide a Social Security number (SSN), if you have been issued one, in accordance with Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C 2714a(f). If you do not have a Social Security number, you must enter zeros in this field and submit a statement, signed and dated, that includes the phrase, ("*I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:  I have never been issued a Social Security Number by the Social Security Administration.*" If you reside abroad, you must also provide the name of the foreign country where you reside. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of the Treasury which will use it in connection with debt collection and check against lists of persons ineligible or potentially ineligible to receive a U.S. passport, among other authorized uses. If you fail to provide the information, we may deny your application and the Internal Revenue Service (IRS) may enforce a penalty. Refer all questions on this matter to the nearest IRS office. |

| | | | |
|---|---|---|---|
| **6.** | **Email:** By providing your email you are consenting to us communicating with you by email about your application. | **7.** | **Primary Contact Phone Number:** If providing a mobile/cell phone number you are consenting to receive calls and/or text messaging about your application. |

| | |
|---|---|
| **8.** | **Mailing Address Line 1 and 2 "In Care Of"**: For line 1 enter applicant's Street/RFD #, *or* P.O. Box *or* URB. For line 2, if you do not live at the address listed in this field, put the name of the person who lives at this address and mark it "In Care Of". **If the applicant is a minor child, you must include the "In Care Of" name of the parent or adult registered to receive mail at this address.** |
| **9.** | **List all other names you have used:** Enter all legal names previously used to include maiden name, name changes, and previous married names. You can enter up to two names: one in item A and one in item B. If only your last name has changed just enter your last name. If you need more space to write additional names, please use a separate sheet of paper and attach it to this form. |

| ⚠ | **Blue Section Application Page 1 - Signature Blocks: Remember to sign this page then complete Application Page 2.** |
|---|---|

| SECTION D. ATTACHMENTS TO SUBMIT WITH THIS FORM |
|---|
| Once you have completed Application Pages 1 and 2, attach the supporting documents as outlined in this section. |

1.   **YOUR MOST RECENTLY ISSUED U.S. PASSPORT BOOK AND/OR CARD**
Submit the most recent passport issued with the data error (e.g., name, gender marker, or place of birth) or printing error (e.g., data is missing on the biographical page, discoloration, crooked printing, etc.)  If your U.S. passport book and/or card has been mutilated, damaged, or reported lost or stolen, you must apply on form DS-11, Application for a U.S. Passport.

2.   **A RECENT COLOR PHOTOGRAPH** See the full list of photo requirements on travel.state.gov/photos. Attach one photo, 2x2 inches in size. U.S. passport photo requirements may differ from photo requirements of other countries. To avoid processing delays, be sure your photo meets all the following requirements (Refer to the photo template on Application Page 1):

- Taken less than six months ago
- Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
- Head must face the camera directly with full face in view

- No eyeglasses and head covering and no uniforms*
- Printed on matte or glossy photo quality paper
- Use a plain white or off-white background

*Head coverings are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public or a signed doctor's statement verifying its daily use for medical purposes. Glasses or other eyewear are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery). Photos are to be taken in clothing normally worn on a daily basis.  You cannot wear a uniform, clothing that looks like a uniform, or camouflage attire.

**USE CAUTION WHEN STAPLING YOUR PHOTO**: Use 4 staples vertically in the corners as close to the outer edges as possible. Do not bend the photo. Follow the photo template on Application Page 1.

## APPLICATION FOR A U.S. PASSPORT FOR ELIGIBLE INDIVIDUALS

### CORRECTION, NAME CHANGE TO PASSPORT ISSUED 1 YEAR AGO OR LESS, AND LIMITED PASSPORT REPLACEMENT

| | |
|---|---|
| 3. | **SUPPORTING DOCUMENTS** |

**Name Change:** If your name has changed **less than one year** after your U.S. passport book and/or card was issued **and** your U.S. passport book and/or card was issued **less than one year ago**, you may use this form. You must submit an official certified name change document (such as a certified copy of a marriage certificate, divorce decree, or a certified copy of a court order) showing a seal and officiate's/judge's signature. Please visit travel.state.gov/namechange for a complete description of accepted documents. If you are unable to document your name change in this manner, you must apply on form DS-11.

**Correction:** If there is a data error (e.g., name, gender marker, or place of birth) or printing error (e.g., data is missing on the biographical page, discoloration, crooked printing, etc.) in your recently issued, valid U.S. passport book and/or card, you must submit the appropriate document showing the correct information (e.g., certified birth certificate or certified marriage certificate as described above.) The validity period of the new, corrected passport depends on when you report the error.

| If... | Then... |
|---|---|
| Reported within one year of issue date | The new passport will be valid for 10 years from the date it is issued. |
| Reported after one year of issue date | The new passport will be valid until the expiration of the original, incorrect passport. |

**Limited Passport Replacement**

- If you are reapplying because your U.S. passport book was limited in validity due to insufficient evidence of U.S. citizenship and/or identity and you paid the full passport fees, you must submit evidence of your U.S. citizenship (such as a government-issued birth certificate or a U.S. Certificate of Naturalization) and/or evidence of your identity (such as a driver's license or a state-issued identification card). You must establish your citizenship and identity to the satisfaction of the U.S. Department of State. We may ask you to provide additional evidence to support your claim to U.S. citizenship and/or to establish your identity. Please refer to the notice included with your passport for instructions.
- If your U.S. passport book was limited due to gender transition under our prior gender policy, submit this form within two years of your previous passport's issuance date. If your limited-validity passport was issued more than two years ago, please use form DS-11. If your U.S. passport book was limited for another reason (such as multiple losses or damage/mutilation of previous passports), please visit travel.state.gov for more information. **Passport books limited in validity due to serious damage or multiple losses cannot be extended.**
- **All documentary evidence that is not damaged, altered, or forged will be returned to you.** Photocopies will not be returned.

| | |
|---|---|
| 4. | **EXPEDITE FEE** (Optional for name change or limited passport replacement only. Only available for passports mailed in the United States and Canada. |

- There is **no fee to use this form** unless expedited service is requested for a name change or limited passport replacement. A passport issued with a data or printing error (as described in the supporting document section above) is **corrected at no cost (with no expedite fee) if the passport is still valid.** Pay by check (personal, certified, cashier's, travelers) or money order (U.S. Postal, international, currency exchange) with the applicant's full name and date of birth printed on the front and payable to "U.S. Department of State." Please write "Expedite" on the outer envelope when mailing. **Do not send cash.**
  The Department cannot be responsible for cash sent through the mail. By law, passport service fees are **non-refundable**.
- Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R. 22.1, and 22 C.F.R. 51.50-56). Visit travel.state.gov/passportfees for current fees and how fees are used and processed.)

### SECTION E. HOW TO SUBMIT THIS FORM
The Department recommends using a trackable mailing service when submitting your application.

Print page one and page two of your application on separate pieces of paper. Mail this form and attachments to one of the addresses below:

| **FOR ROUTINE SERVICE (No fee required)**: | **FOR EXPEDITED SERVICE (Fee required, see above for details)**: |
|---|---|
| National Passport Processing Center | National Passport Processing Center |
| Post Office Box 90107 | Post Office Box 90907 |
| Philadelphia, PA 19190-0107 | Philadelphia, PA 19190-0907 |

**Notice to Applicants Located Outside the United States:** U.S. citizens residing outside the United States and Canada cannot submit this form to the domestic addresses listed above. Each U.S. embassy and consulate has different procedures for submitting and processing your application. Visit travel.state.gov to check the U.S. embassy or consulate webpage for more information.

### SECTION F. RECEIVING YOUR PASSPORT AND SUPPORTING DOCUMENTS

- **Difference Between U.S. Passport Book and Card:** The book is valid for international travel by air, land, and sea. The card is not valid for international air travel, only for entry at land border crossings and seaports of entry when traveling from Canada, Mexico, Bermuda, and the Caribbean. The maximum number of letters provided for your given name (first and middle) on the card is 24 characters. If both your given names are more than 24 characters, you must shorten one of your given names you list on item #1 of Application Page 1.
- **Separate mailings:** Your new passport book and/or card and any documentary evidence submitted to the Department will be returned to you by priority or first-class mail, unless overnight delivery is requested.
- **Passport numbers:** Each newly issued passport book or card will have a different passport number than your previous one.
- **Shipping and Delivery Changes:** If your mailing address changes prior to receipt of your new passport, please contact NPIC. **NOTE:** We will not mail a U.S. passport to a private address outside the United States or Canada.
- **Passport Corrections, Non-Receipt/Undeliverable Passports, and Lost/Stolen Passport:** For more information visit travel.state.gov or contact NPIC.



## APPLICATION FOR A U.S. PASSPORT FOR ELIGIBLE INDIVIDUALS

### CORRECTION, NAME CHANGE TO PASSPORT ISSUED 1 YEAR AGO OR LESS, AND LIMITED PASSPORT REPLACEMENT

**WARNING**

False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.

**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.**

**ACTS OR CONDITIONS**

If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.

*I have not been convicted of a federal or state drug offense or convicted of a "sex tourism" crimes statute, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.*

**PRIVACY ACT STATEMENT**

**AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211 a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.

**PURPOSE:** We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.

**ROUTINE USES:** This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. Your Social Security number will be provided to the U.S. Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section. More information on the routine uses for the system can be found in System of Records Notices State-05, Overseas Citizen Services Records and Other Overseas Records and State-26, Passport Records.

**DISCLOSURE:** Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could also result in the refusal or denial of your application. Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law on Instruction Page 2 (Section C) to this form.

**PAPERWORK REDUCTION ACT STATEMENT**

Public reporting burden for this collection of information is estimated to average 40 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Bureau of Consular Affairs, Passport Services, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 1199, Sterling, Virginia 20166-1199.

**For more information about your application status, online tools, current fees, and processing times, please visit <u>travel.state.gov</u>.**

U.S. Department of State

OMB Control No. 1405-0160
Expiration Date: 04-30-2025
Estimated Burden: 40 Minutes

# APPLICATION FOR A U.S. PASSPORT FOR ELIGIBLE INDIVIDUALS
## CORRECTION, NAME CHANGE TO PASSPORT ISSUED 1 YEAR AGO OR LESS, AND LIMITED PASSPORT REPLACEMENT
*Use __black ink__ only. If you make an error, complete a new form. Do not correct.*

**Select document(s) for which you are applying:**

☐ U.S. Passport Book      ☐ U.S. Passport Card      ☐ Both

The U.S. passport card is __not__ valid for international air travel.  (See Instruction Page 3)

☐ Regular Book (Standard)      ☐ Large Book (Non-Standard)

The large book is for frequent travelers who need more visa pages.

☐ D   ☐ O   ☐ S   ☐ NFR

End. # _____   Exp. _____

**1. Name** Last

First

Middle

**2. Date of Birth** *(mm/dd/yyyy)*

**3. Gender (Read Instruction Page 2)** M ☐ F ☐ X ☐
Changing gender marker? Yes ☐

**4. Place of Birth** *(City & State if in the U.S., or City & Country as it is presently known.)*

**5. Social Security Number**

**6. Email** *(See application status at passportstatus.state.gov)*

**7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** *(Street/RFD#, PO Box, or URB)*

**Address Line 2:** *(Include Apartment, Suite, etc. If applicant is a child, write "In Care Of" the parent. Example: In Care Of - Jane Doe)*

**City**      **State**      **Zip Code**      **Country** *(if outside the United States)*

**9. List all other names you have used.** *(Example: Birth Name, Maiden, Previous Marriage, Legal Name Change.  Attach additional  pages if needed.)*

A.      B.

STAPLE   STAPLE
FROM 1" TO 1 3/8"
2" x 2"   2" x 2"
STAPLE   STAPLE
Attach a color photograph taken within the last six months

**10. U.S. Passport Information**

Your name as printed on your most recent U.S. passport book and/or passport card

Most recent U.S. passport book number      Book Issue Date *(mm/dd/yyyy)*

Most recent U.S. passport card number      Card Issue Date *(mm/dd/yyyy)*

## YOU MUST SIGN AND DATE THE APPLICATION IN THE DESIGNATED AREA BELOW
## THEN COMPLETE PAGE 2

I declare under penalty of perjury all of the following:  1) I am a citizen or non-citizen national of the United States and have not performed any of the acts listed under "Acts or Conditions" on page 4 of the instructions of this application (unless explanatory statement is attached);  2) the statements made on the application are true and correct;   3) I have not knowingly and willfully made false statements or included false documents in support of this application;  4) the photograph submitted with this application is a genuine, current photograph of me; and  5) I have read and understood the warning on page 4 of the instructions to the application form.

x _____
**Applicant's Legal Signature - age 16 and older**

x _____
**Mother/Father/Parent/Legal Guardian's Signature** *(if identifying minor)*

**Date** _____

## FOR ISSUING OFFICE ONLY

☐ Name Change   ☐ Replacement   ☐ Correction:   LName  FName  MName  DOB  Gender  POB  Other

From: _____

To: _____

BC   Nat/Citz Cert   Report of Birth   Prev PPT   MC   Adoption C/O   NC C/O   ACRQ   Other

Filed/Issued/Place: _____   Doc #: _____

☐ Other: _____

☐ Attached: _____

EF _____   Postage _____   Other _____

App. 711

**Name of Applicant** *(Last, First & Middle)*

**Date of Birth** *(mm/dd/yyyy)*

| 11. Height | 12. Hair Color | 13. Eye Color | 14. Occupation *(if age 16 or older)* | 15. Employer or School *(if applicable)* |
|---|---|---|---|---|
| | | | | |

**16. Additional Contact Phone Numbers**

☐ Home ☐ Cell
☐ Work _____

☐ Home ☐ Cell
☐ Work _____

**17. Permanent Address:** *(Complete if PO Box is listed in Mailing Address **or** if residence is different from Mailing Address. **Do not list a PO Box**.)*

Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**18. Your Emergency Contact** *(Provide the information of a person not traveling with you to be contacted in the event of an emergency.)*

Name

Address: Street/RFD # or PO Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship to Applicant

**19. Travel Plans** *(If no travel plans, please write "none")*

Departure Date *(mm/dd/yyyy)*   Return Date *(mm/dd/yyyy)*   Countries to be visited

## Please complete the following questions

**20. Has your name changed by marriage or court order less than one year after your U.S. passport book and/or card was issued?**

☐ Yes  ☐ No

**21. If yes, and your submitted passport book and/or card is less than one year old, please complete this section with your new name.**

**Name** Last

First

Middle

Note: You must submit evidence documenting your name change (such as a certified marriage certificate or a certified court order) and your current U.S. passport book and/or card, along with this completed form to the address listed on Instruction Page 3.

If you cannot or did not meet the above criteria, please complete form DS-82, U.S. Passport Renewal Application for Eligible Individuals or form DS-11, Application for a U.S. Passport.

**22. Was your identifying information printed incorrectly in your U.S. passport book and/or card?**

☐ Yes  ☐ No

If yes, **only check the box(es) next to the field(s) that need to be corrected** and complete the information as it should appear.

☐ **Name** Last

☐ First

☐ Middle

☐ Date of Birth (mm/ddyyyy)

☐ Gender
☐ M ☐ F ☐ X

☐ Place of Birth *(State or Country)*

Note: Please submit evidence documenting your correct identifying information (such as a certified marriage certificate or birth certificate, if applicable) and your current U.S. passport book and/or card, along with this completed form to the address listed on Instruction Page 3.
**Visit travel.state.gov for information on gender markers.**

**23. Was your most recent U.S. passport book limited for two years or less?**

☐ Yes  ☐ No

If yes, please submit evidence of your U.S. citizenship (such as U.S. birth certificate or naturalization certificate) and/or evidence of your identity (such as a driver's license or state-issued ID card).

Note: To complete a limited U.S. passport book replacement, **your submitted U.S. passport book must not be expired.** Passport books limited in validity because of multiple losses, damages, or mutilations cannot be extended.

Please be sure to enclose your U.S. passport book along with this application to the address listed on Instruction Page 3.

DS 5504 C 03 2022 2

App. 712

Clear Form

Case: 1:25-cv-10313-BEM    Document: 33-5    Filed: 02/18/25    Page 1 of 7

# EXHIBIT

U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT

OMB CONTROL NO. 1405-0004
EXPIRATION DATE: 12-31-2023
ESTIMATED BURDEN: 85 MINUTES

This form is used to apply for a U.S. passport. For information or questions, visit the official Department of State website at travel.state.gov or contact the National Passport Information Center at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov.

## WHAT TO SUBMIT WITH THIS APPLICATION

### 1.  PROOF OF U.S. CITIZENSHIP

Submit an original or certified copy <u>and a photocopy</u> of the front (and back, if there is printed information) with your application. Your evidence will be returned to you if it is not damaged, altered, or forged. Submit one of the following:

- U.S. birth certificate that meets all of the following requirements:
  - Issued by the city, county, or state of birth
  - Lists your full name, date of birth, and place of birth
  - Lists your parent(s)' full names
  - Has the date filed with registrar's office (must be within one year of birth)
  - Has the registrar's signature and the seal of the issuing authority

- Fully-valid, undamaged U.S. passport (may be expired)
- Consular Report of Birth Abroad or Certification of Birth
- Certificate of Naturalization or Citizenship

You must establish your citizenship to the satisfaction of the Department and may be asked to provide additional evidence. If you are claiming citizenship through the naturalization of your parents or if your U.S. birth certificate was filed more than one year after your birth, see instruction page 2. More information can be found on travel.state.gov/citizenship.

### 2. PROOF OF IDENTITY

Present your original identification <u>and submit a photocopy</u> of the front and back with your application. It must show a photograph that is a good likeness of you. Examples include:

- Previous or current U.S. passport book/card
- Driver's license (not temporary or learner's permit)

- Military identification; federal, state, or city government employee identification
- Certificate of Naturalization or Citizenship

You must establish your identity to the satisfaction of the Department and may be asked to provide additional evidence. More information can be found at travel.state.gov/identification. If you have changed your name, please see instructions on what to submit at travel.state.gov/namechange.

### 3. A RECENT COLOR PHOTOGRAPH

Submit one color photograph, 2x2 inches in size. Photographs must meet the following requirements (see the full list on travel.state.gov/photos):

- Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
- Taken less than six months ago
- No glasses or hat/head covering*

- Use a plain white or off-white background
- Head must face the camera directly with full face in view
- Printed on matte or glossy photo quality paper

* Head coverings are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public or a signed doctor's statement verifying its daily use for medical purposes. Glasses or other eyewear are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery).

### 4. FEES

Please visit our website at travel.state.gov/passportfees for current fees. For information on optional services, see instruction page 2. Payment methods:

- If applying at an <u>acceptance facility</u>: Passport fees must be made by check (personal, certified, cashiers, travelers) or money order (U.S. Postal, international, currency exchange) with the applicant's full name and date of birth printed on the front and payable to "U.S. Department of State." The execution fee **must be paid separately** and made payable to the acceptance facility in the form that they accept.
- If applying at a <u>passport agency</u>: We accept checks (personal, certified, cashiers, travelers); major credit cards (Visa, Master Card, American Express, Discover); money orders (U.S. Postal, international, currency exchange); or exact cash (no change provided). All fees should be payable to the "U.S. Department of State."
- If applying <u>outside the United States</u>: Please see the website of your embassy, consulate, or consulate agency to see what forms of payment they accept.

## FOR CHILDREN UNDER 16

To submit an application for a child under age 16, **both parents or the child's legal guardian(s)** must appear and present <u>all</u> of the following:
- Evidence of the child's U.S. citizenship
- Evidence of the child's relationship to parents/guardian(s) (Example: a birth certificate or consular report of birth abroad listing the names of the parent(s)/guardian(s) and child)
- Original parental/guardian government-issued identification and a photocopy of the front and back

**If only one parent/guardian can appear, you must also submit one of the following:**
- The second parent's notarized written statement or DS-3053 (including the child's full name and date of birth) consenting to the passport issuance for the child. The notarized statement <u>cannot</u> be more than three months old, <u>must</u> be signed and notarized on the same day, and <u>must</u> come with a photocopy of the front and back side of the second parent's government-issued photo identification.
- The second parent's death certificate (if second parent is deceased)
- Evidence of sole authority to apply (Example: a court order granting sole legal custody or a birth certificate listing only one parent)
- A written statement (made under penalty of perjury) or DS-5525 explaining, in detail, why the second parent cannot be reached

## FOR CHILDREN AGE 16 OR 17

The Department may request the consent of one legal parent/legal guardian to the issuance of a passport to an applicant who is 16 or 17 years of age. In many cases, the passport authorizing officer may be able to ascertain parental awareness of the application by virtue of the parent's presence when the minor submits the application or a signed note from the parent or proof the parent is paying the application fees. However, the passport authorizing officer retains discretion to request the legal parent's/legal guardian's notarized statement of consent to issuance (e.g., on Form DS-3053).

App. 714



U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT

### HOW TO SUBMIT THIS APPLICATION

Complete and submit this application in person to a designated passport acceptance facility, a passport agency (by appointment only), or a U.S. embassy, consulate, or consular agency (if abroad). To find your nearest acceptance facility, visit travel.state.gov or call the National Passport Information Center at 1-877-487-2778 (TDD/TTY: 1-888-874-7793).

### OTHER FORMS OF PROOF OF U.S. CITIZENSHIP

#### APPLICANTS BORN IN THE UNITED STATES

An acceptable U.S. birth certificate must include your full name, date and place of birth, sex, date the birth record was filed, the seal or other certification of the official custodian of such records (state, county, or city/town office), and the full names of your parent(s).

- If the birth certificate was filed more than one year after the birth: It must be supported by evidence described in the next paragraph.

- If no birth record exists: Submit a registrar's notice to that effect. Also, submit a combination of the evidence listed below, which should include your first and last name, date and/or place of birth, the seal or other certification of the office (if customary), and the signature of the issuing official.
  - A hospital birth record
  - An early baptismal or circumcision certificate
  - Early census, school, medical, or family Bible records
  - Insurance files or published birth announcements (such as a newspaper article)
  - Notarized affidavits (or DS-10, Birth Affidavit) of older blood relatives having knowledge of your birth may be submitted in addition to some of the records listed above.

#### APPLICANTS BORN OUTSIDE THE UNITED STATES

<u>Please note</u>: If we determine that you are a U.S. citizen, your lawful permanent resident card submitted with this application will be forwarded to U.S. Citizenship and Immigration Services.

- If you claim citizenship through naturalization of one or both parent(s), submit all of the following:
  - Certificate(s) of Naturalization of your parent(s)
  - Your foreign birth certificate (and official translation if the document is not in English)
  - Evidence of your admission to the United States for legal permanent residence and proof you subsequently resided in the United States
  - Your parents' marriage/certificate and/or evidence that you were in the legal and physical custody of your U.S. citizen parent, if applicable

- If you claim citizenship through birth abroad to at least one U.S. citizen parent, submit all of the following:
  - Consular Report of Birth Abroad (Form FS-240), Certification of Birth (Form DS-1350 or FS-545), or your foreign birth certificate (and official translation if the document is not in English)
  - Proof of U.S. citizenship of your parent
  - Your parents' marriage certificate
  - Affidavit showing all of your U.S. citizen parents' periods and places of residence and physical presence before your birth (DS-5507)

- If you claim citizenship through adoption by a U.S. citizen parent(s)*, submit all of the following:
  - Evidence of your permanent residence status
  - Evidence of your full and final adoption
  - Evidence that you were in the legal and physical custody of your U.S. citizen parent(s)
  - Evidence you have resided in the United States

  *Only applies if the applicant was born on or after 10/05/1978.

You must establish your citizenship to the satisfaction of the Department. We may ask you to provide additional evidence to establish your claim to U.S. citizenship. Visit travel.state.gov/citizenship for details.

### OTHER FEE INFORMATION

*FEES ARE LISTED ON OUR WEBSITE AT TRAVEL.STATE.GOV. BY LAW, THE PASSPORT FEES ARE NON-REFUNDABLE.*

**Expedited service**: Available for an additional fee. Our website travel.state.gov contains updated information regarding fees and processing times for expedited service. Expedited service is only available for passports mailed in the United States and Canada. Please include the appropriate fee with your payment.

**1-2 Day Delivery:** Available for an additional fee. This service is only available for passport book (and not passport card) mailings in the United States. Please include the appropriate fee with your payment.

**Verification of a previous U.S. Passport or Consular Report of Birth Abroad:** An additional fee will be charged when, upon your request, we verify issuance of a previous U.S. passport or Consular Report of Birth Abroad because you are unable to submit evidence of U.S. citizenship.

**Special Issuance Passports:** If you present U.S. government authorization to apply for a special issuance passport (no-fee regular, service, official, or diplomatic), you must pay the execution fee when applying at a designated acceptance facility. No other fees are charged when you apply.

App. 715



U.S. Department of State

## APPLICATION FOR A U.S. PASSPORT

### INFORMATION ON HOW YOU RECEIVE YOUR PASSPORT(S)

**Separate mailings:** You may receive your newly-issued U.S. passport book and/or card and your citizenship evidence in two separate mailings. If you are applying for both a U.S. passport book and passport card, you may receive three separate mailings; one with your returned evidence, one with your newly-issued passport book, and one with your newly-issued passport card.

**Passport numbers:** Each newly issued passport book or card will have a different passport number than your previous one.

**"In care of":** If you do not live at the address listed in the "mailing address" section of this application, put the name of the person who does and mark it "In Care Of" in item # 8 on page 1 of 2. **If the applicant is a minor child, please include the "in care of" name of the adult registered to receive mail at this address.**

**Moved?** If your mailing address changes prior to receipt of your new passport, please contact the National Passport Information Center at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov.

NOTE: The U.S. Department of State will not mail a U.S. passport to a private address outside the United States or Canada.

### WHAT IS THE DIFFERENCE BETWEEN A PASSPORT BOOK AND A PASSPORT CARD?

**The U.S. passport card is not valid for international air travel.** Unlike the U.S. passport book, the U.S. passport card is valid only for entry at land border crossings and sea ports of entry when traveling from Canada, Mexico, the Caribbean, and Bermuda.

The maximum number of letters provided for your given name (first and middle) on the U.S. passport card is 24 characters. If both your given names are more than 24 characters, you must shorten one of your given names you list on item #1 on page 1 of 2.

Both the passport book and card are U.S. passports. They reflect the bearer's identity and nationality, and they are subject to existing passport laws and regulations. U.S. passports are only issued to U.S. citizens or non-citizen U.S. nationals.

### HOW FEES ARE ESTABLISHED AND PROCESSED

Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R. 22.1, and 22 C.F.R. 51.50-56) and are collected at the time you apply for the passport service.

If we fail to receive full payment of the applicable fees (for example, if your check is returned for any reason or you dispute a passport fee charge to your credit card), the U.S. Department of State will take action to collect the delinquent fees from you under 22 C.F.R. Part 34 and the Federal Claims Collection Standards (see 31 C.F.R. Parts 900-904). In accordance with the Debt Collection Improvement Act (Pub.L. 04-134), if the fees remain unpaid after 180 days and no repayment arrangements have been made, we will refer the debt to the U.S. Department of Treasury for collection. Debt collection procedures used by U.S. Department of Treasury may include referral of the debt to private collection agencies, reporting of the debt to credit bureaus, garnishment of private wages and administrative offset of the debt by reducing, or withholding eligible federal payments (e.g., tax refunds, social security payments, federal retirement, etc.) by the amount of your debt, including any interest penalties or other costs incurred. In addition, non-payment of passport fees may result in the invalidation of your passport. An invalidated passport cannot be used for travel.

If you send us a check, it will be converted into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check. The debit from your account will usually occur within 24 hours and will be shown on your regular account statement. You will not receive your original check back. We will destroy your original check, but we will keep the copy of it. If the EFT cannot be processed for technical reasons, you authorize us to process the copy in place of your original check. If the EFT cannot be completed because of insufficient funds, we may try to make the transfer up to two times, and we will charge you a one-time, non-refundable fee of $25, which we will also collect by EFT.

### NOTICE TO APPLICANTS FOR NO-FEE REGULAR, SERVICE, OFFICIAL, OR DIPLOMATIC PASSPORTS

You may use this application if you meet all of the provisions listed; however, you must consult your sponsoring agency for instructions on proper routing procedures before forwarding this application. Your completed passport will be released to your sponsoring agency for forwarding to you.

### PROTECT YOURSELF AGAINST IDENTITY THEFT - REPORT YOUR PASSPORT LOST OR STOLEN!

A United States citizen or non-citizen national may not normally have more than one valid or potentially valid U.S. passport book or more than one valid or potentially valid U.S. passport card at a time. Therefore, when a valid or potentially valid U.S. passport book or card cannot be presented with a new application, you must submit a Form DS-64, Statement Regarding a Lost or Stolen U.S. Passport. Your statement must detail why the previous U.S. passport book or card cannot be presented.

The information you provide regarding your lost or stolen U.S. passport book or card will be placed into our Consular Lost or Stolen Passport System. This system is designed to prevent the misuse of your lost or stolen U.S. passport book or card. Anyone using the passport book or card that was reported lost or stolen may be detained upon entry into the United States. **If you find the U.S. passport book or card that was reported lost or stolen, report it as found, and submit it for cancellation. It has been invalidated. You cannot use that passport book or card for travel.**

For more information regarding reporting a lost or stolen U.S. passport book or card, please call the National Passport Information Center at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or visit travel.state.gov.

# APPLICATION FOR A U.S. PASSPORT

## WARNING

False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of the passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.

**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.**

## FEDERAL TAX LAW

Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C 2714a(f) require you to provide your Social Security number (SSN), if you have one, when you apply for or renew a U.S. passport. If you have never been issued a SSN, you must enter zeros in box #5 of this form. If you are residing abroad, you must also provide the name of the foreign country in which you are residing. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of the Treasury. If you fail to provide the information, your application may be denied and you are subject to a $500 penalty enforced by the IRS. All questions on this matter should be referred to the nearest IRS office.

Your Social Security number will be provided to U.S. Department of Treasury, used in connection with debt collection and checked against lists of persons ineligible or potentially ineligible to receive a U.S. passport, among other authorized uses.

## ACTS OR CONDITIONS

If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.

*I have not been convicted of a federal or state drug offense or convicted of a "sex tourism" crimes statute, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.*

## PRIVACY ACT STATEMENT

**AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.

**PURPOSE:** We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.

**ROUTINE USES:** This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. More information on the Routine Uses for the system can be found in System of Records Notices State-05, Overseas Citizen Services Records and Other Overseas Records and State-26, Passport Records.

**DISCLOSURE:** Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could result in the refusal or denial of your application.

Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to a penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law section of the instructions to this form. Your Social Security number will be provided to the Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section.

## PAPERWORK REDUCTION ACT STATEMENT

Public reporting burden for this collection of information is estimated to average 85 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Bureau of Consular Affairs, Passport Services, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 1199, Sterling, Virginia 20166-1199.

**DS-11    12-2020**                                                                                                       **Instruction Page 4 of 4**

U.S. Department of State

OMB CONTROL NO. 1405-0004
EXPIRATION DATE: 12-31-2023
ESTIMATED BURDEN: 85 MIN

# APPLICATION FOR A U.S. PASSPORT

*Use __black ink__ only. If you make an error, complete a new form. Do not correct.*

## Select document(s) for which you are submitting fees:

☐ U.S. Passport Book      ☐ U.S. Passport Card      ☐ Both
The U.S. passport card is __not__ valid for international air travel. (See Instructions Page 3)

☐ Regular Book (Standard)      ☐ Large Book (Non-Standard)
The large book is for frequent travelers who need more visa pages.

**1. Name** Last

☐ D  ☐ O  ☐ S  ☐ NFR
End. #                    Exp.

First                                        Middle

**2. Date of Birth** *(mm/dd/yyyy)*      **3. Sex**   M ☐  F ☐      **4. Place of Birth** *(City & State if in the U.S. or City & Country as it is presently known.)*

**5. Social Security Number**      **6. Email** *(see application status at passportstatus.state.gov)*      **7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** *(Street/RFD#, P.O. Box or URB)*

**Address Line 2:** *(Include Apartment, Suite, etc. If applicant is a child, write "In Care Of" of the parent. Example: In Care Of - Jane Doe, mother)*

**City**                          **State**      **Zip Code**      **Country,** *(if outside the United States)*

**9. List all other names you have used.** *(Examples: Birth Name, Maiden, Previous Marriage, Legal Name Change.  Attach additional  pages if needed.)*

A.                                                    B.

## STOP! CONTINUE TO PAGE 2 ➡
## DO NOT SIGN APPLICATION UNTIL REQUESTED TO DO SO BY AUTHORIZED AGENT

STAPLE   2" X 2"   STAPLE

FROM 1" TO 1 3/8"

STAPLE   2" X 2"   STAPLE

Attach a color photograph taken within the last six months

☐ Acceptance Agent      ☐ (Vice) Consul USA

☐ Passport Staff Agent

(Seal)

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Second Signature Line (if identifying minor)**

☐ Driver's License   ☐ State Issued ID Card   ☐ Passport   ☐ Military   ☐ Other

Name

Issue Date *(mm/dd/yyyy)*      Exp. Date *(mm/dd/yyyy)*      State of Issuance

ID No                          Country of Issuance

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Third Signature Line (if identifying minor)**

☐ Driver's License   ☐ State Issued ID Card   ☐ Passport   ☐ Military   ☐ Other

Name

Issue Date *(mm/dd/yyyy)*      Exp. Date *(mm/dd/yyyy)*      State of Issuance

ID No                          Country of Issuance

I declare under penalty of perjury all of the following: 1) I am a citizen or non-citizen national of the United States and have not performed any of the acts listed under "Acts or Conditions" on page 4 of the instructions of this application (unless explanatory statement is attached); 2) the statements made on the application are true and correct; 3) I have not knowingly and willfully made false statements or included false documents in support of this application; 4) the photograph attached to this application is a genuine, current photograph of me; and 5) I have read and understood the warning on page 4 of the instructions to the application form.

_____
Signature of person authorized to accept applications

*By signing this form, I certify that I have provided the verbal oath and witnessed the applicant's/legal guardian's signature.*

Date

Agent ID Number

_____
Print Facility Name/Location

Facility ID Number

x _____
Applicant's Legal Signature - age 16 and older

x _____
Mother/Father/Parent/Legal Guardian's Signature (if identifying minor)

x _____
Mother/Father/Parent/Legal Guardian's Signature (if identifying minor)

_____
Name of courier company *(if applicable)*

For Issuing Office Only ── Bk ____ Card ____ EF ____ Postage ____ Execution ____ Other ____

App. 718

DS 11 C 12 2020 1

DS-11 12-2020                                                                                    Page 1 of 2

**Name of Applicant** (Last, First, & Middle)

**Date of Birth** (mm/dd/yyyy)

**10. Parental Information**
Mother/Father/Parent - First & Middle Name (at Parent's Birth)

Last Name (at Parent's Birth)

Date of Birth (mm/dd/yyyy)

Place of Birth (City & State if in the U.S. or City & Country as it is presently known)

Sex
☐ Male
☐ Female

U.S. Citizen?
☐ Yes
☐ No

Mother/Father/Parent - First & Middle Name (at Parent's Birth)

Last Name (at Parent's Birth)

Date of Birth (mm/dd/yyyy)

Place of Birth (City & State if in the U.S. or City & Country as it is presently known)

Sex
☐ Male
☐ Female

U.S. Citizen?
☐ Yes
☐ No

**11. Have you ever been married?**    ☐ Yes    ☐ No    *If yes, complete the remaining items in #11.*
Full Name of Current Spouse or Most Recent Spouse (Last, First & Middle)

Date of Birth (mm/dd/yyyy)

Place of Birth

U.S. Citizen?
☐ Yes    ☐ No

Date of Marriage (mm/dd/yyyy)

Have you ever been widowed or divorced?    ☐ Yes    ☐ No

Widow/Divorce Date (mm/dd/yyyy)

**12. Additional Contact Phone Number**
☐ Home    ☐ Cell
☐ Work

**13. Occupation** (if age 16 or older)

**14. Employer or School** (if applicable)

**15. Height**    **16. Hair Color**    **17. Eye Color**

**18. Travel Plans** (If no travel plans, please write "none")
Departure Date (mm/dd/yyyy)    Return Date (mm/dd/yyyy)    Countries to be Visited

**19. Permanent Address** (Complete if P.O. Box is listed under Mailing Address or if residence is different from Mailing Address. **Do not list a P.O. Box**)
Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**20. Your Emergency Contact** *Provide the information of a person not traveling with you to be contacted in the event of an emergency.*
Name

Address: Street/RFD # or P.O. Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship

**21. Have you ever applied for or been issued a U.S. Passport Book or Passport Card?**    ☐ Yes    ☐ No    *If yes, complete the remaining items in #21.*
Name as printed on your most recent passport book

Most recent passport book number

Most recent passport book issue date (mm/dd/yyyy)

Status of your most recent passport book:    ☐ Submitting with application    ☐ Stolen    ☐ Lost    ☐ In my possession (if expired)

Name as printed on your most recent passport card

Most recent passport card number

Most recent passport card issue date (mm/dd/yyyy)

Status of your most recent passport card:    ☐ Submitting with application    ☐ Stolen    ☐ Lost    ☐ In my possession (if expired)

## PLEASE DO NOT WRITE BELOW THIS LINE - FOR ISSUING OFFICE ONLY

Name as it appears on citizenship evidence

☐ Birth Certificate    SR    CR    City    Filed:    Issued:    ☐ Sole Parent

☐ Nat. / Citz. Cert.    USCIS    USDC    Date/Place Acquired:    A#

☐ Report of Birth    Filed/Place:

☐ Passport    C/R    S/R    See #21    #/DOI:

☐ Other:

☐ Attached:

☐ P/C of Citz    ☐ P/C of ID    ☐ DS-71    ☐ DS-3053    ☐ DS-64    ☐ DS-5520    ☐ DS-5525    ☐ PAW    ☐ NPIC    ☐ IRL    ☐ Citz W/S

DS 11 C 12 2020 2

App. 719

EXHIBIT



## U.S. PASSPORT RENEWAL APPLICATION FOR ELIGIBLE INDIVIDUALS

For information or questions, visit the official Department of State website at travel.state.gov or contact the National Passport Information Center (NPIC) at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov.

## CAN I USE THIS FORM?

☐ Yes  ☐ No    I can submit my most recent U.S. passport book and/or card with this application.

☐ Yes  ☐ No    I was at least 16 years old when my most recent U.S. passport book and/or card was issued.

☐ Yes  ☐ No    I was issued my most recent U.S passport book and/or card less than 15 years ago.

☐ Yes  ☐ No    The U.S. passport book and/or card that I am renewing **has not** been mutilated, damaged, or reported lost or stolen.

☐ Yes  ☐ No    My U.S. passport was not limited to less than the normal ten-year validity period due to passport damage/mutilation, multiple passport thefts/losses, or non-compliance with 22 C.F.R. 51.41.
(Refer to the last page of your U.S. passport book for endorsement information.)

☐ Yes  ☐ No    My name has not changed since my most recent U.S. passport book and/or card was issued.

**--OR--**

My name has changed by marriage or court order, and I can submit proper certified documentation to reflect my name change.

### If you answered no to any of the statements above, STOP. You cannot use this form.

**You must apply on form DS-11, Application for a U.S. Passport by making a personal appearance before an acceptance agent authorized to accept passport applications. Visit travel.state.gov to find your nearest acceptance facility.**

## NOTICE TO APPLICANTS RESIDING ABROAD

United States citizens residing outside the U.S. and Canada **cannot** submit this form to the domestic addresses listed below. Such applicants should visit usembassy.gov to find the nearest U.S. embassy or consulate for procedures for applying outside the United States.

## WHERE DO I MAIL THIS APPLICATION?

The Department recommends using trackable mailing service when submitting your application.

**FOR ROUTINE SERVICE** (If you live in CA, FL, IL, MN, NY, or TX):
National Passport Processing Center
PO Box 640155
Irving, TX 75064-0155

**FOR ROUTINE SERVICE** (If you live in any other state or Canada):
National Passport Processing Center
PO Box 90155
Philadelphia, PA 19190-0155

**FOR EXPEDITED SERVICE** (Additional Fee, from any state or Canada):
National Passport Processing Center
PO Box 90955
Philadelphia, PA 19190-0955

**Expedited Service**: Available for an additional fee. Our website travel.state.gov contains updated information regarding fees and processing times for expedited service. Expedited service is only available for passports mailed in the United States and Canada. Please include the appropriate fee with your payment. Please write "Expedite" on the outer envelope when mailing.

**1-2 Day Delivery**: Available for an additional fee. This service is only available for passport book (and not passport card) mailings in the United States. Please include the appropriate fee with your payment.

NOTE: To ensure minimal processing time for expedited applications, the Department recommends using 1-2 day delivery service to submit the application and to include the appropriate postage fee for 1-2 day return delivery for the newly issued passport book. Please visit travel.state.gov for updated information regarding fees, processing times, or to check the status of your passport application online.

If you choose to provide your email address in item #6 on page 1 of this application, the Department may use that address to contact you in the event there is a problem with your application or if you need to provide additional information.

App. 721

# WHAT TO SUBMIT WITH THIS APPLICATION

**Please print page one and page two of your application on separate pieces of paper.
You do not need to submit instruction pages.**

- Your most recently issued U.S. passport book and/or card;
- A certified marriage certificate or court order <u>if your name has changed</u>;
- Fees; and
- A new color photograph (taken within the last six months).

## 1. YOUR MOST RECENTLY ISSUED U.S. PASSPORT BOOK AND/OR CARD

Submit your **most recently issued** U.S. passport book and/or card. When submitting a U.S. passport book and/or card with this form, please verify that the document was issued at age 16 or older in your current name (or see item #2 below) and issued within the past 15 years.

You are also eligible to use this form if you currently have a U.S. passport book or card that meets requirements listed on the top of instruction page 1, and would like to get the other type of passport product (U.S. passport book or card) **for the first time**. Please submit any valid passport product you have with this application. If your U.S. passport book and/or card has been mutilated, damaged or reported lost or stolen, you must apply on form DS-11, Application for a U.S. Passport. (Please see instruction page 3.)

## 2. A CERTIFIED MARRIAGE CERTIFICATE OR COURT ORDER

If the name you are currently using is different from the name on your most recent U.S. passport, you must submit a copy of your certified marriage certificate, divorce decree, or original court order showing the change of name. Please make sure all documents are clear and legible. All original documents will be returned to you by mail. If you are unable to document your name change in this manner, you must apply on form DS-11, Application for a U.S. Passport.

## 3. FEES - Visit travel.state.gov/passportfees

Enclose the fee in the form of a personal check or money order. You do not need to pay the acceptance fee with this form.

**MAKE CHECKS PAYABLE TO "U.S. DEPARTMENT OF STATE." The full name and date of birth of the applicant must be typed or printed on the front of the check. Do not send cash.**

The Department of State cannot be responsible for cash sent through the mail. By law, the fees are non-refundable.

Please visit travel.state.gov/passportfees for current fees. Newly issued passport cards are delivered via first class mail only.

## 4. A NEW COLOR PHOTOGRAPH

Submit one new color photograph, 2x2 inches in size. Photographs must meet the following requirements:

- Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
- High resolution photo that is not blurry, grainy, or pixelated
- Taken less than six months ago
- No glasses or hat/head covering*
- Use a plain white or off-white background
- Head must face the camera directly with full face in view
- Printed on matte or glossy photo quality paper

(See the full list on travel.state.gov/photos)

*Head coverings are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public or a signed doctor's statement verifying its daily use for medical purposes. Glasses or other eyewear are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery).

USE CAUTION WHEN STAPLING YOUR PHOTO:
Use 4 staples vertically in the corners as close to the outer edges as possible. Do not bend the photo.

App. 722

**Separate mailings**: You may receive your newly issued U.S. passport book and/or card and your citizenship evidence/original documents in two separate mailings. If you are applying for a U.S. passport book and card, you may receive three separate mailings: one with your returned citizenship evidence/original documents; one with your newly issued U.S. passport book; and one with your newly issued U.S. passport card. Photocopies will not be returned.

**Passport number**: Each newly issued passport book and/or card will have a different passport number than your previous one.

**"In care of"**: If you do not live at the address listed in the "mailing address" section of this application, put the name of the person who does live at that address and write "In Care Of" in item #8 on page 1 of 2.

**Moved?** If your mailing address changes prior to receipt of your new passport, please contact the National Passport Information Center at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov.

NOTE: The U.S. Department of State will not mail a U.S. passport to a private address outside of the United States or Canada.

## WHAT IS THE DIFFERENCE BETWEEN A PASSPORT BOOK AND A PASSPORT CARD?

**The U.S. passport card is not valid for international air travel.** Unlike the U.S. passport book, the U.S. passport card is valid only for entry at land border crossings and sea ports of entry when traveling from Canada, Mexico, the Caribbean, and Bermuda.

The maximum number of letters provided for your given name (first and middle) on the U.S. passport card is 24 characters. If both your given names are more than 24 characters, you must shorten one of your given names you list on item #1 on page 1 of 2.

Both the passport book and card are U.S. passports. They reflect the bearer's identity and nationality, and they are subject to existing passport laws and regulations. U.S. passports are only issued to U.S. citizens or non-citizen U.S. nationals.

## HOW FEES ARE ESTABLISHED AND PROCESSED

Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R 22.1, and 22 C.F.R. 51.50-56), and are collected at the time you apply for the passport service.

If we fail to receive full payment of the applicable fees (for example, if your check is returned for any reason or you dispute a passport fee charge to your credit card), the U.S. Department of State will take action to collect the delinquent fees from you under 22 C.F.R. Part 34 and the Federal Claims Collection Standards (see 31 C.F.R. Parts 900-904). In accordance with the Debt Collection Improvement Act (Pub.L. 104-134), if the fees remain unpaid after 180 days and no repayment arrangements have been made, we will refer the debt to the U.S. Department of Treasury for collection. Debt collection procedures used by the U.S. Department of Treasury may include referral of the debt to private collection agencies, reporting of the debt to credit bureaus, garnishment of private wages, and administrative offset of the debt by reducing, or withholding eligible federal payments (e.g., tax refunds, Social Security payments, federal retirement, etc.) by the amount of your debt, including any interest penalties or other costs incurred. In addition, non-payment of passport fees may result in the invalidation of your passport. An invalidated passport cannot be used for travel.

If you send us a check, it will be converted into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check. The debit from your account will usually occur within 24 hours and will be shown on your regular account statement. You will not receive your original check back. We will destroy your original check, but we will keep the copy of it. If the EFT cannot be processed for technical reasons, you authorize us to process the copy in place of your original check. If the EFT cannot be completed because of insufficient funds, we may try to make the transfer up to two times, and we will charge you a one-time, non-refundable fee of $25, which we will also collect by EFT.

## NOTICE TO APPLICANTS FOR NO-FEE REGULAR, SERVICE, OFFICIAL OR DIPLOMATIC PASSPORTS

You may use this application if you meet all of the provisions listed; however, you must consult your sponsoring agency for instructions on proper routing procedures before forwarding this application. Your completed passport will be released to your sponsoring agency for forwarding to you.

## PROTECT YOURSELF AGAINST IDENTITY THEFT - REPORT YOUR PASSPORT LOST OR STOLEN

A United States citizen or non-citizen national may not normally have more than one valid or potentially valid U.S. passport book or more than one valid or potentially valid U.S. passport card at a time. Therefore, when a valid or potentially valid U.S. passport book or U.S. passport card cannot be presented with a new application, you must submit form DS-64, Statement Regarding a Lost or Stolen U.S. Passport. Your statement must detail why the previous U.S. passport book or card cannot be presented.

The information you provide regarding your lost or stolen U.S. passport book or card will be placed into our Consular Lost or Stolen Passport System. This system is designed to prevent the misuse of your lost or stolen U.S. passport book or card. Anyone using the passport book or card that was reported lost or stolen may be detained upon entry into the United States. **If you find the U.S. passport book or card that was reported lost or stolen, report it as found, and submit it for cancellation. It has been invalidated. You may not use that passport book or card for travel.**

For more information about how to report a lost or stolen U.S. passport book or card, please call the National Passport Information Center (NPIC) at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or visit travel.state.gov/loststolen.

App. 723

**WARNING**

False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of the passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.

**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.**

## FEDERAL TAX LAW

Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C. 2714a(f) require you to provide your Social Security number (SSN), if you have one, when you apply for or renew a U.S. passport. If you have never been issued an SSN, enter zeros in item #5 on page 1 of 2. If you are residing abroad, you must also provide the name of the foreign country in which you are residing. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of Treasury. If you fail to provide the information, your application may be denied and you are subject to a $500 penalty enforced by the Internal Revenue Service (IRS). All questions on this matter should be referred to the nearest IRS office.

Your Social Security number will be provided to the U.S. Department of Treasury and may be used in connection with debt collection and checked against lists of persons inelible or potentially ineligible to receive a U.S. passport, among other authorized uses.

## ACTS OR CONDITIONS

If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.

*I have not been convicted of a federal or state drug offense or convicted of a "sex tourism" crimes statue, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.*

## PRIVACY ACT STATEMENT

**AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.

**PURPOSE:** We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.

**ROUTINE USES:** This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. More information on the routine uses for the system can be found in System of Records Notices State-05, Overseas Citizen Services Records and Other Overseas Records and State-26, Passport Records.

**DISCLOSURE**: Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could also result in the refusal or denial of your application.

Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law section of the instructions to this form. Your Social Security number will be provided to the Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section.

## PAPERWORK REDUCTION ACT STATEMENT

Public reporting burden for this collection of information is estimated to average 40 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documentation required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Bureau of Consular Affairs, Passport Services, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 199, Sterling, Virginia 20166-1199.

App. 724

# U.S. PASSPORT RENEWAL APPLICATION FOR ELIGIBLE INDIVIDUALS

*Use __black ink__ only. If you make an error, complete a new form. Do not correct.*

OMB CONTROL NO. 1405-0020
OMB EXPIRATION DATE: 03-31-2023
ESTIMATED BURDEN: 40 MIN

## Select document(s) for which you are applying:

☐ U.S. Passport Book    ☐ U.S. Passport Card    ☐ Both

The U.S. passport card is **not** valid for international air travel. (See instruction page 3)

☐ Regular Book (Standard)    ☐ Large Book (Non-Standard)

The large book is for frequent international travelers who need more visa pages.

☐ D    ☐ O    ☐ DP    DOTS Code
End. # _____    Exp. _____

**1. Name**  Last *(Your name must match previous passport or name change document)*

First                                      Middle

**2. Date of Birth** *(mm/dd/yyyy)*    **3. Sex** M  F    **4. Place of Birth** *(City & State if in the U.S., or City & Country as it is presently known)*

**5. Social Security Number**    **6. Email** *(See application status at passportstatus.state.gov)*  @    **7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** *(Street/RFD#, P.O. Box, or URB)*

**Address Line 2:** *(Include Apartment, Suite, In Care Of or Attention if applicable.)*

**City**    **State**    **Zip Code**    **Country** *(if outside the United States)*

**9. List all other names you have used.** *(Example: Birth Name, Maiden, Previous Marriage, Legal Name Change. Attach additional pages if needed.)*

A.                                      B.

STAPLE    STAPLE
2" X 2"    FROM 1" TO 1 3/8"    2" X 2"
STAPLE    STAPLE

Attach a color photograph taken within the last six months

**10. Passport Information**
Your name as printed on your most recent U.S. passport book and/or passport card

Most recent U.S. passport book number    Book Issue date *(mm/dd/yyyy)*

Most recent U.S. passport card number    Card Issue date *(mm/dd/yyyy)*

**11. Name Change Information** Complete if name is different than last U.S. passport book or passport card
☐ Changed by Marriage    Place of Name Change *(City/State)*    Date *(mm/dd/yyyy)*
☐ Changed by Court Order
Please submit a certified copy.

## CONTINUE TO PAGE 2 ➡

### YOU MUST SIGN AND DATE THE APPLICATION IN THE DESIGNATED AREA BELOW

I declare under penalty of perjury all of the following: 1) I am a citizen or non-citizen national of the United States and have not performed any of the acts listed under "Acts or Conditions" on page 4 of the instructions of this application (unless explanatory statement is attached); 2) the statements made on the application are true and correct; 3) I have not knowingly and willfully made false statements or included false documents in support of this application; 4) the photograph submitted with this application is a genuine, current photograph of me; and 5) I have read and understood the warning on page 4 of the instructions to the application form.

x _____
**Applicant's Legal Signature**    **Date**

## FOR ISSUING OFFICE ONLY

☐ PPT BK C/R    ☐ PPT BK S/R    ☐ PPT CD C/R    ☐ PPT CD S/R

☐ Marriage Certificate    Date of Marriage/Place Issued:

☐ Court Order    Date Filed/Court:

From _____

To: _____

☐ Other:

☐ Attached:

For Issuing Office Only ➡ Bk Fee _____ Cd Fee _____ EF _____ App. 725 Proc _____ Other _____

* DS 82 C 03 2020 1 *

**Name of Applicant** *(Last, First & Middle)*

**Date of Birth** *(mm/dd/yyyy)*

| 12. Height | 13. Hair Color | 14. Eye Color | 15. Occupation | 16. Employer or School *(if applicable)* |
|---|---|---|---|---|
| | | | | |

**17. Additional Contact Phone Numbers**

☐ Home ☐ Cell
☐ Work _____

☐ Home ☐ Cell
☐ Work _____

**18. Permanent Address:** *(Complete if PO Box is listed in Mailing Address __or__ if residence is different from Mailing Address. **Do not list a PO Box**.)*

Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**19. Your Emergency Contact** *(Provide the information of a person not traveling with you to be contacted in the event of an emergency.)*

Name

Address: Street/RFD # or PO Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship to Applicant

**20. Travel Plans** *(If no travel plans, please write "none")*

Departure Date *(mm/dd/yyyy)*

Return Date *(mm/dd/yyyy)*

Countries to be visited

# STOP!

# PLEASE BE SURE TO:

## 1. Print form on two separate pages

## 2. Sign and date on page one

## 3. Submit both pages (see instruction page 1)

App. 726

* DS 82 C 03 2020 2 *

# EXHIBIT



U.S. Department of State

## APPLICATION FOR A U.S. PASSPORT FOR ELIGIBLE INDIVIDUALS

**CORRECTION, NAME CHANGE TO PASSPORT ISSUED 1 YEAR AGO OR LESS, AND LIMITED PASSPORT REPLACEMENT**

OMB CONTROL NO. 1405-0160
EXPIRATION DATE: 11-30-2022
ESTIMATED BURDEN: 40 MIN

For information or questions, visit the official Department of State website at travel.state.gov or contact the National Passport Information Center (NPIC) at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov.

---

# CAN I USE THIS FORM?

☐ Yes ☐ No   I changed my name, by marriage or court order, <u>less than one year</u> after my most recent U.S. passport book and/or card was issued **and** my U.S. passport book and/or card was issued <u>less than one year ago</u>.

**OR**

☐ Yes ☐ No   My identifying information in my most recent U.S. passport book and/or card was printed incorrectly.

**OR**

☐ Yes ☐ No   My most recent U.S. passport book was limited to two years or less for a reason other than multiple losses or a seriously damaged/mutilated passport.

### If you answered no to all of the three statements above, STOP.  You cannot use this form.

### Instead, you must apply on form DS-82 or DS-11 depending on your circumstances. Passport forms are available at travel.state.gov/passportforms.

### NOTICE TO APPLICANTS RESIDING ABROAD

United States citizens residing outside the U.S. and Canada **cannot** submit this form to domestic addresses listed below. Such applicants should visit usembassy.gov to find the nearest U.S. embassy or consulate for procedures when applying outside the United States.

### IS THERE A FEE WITH THIS APPLICATION?

**There is no fee to use this form unless expedited service is requested** (see below). Your re-issued passport book and/or card and any documentary evidence submitted to the Department will be returned to you by priority or first class mail, unless overnight delivery is requested. Photocopies will not be returned.

Enclose expedited service fee(s) in the form of a personal check or money order.  **MAKE CHECKS PAYABLE TO "U.S. DEPARTMENT OF STATE." The full name and date of birth of the applicant must be typed or printed on the front of the check.** For information on fees, please visit travel.state.gov/passportfees.

**Do not send cash.** The Department cannot be responsible for cash sent through the mail.

### WHERE DO I MAIL THIS APPLICATION?
The Department recommends using trackable mailing service when submitting your application.

1. Complete, sign, and date this form.

2. Send this form with your most recent U.S. passport book and/or card, a new color photograph (taken within the last six months), and any required additional documents.

**FOR ROUTINE SERVICE (No fee required):**
National Passport Processing Center
Post Office Box 90107
Philadelphia, PA  19190-0107

**FOR EXPEDITED SERVICE (Fee required, see below):**
National Passport Processing Center
Post Office Box 90907
Philadelphia, PA  19190-0907

**Expedited service:** Available for a fee. Our website travel.state.gov contains updated information regarding fees and processing times for expedited service. Expedited service is only available for passports mailed in the United States and Canada. Please write "Expedite" on the outer envelope when mailing.

**1-2 Day Delivery:** Available for a fee. This service is only available for passport books (and not passport cards) mailed within the United States.

NOTE: To ensure minimal processing time for expedited applications, the Department recommends using 1-2 day delivery service to submit the application and to include the appropriate postage fee for 1-2 day return delivery for the newly issued passport book. Please visit travel.state.gov for updated information regarding fees, processing times, or to check the status of your passport application online.

If you choose to provide your email address in item #6 on page 1 of 2, the Department may use that information to contact you in the event there is a problem with your application or if additional information is required.

App. 728

## WHAT TO SUBMIT WITH THIS APPLICATION?

- **Your most recent U.S. passport book and/or card;**
- **A new color photograph (taken within the last six months); and**
- **Any required additional documents.**

## A NEW COLOR PHOTOGRAPH

Submit one color photograph, 2x2 inches in size. Photographs must meet the following requirements:

• Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
• High resolution photo that is not blurry, grainy, or pixelated
• Taken less than six months ago
• No glasses or hat/head covering*
• Use a plain white or off-white background
• Head must face the camera directly with full face in view
• Printed on matte or glossy photo quality paper

(See the full list on travel.state.gov/photos)

*Head coverings are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public, or a signed doctor's statement verifying its daily use for medical purposes. Glasses or other eyewear are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery).

USE CAUTION WHEN STAPLING YOUR PHOTO:
Use 4 staples vertically in the corners as close to the outer edges as possible. Do not bend the photo.

## ADDITIONAL DOCUMENTS

**NAME CHANGE:**
- If your name has changed **less than one year** after your U.S. passport book and/or card was issued **and** your U.S. passport book and/or card is **less than one year** old, you may use this form.

- You must submit a certified name change document such as a certified copy of your marriage certificate or a certified copy of a court order showing a seal and officiate/judge's signature. If you are unable to document your name change in this manner, you must apply on form DS-11, Application for a U.S. Passport.

**CORRECTION:**
- If there is an error in your recently issued, valid U.S. passport book and/or card, you must submit the appropriate document showing the correct information (e.g. certified birth certificate or certified marriage certificate as described above.)

**LIMITED PASSPORT REPLACEMENT:**
- If you are re-applying because your U.S. passport book was limited in validity due to a lack of citizenship evidence or identity, you must submit evidence of your U.S. citizenship (such as a government-issued birth certificate or a U.S. Certificate of Naturalization) and/or evidence of your identity (such as a driver's license or a state-issued identification card). You must establish your citizenship and identity to the satisfaction of the Department of State. We may ask you to provide additional evidence to support your claim to U.S. citizenship and/or your identity. Please refer to the letter included with your passport for instructions.

- If your U.S. passport book was limited due to sex transition, please visit travel.state.gov/sexmarker for information on the documentation you need to submit with this application.

- **Passport books limited in validity due to serious damage or multiple losses cannot be extended.** Please contact the National Passport Information Center or visit travel.state.gov for more information.

   **All documentary evidence that is not damaged, altered, or forged will be returned to you.** Photocopies will not be returned.

App. 729

**INFORMATION ON HOW YOU RECEIVE YOUR PASSPORT(S)**

Separate mailings: You may receive your newly issued U.S. passport book and/or card and your documentary evidence in two separate mailings. If you are applying for both a U.S. passport book and card, you may receive three separate mailings: one with your documentary evidence; one with your newly issued U.S. passport book, and one with your newly issued U.S. passport card. Photocopies will not be returned.

Passport numbers: Each newly issued passport book and/or card will have a different passport number than your previous one.

"In care of": If you do not live at the address listed in the "mailing address" section of this application, put the name of the person who does live at that address and write "In Care Of" in item #8 on page 1 of 2. If the applicant is a minor child, you must include the "in care of" name of the adult registered to receive mail at this address.

Moved? If your mailing address changes prior to receipt of your new passport, please contact the National Passport Information Center (NPIC) at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or NPIC@state.gov.

NOTE: The U.S. Department of State will not mail a U.S. passport book and/or card to a private address outside the United States or Canada.

## WHAT IS THE DIFFERENCE BETWEEN A PASSPORT BOOK AND A PASSPORT CARD?

The U.S. passport card is not valid for international air travel. Unlike the U.S. passport book, the U.S. passport card is valid only for entry at land border crossings and sea ports of entry when traveling from Canada, Mexico, the Caribbean, and Bermuda.

The maximum number of letters provided for your given name (first and middle) on the U.S. passport card is 24 characters. If both your given names are more than 24 characters, you must shorten one of the given names you list on item #1 on page 1 of 2.

Both the U.S. passport book and card are U.S. passports. They reflect the bearer's identity and nationality, and they are subject to existing passport laws and regulations. U.S. passports are only issued to U.S. citizens or non-citizen U.S. nationals.

## HOW FEES ARE ESTABLISHED AND PROCESSED

Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R 22.1, and 22 C.F.R. 51.50-56), and are collected at the time you apply for the passport service.

If we fail to receive full payment of the applicable fees (for example, if your check is returned for any reason or you dispute a passport fee charge to your credit card), the U.S. Department of State will take action to collect the delinquent fees from you under 22 C.F.R. Part 34, and the Federal Claims Collection Standards (see 31 C.F.R. Parts 900-904). In accordance with the Debt Collection Improvement Act (Pub.L. 104-134), if the fees remain unpaid after 180 days and no repayment arrangements have been made, we will refer the debt to the U.S. Department of Treasury for collection. Debt collection procedures used by the U.S. Department of Treasury may include referral of the debt to private collection agencies, reporting of the debt to credit bureaus, garnishment of private wages, and administrative offset of the debt by reducing, or withholding eligible federal payments (e.g. tax refunds, Social Security payments, federal retirement, etc.) by the amount of your debt, including any interest penalties or other costs incurred. In addition, non-payment of passport fees may result in the invalidation of your passport. An invalidated passport book or card cannot be used for travel.

If you send us a check, it will be converted into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check. The debit from your account will usually occur within 24 hours and will be shown on your regular account statement. You will not receive your original check back. We will destroy your original check, but we will keep the copy of it. If the EFT cannot be processed for technical reasons, you authorize us to process the copy in place of your original check. If the EFT cannot be completed because of insufficient funds, we may try to make the transfer up to two times, and we will charge you a one-time, non-refundable fee of $25, which we will also collect by EFT.

## NOTICE TO APPLICANTS FOR NO-FEE REGULAR, SERVICE, OFFICIAL, OR DIPLOMATIC PASSPORTS

You may use this application if you meet all of the provisions listed; however, you must consult your sponsoring agency for instructions on proper routing procedures before forwarding this application. Your completed passport will be released to your sponsoring agency for forwarding to you.

## PROTECT YOURSELF AGAINST IDENTITY THEFT - REPORT YOUR PASSPORT LOST OR STOLEN

A United States citizen or non-citizen national may not normally have more than one valid or potentially valid U.S. passport book or more than one valid or potentially valid U.S. passport card at a time. Therefore, when a valid or potentially valid U.S. passport book or card cannot be presented with a new application, you must submit form DS-64, Statement Regarding a Lost or Stolen U.S. Passport. Your statement must detail why the previous U.S. passport book or card cannot be presented.

The information you provide regarding your lost or stolen U.S. passport book or card will be placed into our Consular Lost or Stolen Passport System. This system is designed to prevent the misuse of your lost or stolen U.S. passport book or card. Anyone using the U.S. passport book or card that was reported lost or stolen may be detained upon entry into the United States. If you find the U.S. passport book or card that was reported lost or stolen, report it as found, and submit it for cancellation. It has been invalidated. You may not use that U.S. passport book or card for travel.

For more information about how to report a lost or stolen U.S. passport book or card, please call the National Passport Information Center (NPIC) at 1-877-487-2778 (TDD/TTY: 1-888-874-7793) or visit travel.state.gov/loststolen.

## WARNING

False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of the passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.

**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.**

### FEDERAL TAX LAW

Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C. 2714a(f) require you to provide your Social Security number (SSN), if you have one, when you apply for or renew a U.S. passport. If you have never been issued an SSN, enter zeros in item #5 on page 1 of this form. If you are residing abroad, you must also provide the name of the foreign country in which you are residing. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of Treasury. If you fail to provide the information, your application may be denied, and you are subject to a $500 penalty enforced by the Internal Revenue Service (IRS). All questions on this matter should be directed to the nearest IRS office.

Your Social Security number will be provided to the U.S. Department of Treasury, and may be used in connection with debt collection and checked against lists of persons ineligible or potentially ineligible to receive a U.S. passport, among other authorized uses.

### ACTS OR CONDITIONS

If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.

*I have not been convicted of a federal or state drug offense or convicted of a "sex tourism" crimes statute, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.*

### PRIVACY ACT STATEMENT

**AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.

**PURPOSE:** We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.

**ROUTINE USES:** This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. More information on the routine uses for the system can be found in System of Records Notices State-05, Overseas Citizens Services Records and Other Overseas Records and State-26, Passport Records.

**DISCLOSURE:** Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could also result in the refusal or denial of your application.

Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law section of the instructions to this form. Your Social Security number will be provided to the Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section.

### PAPERWORK REDUCTION ACT STATEMENT

Public reporting burden for this collection of information is estimated to average 40 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 1199, Sterling, Virginia, 20166-1199.

App. 731

U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT FOR ELIGIBLE INDIVIDUALS
**CORRECTION, NAME CHANGE TO PASSPORT ISSUED 1 YEAR AGO OR LESS, AND LIMITED PASSPORT REPLACEMENT**
*Use <u>black ink</u> only. If you make an error, complete a new form. Do not correct.*

OMB CONTROL NO. 1405-0160
EXPIRATION DATE: 11-30-2022
ESTIMATED BURDEN: 40 MIN

## Select document(s) for which you are applying:
☐ U.S. Passport Book    ☐ U.S. Passport Card    ☐ Both

The U.S. passport card is **not** valid for international air travel.  (See Instruction Page 3)

☐ Regular Book (Standard)    ☐ Large Book (Non-Standard)

The large book is for frequent travelers who need more visa pages.

☐ D    ☐ O    ☐ S    ☐ NFR

End. # _____    Exp. _____

**1. Name** Last

First

Middle

**2. Date of Birth** *(mm/dd/yyyy)*

**3. Sex**  M  F

**4. Place of Birth** *(City & State if in the U.S., or City & Country as it is presently known.)*

**5. Social Security Number**

**6. Email** *(See application status at passportstatus.state.gov)*

**7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** *(Street/RFD#, PO Box, or URB)*

**Address Line 2:** *(Include Apartment, Suite, etc. If applicant is a child, write "In Care Of" the parent. Example: In Care Of - Jane Doe, mother)*

City

State

Zip Code

Country *(if outside the United States)*

**9. List all other names you have used.** *(Example: Birth Name, Maiden, Previous Marriage, Legal Name Change.  Attach additional  pages if needed.)*

A.

B.

STAPLE    STAPLE

2" x 2"    FROM 1" TO 1 3/8"    2" x 2"

STAPLE    STAPLE

Attach a color photograph taken within the last six months

**10. U.S. Passport Information**

Your name as printed on your most recent U.S. passport book and/or passport card

Most recent U.S. passport book number

Book Issue Date *(mm/dd/yyyy)*

Most recent U.S. passport card number

Card Issue Date *(mm/dd/yyyy)*

## CONTINUE TO PAGE 2

### YOU MUST SIGN AND DATE THE APPLICATION IN THE DESIGNATED AREA BELOW

I declare under penalty of perjury all of the following: 1) I am a citizen or non-citizen national of the United States and have not, performed any of the acts listed under "Acts or Conditions" on page four of the instructions of this application (unless explanatory statement is attached); 2) the statements made on the application are true and correct; 3) I have not knowingly and willfully made false statements or included false documents in support of this application; 4) the photograph submitted with this application is a genuine, current photograph of me; and 5) I have read and understood the warning on page 4 of the instructions to the application form.

x _____
**Applicant's Legal Signature - age 16 and older**

x _____
**Mother/Father/Parent/Legal Guardian's Signature** *(if identifying minor)*

Date

### FOR ISSUING OFFICE ONLY

☐ Name Change  ☐ Replacement  ☐ Correction:  LName  FName  MName  DOB  Sex  POB  Other

From: _____

To: _____

BC    Nat/Citz Cert    Report of Birth    Prev PPT    MC    Adoption C/O    NC C/O    ACRQ    Other

Filed/Issued/Place: _____    Doc #:

☐ Other:

☐ Attached:

EF _____    Postage _____    Other _____

App. 732

DS 5504 C 11 2019 1

**Name of Applicant** *(Last, First & Middle)*

**Date of Birth** *(mm/dd/yyyy)*

| 11. Height | 12. Hair Color | 13. Eye Color | 14. Occupation *(if age 16 or older)* | 15. Employer or School *(if applicable)* |
|---|---|---|---|---|

**16. Additional Contact Phone Numbers**

☐ Home ☐ Cell
☐ Work _____

☐ Home ☐ Cell
☐ Work _____

**17. Permanent Address:** *(Complete if PO Box is listed in Mailing Address **or** if residence is different from Mailing Address.* ***Do not list a PO Box.****)*

Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**18. Your Emergency Contact** *(Provide the information of a person not traveling with you to be contacted in the event of an emergency.)*

Name

Address: Street/RFD # or PO Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship to Applicant

**19. Travel Plans** *(If no travel plans, please write "none")*

Departure Date *(mm/dd/yyyy)*

Return Date *(mm/dd/yyyy)*

Countries to be visited

## Please complete the following questions

**Has your name changed by marriage or court order <u>less than one year</u> after your U.S. passport book and/or card was issued?**

☐ Yes ☐ No

**If yes, <u>and</u> your submitted passport book and/or card is less than one year old**, please complete this section with your <u>new name</u>.

**Name** Last

First

Middle

Note: You must submit evidence documenting your name change (such as a certified marriage certificate or a certified court order) and your current U.S. passport book and/or card, along with this completed form to the address listed on instruction page 1.

If you cannot or did not meet the above criteria, please complete form DS-82, U.S. Passport Renewal Application for Eligible Individuals or form DS-11, Application for a U.S. Passport.

**Was your identifying information printed incorrectly in your U.S. passport book and/or card?**

☐ Yes ☐ No

**If yes, only check the box(es) next to the field(s) that need to be corrected** and complete the information as it should appear.

☐ **Name** Last

☐ First ☐ Middle

☐ **Date of Birth** *(mm/dd/yyyy)* ☐ **Sex** ☐ **Place of Birth** *(State or Country)*

☐ M
☐ F

Note: Please submit evidence documenting your correct identifying information (such as a certified marriage certificate or birth certificate) and your current U.S. passport book and/or card, along with this completed form to the address listed on instruction page 1.

**Was your most recent U.S. passport book limited for two years or less?**

☐ Yes ☐ No

If yes, please submit evidence of your U.S. citizenship (such as U.S. birth certificate or naturalization certificate) and/or evidence of your identity (such as a driver's license or state-issued ID card). Visit **travel.state.gov/sexmarker** for information on sex transition.

Note: To complete a limited U.S. passport book replacement, <u>**your submitted U.S. passport book must not be expired**</u>. Passport books limited in validity because of multiple losses, damages, or mutilations cannot be extended.

Please be sure to enclose your U.S. passport book along with this application to the address listed on instruction page 1.

DS 5504 C 11 2019 2

App. 733

# EXHIBIT

# Transgender Americans Challenge Trump's Passport Policy in Court

**The A.C.L.U. filed a lawsuit after the president's administration stopped issuing passports that reflect the gender identity of transgender and nonbinary people.**

 **By Ernesto Londoño**

Feb. 7, 2025

Seven transgender American citizens sued President Trump and the State Department in federal court on Friday, arguing that a new policy that prevents people from changing gender markers on passports violates their constitutional rights.

The new passport policy stems from an executive order titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," which was among the orders Mr. Trump signed on his first day back in office.

The order asserts that the government must end "gender ideology," which the president described as "an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa."

After reading President Trump's order, Zaya Perysian, a transgender woman in California, rushed to apply for a new passport last month, hoping she would receive one that included an "F" for female before the State Department rescinded longstanding policies allowing transgender people to update gender markers on their documents.

When the passport arrived in the mail, it identified her as a man.

"We didn't expect the federal government to turn on us so quickly and render us void, basically," said Ms. Perysian, 22, who is a plaintiff. "I am not a man and I will not accept being seen as a man while traveling."

Lawyers with the American Civil Liberties Union filed the lawsuit in federal court in Massachusetts, where several of the plaintiffs live. It adds to a torrent of legal challenges the Trump administration is facing on a host of initiatives, including efforts to end birthright citizenship and to drastically downsize the federal work force.

Harrison Fields, a White House spokesman, said on Friday evening that the administration was prepared to defend the passport policy in court.

"Radical Leftists can either choose to swim against the tide and reject the overwhelming will of the people, or they can get on board and work with President Trump to advance his wildly popular agenda," he said in an email.

The president's orders have sought to limit government recognition of an individual's gender to the sex listed on the original birth certificate, bar transgender soldiers from serving in the military and require the Bureau of Prisons to house female transgender prisoners in men's prisons. Mr. Trump also has called for the halting of any medical treatment to prisoners "for the purpose of conforming an inmate's appearance to that of the opposite sex."

The plaintiffs in the passports case argue that Mr. Trump's policy violates constitutional protections against sex discrimination and infringes on the rights to privacy and freedom of speech.

The State Department has not issued detailed guidance to the public on its new passport rules. But transgender rights groups said the department in recent weeks did away with an option to select gender-neutral markers on passport applications and began issuing new documents to transgender people with markers that reflect the sex listed on applicants' original birth certificates.

Tammy Bruce, a spokeswoman for the State Department, did not respond to an email seeking details of the new policy. Karoline Leavitt, the White House press secretary, told the news outlet NOTUS last month that the new policy would not be applied retroactively, but that any new passports would reflect a person's "God-given sex, which was decided at birth."

Sruti Swaminathan, who represents the plaintiffs, said the new policy exposes transgender people to the potential for harassment, suspicion by the authorities about fraudulent documents and even violence when they travel abroad.

"It's deterring people from even wanting to travel," said Mx. Swaminathan, who is nonbinary.

The change has broad implications beyond overseas travel, said Rodrigo Heng-Lehtinen, the executive director of Advocates for Trans Equality. In recent years, he said, passports have become vital documents transgender people use to apply for jobs, housing, loans and government benefits, particularly in states where it's difficult or impossible to include their gender identity on other forms of identification.

The newly issued passports effectively out transgender people against their will at a time when animus against them is widespread, he said.

"It puts a scarlet letter on someone just because of who they are," Mr. Heng-Lehtinen said.

Reid Solomon-Lane, 36, a transgender man from Massachusetts who transitioned in 2007, said that obtaining a passport that identified him as male felt empowering and enabled him to work as a flight attendant for nearly a decade without worrying about his safety.

"At this point in my life, having transitioned so long ago, my trans status is not something I think about every day," said Mr. Solomon-Lane, who is also a plaintiff in the suit. "To have something that challenges my identity so deeply, and to feel that you are losing your status as an American citizen simply because of being transgender, nonbinary or intersex, is terrifying."

Mr. Solomon-Lane, whose current passport will expire during this administration, said he would be too fearful to travel abroad with a document that identifies him as a woman.

"The thought of being separated from my children for questioning, or anything like that, just is not a risk that I'm willing to take," said Mr. Solomon-Lane, a flight coordinator for a pilot organization.

Ms. Perysian, who transitioned in 2020, said she experienced unwelcome and demeaning treatment while traveling domestically using documents that bore her former name and identified her as male.

"All of that stopped after my license was updated," said Ms. Perysian, a social media content creator who documented her gender transition on TikTok, where she has nearly five million followers.

The State Department's policy on passports and gender has grown more permissive since the agency issued its first directive on the subject in 1971.

Back then, passports did not feature a sex marker. But the State Department issued guidance authorizing requests for name changes that were "suggestive of a change of sex," according to a 2017 memo outlining the history of sex identifiers on passports the agency produced as part of a lawsuit.

The State Department began including sex markers on passports in 1977, a change government officials attributed to the rise of unisex fashion and hair styles.

"Gender-bending fashion made it harder for border officials to identify someone as male or female," said Craig Robertson, a professor of communication studies at Northeastern University who wrote a book about the history of the American passport. "I sometimes joke David Bowie caused M/F sex markers to be added to the passport."

In the early 1990s, the State Department issued new guidance allowing transgender people to obtain passports with an updated sex marker as long as they provided evidence that they had undergone surgery as part of their gender

App. 738

transition.

In 2010, then-Secretary of State Hillary Clinton rescinded the surgery requirement. The agency adopted a more lenient standard, asking only that transgender passport applicants produce a letter from a doctor asserting they had received "appropriate clinical treatment for gender transition."

In 2021, the State Department issued the first passport with a gender-neutral marker — an x — the result of a yearslong legal battle by Dana Zzyym, an intersex military veteran.

The next year, the Biden administration issued a new policy allowing passport applicants to select any gender marker. Gone was the requirement to provide medical records or a rationale.

Mr. Robertson said little would be lost if passports once again did not include sex markers.

"The State Department has always struggled to offer a compelling argument why a traveler's sex and gender is critical to identify them as a citizen, especially in an era of retina scans and biometrics," he said.

Seamus Hughes contributed research.

**Ernesto Londoño** is a Times reporter based in Minnesota, covering news in the Midwest and drug use and counternarcotics policy. More about Ernesto Londoño

A version of this article appears in print on , Section A, Page 17 of the New York edition with the headline: Trump Passport Policy Is Challenged in Court By Transgender People

# EXHIBIT T

## Michigan Journal of Gender & Law

Volume 19 | Issue 2

2013

# Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People

Lisa Mottet
*National Gay and Lesbian Task Force*

Follow this and additional works at: https://repository.law.umich.edu/mjgl

Part of the Law and Gender Commons, Legislation Commons, Sexuality and the Law Commons, and the State and Local Government Law Commons

## Recommended Citation

Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 Mɪᴄʜ. J. Gᴇɴᴅᴇʀ & L. 373 (2013).
Available at: https://repository.law.umich.edu/mjgl/vol19/iss2/4

This Article is brought to you for free and open access by the Journals at University of Michigan Law School Scholarship Repository. It has been accepted for inclusion in Michigan Journal of Gender & Law by an authorized editor of University of Michigan Law School Scholarship Repository. For more information, please contact mlaw.repository@umich.edu.

# MODERNIZING STATE VITAL STATISTICS STATUTES AND POLICIES TO ENSURE ACCURATE GENDER MARKERS ON BIRTH CERTIFICATES: A GOOD GOVERNMENT APPROACH TO RECOGNIZING THE LIVES OF TRANSGENDER PEOPLE

*Lisa Mottet\**

INTRODUCTION • 376

I.  UNDERSTANDING THE PROBLEM • 379

   A.  *A Brief Overview of the Legal Landscape with Regard to Correcting Gender on Birth Certificates* • 379

      1.  The Model State Vital Statistics Act (MSVSA) • 380

      2.  Current U.S. State Law and Policies Overview • 381

      3.  New Policy on Consular Reports of Birth Abroad and Passports • 383

      4.  The U.K. Approach: The Gender Recognition Act of 2004 • 384

      5.  Argentina's New Law • 385

\*  Transgender Civil Rights Project Director at the National Gay and Lesbian Task Force. I would like to thank the National Gay and Lesbian Task Force for establishing and continuing to fund my work at the Transgender Civil Rights Project since 2001. I would also like to thank Equal Justice Works for funding the first two years of the project through an Equal Justice Works Fellowship. Although this article represents scholarship conducted in large part outside of my role at the Task Force, I am indebted to the many law students and legal volunteers of the Task Force who helped with doing much of the background research, specifically Thomas Bousnakis, Alex Garnick, Ashland Johnson, and Yam Menon. I am incredibly appreciative to Donald Johnson who served as one of my research assistants for much of this project. I am also especially grateful to Vikram Swaruup who assisted with this article first as a legal fellow at the Task Force, and later by reviewing drafts and serving as one of my research assistants for this project. I am especially indebted to Professor Dean Spade who encouraged me to write; over the years, his work and thoughts have influenced mine, and while we do not always agree, he has been a visionary for change for the transgender and social justice movements. I am grateful to Professor Shawn Crincoli, Professor Julie Greenberg, Sarah Josephson, Anya Lakner, Dylan Orr, Harper Jean Tobin, and Janson Wu who reviewed drafts and provided insight into the best analysis to make and Donna Cartwright for editing. I am also grateful for the encouragement and support of my spouse, AJ Pearlman.

B.  *An Overview of Gender Transition and its Relation to Corrections on Birth Certificates* • 386

C.  *Data on the Ability to Correct Gender Markers on Birth Certificates* • 389

D.  *The Importance of an Accurate Birth Certificate* • 391
    1. Purpose of a Birth Certificate • 391
    2. Legal and Practical Implications of an Inaccurate Gender Designation • 391
        a. *Initial Gender Designation on Governmental Identity Documents and Those Governmental and Non-Governmental Documents Derived Therefrom* • 392
        b. *Discrimination in Employment* • 393
        c. *Police, Security Personnel, and Others that Inspect Identification During Daily Life and Travel* • 395
        d. *Marriage Recognition* • 396
        e. *Health and Health Insurance Records* • 397
        f. *Access to, and Treatment in, Sex-Segregated Facilities* • 398
        g. *College Admissions* • 398
        h. *International Adoption* • 399

II.  MODERNIZING THE LEGAL STANDARD FOR CORRECTING GENDER MARKERS • 399

A.  *Overview of Existing Legal Standards* • 400
    1. Standard from the MSVSA, State, and Local Jurisdictions • 400
    2. Modernized Laws and Policies • 402
        a. *Washington* • 402
        b. *Vermont* • 402
        c. *California* • 403
        d. *Standard from Consular Reports of Birth Abroad* • 404
        e. *Standard from the United Kingdom's Gender Recognition Act* • 404

B. *Issues to Consider When Modernizing the Legal Standard* • 405

1. A Surgical Requirement Contradicts Current Medical Understanding • 405

2. Surgery is Not Common and is Often Unattainable • 407

3. A Surgical Requirement is Inconsistent with Other Public Policies Related to Transgender People • 410

4. Reasons Given for a Surgical Requirement are Not Valid • 413

   a. *Fraud or Security* • 413

   b. *Permanence of the Correction* • 416

   c. *Concerns About Sex-Specific Facilities and Situations* • 417

5. Surgical Requirements Raise Serious Constitutional Concerns • 422

C. *Specific Recommendation for Legal Standard for Gender Correction* • 425

III. DEVELOPING AN ACCESSIBLE AND EFFICIENT PROCEDURE FOR GENDER MARKER CORRECTIONS • 427

A. *Existing Laws and Policies Related to Process* • 428

B. *Issues to Consider When Designing a Correction Process* • 431

1. Practical Concerns with the Court Order Process • 431

2. Privacy Concerns with the Court Order Process • 432

3. Concerns about Lack of Judicial Education and Bias Toward Surgery • 433

4. Constitutional Problems with a Court Order Process • 435

C. *Specific Recommendation for the Gender Correction Process* • 435

IV. ESTABLISHING COMPREHENSIVE PRIVACY PROTECTIONS • 437

A. *Existing Privacy Protections* • 437

1.  Privacy Protections in the
    MSVSA  •  437
    a.  *New Versus Amended
        Certificates*  •  437
    b.  *Treatment of Name Changes in the
        MSVSA*  •  439
    c.  *Records Storage and Accessibility in
        the MSVSA*  •  439
2.  State Laws and Policies Related to
    Privacy  •  440
3.  Privacy for Consular Reports of Birth
    Abroad  •  443
4.  Privacy Protections in the U.K. and
    Argentina  •  443
B.  *Issues to Consider When Developing Privacy
    Policies*  •  444
    1.  The Individual Importance of
        Privacy  •  444
    2.  Constitutional Right to
        Privacy  •  444
C.  *Specific Recommendations Related to Privacy
    Protections*  •  446
V.  RECOMMENDED LANGUAGE AND
    POLICY  •  447
A.  *The Model Provision*  •  447
B.  *Implementation*  •  450
CONCLUSION  •  451

### INTRODUCTION

Across the country, laws governing corrections to gender markers on birth certificates are relatively uniform, in large part because many states adopted the relevant provisions of the 1977 revision of the Model State Vital Statistics Act (MSVSA). The MSVSA, developed by the U.S. Department of Health and Human Services, guides states on the most efficient laws and procedures related to maintaining accurate birth, death, and other vital records at the state, local, and territorial level. At the time when the government promulgated the MSVSA provision related to gender corrections, it served as a forward-thinking model because it acknowledged that vital records should be corrected in the case of individuals who change their gender. Specifically, the 1977 MSVSA recommended that corrections to gender markers on birth certificates be granted after applicants change their

sex by "surgical procedure" and provide a court order to that effect.[1] Additionally, the MSVSA recommended that the correction be kept private.[2]

Over the past three decades, transgender legal rights have advanced and understanding of transgender medicine has evolved. Experts in transgender law and medicine entirely reject the idea that recognition of a person's gender should come only after surgery. This notion has also been significantly eroded in law and policy. Yet, with the exception of new laws and/or policies in three states,[3] birth certificate statutes and policies have yet to be modernized in this respect.

Other scholars have examined the harms to transgender people caused by medically out-of-date policies related to updating gender markers on identity documents and have suggested general frameworks for updating these policies.[4] This Article focuses more specifically on birth certificates by providing a detailed analysis of the rules governing a change in gender markers for all United States jurisdictions that issue them. It also presents policymakers with model statutory and policy language and is the first to resolve this issue within the framework of good government practices in addition to transgender rights.

This Article explains why and how state, local, and territorial birth certificate laws and regulations ought to be revised based on changes in law and medicine. In addition, the Article discusses public policy factors that governments should consider when modernizing their policies, including the cost of various policies and the policies' legal and practical effects on the lives of transgender people.

After providing important background information about gender transition and the state of the law in Section I, the Article discusses three aspects of birth certificate laws and policies. In Section II, it examines the standard of proof—the evidence a person must demonstrate to be eligible for the correction. In Section III, the Article considers the procedure by which the correction is authorized—primarily whether an individual must

---

1. MODEL STATE VITAL STATISTICS ACT AND REGULATIONS § 21(e) (Ctr. for Disease Control & Prevention 1992), *available at* http://www.cdc.gov/nchs/data/misc/mvsact92b.pdf.

2. *See infra* notes 245–48 and accompanying text.

3. The exceptions are California, Washington, and Vermont, each of which has updated statutes or policies in the last several years. *See infra* Part II. A. 2.

4. *See* Dean Spade, *Documenting Gender*, 59 HAST. L.J. 731 (2008); Harper Jean Tobin, *Against the Surgical Requirement for Change of Legal Sex*, 38 CASE W. RES. J. INT'L L. 393 (2005) [hereinafter Tobin, *Against the Surgical Requirement*]; Harper Jean Tobin, *Fair and Accurate Identification for Transgender People*, HARV. KENNEDY SCH. LGBTQ POL'Y J. (2011), *available at* http://isites.harvard.edu/icb/icb.do?key word=k78405&pageid-icb.page414493 [hereinafter Tobin, *Fair and Accurate Identification*].

obtain a court order or whether that individual can go directly to the vital statistics agency for the correction. In Section IV, the Article analyzes privacy protections, or their lack thereof, that exist in these policies.

In each of these sections, the Article documents the state of the law, presents issues to consider when designing a new policy, including constitutional considerations, and provides detailed recommendations for a modernized statute. The Article reviews the relevant MSVSA provisions, provides an overview of birth certificate laws in the fifty-seven state, local, and territorial jurisdictions[5] that administer birth certificates, and examines in greater detail the laws of states which have policies that might serve as models. Where relevant, the Article also describes the 2010 policy regarding federal birth certificate equivalents (known as "Consular Reports of Birth Abroad") for U.S. citizens born outside of the country, as well as the approaches taken by the United Kingdom and Argentina.

Ultimately, in Section V, the Article delineates a model statute for the 21st century, recommending statutory language to be used by state, local, and territorial legislatures, vital statistics agencies, and the U.S. Department of Health and Human Services in future revisions of the MSVSA.[6] Adoption of the language presented here will ensure implementation of a vital statistics system that meets four goals: (1) issuance of accurate birth certificates in accordance with contemporary medical standards, (2) efficient use of government resources, 3) respect for constitutional rights, and (4) proper consideration of both the human and legal effect of an accurate birth certifi-

---

5. The fifty-seven jurisdictions are the fifty states, Guam, Puerto Rico, United States Virgin Islands, American Samoa, Commonwealth of the Northern Mariana Islands, New York City, and the District of Columbia. *See infra* app. A.

6. The U.S. Department of Health and Human Services is currently revising the Model State Vital Statistics Act. *See* Ctrs. For Disease Control & Prevention, *2011 – Model Law Revision*, http://www.cdc.gov/nchs/nvss/model_law_revision.htm (last updated Nov. 10, 2009). I am indebted to my colleagues Mara Keisling and Harper Jean Tobin of the National Center for Transgender Equality, Masen Davis and Kristina Wertz of the Transgender Law Center, Dean Spade of the Sylvia Rivera Law Project, Dru Levasseur of Lambda Legal, Shannon Minter of the National Center for Lesbian Rights, and Jennifer Levi and Janson Wu of the Gay & Lesbian Advocates & Defenders with whom I have discussed and debated extensively the best legislation and policy in this arena. My recommendations are sharper because of their insight. Furthermore, our organizations were, in 2009, able to make a collective recommendation to the Model State Vital Statistics Working Group of the National Center for Health Statistics of the U.S. Department of Health and Human Services, as it considers revisions to the MSVSA. *See* Harper Jean Tobin, Nat'l Ctr. Transgender Equality, Comments of Legal and Public Policy Organizations on Corrected Birth Certificates for Transgender People (Sept. 8, 2009) (on file with author). The recommended legislation in this Article deviates from that collective recommendation in some important respects and should not be taken as the recommendation of my colleagues.

cate. In certain states, this recommended statutory language could be adopted as regulations or written policy to the same positive effect.

While the changes discussed in this Article to vital statistics laws and policies can seem technical in nature, the effect of not having government documentation that matches one's gender identity is tremendous. Although for many, lack of accurate documentation may trigger smaller problems caused by undesired disclosure of their transgender status, for others, the lack of government documentation can have dire effects. Policies that provide transgender people with identity documents that match their gender identity give them a better chance to live life in their gender, and avoid bias, discrimination, and violence in the areas most critical to quality of life, such as employment, housing, and education.

Finally, there is another benefit—to governments and to transgender people—that may result from modernizing birth certificate statutes and policies. Currently, courts struggle to determine the appropriate assessment of legal gender, and often settle on finding physical attributes or presumed genetic traits of the body to be determinative.[7] Transgender rights litigators, aware that relying upon bodily attributes to define legal gender leaves a large majority of transgender people without recognition, often with disastrous consequences, instead point to gender identity—a person's innate sense of themselves as male or female—as the relevant legal determinant.[8] If birth certificate laws and policies were reformed in the manner described in this Article, both courts and litigators could find a mutually satisfactory path forward. Courts would be able to defer to a person's official gender marker on his or her birth certificate, and transgender rights litigators would be satisfied because the ability to change the gender marker on one's certificate would be accessible to all transgender people who undergo gender transition.

### I. UNDERSTANDING THE PROBLEM

#### A. A Brief Overview of the Legal Landscape with Regard to Correcting Gender on Birth Certificates

For decades, various government agencies have recognized that those who transition gender should be able to correct the gender on their identity documents. The following section provides an overview of the legal and

---

7. *See, e.g., In re* Estate of Gardiner, 42 P.3d 120 (Kan. 2002); Littleton v. Prange, 9 S.W.3d 223 (Tex. Ct. App. 1999); Kantaras v. Kantaras, 884 So. 2d 155 (Fla. Dist. Ct. App. 2004).

8. Interview with Dru Levasseur, Transgender Rights Attorney, Lambda Legal in New York, N.Y. (October 12, 2012).

policy approaches taken in the United States related to correcting gender
markers, as well as information about the approaches taken in the United
Kingdom and Argentina for comparison.

### 1. The Model State Vital Statistics Act (MSVSA)

The first Model State Vital Statistics Act[9] was issued in 1907 by the
United States Census Bureau.[10] The stated purpose of having an MSVSA is
to "promote uniformity among States in definitions, registration practices,
disclosure and issuance procedures, and in many other functions that com-
prise a State system of vital statistics."[11]

Since its inception, the MSVSA has been updated only five times,
with the most recent version being released in 1992. The 1977 version of
the MSVSA was the first to address corrections to gender markers. The
1992 revision did not alter the language regarding gender markers; thus,
today, the MSVSA reflects the best thinking of 1977 on gender corrections.
It is quite remarkable that the MSVSA included language regarding these
corrections in 1977, as transgender people had only been in national public
consciousness beginning in the 1950s.[12]

The MSVSA is currently under review for additional revisions, a
multi-year process that started in 2009 and was expected to conclude in
2011, although it has not yet been completed.[13] Organizations engaging in

---

9. Although I abbreviate the Model State Vital Statistics Act as MSVSA, the U.S. De-
partment of Health and Human Services refers to it as the "Model Law" or "Model
Law and Regulations." *See* MODEL STATE VITAL STATISTICS ACT AND REGULA-
TIONS (1992), *available at* http://www.cdc.gov/nchs/data/misc/mvsact92b.pdf. Be-
cause this Article sets out its own model law, I use the MSVSA abbreviation to avoid
confusion for the reader.

10. The 1942 version was also drafted by the Census Bureau. NAT'L CTR. FOR HEALTH
STATISTICS, U.S. DEP'T OF HEALTH & HUMAN SERVS., U.S. VITAL STATISTICS
SYSTEM: MAJOR ACTIVITIES AND DEVELOPMENTS, 1950–95 5 (1997), *available at*
http://www.cdc.gov/nchs/data/misc/usvss.pdf. In 1946, the responsibility for the
MSVSA was transferred to the U.S. Department of Health, Education and Welfare,
which issued the 1959 version. *Id.* at 6. The Department of Health, Education and
Welfare was split, and became the Department of Health and Human Services
(HHS) and Department of Education. HHS now issues the MSVSA.

11. CTR. FOR DISEASE CONTROL & PREVENTION, *Preface* to MODEL STATE VITAL STA-
TISTICS ACT AND REGULATIONS (1992).

12. In the early 1950s, Christine Jorgensen's gender transition was well-documented by
national media. *See Medicine: The Case of Christine*, TIME, Apr. 20, 1953, http://
www.time.com/time/magazine/article/0,9171,822780,00.html.

13. Cathy Molchan Donald, Karen Hampton & Linette Scott, Model Law Work Group
Progress Report at The Joint Annual Conference of National Association for Public
Health Statistics and Information Systems and the National Center for Health Statis-
tics (June 7, 2010) (PowerPoint presentation available at http://www.naphsis.org/
mtg/Pages/2010AnnualMeetingPowerPointPresentationLibrary.aspx).

advocacy for the lesbian, gay, bisexual, and transgender (LGBT) communities have submitted recommendations to the Department of Health and Human Services on this issue, but it is not yet clear to what extent these will be adopted.[14]

### 2. Current U.S. State Law and Policies Overview

In addition to the fifty states, birth certificates are issued by the District of Columbia, New York City, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the United States Virgin Islands.

Twenty-nine of these fifty-seven jurisdictions[15] explicitly allow for gender corrections on birth certificates in their statutory codes, potentially with accompanying policies or regulations to implement the statute. Nine more jurisdictions[16] deal with gender corrections only in their regulations while two have written, sub-regulatory policies.[17] Ten operate without a written policy, or at least not one available to the public, but will correct the birth certificate upon court order or doctor's affidavit, generally using the same procedure for other corrections.[18]

In total, forty-six states, the District of Columbia, New York City, Guam, and Northern Mariana Islands clearly allow people to correct their gender marker.[19] Oklahoma, Texas, and American Samoa do not have clear policies on whether or not changes are actually allowed. Tennessee has the only explicit statutory ban on correcting gender markers;[20] for various reasons, Idaho, Ohio, and Puerto Rico also do not allow individuals to correct gender. Ohio does not correct gender markers as a result of a trial court decision that interpreted its ambiguous statute regarding birth certificate

---

14. Tobin, *supra* note 6.

15. The twenty-nine jurisdictions are Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Illinois, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nebraska, New Jersey, New Hampshire, New Mexico, North Carolina, Oregon, Utah, Vermont, Virginia, Wisconsin, the District of Columbia, Guam, and the Commonwealth of Northern Mariana Islands. For citations to the relevant laws in these jurisdictions, *see infra* app. A.

16. These are Delaware, Kansas, Maine, Mississippi, Montana, North Dakota, Nevada, Wyoming, and New York City. *See infra* app. A.

17. These are New York State and Washington. *See infra* app. A.

18. These are Alaska, Florida, Indiana, Minnesota, Pennsylvania, Rhode Island, South Carolina, South Dakota, West Virginia, and United States Virgin Islands. *See infra* app. A.

19. *See infra* app. A for a comprehensive listing of these statutes and regulations.

20. "The sex of an individual will not be changed on the original certificate of birth as a result of sex change surgery." TENN. CODE. ANN. § 68-3-203(d) (West 1997).

amendments to disallow gender marker corrections.[21] Idaho's state vital statistics agency does not interpret its general authority to make corrections on certificates to include the authority to make corrections for gender markers.[22] Puerto Rico does not make corrections based on a 2005 Puerto Rico Supreme Court decision.[23]

Of the fifty-three jurisdictions that allow gender marker changes to birth certificates, twenty-five require a court order,[24] twenty-one utilize an administrative process,[25] and a handful allow either process[26] or have unclear procedures.[27] Most jurisdictions do not have clear policies carefully guarding the privacy of people who have corrected their gender. The poli-

---

21. *In re* Ladrach, 513 N.E.2d 828 (Ohio Prob. Ct. 1987) (finding the statute only authorized corrections if there was an error at the time of birth, thus only permitting a probate court to correct a fact that was inaccurate at the time of birth in the court's view). However, since the case was decided, the statute related to corrections (now also called amendments) has changed. The current provision is now titled "Amended records" (changed from "[c]orrection of birth record") and refers to corrections and amendments, whereas the old statute referred only to facts that have "not been properly and accurately recorded." *Compare* OHIO REV. CODE ANN. § 3705.20 (Lexis-Nexis 1980) *with* OHIO REV. CODE ANN. § 3705.22 (West 2011). Therefore, there is a textual argument that the new text is not as limiting, and that the measure of accurateness could be taken as a contemporary measure, as opposed to one connected to a person's time of birth.

22. The Idaho statute provides that "alterations" may be made to birth records in accordance with the statute or rules promulgated by the State Board of Health and Welfare. *See* IDAHO CODE ANN. § 39-250 (West 2010). Lambda Legal indicates that there is anecdotal evidence that the agency does not allow gender changes on birth certificates. *Sources of Authority to Amend Sex Designation on Birth Certificates*, LAMBDA LEGAL, http://www.lambdalegal.org/publications/sources-of-authority-to-amend (last updated Oct. 3, 2012). Idaho's statute also notes that an amendment denied by the Registrar may be appealed to a court of law. *See* IDAHO CODE ANN. § 39-250(5) (West 2010). However, there is no published case law of a person attempting to appeal a denial to a court; thus, there could be an opening for an individual to achieve gender change through a court appeal.

23. *Ex Parte* Alexis Delgado Hernandez, 2005 TSPR 95 (P.R. 2005) (holding that a transgender person may not correct the gender on one's birth certificate).

24. The twenty-five jurisdictions that require a court order are Alabama, Alaska, Arkansas, California, Colorado, Delaware, Georgia, Indiana, Louisiana, Maryland, Missouri, Mississippi, Montana, New Hampshire, Nevada, Oregon, South Dakota, Utah, the Virgin Islands, Virginia, Vermont, Wisconsin, Wyoming, the District of Columbia, and the Northern Mariana Islands. *See infra* app. A.

25. The twenty-one jurisdictions that do not require a court order are Arizona, Connecticut, Florida, Hawaii, Iowa, Illinois, Kansas, Kentucky, Massachusetts, Maine, Michigan, Nebraska, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, Washington, New York City, and Guam. *See infra* app. A.

26. Minnesota, Pennsylvania, and West Virginia allow individuals to use either a court order or an administrative process. *See infra* app. A.

27. Four jurisdictions have unclear procedures: Oklahoma, South Carolina, Texas, and American Samoa. *See infra* app. A.

cies of all fifty-seven U.S. jurisdictions that administer birth certificates are summarized in a chart in Appendix A.

### 3. New Policy on Consular Reports of Birth Abroad and Passports

The U.S. Department of State, in June of 2010, updated its policy with regard to Consular Reports of Birth Abroad of U.S. Citizens (CRBAs) and passports.[28] CRBAs are provided to U.S. citizens who were born outside the U.S., where the fifty-seven birth certificate issuing agencies do not have jurisdiction. CRBAs are functionally equivalent to birth certificates for those born in the United States; they prove citizenship, identity, and other information about the person's circumstances of birth.

Since at least 1992, the Department of State has required proof of "sex reassignment surgery" to correct gender on passports, and the same policy was presumably applied to CRBAs.[29] In an effort to modernize its policy in accord with medical standards, the Department of State adopted a new policy simply requiring that an applicant's treating or evaluating physician write a letter certifying that a person "has had appropriate clinical treatment for gender transition to the new gender."[30]

---

28. *New Policy on Gender Change in Passports Announced*, U.S. Dep't of State (June 9, 2010), http://www.state.gov/r/pa/prs/ps/2010/06/142922.htm. There were slight, but important, changes to the policy in January 2011. *VICTORY: State Department Makes Additional Changes*, Advancing Transgender Equality (Jan. 28, 2011, 6:58 PM), http://transgenderequality.wordpress.com/2011/01/28/victory-state-department-makes-additional-changes.

29. The 1992 State Department policy regarding passports required "sex reassignment surgery" to permanently change the gender marker on one's passport and on its face did not deal with CRBAs. U.S. Dep't of State, Passport Bulletin 92-22 (1992). However, in the new policy for passports, the Foreign Affairs Manual explains that: "The . . . Consular Report of Birth Abroad of Citizen of the United States of America, can be amended by the Vital Records Section of Passport Services . . . to reflect the change in gender. The same documentary requirements specified above for passport services would pertain to amending gender in a [CRBA]." U.S. Dep't of State, 7 Foreign Affairs Manual 1340 app. M (2012), *available at* http://www.state.gov/documents/organization/143160.pdf. I have not located an old policy that specifically applies to CRBAs. It is also possible that: (1) gender corrections on CRBAs were denied entirely, (2) gender corrections were processed under an old policy that is not publicly available, or (3) gender corrections were processed utilizing no written policy and therefore were not standardized. Regardless, because the Passport Vital Records section processes the corrections, the standard of proof for CRBAs was likely the same as that for passports.

30. U.S. Dep't of State, 7 Foreign Affairs Manual 1320 app. M(b)(1)(g) (2012), *available at* http://www.state.gov/documents/organization/143160.pdf.

### 4. The U.K. Approach: The Gender Recognition Act of 2004

The United Kingdom enacted a groundbreaking statute in 2004 when it passed the Gender Recognition Act. This statute is understood as the first national statute to recognize the gender of transgender people who transition without surgical procedures. Other countries have considered or adopted similar approaches, some being more or less restrictive.[31]

The Gender Recognition Act, passed in response to the 2002 decision in *Goodwin v. United Kingdom*, required the government to develop a system to recognize the post-transition gender of transgender people, finding that failure to provide such recognition was a human rights violation.[32]

The Gender Recognition Act does not require any specific medical treatment; however, it requires: (1) a diagnosis of Gender Dysphoria,[33] (2)

---

31. The United Kingdom law is included here because it is the basis for many of the other laws, and full texts of other laws, other than Argentina's, are not available in English. In 2007, Spain passed a law similar to the Gender Recognition Act, although hormonal treatment is required unless advanced age or medical concerns exist. Marc-Roger Lloveras Ferrer, *A Spanish Law for Transsexual Citizens*, INDRET (2008), http://ssrn.com/abstract=1371559. In 2009, Uruguay passed a law that allows gender amendments after a showing the person has gender dysphoria, with no medical treatment required, but the diagnosis has to be persistent and stable for two years, and amendments are only available to those over eighteen. Derecho A La Identidad De Género Y Al Cambio De Nombre Y Sexo En Documentos Identificatorios (Parliament Law No. 18, 620/2009) (Uruguay), *available at* http://www0.parla mento.gub.uy/leyes/AccesoTextoLey.asp?Ley=18620&Anchor=. In 2011, Portugal enacted a law, considered less restrictive than both the United Kingdom and Spanish laws, which replaced its law requiring a court order and sex reassignment surgery. The Portuguese law requires a report from medical professionals to be submitted to the Civil Registry, one being a psychiatrist and the other a psychologist, with no reported apparent time or age requirement. Cria o procedimento de mudança de sexo e de nome próprio no registo civil e procede à décima étima alteração ao Código do Registo Civil (No. 7/2011) (Portugal), *available at* http://dre.pt/pdf1sdip/2011/03/05200/0145001451.pdf.

32. Goodwin v. United Kingdom, VI Eur. Ct. H.R. (2002).

33. "*Gender dysphoria* refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)." WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, STANDARDS OF CARE 5 (7th ed. 2011). Currently, the Diagnostic and Statistical Manual, published by the American Psychiatric Association, uses the slightly different diagnostic term, "Gender Identity Disorder," and the International Classification of Diseases uses the diagnostic term "transsexualism." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL 576 (4th ed., 2000); *see also* WORLD HEALTH ORG., INTERNATIONAL CLASSIFICATION OF DISEASES (10th ed. 2010), http://apps.who.int/classifications/icd10/browse/2010/en#/F64. The next version of the DSM, to be officially released in 2013, will use "Gender Dysphoria." *See* Rosie Mestel, *Changes to the Psychiatrists' Bible, DSM: Some Reactions*, L.A. TIMES, December 9, 2012, http://www.latimes.

that people live in their "acquired gender" for at least two years and intend to do so until death, and (3) documentation from two medical professionals.[34] Upon submitting satisfying evidence to the Gender Recognition Panel,[35] people receive a Gender Recognition Certificate, a new entry in the birth registry,[36] and general recognition that they are the new gender as a legal matter.[37] The law requires that information about the gender correction is kept confidential throughout the process.

### 5. Argentina's New Law

In May of 2012, Argentina became the first country to allow transgender people to update the gender marker on their birth certificates with no requirement for them to show any medical condition or supervision.[38] People over eighteen have the right to update gender markers and first

---

com/health/boostershots/la-heb-dsm5-american-psychiatric-association-20121207,0, 1392058.story. Despite the different terminology, these are roughly equivalent diagnoses. All of the diagnoses are controversial. *See, e.g.*, Kate Richmond & Kate Sheese, *Gender Interrupted: Controversy & Concerns about Gender Identity Disorder (GID)*, ASS'N FOR WOMEN IN PSYCHOLOGY, http://www.awpsych.org/index.php?option= com_content&view=article&id=96&catid=74&Itemid=126 (last visited Dec. 25, 2011).

34. Gender Recognition Act 2004, c. 7 § 2 (U.K).

35. *Id.* at c. 7 § 1 (U.K).

36. *Id.* at c. 7 § 10 sch. 3 (U.K).

37. Generally, having a Gender Recognition Certificate entitles the holder to be legally recognized as that gender for the majority of purposes. *Id.* at c. 7 §§ 9–21 (U.K). Exceptions include: religious officials do not need to perform marriages involving a holder of a Gender Recognition Certificate, sports organizations are exempt from recognizing the gender if it would affect "fair competition" or the "safety of competitors," and, for crimes where gender is a relevant factor, the acquired gender will not be recognized. *Id.* at c. 7 § 11 sch. 4, c. 7 §§ 19–20 (U.K). One very controversial part of the law is the provision of only Interim Recognition Certificates to transgender people who are married at the time of application. *Id.* at c. 7 § 4 (U.K). The individual must either divorce or get an annulment in order to receive a full Gender Recognition Certificate. *Id.* Couples in this situation who desire to stay in a legally-recognized relationship must then receive a "Civil Partnership" which provides some, but not all, the rights and responsibilities of marriage to same-sex couples in the U.K. Civil Partnership Act 2004, ch. 33 (U.K). This has been criticized by Press for Change, the U.K.'s transgender advocacy group, as requiring individuals to choose between "their marriage and another human right." Camillo Fracassini, *Sex-Change Couple Seek Marriage Recognition*, THE SUNDAY TIMES, Oct. 30, 2005, http://www.timesonline.co.uk/tol/news/uk/scotland/article584590.ece.

38. The new law, Regime for Recognition and Respect for Gender Identity, also granted updated national identity cards as well as a right to medical treatment under all health care systems and plans in the country. Law No. 26.743, May 23, 2012, 32.404 B.O. 1, 2 (Arg.), *available at* http://www1.hcdn.gov.ar/proyxml/expediente.asp?fundamentos=si&numexp=8126-D-2010. An English translation is available at http://www.msrngf.org/files/msmgf//Advocacy/Argentina_GenderIdentity_Law.pdf.

names upon request. Those under eighteen must also have their legal representative (which will likely be their parent) or a judge agree to the correction. The law is explicit that no surgical, hormonal, or psychological treatment of any kind can be required.[39] The birth certificate and information about the corrections are kept confidential and are accessible only by court order.

Although this law is relatively new and has not yet been emulated by other countries, the explicit shift from any proof of gender identity, other than the person's statement, is enlightening and encouraging.[40]

### B. An Overview of Gender Transition and its Relation to Corrections on Birth Certificates

A short review of terminology related to transgender people and gender transition is helpful before going any further.

*Transgender* is used generally as a broad term to refer to all of those whose gender identity[41] or expression[42] does not match the social attributes of the gender that they were assigned at birth.[43] While the term "transgender" is used appropriately to refer to a range of people, including transsexuals, cross-dressers, genderqueers, the androgynous, and many other identities, this Article only addresses one specific type of transgender per-

---

39. *Id.* at Art. 4.

40. While Argentina's new law should be considered for the basis of the recommendations made in this Article, I have chosen to factor in the political landscape of this country in shaping the more conservative recommendations found herein.

41. *Gender identity* is used to mean an individual's internal sense of being male, female, or another gender.

42. *Gender expression* is used to mean how individuals outwardly indicate their gender identity to others, often through behavior, clothing, hairstyle, voice or body characteristics.

43. National Center for Transgender Equality, *Transgender Terminology* (May 2009), http://transequality.org/Resources/NCTE_TransTerminology.pdf.

son—those who undergo gender transition to live their life as a gender different from their sex[44] assigned at birth.[45]

*Gender transition* is the process of beginning to live and outwardly express a gender different from one's assigned gender at birth.[46] Gender transition is not undertaken casually, as it is often accompanied by a wide range of negative social consequences, including rejection by friends or family, losing one's job, or even being physically attacked. Gender transition is

---

44. Throughout this article, the terms *sex* and *gender* are used interchangeably, with a tendency for *sex* to be used in contexts where a statute uses that term, and "gender" to be used otherwise. Some believe that the two terms have different meanings and should be used accordingly. *What Do We Mean by "Sex" and "Gender"?*, WORLD HEALTH ORGANIZATION, http://www.who.int/gender/whatisgender/en/ (last visited Dec. 25, 2011). In that conception, *sex* refers to one's biological status and *gender* refers to the social identity and expression of being male and/or female. *Id.* However, the Supreme Court uses both terms in its jurisprudence relating to women's constitutional rights and Congress also has used both *sex* and *gender* in different civil rights statutes, while not intending a different meaning. *See* Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (collapsing the distinction between biological status and social expectations for the purposes of Title VII analysis); Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000) (using the framework of *sex* under Title VII to *gender* under the Gender Motivated Violence Act). This Article uses the terms interchangeably because interpreting them in a legal context to mean separate things would lead to absurd results. Furthermore, the conception of sex being biologically based tends to imply, incorrectly, that the biology of sex is clear cut and easy to measure, when in fact, much more diversity exists. *See* Erwin K. Koranyi, *Transsexuality Revisited,* 16 AUSTRL. J. OF FORENSIC SCI. 34, 37 (1983) *available at* http://www.tandfonline.com/doi/abs/10.1080/00450618309410678 ("Sex of a person—a simple 'yes' or 'no' before—was broken down by Science to chromosomal sex, nuclear sex, hormonal sex, gonadal sex, and gender sex- to the dismay of courts, finding scientists in argument over as 'simple' a question as whether the subject is male or female.").

45. This subset of the transgender community are sometimes called *transsexuals* to distinguish them from others covered by the broad term *transgender*. However, many transsexual people, as well as advocates for equality, disfavor the term *transsexual* as overly medical, scientific, and technical, or because the word's integration of the term *sex* could be taken to sexualize the person. In addition, *transsexual* is often used by those who oppose equal rights as an inflammatory and disrespectful term. *See, e.g., 'Speechless' awaits March premiere,* AM. FAMILY ASS'N J., Feb. 2008, http://www.afajournal.org/0208afa_insp.asp (referring to homosexuals and transsexuals with regard to federal legislation); *Transgendered Confu-; Homosexual movement takes U.S. into bizarre world,* AM. FAMILY ASS'N, Oct. 2000, http://www.afajournal.org/2000/102000AFAJ.pdf (using the term transsexual repeatedly to refer to transgender people). This phenomenon is similar to how many gay and lesbian people prefer these identity terms over the more scientific and sexualizing term "homosexual." GLAAD, MEDIA REFERENCE GUIDE 6, 8 (8th ed. 2010) (noting that many transgender people prefer "transgender" to "transsexual"). In respect for the generally favored terminology preferences of the community, this article uses the term "transgender" throughout, unless describing case law that uses other terminology.

46. Gender transition may happen, or appear to happen, over a short period of time or a long period of time, depending on the individual.

often mistaken as referring only to the process of altering one's hormonal makeup and other bodily characteristics to match one's gender identity. However, gender transition actually refers primarily to the *social process* of transition, and includes the process of changing one's name (if needed or desired), updating identity documents and records (if able to do so), in addition to taking medical steps, depending on the individual.

The medical processes, for those who undergo them, are incredibly important. The American Medical Association has recognized that treatment is effective and medically necessary and has recommended that public and private health insurance systems cover care related to gender transition.[47] According to the expert medical consensus,[48] treatment can consist of four therapeutic options: 1) changes in gender expression or role, 2) hormone therapy, 3) various surgeries,[49] and 4) psychotherapy.[50] Whether a person should undergo all four or just one of the options is determined based on the needs of the individual. It is important to realize that those who undergo only changes in their gender expression or role (the first option) are still considered to have made a *medical* transition.[51]

Name and gender are the two pieces of information that transgender people typically seek to correct on their birth certificates. Although the process and accessibility of *name* changes are not going to be addressed by this Article,[52] the Article will address the privacy concerns regarding name

---

47. AM. MED. ASS'N HOUSE OF DELEGATES, RESOLUTION 122 (2008).

48. *See* WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, *supra* note 33; *infra* Section II.B.1.

49. Despite the popular conception of one surgery that completely transforms a person's gender, in reality, there are many different surgical options. For example, breast or chest surgery, metoidioplasty, phalloplasty, penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty, hysterectomy/ovariectomy, facial feminization surgery, voice surgery, thyroid cartilage reduction, vaginectomy, scrotoplasty, and implantation of erection and/or testicular prostheses are some of the primary surgical options, although others exist. *See* WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, *supra* note 33, at 57–58, 62–64.

50. Psychotherapy may be important for: "exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience." *Id.* at 10.

51. The medical seriousness of changing gender role is apparent throughout the WPATH Standards of Care. For example, changes in gender role are supposed to be recorded in a person's medical chart and changes in gender role are required for 12 months before genital surgeries. *Id.* at 61.

52. To receive a name change, one typically has to receive a court order and go through a publication process, although sometimes courts allow the publication requirement to be waived due to privacy concerns. *See, e.g.*, TRANSGENDER LAW CENTER, ID PLEASE. . . 9–22, 31–32 (2010) *available at* http://transgenderlawcenter.org/issues/id/id-please.

changes related to gender transition. Importantly, not all transgender people choose to change their names. Some may have a gender-neutral name and keep it, or may initially keep it and decide to change it later. Others may choose to keep what others consider a gender-specific[53] name for personal reasons, despite the fact that it does not "match" their gender identity. Regardless, not all transgender people change their name and name changes will not necessarily occur before or simultaneously with the request to correct their gender marker.

## C. Data on the Ability to Correct Gender Markers on Birth Certificates

In order to understand the impact of birth certificate laws and policies, newly available data describing the ability of transgender people to correct gender on their birth certificates in the United States should be examined. Specifically, reporting on only those individuals who are already living full-time as a gender different from the gender that they were assigned at birth, the National Transgender Discrimination Survey[54] found:

- 24% were able to correct the gender marker on their birth certificates;
- 18% were denied the correction, and;
- 53% had not attempted to correct their birth certificate.[55]

Many of the 53% who did not attempt to correct their birth certificates likely chose not to try because they knew they would not meet the requirements of the established policies; for example, they may not have had a required surgery. The data appear to confirm this, with higher rates of attempting to change one's gender marker among those who have had surgery:

---

53. Gender associations of first names are somewhat arbitrary and have a tendency to change over time. *See, e.g.,* Stanley Lieberson, Susan Dumais & Shyon Baumann, *The Instability of Androgynous Names: The Symbolic Maintenance of Gender Boundaries,* 105 AM. J. SOC. 1249 (2000) (describing 80 years of naming practices in Ohio and noting how names changed with regard to being considered feminine or masculine).

54. The National Transgender Discrimination Survey, conducted in 2008–09 both in paper and online, had 6,456 respondents from all fifty states, D.C., the U.S. Virgin Islands, Puerto Rico, and Guam. For a detailed description of the methodology, see JAIME M. GRANT ET. AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 12–15 (2011).

55. *Id.* at 143. Five percent of the respondents selected "not applicable" in response to the birth certificate question. These individuals likely either "did not have a birth certificate or they did not desire to change it." *Id.*

| Description of Respondents[56] | % Who Attempted to Correct Birth Certificate[57] |
|---|---|
| Transgender Women with Some Type of Surgery | 65% |
| Transgender Men with Some Type of Surgery | 56% |
| Transgender Women with No Surgery | 28% |
| Transgender Men with No Surgery | 12% |

In addition, those who have had some type of surgery were more than six times as likely to have been able to correct their gender marker than those who have not had any surgery (39% compared to 6%).[58] Yet, notably, even surgery does not guarantee the approval of a gender marker correction. Twenty percent (20%) of people who had some surgery were still denied the correction.[59] Some courts and state agencies also appear to consider the *type* of surgery undergone, summarized in the following chart.[60]

| Description of Respondent | % Who Received a Corrected Birth Certificate |
|---|---|
| Transgender Women with Any Surgery | 43% |
| Transgender Women with Breast Surgery | 32% |
| Transgender Women with Orchiectomy[61] or Vaginoplasty[62] | 74% |
| Transgender Men with Any Surgery | 37% |
| Transgender Men with Chest Surgery | 56% |
| Transgender Men with Metoidioplasty[63] | 82% |
| Transgender Men with Phalloplasty[64] | 78%[65] |

---

56. Transgender woman refers to a person who was assigned male at birth and now lives as a woman. Transgender man refers to a person who was assigned female at birth and now lives as a man.

57. GRANT ET AL., *supra* note 54, at 143–44.

58. *Id.* at 144.

59. *Id.*

60. *Id.* at 143–44.

61. Orchiectomy refers to the "surgical removal of the testes (the scrotum and testicles)." *Id.* at 181.

62. Vaginoplasty refers to the "surgical creation of a vagina." *Id.*

63. Metoidioplasty is a "surgical procedure to create a neopenis by releasing and extending the clitoris, often combined with surgery to allow for urination through the penis." *Id.* at 181.

64. Phalloplasty refers to the "surgical creation of a penis." *Id.* at 181.

65. Note that the different rates of ability to change their birth certificates between metoidioplasty (82%) and phalloplasty (78%) may not be meaningful because of the

These data show that courts and agencies are looking at the specific types of surgeries[66] individuals undergo and are making the determination that many do not meet the standard in their current law or policy to receive a gender marker correction.

### D. The Importance of an Accurate Birth Certificate

#### 1. Purpose of a Birth Certificate

According to the Office of Inspector General at the Department of Health and Human Services, birth certificates provide "vital information about the person whose name appears on the certificate (e.g., legal proof of parentage, citizenship, date, place, and time of birth)."[67] While originally intended as a record of the existence and circumstances of birth, the birth certificate is now used widely in determining eligibility for employment, obtaining other documents (e.g., driver's licenses, Social Security cards, passports, and other state identification documents), establishing school records, proving age, and enrolling in government programs.[68] Thus, the birth certificate is currently used as an identity document[69] and has evolved away from being a simple historical or statistical record.

#### 2. Legal and Practical Implications of an Inaccurate Gender Designation

There are many practical, legal, and social realities that result from having an inaccurate gender marker, some of them with potentially fatal consequences. Although the gender recorded on a person's birth certificate may not be considered legally binding,[70] in many circumstances, it is an

---

low numbers of transgender men who have had these surgeries in the survey sample. *Id.*

66. *See infra* note 114 and accompanying text.

67. OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OEI-07-99-00570, BIRTH CERTIFICATE FRAUD at 2 (2000), *available at* http://oig.hhs.gov/oei/reports/oei-07-99-00570.pdf.

68. "[Birth certificates] are also used extensively for employment purposes, to obtain benefits or other documents (e.g., driver's licenses, Social Security cards, and passports), to assist in determining eligibility for public assistance and other benefits, to enroll children in school, and as proof of age eligibility for sports and other age restricted activities." *Id.* at 6.

69. Federal experts caution that a birth certificate should not be used alone as an identity document because it is impossible be sure that the holder of the certificate is the person appearing before the agency. *See id.* at 20.

70. Because of this, some have pursued gender change orders that declare a person's legal gender (unrelated to birth certificate corrections). Interview with Janson Wu, Staff Attorney, Gay & Lesbian Advocates & Defenders (confirmed Feb. 11, 2012). Gender change orders can be particularly helpful for people who are at higher risk of

important factor in determining whether or how an individual's gender is recognized as a practical matter. In addition, transgender people holding birth certificates that are not corrected following gender transition risk having their transgender histories revealed, which can lead to a number of serious harms. This is not an abstract issue; inspection of one's birth certificate (or documents it generates) can lead directly to discrimination and even violence, especially when a situation involves interactions with security officers, employment, or access to sex-segregated facilities. The following subsections describe areas in which an incorrect gender designation and one's transgender status, as revealed by the gender on one's birth certificate, can be especially consequential in the United States, either because of the meaning attached to the gender designation, or because the disclosure of one's transgender status may lead to harm.

a.    Initial Gender Designation on Governmental Identity Documents
and Those Governmental and Non-Governmental
Documents Derived Therefrom

Birth certificates establish the initial gender designation for other governmental identity documents, such as driver's licenses, passports and Social Security records.[71] The birth certificate, as well as these other government documents, in turn breed[72] many other identity documents, such as school records, college ID cards, work identification, and commercial licenses.

---

having their gender challenged by interested third parties, such as parents or children who would gain a right to inherit if their transgender relative's marriage is held invalid.

71.  Although generally not written formally in policy, a person's initial gender on a driver's license/state ID will match that on one's birth certificate. Although it is less common, at least two state Departments of Motor Vehicles require a corrected gender on one's birth certificate before updating the gender on one's driver's license (Montana and Kentucky). *See Driver's License Policy by State*, NAT'L CTR. FOR TRANSGENDER EQUAL., http://transequality.org/Resources/DL/DL_policies.html (last visited Sept. 20, 2012). Similarly, to establish a person's initial gender on a passport, the birth certificate gender (or gender on other citizenship/identity evidence) is generally used. *See* 7 DEPT. OF STATE FOREIGN AFF. MANUAL 1310 app. M (2011) ("This appendix provides policy and procedures that passport specialists and consular officers must follow in cases in which an applicant requests a gender on the passport application different from the one reflected on some or all of the submitted citizenship and/or identity evidence, including a prior passport.").

72.  In fact, birth certificates and driver's licenses are both referred to as "breeder" documents because once a person had these forms of identification, other identity documents can be created, with birth certificates being the primary breeder document. *See* John Mercer, *Breeder Documents: The Keys to Identity*, 29 KEESING J. OF DOCUMENTS & IDENTITY 14, 14 (2009), *available at* http://www.naphsis.org/NAPHSIS/files/ccLibraryFiles/Filename/000000001179/breeder_documents_the_keys_to_identity.pdf.

Regulations under the REAL ID Act, which has been partially implemented in the U.S.,[73] require persons to show they are a U.S. citizens or are in the U.S. lawfully, as well as "establish their identity" to obtain a driver's license.[74] Accepted documents include birth certificates and passports (as well as various immigration documents).[75] Among U.S. citizens, birth certificates are more commonly used because only 28% of the U.S. population have passports.[76]

### b.     Discrimination in Employment

Some employers may discriminate against a transgender person, especially in the hiring process, when the employer inspects identity documents that do not match a person's gender presentation. In much of the United States, this discrimination may be viewed as legal.[77] For example, U.S. employers are required to fill out the I-9 Employment Eligibility Verification Form for each employee at the time of hire. Although various documents can be used to show eligibility for work, if a U.S. citizen does not have a passport or a Social Security card, he or she must show a birth certificate to

---

73. *Real ID Deadlines Looms*, HOMELAND SECURITY NEWS WIRE (Jan. 31, 2012), http://www.homelandsecuritynewswire.com/dr20120131-real-id-deadlines-looms.

74. Real ID Act, Pub. L. No. 109-13 § 202(c)(2)(b) (2005). Because the Real ID Act also required gender to appear on the license, some state motor vehicle agencies were concerned that it would curtail their authority to set policies on gender corrections. However, the regulations issued by the Department of Homeland Security in 2008 indicated the opposite. *See* 6 C.F.R. § 37.17 (2008).

75. 6 C.F.R. § 37.11 (2011) (listing acceptable documents as a U.S. passport, a birth certificate, a Consular Report of Birth Abroad, a Permanent Resident Card, a U.S. visa, Certificate of Naturalization or Citizenship, a REAL ID-compliant driver's license or identification card).

76. U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-891, STATE DEPARTMENT: COMPREHENSIVE STRATEGY NEEDED TO IMPROVE PASSPORT OPERATIONS 11 (2008), *available at* http://www.gao.gov/new.items/d08891.pdf.

77. Although "sex" in Title VII of the Civil Rights Act of 1964 should be interpreted to prohibit employment discrimination against transgender people, not all federal courts have agreed with this proposition. *Compare* Schroer v. Billington, 577 F. Supp. 2d 293, 300 (D.D.C. 2008) (holding that "sex" in Title VII protects the transgender plaintiff), *and* Glenn v. Brumby, 663 F.3d 1312, 1320 (11th Cir. 2011) (holding that plaintiff's termination due to transgender status was sex discrimination in violation of the Equal Protection Clause), *with* Etsitty v. Utah Transit Authority, 502 F.3d 1215, 1221 (10th Cir. 2007) (holding that the sex discrimination prohibition does not protect a transgender plaintiff). Therefore, discrimination is only clearly illegal in the 16 states and over 150 local jurisdictions that have gender identity/expression protections explicit in the law, which cover 45% of the US's population. NAT'L GAY & LESBIAN TASK FORCE, JURISDICTIONS WITH EXPLICITLY-TRANSGENDER INCLUSIVE NONDISCRIMINATION LAWS (2012), *available at* http://www.thetaskforce.org/downloads/reports/fact_sheets/all_jurisdictions_w_pop_6_12.pdf.

satisfy this requirement. If a person does have a Social Security card and therefore can avoid showing a birth certificate, the person must also show an identity document like a driver's license or school identity card. However, these documents may also have an inaccurate gender marker on them if they were derived from an inaccurate birth certificate. Employers may also learn of a person's transgender status if a background check reveals the gender assigned at birth, based on documents derived from a birth certificate.

The National Transgender Discrimination Survey found that 90% of transgender people had experienced mistreatment or discrimination at work or took actions to avoid such discrimination.[78] Nearly 47% of those surveyed lost their jobs, were denied a promotion, or were denied a job as a direct result of being transgender.[79] Hiring discrimination was also rampant, and rates of discrimination were higher for those whose driver's license gender marker did not match their gender identity.[80] The percentages of those experiencing hiring discrimination rose from 52% of those with corrected driver's licenses to 64% for those without corrected driver's licenses.[81] For understandable reasons, many transgender people desire to keep their transgender identity private from employers at the time of hiring, yet may be unable to do so because of birth certificate policies in their jurisdiction of birth.

Other discrimination can arise when a person goes through gender transition while remaining in the same workplace. One of the primary issues that can arise is which bathroom a person should use. Many employers think a fair policy is to have persons switch bathrooms when they have corrected the gender on their driver's licenses, state identification documents, or less commonly, their birth certificates. Because the gender on a driver's license often is generated by the gender on a person's birth certificate, the state's failure to correct gender on birth certificates can prevent a transgender person from being able to access the appropriate gender-specific restroom facility at the workplace.

---

78. GRANT ET AL., *supra* note 54, at 51.

79. *Id.*

80. *Id.* at 139.

81. *Id.* at 154.

c.   Police, Security Personnel, and Others who Inspect Identification
During Daily Life and Travel

Unfortunately, it is not uncommon for police, security personnel, and others to respond in violent or discriminatory ways when they discover a person is transgender.[82]

In addition, a police or security officer, or any other person who inspects ID (such as a store clerk) may share information about a transgender person's status with others in the community, who in turn may cause the person harm. For example, consider the case of a person who lives in a small community who presents identification with an inaccurate gender marker to a Transportation Security Officer at the local airport, or a store clerk to verify identity when using a credit card at the local market. When the clerk or officer discusses this information with others in the community, the transgender individual could be fired from his or her job or become the victim of a bias-motivated assault.

The National Transgender Discrimination Survey found that 40% of people who presented identification that did not match their gender presentation were harassed at some point due to the mismatch, 15% were asked to leave an establishment, and 3% were assaulted.[83] Higher numbers of people of color were assaulted, with 9% of African Americans and Latino/Latinas and 6% of multiracial respondents reporting assault when presenting ID that did not match their gender presentation.[84]

The data is supported by published reports of violence and discrimination that have occurred after a person is outed as transgender. For example, in an incident brought to public consciousness by an award-winning movie, Brandon Teena was sexually assaulted and later murdered by those who knew him as a man when they discovered, due to a printed police report in the newspaper, that his legal name was "Teena Brandon."[85] In a less violent case, a transgender woman was sent a threatening letter and DVD saying that homosexuals should be put to death by the DMV clerk who had processed her gender correction.[86]

---

82. 22% of respondents reported harassment, 6% reported physical assault, and 2% reported sexual assault by police officers due to being transgender. GRANT ET AL., *supra* note 54, at 160.

83. *Id.* at 153.

84. *Id.*

85. THE BRANDON TEENA STORY (Bless Bless Productions 1998); BOYS DON'T CRY (Fox Searchlight Pictures 1999).

86. Bob Egelko, *Transgender Woman Settles DMV Suit*, S.F. CHRONICLE (Aug. 16, 2011, 5:01 PM), http://articles.sfgate.com/2011-08-16/bay-area/29891260_1_transgender-woman-amber-yust-dmv; http://www.huffingtonpost.com/2011/08/16/amber-yust-settlement_n_928285.html.

The actual discrimination, disclosure, and violence, as well as the fear of it, can cause transgender people to limit interactions where their identity documents can be inspected, especially travel. Furthermore, as proving one's lawful presence in the U.S. becomes more important as a political and/or criminal matter, showing one's actual birth certificate—not just documents derived from it—may become a more common practice. Already several states have passed laws that allow police to require people to show proof of citizenship.[87] The Supreme Court approved the part of the Arizona law that allows officers to ask for documentation of citizenship of those that they suspect may be undocumented.[88]

### d.   Marriage Recognition

Transgender people should also be able to marry, and be recognized as legally married to their partners. Because forty-one states restrict marriage to different-sex couples,[89] a transgender person's gender is of great legal significance in those states. Being legally married, or not, is of great legal consequence to whether or not a person has rights to child custody and visitation. Additionally, marital status is important for intestate inheritance,[90] ability to sue for wrongful death,[91] spousal support after marriage, eligibility for Social Security benefits after death of a spouse, and potentially, the ability to be granted a divorce and have marital property divided. For bi-national couples, marriage recognition is critically important for the ability to reside legally in the United States. During the marriage, being recognized as a spouse by third parties can be important to determine eligibility for a host of benefits, including health insurance, ability to make medical decisions for

---

87. *Anti-Immigrant Arizona Copy Cat Laws*, ACLU, http://www.aclu.org/arizonas-sb-1070-and-copycat-laws (last visited Dec. 10, 2012) (stating that five states - Alabama, Georgia, Indiana, South Carolina and Utah - have passed laws similar to that in Arizona that allow police to ask documentation of a person's citizenship).

88. Arizona v. United States, 567 U.S. ___ (2012).

89. As of November 2012, Connecticut, Iowa, Maine, Maryland, Massachusetts, New Hampshire, New York, Vermont, Washington and the District of Columbia are the only U.S. jurisdictions that perform and recognize same-sex marriage. *See* Teresa Walsh, *Will the Gay Marriage Election Results Have a National Impact?*, U.S. NEWS & WORLD REPORT, November 8, 2012, http://www.usnews.com/opinion/articles/2012/11/08/will-the-gay-marriage-election-results-have-a-national-impact.

90. J'Noel Gardiner lost her inheritance, due to her as a wife, when her husband died intestate and the Kansas Supreme Court decided that she was legally male and thus, not married to her husband. *In re* Estate of Gardiner, 42 P.3d 120, 121-122 (Kan. 2002).

91. Christie Lee Littleton's wrongful death case relating to medical malpractice committed against her husband was dismissed by Texas courts, which declared her a legal male and as such did not have standing as a spouse. Littleton v. Prange, 9 S.W.3d 223 (Tex. Ct. App. 1999).

each other, tax filing status, and numerous others. Transgender people in different-sex marriages often worry their marriage will be nullified by a judge's decision that they have not validly and legally changed their gender. Although there is no single place where one's "legal gender" is recorded, the gender on a person's birth certificate is sometimes given at least some legal deference by courts.[92]

Because most of the marriage cases involving a transgender spouse indicate that having a corrected gender marker on one's birth certificate is not a controlling factor, the *practical* effect, in the form of discouraging third parties from challenging the legality of a marriage, is likely more important than the actual *legal* effect during a challenge.

The story of a New Jersey couple—a non-transgender woman and a transgender man who had problems getting a marriage license—is illustrative. Because the transgender man's birth certificate still designated him as female, the local clerk refused to issue a marriage license and instead said she could only issue them a civil union license. This issue was resolved only after they consulted with an attorney, who helped the man get his birth certificate amended. This process took several months, delaying many of the couple's life plans, as well as requiring a significant financial outlay.[93]

c. Health and Health Insurance Records

Birth certificates and the documents they influence can also affect what gender people are considered to be by their health insurance providers, their health systems, their state's medical assistance program, or Medicare. Depending on what gender is recorded in these records, certain treatments, screenings and procedures may be disallowed, despite the fact that the best practice is to screen and treat all of a person's bodily organs, regardless of a person's gender identity and regardless of whether or not the treatment relates to gender transition. For example, a transgender man might be denied hormone therapy on the basis that he should not be receiving testosterone when his records indicate *female*. Or a transgender woman may be denied needed gynecological services because they are only covered for females.[94]

---

92. *See* Kantaras v. Kantaras, 884 So. 2d 155, 161 (Fla. Dist. Ct. App. 2004); *In re* Lovo-Lara, 23 I. & N. Dec. 746, 753 (B.I.A. 2005).

93. Email from Angie Gambone, attorney, to author (Feb. 13, 2012, 9:08 EST) (on file with author).

94. AM. C. OF OBSTETRICIANS AND GYNECOLOGISTS, COMMITTEE OPINION NUMBER 512: HEALTH CARE FOR TRANSGENDER INDIVIDUALS (December, 2011) http://www.acog.org/Resources_And_Publications/Committee_Opinions/Committee_on_Health_Care_for_Underserved_Women/Health_Care_for_Transgender_Individuals.

### f. Access to, and Treatment in, Sex-Segregated Facilities

A small but important number of facilities are sex-segregated. These range from those needed on a daily basis—such as bathrooms—to those in otherwise non-segregated spaces—such as locker rooms in gyms. Further, there are a number of gender-segregated residential or quasi-residential facilities, programs or services that can be critically important and life-sustaining, such as homeless shelters, group foster homes, substance abuse facilities (including court-mandated drug programs), and domestic violence shelters. In these places, transgender people can be kept out of the correct facility, or forced into the wrong facility, because of the gender on their identity documents, and violence can sometimes result. For example, although it is contrary to best practices developed nationally,[95] in homeless shelters, transgender people are typically housed with others of their sex assigned at birth, which can create dangerous conditions.[96] According to the National Transgender Discrimination Survey, 55 percent of transgender people who stayed at a shelter were harassed there and 22 percent were sexually assaulted there.[97] In addition, 29 percent who sought shelter were denied outright.[98] In many emergency housing facilities, transgender people are processed by low-level intake staff who make on-the-spot decisions about where to place a person. Therefore, the gender markers on a person's identification documents take on heightened importance.[99]

Although there is no case law on the question of how relevant a person's gender marker on his or her birth certificate is when it comes to having a legal right to access these sex-segregated facilities, certainly one can imagine that disputes with regard to access to any of these facilities could in part hinge on gender markers on birth certificates.

### g. College Admissions

In 2011, the "Common Application," a standardized college application for admission used by over 400 colleges, included new instructions which state: "Federal guidelines mandate that we collect data on the legal sex of all applicants. Please report the sex currently listed on your birth certificate."[100] Given the highly burdensome medical requirements and procedures for changing birth certificates, most transgender college-age youth

---

95. *See infra* notes 169–170 and accompanying text.

96. *Housing and Homelessness*, NAT'L CTR. FOR TRANSGENDER EQUAL., http://transequality.org/Issues/homelessness.html (last visited Sept. 26, 2012).

97. GRANT ET AL., *supra* note 54, at 106.

98. *Id.*

99. *See* Spade, *supra* note 4, at 775.

100. *How Should I Answer the Sex Question?*, COMMONAPP.ORG, https://www.commonapp.org/commonapp/helpinline.aspx?src=sexHelp (last visited Sept. 26, 2012).

do not have a corrected birth certificate. Even those with supportive parents and financial ability to pay are unlikely to have had any surgery, given that surgery is disfavored by the WPATH Standards of Care for those under 18.[101] The new Common Application policy is especially devastating for those who have been living in their gender since a very young age[102] and who may not be "out" to anyone other than family members. For these young people, the application would require them to "out" themselves or otherwise be at risk for accusations of fraud on their application. For this reason alone, some transgender students may decide not to apply through the Common Application, therefore limiting their access to higher education. Similarly, potential students may worry that if they write their birth certificate gender on the Common Application, as they are required to do, they will be assigned to gendered dormitories on that basis.

Women's colleges may also look to the gender designation on a potential student's birth certificate or school records or other government documentation derived from the birth certificate to determine whether a student is eligible to attend.[103]

### h.  International Adoption

Given that international adoptions generally require prospective parents to show their birth certificates during the adoption process, international adoption agencies and/or the country of the child may learn about the transgender history of the applicant, and take adverse actions.[104] Thus, lack of a new birth certificate with a corrected gender marker could put international adoptions at risk.

### II. MODERNIZING THE LEGAL STANDARD FOR CORRECTING GENDER MARKERS

The first area of law and policy that needs to be examined is the legal standard—what a person has to show—to qualify for the correction of their gender marker. When determining the legal standard, policymakers should

---

101. *See* WORLD PROF. ASS'N FOR TRANSGENDER HEALTH, *supra* note 33, at 21 (stating that surgery should not be allowed until a youth reaches the age of legal majority in their country).

102. Alan B. Goldberg & Joneil Adriano, *'I'm a Girl'—Understanding Transgender Children*, ABC 2020, Apr. 27, 2007, http://abcnews.go.com/2020/story?id=3088298&page=1#.UGI8MtCXRUM.

103. Allie Grasgreen, *Women's Colleges Examine Transgender Policies*, USA TODAY, Aug. 2, 2011, 6:09 PM, http://www.usatoday.com/news/education/2011-08-01-womens-college-transgender_n.htm.

104. *Dossier*, ADOPTION.COM, http://international.adoption.com/foreign/dossier.html (last visited Sept. 26, 2012).

consider contemporary medical standards, legal and constitutional concerns, as well as other public policy issues, including how the standard affects the ability of those who seek the correction to receive it.

### A. Overview of Existing Legal Standards

#### 1. Standard from the MSVSA, State, and Local Jurisdictions

The 1977 MSVSA requires that a person seeking a correction to the gender on his or her birth certificate show that "the sex of an individual born in this State has been changed by *surgical procedure*"[105] (terms not defined in the model statute).[106] Thirteen jurisdictions use the exact language from the MSVSA in their statutes.[107] Another nine states[108] and Guam have a surgery standard in their statute, not using the language of the MSVSA. Several more states refer to gender corrections in statutes but do not specify that surgery must take place: Mississippi ("gender reassignment"), New Hampshire ("has had a sex change"), Utah ("has had a sex change"), and Virginia ("medical procedure"). In three states, legislatures have explicitly repudiated surgical or hormonal requirements, with language noting that "surgery or other treatment" (Iowa[109]), "clinically appropriate treatment" (California) or "surgical, hormonal, or other treatment" (Vermont) will suffice.[110]

Some states do not address gender corrections in statute, but deal with them in official regulations or written, sub-regulatory policy. Connecticut,

---

105. MODEL STATE VITAL STATISTICS ACT AND REGULATIONS § 21(d) (Ctr. for Disease Control & Prevention 1992) (emphasis added).

106. There is no published case law interpreting the term "surgical procedure."

107. Alabama, Arkansas, Colorado, Commonwealth of the Northern Mariana Islands, Delaware, District of Columbia, Georgia, Kentucky, Maryland, Missouri, New Jersey, New Mexico, and Oregon. (Montana integrates the language from the MSVSA into its regulations, not statute). *See infra* app. A.

108. Arizona, Hawaii, Illinois, Louisiana, Massachusetts, Michigan, Nebraska, North Carolina, and Wisconsin. *See infra* app. A.

109. Iowa has statutory language making it clear that surgery is not required. The code requires a "notarized affidavit by a licensed physician and surgeon or osteopathic physician and surgeon stating that by reason of *surgery or other treatment* by the licensee, the sex designation of the person has been changed." IOWA CODE ANN. § 144.23 (West 2009) (emphasis added). However, the fact that the law twice says "and surgeon" in referring to the physician that must provide the letter seems to imply, for those unfamiliar with Iowa's medical code, that a surgeon is involved in the person's care. In fact, all physicians in Iowa are referred to, throughout Iowa code, as "physician and surgeon." *See, e.g.*, IOWA CODE ANN. § 147.139 (West 2011). In practice, despite the statutory rejection of a surgery requirement, the Iowa Department of Public Health does require proof of surgical treatment. *See* Spade, *supra* note 4, at 768.

110. *See infra* app. A.

Maine, Montana, New York City, and North Dakota each have surgical requirements in official regulations, although their statutes are silent.[111] In New York State, a written policy requires surgery even where the regulations and statutes do not. In Virginia, even though the statute specifies only a "medical procedure," the regulations require surgery.[112]

In Kansas, Mississippi, Nevada, and Wyoming, there is no statutory language related to gender corrections, and the official regulations are ambiguous with regard to whether surgery is required.[113] In two more states, Florida and Rhode Island, there is no official written policy but surgery is essentially required in practice.[114]

Regardless of the exact language used relating to surgery, medical treatment, or gender corrections more generally, there are a wide variety of surgeries deemed sufficient to be eligible for the correction of a gender marker. For example, as a practical matter, sometimes any surgery will qualify an individual for correction, but other times an agency will have strict (generally unwritten) rules that a particular surgery must be shown.[115]

In nine jurisdictions, *the judge determines the standard* because there is no statutory or regulatory language, or the language is too vague.[116] An additional three states let people choose to get a court order.[117] While a court order requirement does not explicitly mean proof of surgery is necessary, generally advocates have found this to be the case in practice.[118] Although there has been at least one instance where a person has successfully received a court-ordered correction to her birth certificate without surgery,

---

111. *Id.*

112. *Id.*

113. *Id.*

114. *Id.*

115. Interview with Janson Wu, *supra* note 70; Interview with Kristina Wertz, Director of Policy and Programs, Transgender Law Center (Feb. 14, 2012, 10:55 AM); Interview with Dru Levasseur, Transgender Rights Attorney, Lambda Legal (Feb. 10, 2012).

116. These are Alaska, Indiana, Mississippi, New Hampshire, Nevada, South Dakota, Utah, Wyoming, and the United States Virgin Islands. *See infra* app. A. Several more jurisdictions are not clear what the process even is—whether it requires going to the agency or to a court—for gender correction: Kansas, Oklahoma, South Carolina, Texas, and American Samoa. Thus, in those jurisdictions, a judge may be the one determining the standard. *See infra* app. A.

117. In three of these states—Minnesota, Pennsylvania, and West Virginia—a person can go directly to the agency, but must show surgery, or the person can choose to seek an order from a judge, who can use whatever standard he or she judges appropriate. *See infra* app. A.

118. *See infra* Section III.B.3.

this case involved an individual who was able to demonstrate that surgery was not medically feasible for her given her health conditions.[119]

## 2. Modernized Laws and Policies

Although it has been decades since most state's legislatures or policy-makers have examined their policies regarding gender corrections, Washington, Vermont, and California have done so in the last few years. As a result, these three states have the laws or policies that most closely comport with contemporary medical and legal standards and warrant closer examination. In addition, the standard from the U.S. Department of State with regard to Consular Reports of Birth Abroad, updated in 2010, and the U.K. Gender Recognition Act from 2004 are also helpful.

### a.   Washington

The Washington statute governing birth certificates gives the Secretary of Health broad authority to administer birth certificates.[120] Because the statute does not mention gender corrections specifically, the Secretary of Health has empowered the Director of the Center for Health Statistics to develop the policy. The policy currently in effect[121] has been in place since July 1, 2008 and, according to staff at the agency, is a codification of the unwritten policy that was in effect for many years.[122] The policy requires a registrant to submit a written request and to include a "letter, on applicable letterhead, from the requestor's medical or osteopathic physician stating that the requestor has had the *appropriate clinical treatment*."[123]

### b.   Vermont

Vermont's updated statute was originally part of an overall modernization effort of the vital statistics law in 2011.[124] However, the overall modernization effort was stalled due to its length and complexity, and the

---

119. Interview with Kristina Wertz, *supra* note 114.

120. Wash. Rev. Code Ann. §43.70.150 (West 2009).

121. Wash. Dept. of Health, Ctr. for Health Stats., Proc. No. CHS-B5, Changing Gender on Birth Certificates (2008) (on file with author).

122. Email from Spencer Bergstedt to author (October 2, 2012, 20:01 EST) (noting that their previous unwritten policy was not very clear, but that gender marker corrections were approved under the old policy with very little information submitted with the request).

123. Wash. Dept. of Health, *supra* note 120 (emphasis added). Washington is the first jurisdiction to use the term "appropriate."

124. H. 99, 2011–12 Leg. (Vt. 2011).

Commissioner on Health asked the legislature to add this provision to a bill related to midwifery so that these provisions could become law in 2011.[125]

Before this law passed, Vermont's statutes did not explicitly provide for gender corrections, so they were processed as any other amendment after an individual received a court order ordering the vital statistics agency to amend the gender marker.[126] Anecdotal evidence indicates that only a limited number of judges were willing to make a gender correction using this provision and did so only upon proof of completed surgery.[127]

The new language in Vermont requires that "the individual has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition."[128] This language accurately reflects the contemporary medical understanding of transgender people because it explicitly considers that an individual may not undergo hormonal or surgical treatment as part of their transition. Treatment "appropriate" to an individual may be limited to living full-time in one's new gender role.

However, the statute also requires a person to have "completed" sexual reassignment.[129] While this should not cause significant confusion, using the term "completed" may unduly exclude some people who have fully transitioned but hope or plan for additional medical treatment later in life. Furthermore, since many individuals receive hormonal treatment indefinitely, they may be seen as never having "completed" treatment.

### c. California

In 2011, the California legislature enacted a law that modernized and simplified the state's existing statute in various ways. The law replaced the requirement for "surgical treatment"[130] with a requirement that the individ-

---

125. Interview with Bill Lippert, Vermont Representative (Feb. 10, 2012); S, 15, 211-12 Leg. (2011), available at http://www.leg.state.vt.us/docs/2012/Acts/ACT035.pdf.

126. VT. STAT. ANN. tit. 18, § 5075 (West 2011).

127. Interview with Jes Kraus, Vermont Attorney (Feb. 13, 2012).

128. VT. STAT. ANN. tit. 18, § 5112(b) (West 2011).

129. *Id.* ("An affidavit by a licensed physician who has treated or evaluated the individual stating that the individual has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition shall constitute sufficient evidence for the court to issue an order that sexual reassignment has been completed.").

130. CAL. HEALTH & SAFETY CODE § 103425 (West 2009) ("Whenever a person born in this state has undergone surgical treatment for the purpose of altering his or her sexual characteristics to those of the opposite sex . . . A petition for the issuance of a new birth certificate in those cases shall be filed with the superior court of the county where the petitioner resides.").

ual "has undergone clinically appropriate treatment for the purpose of gen-
der transition, based on contemporary medical standards."[131]

### d. Standard from Consular Reports of Birth Abroad

As described earlier, the 2010 U.S. Department of State policy for
Consular Reports of Birth Abroad requires simply that a person's treating or
evaluating physician write a letter certifying that a person "has had appro-
priate clinical treatment for gender transition to the new gender."[132] To be
clear, the policy makes explicit that surgery is not required.[133]

### e. Standard from the United Kingdom's Gender Recognition Act

The United Kingdom's Gender Recognition Act of 2004 requires that
individuals live in their "acquired gender" for at least two years and have a
diagnosis of gender dysphoria.[134] An individual must submit reports by two
medical professionals, one of whom must be an expert in the field of gender
dysphoria, detailing any medical treatment that the person has had. The
individual must also affirm that he or she intends to continue to live in their
acquired gender until death.[135]

Although this policy has the advantage of not requiring surgery or any
specific medical treatment, the requirement of living in the "acquired gen-
der" for two years is both arbitrary and burdensome, heightening one's risk
of violence, discrimination, and harassment for that two-year period. Simi-
larly, the fact that one of the medical professionals submitting their evalua-
tion must be practicing in the field of gender dysphoria is unduly limiting
for those who live in rural or other areas that do not have access to these
professionals. Lastly, the requirement that there be a diagnosis is similarly
arbitrary and is not particularly useful for potential inclusion in U.S. policy

---

131. CAL. HEALTH & SAFETY CODE § 1004430 (West 2012) ("The petition shall be
accompanied by an affidavit of a physician attesting that the person has undergone
clinically appropriate treatment for the purpose of gender transition, based on con-
temporary medical standards, and a certified copy of the court order changing the
applicant's name, if applicable. The physician's affidavit shall be accepted as conclu-
sive proof of gender change if it contains substantially the following language: 'I,
(physician's full name), (physician's medical license or certificate number), am a li-
censed physician in (jurisdiction). I attest that (name of petitioner) has undergone
clinically appropriate treatment for the purpose of gender transition to (male or
female).'").

132. See U.S. DEP'T ST., 7 FOREIGN AFF. MANUAL 1320 app. M(b) (2011) available at
http://www.state.gov/documents/organization/143160.pdf.

133. "Sexual reassignment surgery is not a prerequisite for passport issuance." Id.

134. Gender Recognition Act, 2004, c. 7 § 2 (U.K.).

135. Id.

because many people do not receive the diagnosis of gender dysphoria in the United States.[136]

### B. Issues to Consider When Modernizing the Legal Standard

When considering how to update the legal standard, policymakers should look to the modern medical understanding of transgender people, the effect of the surgical standard on transgender people, how other areas of the law have acknowledged transgender people, the constitutional impact of these policies, and the public policy justifications and implications.

### 1. A Surgical Requirement Contradicts Current Medical Understanding

Current medical thinking has rejected the one-size-fits-all mentality that was common in early treatment of transgender people. In the middle of the twentieth century, the medical community's viewpoint, developed by a small set of early practitioners, was that genital surgery was the successful culmination of a person's treatment and gender transition. Although the lived reality of transgender people never uniformly reflected this understanding, it was widely believed then and continues to persist today among the general population.[137] As more providers began treating transgender people and contributed to medical literature and practice over the past several decades, the view of transgender medicine greatly evolved and expanded.

The World Professional Association for Transgender Health (WPATH), established in 1979, is the international medical association devoted to understanding and properly treating transgender people. WPATH develops and publishes the collective understanding of the best treatment for transgender people based on "the best available science and expert professional consensus," known now as the "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People."[138] WPATH has altered its Standards of Care six times since 1979 to reflect the continually evolving medical understanding of transgender people and the efficacy of various treatment protocols.[139]

---

136. For various reasons, requiring people in the U.S. to get a diagnosis would be ill advised. First, some people cannot get a diagnosis because of limited access to doctors or counselors (less of an issue in the U.K. where socialized medicine is in place). Second, people who are deemed not "clinically distressed" enough may not receive the diagnosis. Third, some doctors and counselors have a limited viewpoint about who should receive the diagnosis. *See infra* note 153 and accompanying text.

137. Spade, *supra* note 4, at 755.

138. WORLD PROF. ASS'N FOR TRANSGENDER HEALTH, *supra* note 33.

139. *Id.*

Over this time period, WPATH increasingly encouraged and required individualized evaluation and individualized treatment, reflecting both its increasingly multi-disciplinary membership and the best available science. The Standards of Care refer to themselves as "flexible clinical guidelines"[140] and state that treatment is to be individualized.[141] As discussed earlier, the current Standards of Care are clear that changes in gender role alone may be sufficient treatment for some transgender people.[142]

Recognizing that surgery is not necessary for many transgender people, as well as the fact that many of these procedures result in sterilization, WPATH issued a statement condemning surgical requirements in 2010, stating, "[n]o person should have to undergo surgery or accept sterilization as a condition of identity recognition . . . ." The WPATH Board of Directors urges governments and other authoritative bodies to move to eliminate requirements for identity recognition that require surgical procedures."[143]

In addition to WPATH, other experts have recommended de-linking social and legal recognition of gender from specific medical treatments. The foremost organization for psychologists in the United States, the American Psychological Association, released a statement with its medical, social, and legal recommendations related to transgender people in August of 2008, which stated:

> THEREFORE, BE IT FURTHER RESOLVED THAT APA encourages legal and social recognition of transgender individuals consistent with their gender identity and expression, including access to identity documents consistent with their gender identity and expression which do not involuntarily disclose their

---

140. *Id.*, at 2.

141. "Treatment is individualized: What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change in gender expression or body modifications." *Id.*, at 5.

142. "As the field matured, health professionals recognized that while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither. Often with the help of psychotherapy, some individuals integrate their trans- or cross-gender feelings into the gender role they were assigned at birth and do not feel the need to feminize or masculinize their body. For others, changes in gender role and expression are sufficient to alleviate gender dysphoria. Some patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery, but not hormones. In other words, treatment for gender dysphoria has become more individualized." *Id.*, at 2 (citations omitted).

143. Press Release, World Prof. Ass'n for Transgender Health (June 16, 2010), *available at* http://www.wpath.org/documents/Identity%20Recognition%20Statement%206-6-10%20on%20letterhead.pdf.

status as transgender for transgender people who permanently socially transition to another gender role . . .[144]

Note that the basis for changing the gender markers on identity documents according to the APA is a person's "social transition," not a specific other medical event, such as hormones or surgery.

In sum, the professional medical associations that have looked at the question of gender transition and how it relates to identity documents like birth certificates have all come to the same conclusion: it is social transition, not surgery, that is medically relevant.

### 2. Surgery is Not Common and is Often Unattainable

Sex reassignment surgeries are significantly less common than is popularly believed. Transgender people have a variety of medical, personal, and practical reasons for not seeking or being able to acquire surgery. Here are common barriers and considerations:

(1)  Some individuals cannot afford the surgery they desire, especially given that a large majority of private and public health insurance plans do not currently[145] cover sex reassignment surgeries.[146]

(2)  Many people have medical conditions that make surgery risky or contraindicated.[147]

---

144. Policy Statement, Am. Psychological Ass'n, *Transgender, Gender Identity, & Gender Expression Non-Discrimination* (Aug. 2008), http://www.apa.org/about/governance/council/policy/transgender.aspx.

145. Increasingly, companies are ensuring that transgender employees do receive transition-related care through their insurance policies, and a number of colleges and universities have also ended these discriminatory exclusions. Human Rights Campaign Foundation, Corporate Equality Index 2012 27-28 (2011); Karen Aquino, *U. Adds Transgender Insurance*, THE DAILY PENNSYLVANIAN (Apr. 14, 2010), *available at* http://thedp.com/index.php/article/2010/04/u._adds_transgender_insurance.

146. Kari E. Hong, *Categorical Exclusions: Exploring Legal Responses to Health Care Discrimination Against Transsexuals*, 11 COLUM. J. GENDER & L. 88, 96–98 (2002); *see also* Jamison Green, *Introduction to Transgender Issues* in TRANSGENDER EQUALITY: A HANDBOOK FOR ACTIVISTS AND POLICY MAKERS 12 (Paisley Currah & Shannon Minter eds., 2001).

147. Editorial, *Looking Past Transgender*, THE DAILY FREE PRESS, Nov. 8, 2006, http://dailyfreepress.com/2006/11/08/editorial-looking-past-transgender/ (quoting Lorna Thorpe, Deputy Commissioner of New York's Department of Health and Human Hygiene as saying, "A smaller number undergo surgery – in part because not everyone is medically capable of undergoing the procedure."); *see also* Susan Donaldson James, *Transgender Sue Over Surgery Requirement to Alter Gender on Birth Certificate*, ABCNEWS, Mar. 24, 2011, http://abcnews.go.com/Health/transgender-yorkers-sue-

(3)   Many people who want and can afford surgery do not pursue it because they fear complications.[148]

(4)   Many individuals are unsure whether the surgery will provide the desired physical or aesthetic result, especially given individual variation and the chance of achieving an optimal result.[149]

(5)   Some are prevented by practical considerations involved in undergoing major surgery, including having difficulty in taking several weeks off from work or school, having caregiving responsibilities for family members, or lacking caregivers for themselves following surgery.[150]

(6)   Some hold sincere religious beliefs, or personal beliefs, against surgical body modification.[151]

(7)   Some have family members or other loved ones who would be upset if they had the surgery, and thus forgo surgeries to maintain these relationships.[152]

(8)   For some, maintaining reproductive capacity is important and many surgeries eliminate this possibility.[153]

birth-certificates-genital-surgery-requirement/story?id=13204628 ("Prinzivalli is morbidly obese and has type 2 diabetes, high cholesterol and a blood disorder that would make surgery dangerous"); *Western Australia Gender Project*, CHANGELING ASPECTS, http://www.changelingaspects.com/Advocacy/WA%20Gender%20Project.htm (last updated Jan. 22, 2008) ("Common medical contraindications for sex reassignment surgeries include: . . . mental illness, poorly controlled diabetes, hemophilia, severe hypertension and deep vein thrombosis").

148. Cameron Bowman & Joshua M.Goldberg, *Care of the Patient Undergoing Sex Reassignment Surgery*, 9 INT'L J. OF TRANSGENDERISM 135 (2006) (noting the risks of complications that may arise from various gender reassignment surgeries).

149. The aesthetic and functional results of surgeries cannot be guaranteed. Furthermore, for transgender men, there exists no surgery that will create an adult-sized erectile phallus without the assistance of an insert device.

150. BOWMAN & GOLDBERG, *supra* note 148; *FTM Genital Reconstruction Surgery (GRS)*, HUDSON'S FTM RESOURCE GUIDE, http://www.ftmguide.org/grs.html (last visited Dec. 27, 2011) (discussing the months-long recovery process for many surgeries).

151. *See* Tobin, *Against the Surgical Requirement*, *supra* note 4, at 400–01 (discussing religious factors as rationale for low rates of sex-reassignment surgery in some communities).

152. Joanne Herman, *Transgender Issues: The Additional Challenges of LBGT Aging*, HUFFINGTON POST, Nov. 4, 2010, http://www.huffingtonpost.com/joanne-herman/shining-the-spotlight-on-_b_777551.html (noting "opposition by family members" as one of the reasons transgender people may not have surgery).

153. Madeline H. Wyndzen, *MtF Transsexual Reproductive Option Preservation*, ALL MIXED UP, http://www.genderpsychology.org/reproduction/index.html (last visited June 27, 2011) (discussing the costs associated with attempting to maintain postoperative reproductive abilities).

(9) Some are denied access to needed approval or diagnosis "letters" from psychologists when their life experiences do not neatly fit the "transsexual" pattern, when they do not match closely enough the stereotypes of man or woman, or when they are not sufficiently "clinically distressed."[154]

(10) A significant percentage of transgender people have determined that surgery is not necessary for them to be comfortable living in their new gender.[155] Many transgender people determine that the alterations they make to their gendered appearance, names, and pronouns give them the well-being they need without further medical treatment.[156]

Ultimately, according to the National Transgender Discrimination Survey, less than 4% of transgender men and only 23% of transgender women have what are popularly understood as genital surgeries.[157] Given these facts, any policy that requires surgery will block the vast majority of transgender people from being able to have an accurate birth certificate.

Given the multitude and severity of the previously discussed practical and legal harms caused by an inaccurate birth certificate, combined with the statistics on the frequency that transgender people receive surgeries, the collective harm to transgender people caused by a surgical requirement must be

---

154. Dean Spade, *Resisting Medicine, Re/modeling Gender*, 18 BERKELEY WOMEN'S L. J. 15, 24–29 (2003). Because many health care professionals voluntarily follow WPATH's Standards of Care, transgender individuals need one or two letters from mental health professionals before they can have surgery, depending on the type of surgery. WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, *supra* note 33, at 27; *see also Choosing a Therapist*, TRANSSEXUAL ROAD MAP, http://www.tsroadmap.com/mental/therapy.html (last visited June 27, 2011) ("Some therapists require more than others before they'll recommend hormones or surgery. Some use a kind of weeding-out policy, trying to test your conviction. Some feel they are gatekeepers who must keep people from making mistakes, and require a lot of sessions. Others are much more open or easy-going.").

155. Tobin, *Against the Surgical Requirement, supra* note 4, at 401 n. 39; *see also* Gabriel Arkles, *Prisons as a Tool for Reproductive Oppression: Cross-Movement Strategies for Gender Justice*, SYLVIA RIVERA LAW PROJECT (Sept. 27, 2008), http://srlp.org/prisons/reproductiveoppression (noting the individualized needs of transgender people when it comes to health care); Damien Cave, *New York Plans to Make Gender Personal Choice*, N.Y. TIMES, Nov. 7, 2006, http://www.nytimes.com/2006/11/07/nyregion/07gender.html?pagewanted=all.

156. Tobin, *Against the Surgical Requirement, supra* note 4, at 401.

157. GRANT ET AL., *supra* note 54, at 79. What is considered genital surgery by the transgender community is more expansive than what is often considered genital surgery by government staff and others. Here, the Article refers to phalloplasty or metiodioplasty for men and vaginoplasty for women as those surgeries popularly understood as genital surgeries.

recognized for its severity, and should be taken into account when making policy.

In addition, there may be a public health harm caused by policies that require people to undergo unnecessary and unwanted surgeries. When a person undergoes surgical treatment, his or her time and resources, as well as those of others, would be spent securing and recovering from this treatment. Complications may also occur, adding new health problems. A cascade of unnecessary expenditures result from surgeries, including depleting one's personal financial resources, causing an interruption in one's school or work, being unable to complete family care-giving duties, and relying on financial or care-giving resources from family members or others.[158]

### 3. A Surgical Requirement is Inconsistent with Other Public Policies Related to Transgender People

As legal rights and recognition of transgender people have rapidly increased in the past two decades in the United States, there has been a clear trend that such rights *do not depend on whether a person has had specific medical treatments.*[159] Most pertinently, non-discrimination laws that cover transgender people prohibit discrimination on the basis of "gender identity or expression," or similar language, regardless of whether a person has had or is seeking medical treatment.[160] This implies that transgender people should have the freedom to live their daily lives consistent with their gender identities without facing discrimination or restrictions. In 2011, legislators in Maine considered a bill that would have narrowed the existing non-discrimination protections for transgender people in that state by granting the authority to businesses to limit access to sex-segregated facilities based on "biological sex." This bill was handily defeated (61-81 in the House, 11-23

---

158. All of these have potential public health consequences in direct or indirect ways, ranging from a person not having resources to be treated for other medical conditions and causing medical issues where none existed before to not being able to care for another family member because of having to recover from surgery. The collective effect has an impact on public health.

159. Interview with Mara Keisling, Executive Director, National Center for Transgender Equality, Washington D.C. (Feb. 10, 2012).

160. Of the 150 local non-discrimination laws in the U.S., only three currently have any references to surgery. Passed in 1999 and 2000, laws in Boulder and Denver in Colorado, and Lexington-Fayette Urban County in Kentucky have references to surgery (although their coverage is not limited to only those who had surgery). BOULDER ORD. No. 7040, Title 12 Human Rights, Section 12-1-1 Definitions (2000), DENVER ORD. No. 934-01, Article IV, Section 28-92 Definitions (2001); LEXINGTON-FAYETTE URBAN COUNTY ORD. No. 201-99, Article II, Chapter 2, Section 2-33 (1999).

in the Senate) by the majority Republican Legislature.[161] As a result, there are no surgical or hormonal lines drawn by any of the 16 state laws that currently protect transgender people from discrimination.[162] As a further example, in proposed federal non-discrimination legislation such as the Employment Non-Discrimination Act even the provision related to sex-segregated shower facilities does not include language requiring surgery as a prerequisite for admittance, but instead speaks of "gender transition."[163]

In fact, many of these laws have already been explicitly interpreted to require access to sex-segregated facilities such as restrooms based on a person's gender identity without regard to medical treatment.[164]

Driver's license policies related to corrections of gender markers, which vary by state, have also moved away from surgery requirements.[165] Although the events of September 11, 2001 and the resulting enactment of

---

161. L.D. 1046. 2011 Leg., 125th Sess. (Me. 2011), *available at* http://www.mainelegislature.org/legis/bills/bills_125th/billtexts/HP078101.asp ("It is not unlawful public accommodations discrimination, in violation of this Act, for a public or private entity to restrict rest room or shower facilities that are part of a public accommodation to the use of single-sex facilities to members of a biological sex regardless of sexual orientation. Unless otherwise indicated, a rest room or shower facility designated for one biological sex is presumed to be restricted to that biological sex.").

162. *See* CAL. GOV'T CODE § 12926(q) (West 2011); COLO. REV. STAT. § 24-34-401(7.5) (2011); CONN. GEN. STAT. § 46A-51(21) (West 2011); HAW. REV. STAT. §§ 515-2, 489-2 (West 2011); 775 ILL. COMP. STAT. 5/1-102 (West 2011); IOWA CODE § 216.2(9A) (2011); ME. REV. STAT. ANN. tit. 5, § 4553(9-C) (2011); MINN. STAT. ANN. § 363A.03(44) (West 2011); N.J. REV. STAT. § 10:5-5(rr) (2011); N.M. STAT. ANN. § 28-1-2(Q) (West 2011); OR. REV. STAT. § 174.100(6) (2011); R.I. GEN. LAWS § 11-24-2.1(l) (2011); VT. STAT. ANN. tit. 1 § 144 (West 2011); WASH. REV. CODE § 49.60.040 (15) (2011); A.B. 211, 2011 Leg., 76 Sess. (Nev. 2011); H.B. 502, 2011 Leg., 187 Sess. (Ma. 2011).

163. Employment Non-Discrimination Act, H.R. 1397, 112th Cong. § 8(a)(3) (2011) ("Nothing in this Act shall be construed to establish an unlawful employment practice based on actual or perceived gender identity due to the denial of access to shared shower or dressing facilities in which being seen unclothed is unavoidable, provided that the employer provides reasonable access to adequate facilities that are not inconsistent with the employee's gender identity as established with the employer at the time of employment or upon notification to the employer that the employee has undergone or is undergoing gender transition, whichever is later.").

164. *See, e.g.*, COLO. CODE REGS. § 708-1 Rule 81.11 (2011); WASH. STATE HUMAN RIGHTS COMM'N, GUIDE TO SEXUAL ORIENTATION, GENDER IDENTITY, DISCRIMINATION AND WASHINGTON STATE LAWS: SELF-ASSESSMENT CHECKLIST FOR COMPLIANCE AND SUGGESTED BEST PRACTICES FOR EMPLOYMENT 6, *available at* http://www.hum.wa.gov/Documents/Publications/SelfAssessments/Self-Assessment-Employment2ndEdition.pdf; IOWA CIVIL RIGHTS COMMISSION, SEXUAL ORIENTATION AND GENDER IDENTITY: AN EMPLOYER'S GUIDE TO IOWA LAW COMPLIANCE, *available at* http://www.state.ia.us/government/crc/docs/SOGIEmpl.pdf; D.C. MUN. REGS. tit. 4 § 802 (2006).

165. Tobin, *Fair and Accurate Identification, supra* note 4.

the Real ID Act initially caused some state agencies to be concerned about any changes to driver's license data, stricter, surgery-based policies on gender markers were not promulgated.[166] Despite the terrorism scare, the trend in the last decade has been away from surgery-based policies and toward gender identity-based policies.[167] The District of Columbia currently has a model policy because it provides a corrected gender marker upon (1) signed documentation from the license holder that they are seeking to have the gender on their license corrected to reflect their gender identity, and (2) the signature of a health or social service professional who attests, in their professional opinion, that the person's gender is as stated.[168] Slightly modified versions of D.C.'s policy have been adopted in New Jersey, Maine, Massachusetts, Pennsylvania, Rhode Island, and Virginia. Although not modeled on the D.C. policy, new policies that eliminated surgery requirements have also been adopted in Colorado, Florida, Nevada, New Mexico, and Ohio. Many other states have long maintained non-surgery based policies.[169]

Furthermore, although not yet adopted nationally, the trend with regard to homeless shelter policies is increasingly to house people based on their self-identified gender, regardless of whether a person has had any medical treatments. Because most homeless shelters are segregated by gender and

---

166. One state to roll its policy back was Michigan, which had a policy of self-identification a decade ago. Under the old policy, a person only had to sign a generic form (used for many purposes), writing a sentence that stated that he or she wished the gender on his or her license changed, and the correction was granted, with questions by the staff prohibited. The policy stated: "DO NOT ASK THE APPLICANT TO SPECIFY THE REASON FOR THE REQUEST." MICH. DEP'T OF STATE, TR-34, CHANGING GENDER (1995) (on file with author). The policy was ended in 2003 and changed to a surgery-based policy, due to a change in Secretary of State—not due to any problem caused by the policy, according to state advocates. The policy has changed two more times at least. Dawn Wolfe Gutterman, *Secretary of State Reverses Pro-Trans Policy*, PRIDE SOURCE, May 12, 2005, http://www.pridesource.com/article.html?article=14010; Interview with Jay Kaplan, Attorney, ACLU of Michigan, Detroit, MI (Oct. 2, 2012).

167. Tobin, *Fair and Accurate Identification*, *supra* note 4.

168. The D.C. DMV has an easy-to-use and easy-to-process form developed specifically for gender marker corrections. Gender Designation on a License or Identification Card (D.C. Dep't of Motor Vehicles, 2006), *available at* http://dmv.dc.gov/info/forms/gcp-app_pdf.shtm; *see also* Tobin, *Fair and Accurate Identification*, *supra* note 4; Mara Keisling et. al., *Gender Identity and the Driver Licensing Process*, AM. ASS'N OF MOTOR VEHICLE ADM'RS, Aug. 3, 2011, *available at* http://www.aamva.org/largefiles/webinars/GenderIdentityAndDLProcess_08032011.wmv; Tom Manuel, *Transgender Drivers: New Norms in Customer Service*, MOVE MAG., Spring–Summer 2011, at 29.

169. *See, e.g.*, Memorandum from Patricia D. Aducci, Comm'r N.Y. Dep't Motor Vehicles b(April 29, 1987), *available at* http://rnytg.org/DMVGenderChangeMemo.pdf (noting that "[p]roof that an operation occurred is no longer necessary."); *see also Driver's License Policy By State*, *supra* note 71.

many do not have private areas for changing or bathing, historically there had been a policy of housing people according to their genitals. In 2003, the National Coalition for the Homeless adopted a resolution urging shelters to house people according to their "self-identified gender."[170] Shelter systems, such as those in Boston, New York City, San Francisco, and Washington, D.C., have had formal policies to this effect for years and the implementation has not caused any problems.[171]

In sum, legislatures and policymakers in a variety of arenas have determined that surgical treatment is immaterial to whether a person should be recognized in accord with the person's gender identity.

### 4. Reasons Given for a Surgical Requirement are Not Valid

Originally, recognizing that surgery changed a person's gender was a progressive idea—it provided a way for transgender people to correct their gender markers on official government documents whereas before, there was no option to correct the gender marker at all. Generally, courts and agencies have not articulated a state interest in a surgery requirement, presumably because the choice of surgery was so obvious as the dividing line between male and female that the reason it had been used was not seen as necessary to articulate. Thus, it is difficult to locate arguments in favor of a surgery requirement. The few examined below are taken mostly from driver's license and marriage recognition contexts, and one policy debate on birth certificates in New York City. The arguments can be understood best as three separate concerns; as such, they are each explained and analyzed in turn.

#### a. Fraud or Security

On the rare occasions when a court or agency tries to justify a surgical standard, the government sometimes articulates an interest in "fraud pre-

---

170. Broader best practices were described in a joint publication of the National Coalition for the Homeless and the National Gay and Lesbian Task Force, which also includes the National Coalition for the Homeless resolution in its Appendix. LISA MOTTET & JOHN M. OHLE, TRANSITIONING OUR SHELTERS: A GUIDE TO MAKING HOMELESS SHELTERS SAFE FOR TRANSGENDER PEOPLE, app. A (2003).

171. Interview with Mara Keisling, *supra* note 158.

vention."[172] This issue often arises in reference to same-sex marriage,[173] and sometimes is presented more generally and vaguely as a potential security problem. For example, there has been the suggestion that terrorists[174] could take advantage of the ability to alter gender markers on birth certificates.

With regard to marriage, most states do not require a person to show a birth certificate when applying for a marriage license; instead, they typically require a driver's license,[175] which, as discussed above, often allow people to change their gender markers without proof of surgery. There have been no reported cases of same-sex couples made up of two non-transgender people where one person changes the gender marker on a driver's license for the purpose of receiving a marriage license.[176]

With regard to the claim that people may disguise their gender to be better able to commit crimes or terrorist acts, one prominent transgender advocate has commented that the last thing a person who is trying to blend in and escape notice should do is dress in the opposite gender.[177] Furthermore, federal policy implicitly indicates that gender marker changes do not impair national security interests. For example, in implementing the Real ID Act, the Department of Homeland Security decided to "leave the deter-

---

172. Daniel Trotta, *Being Transgender No Longer About Surgery in N.Y.*, REUTERS, Nov. 22, 2006, http://uk.reuters.com/article/2006/11/23/lifestyle-life-transgender-dc-id UKN2020431620061123 ("Opponents are concerned about the possibilities for fraud."). Kenji Yoshino, notes a potential objection: "[P]revention of fraud: Lowering the barriers to sex reassignment increases the incentive for individuals who have no sincere desire to change their sex to do so for opportunistic reasons." Kenji Yoshino, *Sex and the City: New York City Bungles Transgender Equality*, SLATE, Dec. 11, 2006, http://www.slate.com/articles/news_and_politics/jurisprudence/2006/12/sex_and_the_city.html.

173. Interview with Reverend Moonhawk River Stone, M.S., LMHC, to author (confirmed Feb. 11, 2012).

174. Yoshino, *supra* note 172 ("[N]ational security: Permitting individuals to make any alterations to their birth certificates makes those records less useful to Homeland Security.").

175. This determination was made after a review of requirements for the 50 states and DC listed on *Marriage License Requirements By States*, USMARRIAGELAWS.COM, http://usmarriagelaws.com/ (last visited Dec. 28, 2011).

176. The implausibility that non-transgender people would fraudulently seek a gender correction on their birth certificate in order to receive a marriage license is easily rebutted when analogized to different situations. For example, typically people understand that fraudulent manipulations, such as a 13 year-old pretending to be 18, would not require the government to recognize a marriage involving a 13 year old. Similarly, non-transgender gay and lesbian people generally understand that they will not receive a legally valid marriage by fraudulently changing the gender marker on their government identity documents.

177. Interview with Mara Keisling, *supra* note 158; GRANT ET AL., *supra* note 54, at 163 (noting that seven percent of participants "reported being arrested or held in a cell strictly due to bias of police officers on the basis of gender identity/expression").

mination of gender up to the States."[178] Further, the State Department allows individuals to update gender markers on their passports without surgery.[179] These should be taken as indications that gender was not an important classification related to prevention of terrorism in the federal government's view.

In fact, there are particularly strong arguments that security and law enforcement agencies' ability to protect the public is *enhanced* by having gender marker policies that are not based on surgeries, but are instead based upon the gender to which a person has transitioned. Transgender people often report being delayed, detained, or otherwise harassed by law enforcement officers because the gender marker on their ID does not match their external gender expression.[180] Sometimes officers are concerned the ID is fraudulent and take various steps to determine the legitimacy of the document. This extra scrutiny consumes law enforcement resources that are better spent identifying truly counterfeit identity documents or dealing with other law enforcement duties.

A second advantage for law enforcement of accurate, up-to-date gender markers involves situations in which police officers respond to crimes, identify witnesses, or attempt to locate persons of interest. The officer attempting to locate someone is better served by knowing the gender that the person is known as by friends and acquaintances, who may be confused or unhelpful when the officer asks about the "woman" or "man" who lives next door. Similarly, when the officers interact with a victim or a witness, they are more likely to alienate a transgender man, with a female designation on his license, by using the terms "ma'am" and "Ms.," or by using "sir" or "Mr." for a transgender woman. This alienation could make the transgender person, or others aware of the disrespect shown, less likely to trust, inform, and work with police in the instant case or in future situations.

In conclusion, there are no realistic fraud or security concerns that are addressed by maintaining a surgery requirement. On the contrary, federal

---

178. 6 C.F.R. § 37.17 (2008) ("Requirements for the surface of the driver's license or identification card. To be accepted by a Federal agency for official purposes, REAL ID driver's licenses and identification cards must include on the front of the card (unless otherwise specified below) the following information: . . . (c) Gender, as determined by the State."). In the explanatory notes that accompany the rule, DHS explains that it "will leave the determination of gender up to the States since different States have different requirements concerning when, and under what circumstances, a transgendered [sic] individual should be identified as another gender." Minimum Standards for Driver's Licenses and Identification Cards Acceptable by Federal Agencies for Official Purposes, 73 Fed. Reg. 5272, 5301 (Jan. 29, 2008) (to be codified at 6 C.F.R. pt. 37).

179. *See supra* notes 132–133 and accompanying text.

180. Interview with Mara Keisling, *supra* note 159.

security experts at the U.S. Department of Homeland Security and U.S. Department of State have instead established or changed policies to allow gender markers to be updated without surgery.

### b. Permanence of the Correction

Occasionally, an administrator or judge will state the desire for permanence or irreversibility as a requirement for granting a correction of gender.[181] Presumably, the concern is that someone could "switch back" after changing their gender. The harm to society if a person undergoes a gender correction more than once is never explicitly identified.[182]

A policymaker misses the mark if he or she focuses on avoiding multiple corrections. The proper agency aim should be to maintain *accurate* records. A record should be updated to maintain accuracy as often as there is a change to relevant data. For example, if a person changes his or her name four times over their life due for various reasons, and seeks to amend their birth certificate each time, updating the birth certificate several times maintains an accurate record for them throughout his or her entire life.

In addition, research proves that a concern about impermanence is unsupported by the evidence. Data show that a return to previous gender happens extremely rarely and is generally a result of discrimination and rejection from family, friends, and colleagues.[183] A person is no less likely to transition back to the originally assigned gender after surgery as opposed to before surgery.[184]

There is another reliable way in which people can indicate to the agency that they have undergone medically-recognized gender change: namely, an evaluation by a medical professional. An evaluation from a medical professional should be sufficient to determine if an individual has un-

---

181. Cave, *supra* note 155 (quoting the city's health commissioner as saying "[s]urgery versus nonsurgery can be arbitrary[.] . . . Somebody with a beard may have had breast-implant surgery. It's the permanence of the transition that matters most."). Maryland's highest court, in considering whether the judicial system has authority to grant a legal order of gender change, decided that the court's equitable jurisdiction did cover such orders, and remanded to the courts below to determine whether the petitioner had "completed a permanent and irreversible change from male to female." *In re* R.W. Heilig, 816 A.2d 68, 87 (Md. 2003).

182. Although the administrative burden of having to process multiple changes may be a cause for concern, this could be addressed by charging fees for corrections. It is difficult to imagine what other harms may exist without resorting to concerns about maintaining sex stereotypes or differences between the sexes.

183. *See* M. Landen et al., *Factors Predictive of Regret in Sex Reassignment*, 97 ACTA PSYCHIATRICA SCANDINAVICA 284 (1998).

184. Even a surgical requirement does not eliminate the possibility of a person changing gender a second time. Relevant surgical procedures could be reversed or undertaken to change a person's body again.

dergone a gender transition and that the gender marker should be changed. Because no method can guarantee that a person may not elect to transition their gender a second time, the method of deferring to a medical professional should be sufficient.

A policy allowing a larger majority of people to have accurate birth certificates should not be dismissed due to conjecture concerning outliers who may change their gender more than once, especially because there is no articulation of the harm to society caused by multiple gender corrections. Instead, the focus should remain on maintaining accurate records.

c.   Concerns About Sex-Specific Facilities and Situations

Sometimes government actors, or others who favor surgical requirements, claim that sex-segregated institutions need to know people's anatomical structure, either to ensure bodily privacy or for the prevention of assault.[185] Or, they may assert that for sex-specific jobs or job duties, such as those that might exist in a nursing or medical facility (although increasingly rare), bodily privacy of clients would be violated if a staff member of one anatomical structure observes or treats an unclothed client of another anatomical structure.[186] Yet, on a daily basis and in almost all social situations, a

---

185. Yoshino, *supra* note 171 (describing reservations "voiced by institutions like hospitals, jails, and schools, which routinely segregate according to sex" and explaining others' potential objections). Yoshino also notes that:

"Another moment of reflection suggests at least four interests that a person or the state might have in another person's gender. First, personal safety: Many communal spaces, like prison cells and public bathrooms, are segregated by sex to protect women, who are generally physically weaker than men, from assault or rape. Second, privacy: As employment-discrimination law recognizes, individuals have an interest in ensuring that their sexual privacy is not invaded by members of the opposite sex in contexts like nursing or medical care. . . . There is little evidence that transgender individuals present a security risk to women, while there is a great deal of evidence that transgender individuals themselves are at immense risk if they are not given accommodations. To the extent that privacy concerns rest on a fear of sexual objectification, they rely on a specious assumption of universal heterosexuality." *See also* Daniel Trotta, *New York Rejects Transgender Birth Certificate Law*, REUTERS, Dec. 5, 2006 (quoting a health department official as saying "how can you send a person with a penis to a women's prison?").

186. "As employment-discrimination law recognizes, individuals have an interest in ensuring that their sexual privacy is not invaded by members of the opposite sex in contexts like nursing or medical care." Yoshino, *supra* note 171. However, it should be noted that the case law on this question is quite old and modern nursing practices, for example, do not include dividing tasks by sex. *See, e.g.*, Backus v. Baptist Med. Ctr., 510 F. Supp. 1191, 1193 (E.D. Ark. 1981), *vacated as moot*, 671 F.2d 1100 (8th Cir. 1982). Telephone Interview with Allyson Pearlman, 2010 graduate from the Simmons College of Nursing (July 30, 2011) (noting that in her recent education and previous multi-year experience as a volunteer at UCLA Jonsson Cancer Center, she has never seen jobs or job duties divided by gender, and the only instruc-

person's genitals remain entirely private, even inside sex-segregated facilities or in work situations where a person is performing gender-specific duties.[187]

Increasingly, it is rare that people find themselves in environments that involve potential observation of another person's genitals (such as in a shared showering facility inside an institution, like a homeless shelter or prison). Within these contexts, before or at the relevant moment, a person will generally disclose to the authorities that he or she has a different anatomical structure than is typical for that facility. As a general rule, transgender people who have not had genital surgery are very likely to go to great lengths to avoid having other people observe their unclothed bodies. If they are able to do so, their bodily characteristics should not be considered relevant. If one is not able to keep their body private, the facility will learn of the person's bodily anatomy as a practical matter, typically through voluntary verbal disclosure.[188]

Individuals who believe that transgender people should complete surgery before being allowed to change their birth certificates often cite the protection of women as their main goal. More specifically, these individuals feel that transgender women who have not undergone surgery will enter women's bathrooms and locker rooms to sexually assault non-transgender women who also frequent those facilities. However, this concern is based on several incorrect assumptions, including that access to these facilities is currently based on the gender marker listed on a person's birth certificate.

---

tion that she received related to this was during cultural competence training, where she was instructed that some Muslim patients may request nurses of the same gender). Also relevant to the issue of gender-specific tasks related to bodily privacy are studies done on whether women prefer male or female gynecologists. Data suggest that gender is not particularly important when women choose gynecologists. *See* Michael Zuckerman et al., *Determinants of Women's Choice of Obstetrician/Gynecologist*, 11 J. WOMEN'S HEALTH & GENDER-BASED MED. 175, 175–76 (2002) (finding that 62% of women did not feel strongly about the gender of their provider and that "almost as many women with a female provider indicated a preference for a male provider (46%) as women with male providers indicated a preference for a female provider (54%)"); Amy M. Johnson, et. al., *Do Women Prefer Care From Female or Male Obstetrician-Gynecologists? A Study of Patient Gender Preference*, 105 J. AM. OSTEOPATHIC ASS'N 369, 369 (2005) ("[t]he majority of patients (66.6%) had no gender bias when selecting an obstetrician-gynecologist, and an even larger majority (198, 80.8%) felt that physician gender does not influence quality of care. There was no statistical difference in patient satisfaction based on physician sex.").

187. "[P]reoccupation with the appearance of body parts that are already hidden from public view has no justification." Tobin, *Against the Surgical Requirement, supra* note 4, at 420.

188. It is difficult to imagine an instance where a transgender woman, who still has male genitalia and who has struggled all her life to be seen as a woman by others, would walk into an open women's shower without attempting to conceal that area of her body.

In fact, the large majority of sex-segregated facilities do not maintain written policies with regard to restroom access. Although this is changing, the default rule is essentially a social one: if you look like a man, you can use the men's room and if you look like a woman, you can use the women's room.

When a person's gender is challenged, a person is likely to receive access only if they can present identification with a matching gender marker. An entity will sometimes ask for additional information, such as surgical status, before allowing access. Those who do not have the correct gender on their ID (which is more likely for those whose birth certificates are inaccurate) may be asked to show documentation of their surgical status, a letter from their health care provider, or other official documentation.

The stated concerns are further undermined by the fact that a wide range of companies, organizations, and public places *already* have in place best practices dictating use of facilities by transgender people. These policies explain that transgender people may and should use the restroom and/or locker rooms according to their *gender identity*, not their anatomical structure.[189] As explained above, non-discrimination laws, which cover 45 percent of the U.S. population,[190] are regularly interpreted to ensure that transgender people can access restroom and shower facilities based on their gender identity, regardless of their anatomical status. Moreover, there are no reported cases of these laws being used to gain improper access to a facility for criminal purposes.

Thus, allowing transgender individuals to correct the gender marker on their birth certificates would not markedly alter the existing trend to base access to facilities on self-identity.

The alleged importance of a surgical standard is also sometimes asserted when discussing placement of individuals who are incarcerated. The fear is that non-transgender women in jail, prison, or juvenile justice facilities will be sexually assaulted by transgender women who have not yet had surgery. First, it is important to understand that gender markers on birth certificates have almost no influence on where people are placed in prison, juvenile justice facilities, and longer-term jail stays.[191] The only cognizable

---

189. Mottet & Ohle, *supra* note 169; *see also* ERNST & YOUNG, WORKPLACE GENDER TRANSITION GUIDELINES (2006) *available at* http://www.hrc.org/files/assets/resources/ErnstYoung_TransitionGuidelines_2006.pdf.; Peter Likins, *Statement on Restroom Access*, UNIV. OF ARIZ. (June 26, 2006), http://equity.arizona.edu/restroom_access.

190. NAT'L GAY & LESBIAN TASK FORCE, *supra* note 77.

191. In addition to the strip search conducted to identify contraband that often precedes incarceration, prisons and juvenile justice facilities generally do medical exams of incoming prisoners. Transgender individuals are then classified/housed by their ex-

situation in which a birth certificate gender marker could become relevant would be for the initial twenty-four to seventy-two hours after arrest while in a jail or holding cell. Second, for a variety of reasons,[192] police are likely to know that the person they arrested is transgender. Thus, even if a person's birth certificate had been altered to reflect their identified gender prior to surgery, the police are unlikely to make housing decisions based on the certificate. As a result, birth certificate policies could only potentially affect an extremely small percentage of transgender women's placement.[193]

Furthermore, just as in homeless shelters and sex-segregated spaces generally, there is a new standard related to the placement of transgender people in jails and prisons. This standard makes a transgender person's physical anatomy only one consideration in housing determinations. The recently promulgated Prison Rape Elimination Act regulations which apply to all prisons, jails, and lockups in the U.S., set forth exactly this policy: that housing classification, including whether a person is to be housed in the male or female facility, be made on a case-by-case basis.[194] Notably, gender

ternal genitalia, regardless of documentation. *See* Farmer v. Haas, 990 F.2d 319, 320 (7th Cir. 1993) ("The practice of the federal prison authorities . . . is to incarcerate persons who have completed sexual reassignment with prisoners of the transsexual's new gender, but to incarcerate persons who have not completed it with prisoners of the transsexual's original gender.").

192. Strip searches when being placed in a cell or holding area with others are common for those who are arrested for violent crimes or drug-related activity so that police can look for weapons, drugs, or other contraband. *See* Brief of the A.B.A. as Amicus Curiae in Support of Petitioner, Florence v. Board of Chosen Freeholders of the County of Burlington (June 27, 2011) (No. 10-945), 2011 WL 2578557, at *8, *12–*14. Furthermore, if people have been arrested before, their arrest or criminal record should disclose their transgender status to arresting police. Finally, police, depending on what is available to them from the driver's license database, are likely to be able to quickly determine whether the arrestee has undergone a name change by examining their driving record, so unless the person had a gender-neutral name at birth, the name change would likely disclose to officers that the arrestee is transgender.

193. In order for the police not to determine that a transgender woman arrestee is transgender, she would have to (1) be arrested for the first time, (2) be arrested for a nonviolent crime not involving drugs, (3) not be visibly transgender, and (4) have a driver's license record that does not indicate that a gender or name change occurred.

194. National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106 (June 20, 2012) (to be codified at 28 C.F.R. pt. 115) (mandating that transgender and intersex inmates, who may be especially vulnerable, receive an individualized assessment on whether the inmate should be housed in a male or female facility). In making the assessment, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems. *Id.*; *see* WASHINGTON D.C. DEP'T OF CORRECTIONS, INMATE MANAGEMENT RULE 4020.3C, PROGRAM STATEMENT: GENDER CLASSIFICATION AND HOUSING (2011) (explaining that for inmate housing classification, the Transgender Committee makes the assessment and

markers on birth certificates are not considered in placing inmates. These new policies are being established because of the very real levels of sexual violence transgender women face when housed in male areas of jails, prisons, and juvenile justice facilities. According to a University of California-Irvine study in 2007, transgender women in male units experience thirteen times more sexual assault than non-transgender men in the unit.[195]

Last, it is also important to note that one court has found that a female inmate had no right to a different cellmate after she had been placed with a transgender woman who had not had genital surgery. In this case, the court considered whether the inmate possessed a clear constitutional right to be housed with someone having the same anatomical structure and concluded that they did not.[196] Thus, the only court to consider whether there was a right for an inmate to be housed with an anatomically similar inmate has concluded that no such right exists.

Ultimately, transgender women using or living in sex-segregated facilities do not create or increase threats to non-transgender women, regardless of whether those facilities are bathrooms, jails, prisons, homeless shelters, foster care group homes, or college dormitories. In fact, many of these facilities long ago voluntarily abandoned surgical or anatomy-based requirements, recognizing that safety and fairness dictate that transgender people be provided access to the facility that matches their gender identity. Thus, while updating the legal standard for correcting birth certificates will have some positive effects for some transgender people who are currently denied access to sex-segregated facilities because of their lack of government identity documents, overall, there will be little to no noticeable effect on the

---

recommendation after interviewing the transgender inmate based on safety/security needs, housing availability, gender identity, and genitalia); KING COUNTY, WASHINGTON DEP'T OF ADULT AND JUVENILE DETENTION, ADULT DIVISIONS, GENERAL POLICY MANUAL 6.03.007 TRANSGENDER INMATES (2006) (assigning inmates' housing based on their safety/security needs, housing availability, gender identity, and genitalia).

195. VALERIE JENNESS ET AL., VIOLENCE IN CALIFORNIA CORRECTIONAL FACILITIES: AN EMPIRICAL EXAMINATION OF SEXUAL ASSAULT, UNIV. OF CALIFORNIA-IRVINE 3 (2007), *available* at http://ucicorrections.seweb.uci.edu/pdf/FINAL_PREA_REPORT.pdf.

196. "Expert medical opinion informed Jail officials that housing Lamson [a transgender woman] with the female population would best satisfy Lamson's unique psychological needs and that there was *no risk to the female inmates*. . . . Although it is clear that there is a constitutional right to privacy, I conclude that the contours of that right are not clear when it comes to the determination of where to house transsexuals. Such a constitutional right was not 'clearly established in its more particularized sense' under these circumstances." Crosby v. Reynolds, 763 F. Supp. 666, 669–70 (D. Me. 1991) (emphasis added).

safety of sex-segregated facilities for non-transgender people if birth certificate laws and policies are modernized to eliminate the surgical standard.

5. Surgical Requirements Raise Serious Constitutional Concerns

The surgical requirement for gender correction raises both Equal Protection and Substantive Due Process concerns.

There is a well-founded Equal Protection Clause argument to be made that a surgical requirement discriminates against the class of transgender people—who all must have surgery or else be denied an accurate birth certificate—compared to non-transgender people who have accurate birth certificates without being required to undergo surgery.[197] Depending on which level of scrutiny the court would apply to the class of transgender people, at minimum, there would have to be a legitimate state interest that the surgical policy was rationally related to advancing. None of the policy reasons related to fraud, permanence, and sex-segregated facilities, which were articulated and dismissed in this Section, should be considered rationally related to a legitimate[198] state interest.[199]

---

197. A second approach under the Equal Protection Clause would be to compare transgender people who have had surgery versus those who have not had surgery. This type of distinction, based on surgical status, is more likely to receive rational basis review.

198. Interests of prevention of fraud and security, and safety, may all be legitimate, however, the surgical rule fails because it is not *rationally related* to advancing these interests.

199. Presumably, the government might also make an argument that a surgical standard is simply easier to administrate than other options. Given the multitude of different surgeries that a person may receive, as well as the fact that the way most agencies determine that surgery has been undergone is through a letter or other document from a health care provider, it should not be *more* difficult to process a letter or other document from a provider stating that the person has had appropriate treatment for the purpose of gender transition. Thus, the argument that surgery is an easier standard to administrate is faulty.

Moreover, there is a sound argument that transgender people deserve either heightened[200] or strict scrutiny[201] in Equal Protection analysis. If the former, the reasons for the policy would need to be "important" and the policy would need to be "substantially related" to forwarding that interest. If the latter, the policy reasons would need to be "compelling" and the policy would need to be "narrowly-tailored" to advancing that interest. Even if a court was to declare that the state interests were "legitimate" and the classification was rationally related to meeting that interest, which would enable it to pass rational basis review, these policy justifications should certainly fail under heightened review or strict scrutiny.

There are also a series of rights implicated by surgical requirements that could be protected by the Substantive Due Process protections of the

---

200. Heightened or "intermediate" scrutiny is provided for all classifications based on gender. *See* United States v. Virginia, 518 U.S. 515 (1996). A good argument can be made that this issue qualifies for heightened scrutiny because at its most basic level, the government is making a classification based on gender when it is determining which gender marker is appropriate and it is potentially judging or classifying a person based on their sexual characteristics, which may be related to sex stereotypes about what makes a man and a woman. *See* Glenn v. Brumby, 663 F.3d 1312, 1316 (11th Cir. 2011) (reasoning that a "person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes" and therefore that discrimination against transgender individuals on the basis of their gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause, which receives heightened scrutiny). In addition, the Department of Justice released a report saying that all LGBT people should receive heightened scrutiny. U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF THE NEW ORLE-ANS POLICE DEPARTMENT 33 (2011) *available at,* http://www.justice.gov/crt/about/spl/nopd_report.pdf ("[W]e note that a number of factors weigh in favor of applying heightened scrutiny in the context of discrimination by law enforcement on the basis of sexual orientation and gender identity, including a long history of animus and deeply-rooted stereotypes about lesbian, gay, bisexual, and transgender ('LGBT') individuals.").

201. In determining whether to apply a heightened level of scrutiny, the Supreme Court has set forth two requirements: (1) that the group affected have been historically victims of discrimination by the government, and (2) that the characteristics that differentiate the group bear "no relation" to the ability of members of that group to contribute to society. *See* Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 313 (1976); Frontiero v. Richardson, 411 U.S. 677, 686 (1973). In addition, courts have sometimes considered whether the characteristics that define the group are immutable and whether the group is politically powerless. *See* Nyquist v. Mauclet, 432 U.S. 1, 9 n.11 (1977) (demonstrating the flexibility of immutability by holding that classifications based on alienage warrant heightened scrutiny even though they can naturalize); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28 (1973) (finding that poor families are not politically powerless). Transgender people should be able to meet the two required factors and also satisfy the two other characteristics that courts have considered. Therefore, they should be deemed a "suspect class" for purposes of applying Equal Protection analysis.

Constitution. First, there is a long-established right to be free of unwanted medical treatment.[202] Second, there is a long line of cases establishing the right to choose parenthood and control one's reproductive capacity.[203] Third, there is a right to be free of sterilization.[204] The latter two rights are restricted by surgical requirements because sterilization and other effects on one's reproductive capacity are inherent in many sex reassignment surgeries. In addition, a good argument can be made for a previously unrecognized right to gender self-determination.[205] Thus, if the government desires to limit any of these rights—which a surgical requirement does[206]—the government action would need to be justified by a compelling state interest, with the policy narrowly tailored to forwarding that interest.[207] As previously discussed, however, the articulated policy reasons for a surgical requirement do not meet that standard.

All of the Substantive Due Process arguments should also be considered valid public policy concerns, even if a court would not accept them as constitutionally guaranteed freedoms. For example, some would argue that the highly personal and private nature of a person's decisions regarding surgical options should not be interfered with by the government, that an individual's bodily integrity should be protected against government intrusion, and finally, that sterilization should not be required of any citizen without a serious public policy justification.

---

202. *See, e.g.*, Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261 (1990).

203. *See, e.g.*, Griswold v. Connecticut, 381 U.S. 479 (1965); Roe v. Wade 410 U.S. 113 (1973); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992).

204. *See, e.g.*, Skinner v. Oklahoma, 316 U.S. 535 (1942).

205. This argument would be based on *Lawrence* and, more generally, existing Substantive Due Process jurisprudence that recognizes a person's intimate and personal decisions should be respected absent government need to the contrary. Lawrence v. Texas, 510 U.S. 538 (2003). There is also international support for the existence of this right. *See* Goodwin v. United Kingdom, Eur. Ct. H.R. 1 (2002).

206. A surgical requirement can interfere with these rights for several reasons. First, for many, surgery is unwanted medical treatment. Second, a side effect of surgery is often sterilization, which would interfere with one's ability to parent and control one's reproductive capacity. Third, a person's right to gender self-determination is interfered with when the government insists upon providing official government documents that contradict one's self-determination and disclosing this information to third parties.

207. The rights listed are typically referred to as *fundamental* rights, although the Court may be shifting to a "liberty interest" frame, where the requirement that rightsbe connected to or established by our nation's history is no longer present. In addition, the test for the restriction of fundamental rights may be becoming less rigid. For a discussion of the evolution of substantive due process analysis, see Laurence H. Tribe, Lawrence v. Texas: *The "Fundamental Right" That Dare Not Speak Its Name*, 117 HARV. L. REV. 1893, 1897–98 (2004).

Regardless of the strength of these arguments, state governments should be concerned that they will be subject to litigation, potentially based on state or federal constitutional provisions. Two lawsuits were filed in 2011 challenging surgical requirements for updating birth certificates and driver's licenses.[208]

### C. Specific Recommendation for Legal Standard for Gender Correction

Individuals should be permitted to correct the gender marker on their birth certificates if they make a gender transition that is medically recognized, using a modern medical understanding of transgender people. As official government records, birth certificates must remain reliable documents; therefore, it is important to establish a process to ensure that the amendments are reliable. Usually, agencies require external verification when individuals wish to make other corrections to their birth certificates (e.g. name, paternity, etc.). In order to put forth a statute that will be acceptable by government agencies, some compromise[209] in the form of external verifica-

---

208. In Alaska, the state ACLU challenged the driver's license / state identification card policy of requiring surgery on the grounds that it violated substantive/fundamental rights protected by the Alaska Constitution. *See* Brief of Appellant, K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431 (Alaska Super. Ct. July 18, 2011), *available at* http://www.akclu.org/InTheCourts/KLvAlaska.AppellantsBrief.pdf. In a Memorandum of Decision, the judge determined that the surgery-based policy was not enacted with appropriate procedure, thus struck it down, not reaching the larger constitutional claims brought by the plaintiffs. However, the judge did determine that the agency not having a gender correction policy at all constituted a breach of the right to privacy of the transgender licensee. K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) (memorandum decision). In New York, the New York City birth certificate policy of requiring proof of surgical treatment was challenged on the basis that it violated the city's Administrative Procedure Act, was an arbitrary and capricious agency action, and was a violation of numerous provisions of the New York City Human Rights Law. *See* Press Release, Transgender Legal Defense and Education Fund, Transgender Rights Group Files Lawsuit Against New York City Over Refusal to Correct Transgender Birth Certificates (March 22, 2011), *available at* http://tldef.org/press_show.php?id=327.

209. Some may favor a self-identity based policy. *See, e.g.,* TRANSGENDER EQUAL. NETWORK IR., A TIME FOR RECOGNITION: RESPECT, RECOGNITION AND EQUALITY FOR TRANSGENDER PEOPLE 9, *available at* http://www.teni.ie/attachments/714a4ffb-3240-496b-8905-06002a24d6c7.pdf ("TENI would propose that a statutory declaration rather than an affidavit would be appropriate for gender recognition and that the person swear that they have given the matter careful consideration and declare their wish to change their gender and have this recognized legally."). In Argentina, a self-identity based policy, with no external verification, is now national law. *See supra* notes 38–40 and accompanying text. Yet, given the lack of even any U.S. driver's license policies, seen as less legally meaningful, being based entirely on self-identity with no external verification, it seems unlikely that a jurisdiction would

tion is necessary. However, it can be done without obstructing a person's constitutional rights and can be done in a way that comports with contemporary medical understanding.

Although the complete model law is presented in Part V.,[210] the relevant portion regarding the standard of proof is the following:

> A notarized statement from the registrant's licensed treating or evaluating physician or health care provider stating that the registrant *has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition, based on contemporary medical standards*, or stating that the registrant has an intersex condition, and that in the *provider's professional opinion* the registrant's gender designation should be changed accordingly.

There are seven important features to this model language:

(1) First, the language uses the term "licensed physician or health care provider" because, as the Standards of Care recognize, a number of physicians and non-physician health care providers can be appropriately involved in a person's gender transition and have the requisite knowledge to make a competent evaluation. This language is broad enough to include therapists, psychologists, psychiatrists, social workers, as well as other physicians who are licensed to provide health care.

(2) Second, there is no requirement that the provider personally conducted or supervised the person's treatment—a provider

---

agree to a solely self-identity based policy for birth certificates. In addition, there are some that want gender removed entirely from the birth certificate. *See* Spade, *supra* note 4, at 805–08. This is more feasible than one might think because the government health statisticians who want gender data can get it on the more detailed health questionnaire that is filled out at the same time with the birth certificate. For example, the health questionnaire typically asks race, whether or not pre-natal care was received, and the health of the baby as delivered. While I am sympathetic to this way of thinking, at this point it is not politically realistic to suggest to state legislatures to remove gender entirely. Also, as discussed in *supra* Part I.D.2., there are important practical and legal reasons that a person may need to have some official record of gender to present to authorities. A gender-less birth certificate cannot meet that need.

210. *See infra* Part V.

who has completed an evaluation should be considered qualified.[211]

(3) Third, the language uses the phrase "has undergone" as opposed to "complete," which is sometimes found in existing statutes and implies that the treatment has ended.

(4) Fourth, the language is clear that it is an *individual* standard and no specific medical treatment is required. This is due to the use of the conjunctive in "surgical, hormonal, *or* other treatment" as well as the important phrase "appropriate for that individual."

(5) Fifth, the reference to "contemporary medical standards" in the statute is included to help ensure that as medicine evolves, so does the statute.[212]

(6) Sixth, the language ensures that providers are exercising their professional judgment, based on the treatment they provided or based on their evaluation, with the phrase "in the provider's professional opinion."

(7) Seventh, the language has an alternative standard for those with intersex conditions so that they do not have to demonstrate treatment of gender transition. For people with intersex conditions, it is sufficient to only require that their provider deem it appropriate for the gender marker on their birth certificate to be corrected.[213]

## III. DEVELOPING AN ACCESSIBLE AND EFFICIENT PROCEDURE FOR GENDER MARKER CORRECTIONS

The procedure for correcting gender markers on birth certificates must be examined in light of two primary goals. First, the process for gender

---

211. This is in large part about convenience and practicality. Some people receive treatment from doctors in other countries. Also, occasionally, the specific provider who treated a person retires, dies, or is otherwise not easily locatable. Thus, any doctor who can evaluate the person should be eligible to provide the information about the person's treatment.

212. The inclusion of this "contemporary medical standards" phrase should also help legislators support the measure because they know that what they are endorsing is supported by modern medicine, which otherwise may not be obvious.

213. This is similar to the U.S. Department of State policy related to Consular Reports of Birth Abroad and Passports, which requires only the provider review the gender-related history of the applicant to determine which gender marker should be male or female. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL 1300, App. M, Intersex Conditions (2011) *available at* http://www.state.gov/documents/organization/1431 60.pdf.

correction should be as accessible as possible so that transgender people who warrant the correction can access it, regardless of their income or other personal factors. Relevant to this inquiry is primarily whether a court order process is used or whether a person can go directly to the agency with a provider's statement. Second, the process should be as efficient as possible to conserve government resources.

### A. Existing Laws and Policies Related to Process

While the MSVSA requires a court order, only twenty-two states, the Commonwealth of Northern Mariana Islands, District of Columbia, and U.S. Virgin Islands require court orders.[214] In nineteen states, New York City, and Guam, a doctor's affidavit or other documentation submitted directly to the vital statistics agency is sufficient evidence of a gender transition.[215] Three states allow a person to use either process.[216] Procedures are unclear in several other jurisdictions.[217]

One of the consequences of using a court order system, especially when the statutory standard is nonexistent or vague, is that individual judges are likely to establish or apply their own standards of eligibility for a gender correction based on their individual knowledge. Even if the word "surgery" is used in the statute, some judges may distinguish between the types of surgery they deem would make a petitioner eligible for the correction. This problem is exacerbated in states where people are required to go to court in their county of birth or residence, and thus are not able to go to an area of the state where judges might be more familiar with, and less biased against, transgender people and gender transition.[218] Similarly, if

---

214.  The states are Alabama, Alaska, Arkansas, California, Colorado, Delaware, Georgia, Indiana, Louisiana, Maryland, Missouri, Mississippi, Montana, Nevada, New Hampshire, Oregon, South Dakota, Utah, Virginia, Vermont, Wisconsin, and Wyoming. *See infra* app. A

215.  The nineteen states are Arizona, Connecticut, Florida, Hawaii, Iowa, Illinois, Kansas, Kentucky, Massachusetts, Maine, Michigan, North Carolina, North Dakota, Nebraska, New Jersey, New Mexico, New York, Rhode Island, and Washington. *See infra* app. A.

216.  These are Minnesota, Pennsylvania, and West Virginia. *See infra* app. A.

217.  These are Oklahoma, South Carolina, Texas, and American Samoa. *See infra* app. A.

218.  For example, in Vermont, people have to go to the probate judge in their county of birth. VT. STAT. ANN. tit. 18, § 5075 (West 2011). Each county has one elected probate judge. Although Vermont's probate judicial system is relatively easy to access and can be utilized without an attorney, this system remains highly restrictive because it increases the potential for someone having to appeal (and hire an attorney) if the elected judge in the county of birth denies the correction. Anecdotally, we know that the ability to go to certain judges or to the courts in a large geographic area, where most judges are more educated about and less biased toward transgender people, is an important survival technique. A system that forces a person to go to a

judges are attempting to determine what treatment is "appropriate" for the individual, one can imagine that different judges will come to different conclusions.

In an attempt to mitigate the problems of judicial inexpertise, both California[219] and Vermont adopted statutory language to limit judges' ability to determine what qualifies as appropriate medical treatment. In Vermont, the statute says that the documentation from the medical provider is "sufficient evidence,"[220] and in California, the documentation should be considered "conclusive proof" of the change in gender.[221] Furthermore, in California, the gender change process is already facilitated by a series of court-created, consumer-friendly forms that reduce the need for an attorney.[222]

In the twenty-four states without requirements for a court order, typically a doctor's statement (nine states), certificate (two states), letter (two states), or affidavit (nine states) must be provided directly to the vital statistics agency. Two jurisdictions require that the documentation be "sworn"[223] and seven require that the documentation be notarized.[224] Nine states require that the physician signing the letter or statement is the actual surgeon who performed the surgery.[225] Two states have more burdensome require-

---

specific judge or area of the state makes it more likely a person will be unable to steer away from discrimination. Interview with Kristina Wertz, *supra* note 114 (noting variation on outcome based on judge when California had a surgical requirement).

219. The new law could still be improved by eliminating the requirement of receiving a court order entirely. Conversations with transgender advocates in California indicate that they decided to address primarily the surgical requirement with this legislation. Additional, they have already attempted to minimize the burden of needing to go to court by creating a combined process for name and gender corrections and easy-to-use forms. Interview with Kristina Wertz, *supra* note 115.

220. Vt. Stat. Ann. tit. 18, § 5112(b) (West 2011).

221. Ca. Health & Safety Code § 103430 (West 2012). However, the strength of the "conclusive proof" statement is somewhat tempered by a later statement that "[a]t the conclusion of the hearing the court shall grant the petition if the court determines that the physician's affidavit shows that the person has undergone clinically appropriate treatment for the purpose of gender transition." *Id.*

222. The Judicial Council of California promulgates a variety of forms, including forms for the applicant, medical affidavits, and judicial orders and decrees. *See Browse All Forms*, California Courts, http://www.courts.ca.gov/forms.htm?filter=NC (last visited Dec. 27, 2011) (including relevant forms for name and gender changes: NC-200, NC-210, NC-220, NC-230, NC-300, NC-310, NC-320, and NC-330).

223. These are Kentucky and Guam. *See infra* app. A.

224. These are Iowa, Massachusetts, Maine, Nebraska, North Carolina, Rhode Island, and West Virginia. *See infra* app. A.

225. These are Connecticut, Illinois, Maine, North Dakota, Nebraska, New Mexico, Pennsylvania, Virginia, and West Virginia. *See infra* app. A.

ments for post-surgical reports or descriptions of procedures.[226] For Consular Reports of Birth Abroad, a letter on letterhead is required to be given directly to the State Department.[227]

Although it is not found as a written part of these policies, presumably these documents are examined for authenticity by agency staff. Requiring only a letter or notarized statement, as opposed to an "affidavit," should be easier for a non-lawyer to understand how to produce.[228] In addition, both the Consular Reports of Birth Abroad policy and the new California statute provide suggested language for the medical provider to include in a letter or statement. This also can be helpful for a non-lawyer to navigate the system.

Another important feature, which currently only exists in Connecticut, is a provision relating to the jurisdiction of judges to issue court orders to correct a current resident's gender on his/her birth certificate when they were born in a different state that requires a court order. Because of the time, money, travel, and other costs associated with traveling to the place of birth to hire an attorney and appear in court, it is significantly easier for individuals to file for a court order from their current state of residence. Connecticut's statute provides:

> In the case of a person who is a resident of this state and was born in another state or in a foreign jurisdiction, if such other state or foreign jurisdiction requires a court decree in order to amend a birth certificate to reflect a change in gender, the probate courts in this state shall have jurisdiction to issue such a decree.[229]

---

226. For New York, this involves "a letter from the surgeon specifying date, place, and type of sex reassignment surgery performed; an operative report from the sex reassignment surgery; and some additional medical documentation." For Virginia, the applicant needs a "preoperative diagnosis, postoperative diagnosis and description of procedure." *See infra* app. A.

227. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL, *supra* note 29, at 1320 app. M(b).

228. Affidavits, depending on the state law, can require additional formatting or other requirements that a lay person would have to research in order to complete properly. However, most non-lawyers know what a "notarized" statement is; thus, this is more accessible.

229. CONN. GEN. STAT. ANN. § 19a-42b(1) (West 2011).

This clarification is important because it reduces the likelihood that courts[230] will express concern about lack of jurisdiction over an executive agency in another state or country.[231]

### B. Issues to Consider When Designing a Correction Process

Approximately half of jurisdictions currently have a court order process instead of a direct-to-agency process. These jurisdictions need to consider the various consequences of this policy. For many, the court order process can be an insurmountable practical or financial barrier to obtain a corrected birth certificate. It also compromises privacy, leads to problems caused by lack of judicial inexpertise and bias, as well as raises serious constitutional questions.

#### 1. Practical Concerns with the Court Order Process

Administrative processes are a critical feature of government record keeping and daily life. The government keeps records on our lives in many ways. If people had to hire attorneys or visit judges for all of the government record-keeping features of their lives, the cost of running the government would exponentially increase. Imagine if everyone had to hire an attorney and go to court for every interaction they had with the government, such as having a child and needing to establish a birth record, getting a driver's license, registering the ownership of a car, getting married, recording a death, etc. Because of their easy accessibility, efficiency, and lower cost, administrative processes are often used in lieu of judicial action for record-keeping functions. The judicial process is utilized when there is a need for judicial oversight to prevent fraud or for an investigation where facts are contested.

Requiring people to get court orders to correct the gender markers on their birth certificates is typically a significant burden. There are many expenses associated with it: hiring an attorney competent in the matter, taking time off work or school to meet with an attorney and appear in court, traveling to the courtroom and attorney's office (the cost of which, especially for non-residents of the state, may be significant and time consum-

---

230. *In re* Heilig, 816 A.2d 68, 84 (Md. 2003) (noting that a lower court in Maryland had held that it did not have power over the Secretary of State of Pennsylvania to order a change in the individual's birth certificate and, in dicta, stating "[o]bviously, the Legislature cannot direct officials in other States to change birth certificates issued or issuable in those States but may deal only with birth certificates issued or issuable in Maryland . . . ").

231. Of course, the receptive state or country may not accept the order, but many states are known to do so as a practical matter.

ing), and court fees. Although court forms may be created to simplify the process somewhat and court fee waivers may be available to those with low incomes, in general, a court order process is significantly more burdensome than an administrative process.

Thus, to reduce costs to both the government and the individual, states should provide an administrative process for birth certificate gender corrections.

### 2. Privacy Concerns with the Court Order Process

There is no public policy reason to require a person to discuss their intimate feelings regarding their birth sex, gender identity, or the medical treatments they have received in open court. Privacy of the details of one's sex, gender identity, and medical treatment, or the facts surrounding one's gender transition or transgender status, should not depend on the happenstance of who is in the courtroom[232] or whether the judge agrees to seal or redact the judicial records.

Furthermore, depending on the system, the very instigation of the court proceeding can create permanent court records that document the proceeding in some way regardless of attempted confidentiality.[233] The future availability of court records to members of the public can also cause psychological distress.

As will be discussed fully in Part IV-B, the mere disclosure of a person's transgender status, or his or her medical treatment related to being transgender, is likely to be a constitutional privacy violation. One effective

---

232. This concern may be mitigated in systems in which the person only appears before the judge, not in open court. However, at the minimum, the judge and potentially a clerk will be listening to these intimate details. In a direct-to-agency procedure, less private and intimate details are disclosed by the medical provider's statement, and there may be only one person who examines the provider's statement. In California, the Transgender Law Center has recommended to people worried about disclosures in open court that they ask to go last or ask to speak with the judge in closed court if questions come up that they would prefer not to answer in open court. TRANS-GENDER LAW CENTER, ID PLEASE. . . 9–22, 31–32 (2010) *available at* http://transgenderlawcenter.org/issues/id/id-please.

233. This concern may be mitigated if the record is sealed by the judge, which, depending on the system, may only be allowed at the judge's discretion. However, in some states even a sealed record will be available in the court index. See, e.g. LEGAL VOICE, Family Law COURT RECORDS AND YOUR PRIVACY 5 (2008) *available at* http:// www.legalvoice.org/pdf/self_help/Family_Law_Court_Records_%20and_Your_Privacy.pdf ("When the court seals a file or a document, the court means to protect it from examination by the public. The existence of the sealed file can be found on a court index with the case number and the names of the parties and the notation 'case sealed'. However, the contents of the case will not be available to the public.").

way to deal with this potential privacy violation is to avoid it by not going through the court system in the first place.[234]

### 3. Concerns about Lack of Judicial Education and Bias Toward Surgery

Judges are often called upon to make a factual determination with regard to medical facts, including in the most complicated cases of medical malpractice, and they do so competently. However, to do so, they rely in large part on medical and scientific experts. When it comes to transgender medicine, judges' views may be similar to those of the general public. Absent testimony from medical experts, judges may not be aware of the current well-accepted Standards of Care or how inaccessible surgical treatment can be. There is a greater risk that a judge will misapply the standard "appropriate treatment . . . based on contemporary medical standards" than there is in having a medical professional apply the standard.

That judges are not fully educated on transgender medical issues has been documented in other areas of the law. Judges often have required surgery as a condition for gender recognition, especially in cases related to marriage, even when there is no medical or legal basis for that requirement.[235] Moreover, certain judges have required proof of surgery for *name* changes for transgender people, which according to longstanding common law principles are to be granted except in the narrowest circumstances. The fact that many judges have applied a surgical standard where none exists indicates that many share the belief that anatomical presentation is what determines gender. Battles over proof of surgery in the name change context have bubbled up to appellate courts in New Jersey, Pennsylvania, and New York,[236]

---

234. Another alternative would be to require in the statute that the court proceeding be conducted in private and to be sealed afterwards. This lessens some of the confidentiality concerns but does not entirely eradicate them.

235. *See* Tobin, *Against the Surgical Requirement, supra* note 4, at 413–17.

236. Longstanding common law principles establish a person's right to change their name, with an affirmative right to do so absent harm to another person, fraud, or other public policy interest. Judges may consider whether the name would create other fraudulent issues, such as someone adopting the name of a well-respected professional in order to get business fraudulently, whether or not the name is overly long or ridiculous, or profane. *In re* Falcucci, 50 A.2d 200, 202–03 (Pa. 1947). Some judges in New York required documentation of sex reassignment surgery before granting a simple name change from a traditionally male name to a female name. This happened throughout New York until a series of appellate decisions appear to have definitively declared that proof of medical treatment was not required. *In re* Winn-Ritzenberg, 891 N.Y.S.2d 220, 221 (N.Y. App. Term 2009) (per curiam) ("There is no sound basis in law or policy to engraft upon the statutory provisions an additional requirement that a transgendered-petitioner present medical substantiation for the desired name change."); *see also In re* Guido, 771 N.Y.S.2d 789 (N.Y. Civ. Ct. 2003) (reversing the court's own decision after initially requiring medical

and include a case where a judge denied a transgender woman a name change from "Brian" to "Lisa" who had been living as Lisa for 22 years.[237] In other areas of the country, denials of name changes based on lack of medical evidence still happen on a regular basis.[238] That this continues to be a problem, despite clear case law that surgery should not be required, demonstrates the persistence of the judges' views that surgery is properly required before recognizing a person's gender.

In order to remedy a judge's possible lack of education about transgender medicine, an applicant would potentially need to hire a medical expert, or experts, to provide this expertise to the judge.[239] This is a costly burden. In the alternative, the judge could defer to the physician who provides a statement that the person in question has undergone appropriate medical treatment, in the way suggested by California and Vermont's statutes. In that scenario, the judge is not performing any fact-finding beyond determining that the physician is a real person who signed the paper. The role that judges play in these places could be filled as competently, or more competently, by an official in the vital records office who regularly inspects documents for authenticity.

It is helpful to analogize this situation to one where a person with epilepsy had to obtain a court order to drive. Certainly a judge is capable of determining that the person has been adequately medicated by examining the testimony of experts or that person's doctor. However, a more efficient system is one that allows the DMV to process the provided medical infor-

---

evidence). Appellate courts in Pennsylvania and New Jersey have also overruled lower judges on this question. *See In re* McIntyre, 715 A.2d 400, 402–03 (Pa. 1998) ("Here, it was undisputed that Appellant was judgment free and was not seeking a name change to avoid any financial obligations or commit fraud. The fact that he is a transsexual seeking a feminine name should not affect the disposition of his request."); *In re* Eck, 584 A.2d 859, 860–61 (N.J. Super. Ct. App. Div. 1991) ("Absent fraud or other improper purpose a person has a right to a name change whether he or she has undergone or intends to undergo a sex change through surgery, has received hormonal injections to induce physical change, is a transvestite, or simply wants to change from a traditional "male" first name to one traditionally "female," or vice versa.").

237. *In re* Harris, 707 A.2d 225 (Pa. Super. Ct. 1997).

238. Interview with Dru Levasseur, *supra* note 115.

239. The highest court in Maryland appeared to realize its limitations in knowledge of transgender medical issues in *In re Heilig*, 816 A.2d 68, 72 (Md. 2003). The court asserted it is not qualified to write a medical text on the subject of transgender medicine and noting that it is unable to evaluate that field "unguided by expert testimony." *Id.* Despite this statement, the court then wrote ten pages summarizing medical research into transsexualism and intersex conditions, presumably showing willingness to venture into areas of scientific knowledge despite being unguided by expert testimony. *Id.* at 71–79.

mation; in fact, this is generally how this issue is handled.[240] It is simply inefficient—a waste of judicial resources—and prone to error to have a judge make or supervise the medical determination instead of a person's doctor.

### 4. Constitutional Problems with a Court Order Process

There is a novel argument that requiring a court order is a substantial, and therefore invalid, burden upon a person's right to determine his or her gender. First, the court would need to recognize that there is a right to self-determination of gender, discussed previously in Section II.B.5.

Once the right is established, the burden of going to court must be analyzed. Certainly, as previously discussed, the process of getting a court order typically requires money for court fees, hiring an attorney, time to prepare for and make a court appearance, and potentially travel to one's state or county of birth. Furthermore, it may compromise the privacy of one's transgender or medical status. Thus, going through the court process is legitimately considered a real burden for those attempting to update the gender on their birth certificate. If the burden is considered significant or substantial,[241] the court order process is unconstitutional, unless it is justified by sufficiently important government interests and closely tailored to meet them.[242]

### C. Specific Recommendation for the Gender Correction Process

In order to maximize both the accessibility of the gender marker change and the efficiency of the government in making the change, an administrative process in which an individual goes directly to the agency with the relevant documentation should be the standard method for gender

---

240. DMVs have slightly different rules on how to determine when a person with epilepsy should be cleared to drive, but none of the states have any judicial involvement. *See* Robert S. Fisher, *Driving and Epilepsy*, EPILEPSY THERAPY PROJECT, (Mar. 2009) http://www.epilepsy.com/epilepsy/newsletter/mar09_driving.

241. *See* Zablocki v. Redhail, 434 U.S. 374 (1978).

242. *See Zablocki*, 434 U.S. at 388 ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."); *See also* Bullock v. Carter, 405 U.S. 134, 144 (1972) (finding that a law infringing on a constitutional right "must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster"). I plan to explore this argument further in a future article.

marker corrections on birth certificates.[243] A notarized statement from a doctor, with the relevant information, should be sufficient documentation to ensure that the applicant has a bona fide need for a corrected gender marker. Using the term "notarized statement" is more desirable than "affidavit" because the general public is more aware of how to get a statement notarized than how to write an affidavit, the format of which may be highly technical and differs from state-to-state.

In the case of bias or misapplication of the relevant standard by the agency official, the statute should make clear that there is an appeals process through the courts that an individual may pursue if denied a gender marker correction. The MSVSA has such language relating to all potential corrections, and a number of states have also adopted it.[244]

In addition, the statute should give courts of that state clear authority to provide court orders that residents can use in their state or country of birth where court orders are still required. This is relatively straightforward and should be included as a matter of course until there are no longer states or countries that require court orders. If this provision is not included, judges may be concerned that they lack authority to issue such an order.[245]

---

243. My proposed statute dictates that the administrative process is the only process. In joint recommendations to the U.S. Department of Health and Human Services, organizations have recommended that the statute allow that an individual can either submit a court order to the agency or submit a statement from the physician. *See* Harper Jean Tobin, Nat'l Ctr. for Transgender Equality, Comments of Legal and Public Policy Organizations on Corrected Birth Certificates for Transgender People (Sept. 8, 2009) (on file with author). I have omitted the court order option from this proposed statute in large part to avoid suggesting that states should choose which option to include in their statute. In reality, including both court order and administrative processes as options for an individual to use in the state's statute or policy, is also an acceptable outcome. In that case, a person who finds that the court order process is a burden can use the administrative process. The benefit of also including a court order option is that people who need a court order declaring their legal gender for other reasons may potentially be able to avoid the difficulties of acquiring statements from their health provider.

244. MODEL STATE VITAL STATISTICS ACT § 21(e) (Ctr. for Disease Control & Prevention 1992). *See* ARK. CODE ANN. § 20-18-307 (West 2005) ("When an applicant does not submit the minimum documentation required in the regulations for amending a vital record or when the state registrar has cause to question the validity or adequacy of the applicant's sworn statements or the documentary evidence and if the deficiencies are not corrected, the state registrar shall not amend the vital record and shall advise the applicant of the reason for this action. The state registrar shall advise the applicant of his or her right of appeal to a court of competent jurisdiction."); COLO. REV. STAT. ANN. §25-2-115 (West 2010); IDAHO CODE ANN. § 39-250 (2010); OR. REV. STAT. § 432.235 (2007).

245. *See In re* Heilig, 816 A.2d 68.

## IV. Establishing Comprehensive Privacy Protections

The state may be violating an individual's right to privacy if it reveals information regarding a person's gender assigned at birth, gender transition, or transgender status. In creating a policy related to privacy, policymakers should consider the impact of government disclosure on transgender people as well as constitutional privacy rights that may be implicated.

The transgender person's right to privacy can be implicated by a birth certificate policy in three ways. First, if the agency refuses to provide a transgender person an updated gender marker, then the individual is "outed" as transgender to all who inspect the certificate. Second, in the process of pursuing and executing the gender correction, there are records created and altered that may leave a publicly available paper trail, including a visibly amended birth certificate. Here, how the gender marker correction is dealt with is only part of the issue, since policies related to how a change of name is recorded also matter. Third, the government staff involved in the process may learn of and disclose a person's transgender status to others. This Section deals primarily with the latter two issues—i.e. how to avoid privacy violations in the process and recording of gender correction as well as the role that government officials play. The first was fully addressed by recommendations in Sections II and III.

### A. Existing Privacy Protections

#### 1. Privacy Protections in the MSVSA

##### a. New Versus Amended Certificates

The MSVSA provides a general rule for any kind of amendment: it should be shown on the face of the document unless otherwise provided for by regulation.[246] Thus, unless a state adopts a regulation setting forth a different policy, the fact that an amendment has been made will be plain *on the face* of the certificate in some way.

The Model Regulations that accompany the MSVSA list the various ways in which a birth certificate can be amended so that the amendment, or the fact that an item was amended, is visible (or not) to those who inspect it: (1) by preparing a new certificate with a note that the item number was amended and on what date; (2) by drawing a single line through the incorrect information (without obliterating the underlying entry) and writing the

---

246. "A certificate or report that is amended under this section shall indicate that it has been amended, except as otherwise provided in this section or by regulation." Model State Vital Statistics Act § 21(e) (Ctr. for Disease Control & Prevention 1992).

correct data above or to the side; (3) by creating a special amendment form that includes the correct information and is attached to the original, unaltered certificate; and, (4) for electronic records, by changing the item, noting the date, and retaining the original information. The MSVSA Model Regulation provides these in brackets, indicating that they are all "optional,"[247] with the implication that states choose the provision(s) that they prefer. At the end of the list of options, there is a provision that specifically applies to gender correction, which is indicated through cross-referencing Section 21(d), the gender correction provision:

> (f) A certificate of birth amended pursuant to the provisions of (Section 21(d) of the Model Act) shall be amended by preparing a *new* certificate. *The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate.*[248]

Thus, the MSVSA Model Regulations treat gender correction as an amendment that *should* be kept private from those who are permitted to inspect the certificate. However, the provision could go unnoticed as an option to be used, or alternatively, policymakers could assume that it is one option of many when viewed in conjunction with the other options listed in this section. This is compounded by the fact that this optional provision's application to gender markers was only indicated through cross-referencing.

In fact, presumably because of the lack of clarity caused by the cross-referencing used in subsection (f), or otherwise lack of attention to detail by state policymakers, some states have adopted the MSVSA statutory language related to gender corrections *without* adopting the accompanying regulation in (f). Of course, some states may have also intentionally not adopted the provision because they wanted gender marker corrections to be visible. Yet, remarkably, some jurisdictions (such as Alabama, the Commonwealth of the Northern Mariana Islands, Kentucky, and Oregon)[249] have the exact MSVSA language that directs gender on one's birth certificate to be "amended as provided by regulation" but do not have *any* regulation instructing how amendments are to be made. Thus, in many states following part of the MSVSA, gender corrections are processed and marked as amended in the same way that other amendments are processed and marked, whether through a single-line cross out or another method.

---

247. "In cases where recommendations were considered optional, brackets, '[ ],' have been placed around the word or phrase." *Id.* at 1.

248. *Id.* at §11.8(f) (emphasis added).

249. For citations of these statutes, see *infra* app. A.

### b. Treatment of Name Changes in the MSVSA

How a policy treats name changes is an important part of privacy analysis since the revelation of a name change has the potential to disclose that someone is transgender, even if the gender marker correction is kept private. The MSVSA requires a court-ordered name change to amend a name on the birth certificate.[250] Except in cases of adoption, or for name changes before the age of one, names will be amended visibly on the face of the document itself, following whichever amendment process the state chooses.[251]

However, the MSVSA's gender correction provision, Section 21(d), also refers to name changes that occur due to a change in gender. Accordingly, the fact and details of a transgender person's name change presumably should remain confidential on the certificate if the MSVSA Model Regulation's provision related to privacy is adopted.[252] However, the MSVSA's lack of clarity on this point renders it insufficient to ensure adequate privacy protections.

### c. Records Storage and Accessibility in the MSVSA

The MSVSA generally limits access to copies of birth certificates to registrants; the registrant's spouses, children, parents or guardians; the legal representatives of any of them; or a person who is able to show that the certificate is necessary to determine or protect a property interest.[253]

---

250. "Upon receipt of a certified copy of an order of (a court of competent jurisdiction) changing the name of a person born in this State and upon request of such person or his or her parents, guardian, or legal representative, the State Registrar shall amend the certificate of birth to show the new name." MODEL VITAL STATISTICS ACT, *supra* note 1, § 21(c), at 10.

251. The Model State Vital Statistics Act's Regulations list possible options states could choose. *Id.* at §11.8.

252. *Id.* at Reg. 11.8(f) ("A certificate of birth amended pursuant to the provisions of (Section 21(d) of the Model Act) shall be amended by preparing a new certificate. The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate.").

253. *Id.* at § 24(a) ("The State Registrar [and other custodian(s) of vital records authorized by the State Registrar to issue certified copies] shall, upon receipt of an application, issue a certified copy of a vital record in his or her custody or a part thereof *to the registrant, his or her spouse, children, parents, or guardian, or their respective authorized representative. Others may be authorized to obtain certified copies when they demonstrate that the record is needed for the determination or protection of his or her personal or property right.* The State Agency may adopt regulations to further define those who may obtain copies of vital records filed under this Act.") (emphasis added).

The MSVSA also ensures that the documents used to justify an amendment, including the correction of gender or name, must be kept by the vital statistics agency:

> A record shall be maintained which identifies the evidence upon which the amendment was based, the date of the amendment, and the identity of the person making the amendment.[254]

There is some ambiguity with regard to the documentation that must be preserved. It could be argued that, at a minimum, the official must make a note identifying the type of documentation received (physician's letter, court order, etc.). However, this language may also be read to mean that the documents themselves must be preserved as well.

Whether these records are sealed or available to those authorized to receive a copy of the certificate is not clear because the topic is not explicitly addressed by the MSVSA or Model Regulation. If a state also adopts the Model Regulation provision related to privacy,[255] which states that individuals requesting a copy of a birth certificate should only be given the *new* birth certificate, then that state has at least demonstrated evidence of the intent to protect privacy in the context of gender corrections. Potentially, then, all of the retained records should be kept confidential as well.[256]

### 2. State Laws and Policies Related to Privacy

Of the fifty-three jurisdictions that allow gender marker corrections to documentation, seventeen states,[257] the District of Columbia, and Guam have procedures that allow for amending the original birth certificate but do

---

254. *Id.* at Reg. 21(b).

255. *Id.* at Reg. 11.8(f) ("A certificate of birth amended pursuant to the provisions of (Section 21(d) of the Model Act) shall be amended by preparing a new certificate. The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate.").

256. Although the regulations do not specify that these records will be sealed, other provisions regarding instances where "new" birth certificates are issued very clearly indicate that the old certificate and its information will be sealed and not available to anyone without a court order. MODEL STATE VITAL STATISTICS ACT § 12(g) (Ctr. for Disease Control & Prevention 1992) ("When a new certificate of birth is established by the State Registrar, all copies of the original certificate of birth in the custody of any other custodian of vital records in this State shall be sealed from inspection or forwarded to the State Registrar, as he or she shall direct.").

257. These are Alaska, Alabama, Arkansas, Arizona, Colorado, Kansas, Kentucky, Massachusetts, Maryland, Missouri, North Dakota, New Mexico, Oregon, South Carolina, Utah, and West Virginia. *See infra* app. A.

not allow issuance of a new birth certificate. Sixteen states[258] and New York City issue a new certificate. In seventeen jurisdictions, it is unclear what is done or it depends on instructions in the court order.[259] Only eighteen jurisdictions clearly seal their records, blocking access to the original certificate and ensuring the privacy of the medical records related to the gender correction.[260]

Name changes are generally allowed on birth certificates when an individual produces a court-ordered[261] name change directly to the state vital statistics agency. For name changes unrelated to gender transition, often the previous and new names both appear on the certificate. In thirteen jurisdictions, there is a clear statute or policy that a name change related to a gender correction should not appear on the face of the certificate.[262] In addition, at least one jurisdiction appears to *require* that people change their name when changing gender.[263]

States vary in their policies regarding access to birth certificates and other records. Most states have a policy similar to the MSVSA, which restricts access to immediate family members, their legal representatives, and those that have a proven property interest.[264] However, at least ten states allow either certified or informational copies of birth certificates to be provided to members of the public.[265]

---

258. These are California, Connecticut, Georgia, Hawaii, Iowa, Illinois, Louisiana, Maine, Michigan, Minnesota, North Carolina, Nebraska, New Hampshire, New Jersey, Nevada, and Vermont. *See infra* app. A.

259. These are Delaware, Florida, Indiana, New York, Pennsylvania, Rhode Island, South Dakota, Texas, Virginia, Washington, American Samoa, the Northern Mariana Islands, and the U.S. Virgin Islands. *See infra* app. A. In Montana, Oregon, Wisconsin, and Wyoming, it depends on the order. *See id.*

260. These are Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Louisiana, Maine, Michigan, Minnesota, Nebraska, New Jersey, New York City, North Carolina, North Dakota, South Dakota, Vermont, and Wisconsin. *See infra* app. A.

261. In Hawaii, official name changes are processed by the office of Lieutenant Governor, not the judicial system. *Name Changes*, HAW. OFFICE OF THE LIEUTENANT GOVERNOR, http://hawaii.gov/ltgov/office/name (last visited Dec. 28, 2011).

262. These are Arkansas, California, Connecticut, Delaware, Georgia, Kansas, Maine, Minnesota, Nebraska, New Jersey, New York, State, Vermont, and New York City. *See infra* app. A.

263. D.C. CODE § 7-217(d) (2011) ("Upon receipt of a certified copy of an order of the Court indicating that the sex of an individual born in the District has changed by surgical procedure and that such individual's name has been changed, the certificate of birth of such individual shall be amended as prescribed by regulation.").

264. MODEL STATE VITAL STATISTICS ACT § 24 (Ctr. for Disease Control & Prevention 1992).

265. The public can receive certified copies in Kentucky, Ohio, Massachusetts, Vermont, and Washington. *See Kentucky Birth Certificates*, KY. CABINET FOR HEALTH & FAMILY SERVS., http://chfs.ky.gov/dph/vital/birthcert.htm (last visited June 24, 2011); *Obtaining Certified Copies of Vital Records*, MASS. DEP'T OF HEALTH & HUMAN

One of the states with the strongest policy of protecting privacy is Nebraska. Although other features of Nebraska's policy are in need of updating, the privacy protections are comprehensive.[266] The statute states that:

> [T]he department shall prepare a new certificate of birth in the new name and sex of such person in substantially the same form as that used for other live births. The evidence from which the new certificate is prepared and the original certificate of birth shall be available for inspection only upon the order of a court of competent jurisdiction.[267]

There are three important features of this policy. First, a new, not amended, certificate is prepared. Second, only the new certificate, not the former one, is available for viewing. Third, the documentation that the registrant provided, as well as the old certificate, are both confidential and only available by a court order. These privacy protections could be marginally improved if the word "sealed"[268] was used; however, the meaning is clear in the statute.

---

SERVS., http://www.mass.gov/eohhs/consumer/basic-needs/vitals/obtaining-certified-copies-of-vital-records.html (last visited Feb. 3, 2011); OHIO DEP'T OF HEALTH, FREQUENTLY ASKED QUESTIONS CONCERNING VITAL RECORDS, *available at* http://www.odh.ohio.gov/-/media/ODH/ASSETS/Files/vs/general/frequentlyaskedquestionsonvitalrecords.ashx (last updated Sept. 29, 2010); VT. DEP'T OF HUMAN SERVS., ACCESS TO BIRTH AND DEATH CERTIFICATES: RECOMMENDATIONS FOR LEGISLATIVE CHANGES 9 (2010), *available at* http://healthvermont.gov/admin/legislature/documents/VitalRecords_legislative_recommendations_091310.pdf; WASH. DEP'T OF HEALTH, Center for Health Statistics Mail-In Request Form, *available at* http://www.doh.wa.gov/Portals/1/Documents/Pubs/422-044-MailinRequestForm.pdf (last visited Dec. 4, 2012). The public can receive "informational" or "uncertified" copies in California, New Jersey (unclear if it includes gender), North Carolina, South Dakota, and Wisconsin (except in limited cases). *See* CAL. HEALTH & SAFETY CODE § 103526 (West 2011); *Frequently Asked Questions*, N.J. DEP'T OF HEALTH & SENIOR SERVS., http://www.state.nj.us/health/vital/faq.shtml#BIR (last visited June 24, 2011); N.C. GEN. STAT. § 130A-93(c) (2011); *Data, Statistics and Vital Records,* S.D. DEP'T OF HEALTH, http://doh.sd.gov/vitalrecords/order.aspx#Eligibility (last visited June 24, 2011); WISC. STAT. § 69.21 (2011).

266. Nebraska requires sex reassignment surgery and a court order. NEB. REV. STAT. § 71-604.01 (2011). Also, the fact that the physician signing the affidavit has to be the surgeon that "performed" the surgery is unduly limiting.

267. *Id.*

268. I use, as is custom, "sealed" to refer to the process of blocking from public view unless a party has a court order to open the record. Depending on the state, "confidential" may have the same implication and "sealed" may not. *Compare* BLACK'S LAW DICTIONARY 1467 (9th ed. 2009) (defining sealing of records as "[t]he act or practice of officially preventing access to particular . . . records, in the absence of a court order.") *with id.* at 339 (defining confidential as "meant to be kept secret").

Similarly, under the policy in Washington State, a new birth certificate is prepared, rather than amending the original.[269] The policy further stipulates that the medical documentation submitted by the individual in support of the gender marker correction, including the doctor's letter, will be sealed.[270] However, the policy does not specify that the original birth certificate must be kept confidential, nor does it explain how name changes would or would not show on the face of the new certificate.

In Vermont, a new certificate is also prepared, with a requirement that the information about the correction be kept "confidential."[271] In California, the new statute retained the existing privacy protections, ensuring that the new certificate does not show the previous gender or name and that records related to the correction are "sealed."[272]

### 3. Privacy for Consular Reports of Birth Abroad

With regard to Consular Reports of Birth Abroad, the serial number is slightly modified to indicate that it is an amended document, but it does not indicate the previous gender or name of the registrant.[273] The documents that are submitted to the agency and retained by the agency are considered confidential, covered by the Privacy Act.[274]

### 4. Privacy Protections in the U.K. and Argentina

The Gender Recognition Act in the United Kingdom also ensures privacy, as does the recently-passed law in Argentina. The U.K. disallows disclosure of the information presented in the application for a Gender Recognition Certificate.[275] In Argentina, original birth certificates are un-

---

269. WASH. DEP'T OF HEALTH, *supra* note 121.

270. "The department retains documentation from the physician or hospital in a sealed file." *Id.*

271. VT. STAT. ANN. tit. 18, § 5112(c) (2011).

272. CAL. HEALTH & SAFETY CODE § 103430 (West 2012) .

273. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL, *supra* note 29 at 1447.4 ("The serial number assigned to an amended Form FS-240, Consular Report of Birth Abroad of a Citizen of the United States of America, will be the same as the number on the original, but will be followed by a dash and a number indicating it is not the original issuance (e.g., -1 for the first amendment).").

274. *Id.* at 1449.3-1 ("Information contained in the Form FS-240, Consular Report of Birth Abroad of a Citizen of the United States of America, including Form DS-2029, Application for Consular Report of Birth Abroad of a Citizen of the United States of America, the Form FS-240, as well as data in the ACS System, is subject to the Privacy Act."). The Privacy Act is a federal statute that protects against the disclosure of records without the consent of the "individual to whom the record pertains." Privacy Act of 1974, 5 U.S.C. § 552a (2006).

275. Gender Recognition Act, 2004, c. 7, § 22 (U.K.).

MICHIGAN JOURNAL OF GENDER & LAW [Vol. 19:373

available except by court order.[276] The Gender Recognition Act specifically notes that with regard to birth certificates, the new birth certificate is the only version available to the public. There is also no note or other information indicating that the person has a previous version of the certificate or went through the gender recognition process.[277]

### B. Issues to Consider When Developing Privacy Policies

#### 1. The Individual Importance of Privacy

Given the risk of violence and discrimination that comes with being known as transgender, it is understandable that some people desire to keep information about their transgender status limited to only those whom they choose to tell. Of course not all transgender people want to be "closeted" all of the time, but generally, people do want to have control over how they present and manage information related to being transgender. Even if the risk of violence is not present, being able to decide with whom and when to have a "coming out" conversation should be a matter of individual choice. The harms discussed above from having an incorrect gender marker can also result from being "outed" by an insufficiently private procedure for correcting gender. The person whose gender transition is revealed may be subject to increased scrutiny because of the possibility of fraudulent documents, often being subjected to questioning about his or her body and identity.[278]

#### 2. Constitutional Right to Privacy

If a governmental entity does not protect the privacy of a transgender person and reveals his or her status—either through issuing visibly amended birth certificates or by providing access to records that indicate a person is transgender—it may be in violation of the right to privacy guaranteed by the U.S. Constitution.[279] Whether the U.S. Supreme Court has officially recognized a constitutionally derived right to privacy that guarantees people to be free of governmental "disclosure of personal matters" is not entirely

---

276. Regime for Recognition and Respect for Gender Identity (File 8126-D-2010) (Argentina), *available at* http://www1.hcdn.gov.ar/proyxml/expediente.asp?funda mentos=si&numexp=8126-D-2010. (An English translation is available at http://www.msmgf.org/files/msmgf//Advocacy/Argentina_GenderIdentity_Law.pdf).

277. Gender Recognition Act, 2004, c. 7 § 10 sch. 3 (U.K.).

278. Spade, *supra* note 4, at 738.

279. This right to privacy should not be confused with the other well-established right to privacy, generally understood as the right to make decisions about intimate details of one's life. "[T]his right to privacy can be characterized as a right to 'confidentiality,' to distinguish it from the right to autonomy and independence in decision-making for personal matters." Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994).

clear.[280] While the Court has considered the issue, and has "assumed without deciding" that such a right exists, it has only done so in limited contexts that are not directly applicable to privacy claims related to birth certificate records.[281]

However, while the Supreme Court has not yet definitively ruled on the existence of this privacy right and certainly has not made a decision regarding disclosure of transgender status by a government actor, the Second Circuit has done so. In *Powell v. Shriver*,[282] the Court of Appeals held that the constitutional right to privacy protects transgender people from unnecessary government disclosure of their transgender status.[283] The appellate court concluded that, "[t]he excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate."[284]

Thus, the only court to rule on this question has decided that there clearly is a privacy right to protect information regarding transgender status, and other judges have cited this decision with approval.[285] In addition, although less dispositive on a federal constitutional right to privacy claim, a judge in Alaska determined it was a violation of a transgender person's right to privacy under the Alaska Constitution to not be able to update the gender on one's driver's license.[286] Accordingly, policymakers should recognize

---

280. Whalen v. Roe, 429 U.S. 589, 599 (1976) (describing one type of privacy protection apparently protected by the Constitution as "the individual interest in avoiding disclosure of personal matters").

281. In a recent case, the Court assumed that there was such a privacy right. NASA v. Nelson, 131 S. Ct. 746, 751 (2011) ("We assume, without deciding, that the Constitution protects a privacy right of the sort mentioned in Whalen and Nixon."); *see also Whalen*, 429 U.S. 589 (1976) (relating to a state statutory scheme mandating confidential reporting of prescriptions of certain controlled substances to the state department of health, which was monitoring for fraud and abuse); Nixon v. Adm'r of Gen. Services, 433 U.S. 425, 457 (1977) ("We may agree with appellant that, at least when Government intervention is at stake, public officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity. . . . In sum, appellant has a legitimate expectation of privacy in his personal communications.").

282. 175 F.3d 107 (2d Cir. 1999) (finding a violation of a constitutional right to confidentiality when corrections officers revealed an inmate's transgender identity and HIV status to other inmates).

283. The court determined that there was no "legitimate penological interest" in disclosing this information to fellow inmates as well as staff members. *Powell*, 175 F.3d at 113.

284. *Powell*, 175 F.3d at 111.

285. *See, e.g.*, Franklin v. McCaughtry, 110 F. App'x 715, 719 (7th Cir. 2004); Moore v. Prevo, 379 F. App'x 425, 428 (6th Cir. 2010).

286. K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) (memorandum decision).

the potential legitimacy of this constitutional right on the federal level and develop privacy policies to protect it.

### C. Specific Recommendations Related to Privacy Protections

In order to protect a person's privacy, a new birth certificate should be issued with no markings of any kind indicating that it was amended.[287]

Both the original birth certificate and the documents related to the gender marker correction should be sealed and only made available upon court order or upon request of the individual. The original birth certificate and the documents related to the gender marker correction should be available to the individual because the person may need to establish continuous identity.[288]

The statute should provide privacy protections for related name changes, regardless of whether the name change is acquired simultaneously, before, or after the gender correction. If the agency's policy is to make visible amendments for name changes, an exception should be made for name changes related to gender corrections. Thus, although a change of name that precedes a gender correction will be visible, at the time of gender correction, the name change should become confidential. Similarly, a gender-related name change occurring after the gender correction should also be made confidential. The statute needs to explicitly discuss each of these situations so the determination is made correctly regardless of timing.

The statute should also prohibit further inquiry into medical information. To respect the individual's medical privacy, staff should not either officially or casually ask the applicant for additional medical or other information beyond what is required by the statute. In addition to protecting privacy concerns, this also streamlines the administrative process and ensures that staff will treat applicants respectfully and consistently with how other applicants for documentation corrections are treated. Furthermore, any information received about a gender correction should be kept confidential, unless disclosure is necessary in the course of conducting official business.

---

287. Spade, *supra* note 4, at 770 (discussing the importance of having a "clean" birth certificate).

288. Name change orders may also be helpful to show continuous identity, but not everyone changes names or has those records easily available. Where exactly one might need the original copy of one's birth certificate is not entirely clear, but it does appear to be in rare situations where multiple forms of proof are required. For example, a bank may request multiple forms of identification from a customer who seeks to use his or her funds, to ensure that the person is the same customer with a different name. Interview with Alison Gill, D.C. Trans Coalition, in Washington, D.C. (Confirmed Oct. 12, 2012).

Lastly, the statute should ensure that those who hold an amended certificate that was acquired *before* the new statute came into effect are able to receive a new certificate with the same privacy protections (i.e. sealing of the original certificate and the associated documents from public inspection). In states that have had a policy of issuing "amended" certificates and/or not sealing the records related to correction of gender in the past, this provision is necessary to afford these individuals the same privacy protections that are afforded to individuals who process their gender correction under the new statute. Thus, upon application and payment of appropriate fees,[289] a person who previously received an amended certificate should be able to receive a new certificate.

Ideally, the vital statistics agency should go through old records and seal those related to all of the previously executed gender corrections as well, regardless of whether the person has asked for sealing of records; however, as a practical matter, this may not be feasible. Therefore, at the minimum, the sealing of old records related to gender correction should be completed at the request of the applicant.

## V. RECOMMENDED LANGUAGE AND POLICY

### A. *The Model Provision*

This Section proposes new language that should be easy to insert into any vital statistics code to comprehensively address gender marker corrections.[290] For the new version of the MSVSA, this would be its own section and Section 21(d) would need to be deleted. This model statutory provision incorporates all of the features needed in a statute to have a clear, comprehensive policy with regard to gender corrections and associated name changes. It would be based on current medical consensus, sound policy considerations, and in compliance with applicable constitutional requirements. This model language is based on, and borrows heavily from, the statutory language in Vermont and California, as well as the policy of both Washington and the U.S. Department of State relating to Consular Reports of Birth Abroad.

Although it is drafted in the style of statutory language, this language can instead be adopted by the vital statistics agency, in whole or in part, as regulations or as written policy. This would be most applicable in jurisdic-

---

289. Throughout this article, no recommendation is made with regard to the appropriate amount of fees. As guidance, fees should not be prohibitively costly and should be waivable, without significant delay, with a showing of indigence.

290. Of course, any such legislation should delete the existing language related to gender corrections, if it exists.

tions with no statute on the issue of gender correction or a gender correction statute that would not conflict with such regulations. Here is the recommended text:

> *Section X. Changes to Birth Certificate Related to a Change of Gender*
>
> *(a) The State Registrar shall issue a new birth certificate to a person who was born in [this state] and who has a gender different from the gender denoted on that person's birth certificate when the State Registrar receives:*
>
> > *1) A written request by the registrant, his or her parents, guardian, or legal representative signed under penalty of law, that the State Registrar issue a birth certificate with a gender designation that differs from the gender designated on the registrant's original birth certificate;*
> >
> > *2) A notarized statement from the registrant's licensed treating or evaluating physician or health care provider stating that the registrant has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition, based on contemporary medical standards, or stating that the registrant has an intersex condition, and that in the provider's professional opinion the registrant's gender designation should be changed accordingly; and*
> >
> > *3) If the registrant or his or her legal representative is also requesting a name change on the certificate, an original or certified copy of a name change order issued by a court of competent jurisdiction.*
>
> *(b) The State Registrar shall not request any additional information or records other than those required by subsection (a)(2). The State Registrar shall not disclose information relating to a gender correction, including to other government employees, unless required in order to conduct official business.*
>
> *(c) When the State Registrar receives the documentation described in subsection (a) of this Section, the State Registrar shall issue a new birth certificate reflecting the new gender designation and, if applicable, new name of the registrant. The new birth certificate supersedes the original as the official public record. The new certificate shall not be marked as amended and shall in no way disclose the original information. When such a birth certificate is issued, the State Registrar shall cause the registrant's original birth certificate and all documentation received pursuant to subsection (a) of this Section to be placed under seal and kept in a confidential file. The State Registrar shall provide access to the*

*original birth certificate and/or documentation received pursuant to subsection (a) of this Section only upon order of a court of competent jurisdiction or written request of the registrant.*

*(d) The State Registrar shall issue, upon request, a new birth certificate reflecting the new gender designation or new name (or as previously amended), and shall seal relevant records, as described in subsection (c) in these additional circumstances:*

*(1) when a birth certificate is amended to reflect a change in gender designation at any point in time after that birth certificate has been amended to reflect a name change*

*(2) when a birth certificate is amended to reflect a name change at any point in time after the birth certificate has been amended to reflect a change in gender designation, or*

*(3) if a person holds an amended birth certificate related to change of gender and/or name issued under [a previous version of this Section].*

*(e) The State Registrar shall not amend the vital record if: (1) an applicant does not submit the minimum documentation required in this Section for amending a vital record; or (2) when the Registrar has reasonable cause to question the validity or adequacy of the applicant's sworn statements or the documentary evidence, and the deficiencies are not corrected. The State Registrar shall state in writing the reason for this action. Upon the State Registrar's refusal to amend the vital record, the applicant shall have a cause of action in court to amend the vital record. The Registrar shall give the applicant written notice of this right.*

*(f) In the case of a person who is a resident of this state and was born in another state or in a foreign jurisdiction, if such other state or foreign jurisdiction requires a court decree in order to amend a birth certificate to reflect a change in gender, the [courts/probate courts] in this state shall have jurisdiction to issue such a decree.*

Legislative drafters from a state considering adopting this language should also contemplate how these new provisions related to privacy and procedures for gender marker corrections would affect the meaning of any other existing provisions related to privacy or procedures for to other corrections.[291] While subsequently amended or adopted statutes would not nor-

---

291. For example, the precision and specificity in a new gender correction provision may cause a question about how an existing privacy provision regarding other corrections or amendments should be interpreted. For example, if the adoption provision refers to records being "confidential," and the gender correction provision refers to records being "sealed," the agency or courts may think that different meaning was intended, when in actuality, the same meaning was likely intended. In this case, the adoption provision's language should also be changed to "sealed" to avoid this confusion.

mally be read to create confusion with prior provisions, the legislative drafter ought to review carefully the structure and text of the entire existing statute to avoid future confusion or unintended consequences from the potentially different wording introduced into the statute by this provision. Also, if not already clear from the existing statute, it should be made clear that "State Registrar" refers to relevant staff of the vital records agency that have been authorized by the Registrar to execute these corrections.

### B. Implementation

This model statute was designed to avoid the need for additional clarification in the form of regulations or written policies. Eliminating vagueness in statutory language increases the efficiency of the process by not requiring deliberation and determination of what processes need to be established and followed by the state agency. However, there are also important implementation items that would greatly increase the efficiency and success of the new statute.

First, it would streamline the process for staff, as well as the holder of the birth certificate, if there were a form promulgated by the vital statistics agency for gender corrections. The use of forms for updating gender on driver's licenses has become a best practice.[292] In what is considered the model policy and has been adopted for use in several states, the Washington, D.C. Department of Motor Vehicles has a one-page form where the applicant fills out the top part (which requests the correction) and the medical or social service authority fills out and signs the bottom part (which indicates their professional opinion).[293] A similar form could be used by vital statistics agencies.

Second, providing staff with training for implementation is an essential part of successfully effectuating any policy change. Staff training should include not only the policies and procedures to process the correction of gender and/or name on birth certificates, but should also provide basic cultural competency so that transgender people interacting with staff are treated respectfully throughout the process.

Third, the practical instructions of how old records are removed from the files and new ones inserted, as well as how to seal the documents used in updating gender may need to be developed. Furthermore, the issue of whether the agency has the ability to go back to previous gender corrections and seal the records without a request by each individual needs to be ex-

---

292. Tobin, *Fair and Accurate Identification, supra* note 4.
293. District of Columbia Dept. of Motor Vehicles, Gender Designation on a Driver's License or Identification Card (2006), *available at* http://dmv.dc.gov/pdf/Gender_Change_Policies.pdf.

amined. Whether these privacy concerns will need to be dealt with by new regulations or written policy will depend on the state's existing policies and practices. Accordingly, there could be a need to update existing regulations or policies to ensure that confidentiality is maintained.

## CONCLUSION

Laws and policies related to birth certificates need to be updated to keep up with advances in the medical, legal, and public policy fields. By recognizing the needs of its citizens, responding in a low-cost, efficient manner, and making policies based on careful legal and scientific analysis, the government can improve transgender people's access to vital services and take steps toward eliminating discrimination, harassment, and violence. The statute recommended by this Article results in four significant goals: 1) that vital records will be accurate and in accord with contemporary medical standards, 2) that government resources are used efficiently, 3) that constitutional rights are respected, and 4) that proper consideration was given to the human and legal impacts of having an inaccurate birth certificate.

Any state, local, or territorial government that adopts the recommended statutory language (via statute, regulation, or written policy) can be sure that it has improved its own functioning and has enabled transgender people to live their lives with one less burden imposed on them by the government.

As birth certificate statutes and policies are modernized, the birth certificate's legal relevance should increase because judges will be better able to defer to those documents when they have been corrected. However, until then, their legal weight in cases where a person has been unable to receive a corrected certificate should not be controlling. Eventually, the hope is that both executive agencies and the judicial system will be able to rely on birth certificates as an accurate indicator of gender.

While these changes in vital statistics laws may seem technical in nature, modernizing these laws will have important and positive human impact, and should not be avoided or delayed any longer. Given the solid legal and medical foundation for updating these laws discussed in the Article, these changes should be viewed as cost-neutral or cost-saving, based on the best science available, and rooted in the constitution. Policymakers interested in good government should take these developments seriously and make the necessary amendments immediately. ⚜

Case: 25-1576 Case Document 10303 Filed 27 Document Page 249 Filed 02/18/25 Page 682 of 100 ID: 6774450

APPENDIX: LAWS AND POLICIES REGARDING GENDER CORRECTIONS FOR THE 57 U.S. JURISDICTIONS
THAT ADMINISTER BIRTH CERTIFICATES

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[293] | Similar to MSVSA?[294] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[295] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Alabama ALA. Code §§ 22-9A-19, 22-9A-21 | Gender Correction in Statute | Exact Standard and Process, But Absent Privacy Protections | "sex . . . has been changed by surgical procedure" | Court | Amended | Unclear | Unclear | No | |
| Alaska Alaska Stat. § 18.50.290 | No Specific Gender Correction Provision and No Publicly Available Policy | No | None (Judge Determines) | In practice, Court orders are accepted | Amended | Single-Line Cross Out. Alaska Administrative Code 7 AAC 05.895. | Single Line Cross Out. See Alaska Administrative Code 7 AAC 05.895 | No. | See *Sources of Authority to Amend Sex Designation on Birth Certificates*, Lambda Legal, http://www.lambdalegal.org/publications/sources-of-authority-to-amend (last updated Oct. 3, 2012) (hereinafter, Lambda, *Sources of Authority*). |
| American Samoa Am. Samoa Code Ann. Ch. 5 § 13.0530 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Unclear | Unclear | Unclear | Unclear | Unclear | Unclear | A call to the Registrar of Vital Records office indicated that they do not have a policy with regard to gender corrections. The clerk suggested a court order would likely be sufficient. Telephone Interview with the American Samoa Governor's Office Registrar of Vital Records, Pago Pago, AS (December 20, 2011). |

293. Gender is used here interchangeably with sex, as explained in note 44 *supra*.

294. This indicates whether the exact language of the MSVSA is used, with regard to three aspects: procedure, standard, and privacy, measured by the issuance of a new certificate.

295. Unless the statute or policy refers to "sealing" the old certificate or says it is available only by court order, it is presumed that the certificate is not sealed.

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[88] | Similar to MSVSA?[89] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[90] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Arizona Ariz. Rev. Stat. §§ 36-337, 36-323, 36-322 | Gender Correction in Statute | No | "a person who has undergone a sex change operation or has a chromosomal count that establishes the sex of the person as different [than on original certificate]" must provide "a written statement by a physician that verifies the sex change operation or chromosomal count" | Administrative | Amended | Unclear | Unclear | Yes | "For a person who has undergone a sex change operation or has a chromosomal count that establishes the sex of the person as different than in the registered birth certificate, both of the following: a) A written request for an amended birth certificate from the person or, if the person is a child, from the child's parent or legal guardian; b) a written statement by a physician that verifies the sex change operation or chromosomal count." Ariz. Rev. Stat. §§ 36-337. |
| Arkansas Ark. Code Ann. §§ 20-18-307, 20-18-304, 20-18-305 | Gender Correction in Statute | Standard and Procedure Exact, Privacy Similar | "sex . . . has been changed by surgical procedure" | Court | Amended | Kept Private | Kept Private | Unclear | "The original certificate shall be removed to a special file" Department of Health Regulation for Registration of Vital Statistics 14.7(d). |
| California Cal. Health & Safety Code §§ 103425-103445 | Gender Correction in Statute | No | "has undergone clinically appropriate treatment for the purpose of gender transition, based on contemporary medical standards" | Court | New | Kept Private | Kept Private | Yes | |
| Colorado Colo. Rev. Stat. § 25-2-115, 25-2-117 | Gender Correction in Statute | Exact | "sex . . . has been changed by surgical procedure" | Court | Amended | Kept Private | Unclear | Unclear | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[28] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[26] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Connecticut Conn. Gen. Stat. §§ 7-51, 19a-42, Reg. 19a-41-9(e) | Gender Correction in Both Statute and Regulations | No | From Regulations: (1) Affidavit from a licensed psychiatrist, psychologist, or clinical social worker performing a psycho-social evaluation, attesting to the fact that the registrant is socially, psychologically and mentally the designated sex; (2) Affidavit from the surgeon performing the sex change operation, attesting to the fact that the surgery was performed | Administrative | New | Kept Private | Kept Private | Yes | Standard appears in regulations, statute only refers to "gender change" |
| Delaware Del. Vital Statistical Regulation 10.9.4 | Gender Correction Provision in Regulation only | Exact for Standard and Procedure; Differs for Privacy | "sex . . . has been changed by surgical procedure" | Court | Unclear | Kept Private | Kept Private | Unclear | |
| District of Columbia D.C. Code §§ 7-217, 7-219 | Gender Correction in Statute | Exact for Standard and Procedure; Differs for Privacy | "sex . . . has been changed by surgical procedure" | Court | Amended | Unclear | Unclear | No | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[9x] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[98] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Florida Fla. Stat. Ann. §§ 382.016, 382.025 | No Specific Gender Correction Provision and No Publicly Available Policy | No | "sex reassignment surgery" See Lambda, Sources of Authority. | Administrative ("sworn affidavit of the physician") | Unclear | Unclear | Unclear | Unclear | "Florida Office of Vital Statistics policy allows for the change of sex designation on birth certificates upon the provision of: a completed Application for Amended Birth Certificate and notarized Affidavit of Amendment to Certificate of Live Birth; a certified copy of a court order of name change; a sworn affidavit from the physician who performed sex reassignment surgery, containing the medical license number, stating that you have completed sex reassignment in accordance with appropriate medical procedures and that you are now considered to be a member of the reassigned gender; and the required fee." Lambda, Sources of Authority. |
| Georgia Ga. Code Ann. §§ 31-10-23, 31-10-25 | Gender Correction in Statute | Exact for Standard and Procedure, Minor Differences for Privacy | "sex . . . has been changed by surgical procedure" | Court | New | Kept Private | Kept Private | Unclear | "A certificate of birth amended pursuant to the provisions of Section 31-10-23(e) of the Official Code of Georgia Annotated shall be amended by preparing a new certificate. The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate. A new State file number shall be assigned to the new certificate. The original certificate shall be removed from the active files and placed with the order in the confidential files." Ga. Comp. R. & Regs. 290-1-3-.31. |
| Guam Guam Code Ann. tit. 10, § 3222 | Gender Correction in Statute | No | "a sworn statement from the physician performing the surgery certifying the sex of an individual has been changed by surgical procedure" | Administrative | Amended | Single Line Cross Out. See 26 Guam Admin. R. & Regs. § 2111 (i) (3). | Unclear | No | |

Case: 25-1757 Document: 10-3 Filed: 03/04/2025 Page: 253 of 360

MICHIGAN JOURNAL OF GENDER & LAW [Vol. 19:373

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[98] | Similar to MSVSA?[99] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[100] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Hawaii Haw. Rev. Stat. §§ 338-17.7, 338-18 | Gender Correction in Statute | No | "affidavit of a physician" that the person "had a sex change operation and the sex designation on the birth registrant's birth certificate is no longer correct" | Administrative | New | Kept Private | Unclear | Yes | "Upon receipt of an affidavit of a physician that the physician has examined the birth registrant and has determined the following: . . . The birth registrant has had a sex change operation and the sex designation on the birth registrant's birth certificate is no longer correct; provided that the director of health may further investigate and require additional information that the director deems necessary" Haw. Rev. Stat. § 338-17.7(4). |
| Idaho Idaho Code Ann. §§ 39-250, 39-270 | No | No | n/a | n/a | n/a | n/a | No | n/a | Idaho does not permit gender corrections |
| Illinois 410 Ill. Comp. Stat. Ann. 535/17 | Gender Correction in Statute | No | "affidavit by a physician that he has performed an operation on a person, and that by reason of the operation the sex designation on such person's birth record should be changed" | Administrative | New | Kept Private | Unclear | Yes | |
| Indiana Ind. Code Ann. §§ 34-28-2, 16-37-2-10, 16-37-1-10 | No Specific Gender Correction Provision and No Publicly Available Policy | No | In Practice: Judge Determines. See Lambda, *Sources of Authority*. | In Practice: Court. See Lambda, *Sources of Authority*. | Unclear | Unclear | Unclear | Unclear | Lambda Legal indicates that a court order is required. See Lambda, *Sources of Authority*. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[m] | Similar to MSVSA?[m] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[m] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Iowa Iowa Code §§ 144.23, 144.39, 144.24 | Gender Correction in Statute | No | "notarized affidavit by a licensed physician and surgeon or osteopathic physician and surgeon stating that by reason of surgery or other treatment by the licensee, the sex designation of the person has been changed" | Administrative | New | Kept Private. See also, IA Admin. Code 641-100.7. | Likely Private but Unclear. See IA Admin. Code 641-100.7 | Yes. IA Admin. Code 641-100.7. | "The original certificate and the evidence upon which it was based are to be sealed and placed in a special file. The state registrar may inspect such sealed information for purposes of properly administering the vital statistics program. IA Admin. Code 641—100.7. Note that information provided over the phone indicates that surgery is required, despite the broader statutory language. See also, Iowa Code 144.24; Iowa Admin. Code r. 641-100.7. |
| Kansas Kan. Stat. Ann. §§ 65-2422a, 65-2422d; Kan. Admin. Regs. § 28-17-20(b)(1)(A)(i) | Gender Correction in Regulation only | No | Regulation: "with a medical certificate substantiating that a physiological or anatomical change occurred" | Administrative | Amended | Unclear | Kept Private | Unclear | |
| Kentucky Ky. Rev. Stat. Ann. §§ 213.121, 213.136 | Gender Correction in Statute | Standard Exact, Process Different, No Privacy Provision | "sworn statement by a licensed physician indicating that the gender of an individual. . . has been changed by surgical procedure" | Administrative | Amended | Unclear | Unclear | Unclear | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[98] | Similar to MSVSA?[99] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[100] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Louisiana La. Rev. Stat. Ann. §§ 40:41, 40:60, 40:62 | Gender Correction in Statute | No | "such proof as [the court] deems necessary to be convinced that the petitioner was properly diagnosed as a transsexual or pseudo-hermaphrodite, that sex reassignment or corrective surgery has been properly performed upon the petitioner, and that as a result of such surgery and subsequent medical treatment the anatomical structure of the sex of the petitioner has been changed" La. Rev. Stat. Ann. §§ 40:62. | Court | New | Kept Private | Unclear | Yes | |

Case: 25-1537 Case: 25-1536 Document: 00118313862 Page: 256 Date Filed: 02/18/2025 Entry ID: 6774450

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[1] | Similar to MSVSA?[2] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[3] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Maine Me. Rev. Stat. Ann. §§ 2705, 2706, 10.146.2 Me. Code R. § 6-11 | Gender Correction in Regulation only | No | "sex has been changed by surgical procedure" and "a notarized affidavit by the physician who performed the surgical procedure" | Administrative | New | Kept Private | Kept Private | Yes | "1. A new birth certificate showing only the new information shall be prepared when a legal change of sex has been established in accordance with section 11 of this chapter.  [. . .]  3. When a new certificate is prepared pursuant to this subsection, the original certificate shall be held confidential and only the registrant or his or her other legal representative shall have access to the original record, except by court order.  [. . .]  Certificates established under this section shall not be regarded as amended."  10.146.2 Me. Code R. § 6-11. |
| Maryland Md. Code Ann., Health-Gen. §§ 4-214, 4-217, 4-224 | Gender Correction in Statute | Exact for Standard and Procedure, Differs for Privacy | "the sex . . . has been changed by surgical procedure" | Court | Amended | Single-line cross out | Single-line cross out | No | "D. (1) To amend or correct data other than the name on a birth certificate, the following documents and information shall be submitted:  [. . .]  (d) For sex changed by surgery, a court order shall be submitted specifying that the sex of the individual has been changed and directing the Secretary to change the data concerning the sex of the individual, and any other relevant data.  E. (1) Amendments and corrections under this regulation shall be made by:  (a) Placing a line through the original data and entering new data in black ink; or  (b) Entering the amendment or correction on electronic media."  Md. Code Regs. 10.03.01.02 |

Case: 25-1758   Case: 10-3309   Document: 103-1   Document: 27   Filed: 02/18/2025   Page: 257   Page ID: 6774450

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[20] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[20] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Massachusetts Mass. Gen. Laws Ch. 46, §§ 13, 17C | Gender Correction in Statute | No | "has completed sex reassignment surgery, so-called," and " a physician's notarized statement that the person named on the birth record has completed sex reassignment surgery" | Administrative | Amended | Unclear | Unclear | Unclear | |
| Michigan Mich Comp. Laws §§ 333.2831, 333.2682, 333.2872 | Gender Correction in Statute | No | "an affidavit of a physician certifying that sex-reassignment surgery has been performed" | Administrative | New | Kept Private | Unclear | Yes | |
| Minnesota Minn. Stat. §§ 144.218, 144.225 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Judge determines for Court order, Agency requires surgery if no court order | Either | New | Kept Private | Kept Private | Yes | Changing Gender on a Minnesota Birth Record, Minnesota Dep't of Health (on file with author). |
| Mississippi Miss. Code Ann. §§ 41-57-21, 41-57-2; 15-4 Miss. Code R. §1:106. | Gender Correction in Regulation only | No | "Gender reassignment" | Court | Amended | Not Private | Not Private | No | "Gender reassignment shall be added to the birth certificate as a marginal notation, upon receipt of a certified court order, a medical statement that attests to the reassignment." 15-4 Miss. Code R. §1:106. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[20] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[20] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Missouri Mo. Rev. Stat. § 193.215 | Gender Correction in Statute. | Exact for Standard and Procedure. Differs for Privacy | "sex . . . has been changed by surgical procedure" | Court | Amended | Single-Line Cross Out | Single Line Cross Out | No | "The original certificate/office working copy of the birth, death or fetal death shall have the correction entered on its face by interlineation with a line drawn through the incorrect entries. It shall be marked amended. The date of amendment and a summary description of the evidence submitted in support of the amendment shall be endorsed on or made part of the record." 19 Mo. Code Regs. 10-10.110. |
| Montana Mont. Code Ann. §§ 50-15-204; Mont. Admin. R. 37.8.111(5) | Gender Correction in Regulation only | Exact for Standard and Procedure. Differs for Privacy | "sex of an individual born in Montana has been changed by surgical procedure" | Court | Depends on Instructions in Court Order | Depends on Instructions | Depends on Instructions | Unclear | "(5) The sex of a registrant as cited on a certificate may be amended only if the department receives a certified copy of an order from a court with appropriate jurisdiction indicating that the sex of an individual born in Montana has been changed by surgical procedure. The order must contain sufficient information for the department to locate the record. If the registrant's name is also to be changed, the court order must indicate the full name of the registrant as it appears on the original birth certificate and the full name to which it is to be altered. If the order from the court directs the issuance of a new certificate that does not show amendments, the new certificate will not indicate on its face that it was altered. If the sex of an individual was listed incorrectly on the original certificate, refer to ARM 37.8.108." Mont. Admin R. 37.8.311. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[3c] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[3n] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Nebraska Neb. Rev. Stat. §§ 71-604.01, 71-602 | Gender Correction in Statute | No | "a notarized affidavit from the physician that performed sex reassignment surgery" | Administrative | New | Kept Private | Kept Private | Yes | "Upon receipt of a notarized affidavit from the physician that performed sex reassignment surgery on an individual born in this state and a certified copy of an order of a court of competent jurisdiction changing the name of such person, the department shall prepare a new certificate of birth in the new name and sex of such person in substantially the same form as that used for other live births. The evidence from which the new certificate is prepared and the original certificate of birth shall be available for inspection only upon the order of a court of competent jurisdiction."<br><br>Neb. Rev. Stat. § 71-604.01. |
| Nevada Nev. Admin. Code § 440.130 | Gender Correction in Regulation only | No | "having a sexual transformation" | Court | New | Depends on Instructions in Court Order | Depends on Instructions | Unclear | "1. The State Registrar may prepare a new certificate of birth for a person having a sexual transformation only upon order of a court of competent jurisdiction.<br><br>2. The court order must specify those facts to be changed on the new certificate. All other items must remain as on the original certificate." |
| New Hampshire N.H. Rev. Stat. Ann. §§ 5-C:87, 5-C:88, 5-C:9 | Gender Correction in Statute | No | "such individual . . . has had a sex change" | Court | New (In effect) | Kept Private | Unclear | Likely, in effect | "II. The clerk of the town or city shall: replace the original record with the amended birth record; retain the originally assigned file number; retain the original record attached to the amended record; prepare an amended birth record using the form appropriate for the year of birth; and forward the amended birth record to the division.<br><br>III. The clerk of the town or city shall use the amended record for all future inquiries to the record."<br><br>N.H. Rev. Stat. Ann. § 5-C:88. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[93] | Similar to MSVSA?[94] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[95] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| New Jersey N.J. Stat. Ann. §§ 26:8-40.12, 26:8-40.23 | Gender Correction in Statute | Exact in Standard, Different in Procedure, Similar in Privacy | "a medical certificate from the person's licensed physician which indicates the sex of the person has been changed by surgical procedure" | Administrative | New (in effect) | Kept Private | Kept Private | Yes | "The State registrar shall issue an amended certificate of birth to a person born in this State who undergoes sex reassignment surgery and requests an amended certificate of birth which shows the sex and name of the person as it has been changed.<br><br>The State registrar shall place the original certificate of birth and all papers pertaining to the amended certificate of birth under seal. The seal shall not be broken except by order of a court of competent jurisdiction.<br><br>Thereafter, whenever a certified copy of the certificate of birth is prepared, it shall be made from the amended certificate of birth, except when an order of a court of competent jurisdiction requires that a certified copy be made of the original certificate of birth."<br><br>N.J. Stat. Ann. §§ 26:8-40.12. |
| New Mexico N.M. Stat. Ann. §§ 24-14-25, 24-14-27 | Gender Correction in Statute | Exact for Standard Differs for Process, Absent Regulations on Privacy | "a statement signed under penalty of perjury by the person in charge of an institution or from the attending physician indicating that the sex of an individual born in this state has been changed by surgical procedure" | Administrative | Amended | Unclear | Unclear | No | "A certificate or report that is amended under this section shall be marked 'amended', except as otherwise provided in Subsection C of this section. The date of the amendment and a summary description of the evidence submitted in support of the amendment shall be endorsed on or made a part of the record. The department shall prescribe by regulation the conditions under which additions or minor corrections may be made to certificates or records within one year after the date of the event without the certificate or record being marked 'amended'."<br><br>N.M. Stat. Ann. § 24-14-25. |

Case: 25-1757   Case: 25-1757   Document: 00118341227   Document: 36   Page: 360   Filed: 02/18/2025   Filed: 02/18/2025   Page: 100   ID: 6774450

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[68] | Similar to MSVSA?[69] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[70] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| New York N.Y. Pub. Health Law § 4138 | Gender Correction in Written Policy | No | "sex reassignment surgery" | Administrative | Unclear | Unclear | Kept Private | Unclear | "The New York State Department of Health, Vital Records Division has a policy providing for the change of sex designation on birth certificates upon the receipt of a completed application; a letter from the surgeon specifying date, place, and type of sex reassignment surgery performed; an operative report from the sex reassignment surgery; and some additional medical documentation." Lambda, *Sources of Authority.* |
| New York City 24 RCNY Hlth. Code § 207.05(a)(5) | Gender Correction in Regulations only | No | "proof satisfactory to the Department has been submitted that such person has undergone convertive surgery" | Administrative | New | Kept Private | Kept Private | Yes | |
| North Carolina N.C. Gen. Stat. §§ 101-2, 130A-118, 130A-93 | Gender Correction in Statute | No | "a notarized statement from the physician who performed the sex reassignment surgery or from a physician licensed to practice medicine who has examined the individual and can certify that the person has undergone sex reassignment surgery" | Administrative | New | Kept Private | Unclear | Yes | |

Case: 25-1573 Case Document 103-3 Filed: ER 27 Document 336-9 Filed 02/18/25 27 Page 695 of 100 Page ID: 6774450

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[99] | Similar to MSVSA?[99] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[99] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| North Dakota N.D. Cent. Code §§ 23-02.1-25, 23-02.1-27; N.D. Admin. Code 33-04-12-02(1) | Gender Correction in Regulation only | No | "has undergone a sex conversion operation" and "an affidavit by a physician that the physician has performed an operation on the person, and that by reason of the operation, the sex designation of such person's birth record should be changed" | Administrative | Amended | Unclear | Unclear | Yes | |
| Northern Mariana Islands 2006 N. Mar. I. Pub. L. 15-50 | Gender Correction in Statute | Exact for Standard and Process, Unclear for Privacy | "sex. . . has been changed by surgical procedure" | Court | Amended | Unclear | Unclear | Unclear | Northern Mariana Islands adopted much of the MSVSA in whole in 2006, including the gender correction provisions, but not the Model Regulations, which would specify how the amendments are executed and whether they are kept private. Telephone Interview with Northern Mariana Islands Dep't of Public Health in Saipan, MP. (Dec. 20, 2011). |
| Ohio Ohio Rev. Code Ann. §§ 3705.13, 3705.22, 3705.23 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | Ohio does not permit gender corrections on certificates. Lambda, *Sources of Authority*. |
| Oklahoma Okla. Stat. Ann. §§ 1-321, 1-323 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Unclear | Unclear | Unclear | Unclear | Unclear | Unclear | |

App. 834

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[39] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[30] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Oregon Or. Rev. Stat. §§ 432.235, 432.121 | Gender Correction in Statute | Exact for Standard and Process, Absent Regulations on Privacy | "sex. . . has been changed by surgical procedure" | Court | Amended or New, in Discretion of Agency | Unclear | Unclear | Unclear | |
| Pennsylvania 35 Pa. Cons. Stat. §§ 450.603, 450.801, 450.804 | No Specific Gender Correction Provision and No Publicly Available Policy | No | In practice, surgery if going to the agency directly, and for a court order, the judge determines | Either | Unclear | Unclear | Unclear | Unclear | "Although not specifically mentioned in the statute, the Division of Vital Records will issue a revised birth certificate upon court order or submission of a letter from the treating physician stating that reassignment surgery has been performed." Lambda, *Sources of Authority*. |
| Puerto Rico P.R. Laws. Ann. tit. 3 § 177 | No | n/a | n/a | n/a | n/a | n/a | n/a | n/a | Puerto Rico does not permit gender corrections. See *Ex Parte Alexis Delgado*, 2005 TSPR 095, in which the Puerto Rico Supreme Court denied a corrected gender marker. |
| Rhode Island R.I. Gen. Laws §§ 23-3-21, 23-3-23 | No Specific Gender Correction Provision and No Publicly Available Policy | No | In practice, surgery | Administrative | Unclear | Unclear | Will be marked Amended, but old name will not appear | Unclear | "For changes to the sex designation on birth certificates, the Office of Vital Records has a policy requiring a notarized statement from the hospital or clinic where surgery was performed, signed by the physician in charge of the surgery. The amended certificate will state only that the name has been amended; it will not show the former name." Lambda, *Sources of Authority*. |
| South Carolina S.C. Code Ann. §§ 44-63-150, 44-63-80 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Unclear | Unclear | Amended by Attaching a Special Form | Not Private | Not Private | No | "South Carolina will issue an amendment as an attachment to the original birth certificate." Lambda, *Sources of Authority* |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[20] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[20] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| South Dakota S.D. Codified Laws §§ 34-25-51, 34-25-16.5, 34-25-52, 34-25-52.6 | No Specific Gender Correction Provision and No Publicly Available Policy | No | None (In practice, Judge determines) | In Practice, Court | In practice, generally new | In practice, generally kept private | In practice, generally kept private | Yes | "South Dakota's Registrar will follow any instructions in a court order. The general practice of the registrar is to issue a new certificate with no indication of amendment." Lambda, *Sources of Authority*. |
| Tennessee Tenn. Code Ann. § 68-3-203(d) | Gender Correction Prohibited in Statute | n/a | n/a | n/a | n/a | n/a | n/a | n/a | "The sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." |
| Texas Texas Health & Safety Code Ann. §§ 192.010, 192.011 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Unclear | Unclear | Unclear | Unclear | Unclear | Unclear | "Anecdotal reports now indicate that some officials refuse to correct the sex designation on transgender people's birth certificates, although judges may order such a change." Lambda, *Sources of Authority*. |
| U.S. Virgin Islands V.I. Code Ann. tit. 19 § 806 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Judge Determines | Court | Unclear | Unclear | Unclear | Unclear | Telephone interview with US Virgin Islands Department of Health in Christiansted, VI. (Dec. 21, 2011). |
| Utah Utah Code Ann. § 26-2-11, 26-2-22 | Gender Correction in Statute | No | "has a . . . sex change approved by an order of a Utah district court or a court of competent jurisdiction" | Court | Amended | Unclear | Unclear | No | "the state registrar shall review the application, and if complete, register it and note the fact of the amendment on the otherwise unaltered original certificate" Utah Code Ann. § 26-2-11. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[20] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[20] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Vermont Vt. Stat. Ann. tit. 18 § 5112 | Gender Correction in Statute | No | "the individual has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition" | Court | New | Kept Private | Kept Private | Yes | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[nn] | Similar to MSVSA?[oo] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[pp] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Virginia Va. Code Ann. §§ 32.1-269, 32.1-271; 12 Va. Admin. Code § 5-550-320 | Gender Correction in Statute and Regulations | No | Statute: "sex . . . has been changed by medical procedure." Regulations: "upon presentation of acceptable evidence (preoperative diagnosis, postoperative diagnosis and description of procedure) and a notarized affidavit from the physician performing the surgery, a new certificate of birth may be prepared by the State Registrar for a person born in this Commonwealth whose sex has been changed by surgical gender reassignment procedure" as well as "A certified copy of the court order changing the name of the registrant as well as designating the sex of the registrant" | Court with additional reqs. from the Registrar | Amended according to Statute, although Regulation indicates that a New certificate will be issued | Unclear | Unclear | Unclear | |

Case: 25-1512 Case 2:23-cv-00333-DBB-CMR Document 33-7 Filed 04/11/23 PageID: 6774450

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[30] | Similar to MSVSA?[34] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[45] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Washington State Dep't of Health, Center for Health Statistics Procedure CHS-B5, pursuant to Wash. Rev. Code § 43.70.150 | Gender Correction in Written Policy | No | Policy: "a letter, on letterhead, from the requestor's medical or osteopathic physician stating that the requestor has had the appropriate clinical treatment" | Administrative | Unclear | Unclear | Unclear | Medical letter is sealed, unsure regarding original certificate | This procedure was developed by the Washington Secretary of Health pursuant to Wash. Rev. Code § 43.70.150. |
| West Virginia W. Va. Code §§ 16-5-25, 16-5-27 | No Specific Gender Correction Provision and No Publicly Available Policy | No | In practice, surgery is required if going directly to the agency, and the judge determines in the case of a court order | Either | Amended | Unclear | Unclear | Unclear | "The practice of the State Registrar is to issue an amended birth certificate upon submission of either a court order or a notarized statement from the treating physician that reassignment surgery has been completed." Lambda, *Sources of Authority*. |
| Wisconsin Wis. Stat. Ann. §§ 69.15, 69.20, 69.21 | Gender Correction in Statute | No | "a surgical sex-change procedure" | Court | Depends on Instructions in Court Order | Depends on Court Order | Depends on Court Order | Yes, if new certificate issued | |
| Wyoming Wyo. Stat. Ann. §§ 35-1-424, 35-1-426; 10 Wyo. Code R. § 4(e)(iii) | Gender Correction in Regulation only | No | "when the sex of an individual has been changed" | Court | Amended (Unless Court Order Specifies Otherwise) | Not Private (Unless Court Order Specifies Otherwise) | Not Private (Unless Court Order Specifies Otherwise) | No. | "Unless other specified by court order, the amended certificate will show all changes that have been made." Lambda, *Sources of Authority*. |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR, ZAYA PERYSIAN,
SAWYER SOE, CHASTAIN ANDERSON,
DREW HALL, BELLA BOE, and REID
SOLOMON-LANE, on behalf of themselves
and others similarly situated,

*Plaintiffs,*

v.

Case No. 1-25-cv-10313-JEK

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary of
State; and UNITED STATES OF AMERICA,

*Defendants.*

## DECLARATION OF MATTHEW PIERCE

I, Matthew Pierce, do hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1.  I am Deputy Assistant Secretary for Passport Services of the U.S. Department of State,

Bureau of Consular Affairs, Passport Services Directorate.  I submit this declaration in connection

with the Opposition of the Defendants to Plaintiffs' "Motion to Stay Agency Action and for

Preliminary Injunction" (ECF No. 29).  The statements made herein are based on my personal

knowledge and on information provided to me in the course of my official duties with the

Department of State (the "Department").  I have served in the Passport Directorate for 17 years

and have been in my current position since November 2024.  I previously served as the Managing

Director for Passport Issuance from January 2024 to December 2024.  Before that position, I served

as the Managing Director for Passport Support Operations from November 2023 to January 2024;

the Director of Program Management and Operational Support from April 2022 to November 2023; the Director of the Washington Passport Agency from September 2019 to April 2022; the Division Chief for Workload and Capacity Analysis in Passport Services from February 2015 to September 2019; an analyst in the Office of Management Analysis and Coordination from May 2011 to February 2015; the Operations Officer for the Houston Passport Agency from October 2010 to May 2011; and a passport specialist at the Houston Passport Agency from December 2007 to October 2010.

2.   The Secretary of State has authority under 22 U.S.C. § 211a (the Passport Act of 1926) and Executive Order 11295 (August 5, 1966), to grant and issue U.S. passports, and to authorize U.S. diplomatic and consular officers and such other U.S. citizen employees of the Department as he may designate to issue U.S. passports.  The Secretary has authorized the adjudication of U.S. passports by Specialists serving in U.S. passport centers and agencies domestically and by Foreign Service Officers serving in U.S. Embassies and Consulates abroad.

3.   Under its regulatory authority, 22 C.F.R. § 51.20(a), the Department has prescribed certain forms to be completed by individuals applying for a U.S. passport, including Forms DS-11, DS-82, and DS-5504.  Applicants are required to complete the application, and information that the Department deems material to its adjudication of the applicant's claim of identity and citizenship must be provided.

4.   The International Civil Aviation Organization ("ICAO") is a specialized agency of the United Nations that develops and promotes standards, specifications, and policies that support the civil aviation sector.  Standards and recommended practices developed through ICAO are included in Annexes to the Convention on International Civil Aviation (the "Chicago Convention") through

2

a process of adoption by Member States. In 1980, ICAO added the sex marker to its uniform specifications for travel documents in Document 9303 ("Doc 9303"), incorporated by reference into Annex 9 of the Chicago Convention, to enable travel documents to be used more effectively to identify the holder. Since "sex" was added to ICAO's specifications more than forty years ago, most countries have included it on their passports. According to advocacy groups, the vast majority of countries issue passports with the sex of the holder listed as either male or female. ICAO's sex marker standard ensures interoperability among governments for machine readable travel documents.

5.    The Department introduced sex as a required identity attribute on passport application forms in 1976, directing applicants to indicate "M" for male or "F" for female. For just a brief period, beginning in April 2022 and ending in January 2025, the term "gender" replaced the term "sex" on the Department's passport application forms. During that period, however, no change was made with respect to the field caption for the sex of the holder used on U.S. passports themselves, because ICAO's Doc 9303 specifies that the caption be labelled "sex." From 1977 to 2021, U.S. passports were available only with sex markers of "M" or "F."

6.    Birth certificates and other forms of identification have long been used to confirm the identity and citizenship of U.S. passport applicants. Starting in 1992, an applicant could submit evidence of surgical reassignment in support of a sex indicated on their application form that differed from the sex listed on their birth certificate or other forms of identification. In 2010, the Department eliminated the requirement of surgical reassignment for issuance of a passport in a new sex and instead accepted a physician's certification that the applicant had had appropriate clinical treatment for gender transition.

3

7.   Consistent with Executive Order 13985, "On Advancing Racial Equality and Support for Underserved Communities Through the Federal Government," issued by former President Biden on January 20, 2021, the Department updated its procedures in June 2021 to permit passport applicants to self-select their sex marker as "M" or "F" based upon their gender identity and to no longer require medical certification if an applicant's self-selected sex marker did not match the sex on their citizenship and identity documents.

8.   Consistent with Executive Order 13985, in June 2021 the Department also began the process of changing the language on the passport application form and instructions from "sex" to "gender" and adding a third option of "X" as a gender marker for non-binary, intersex, and gender non-conforming persons.  In October 2021, the Department issued the first U.S. passport bearing an "X," and in April 2022, after revisions implemented pursuant to the Paperwork Reduction Act ("PRA") and approved by the Office of Management and Budget ("OMB"), the Department's passport application forms began to include an "X" gender marker option for applicants identifying as unspecified or another gender identity, in addition to "M" and "F," and well as a checkbox for the applicant to indicate a change in their gender.  Pursuant to the PRA, these forms are due to expire on April 30, 2025.

9.   On November 26, 2024, the Department published 60-day public comment notices for Forms DS-11 and DS-82 pursuant to the PRA.  On November 29, 2024, the Department published a 60-day notice for Form DS-5504 pursuant to the PRA.  These notices published pursuant to the PRA requested OMB's renewed approval for application forms containing the "X" gender marker option and the checkbox for the applicant to indicate a change in gender.

4

10.  On January 20, 2025, President Trump rescinded Executive Order 13985 and signed an Executive Order entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (E.O. 14168, or "the Executive Order").  The Executive Order explained that "[e]fforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being," and that "[t]he erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system."  Moreover, the Executive Order noted that basing Federal policy on biology, rather than identity, is "critical to scientific inquiry, public safety, morale, and trust in government itself."  The Executive Order accordingly announced that "[i]t is the policy of the United States to recognize two sexes, male and female.  These sexes are not changeable and are grounded in fundamental and incontrovertible reality."  The Executive Order provided certain definitions intended to "govern all Executive interpretation of and application of Federal law and administrative policy," including:

> "(a) 'Sex' shall refer to an individual's immutable biological classification as either male or female.  'Sex' is not a synonym for and does not include the concept of 'gender identity.'
>
> \*    \*    \*
>
> "(d) 'Female' means a person belonging, at conception, to the sex that produces the large reproductive cell.
>
> "(e) 'Male' means a person belonging, at conception, to the sex that produces the small reproductive cell.
>
> "(g) 'Gender identity' reflects a fully internal and subjective sense of self, disconnected

5

from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

11.  The Executive Order directed each Federal agency to give the terms "sex," "male," and "female" the above meanings "when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications." The Executive Order further directed every agency and all Federal employees acting in an official capacity on behalf of their agency to use the term "sex," and not "gender," in all applicable Federal policies and documents when administering or enforcing sex-based distinctions.

12.  The Executive Order further directed the Secretary of State "to implement changes to require that government-issued identification documents, including passports, ... accurately reflect" the holder's biological sex, as either male or female. The Executive Order provided that all federal agencies with forms that require an individual's sex "shall list male or female, and shall not request gender identity."

13.  Moreover, the Executive Order directed the Department of Health and Human Services ("HHS") to provide guidance to the U.S. Government, external partners, and the public on the sex-based definitions set forth in the Executive Order, which HHS did on February 19, 2025. HHS's guidance similarly defines "sex" to mean "[a] person's immutable biological classification as either male or female." Instead of "at conception," HHS's guidance defines "female" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)" and "male" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm." It further provides that some females or males may have

6

productive systems that do not produce eggs or sperm "due to factors such as age, congenital disorders or other developmental conditions, injury, or medical conditions that cause infertility." It also states that "[r]are disorders of sexual development do not constitute a third sex because these disorders do not lead to the production of a third gamete. That is, the reproductive system of a person with such a disorder does not produce gametes other than eggs or sperm."

14.  While the Department of State adjudicates identity using a variety of documents, it does not have the capacity to adjudicate "sex at conception" and must defer to definitions and guidance from other agencies, including HHS, when interpreting the Executive Order.

15.  Consistent with directives set out in E.O. 14168, on January 22, 2025, the Department instructed all domestic passport agencies that the Department would no longer issue U.S. passports with an "X" marker and to hold all non-urgent applications seeking an X marker or seeking a sex marker other than the applicant's biological sex at birth to ensure consistent adjudication. On January 23, 2025, these instructions were transmitted to all U.S. diplomatic/consular posts abroad. The instructions advised that additional implementation guidance would be forthcoming, but that overseas posts and passport agencies should contact the Passport Directorate's Office of Adjudication for applicants having urgent travel needs.

16.  On January 29, 2025, the Office of Personnel Management ("OPM") provided initial guidance to all federal departments and agencies regarding E.O. 14168. The guidance required the Department, not later than 5:00 p.m. EST on January 31, 2025, (i) to review all agency forms that require entry of an individual's sex and ensure that all list male and female only, and not gender identity, removing requests for "gender" and substituting requests for "sex"; and (ii) to ensure that all applicable agency policies and documents, including forms, use the term "sex" and

7

not "gender." The guidance required the Department to report to OPM no later than 12:00 p.m. EST on February 7, 2025, on all steps taken to implement the guidance, including a list of actions taken to comply with the guidance and the Executive Order, and a description of plans to fully comply with the guidance and the Executive Order.

17. To remain compliant with E.O. 14168, after receiving guidance from OMB's Office of Information and Regulatory Affairs in late January 2025 the Department uploaded prior versions of the DS-11, DS-82 and DS-5504 application forms that offered only the sex marker of "M" or "F." The Department also removed paper Forms DS-11, DS-82, and DS-5504 that offered "X." The Department advised domestic passport acceptance agents, domestic passport agencies and centers, and foreign posts that it was in the process of updating these forms through the PRA process.

18. On February 7, 2025, the Department resumed processing of the affected applications, employing guidance on how to adjudicate biological sex at birth. Sex at birth, which can generally be adjudicated using a birth certificate, is ascertainable and as such is how the Department has interpreted its obligations under E.O. 14168. The Department also defers to definitions and guidance from other agencies, including HHS.

19. In evaluating how to implement this policy, the Department was cognizant of its prior history of permitting an applicant to self-select a gender identity which could differ from the applicant's biological sex according to E.O. 14168. In recognition of the President's policy objectives identified in the Executive Order, the Department determined that it was appropriate to adopt instead the Executive Order's directive, which has since been supported by HHS's definition, that sex is immutable and that "sex" is not a synonym for and does not include the

App. 847

concept of "gender identity." Moreover, the Executive Order indicates a government-wide shift to using one uniform definition of "sex," so a change in the Department's policies was also needed to support the goal of uniformity. As noted above, the policy set forth in the Executive Order of recognizing only two sexes and of referring to individuals by their immutable biological classification as either male or female now "govern[s] all Executive interpretation of and application of Federal law and administration policy." OPM has also issued guidance to ensure consistency across the Federal government. The Department's compliance with the Executive Order's directive and OPM's guidance furthers that interest.

20. On February 14, 2025, the Department published 30-day public comment notices for Form DS-11 and DS-82 pursuant to the PRA. On February 18, 2025, the Department published a 30-day notice for Form DS-5504 pursuant to the PRA. These notices indicated that to comply with E.O. 14168, the Department was updating these passport application forms to replace the term "gender" with "sex" and to request the applicant's biological sex at birth, male "M" or female "F." Accordingly, the "X" marker option and the checkbox for indicating a change in gender will be removed from the forms. The public comment period for Form DS-11 will end on March 17, 2025, and the public comment periods for Forms DS-82 and DS-5504 will end on March 20, 2025.

21. The steps outlined above, which have been taken to implement E.O. 14168, will, once completed, reinstate the Department's pre-2021 practice of issuing passports with only an "M" or "F" sex marker and will, consistent with HHS's guidance under the Executive Order, require passports to reflect sex at birth.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:    March 12, 2025.

_____
Matthew Pierce

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, and REID SOLOMON-LANE, on behalf of themselves and others similarly situated,<br><br>                    *Plaintiffs*,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA,<br><br>                    *Defendants*. | Case No. 1-25-cv-10313<br><br>Hon. Julia E. Kobick |

## REBUTTAL EXPERT DECLARATION OF SARAH D. CORATHERS, MD

1.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2.      I have actual knowledge of the matters stated in this declaration and have collected and cite relevant literature concerning issues in this litigation throughout this report.

3.      My credentials are set forth in my initial prior declaration, ECF 30-1.

4.      I have reviewed Defendants' Brief in Opposition to the Plaintiffs' Motion to Stay Administrative Proceedings and for a Preliminary Injunction, ECF 53. Here, I respond to some of the Defendants' assertions about the "Defining Sex" guidance issued by the U.S. Department of Health and Human Services (HHS) on Feb. 19, 2025. https://perma.cc/9DNS-CHSZ. ("HHS Guidance"). Based upon my training and clinical expertise, I will explain problems with some of the conclusions that Defendants draw from the HHS Guidance and provide data showing why those conclusions are erroneous. I do not specifically address each study or point made. I reserve the right to supplement my opinions, if necessary, as the case proceeds.

**The HHS Guidance misrepresents and incorrectly asserts that sex can be defined exclusively by ability to produce either egg or sperm.**

5.     As stated in my initial declaration for the Court, ECF 30-1, in a medical and scientific context, sex refers to multiple physiologic attributes, such as chromosomes (genetic sex), gonads (glands that produce hormones), anatomy (reproductive parts both inside and outside of the body), secondary sex characteristics that usually develop during puberty, and gender identity.

6.     The HHS Guidance states, "There are only two sexes, female and male, because there are only two types of gametes." The HHS Guidance fails to acknowledge the existence of the following:

   a. There are people that do not make either gamete (e.g., people with gonadal dysgenesis) and would therefore not fit into either of the categories set forth by the government's definition.

   b. There are people with both ovarian and testicular tissue (e.g., people with ovatestes) and would therefore not fit into either of the categories set forth by the government's definition because they can produce both gametes.

   c. At birth, a person's sex is generally assigned based on their external genitalia, but there are people whose gamete production does not align with external genitalia (e.g., people with congenital adrenal hyperplasia, which causes high exposure to androgen hormones that can result in virilized appearance of external genitalia in a person with ovaries and XX chromosomes, typically associated with females).

   d. For individuals whose chromosomes, gonads, gametes, and external features do not fully align, they may not fit neatly into either of the government's definitions or they would be categorized differently depending on which definition—the EO, HHS, or the State Department's reliance on birth certificates—is used.

7.     The HHS Guidance's definition of sex as binary based upon gamete production is internally inconsistent within its own attempts to operationalize a definition:

   a.   HHS asserts an individual human is either female or male based on whether the person is of the sex characterized by a reproductive system with the biological function of producing eggs (ova) or sperm.  Subsequently, HHS then contradicts their own assertion by stating that having the biological function to produce eggs or sperm does not require that eggs or sperm are ever produced.

   b.   HHS does not explain how to determine a person's sex based on their "biological function of producing eggs (ova) or sperm" if the person cannot produce either gamete. According to the HHS Guidance, such individuals would not have any sex at all.

   c.   HHS does not address the physiologic function of the reproductive system to produce hormones that impact the observable physical attributes of sex characteristics.

8.     The HHS Guidance then conflates gametes with genetics. It incorrectly asserts that the sex of a human, female or male, is determined genetically at conception (fertilization), and is observable before birth.

9.     The combination of chromosomes is determined when the egg is fertilized. The ability to produce eggs or sperm is not determined at fertilization.

10.    To reiterate, gamete production is not present at conception (fertilization), nor is it observable before birth.

11.    The presence of a Y chromosome does not universally confer the ability to make sperm.

12.     The presence of two X chromosomes does not universally confer the ability to make ova.

13.     Medical conditions known as Differences of Sex Development (DSD) or Intersex describes a group of conditions in which biological sex development does not follow a typical path. Some intersex people will not develop the capacity to produce either ova or sperm.[1]

14.     The development of gonads (ovaries or testes) that ultimately have the potential to produce gametes (eggs or sperm) is a complex, multi-step process of activating and repressing factors dependent upon genetic instruction and subsequent embryologic differentiation in response to hormone signals that occur over many weeks following fertilization.

15.     Gonads are not always able to produce either eggs or sperm.

16.     Gonads do not always match external genitalia.

17.     An example of a condition that can result in female external genitalia despite having male internal reproductive organs is androgen insensitivity syndrome.[2] Individuals with complete androgen insensitivity have XY chromosomes (typically associated with males) but cannot respond to androgen hormones due to an impairment in the androgen receptor. A person with complete androgen insensitivity has XY karyotype, but the testes do not descend into the scrotum and a penis is not formed. The result is the appearance of female external genitalia at birth and development of breasts during puberty. Based upon external appearance, people with complete androgen insensitivity are designated female at birth and reared with a female gender identity, yet they do not produce ova. People with complete androgen insensitivity have testes but are not able

---

[1] The Biological Reality of Sex and Intersex: A Response to the Executive Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" - Pediatric Endocrine Society. February 11, 2025.
[2] Gottlieb B, Trifiro MA. Androgen Insensitivity Syndrome. 1999 Mar 24 [Updated 2017 May 11]. In: Adam MP, Feldman J, Mirzaa GM, et al., editors. GeneReviews® [Internet]. Seattle (WA): University of Washington, Seattle; 1993-2025. Available from: https://www.ncbi.nlm.nih.gov/books/NBK1429/

to produce sperm (people with partial androgen insensitivity might be able to produce sperm). People with androgen insensitivity would not necessarily fit into either category set forth in the government's definitions, or which category they are placed in would differ depending on whether the EO, HHS, or the State Department's definition was used. For example, someone with complete androgen insensitivity syndrome would likely be considered male under the HHS and EO definitions because they have XY chromosomes and testes but would be considered female under the State Department definition because they would be designated female on their birth certificate based upon their external genitalia and physical appearance.

18.     In sum, nothing about the Defendants' proposed definitions of male and female reflect "biological truth" because they are blatantly inconsistent with the complex nature of biology of sex development.

**The HHS Guidance's definition of sex based on gamete production cannot be applied in any practical sense.**

19.     The HHS Guidance's proposed definition of sex based upon gamete production is impossible to determine by visual inspection and is not observable before birth.

20.     To meet the HHS Guidance's definition of female as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)" would require ultrasound imaging of every infant born with female appearing external genitalia to identify the presence of gonads. Even then, the presence of a gonadal structure does not guarantee that there is not testicular tissue present or that the gonad is functional to make ova. For example, Turner syndrome is a chromosome condition impacting phenotypic females (phenotype refers to observable appearance) with one intact X-chromosome and complete or partial absence of the

second sex chromosome.[3] Girls with classic Turner syndrome are completely missing one X-chromosome (karyotype 45 XO) and often have streak gonads (gonads that appear as fibrous, streak-like structures instead of fully formed ovaries or testes) that are difficult to distinguish and will not produce ova. Girls with a mosaic karyotype of Turner syndrome in which some cells have a missing X-chromosome and others have two copies of the X-chromosome may have structural ovaries but remain at risk of premature ovarian failure. Girls with mosaic Turner syndrome can also have a karyotype that includes Y-chromosome material and are at risk for gonadal tumor associated with the presence of Y-chromosome material.

21.    To meet the HHS Guidance's definition of male as "a person of the sex characterized by a reproductive system with the biological function of producing sperm" would require biopsy of presumed testicular tissue to confirm presence of seminiferous tubules or waiting until male puberty, between the ages of 9-14 years, and requiring the adolescent to produce a semen sample.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on  March 18 , 2025

SARAH D. CORATHERS, MD

---

[3] Gravholt CH, Andersen NH, Christin-Maitre S, Davis SM, Duijnhouwer A, Gawlik A, Maciel-Guerra AT, Gutmark-Little I, Fleischer K, Hong D, Klein KO, Prakash SK, Shankar RK, Sandberg DE, Sas TCJ, Skakkebæk A, Stochholm K, van der Velden JA; International Turner Syndrome Consensus Group; Backeljauw PF. Clinical practice guidelines for the care of girls and women with Turner syndrome. Eur J Endocrinol. 2024 Jun 5;190(6):G53-G151. doi: 10.1093/ejendo/lvae050. PMID: 38748847; PMCID: PMC11759048.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ASHTON ORR, ZAYA PERYSIAN,
SAWYER SOE, CHASTAIN ANDERSON,
DREW HALL, BELLA BOE, REID
SOLOMON-LANE, VIKTOR AGATHA,
DAVID DOE, AC GOLDBERG, RAY
GORLIN, and CHELLE LeBLANC, on
behalf of themselves and others similarly
situated,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary
of State; and UNITED STATES OF
AMERICA,

*Defendants*.

Case No.1:25-cv-10313-JEK

**AMENDED CLASS ACTION COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     This is an action for declaratory and injunctive relief arising out of the Trump Administration's abrupt, discriminatory, and dangerous reversal of settled United States passport policy.  The United States previously issued passports to transgender, intersex, and nonbinary people that reflected the sex they live as and express, rather than the sex they were assigned at birth.  Under the government's new arbitrary and unlawful policy (the "Passport Policy"), the United States now refuses to issue passports to otherwise eligible Americans because they are transgender, intersex, or nonbinary—except on terms that expose them to grievous harms and violate their constitutional rights to equal protection, travel, privacy, and speech and flout the Administrative Procedure Act (the "APA").

2.     The State Department previously permitted all people—including those who are transgender, intersex, and nonbinary—to obtain passports with sex designations that reflected the

App. 856

sex they live as. This included permitting individuals to use the male or female sex designation that reflected the sex they live as and an "X" designation on passports available to individuals who do not identify as female or male or who did not want their sex specified on their passport. The previous State Department policy enhanced consistency across identification documents: most U.S. states permit transgender residents to have a sex designation on their driver's licenses that match the sex they live as and increasingly allow "X" designations as well. The federal Passport Policy rashly requires passports to list only either female or male based on newly concocted and scientifically inaccurate definitions of an individual's sex determined by whether they "belong[], at conception, to the sex that produces" either "the large" or "the small reproductive cell."

3. The Passport Policy is unlawful and unconstitutional. It discriminates against individuals based on their sex and, as to some, their transgender status. It is motivated by impermissible animus. It cannot be justified under any level of judicial scrutiny, and it wrongly seeks to erase the reality that transgender, intersex, and nonbinary people exist today as they always have.

4. The inevitable, immediate, and direct result of the Passport Policy is that transgender, intersex, and nonbinary people have been injured. Passports are critical documents for international travel and other purposes. For many of the people now barred from receiving a passport unless they accept one with the Trump Administration's inaccurate sex designation, they are forced to "out" themselves over and over again, harming them and imposing wrongful barriers to travel. Those who look at the passport—including anyone hostile to transgender people, as the Trump Administration is and officials in many countries are—may discern that a passport holder is transgender from a perceived mismatch between the sex designation on their passport and their appearance and may question the validity of their passport. The results may be catastrophic, including causing serious psychological harm, denial of the ability to enter or leave a country, physical violence from people who despise transgender people, and even the passport holder being arrested and imprisoned by border control agents in foreign countries.

2

5.     The Passport Policy was the product of an animus-filled executive order issued by President Trump on the first day of his term, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order") (attached as Exhibit A).  On its face, the Executive Order declares that it is the policy of the federal government that there are only two sexes and that, for all federal legal purposes, sex is unalterably fixed at conception; it thus attempts to impose a government-wide policy that transgender, nonbinary, and some intersex people do not exist.  The Executive Order also asserts without basis or evidence that individuals claim to be transgender only to invade women's private spaces.  The Executive Order is transparently unlawful and unconstitutional.  It also is unmoored from scientific and medical reality: Transgender people, intersex people, and people who do not identify as either (or exclusively) male or female exist. Scientific and medical authorities have recognized that fact, as have courts across the country, including the U.S. Supreme Court.  In a stroke, the Executive Order seeks to rewrite those realities and replace them with the sole options of "male" or "female" as defined in the Executive Order based on no science, no evidence, and no meaningful explanation aside from empty, dehumanizing rhetoric.

6.     Though publicly silent, the State Department has already implemented its new Passport Policy.  On information and belief, and according to many news reports, the Secretary of State has ordered the State Department to suspend processing of passport applications that seek to change the sex designation on a person's passport or that selected an "X" sex designation—sowing chaos and causing immediate irreparable harm.  As further proof of implementation, after Plaintiff Zaya Perysian requested a new passport reflecting that she is a woman, she received her passport back on January 28, 2025 with an "M" sex designation, along with a form stating that the sex on her passport application had been "corrected."

7.     Without complying with its statutory obligation to provide a 60-day notice and comment period, the State Department has also changed its passport application forms to exclude the "X" sex designation option that has existed on the form for years.

3

App. 858

8.     The Passport Policy and Executive Order are part of a broader assault against transgender and nonbinary people by this Administration and are part of a historical pattern of federal and state governments attacking and seeking to erase transgender, intersex, and nonbinary people.  The Executive Order's tortured definition of sex is already being implemented across the federal government to deny transgender people's rights, including in military service, education, other identification documents, and healthcare.  It comes on the heels of similar attacks by various states—and by the first Trump Administration.  And it is the latest in a decades-long line of governmental actions seeking to further oppress transgender and gender-nonconforming people.

9.     Plaintiffs are transgender or nonbinary Americans who have been harmed, and will continue to be harmed, by the Passport Policy.  Because of the Passport Policy, as noted, one plaintiff had her passport returned by the State Department with a male sex designation despite the fact that she lives and expresses herself as a woman and her other identification documents correctly have a sex designation of female.  Other plaintiffs have submitted their passports for renewal or to change their passport sex designation, which the State Department will deny under the Passport Policy.  Still others are afraid to do so for fear the State Department will suspend their application and hold their passport or will send back an unusable passport with the wrong sex designation.  All have faced prior mistreatment due to their gender identities, and they fear that having incorrect sex designations on their passports will cause them further mistreatment—including putting them in danger.

10.     This suit seeks a declaration that the Passport Policy and Executive Order as applied to passports are unconstitutional, a declaration that the Passport Policy violates the APA, and a permanent injunction restoring the status quo ante.  Declaratory and injunctive relief are needed to remedy the many constitutional and statutory violations the Passport Policy inflicts.  Relief is needed on a class-wide basis to prevent class-wide harm to the hundreds of thousands, if not millions, of transgender, nonbinary, and intersex people in the United States who need a passport they can use without suffering harm.

4

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1346 (civil actions against the United States).

12.     This Court has jurisdiction to review final agency actions under 5 U.S.C. § 702.

13.     This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

14.     Defendants are subject to personal jurisdiction in this Court.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are the United States, its agencies, and its officers sued in their official capacities. Plaintiffs Bella Boe, Sawyer Soe, Reid Solomon-Lane, and AC Goldberg are residents of this District.  A substantial part of the events or omissions giving rise to this Complaint occurred in this District.

## PARTIES[1]

**A.     Plaintiffs**

16.     Ashton Orr is a United States citizen and a resident of Morgantown, West Virginia.

17.     Zaya Perysian is a United States citizen and a resident of Santa Clarita, California.

18.     Sawyer Soe is a United States citizen and a resident of Salem, Massachusetts.

19.     Chastain Anderson is a United States citizen and lives near Richmond, Virginia.

20.     Drew Hall is a United States citizen and a permanent resident of Wisconsin.

21.     Bella Boe is a United States citizen and a resident of Cambridge, Massachusetts.

---

[1] Bella Boe," "Sawyer Soe," and "David Doe" are pseudonyms used in this Amended Complaint to refer to three of the plaintiffs.  The Court issued an order on March 18, 2025 (ECF 60) permitting Bella Boe and Sawyer Soe to proceed under pseudonyms.  A motion for leave for David Doe to proceed under a pseudonym will be filed shortly with the Court.  "AC Goldberg" is the name that this Plaintiff uses publicly as a professor, speaker, and consultant, and in his day-to-day life, but is not his legal name.  Defendants do not oppose his appearing in this action as "AC Goldberg." Plaintiffs will provide his legal name to the Court and to Defendants, subject to the Protective Order entered by the Court on March 18, 2025 (ECF 59).

22.     Reid Solomon-Lane is a United States citizen and a resident of North Adams, Massachusetts.

23.     Viktor Agatha is a United States citizen and a resident of Dallas, Texas.

24.     David Doe is a United States citizen and a resident of Van Nuys, California.

25.     AC Goldberg is a United States citizen and a resident of Cambridge, Massachusetts.

26.     Ray Gorlin is a United States citizen and a resident of Minneapolis, Minnesota.

27.     Chelle LeBlanc is a United States citizen and a resident of Colorado Springs, Colorado.

**B.      Defendants**

28.     Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.  By statute, the President has authority to prescribe certain rules for the issuance of passports.  *See* 22 U.S.C. § 211a.

29.     Defendant Department of State (the "State Department") is a federal executive department responsible for implementing the Executive Order.  It is an agency within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

30.     Defendant Marco Rubio is the Secretary of State.  He is responsible for supervising and directing the State Department.  He is sued in his official capacity.  By statute, the Secretary of State has authority to issue passports under rules prescribed by the president.  *See* 22 U.S.C. § 211a.  By executive order, the president has delegated the authority to prescribe those rules for passport issuance to the Secretary of State.  *See* Executive Order 11295, 31 Fed. Reg. 10,603 (Aug. 5, 1966).

31.     Defendant United States of America is the government of the United States and includes all government agencies and officials responsible for implementing the Passport Policy and the Executive Order as applied to passports.

32.     The State Department and Secretary Rubio are collectively referred to as the "Agency Defendants."

6

## ALLEGATIONS

**A. Gender Identity, Transgender People, Nonbinary People, and Intersex People**

    1.   <u>Gender Identity</u>

    33.   "Gender identity" refers to a person's core, internal sense of belonging to a particular sex. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

    34.   The concept of "sex" refers to multiple physiologic attributes, such as chromosomes, gonads (glands that produce hormones and gametes), and anatomy (internal and external reproductive parts), secondary sex characteristics that usually develop during puberty, and gender identity. "Sex assigned at birth" refers to the designation of sex generally noted on a birth certificate shortly after birth, almost always based solely on the appearance of an infant's external genitalia. The term "biological sex" is less precise than "sex assigned at birth" because it does not account, for example, for intersex conditions and gender identity.

    35.   A person's gender identity is an essential part of their identity and very frequently predicts how they will be identified by others more accurately than their sex assigned at birth. For purposes of identity documents, including passports, a person's gender identity is the most important and accurate characteristic for determining what their sex is and what their sex designation should be.

    36.   According to the American Medical Association, the American College of Physicians, the American Psychiatric Association, and 25 other major U.S. medical and psychological professional associations, "variations in . . . gender identity are a normal part of human development" and "research and experience shared by scholars, clinicians, and patients have shown that . . . efforts [to change someone's gender identity have not succeeded] and are harmful."[2]

---

[2] United States Joint Statement Against Conversion Efforts (completed Aug. 23, 2023), available at https://d3dkdvqff0zqx.cloudfront.net/groups/apaadvocacy/attachments/USJS-Final-Version.pdf.

### 2.    Transgender People

37.    Transgender people have a gender identity different from their sex assigned at birth. According to one set of surveys, more than 1.6 million Americans are transgender.[3]

38.    When a person's sex assigned at birth and gender identity align, the person is "cisgender."

### 3.    Nonbinary People

39.    "Nonbinary" people have a gender identity that is not exclusively male nor exclusively female. According to one set of surveys, more than 1.2 million Americans identify as nonbinary.[4]

### 4.    Intersex People

40.    "Intersex" is a term used to describe a wide range of natural bodily variations, which some medical professionals refer to as "differences of sexual development." Intersex people are born with sex characteristics that do not fit typical binary notions of bodies designated "male" or "female." Intersex variations differ; some intersex traits may be discovered at birth, some may not be discovered until puberty, and some may never be discovered. For example, intersex people can have certain variations in chromosomes, external genitals, internal reproductive organs, and hormone production and response that cause these variations in their bodies. According to estimates by the United Nations, between 0.05% and 1.7% of the population is born with intersex traits—meaning there are potentially as many as 5.6 million intersex people in the United States.[5]

---

[3] Jody Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Institute, UCLA School of Law 1 (2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf (last accessed Feb. 6, 2025).

[4] Bianca D.M. Wilson et al., *Nonbinary LGBTQ Adults in the United States*, Williams Institute, UCLA School of Law 2 (June 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Nonbinary-LGBTQ-Adults-Jun-2021.pdf (last accessed Feb. 6, 2025).

[5] United Nations Free & Equal, "Intersex People," Office of the United Nations High Commissioner for Human Rights 1 (2024), https://www.unfe.org/sites/default/files/download/Intersex%20factsheet%202024%20EN%20-%20CLEARED.pdf (last accessed Feb. 6, 2025)

41.     During the initial gestation period, embryos with XX chromosomes and embryos with XY chromosomes appear the same in terms of their biological makeup. Various aspects of the embryos later typically begin to develop differently depending on whether the embryo has XX or XY chromosomes. This binary differential development is not always what occurs, however, and there are many variations in genitals, internal reproductive organs, hormones, and other aspects of the body that do not align with a strict sex binary.

42.     Some intersex people do not produce either (and some may produce both) the "large reproductive cell" or "small reproductive cell"—that is, the ovum and sperm—that are at the core of the definitions of female and male in the Executive Order. Further, some intersex people may produce either sperm or ovum but have genitalia or chromosomes typically associated with the different sex (e.g., a person with testes who is assigned female at birth based on genitalia).

43.     Some intersex people are transgender because their gender identity is different from the sex they were assigned at birth. Some intersex people, however, were assigned a sex at birth that is the same as their gender identity, meaning that they are cisgender.

            5.     Gender Dysphoria and Gender-Affirming Care

44.     Gender dysphoria is a medically recognized condition defined by a marked incongruence between a person's gender identity and the sex they were assigned at birth, when accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.[6] Many transgender people (including transgender people who are nonbinary or intersex) experience gender dysphoria. Gender dysphoria is a serious medical condition that, if left untreated, can lead to debilitating depression and even suicidal ideation and acts.

45.     The treatment protocols for gender dysphoria are laid out in established, evidence-based clinical guidelines: (i) the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons and (ii) the World Professional

---

[6] *See, e.g.*, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-5-TR* at 512–13 (2022).

9

Association for Transgender Health ("WPATH") Standards of Care ("SOC") for the Health of Transgender and Gender Diverse People, which was initially published in 1979 and is now in its eighth version, which was released in 2022. These guidelines are supported by all major U.S. medical associations and reflect the professional consensus about the psychological, psychiatric, hormonal, and surgical management of gender dysphoria. These clinical guidelines are comparable to clinical guidelines used to treat other medical conditions.

46.     It is the recognized standard of care to address gender dysphoria with social affirmation as well as medical treatment designed to bring a person's body and expression of their sex in line with their gender identity. This course of treatment has different components depending on the particular needs and age of each person.

47.     Treatment for gender dysphoria brings a person's social interactions, appearance, and body into greater alignment with the person's gender identity, which helps alleviate distress. Treatment for gender dysphoria may involve social transition, hormone treatment, and/or gender-affirming surgery or surgeries.

48.     Social transition involves shifting one's presentation and social functioning so that it is consistent with one's gender identity. Typically, it involves some or all of the following:

    a.   Change in clothing, hair, or appearance;

    b.   Change of name;

    c.   Change in pronouns (e.g., "she," "he," or "they");

    d.   Change in participating in gender-specific activities, events, or spaces; and

    e.   Change of the sex designation on identifying documents, including an individual's driver's license and passport.

49.     Treatment for gender dysphoria typically includes living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity.

50.     While social transition is adequate to treat gender dysphoria for some people, others may need other forms of treatment as well.

51.      Hormone treatment is used to help a person develop secondary sex characteristics consistent with their gender identity, which may affect how the person receiving such treatment physically presents and is perceived by others.

52.      Gender-affirming surgeries may include a wide variety of surgeries, many of which also affect how the person undergoing surgery physically presents and is perceived by others, such as augmentation mammoplasty, chest reconstruction surgery, and facial feminization surgery.

      6.     <u>Violence and Discrimination Against and Harassment and Mistreatment of Transgender, Nonbinary, and Intersex People</u>

53.      Transgender, nonbinary, and intersex people often experience violence, harassment, discrimination, and social stigma when others learn that they are transgender, nonbinary, or intersex.

54.      For decades, transgender, nonbinary, and intersex people have been subject to numerous and varied attempts by both private individuals and government actors to discriminate against and oppress them, and to attempt to erase their existence.

55.      Transgender people are more likely to suffer harassment, discrimination, and violence than the population at large.  According to the National Center for Transgender Equality's U.S. Transgender Survey:

      a.   Around a quarter (24%) of respondents had been physically attacked in a K-12 school because people thought they were transgender.

      b.   In the year prior to completing the survey, 27% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or presentation.

      c.   Nearly half (47%) of respondents had been sexually assaulted during their lifetime.

      d.   Among respondents who had interacted with police, 58% of those whom the police perceived as transgender experienced some form of mistreatment.

     e.   Twenty-five percent of transgender people were verbally harassed, 16% denied services or benefits, 9% asked to leave a location or establishment, and 2% assaulted or attacked after showing identification with a name or sex designation that did not match their gender presentation.

56.    For transgender people of color, these forms of mistreatment are even more common.

57.    As a result of these forms of mistreatment, 39% of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population as a whole.  Moreover, 40% percent of respondents attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population as a whole (4.6%).

58.    Nonbinary people are also subject to violence and discrimination, and many of the statistics regarding violence against transgender people include nonbinary people.[7]

59.    Intersex people also are more likely to suffer violence, discrimination, harassment, and mistreatment.  For instance, surveys indicate that anywhere from one quarter to half of intersex people had been subjected to violence.[8]

**B.    The Importance of Passports Consistent with the Sex a Person Lives As**

60.    A passport is an essential government-issued document that individuals use for various important purposes throughout their lifetime.

---

[7] *See, e.g.*, Human Rights Campaign Foundation, *The Epidemic of Violence Against the Transgender & Gender-Expansive Community in the U.S.: The 2024 Report* (Nov. 2024), https://reports.hrc.org/an-epidemic-of-violence-2024 (last accessed Feb. 6, 2025); Skylar Davidson, *Gender inequality: Nonbinary transgender people in the workplace*, Cogent Social Sciences (2016).

[8] The Trevor Project, *The Mental Health and Well-being of LGBTQ Youth who are Intersex* at 4 (2021), https://www.thetrevorproject.org/wp-content/uploads/2021/12/Intersex-Youth-Mental-Health-Report.pdf (last accessed Feb. 6, 2025); ILGA-Europe and OII Europe, Diving Into the FRA LGBTI II Survey Data: Intersex Briefing (2023), https://www.ilga-europe.org/report/intersections-intersex-diving-into-the-fra-lgbti-ii-survey-data/ (last accessed Feb. 6, 2025).

61.     Passports are necessary for travel outside of the country and for reentry into the United States.  *See* 8 U.S.C. § 1185(b).  Foreign countries generally bar entrance by U.S. citizens without a valid U.S. passport and/or condition issuance of a necessary visa on holding a valid U.S. passport.

62.     When traveling or living abroad, U.S. passports often are necessary for numerous purposes and often are the only form of identification carried by a U.S. citizen that is recognized or acknowledged by foreign authorities or private citizens.  A passport often is needed in other countries to check in to a hotel, to use a bank, to receive medical services and for many other purposes.

63.     If there is an emergency while abroad, passports are the primary way for a U.S. citizen to identify themself to U.S. officials, such as those at an embassy or consulate.

64.     Passports can also be useful or necessary for travel within the United States.  If a person does not have another valid form of identification, they generally cannot board a plane. Under the REAL ID Act, certain state identification documents will no longer be able to be used for domestic travel when the Act comes into effect on May 7, 2025.

65.     Passports are used in a wide variety of contexts as identification documents, such as determining eligibility for employment, enrolling in government programs, and engaging in a wide range of financial transactions.  Passports are also used to obtain other important forms of identification and can be used as an "identification of last resort" due to their widespread acceptance and the weight accorded a federal government document.  For instance, passports can often be used to obtain driver's licenses, as proof of age, as proof of citizenship, and for educational registration.

66.     Forcing transgender, nonbinary, and intersex people to carry and use identity documents that do not align with the sex they live and present themselves as, or denying them necessary identity documents, is inconsistent with protocols regarding social transition.  It can cause anxiety and distress to individuals who are transgender and result in discrimination and violence against them.  Additionally, for those who have struggled for years with the impact of

external invalidation of their identity, the knowledge that their identification documents label them with a sex different from the sex they live as can, by itself, cause serious psychological injury.

67.     Recognizing the importance of identification documents, the American Medical Association "supports every individual's right to determine their gender identity and sex designation on government documents" and urges that governments "allow for a sex designation or change of designation on all government IDs to reflect an individual's gender identity, as reported by the individual and without need for verification by a medical professional."[9]

68.     Forcing transgender people to carry and present identification that lists their sex as defined by the Executive Order can out them to officials and private citizen strangers as transgender, a profoundly private piece of information in which they have a reasonable expectation of privacy. Such a policy deprives transgender people of significant control over the circumstances surrounding disclosure of their transgender identity, including when, where, how, and to whom their identity is disclosed.

69.     The Passport Policy also harms intersex people who are not transgender and who want an "M" or "F" sex designation on their passport. If, for example, someone who is intersex lives their life as a woman and presents to others as a woman and therefore wants an "F" on their passport, but the Passport Policy would require them to have an "M" on their passport, that will wrongly suggest that they are transgender or will out them as being intersex. Their being intersex is a profoundly private piece of information in which they have a reasonable expectation of privacy. The Passport Policy therefore deprives them of significant control over the circumstances surrounding disclosure of the fact that they are intersex, including when, where, how, and to whom their identity is disclosed.

70.     The Passport Policy also harms nonbinary people who are not transgender and who want an "M" or "F" sex designation that is inconsistent with how the Executive Order defines their

---

[9] Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967, Am. Med. Ass'n (2021), https://policysearch.ama-assn.org/policyfinder/detail/gender?uri=%2FAMADoc%2FHOD.xml-0-5096.xml (last accessed Feb. 6, 2025).

sex. Someone who meets the Executive Order's definition of male but who is nonbinary and lives their life and presents as a woman and wants an F on their passport will have it disclosed against their will that they meet the Executive Order's definition of male. That is a profoundly private piece of information in which they have a reasonable expectation of privacy. The Passport Policy therefore deprives them of significant control over the circumstances surrounding disclosure of the fact that they fall within the Executive Order's definition of male, including when, where, how, and to whom that is disclosed.

71. Further, requiring people who want an "X" sex designation on their passport to instead have an "M" or "F" designation forces them to disclose whether they meet the Executive Order's definition male or female. That is a profoundly private piece of information in which they have a reasonable expectation of privacy. Such a policy deprives these people of control over the circumstances surrounding disclosure of that information, including when, where, how, and to whom that information is disclosed.

72. Disclosure that someone is transgender, nonbinary, or intersex when they do not want that information disclosed subjects that person to harm, including an invasion of privacy. It also subjects them to significant risks of discrimination and harassment in a variety of settings, including employment, travel, financial transactions, and in interactions with government employees, including, but not limited to, law enforcement personnel. Disclosure of that information can seriously jeopardize a person's safety and subject the person to risk of bodily harm.

73. In other countries and in the United States, violence, harassment, and other mistreatment of transgender, nonbinary, and intersex people is common and/or accepted, including at the hands of government officials. If a transgender, nonbinary, or intersex person's passport displays a different sex designation on their passport than the person's gender identity and/or presentation, that mismatch could cause officials to question whether the person's passport is valid and interfere with their ability to travel. It could also disclose that the person is transgender, nonbinary, or intersex to foreign officials and private citizens against the person's will. In turn,

that disclosure could result in violence, harassment, arrest, imprisonment, and other mistreatment of the person. According to reports, hundreds of transgender people were killed around the world in 2023, and similar figures exist for prior years.[10]

74.     Having a sex designation on a passport that involuntarily discloses someone is transgender, nonbinary, or intersex can also cause harassment and discrimination while traveling within the United States.

### C.     The Passport Application and Issuance Process

75.     A U.S. passport is a travel document issued under the authority of the State Department attesting to the identity and nationality of the bearer. As noted, to travel out of or into the country, a U.S. citizen must carry a U.S. passport. *See* 8 U.S.C. § 1185.[11]

76.     Before a U.S. passport can be issued, the applicant "shall subscribe to and submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." 22 U.S.C. § 213. A passport application must be signed under penalty of perjury. It is a criminal offense to willfully and knowingly make false statements in a passport application with intent to induce or secure issuance of a passport. *See* 18 U.S.C. § 1542.

77.     A U.S. citizen applying for a passport for the first time must submit an Application for a U.S. Passport (DS-11). A U.S. citizen applying for a renewal of an existing passport must submit a Renewal Application (DS-82). Citizens can also submit a form to make corrections or name changes, including, until the Passport Policy prevented it, changes in the sex designation on one's passport (the DS-5504).

---

[10] *See* Jamie Wareham, *Beaten, Stabbed and Shot: 320 Trans People Killed in 2023 - New Monitoring Report*, Forbes (Nov. 13, 2023), https://www.forbes.com/sites/jamiewareham/2023/11/13/beaten-stabbed-and-shot-320-trans-people-murdered-in-2023 (last accessed Jan. 30, 2025).

[11] Certain people who are not U.S. citizens may also utilize U.S. passports, such as residents of American Samoa.

78.     The DS-11 contains various fields, including for "Sex."  "M" in this field indicates male and "F" indicates female.

79.     From 2010 until 2021, including throughout the first Trump Administration, the State Department permitted individuals to apply to change the sex designation on their passport with certification of a physician that they were being treated for a gender transition.

80.     Starting in 2021, the State Department permitted individuals to change the sex designation on their passport without a physician's certification.

81.     In 2021, the State Department announced it would permit individuals to select an "X" sex designation on their passport, which the State Department form described as denoting "unspecified or another gender identity."  This designation generally signifies that the bearer does not identify as male or female, identifies as both, or does not wish to specify their sex.  It is important to many transgender, intersex, and nonbinary people to have an "X" sex designation on their passport because that is most consistent with how the identify and/or present themselves or for privacy reasons, since a person reviewing a passport with an "X" sex designation will not know *why* the individual has an "X" sex designation.

82.     A United Nations agency, the International Civil Aviation Organization ("ICAO"), sets international standards for air transport, including for travel documents.  ICAO specifications for machine-readable travel documents have for decades required passports to display the "[s]ex of the holder, to be specified by . . . the capital letter 'F' for female, 'M' for male, or 'X' for unspecified."[12]

83.     Numerous other countries permit individuals to select the sex designation on their passport most appropriate for themself, including Australia, Denmark, Argentina, Greece, Brazil, Norway, Portugal, Ireland, and others.  Many other countries also permit "X" designation on their

---

[12] *Doc 9303, Machine Readable Travel Documents*, International Civil Aviation Organization at IV-14 (8th ed. 2021), https://www.icao.int/publications/documents/9303_p4_cons_en.pdf (last accessed Feb. 6, 2025).

passports, including Germany, Pakistan, Taiwan, Austria, Canada, Colombia, and many of the countries that permit self-selection of designation.

**D.    The Executive Order**

84.    Donald J. Trump was inaugurated for the second time as President of the United States on January 20, 2025.

85.    That same day, President Trump signed the Executive Order, purporting to rely solely on 5 U.S.C. § 7301, which generally permits the President to issue regulations for employee conduct in the Executive Branch.

86.    The Executive Order states in its "Purpose" section that it is targeted against those it calls "ideologues who deny the biological reality of sex [who] have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers."  Executive Order § 1.  It declares that transgender people simply existing—or in its words, "[e]fforts to eradicate the biological reality of sex"—"fundamentally attack women by depriving them of their dignity, safety, and well-being." *Id.* It claims that "[t]his unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts." *Id.* And it calls gender identity an "inchoate social concept." *Id.*

87.    The Executive Order explicitly references transgender people by suggesting that the government can prevent people from obtaining legal rights if they "self-identify" as a sex different from their sex assigned at birth—that is the definition of being transgender.

88.    The Executive Order attempts to invalidate the existence of transgender, intersex, and nonbinary people by wrongly proclaiming that there are only two sexes, definable and binary at conception.  Despite the order's insistence that it is communicating "biological truth," it is in fact inconsistent with science.

18

89. To accomplish the Trump Administration's apparent goal of ending all legal recognition of and protections for transgender, nonbinary, and intersex people, the Executive Order states that "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It declares that the "Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy." *Id.* Among the definitions are:

   a. "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

   b. "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

   c. "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

   d. "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

   e. "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

   f. "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

19

g.  "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

90.     The Executive Order directs the Secretary of State, as well as the Secretary of Homeland Security and Director of the Office of Personnel Management, to "implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order." *Id.* § 3(d).

91.     The Executive Order requires that, "[w]ithin 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order." *Id.* § 3(a).  It requires that all federal agencies and employees "enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.* § 3(b).

92.     The Executive Order also requires that all agencies "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages" and that agencies' "forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.* § 3(e).

93.     The Executive Order imposes various other rules related to gender, including with respect to federal employees' records, interpretation of various federal laws, rescission of various agency policies, and proposals for legislation on the topic.  *See id.* §§ 3–7.

E.   **The State Department Implements the Executive Order Through the Passport Policy**

94.    On January 23, 2025, news outlets began reporting that Secretary Rubio had directed the State Department to implement the Executive Order as applied to passports.[13]   In particular, Secretary Rubio instructed in an internal State Department cable that "[t]he policy of the United States is that an individual's sex is not changeable" and that "sex, and not gender, shall be used" on passports.[14]   As a result, State Department staff were ordered to "suspend any application where the applicant is seeking to change their sex marker" and "suspend any application requesting an 'X' sex marker."[15]

95.    Since then, numerous other news outlets have reported on this directive, including that it was made explicitly to implement the Executive Order.[16]

96.    The State Department has not published any public notices or other guidance on this change.

97.    As of February 7, 2025, the DS-11 (initial application) available online does not permit users to select an "X" in the Sex field.[17]   It includes only two boxes that can be checked, for "M" and "F."   The online fillable form that populates the Application likewise permits selecting only "M" or "F" in the Sex field and provides no "X" option.   The posted DS-11 states that it has

---

[13] *See* Joseph Gedeon, *Rubio Instructs Staff To Freeze Passport Applications with 'X' Sex Markers*, Guardian (Jan. 23, 2025), https://www.theguardian.com/us-news/2025/jan/23/trump-rubio-x-gender-passport (last accessed Feb. 6, 2025).

[14] *Id.*

[15] *Id.*

[16] *See, e.g.*, Jo Yurcaba *et al.*, *State Department To Suspend Passport Applications Seeking Sex-Marker Changes*, NBC News (Jan. 24, 2025), https://www.nbcnews.com/nbc-out/out-politics-and-policy/rubio-passport-sex-marker-changes-paused-trump-order-rcna189222 (last accessed Feb. 6, 2025); Shannon K. Kingston *et al.*, *State Department Halts 'X' Passport Gender Marker Applications*, ABC News (Jan. 24, 2025), https://abcnews.go.com/US/state-department-halts-passport-gender-marker-applications/story?id=118062178 (Jan. 30, 2025) (last accessed Feb. 6, 2025).

[17] *See* U.S. Department of State, Application for a U.S. Passport, OMB Control No. 1405-0004 (exp. Dec. 31, 2023), https://travel.state.gov/content/dam/passports/forms-fees/DS-11%20(12-31-2023)%20revision%20date%2012-2020.pdf (last accessed Feb. 7, 2025).

an expiration date of December 31, 2023, implying that the State Department has replaced the currently-approved version of the form with an older version. The same is now true of the DS-82 (renewal form) and DS-5504 (corrections and name changes), which include only "M" and "F" and have expiration dates of March 31, 2023 and November 30, 2022.[18, 19]

98. Prior to changing the forms DS-11, DS-82, and DS-5504, the State Department did not issue a 60-day notice of its intent to make any changes to such forms, depriving the public of the opportunity to comment on such changes.

99. The State Department has also removed references to transgender individuals from its public webpages. For instance, the webpage previously entitled "LGBTQI+ Travelers" has been retitled "LGB" travelers and removed travel information related to transgender people.[20] The Transportation Security Administration ("TSA") previously had webpages discussing screening procedures for transgender people and whether nonbinary individuals could apply for TSA

---

[18] *See* U.S. Department of State, U.S. Passport Renewal Application for Eligible Individuals, OMB Control No. 1405-0020 (exp. Mar. 31, 2023), https://travel.state.gov/content/dam/passports/forms-fees/DS-82%20(3-31-2023)%20revised%203-2020.pdf (last accessed Feb. 7, 2025); U.S. Department of State, Application for a U.S. Passport for Eligible Individuals, Correction, Name Change to Passport Issued 1 Year Ago or Less, and Limited Passport Replacement, OMB Control No. 1405-0160 (exp. Nov. 30, 2022), https://travel.state.gov/content/dam/passports/forms-fees/DS-5504-%202021.pdf (last accessed Feb. 7, 2025).

[19] The State Department has also, according to public reports, begun implementing the Executive Order in other ways, such as with a direction from the Acting Undersecretary for Management that all employees remove gender pronouns from their email signatures. *See* Carla K. Johnson, Health info wiped from federal websites following Trump order targeting transgender rights, PBS (Jan. 31, 2025), https://www.pbs.org/newshour/health/health-info-wiped-from-federal-websites-following-trump-order-targeting-transgender-rights (last accessed Feb. 6, 2025).

[20] *Compare* U.S. Department of State, Bureau of Consular Affairs, LGB Travelers, https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/lgb.html (last accessed Feb. 6, 2025), *with* Michael K. Lavers, *Transgender people removed from State Department travel page*, Washington Blade (Jan. 31, 2025), https://www.washingtonblade.com/2025/01/31/transgender-people-removed-from-state-department-travel-page/ (reporting on prior version of webpage).

PreCheck.[21]  Those pages appear to no longer be online, but they have been captured by web archives and still appear in indexed search results as of January 30, 2025.[22]

100.  The State Department Foreign Affairs Manual (the "FAM") previously recognized that there were individuals that "do[] not fit typical definitions of male or female,"[23] but, although the FAM generally is available online, that section of the FAM is no longer accessible.[24]

101.  The Passport Policy includes at least (a) issuing new passports, renewing existing passports, and making changes to existing passports to comply with the Executive Order's definitions of male and female, including no longer issuing "X" designations on passports, and (b) refusing to grant or suspending processing of applications to issue new passports, renewed passports, and changes to passports that would not comply with the Executive Order's definitions of male and female, including no longer granting applications for "X" designations on passports.

### F.  President Trump and His Administration's Longstanding Animus Against Transgender People

102.  On its face, the Executive Order reflects animus against transgender people, as does the broader context in which it was adopted.

---

[21] *See, e.g.*, "What Are the Screening Procedures for Transgender Persons?," *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions/what-are-screening-procedures-for-transgender-persons (not accessible as of Jan. 30, 2025); "Can I Apply for TSA Precheck® with a Nonbinary Gender and Gender Non-conforming Identity Document on the TSA Precheck Application?," *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions/can-i-apply-for-tsa-precheckr-nonbinary-gender-and-gender-non (not accessible as of Jan. 30, 2025).

[22] *See, e.g.*, *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions (Jan. 17, 2025 22:19:17 GMT) [https://web.archive.org/web/20250117221917/https://www.tsa.gov/travel/frequently-asked-questions] (last accessed Feb. 6, 2025) (WebArchive version as of January 17 providing guidance to transgender and nonbinary people that has since been removed).

[23] *See* 7 Foreign Affairs Manual, 1350 Appendix M (as of 2015).

[24] *See* 7 Foreign Affairs Manual, https://fam.state.gov/Volumes/Details/07FAM (1300s section is inactive).

23

103.    For instance, President Trump has referred to transgender identities as "transgender insanity"[25] and has repeatedly referred to transgender people using derogatory labels, describing them as "deranged," "sick," and drug users.[26]

104.    In just his first two weeks in office, President Trump has issued a series of orders targeting transgender people.[27]

105.    He issued an executive order stating that being transgender while serving in the military "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."[28]  He issued another executive order referring to women who are transgender as "men" and calling their participation in women's sports "demeaning, unfair, and dangerous," asserting that it "results in the endangerment, humiliation, and silencing of women."[29] He issued yet another executive order falsely referring to medical treatment of transgender adolescents supported by evidence-based research and by every major professional health

---

[25] Bill Barrow, *Trump and Vance Make Anti-Transgender Attacks Central to Their Closing Argument Before Election Day*, PBS (Nov. 1, 2024), https://www.pbs.org/newshour/politics/trump-and-vance-make-anti-transgender-attacks-central-to-their-closing-argument-before-election-day (last accessed Feb. 6, 2025).

[26] *See Fact Sheet: Donald Trump on LGTBQ Issues: Transgender Americans*, GLAAD (Aug. 20, 2024), https://glaad.org/fact-sheet-trump-transgender (last accessed Feb. 6, 2025).

[27] In addition to the Executive Order and the orders discussed in the remainder of this section of the Complaint, other executive orders include: Exec. Order 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) (rescinding Biden Administration executive orders protecting transgender people); Exec. Order 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025) (prohibiting governmental employers from considering gender identity in hiring); Exec. Order 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (prohibiting teaching of transgender-related topics in schools).

[28] Exec. Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 § 1 (Jan. 27, 2025).

[29] *Keeping Men Out of Women's Sports* (Feb. 5, 2025) (number and Federal Register entry not yet assigned) (available at https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports/).

association in the country as "chemical and surgical mutilation" and said that such treatment "will be a stain on our Nation's history."[30]

106. President Trump has referred to those who support transgender rights as "pushing the transgender cult."[31]

107. Secretary Rubio, who is tasked with implementing the Executive Order as applied to passports and overseeing the Passport Policy, has referred to the existence of transgender people as "a harmful ideology" and stated that being transgender is "not real."[32]

108. The Executive Order is deeply rooted in this same animus.

109. As noted above, the Executive Order refers to transgender people as "ideologues who deny the biological reality of sex." Executive Order § 1. It inaccurately and offensively states that transgender people live as their true gender to "gain access to intimate single-sex spaces," with the implication that they do so for nefarious reasons, and to "depriv[e] [women] of their dignity, safety, and well-being." *Id.* It says that merely existing as a transgender person is to "attack women." *Id.*

**G. Harm to Plaintiffs**

    1. <u>Ashton Orr</u>

110. Ashton uses the pronouns "he" or "they." Ashton has lived in West Virginia his entire life and is thirty-four years old.

111. Ashton is the Press Relations Manager for a national LGBTQ+ organization, advocating for transgender rights and equality.

---

[30] Exec. Order 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, title and § 1 (Jan. 28, 2025).

[31] *See Fact Sheet: Donald Trump on LGTBQ Issues: Transgender Americans*, GLAAD (Aug. 20, 2024), https://glaad.org/fact-sheet-trump-transgender (last accessed Feb. 6, 2025).

[32] Ken Scheck, *JD Vance Adds to Anti-LGBTQ+ Track Record with Census Letter*, Buckeye Flame (Nov. 13, 2023), https://thebuckeyeflame.com/2023/11/13/jd-vance-adds-to-anti-lgbtq-track-record-with-census-letter (last accessed Feb. 6, 2025) (letter co-written by then-Senator JD Vance and then-Senator Rubio).

112.    Ashton is a transgender man.  His sex assigned at birth was female, but he has a male gender identity.

113.    He was diagnosed with gender dysphoria in 2015, when he was twenty-five years old.

114.    Ashton has lived as a male in all aspects of his life since 2020.  He is known only as a man to his family, his workplace, and in his community in West Virginia.  It has not always been easy for Ashton to be himself in public spaces, and he has experienced significant discrimination and harassment as a result of being open about his transgender identity.  Having accurate identification documents helps Ashton navigate this world safely, as he is perceived as male by those who see him, and a male sex designation affirms his gender identity.

115.    Ashton was able to update his West Virginia driver's license in 2023 and his Social Security Administration record in 2024 to reflect an accurate name and male sex designation.  He typically travels by plane with multiple forms of identification in case he misplaces or loses either his passport or his driver's license.  However, this has recently presented issues for Ashton, as the information on his passport does not match his updated and accurate driver's license.

116.    For example, in early January 2025, Ashton flew from West Virginia to New York City.  Because his REAL ID has a male sex designation, and his passport had a female sex designation, he was flagged by the TSA and accused of presenting a fake identification document.  When TSA screened his REAL ID, they claimed it didn't match the documents they had on record for him.  He offered his passport to confirm his identity, and TSA accused him of presenting a fake identity document.  They repeatedly scanned his ID and took his photo multiple times before pulling him aside for further questioning.  It wasn't until Ashton was forced to explain in detail that he is a transgender man that they finally allowed him through.

117.    This experience prompted Ashton to take steps to update his passport.

118.    On January 16, 2025, Ashton sent his passport, renewal application, birth certificate, and marriage license to apply for an updated passport with an accurate sex designation of male and paid for expedited shipping and servicing given that he had imminent travel plans.  He

was informed that his application arrived on January 18 and began processing on January 22. The passport that Ashton sent with his application had a female sex designation, and his application requested an updated name and sex designation.

119.    On February 18, Ashton received a letter from the State Department stating that it was unable to issue a U.S. passport containing the sex marker he requested because the documents he submitted did not match his "biological sex" at birth.

120.    On March 27, Ashton received a new passport in the mail, which was marked with an "F" sex designation. However, the documents he submitted in support of his updated passport application were not returned in the manner he expected. Despite receiving his passport and documents in an envelope that looked undisturbed, his marriage license was returned to him ripped, and his birth certificate was never returned.

121.    Prior to receiving this new passport, Ashton had to cancel a trip to Ireland on March 13, 2025, because he did not have a passport to travel with. He is planning to reschedule that trip as soon as possible because he is traveling for a medical purpose. His ability to access medically indicated care has already been delayed, and he does not wish to have it delayed any further.

122.    Ashton is terrified that having an inaccurate sex designation on his passport will cause TSA agents, border officials, or airline staff to single him out for invasive questioning, scrutiny, or mistreatment. Ashton's past experiences of having his identity challenged, his passport refused, and being subjected to additional security screenings have led to extremely uncomfortable circumstances for him. Not having a passport with a sex designation of male could cause travel delays, missed flights, or even denial of entry to certain countries. Being forced to explain discrepancies in his documentation could out him as transgender in unsafe situations.

123.    Ashton is devastated that his country is trying to erase his identity and remove his ability to access accurate identification documents. Without an accurate passport, he will not feel safe traveling outside of the United States for any reason, let alone to make his medical appointment in March.

2. <u>Zaya Perysian</u>

124. Zaya Perysian is twenty-two years old and uses the pronouns "she" and "her." Zaya has lived in California since October of 2023, when she moved from New Jersey. Zaya was born in Michigan and left when she was twenty years old.

125. Zaya is a transgender woman. Her sex assigned at birth was male, but she has a female gender identity.

126. Zaya was diagnosed with gender dysphoria in 2020.

127. Zaya has lived as a female in all aspects of her life since 2020, and she has been known since then only as female to her family, friends, her community in California, and her social media followers online. Today, she feels more like herself than ever. It has been a long road for Zaya to feel safe and authentic in her body, and she is grateful to be living her truth in all aspects of her life.

128. Zaya is a social media content creator, and her content focuses mainly on her life as a proud transgender woman. She has documented her transition journey and has been able to connect with a community of LGBTQ+ individuals across the globe. Zaya's content has also allowed her to connect with millions of people who are not LGBTQ+ and she has helped educate them on what it means to be transgender in today's society.

129. Having accurate identification is extremely important to Zaya's safety and her ability to navigate the world. During the first few years after coming out as transgender, before her identification documents were updated, Zaya faced significant harassment and was often put in uncomfortable situations while traveling. She was subjected to intolerant gazes when airport personnel viewed her identification with an inaccurate, male sex designation but observed her female gender expression. She has been patted down by TSA agents expressing their interest in confirming her sex, and she has had agents say that she was the "prettiest boy" they had ever seen. It was devastating for Zaya to endure experiences like this, and it wasn't until she was able to update her driver's license that these occurrences became less frequent.

130.    Zaya updated her Michigan driver's license to her accurate female sex designation in June of 2021 and her accurate name in February of 2022. She is in the process of getting a California driver's license, which will also reflect her accurate name and female sex designation. In addition, Zaya has been able to update her sex designation with the Social Security Administration. Because the passport she had in her possession had an inaccurate male sex designation, she knew that she needed to update her passport to be able to travel for work opportunities abroad. Zaya was filled with anxiety when she learned about the Executive Order.

131.    Zaya had planned to travel outside of the United States in early February 2025 and submitted an expedited application to update the sex designation on her passport to female on January 23, 2025.

132.    On January 24, Zaya received notice via email that her passport application was being processed. On January 28, her passport was returned to her through the mail with a notice stating: "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. The stated reason was "to match our records."

133.    Angered, Zaya posted about the incident on her social media. A representative from CNN who heard about Zaya's situation called the State Department on her behalf to understand why this occurred, and the representative was told that the sex designation on Zaya's passport must be male in accordance with the Passport Policy. Zaya's passport now has a male sex designation, and the new expiration date is January 24, 2035. Unless Zaya is issued a correction, she will effectively have an unusable passport and will be unable to leave the country safely or comfortably for at least ten years. Zaya is perceived as female by those who see her, and using this passport will out her as transgender to people who would not otherwise have known.

134.    This is particularly harmful to Zaya because she has been invited to many opportunities to connect and collaborate with other influencers abroad. Without accurate identification, she will not be able to engage in income-generating opportunities outside of the United States.

135.    Zaya cannot practically travel with her current passport that does not reflect who she is.  If Zaya were to present the current passport with a male sex designation, it could cause problems while interacting with TSA agents and other officers.  She is even more afraid of encounters with officers in countries outside of the United States, where her passport may be the only identity document that would be accepted or recognized by officials, and where there is significant hostility towards the transgender community.

136.    Zaya is devastated that her government would target her community with a policy that takes away her and other members of that community's ability to move around the world safely.

### 3.    Sawyer Soe

137.    Sawyer Soe is thirty-five years old and primarily uses the pronouns "they" and "them."

138.    Sawyer works for a company that is a leader in video game development.  Sawyer designs games and leads a creative team.  They love what they do for work, as it allows them to express themselves creatively and build experiences that engage people of all ages.  Sawyer's company has a global presence, with colleagues in the United States, Canada, South America, and Europe.

139.    Sawyer is a nonbinary person.  Their sex assigned at birth was female, but they do not identify with a binary sex. The term "nonbinary" accurately captures their identity.

140.    Sawyer has lived as a nonbinary person in all aspects of their life since 2019.  They have always known their gender identity to some degree, as they are naturally an androgynous person and that is typically how others perceive them.  Today, Sawyer is fully themselves at work and among friends and family.

141.    Sawyer was able to obtain a Massachusetts driver's license with an "X" sex designation in July of 2023, and this has allowed them to navigate travel and daily interactions safely and comfortably.  Having an "X" sex designation on their identity documents allows them to escape the arbitrary enforcement of an identity projected on them solely based on their sex

assigned at birth. The "X" designation provides Sawyer with freedom and privacy that allows them to exist in a way that is free of a label that they did not choose for themselves and that is inconsistent with how they live.

142. Sawyer has not been able to update their United States passport, which expired in 2019, in a similar manner. This was not something Sawyer sought to do during the earlier days of the COVID-19 pandemic that occurred soon after the passport's expiration because Sawyer did not travel then. Recently, Sawyer has begun traveling more. Sawyer's design team at work is planning an on-site collaboration with their colleagues in Canada, and Sawyer will be required to travel internationally to Canada within the next three months, and potentially several more times in the coming year.

143. Sawyer would feel safer if they had an "X" sex designation on their passport because it would be consistent with their identity, it would protect their privacy as it would prevent disclosure of their sex assigned at birth to strangers, and it would match the other identity documents that they currently carry. Due to the Passport Policy, Sawyer will no longer be able to obtain an "X" sex designation on their passport that accurately reflects who they are, how they express their identity, and how others perceive them.

4.    Chastain Anderson

144. Chastain Anderson has lived in the Richmond area since 2018, when she moved from Louisiana. Chastain uses the pronouns "she" or "they."

145. Chastain holds a Ph.D. in Molecular and Cell Biology and is a board-certified toxicologist. She works as a Principal Scientist with a global consumer product company, where she has been employed for six years. Chastain loves her job, and she loves working in the consumer toxicology space, specifically with respect to applying new and emerging technologies to issues impacting human health.

146. Chastain is a transgender woman. Her sex assigned at birth was male, but she has a female gender identity.

147. She was diagnosed with gender dysphoria in 2015.

31

148.     Chastain has lived as a female in all aspects of her life since 2015.  Since then, she has been known only as a female to her family, to her workplace, and in her community.  Chastain legally changed her name to "Chastain" in September of 2016 via court order in Louisiana.

149.     When Chastain interacts with others, they perceive her as a female.  This is not only affirming for her, it keeps her safe.

150.     As Chastain's career has progressed, she now needs to travel internationally for work with increasing frequency.  She has a work conference in France in October that is sponsored by CORESTA, an organization whose mission is to promote and facilitate international cooperation and best practices in scientific research related to tobacco.  It is important for Chastain's career and for her company that she attend this conference, as she has the requisite subject matter expertise to represent her company globally among scientists in her field of work.

151.     Chastain was able to update her Virginia driver's license in 2019 to an accurate, female sex designation, but her passport has a male sex designation.  She sent her passport in for expedited processing on December 27, 2024 to a passport agency in Philadelphia to receive an accurate, female sex designation.

152.     Having a female sex designation on her driver's license has been very important to Chastain, as it has resulted in her rarely being misgendered when presenting her driver's license, which ensures her safety as she navigates local and domestic travel.  Before having an accurate driver's license, she would face issues carrying out everyday tasks.  For example, providing a driver's license with an inaccurate sex designation has outed Chastain as transgender when trying to attend concerts, order drinks, open a bank account, and lease an apartment.

153.     Chastain is terrified that having an inaccurate sex designation on her passport will place her in uncomfortable and unsafe circumstances.  Her fears are justified: in 2017, prior to updating her driver's license to her accurate sex designation, she had a harrowing experience going through a TSA security checkpoint at the Richmond Airport.  Two agents isolated Chastain in a holding area, where she was left alone for thirty minutes, until a manager entered and conducted a

strip search of her body. She believes that this was a direct result of the perception that her outward appearance did not match the sex designation on her license.

154. Chastain has reached a stage in her career that requires her to travel internationally more frequently, and traveling with an inaccurate passport is not a viable option for her. Chastain is suffering from anxiety knowing that a document that is supposed to help identify her will now not only make it harder to identify her, but will also likely put her safety at risk when she uses it, both abroad and during her return to the United States.

155. Chastain is further concerned that having an inaccurate passport will lead to confusion and increased processing times when traveling internationally, and may result in missed calls, meetings, or flights, and in lost opportunities, creating a financial burden. She is also disheartened that she will potentially lose out on advancement potential at her company given the fact that her cisgender colleagues will be able to attend important international meetings and conferences that she cannot.

     5.    Drew Hall

156. Drew Hall is twenty-five years old and use the pronouns "they" and "them."

157. Drew is currently a Ph.D. candidate in Botany at the University of British Columbia ("UBC") in Vancouver, British Columbia in Canada. Drew is a United States citizen who has lived in Vancouver since August 2022 when their program began, and they will live there until approximately 2027–2028 when their program concludes. In addition to studying at UBC, Drew works as a Research Assistant and Teaching Assistant at their university.

158. Drew's sex assigned at birth was male, but they do not have a male gender identity.

159. Drew was diagnosed with gender dysphoria in August of 2024.

160. Drew identifies as a nonbinary femme person, which means that even though their sex assigned at birth was male, they do not live as or identify as a man and instead express themselves in a feminine manner.

161. Drew has lived as a nonbinary person in all aspects of their life since 2024, and they have known that their gender identity was different than their sex assigned at birth since 2022.

Drew is known as a nonbinary person to their family, to their classmates and professors, and in their community. Drew finally feels like themself and that those around them see them for who they are.

162.  Drew is frequently required to travel internationally because they have been studying and living full time in Canada for over two years and will be in Canada for several more years. Drew's family lives in Wisconsin, and Drew travels back to the United States at least four to five times a year. Two to three of those visits are typically to see their family in Wisconsin, and the other visits are to see close friends in Washington and Oregon, given their proximity to those two states. Most pressingly, Drew needs to travel to Wisconsin for a family wedding in May and for a botany conference in July.

163.  Drew legally changed their name by court order in Wisconsin in December 2024, and has updated their sex designation with the Social Security Administration and on their driver's license, which now both accurately reflect the name "Drew" and an "F" for their sex designation. Drew's birth certificate has an updated name but not an updated sex designation because Wisconsin requires proof of surgical sex change procedure, which Drew cannot provide at this time.

164.  When Drew interacts with government officials, they do not perceive Drew as a man. Instead, Drew is perceived as a femme person. This is not only affirming for Drew, it keeps them safe.

165.  Drew's United States passport (which is their only passport) still reflects an inaccurate name and a male sex designation. On January 9, 2025, Drew mailed their passport to the State Department's national processing center and requested an updated female sex designation and name change on their passport. Drew was notified by email that their passport arrived at the center on January 17. After the Complaint was filed in this case, Drew received an email from the State Department on February 11 stating that their application for a passport was approved and that they should receive the passport in the mail around February 17, 2025. On February 19, they received their renewed passport with an inaccurate "M" marker, along with a letter stating that the State Department had changed the gender marker on their passport.

166.     Drew relies on their passport frequently to travel back to the U.S. to see their family and friends.  There are also many other reasons Drew uses their passport while living in Canada. To open a bank account in Vancouver, Drew is required to present their U.S. passport.  Drew's employer (UBC) requires Drew's passport for their employment at the university.  Any time Drew interacts with the Canadian government, they need to present their U.S. passport, as it is the only form of identification that Canada recognizes for non-citizens and non-permanent residents. Without their passport, Drew is facing many struggles residing in Canada.

167.     Drew is deeply concerned that continuing to have a male sex designation on their passport will lead to negative and invasive interactions with border agents and TSA employees as a result of the increased hostility in the United States and elsewhere toward gender-nonconforming people like Drew—hostility that the Executive Order and Passport Policy embrace and cause. Given that their other identity documents have been updated, Drew is also worried that continuing to carry a passport with a name and sex designation that does not match their other identity documents will lead to even more confusion and distress each time they must present their passport.  Additionally, continuing to have non-matching documents may present other challenges for Drew, including with respect to their temporary status documents in Canada, and when they visit places where multiple forms of identification are required.  Drew's most recent encounters with border agents underscore these fears: border agents have regarded Drew with more suspicion due to their gender nonconformity.

168.     If Drew were to have to continue to carry a passport with a male sex designation, they are afraid that they will encounter additional, invasive scrutiny and harassment every time they use it, including because hostility toward gender nonconforming people like Drew has increased and continues to grow.  Drew is not perceived as a man given their feminine expression, and they would not feel safe traveling in the future, especially internationally, with documentation that inaccurately indicates a male sex designation.  Given how they express their identity and the way they are perceived by other people, continuing to have a male sex designation on their passport will indicate to any person who looks at Drew's passport that they are transgender.  This causes

35

Drew significant anxiety, especially because of the recent increase in anti-transgender rhetoric and violence in the United States and elsewhere.

169.    Drew feels alienated knowing that the U.S. government refuses to recognize them for who they are.  Having a passport that does not match who they are makes them afraid to return to the United States, knowing that they will receive suspicious looks when they present their passport solely based on the fact that they are nonbinary and do not live in accordance with their sex assigned at birth. Drew is devastated that their country has implemented a policy that interferes with their ability to have an accurate and usable passport.

6.    Bella Boe

170.    Bella Boe has lived in Cambridge since 2024, when she moved from New Jersey. Bella is 19 years old and uses the pronouns "she" or "her."

171.    Bella is a freshman in college studying government.

172.    She is a transgender woman.

173.    She was diagnosed with gender dysphoria in 2017.

174.    Bella has lived as female in all aspects of her life since she was 11 years old. Today, she feels fully herself.  Bella is currently known only as female to her family, to staff and peers at her school, and in her communities in New Jersey and Cambridge.

175.    Bella is active on campus.  She is passionate about theater and the arts, and her school offers many opportunities for her to participate in international programs and theater productions.  Bella is currently the stage manager for her theater group at school, which means she manages and runs productions.  Bella loves being a stage manager because it provides her with an opportunity to build leadership skills and it allows her to be fully immersed in an art that she has loved and engaged in since she was six years old.  Bella's theater group travels around the world to put on shows for a range of audiences.  For example, her theater group had a production in Bermuda the week of March 16, 2025.  She was eager to go on that trip to manage that production, and  would have attended had she been able to obtain a new passport with an "F" sex designation.

36

176.     Bella similarly hopes to study abroad while obtaining her undergraduate degree, and she plans on doing so in England.

177.     Bella is only able to partake in these opportunities when she has travel documents, like her passport, that accurately reflect who she is.  That safety allows her to fulfill her educational dreams and goals.

178.     When Bella travels and interacts with government officials, they perceive her as a female.  This is not only affirming for Bella, it keeps her safe.

179.     The passport that Bella received in 2021, had a female sex designation.  Having a female sex designation on her passport afforded her safety and comfort when traveling.  She sent her passport in for renewal on January 23, 2025, to ensure that her current passport would remain usable for as long as possible.  On February 26, 2025, she received a new passport with an "M" sex designation.  Under the new Passport Policy, Bella no longer has the safety afforded to her by a female designation on her passport.

180.     Bella feels very uncomfortable traveling with a passport that inaccurately reflects a male sex designation.  Not only does it erase who she is, it will be confusing for government officials who would otherwise identify her as female based on her gender expression and invite additional, stressful scrutiny.  Bella does not want her passport to out her as transgender every time she uses it, especially when traveling outside of the United States in countries that are not accepting of transgender people.

181.     Without an accurate passport, Bella will be forced to miss out on many educational opportunities that her cisgender peers are afforded, including opportunities that would advance her own passions, education, and future career.  Without an accurate passport, Bella will not be able to leave the United States without anxiety and fear for her safety.

7.     <u>Reid Solomon-Lane</u>

182.     Reid Solomon-Lane is thirty-seven years old and uses the pronouns "he" and "him." He has lived in Massachusetts since July of 2022, when he moved there from Austin, Texas.  Reid lives in North Adams with his wife and three young children.

183.    Reid was a flight attendant for more than eight years and now serves as a senior flight coordinator for a volunteer pilot organization.

184.    Reid is a transgender man.  His sex assigned at birth was female, but he has a male gender identity.

185.    Reid was diagnosed with gender dysphoria in 2007.

186.    Reid has lived as a man in all aspects of his life since 2007.  Since then, he has been known only as male to his family, his workplace, and in his community in Massachusetts, and he is perceived only as male by people who see him.  This allows Reid to feel safe in interactions with new people and prevents him from having to come out as transgender with each encounter.

187.    This safety is especially essential for Reid while he is traveling.

188.    Reid is frequently required to travel internationally because his mother-in-law purchased a home in Ireland three years ago and spends a lot of her time there.  Reid and his family travel to Ireland so that Reid's mother-in-law can see her grandchildren.  Reid also visited Montreal in 2022 and has plans to return to Montreal with friends in the next year given that he and his family are just across the border from Canada.

189.    Reid legally changed his name in 2007 via court order in Texas.  His name and sex designation have been updated with the Social Security Administration and on his driver's license, which now both accurately reflect his name and his being male.

190.    Reid's United States passport also reflects an accurate name and male sex designation and expires in 2028.  Having an accurate passport provides Reid comfort, especially when traveling with three young children outside of the United States.  If Reid did not have a passport that reflects who he is, it would dramatically impact the way he travels.  Reid would be less secure leaving the country with his children, as having a sex designation that so flagrantly does not match his outward gender expression would potentially put him and his children at risk.  Because Reid's passport serves as an identity and citizenship document that accurately reflects his gender identity and presentation.  He uses it for dentification and citizenship verification.

Removing access to an accurate passport will cause Reid repeated stress and risk serious problems from it outing himself in routine interactions.

191.    Reid is very nervous about traveling with his passport because if it is stolen or lost and he has to replace it, the Passport Policy would require the State Department to issue him a new, inaccurate passport with a female sex designation.  Because of that risk, he wants to apply for a passport card instead of seeking a new passport book at this time so that he can carry proof of citizenship on his person when he travels, while keeping his passport book safely at home or at a hotel so that it is not at risk of being stolen or lost and needing replacement.  A passport card is a smaller, plastic passport that is proof of U.S. citizenship and identity and has the same length of validity as the passport book but is not valid for all international travel by air.  Reid is unwilling to submit an application for a passport card at this time given that it would likely be returned to him with a female sex designation under the Passport Policy and related Executive Order 14168.  Reid thought he was at the point in his life where he could live his life with safety and dignity, as an adult, as a husband, and as a parent.  If his passport were to reflect a sex designation that is inconsistent with who he is, that safety and dignity will be taken away from him.

### 8.    Viktor Agatha

192.    Viktor Agatha is a twenty-three-year-old United States citizen and resident of Dallas, Texas. Viktor has lived in the Dallas area since 2009, when he moved there from Japan where his mom was stationed while serving in the U.S. Navy.  Viktor was born in Virginia.

193.    Viktor is a college student studying social work.  He also works as a sales associate and personal shopper.

194.    Viktor is a transgender man, intersex, and comfortable being referred to by many pronouns.

195.    He was assigned female at birth based on his doctor's examination of his external genitalia at birth, but he has a male gender identity.

196.    Viktor's parents told him that they were under the impression that he would be born a boy because his mother's ultrasound scans while pregnant with him showed the presence of what

39

was thought to be a phallus.  But given that he was assigned a female sex at birth by the treating physician, he was raised as female by his family until he was 13 years old.

197.    Viktor discovered his intersex condition when he began puberty around the age of ten.  As he entered puberty, he began developing masculine sex traits that were inconsistent with the female sex he had been assigned at birth.  Viktor began developing an Adam's apple and pronounced body hair. When he turned eleven, he realized that his body did not look like the images of men or women in his biology textbooks at school, and that his genitalia was more ambiguous than anything he saw in his science books.

198.    In 2014, when Viktor turned thirteen, he came out as male. He and his family sought out a medical provider who could help them better understand Viktor's pubertal development.  After running several blood tests, the doctor informed Viktor that he had very high levels of testosterone and diagnosed him with hormonal imbalance.

199.    Viktor has openly lived as male since 2015. His family and community are aware of his intersex condition.

200.    Viktor is also transgender.  He was diagnosed with gender dysphoria in 2019, when he turned eighteen years old.

201.    A court granted Viktor a legal name change in August of 2023, and he updated his Texas state ID card in 2023 to reflect an "M" sex designation, which is consistent with who he is. Having this accurate identification allows Viktor to navigate daily interactions with greater safety and ease. Viktor also took steps in 2023 to update his records with the Social Security Administration to reflect his court-ordered legal name change and male sex designation.  Viktor's Virginia birth certificate is in the process of being updated.

202.    Viktor's previous passport, with a female sex designation, expired in 2010.  From the time his passport expired until now, Viktor did not need to travel internationally.

203.    His imminent travel needs stem from the fact that his sister was recently stationed in Italy as a part of her deployment with the U.S. Navy, and she will live there for the next two

years. Viktor wants to visit his sister in Italy with his mother in the next year, and he will need a valid and usable passport to do so.

204. Under the State Department's current policy, it is Viktor's understanding that he will be unable to get a new passport with an "M" sex designation that accurately reflects who he is.

205. Viktor is also uncertain as to whether he would be considered male or female—or both or neither—under the definition of the terms "male" and "female" in Executive Order 14168 or the State Department's current policy. Based on the information reflected on his original birth certificate, he believes that any renewal request that he submits will result in him receiving a passport with an inaccurate "F" sex designation.

206. Traveling with a passport with an "F" sex designation is not an option for Viktor. Such a passport would likely out him as transgender and/or intersex at every use and could potentially lead him to unsafe situations when he travels, including when traveling abroad to countries that are hostile towards transgender and intersex individuals.

207. Viktor is deeply disappointed that this policy and Executive Order attempt to erase who he is and prevent him from obtaining a usable passport to see his family abroad.

9.    David Doe

208. David Doe is a forty-one-year-old United States citizen and resident of Van Nuys, California. David uses "he" and "him" pronouns.

209. David lives in Van Nuys with his husband and child. David has lived in the Los Angeles area since 2011, when he moved there from New York.

210. David is a lawyer and has worked in entertainment law for about six years. His work involves managing labor relations for film and television productions, including productions in Canada, Mexico, Latin America, and Australia.

211. David is a transgender man. His sex assigned at birth was female, but he has a male gender identity and has lived as a man since 2014.

41

212.     In 2014, when David first realized that his gender identity did not match his sex assigned at birth, he sought out a healthcare provider to address his dysphoria and began receiving medical care shortly after.

213.     To live as and be recognized as a man, David took steps to update his identity documents to reflect both his legal name change and male gender identity.

214.     David changed his sex designation to male in 2015 with both the Social Security Administration and on his California driver's license.   In 2016, he updated his passport to accurately reflect an "M" sex designation.   He was born in Texas, a state that does not permit him to change his birth certificate, so that document remains inaccurate.

215.     David travels for work as he manages productions abroad.   In January 2025, he traveled to Vancouver, Canada for his work, and he anticipates potentially needing to travel to Ontario, Canada this year as well.

216.     David also travels internationally with his family.   Both he and his spouse have friends and family abroad. Most imminently, he and his family anticipate needing to travel to Scotland for a family wedding in the summer of 2026.

217.     Having a male sex designation on his passport and other identity documents is integral to David's ability to move through the world safely and without distress.

218.     However, that safety is no longer afforded to him.   His previous passport with an "M" sex designation was set to expire in February 2026.   David submitted an online application to renew his passport in February of 2025, and on March 21, he received his renewed passport back, but with an "F" sex designation.

219.     On approximately April 17, 2025, David received a letter stating that the "sex" was changed on his passport "to match [his] biological sex at birth."

220.     David will not travel to the wedding in Scotland with a passport that reflects an "F" sex designation.

221. David is worried as international travel for work is part of his job but is potentially dangerous and harmful to his physical and emotional well-being, putting him in an impossible situation.

222. He is anxious about traveling abroad with a passport with an "F" sex designation that outs him as transgender at every use and could put him at risk of being attacked or singled out by someone who holds prejudices against transgender people.

223. Before David was able to update his driver's license (when it still displayed his birth name and sex), he would experience problems while carrying out even the simplest of tasks, such as purchasing wine at the grocery store or going to an R-rated movie when he was younger. People often accused him of presenting a fake ID when they saw an "F" sex designation on an identity document.

224. Since updating his identity documents, David has been able to avoid a lot of these problems. Now, with inconsistent documentation once again, he is terrified that he will be subjected to similar accusations of fraud when traveling abroad or be at increased risk of discrimination and violence.

10. AC Goldberg

225. AC Goldberg is a forty-five-year-old United States citizen living in Cambridge, Massachusetts.

226. AC lives with his wife and two children. He is a professor of speech pathology at a university in Massachusetts. AC has been teaching since 2022. He is also a practicing speech/language pathologist and has been practicing since 2004.

227. AC is a transgender man. AC was assigned female at birth based on a physician's external evaluation of his genitalia but has a male gender identity and has lived as a male since 2002. AC first sought out a provider to address his gender dysphoria in 2002 and was diagnosed soon thereafter. Almost a decade later, in 2012, AC discovered that he is also intersex. AC had always felt uncomfortable in his body, like there was an inconsistency between his genitalia and how he knew himself to be, but he did not know the cause of this discomfort. In the summer of

43

2012, AC received a call from a genetic counselor who told him that he has Congenital Adrenal Hyperplasia ("CAH"), which is a condition that can cause hormone imbalances and genital abnormalities. At first when AC received this call, he was shocked and confused. He did not know much about being intersex, so he was quick to seek out community and arrange meetings with other intersex individuals who could provide him with support as he navigated this new medical information.

228.    It was also important to AC to have a conversation with his parents about what they were told when he was born with respect to his sex and genetic composition. AC's parents told him that, at birth, the doctors told them that he was born with "deformities," and that certain procedures had been conducted on him as an infant. AC's parents, however, were never told what those procedures were, and they did not have an opportunity to consent to those procedures on his behalf.

229.    AC's discomfort with certain aspects of his physical body persisted long after the call from the genetic counselor in 2012. In May 2024, after experiencing severe physical discomfort and menstrual bleeding, AC sought out a provider and underwent a procedure to remove his uterus. In the process of conducting the hysterectomy, AC's provider discovered that he had some kind of cyst, later identified as an ovotestis, and removed both the ovotestis and his ovary during his hysterectomy while AC was under general anesthesia.

230.    AC has updated all his documentation to reflect a male sex designation, which feels true to who he is and how he lives and presents to the world. In 2016, AC obtained a court-ordered legal name change from a court in Massachusetts and updated his New Jersey birth certificate to reflect his name and male sex designation. That same year, AC updated his Massachusetts' driver's license and his records with the Social Security Administration to reflect his name and male sex designation.

231.    In 2017, AC updated his passport to reflect an "M" sex designation. That passport is currently in his possession and expires in January 2027.

44

232.    AC is a frequent traveler.  He typically travels abroad about three to five times a year for work and recreation.  AC also travels domestically one to two times a month for work, and he uses his passport as his primary method of identifying himself for all travel.

233.    This year, AC has canceled several international trips for both work and leisure out of concern about reentering the country as a transgender and intersex person and fear of subjecting himself to potential detainment and invasive scrutiny upon reentry to the United States.  AC has had difficult experiences with TSA in the past as a transgender and intersex man, including experiences of being sexually assaulted and violated by officers conducting searches on his body.

234.    Having an accurate passport that aligns with who AC is provides him with the ability to travel safely and comfortably with his wife and children, with less fear of experiencing harassment and physical violence when traveling abroad.

235.    AC is terrified about the prospect of losing his current passport or having it stolen and being forced to obtain a new passport under the State Department's current policy, which would contain an inaccurate female sex designation because that is the sex designation on his original birth certificate.

236.    AC has no idea whether he would be considered "male" or "female"—or neither or both—under definition of those terms in Executive Order 14168 or the State Department's current policy because he had the presence of both ovaries and an ovotestis for most of his life.

237.    Traveling with an "F" sex designation on his passport is not an option for AC because it would create safety risks and deeply uncomfortable situations.  To AC, this policy feels like an attempt to erase who he is and dictate how he is perceived by those around him.

238.    Massachusetts has been his home for 18 years, and AC does not want to be forced to move his family to another country to ensure that they are safe and that he is afforded the ability to live as the man, husband, and father that he is.

11.   <u>Ray Gorlin</u>

239.   Ray Gorlin is a thirty-year-old United States citizen residing in Minneapolis, Minnesota.  Ray was born in Hopkins, Minnesota, so Minnesota has always been home to them.  Ray uses "they" and "them" pronouns.

240.   Ray is a full-time artist, and their work includes drawing caricatures at amusement parks, festivals, conventions, parties, and more.

241.   Ray travels all over the United States for their work and has recently received international work. He was recently invited to tour with Karikaturen Berlin, a German caricature company. Ray hopes to take more international work, including to be part of a caricature convention in Japan, where caricature art is celebrated.

242.   Ray is a nonbinary person.  Their sex assigned at birth was female, but they do not identity with a binary sex.  The term "nonbinary" accurately captures their gender.  Although Ray does not identify with a particular gender, they feel more comfortable in their body with a masculine presentation.

243.   When Ray started college in 2013, they were aware of nonbinary as a gender identity, but felt very self-conscious about self-identifying that way.  Ray was afraid of experiencing harassment and drawing unwanted attention and was also afraid of how identifying as nonbinary would impact and be received by the people close to them.

244.   After leaving college, Ray sought out transgender and nonbinary communities, and they were able to find safety and comfort in their identity.

245.   Ray was diagnosed with gender dysphoria in 2019, when they were twenty-five.

246.   Ray has lived openly as a nonbinary person since 2019.  Today, they are known only as a nonbinary person to their friends, family, and colleagues.

247.   In July 2022, Ray was able to legally change their name in court.  They shortened their birth name to "Ray," a nickname that they have used their whole life.

248.   Ray also updated their Minnesota driver's license with an "X" sex designation in 2022 and their Real ID with an "X" sex designation in 2025 to reflect their nonbinary identity.

46

They similarly updated their legal name and sex designation with the Social Security Administration in 2022 as well, but because "X" was not an option as a sex designation, they selected "M."

249. Ray has not used their passport to travel internationally in approximately seven years. Given that they did not have a reason to travel internationally until recently, Ray did not submit an application to update the sex designation on their passport at the same time as when they updated their other documents. Their current passport expires in November 2027, and that passport reflects a female sex designation.

250. Without accurate identification, Ray is terrified of experiencing harassment and heightened scrutiny when they travel. When Ray was traveling to Florida in March of 2025, they had a mortifying encounter with the Transportation Security Administration due to the discrepancy between the sex designations on their temporary paper Real ID (provided to them by the Minnesota DMV as a placeholder until their Real ID card was ready) and on their passport. The agent asked that Ray present their passport instead of the paper copy of their Real ID, and when Ray showed the agent their passport, the agent told them "this isn't you."

251. The agent stated that the passport Ray presented was not theirs because it had an "F" sex designation and an older photo of them. Ray had to explain that they are nonbinary, that they changed their name to "Ray" in 2022, and that this ID was in fact theirs. The agent humiliated Ray by having this conversation audibly and openly in front of a large group of people, and sent them to the back of another long line to speak with another security agent, who thankfully understood that Ray is nonbinary and allowed them to proceed through security and make their flight.

252. Ray is afraid that carrying a passport with an "F" sex designation will continue to subject them to uncomfortable and unsafe travel encounters.

253. They have worked hard as a caricature artist and have dreamed of working for the best caricature companies nationally and globally. Those opportunities are finally happening for Ray, and this new passport policy is impeding their ability to achieve their professional aspirations.

254.　The opportunity with Karikaturen Berlin requires Ray to leave for Berlin in July 2025 and stay through August. Ray is anxious about experiencing harassment when presenting a passport with a female sex designation, which is inconsistent with who they are, upon entry into Berlin and upon re-entering the United States after their stay. During that time in Berlin, Ray may also need their passport to check into their accommodations or potentially travel within Europe. Without a passport that reflects who they are and allows them to travel safely, Ray is terrified that they will be deprived of this opportunity that could take their career to the next level. Ray is put in the impossible position of choosing between an opportunity that contributes to their livelihood and risking their physical and emotional safety.

255.　Additionally, Ray's family is going through a difficult time right now. Ray's dad was diagnosed with cancer, and their family wants to take one final international trip together so that they can spend time together before their dad's illness prevents him from traveling. Without accurate identification, Ray will not be able to join their family on this trip and would lose invaluable time with their ailing father and the rest of their family.

256.　It pains Ray to know that opportunities to travel with their family and further their career are now limited by the sex designation on their passport.

12.　Chelle LeBlanc

257.　Chelle LeBlanc is a twenty-seven-year-old United States citizen and resident of Colorado Springs, Colorado. Chelle uses "she" and "her" pronouns.

258.　Chelle has lived in Colorado since October of 2024, and moved there from her home state of Mississippi.

259.　Chelle is a lawyer and practices law at a civil litigation firm in Colorado.

260.　Chelle is a transgender woman. Her sex assigned at birth was male, but her gender identity is female.

261.　She was diagnosed with gender dysphoria in May 2022.

262.　Chelle has lived as a woman in all aspects of her life since March 2022, and she is only known as female to her family, workplace, and community.

48

263.    In the last few years, she has been able to change her identity documents to reflect a female sex designation that is consistent with her gender identity.  Chelle updated her Mississippi driver's license to reflect a female sex designation in November 2023, and that same month, she updated her name and female sex designation with the Social Security Administration.

264.    In January 2024, Chelle updated her Mississippi birth certificate to reflect her name and that she is female.

265.    Chelle's passport is the only identity document in her possession that does not currently reflect who she is.  Her previous passport that had a male sex designation expired in September 2024.  She submitted an application to renew her passport and update her gender marker on January 19, 2025, requesting that the sex designation also be corrected to female.

266.    After several weeks of processing, her renewed passport was issued on February 12, 2025, and it came back to her with an inaccurate "M" sex designation.

267.    Chelle travels internationally frequently, as she has lived and studied in other countries in the past and has enjoyed her time abroad.  There was a brief hiatus in Chelle's traveling due to time constraints and tight finances during law school, but since graduating last year, she hopes to be able to resume traveling internationally. It is especially important that Chelle be able to travel this year because she has an appointment for medical care in Thailand in August 2025. Chelle has already paid for this medical care, accommodations during her recovery, and plane tickets for her and her partner.

268.    Given the steps that Chelle has taken to align her body with her gender identity, she does not feel safe traveling with a passport with an "M" sex designation, especially to countries that are openly hostile towards transgender people.

269.    Unfortunately, Chelle is no stranger to discrimination, especially having grown up in Mississippi where she experienced frequent harassment based on her identity as a transgender woman.  Having accurate identification affords her safety.  To not have that safety while abroad would dramatically shift the way Chelle approaches travel and whether it is possible for her to travel to certain countries.

270.     Chelle is fearful of traveling with a passport with the wrong sex designation. The idea of re-entering the United States with a passport with the wrong sex marker and that outs her as transgender is causing her immense anxiety.

271.     International travel is likely off the table for Chelle without an accurate passport. She is afraid to risk her physical safety and mental well-being to travel internationally with inaccurate identification.

272.     Chelle is disappointed that her country would take away her right to have identification that is consistent with who she is, and that allows her to feel safe traveling abroad and living domestically as a woman who is transgender.

## CLASS ACTION ALLEGATIONS

273.     Plaintiffs bring this action for themselves and on behalf of others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2).  Plaintiffs seek certification of the following Classes:

>  a.  All people who currently want, or in the future will want, a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy; and

>  b.  All people who currently want, or in the future will want, a U.S. passport and wish to use an "X" sex designation.

274.     Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families and (2) Defendants.

275.     The Classes are each so numerous that joinder of all members is impractical.  As alleged above, there are more than 1.6 million transgender people in the United States, more than 1.2 million nonbinary people, and as many as 5.6 million intersex people.  A high percentage of those people need and want to have passports with a sex designation the State Department will refuse to issue them under the Passport Policy.

276.     There are questions of law and fact common to the each Class, including (but not limited to):

a. Whether the Passport Policy and the Executive Order as applied to passports discriminate on the basis of sex in violation of the Fifth Amendment;

b. Whether the Passport Policy and the Executive Order as applied to passports discriminates on the basis of transgender status in violation of the Fifth Amendment;

c. Whether the Passport Policy and the Executive Order as applied to passports are motivated by illegitimate animus;

d. Whether the Passport Policy and the Executive Order as applied to passports infringe the Fifth Amendment rights to free movement and travel;

e. Whether the Passport Policy and the Executive Order as applied to passports infringe the Fifth Amendment right to privacy;

f. Whether the Passport Policy and the Executive Order as applied to passports infringe the First Amendment right to free speech and expression;

g. Whether the discrimination perpetuated by the Passport Policy and the Executive Order as applied to passports survives the requisite level of scrutiny, including:

    i. The legitimacy and strength of the government interests asserted in support of it; and

    ii. The extent to which it serves, is related to, or is tailored to those interests; and

h. Whether the Passport Policy is arbitrary, capricious, an abuse of discretion, or otherwise contrary to the APA.

277. Plaintiffs' claims are typical of the claims of the Class members they represent. Plaintiffs have been harmed by the same Defendants and on the same basis as all members of the Classes they represent, including because Defendants' actions violate Plaintiffs' and the Class members' constitutional rights, are in violation of law, and are arbitrary and capricious and

51

App. 906

otherwise in violation of the APA. Plaintiffs seek the same relief as all Class members they represent.

278.　Plaintiffs will fairly and adequately protect the interests of the Classes they represent and have retained counsel competent and experienced in similar litigation, including class actions. Plaintiffs are committed to the vigorous prosecution of this suit and have no interests that are adverse to the Classes. Plaintiffs are represented by experienced counsel from the American Civil Liberties Union Foundation, the ACLU Foundation of Massachusetts, and the law firm of Covington & Burling LLP. The attorneys affiliated with the above law firm and organizations, and who are appearing in this matter, have extensive experience in complex constitutional litigation and class action litigation. They also have extensive experience representing transgender litigants. Plaintiffs' counsel intends to describe their credentials more fully in any forthcoming motion for class certification.

279.　Defendants have acted or refused to act on grounds that apply generally to the Classes, and final injunctive or declaratory relief is appropriate for the Classes as a whole. The Passport Policy and the Executive Order as applied to passports apply to every member of the Classes and cause the same injuries. Defendants' refusal to provide Plaintiffs and members of the Classes with accurate sex designations on their passports—as a result of Defendants' views on the meaning of sex and animus toward transgender, intersex, and nonbinary people—applies to both Classes. Injunctive or declaratory relief holding that the Passport Policy and the Executive Order as applied to passports are unconstitutional and unlawful and that the Passport policy violates the APA would benefit each Class in the same way and remedy the same injuries as to each Class.

280.　All Class members have been injured by Defendants' conduct and will continue to be injured by Defendants' conduct going forward unless declaratory or injunctive relief prevents that continued and future injury.

## CLAIMS

### FIRST CAUSE OF ACTION
### (Fifth Amendment – Equal Protection)
### All Defendants

281.     Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

282.     The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Supreme Court has held that the Due Process Clause includes a guarantee against the United States of equal protection of the laws equivalent to that guaranteed against the States by the Equal Protection Clause of the Fourteenth Amendment.

283.     The Passport Policy and the Executive Order as applied to passports violate the Fifth Amendment's equal protection guarantee in at least two distinct ways and do so both facially and as applied. Defendants' actions have harmed Plaintiffs and the putative Class members by depriving them of the equal protection of the laws and will continue to deprive Plaintiffs and the putative Class members of that constitutional protection unless Defendants are permanently enjoined and their unlawful actions set aside.

**Discrimination Based on Sex**

284.     The Passport Policy and the Executive Order as applied to passports draw a facial sex-based classification; that cannot be justified under the requisite heightened scrutiny or under any standard of constitutional review.

285.     The Passport Policy and the Executive Order as applied to passports define "female" as a "person belonging, at conception, to the sex that produces the large reproductive cell" and "male" as a "person belonging, at conception, to the sex that produces the small reproductive cell," and then restricts sex designations on passports to those definitions of "male" and "female." That is a sex classification.

286.     If, for example, Plaintiff Perysian, who lives and expresses herself as a woman, and has a female gender identity, were a "person belonging, at conception, to the sex that produces the

large reproductive cell," the Passport Policy and the Executive Order as applied to passports would provide her a female sex designation on her passport. But because Plaintiff Perysian is a "person belonging, at conception, to the sex that produces the small reproductive cell," the Passport Policy and the Executive Order as applied to passports force her to have a male sex designation on her passport. Or if Plaintiff Solomon-Lane, who lives and expresses himself as a man, and has a male gender identity, were a "person belonging, at conception, to the sex that produces the small reproductive cell," the Passport Policy and the Executive Order as applied to passports would provide him a male sex designation on his passport. But because Plaintiff Solomon-Lane is a "person belonging, at conception, to the sex that produces the large reproductive cell," the Passport Policy and the Executive Order as applied to passports prohibit that.

287. By issuing passports with a female sex designation to women who meet the Executive Order's definition of female but denying it to women who do not, and by issuing passports with a male sex designation to men who meet the Executive Order's definition of male but denying it to men who do not, the Passport Policy and the Executive Order as applied to passports facially classify based on sex.

288. The Passport Policy and the Executive Order also classify on the basis of sex in its treatment of nonbinary and intersex people who desire an "X" sex designation on their passport. Rather than allowing them to obtain a sex designation that accords with how they live their lives and express themselves, or allowing them to obtain an unspecified sex designation, the Passport Policy and the Executive Order as applied to passports require that intersex and nonbinary people's sex designations conform to the Executive Order's definition of female or male. This facially enforces the government's binary and specific sex designations—that is, that a person the Executive Order defines as male must have a passport that labels that person as a man and a person the Executive Order defines as female must have a passport that labels that person as a woman regardless of how they live and express themselves.

289.    The Executive Order and Passport Policy were implemented in part because of, and not simply in spite of, their adverse effects on the ability of people to depart from overbroad expectations about sex. That, too, warrants heightened scrutiny as a sex classification.

290.    Defendants cannot justify the sex classification utilized by the Passport Policy and the Executive Order as applied to passports under the requisite heightened scrutiny or any level of equal protection scrutiny.  The Passports Policy's sex classification is not substantially related to an important government purpose.  Reversing the previous policy permitting Americans to passport sex designations that are consistent with the sex they live and express and replacing it with a policy that requires sex designations on passports that are not consistent with Americans' identities or expression does not rationally advance any legitimate government interest—let alone substantially advance an important governmental objective.

291.    In addition, the Passport Policy and the Executive Order as applied to passports are impermissibly premised on assumptions, expectations, stereotypes, or norms about the nature of sex, including that it is entirely determined by the definitions of male and female utilized by the Passport Policy and mandated by provided in the Executive Order, and their insistence that sex can only be a binary characteristic (*i.e.*, either male or female) notwithstanding that for some people it is not exclusively one or the other.  Under the Passport Policy and the Executive Order as applied to passports, Plaintiffs and the putative Class members are precluded from obtaining passports that they may use without violation of their rights and risking serious harms due to the assumption, expectation, stereotype, and norm that a person defined by the Passport Policy and the Executive Order as male must live and present as male, and a person so defined female must live and present as female.  Plaintiffs and the putative Class members do not adhere to that assumption, expectation, stereotype, and norm, and the Executive Order denies them usable passports entirely on that basis. If Plaintiffs and the putative Class members belonged, at conception, to the sex that produces a different size reproductive cell and adhered to the assumption, expectation, stereotype, and norm of such a sex, the Executive Order would permit Plaintiffs and the putative Class members to obtain a useable passport.

**Discrimination Based on Transgender Status**

292.    The Passport Policy and the Executive Order as applied to passports also classify citizens based on transgender status, and that classification cannot be justified under the requisite heightened scrutiny or under any standard of constitutional review.

293.    On its face, the Passport Policy and the Executive Order as applied to passports classify based on transgender status.

294.    The Passport Policy and the Executive Order as applied to passports deny transgender people, but not cisgender people, a passport that they can use without disclosing sensitive personal information about their transgender status and risking discrimination, harassment, and violence solely because they are transgender. The Passport Policy and the Executive Order as applied to passports therefore facially treat people differently on the basis of being transgender.

295.    Even if the Passport Policy and the Executive Order did not facially classify based on transgender status, they were implemented in part because of, and not simply in spite of, their adverse effects on transgender people.

296.    Classifications based on transgender status independently warrant heightened scrutiny.

297.    Transgender individuals as a group possess all the indicia of a suspect or quasi-suspect class that have been identified by the Supreme Court as requiring courts to apply heightened scrutiny. Transgender people have obvious, immutable, or distinguishing characteristics that define that class as a discrete group and these characteristics bear no relation to transgender people's abilities to perform in or contribute to society. Transgender people have historically been subject to discrimination across the country and remain a small minority of the American population that lacks the political power to protect itself through the political process. Gender identity is a core, defining trait that cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person should not be required to abandon it as a condition of equal treatment.

56

298.    Limiting a person's passport to whether they belonged at conception to a sex that produces a particular size reproductive cell does not substantially advance an important governmental interest.

299.    Further, the Passport Policy and the Executive Order as applied to passports fail any level of equal protection scrutiny because they were motivated by animus against transgender people, as illustrated both by the statements of animus described in this Complaint and by the text of the Executive Order itself.  As explained, President Trump and members of his Administration have repeatedly made derogatory and extreme comments about transgender people, including linking them as a class to violence and sexual predation.  The Executive Order itself wrongly states that those who identify as transgender are "ideologues who deny the biological reality of sex [and] have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers."  Executive Order § 1.  It repeatedly links being transgender with seeking to harm women.  *See id.*  There is no empirical support for these assertions, and they are deeply offensive to and dehumanizing of hundreds of thousands of transgender Americans who exist in every part of this country.

### SECOND CAUSE OF ACTION
### (Fifth Amendment – Right to Travel)
### All Defendants

300.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

301.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," and the Supreme Court has held that the liberties protected by this Due Process Clause include fundamental rights to free movement and travel, including travel abroad.

302.    The Executive Order infringes the constitutional rights of Plaintiffs and the putative Class members to free movement and travel, both facially and as applied.  Defendants' actions

have harmed Plaintiffs and the putative Class members by violating their constitutional right to travel and will continue to violate that right unless the Defendants are permanently enjoined and their unlawful actions set aside.

303.    Federal law generally prohibits U.S. citizens from traveling out of or into the country without a valid U.S. passport.  *See* 8 U.S.C. § 1185(b).  Foreign countries likewise generally bar entrance by U.S. citizens without a valid U.S. passport and/or condition issuance of a necessary visa on holding a valid U.S. passport.  As explained in this Complaint, and incorporated here, when traveling abroad, U.S. passports are necessary or practically necessary for numerous purposes and are often the only form of identification carried by a U.S. citizen that will be recognized or acknowledged by foreign authorities or private citizens abroad.

304.    The Passport Policy and the Executive Order as applied to passports infringe the fundamental right of the Plaintiffs and the putative Class members to free movement and travel.

305.    The Passport Policy and Executive Order as applied to passports will entirely prevent certain transgender, nonbinary, and intersex individuals from leaving or returning to the United States because their gender identity is different from that specified by the Executive Order.

306.    The Passport Policy and the Executive Order as applied to passports force Plaintiffs and the putative Class members to either not receive a passport or to receive a passport that puts them at risk of harassment, discrimination, violence, and—in travel to some countries—arrest and imprisonment.  The Executive Order thereby gives Plaintiffs and the putative Class members a Hobson's choice: accept a passport that poses these extreme risks on the one hand or be denied any form of international travel or admittance back into the United States from foreign travel on the other.

307.    Many transgender, nonbinary, and intersex individuals present to the world consistent with their gender identity, rather than their sex as identified under the Executive Order's definitions of male and female. For such individuals, government authorities in the U.S. and around the world may question whether a person's passport is authentic or accurate due to the mismatch between the sex they present as and the sex designation on their passport.  For example,

58

if someone is a transgender woman and presents as a woman but, under the Executive Order, is forced to select "M" on her passport because she is defined by the Passport Policy and the Executive Order as male, government authorities may question whether the passport is authentic and/or whether the holder is entitled to use it. Foreign authorities who question whether a passport is authentic can create substantial difficulties or even dangerous treatment for transgender, intersex, and nonbinary Americans when traveling—including confiscation of the passport and detention, as well as arrest and imprisonment in countries where it is illegal to be transgender. Accordingly, the Passport Policy and Executive Order can directly and foreseeably result in substantial barriers to the exercise of the fundamental rights of Plaintiffs and the putative Class members to free movement and travel.

308. Reversing the previous policy permitting Americans to obtain sex designations on passports that align with the sex they know themselves to be and present as and replacing it with a policy that requires sex designations on passports that do not do so does not rationally advance any legitimate government interest—let alone substantially advance an important governmental objective.

### THIRD CAUSE OF ACTION
### (Fifth Amendment – Privacy)
### All Defendants

309. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

310. The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," and the Supreme Court has held that the liberties protected by this Due Process Clause include avoiding forced disclosure of private and intimate information.

311. Both facially and as applied, the Passport Policy and the Executive Order as applied to passports infringe the constitutional liberty interests of Plaintiffs and the putative Class members, including the right to maintain intimate information as private. Defendants' actions have

harmed Plaintiffs and the putative Class members by violating their constitutional rights and will continue to violate the rights of Plaintiffs and putative Class members unless the Defendants are permanently enjoined and their unlawful actions set aside.

312.    For transgender, nonbinary, and some intersex people, whether "at conception" they "belong[ed] to" "the sex that produces the large reproductive cell" or "the small reproductive cell" is highly sensitive and personal medical information.

313.    Requiring transgender, nonbinary, and intersex people to be identified as "male" or "female" on their passports, when that is not the sex they live and express, reveals private, intimate, and sensitive information about them to others without their consent, and is deeply invasive.  Such forced disclosure of a person's transgender, nonbinary, or intersex status can put their safety at risk, given that transgender, nonbinary, and intersex people are often subject to violence, harassment, and mistreatment on the basis of not being cisgender or identifying in binary terms.

314.    Under the Passport Policy and Executive Order as applied to passports, Plaintiffs and the putative Class members are required to display their sex as determined by the Executive Order, when that does not match their gender identity or gender presentation.  As a result, the Passport Policy and Executive Order as applied to passports force disclosure of Plaintiffs' and the putative Class members' transgender, nonbinary, or intersex status against their will, thereby revealing private, intimate, and sensitive information and potentially inviting violence, harassment, and mistreatment.  By contrast, providing them "M" or "F" to align with their gender identity, or providing an "X," does not reveal this private and sensitive information.

315.    Because the Executive Order infringes a fundamental right, it is subject to strict scrutiny.  It fails that scrutiny because it is not narrowly tailored to advance a compelling government interest. It also does not even rationally advance any legitimate government objective. The conclusory government interests identified in the text of the Executive Order are inaccurate and motivated by animus.  In addition, denying transgender, nonbinary, and intersex people accurate passport sex designations is not rationally related to achieving even the illegitimate interests identified by the Executive Order.

60

## FOURTH CAUSE OF ACTION
### (First Amendment)
### All Defendants

316.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

317.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."

318.    The Passport Policy and the Executive Order as applied to passports violate the First Amendment rights of Plaintiffs and the putative Class members to free speech and expression.

319.    Under the First Amendment, the government cannot require a person to convey a controversial, ideologically-infused message with which they disagree.  The Passport Policy and the Executive Order as applied to passports force transgender people and individuals who do not identify as male or female to either (a) forgo having a passport or (b) express the government's counter-factual and ideologically-infused message that their sex is what the Executive Order defines it to be each time they apply for or use a passport with the definition of sex mandated by the Passport Policy and the Executive Order as applied to passports—a message with which they strongly disagree.

320.    The Passport Policy and the Executive Order as applied to passports therefore impermissibly require compelled speech.

321.    Underscoring that this is compelled speech, many people would reasonably fear that the Passport Policy raises the possibility that the Administration may seek to prosecute them for perjury if they fill out the sex designation field on the State Departments' passport application accurately, instead of following the Administration's factually incorrect definition of sex.[33]

322.    Even if the sex designation on a passport were considered government speech, the fact that the government forces the passport bearer to communicate the government's message every time they travel internationally, on all other occasions when passports must be used, or any

---

[33] For the avoidance of doubt, Plaintiffs do not agree that any such prosecution would be factually or legally appropriate.

other time when they are used, violates their First Amendment rights by forcing them to participate in the dissemination of an ideological message with which they do not agree. A passport is an item that is readily associated with an individual, and the government cannot use it to force someone to convey the government's ideologically-infused speech with which they disagree.

323. Because the Passport Policy and the Executive Order as applied to passports force individuals to communicate an ideological message with which they disagree, they are subject to strict scrutiny. The Passport Policy and the Executive Order as applied to passports engage in this infringement of a First Amendment right without any meaningful justification, let alone the compelling government interest that the Constitution requires. They also are not narrowly tailored to achieve any such interest. Even if a lower level of heightened scrutiny applied, the Passport Policy and the Executive Order as applied to passports would fail because they lack an important governmental objective, and the means the Defendants employ are not substantially related to achieving any legitimate and sufficient objective.

### FIFTH CAUSE OF ACTION
**(Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, 706 – Contrary to Constitutional Right, Power, Privilege or Immunity)**
**Agency Defendants**

324. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

325. The APA, 5 U.S.C. §§ 500 *et seq.*, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2).

326. The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order. The Secretary of State and State Department's Passport Policy and implementation of the Executive Order constitute a final agency action under the APA. As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the

Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment. Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department. For example, Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration. The State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

327. For the reasons described in the preceding claims, and incorporated here, the Passport Policy and any agency actions taken under the Executive Order are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), and therefore must be held unlawful and set aside. In particular, as described above, those actions violate the Due Process Clause of the Fifth Amendment for multiple independent reasons and violate the First Amendment.

### SIXTH CAUSE OF ACTION
**(Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*., 706 – Arbitrary, Capricious, and Abuse of Discretion)**
**Agency Defendants**

328. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

329. The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq*., provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 5 U.S.C. § 706(2).

330. The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order. The Secretary of State and State Department's Passport Policy and implementation of the Executive Order

63

constitute a final agency action under the APA. As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment. Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department. For example, Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration. The State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

331.    Agency actions taken under the Executive Order are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), for multiple independent reasons.

332.    The challenged agency actions are arbitrary, capricious, and an abuse of discretion because they are irrational and unreasonable:

    a.    The classifications imposed by the Passport Policy (as mandated in the Executive Order) are not based on scientific or medical knowledge or evidence. To the contrary, they contradict current scientific and medical understandings and are based on an animus-laden view of sex, gender identity, and being transgender, nonbinary, or intersex, that is divorced from reality. Even though medical and scientific evidence—and the lives of millions of people—attests to the existence of transgender, nonbinary, and intersex people, the Passport Policy and Executive Order sweep that evidence aside in favor of empty rhetoric unmoored from facts.

    b.    The Passport Policy (per the Executive Order) also defines "male" and "female" as a person who "at conception" "belong[s]" to the sex that produces the large

or small reproductive cell—but, as explained above and incorporated here, embryos with either XX or XY chromosomes have undifferentiated reproductive cells during the initial period after conception.

c. In addition, grouping all people into "male" and "female" based on which reproductive cell is likely to be produced ignores the established biological reality that some individuals are intersex and do not, at conception, belong to a sex that produces either large or small reproductive cells.

d. Requiring sex designations based upon the sex a person "belong[s]" to "at conception" based upon the reproductive cells they are likely to produce does not further an interest in accurately identifying passport holders.

333. Further, the challenged agency actions are arbitrary, capricious, and an abuse of discretion because they are unsupported by a reasoned explanation:

a. The Agency Defendants have provided no meaningful explanation for their removal of the option for people to use a designation for their sex as they live and express it, nor does the Executive Order do so.

b. The Agency Defendants have provided no meaningful explanation for their removal of the option for people to not specify their sex by using the "X" designation, nor does the Executive Order do so.

c. The Agency Defendants have provided no meaningful explanation for their attempt to proclaim it the policy of the United States that transgender, nonbinary, and intersex people do not exist. The Executive Order and Passport Policy entirely fail to address any of the medical and scientific evidence demonstrating the importance of legal recognition of transgender, nonbinary, and intersex people and the medical and practical importance of accurate identification.

d. Further, the Agency Defendants have failed to explain what alternatives, if any, were considered to address any potential legitimate interests the Passport Policy

65

could serve, nor does the Executive Order do so. This includes less restrictive alternatives and those that do not discriminate on the basis of sex or being transgender, nonbinary, or intersex.

e. Relatedly, the Agency Defendants have failed to explain why the status quo ante—which the State Department implemented for years before the Executive Order—was in any way flawed, let alone sufficiently flawed to warrant this abrupt and substantial change, nor does the Executive Order do so.

334. The Agency Defendants have also failed to consider or address numerous crucial aspects of the change in policy, nor does the Executive Order do so. Most acutely, they have failed to consider or address the effects on transgender, nonbinary, and intersex people. They have not even considered the effects on their own employees and the operation of the federal government. The Agency Defendants have failed to consider or address the many ways they are foreseeably, obviously, and directly harmed by the Passport Policy. They failed to consider or address the needs of these individuals and their families to obtain accurate passports that do not expose them to mistreatment.

### SEVENTH CAUSE OF ACTION
**(Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*., 706 – Failure to Observe Procedure Required by Law )**
**Agency Defendants**

335. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

336. The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law. . . ." 5 U.S.C. § 706(2)(D).

337. The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order. The Secretary of State and State Department's Passport Policy and implementation of the Executive Order

constitute a final agency action under the APA. As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment. Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department. For example, Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration. The State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

338.    Agency actions taken under the Executive Order are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Under the Paperwork Reduction Act of 1980, 44 U.S.C. §§ 3501 *et seq.*, when a federal agency seeks to collect information from the public (often through government forms), it is obligated to "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information[.]" 44 U.S.C. 3506(c)(2)(A).

339.    As explained above, and incorporated here, the State Department has changed the forms used to apply for, apply for renewal of, and apply to change passports and replaced them with a form that does not permit collection of the "X" sex designation, but only permits collection of the "M" and "F." That change was not announced with 60 days' notice in the Federal Register or any other public consultation. Indeed, it was not announced at all. The State Department made the change surreptitiously, using forms that are labelled expired.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

67

a.     Issue declaratory judgment that (i) the Passport Policy and the Executive Order as applied to passports violate Plaintiffs' constitutional rights; and (ii) the Passport Policy is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law in violation of the APA;

b.     Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing the Passport Policy or the Executive Order as applied to passports, and require that they permit (i) changes to the "Sex" designation on passports to the same extent they did before the Executive Order and Passport Policy were issued, including allowing individuals to self-attest to what their sex is and (ii) the use of an "X" sex designation on passports and passport applications to the same extent they did before the Executive Order and Passport Policy were issued;

c.     Hold unlawful, set aside, and vacate any agency actions taken under Passport Policy or the Executive Order as applied to passports that had the purpose or effect of not permitting (i) changes to the "Sex" designation on passports to the same extent they did before the Executive Order and Passport Policy were issued, including allowing individuals to self-attest to what their sex is and (ii) the use of an "X" sex designation on passports and passport applications to the same extent they did before the Executive Order and Passport Policy were issued;

d.     Certify classes as set forth in this Complaint and enter class-wide declaratory and injunctive relief as described above;

e.     Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.     Grant all such other and further relief as the Court may deem just and proper.

*[Signatures on following pages]*

April 25, 2025                          Respectfully submitted,

                                        /s/ *Isaac D. Chaput*
                                        Isaac D. Chaput (*pro hac vice*)
                                        William P. Kasper (*pro hac vice*)
                                        COVINGTON & BURLING LLP
                                        Salesforce Tower
                                        415 Mission Street, Suite 5400
                                        San Francisco, CA 94105
                                        Telephone: 415-591-6000
                                        Facsimile: 415-591-6091
                                        ichaput@cov.com
                                        wkasper@cov.com

                                        Jessie J. Rossman (BBO # 670685)
                                        Zoe R. Kreitenberg (BBO #715356)
                                        AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION OF MASSACHUSETTS,
                                        INC.
                                        One Center Plaza, Suite 850
                                        Boston, MA 02108
                                        Telephone: 617-482-3170
                                        jrossman@aclum.org

                                        Jon W. Davidson (*pro hac vice*)
                                            (admitted only in California)
                                        Li Nowlin-Sohl (*pro hac vice*)
                                            (admitted only in Washington)
                                        Sruti J. Swaminathan (*pro hac vice*)
                                        Malita V. Picasso (*pro hac vice*)
                                        James D. Esseks (*pro hac vice*)
                                        AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION
                                        125 Broad Street, 18th Floor
                                        New York, NY 10004
                                        Telephone: 212-549-2500
                                        Facsimile: 212-549-2650
                                        jondavidson@aclu.org
                                        lnowlin-sohl@aclu.org
                                        sswaminathan@aclu.org
                                        mpicasso@aclu.org
                                        jesseks@aclu.org

                                        Aditi Fruitwala (*pro hac vice*)
                                        AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION

69

915 15th St. NW
Washington, DC 20005
afruitwala@aclu.org

Ansel F. Carpenter (*pro hac vice*)
Gavin W. Jackson (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: 424-332-4758
Facsimile: 424-332-4749
acarpenter@cov.com
gjackson@cov.com

Jonathan Thompson (*pro hac vice*)
Sean M. Bender (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202-662-5891
Facsimile: 202-778-5891
jthompson@cov.com
sbender@cov.com

Robert C. Gianchetti*
Yuval Mor (*pro hac vice*)
Alyssa L. Curcio (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212-841-1000
Facsimile: 212-841-1010
rgianchetti@cov.com
ymor@cov.com
acurcio@cov.com

*Attorneys for Plaintiffs*

**Pro hac vice* application forthcoming

App. 925

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2025, a true copy of the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF).

*/s/ Isaac D. Chaput*
Isaac D. Chaput

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**ASHTON ORR**, et al.,

    *Plaintiffs*,

v.

**DONALD J. TRUMP**, in his official capacity
as President of the United States et al.,

    *Defendants*.

Civil Action No. 1:25-cv-10313

## SECOND DECLARATION OF MATTHEW PIERCE

    I, Matthew Pierce, do hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

    1.   I am Deputy Assistant Secretary for Passport Services of the U.S. Department of State, Bureau of Consular Affairs, Passport Services Directorate. I submit this declaration in connection with Defendants' Opposition to Plaintiffs' Motion to Apply the Preliminary Injunction to the Classes (ECF No. 79). The statements made herein are based on my personal knowledge and on information provided to me in the course of my official duties with the Department of State (the "Department"). I have served in the Passport Directorate for 17 years and have been in my current position since November 2024.

    2.   I have previously submitted a declaration dated March 12, 2025, in connection with Defendants' Opposition to Plaintiffs' Motion to Stay Agency Action and for Preliminary Injunction in this matter. ECF No. 53-1. I hereby incorporate my statements from that declaration.

3.    Consistent with the Executive Order 14168, the Department's current Passport Policy permits issuing passports with only an "M" or "F" sex marker and, requires U.S. passports to reflect the holder's biological sex at birth.

4.    In compliance with the preliminary injunction issued by the District Court on April 18, 2025 (ECF No. 75) (the "Preliminary Injunction"), the Department has provided instructions for five of the six original named Plaintiffs granted relief by the Court—Ashton Orr, Zaya Perysian, Chastain Anderson, Drew Hall, and Bella Boe—to replace their U.S. passports with the sex marker, "F" or "M," based on their self-selection on their recent passport applications.[1]  The Department has further provided instructions for the remaining Plaintiff granted relief by the Court—Sawyer Soe—to apply for a new U.S. passport with an "X" sex marker.[2]

5.    In their Motion for Class Certification (ECF No. 77) ("Class Certification Motion"), Plaintiffs seek certification of two classes:  (1) all people who "currently want, or in the future will want, a U.S. passport issued with an "F" or "M" sex designation that is different from the sex assigned to that individual under the Passport Policy—the "M/F Designation Class"[3]; and (2) all people who "currently want, or in the future will want, a U.S. passport and wish to use an "X" sex designation"—the "X Designation Class."[4]

---

[1] To comply with the Preliminary Injunction, the Department provided these five Plaintiffs with passport replacement forms (Forms DS-5504, ver. 2022) for which OMB approval was extended to May 31, 2025.

[2] To comply with the Preliminary Injunction, the Department provided Plaintiff Soe with a passport application form (Form DS-11, ver. 2022) for which OMB approval was extended to May 31, 2025.  At the time of adjudication for issuance of passports complying with the Preliminary Injunction (or, in the case of Plaintiff Sawyer Soe, issuance of a new passport complying with the Preliminary Injunction more than 15 years after issuance of a previous passport), each Plaintiff will be subject to the Department's standard name-check procedures to verify their continuing eligibility to be issued a U.S. passport under applicable statutes and regulations.

[3] In the Class Certification Motion, Plaintiffs seek to have Plaintiffs Ashton Orr, Zaya Perysian, Chastain Anderson, Drew Hall, Bella Boe, Reid Solomon-Lane, Viktor Agatha, David Doe, AC Goldberg, and Chelle LeBlanc represent the M/F Designation Class.

[4] In the Class Certification Motion, Plaintiffs seek to have Plaintiffs Sawyer Soe and Ray Gorlin represent the X Designation Class.

6. In their Motion to Apply the Preliminary Injunction to the Classes (ECF No. 79), Plaintiffs seek to obtain the same relief granted by the Court to six named Plaintiffs in the Preliminary Injunction to an indeterminate number of U.S. citizens and nationals entitled to U.S. passports who may fall into one of the two putative classes. Specifically, assuming the Court certified those two classes, Plaintiffs seek to extend the preliminary relief to a "PI Class" consisting of members from both classes if: "(a) they do not have a currently-valid passport; (b) they need to renew their current passport because it expires within one year; (c) they need to make changes to their passport to have the sex designation on it align with their gender identity or to reflect a name change; or (d) they need to apply to receive another passport because their passport was lost, stolen, or damaged." ECF No. 80 at 6.

7. Were the Court to grant the motion, the scope of the proposed injunctions sought by Plaintiffs would impose a significant administrative burden on the Department prior to any ruling on the merits, especially if it needs to review the individual circumstances of each applicant to evaluate the applicant's likelihood of injury. Indeed, although the proposed PI Class definition does not reference the need to determine the PI Class members' irreparable injury, Plaintiffs motion to expand the PI is hinged on the PI Class members suffering "the same irreparable injury as those six of the Original Plaintiffs." ECF No. 80 at 1.

8. The Department would expect to receive potentially thousands of passport applications from members of the PI Class for a passport with a sex marker inconsistent with the Passport Policy, *i.e.*, a passport with a "M" or "F" sex marker that is inconsistent with the applicant's biological sex or a passport with an "X" sex marker. The Department does not maintain statistics on the number of passport applicants who, based on supporting evidence of surgical or clinical

3

treatment, sought or were issued "M" or "F" sex markers on passports prior to June 30, 2021, that did not reflect their biological sex at birth. Estimates of the number of transgender Americans from the Household Pulse Survey, the Williams Institute, the Gallup Poll, and the Pew Research Center range from 0.6% to 1.6% of the adult population. Although it is difficult to estimate the likely number of persons to request a passport with an X gender marker, from April 11, 2022, to January 19, 2025, the Department issued more than 44,000 U.S. passports with an "X" sex marker, an average of more than 1,300 per month.

9.    Were the Court to grant Plaintiffs' motion, it would be administratively burdensome for the Department to track every passport issued in compliance with such order for purposes of restoring the status quo ex ante if the Government were to ultimately prevail on the merits in this case. For example, depending on their supporting documentation, for first-time passport applicants seeking a passport with a sex marker that differs from their biological sex at birth and who select either an "M" or an "F" (and not an "X"), absent self-identification by the class member there may be no way to identify their passports for later replacement in the event the Government prevails in this litigation.

10.    When adjudicating a passport renewal application, the Department also does not currently have an automated system to identify from historic applications (except the application immediately before the renewal application) whether the applicant previously changed their sex marker. If a change in passport sex marker occurred prior to the passport being renewed, the only way at present to verify whether a particular renewal applicant had such a previous change in their passport sex marker is to retrieve and manually review their historic applications, a time-consuming and labor-intensive process. It would be impracticable for the Department to engage

in such a manual review of all previous applications as part of the adjudication of each application to renew a U.S. passport.

11. Moreover, if the Court were to issue a more limited preliminary injunction focused on applicants who would otherwise incur irreparable harm, it still would not be feasible for the Department to assess whether the applicants would suffer any irreparable harm. The Court's preliminary injunction was predicated on not only the original six Plaintiffs' imminent travel plans, but also the fact that most have been diagnosed with gender dysphoria, all "would experience anxiety or distress, or fear for their safety, if required to use a passport with a sex marker that corresponds to their sex assigned at birth rather than their gender identity," and some have experienced harassment. ECF 74 at 47. Passport adjudicators would either need to make the requisite irreparable harm determination—which they are not equipped to do—or be required to issue passports in contravention of the Executive Order simply on the basis of an applicant's representation that they are a PI Class member.

12. Further, the Department of State and all other federal agencies, were ordered by the President on January 20 to follow and implement E.O. 14168. The Court's April 18 Preliminary Injunction and any similar court orders that may arise from Plaintiffs' Motion to Apply the Preliminary Injunction to the Classes to issue passports with an "X" marker or to issue passports in a sex other than the applicant's biological sex would create a conflict between the Department and other federal agencies that issue identification documents reflecting the holder's sex. This would result in inconsistencies within the federal government and frustrates the governmental interest in uniformity.

5

13. In sum, the proposed extension of the preliminary injunction to the PI class, if granted, would impose a significant burden on the Department, be nearly impossible to completely reverse, and undermine the uniformity throughout the government that the Department seeks in implementing the Executive Order.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: May 14, 2025.

Matthew Pierce