# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

ASHTON ORR; ZAYA PERYSIAN; SAWYER SOE; CHASTAIN ANDERSON; DREW HALL; BELLA BOE; REID SOLOMON-LANE; VIKTOR AGATHA; DAVID DOE; AC GOLDBERG; RAY GORLIN; CHELLE LEBLANC, on behalf of themselves and others similarly situated,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in the official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES OF AMERICA,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Massachusetts

_____

## BRIEF FOR DEFENDANTS-APPELLANTS

_____

BRETT A. SHUMATE
  _Assistant Attorney General_

LEAH B. FOLEY
  _United States Attorney_

ERIC D. McARTHUR
  _Deputy Assistant Attorney General_

CHARLES W. SCARBOROUGH
LEWIS S. YELIN
  _Attorneys, Appellate Staff_
  _Civil Division_
  _U.S. Department of Justice_
  _950 Pennsylvania Ave. NW, Rm. 7239_
  _Washington, D.C. 20530_
  _(202) 514-3425_
  _lewis.yelin@usdoj.gov_

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 2

STATEMENT OF THE ISSUE ................................................................. 2

STATEMENT OF THE CASE .................................................................. 2

    A.   Legal Background ................................................................... 2

    B.   Procedural History ................................................................ 5

SUMMARY OF ARGUMENT ................................................................ 13

STANDARD OF REVIEW ..................................................................... 17

ARGUMENT ......................................................................................... 17

I.   Plaintiffs Failed To Show A Likelihood Of Success On The Merits Of Their Claims ................................................................................ 18

    A.   Plaintiffs Have Not Demonstrated A Likelihood Of Succes On Their Equal Protection Claim .................................................. 18

        1.   The Challenged Policy Warrants Only Rational-Basis Review ........................................................................... 20

        2.   The Challenged Policy Satisfies Rational-Basis Review ............... 26

    B.   Plaintiffs Have Not Demonstrated A Likelihood Of Success On Their APA Claim .................................................................. 32

        1.   The Challenged Policy Is Not Reviewable Under The APA ........ 32

        2.   In Any Event, Plaintiffs' APA Claim Fails On The Merits .......... 35

    C.   There Is No Paperwork Reduction Act Violation That Could Support The Injunction ......................................................... 37

II.    The Other Factors Require Vacating The District Court's Injunction............. 39

     A.    Plaintiffs Would Not Suffer Irreparable Harm In The Absence Of
        A Preliminary Injunction .......................................................................... 40

     B.    Even If Plaintiffs Could Establish Irreparable Harm, The Balance
        Of The Equities Requires Vacating The Preliminary Injunction ........... 43

CONCLUSION................................................................................................................. 46

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. S.C. State Conf. of the NAACP,*
602 U.S. 1 (2024) ................................................................ 17

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ........................................................ 23, 29

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
473 U.S. 432 (1985) .............................................................. 26

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................................ 42

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .............................................................. 41

*Diamond v. Charles,*
476 U.S. 54 (1986) ................................................................ 42

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) .......................................... 32, 33, 34, 35

*Haig v. Agee,*
453 U.S. 280 (1981) ......................................................... 2, 3, 33

*Heller v. Doe,*
509 U.S. 312 (1993) .............................................................. 26

*Kooritzky v. Reich,*
17 F.3d 1509 (D.C. Cir. 1994) ........................................... 38

*McKenna v. Maine Dep't of Health & Hum. Servs.,*
152 F.4th 14 (1st Cir. 2025) .......................................... 20-21

*Michael M. v. Superior Court,*
450 U.S. 464 (1981) (plurality opinion) ...................... 19, 21

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................................ 36

*Nguyen v. INS*,
533 U.S. 53 (2001) ................................................................ 19, 21

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................................... 18

*Noem v. Vasquez Perdomo, No. 25A169*,
2025 WL 2585637 (Sept. 8, 2025) ................................................ 43

*Schuette v. BAMN*,
572 U.S. 291 (2014) (plurality opinion) ...................................... 25

*Talbott v. United States*,
No. 25-5087, 2025 WL 3533344 (Dec. 9, 2025) .......................... 31

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025) ................................................................. 44

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......................................................... 15, 28, 32

*United States v. Laub*,
385 U.S. 475 (1967) ........................................................................ 2

*United States v. Shilling, No. 24A1030*,
2025 WL 1300282 (U.S. May 6, 2020) ........................................ 31

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......................... 10, 15, 20, 21, 23, 24, 25, 26, 27, 29, 30, 31, 41

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
121 F.4th 339 (1st Cir. 2024) ........................................ 14, 17, 18, 39

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*,
454 U.S. 464 (1982) ...................................................................... 42

*Washington v. Davis*,
426 U.S. 229 (1976) ...................................................................... 30

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................................... 43

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 ................................................................................. 44

**Statutes**

Act of Aug. 18, 1856, ch. 127, § 23, 11 Stat. 52.................................... 3

Act of July 3, 1926, ch. 772, § 1, 44 Stat. 887 ................................... 3

5 U.S.C. § 701 ................................................................... 32

5 U.S.C. § 704 ................................................................... 32

5 U.S.C. § 706 ................................................................... 35

22 U.S.C. § 211a ................................... 3, 7, 13, 16, 33, 35, 36

28 U.S.C. § 1292 .................................................................. 2

44 U.S.C. § 3507 ............................................................. 37, 38

44 U.S.C. § 3506 ............................................................. 37, 38

**Executive Branch Material**

22 C.F.R. § 51.7 ......................................................... 2, 30, 44

89 Fed. Reg. 93,389 (Nov. 26, 2024) ...................................... 38

89 Fed. Reg. 93,390 (Nov. 26, 2024) ...................................... 38

89 Fed. Reg. 94,867 (Nov. 29, 2024) ...................................... 38

90 Fed. Reg. 8,615 (Jan. 30, 2025) ........................................ 4

90 Fed. Reg. 9,652 (Feb. 14, 2025) ....................................... 38

90 Fed. Reg. 9,800-801 (Feb. 18, 2025) ................................. 38

**Rules**

Fed. R. App. P. 4 ................................................................ 2

Fed. R. Civ. P. 23 ............................................................... 8

**Other Material**

Elena Kagan, *Presidential Administration*,
  114 Harv. L. Rev. 2245 (2001) ......................................... 34

# INTRODUCTION

This appeal concerns a presidential directive requiring all new passports to display a historical fact: an individual's biological sex. The district court issued a preliminary injunction on behalf of a nationwide class, requiring the U.S. Department of State to allow passport applicants to self-select the sex designation on their passports—either "M" or "F" without regard to their biology, or even "X" if they would prefer that instead. The Supreme Court has now stayed that injunction, concluding that the government is "likely to succeed on the merits" and that the injunction would cause the government "irreparable injury." Add. 1-2 (quotation marks omitted). As the Court explained, "[d]isplaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment." Add. 1. The Court also found that plaintiffs had not shown that "the Government's choice to display biological sex" was based on animus and that they had not shown that they were "likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Id.* Those determinations, which the Supreme Court made on the same record presented here, are binding and conclusive. They compel vacatur of the preliminary injunction.

## STATEMENT OF JURISDICTION

The district court entered the preliminary injunction on April 18, 2025, Add. 70-72, and extended it to the Preliminary Injunction Class (PI Class) on June 17, 2025, Add. 105-07. The government filed timely notices of appeal on June 13, 2025, ECF 111, and on July 11, 2025, ECF 131; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion by preliminarily enjoining the passport policy because the government is likely to prevail on the merits and because the balance of the harms favors the government.

## STATEMENT OF THE CASE

### A.     Legal Background

1. A U.S. passport is a "political document" issued by the federal government and "addressed to foreign powers." *Haig v. Agee*, 453 U.S. 280, 292 (1981) (quoting *Urtetiqui v. D'Arcy*, 34 U.S. (9 Pet.) 692, 699 (1835)). Its purpose is to identify its bearer as an American citizen and to "request[] foreign powers to allow the bearer to enter and to pass freely and safely." *United States v. Laub*, 385 U.S. 475, 481 (1967). A passport is thus an official communication "by which the Government vouches for the bearer and for his conduct." *Agee*, 453 U.S. at 293. And "[a] passport at all times remains the property of the United States." 22 C.F.R. § 51.7(a).

Since "the earliest days of the Republic," the President's Article II authority over "national security" and "foreign policy" has been understood to encompass the power to issue passports. *Agee*, 453 U.S. at 293. The first Passport Act, enacted in 1856, "'confirmed'" that power in "broad and permissive language." *Id.* at 294; *see* Act of Aug. 18, 1856, ch. 127, § 23, 11 Stat. 52, 60-61. Today, that language is codified at 22 U.S.C. § 211a, which provides: "The Secretary of State may grant and issue passports … under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a; *see* Act of July 3, 1926, ch. 772, § 1, 44 Stat. 887, 887.

2. In 1976, the U.S. Department of State (Department) introduced "sex" as a required marker on U.S. passports. App. 842. Four years later, the International Civil Aviation Organization—a specialized agency of the United Nations that develops standards for the civil aviation sector—added "sex" to its uniform specifications for travel documents. App. 841-42. Since then, most countries have included "sex" as a marker on their passports. App. 842.

From 1977 to 2021, the Department issued U.S. passports with one of two sex markers: "M" for male or "F" for female. App. 842. From 1992 until 2021, the Department required medical documentation to support a passport applicant's change in sex marker. *Id.* In June 2021, the Biden Administration adopted a new passport policy (the 2021 policy). App. 843. The 2021 policy "permit[ted] passport applicants to self-select their sex marker" based on their "gender identity." *Id.* The 2021 policy

also "add[ed] a third option of 'X'" as a marker for applicants who do not self-identify as male or female. *Id.*

3. On Inauguration Day, President Trump issued an Executive Order declaring it "the policy of the United States to recognize two sexes, male and female." App. 1; *see* Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), 90 Fed. Reg. 8615 (Jan. 30, 2025) (Executive Order or Order). The Order defined "'[s]ex'" as "an individual's immutable biological classification as either male or female." App.1. And the Order distinguished the "immutable biological reality of sex" from "the concept of 'gender identity,'" which the Order described as reflecting "an internal, fluid, and subjective sense of self unmoored from biological facts." *Id.*

The Executive Order explained that because "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum," it "does not provide a meaningful basis for identification." App. 2. The Order therefore directed the Secretary of State (Secretary) to "implement changes to require that government-issued identification documents, including passports, … accurately reflect the holder's sex, as defined" by the Order. *Id.* The Order further instructed that "[a]gency forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.*

Soon after, the Department implemented the President's directive to issue passports with a sex marker of either "M" or "F" reflecting the holder's "biological sex." App. 928; *see* App. 846-48. The Department thus ceased issuing passports with an "X" marker. App. 846. It replaced passport application forms that offered an "X" marker with earlier versions of the forms that offered a marker of only "M" or "F." App. 847. And it adopted procedures for adjudicating a passport applicant's sex using birth certificates and other documentation issued close to the applicant's birth. *Id.*

## B. Procedural History

1. In February 2025, seven trans-identifying or non-binary individuals filed a putative class action in the District of Massachusetts against the President, the Secretary, the Department, and the United States. App. 9-10 (Complaint). Plaintiffs did not challenge the inclusion of a sex designation on U.S. passports. Instead, plaintiffs argued that U.S. passports must include a sex designation that "reflect[s] the sex [people] live as and express, rather than the sex they were assigned at birth." App. 5. Plaintiffs thus challenged what they described as the Trump Administration's "reversal" of the 2021 policy of "permitt[ing] all people … to obtain passports with sex designations that reflected the sex they live as." *Id.*

Plaintiffs claimed that the policy change violated the equal-protection component of the Fifth Amendment's Due Process Clause. App. 45-50. Plaintiffs also asserted an Administrative Procedure Act (APA) claim challenging "[a]gency actions taken under the Executive Order" as "arbitrary, capricious, and an abuse of

discretion," App. 56-59, as well as an APA claim challenging the change in passport application forms as contrary to the Paperwork Reduction Act (PRA), App. 59-60. Plaintiffs moved for a preliminary injunction requiring the Secretary and the Department to reinstate the 2021 policy and thus "allow[ p]laintiffs to self-attest to what their sex is," including by choosing "an 'X' sex designation." ECF 29, at 2 (Motion for Preliminary Injunction).

2. On April 18, the district court granted plaintiffs' motion in part. Add. 14-69. The court understood the Department to have "compl[ied] with the Executive Order's directive" by "ma[king] two substantive changes to its prior passport policy":

> First, [the Department] withdrew the option for Americans to obtain a passport reflective of either their gender identity or their sex assigned at birth, and instead required all passports to reflect only applicants' sex assigned at birth. Second, it removed the option for intersex, non-binary, and gender non-conforming applicants to select "X" as the sex marker on their passports.

Add. 15. The court "refer[red] to these changes as the 'Passport Policy.'" *Id.*

The district court then held that plaintiffs were "likely to succeed on the merits of their equal protection claim." Add. 16; *see* Add. 29-45. The court concluded that "[t]he Executive Order and the Passport Policy on their face classify passport applicants on the basis of sex" and failed intermediate scrutiny. Add. 16; *see* Add. 30-38. The court further concluded that the Executive Order and the Passport Policy were motivated by "animus" toward trans-identifying individuals and therefore violated equal protection even under rational-basis review. Add. 40; *see* Add. 39-45.

The district court also concluded that plaintiffs were likely to succeed on their APA claims. Add. 46-59. The court acknowledged that "[p]residential actions, like executive orders, are not … subject to APA review," Add. 47; that the Passport Act requires the Secretary to comply with "such rules as the President shall designate and prescribe," Add. 48 (quoting 22 U.S.C. § 211a); and that the Secretary "adopted the Passport Policy to comply with the directive set forth in the Executive Order," Add. 33. The court nevertheless concluded that the Passport Policy was subject to APA review. Add. 47-50. The court then held that plaintiffs were "likely to succeed on their claim that the Passport Policy is arbitrary and capricious," Add. 16, because the Secretary and the Department "failed to offer a reasoned explanation for" the policy beyond pointing to the Executive Order, Add. 54; *see* Add. 54-55.

The district court further held that plaintiffs were likely to succeed on their claim that the Department's use of passport application forms that offered a sex marker of only "M" or "F" had not complied with "the procedures required by the [PRA]." Add. 16; *see* Add. 57-59. The court stated that, "although the prior passport forms were promulgated in accordance with the PRA's notice and comment requirements, the [Secretary and the Department] were nevertheless required to obtain the [Office of Management and Budget (OMB)] Director's approval before they began using those forms again in January 2025." Add. 59.

After considering the likelihood of irreparable harm and the balance of the equities, the district court concluded that six of the seven plaintiffs were entitled to a

preliminary injunction. Add. 59-64. The court determined, however, that the seventh plaintiff, Reid Solomon-Lane, was not "likely to suffer irreparable harm absent a preliminary injunction because he currently possesses a valid passport bearing a sex marker that corresponds to his gender identity and expression, and his passport remains valid until 2028." Add. 71; *see* Add. 63. The court therefore entered a preliminary injunction requiring the government "to process and issue passports" to the other six plaintiffs "consistent with" the 2021 policy and to "allow[ them] to self-attest to their sex," including by selecting "an 'X' sex designation." Add. 71.

3. Plaintiffs then amended their complaint, adding five named plaintiffs. App. 856. Plaintiffs moved for class certification, emphasizing that the government had "enacted a policy imposing a definition of 'sex' that affects every person in the country in the same way: Americans can only obtain passports that match their sex as this Administration defines it." ECF 78, at 1 (Class Certification Memorandum). Plaintiffs also moved to extend the preliminary injunction to certain members of the proposed classes. ECF 79, at 1.

On June 17, the district court agreed to certify two classes under Federal Rule of Civil Procedure 23(b)(2):

> 1.   A class of all people (1) whose gender identity is different from the sex assigned to them under the Passport Policy and/or who have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class");

2. A class of all people whose gender identity is different from the sex assigned to them under the Passport Policy and who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an "X" designation ("X Designation Class").

Add. 104; *see* Add. 81-91. The court explained that "enforcement of the Passport Policy[ ]uniformly impacts members of [those classes] by preventing them from obtaining passports with a sex marker consistent with their gender identity." Add. 85-86.[1]

The district court also agreed to extend the preliminary injunction to members of the certified classes who:

(a) do not have a currently valid passport, (b) need to renew their current passport because it expires within one year, (c) need to make changes to their passport to have the sex designation on it align with their gender identity or to reflect a name change, or (d) need to apply for another passport because their passport was lost, stolen, or damaged.

---

[1] The district court excluded from the certified classes the plaintiffs in *Schlacter v. U.S. Department of State*, No. 25-cv-1344 (D. Md.), another suit challenging the Executive Order and the State Department's implementation of it. Add. 104. The plaintiffs in *Schlacter* are seven individuals who moved for a preliminary injunction requiring the government "to issue passports to them with sex designations that match their gender identity, including the issuance of passports bearing an 'X' designation." Motion for Preliminary Injunction at 1, *Schlacter*, No. 25-cv-1344, ECF 31. On September 9, the *Schlacter* district court granted the motion as to six of the seven plaintiffs and entered a preliminary injunction requiring the government to "permit (a) changes to the sex designation on [their] passports, including allowing [them] to self-attest to their sex, and (b) an 'X' sex designation on any passport where that is requested by [them]." Order at 2, *Schlacter*, No. 25-cv-1344, ECF 66. The government has appealed the district court's preliminary injunction. Notice of Appeal, *Schlacter*, No. 25-cv-1344, ECF 69.

Add. 105-06. The court referred to that subset of the certified classes as the "PI Class." Add. 92. The court concluded that members of the PI Class faced the same risk of irreparable harm as the six original named plaintiffs. Add. 99. The court also concluded that the burden imposed by classwide relief on the government did "not outweigh the equities favoring the PI Class." Add. 100. The court therefore entered a preliminary injunction requiring the government "to process and issue passports to members of the PI Class consistent with" the 2021 policy and "to permit members of the PI Class to self-select a sex designation—'M,' 'F,' or 'X'—that is different from the sex assigned to those individuals under the Passport Policy." Add. 106.

4. On June 18, the day after the district court granted the classwide injunction, the Supreme Court issued its decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), which held that a prohibition on the prescription of puberty blockers or hormones to enable a minor to live as a purported identity inconsistent with the minor's sex did not discriminate based on sex, *id.* at 510-22. In a motion to dissolve the district court's classwide injunction, the government argued that, under *Skrmetti*, a prohibition on the self-selection of a purported identity inconsistent with a passport holder's sex likewise does not discriminate based on sex. ECF 127, at 5-9. In addition, the government observed that "a key premise of the [c]ourt's prior APA ruling—that forms used by the Department to implement the Executive Order were not approved by the Director of [OMB] as required by the PRA—no longer exists." *Id.* at 11. The government noted that the Director had approved the forms on June 25, thereby

"complet[ing] the PRA process." *Id.* at 12; *see* App. 968-71 (Declaration of Andrina M. Agnew, July 3, 2025).

On July 11, the district court denied the government's motion to dissolve the classwide injunction. App. 972-73. The court stated that even if *Skrmetti* had undermined its conclusion that "the Executive Order and Passport Policy must be reviewed under intermediate scrutiny," and even if the government had "cured its failure to comply with the procedures required by the PRA," the court's "prior conclusions" as to plaintiffs' likelihood of success on their "animus-based equal protection claim" and their "arbitrary-and-capricious claim under the APA" "would remain unchanged." App. 973. The court therefore declined to dissolve its classwide injunction and declined to stay that injunction pending appeal. *Id.* (citing Fed. R. App. P. 8(a)(1)(C)).

5. The government appealed both the district court's injunction and its classwide injunction. *See* ECF 111 (original injunction); ECF 131 (extension to class). On July 18, the government moved this Court for a stay of the classwide injunction pending appeal. Mot. for Stay Pending Appeal (July 18, 2025). On September 4, this Court denied the government's motion for a stay, App. 974-77, explaining that the government had "not made a strong showing that it is likely to succeed on the merits of its appeal" of plaintiffs' APA claim that "the Department's implementation of its Passport Policy was arbitrary and capricious." App. 975. Without resolving "the ultimate merits" of whether the Passport Policy is subject to APA review, this Court

11

stated that it could not "conclude on the present submissions that the government ha[d] made a strong showing that the Passport Policy is unreviewable under the APA." *Id.* The Court further concluded that the government had not "demonstrate[d] a strong likelihood of success" on its argument that "the Passport Policy, if reviewable, passes muster under the APA." *Id.*

On the view that plaintiffs' arbitrary-or-capricious claim was sufficient to "support the preliminary relief that the district court granted," this Court found no need to go "further in considering the likelihood of success on the merits." App. 976. The Court expressed the view, however, that the government's stay motion had not "engage[d] meaningfully" with the district court's conclusion that plaintiffs were likely to succeed on their "Equal Protection Clause claim premised on 'unconstitutional animus toward transgender Americans.'" *Id.* The Court then addressed the remaining stay factors and concluded that "the government 'ha[d] not sufficiently demonstrated that the balance of harms and equities' favors upending the status quo and subjecting the plaintiffs to the immediate harms identified by the district court." App. 977.

6. The government then filed an application for a stay in the Supreme Court. Applying the "familiar stay factors," the Supreme Court "grant[ed] the application." Add. 1. First, the Court concluded that "the Government is likely to succeed on the merits" of plaintiffs' claims. *Id.* The Supreme Court explained that "[d]isplaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting

to a historical fact without subjecting anyone to differential treatment." *Id.* The Supreme Court also concluded that "on this record," plaintiffs "failed to establish that the Government's choice to display biological sex 'lack[s] any purpose other than a bare . . . desire to harm a politically unpopular group.'" *Id.* (alterations in original) (quoting *Trump v. Hawaii*, 585 U.S. 667, 705 (2018)). The Supreme Court further determined that plaintiffs are unlikely "to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Id.* (citing 22 U.S.C. § 211a). The Supreme Court also concluded that "the Government will 'suffer[] a form of irreparable injury' absent a stay," because "the District Court's grant of class-wide relief enjoins enforcement of an Executive Branch policy with foreign affairs implications concerning a Government document." Add. 1-2 (alteration in original) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025)). For these reasons, the Supreme Court stayed the preliminary injunction "pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought." Add. 2.

## SUMMARY OF ARGUMENT

The district court abused its discretion in concluding that the factors governing preliminary injunctive relief—plaintiffs' likelihood of success on the merits, the likelihood that plaintiffs will suffer irreparable injury in the absence of relief, and the balance of the equities—support a preliminary injunction. In granting the govern-

ment's request for a stay of the injunction on the same record presented here, the Supreme Court determined that the government is likely to succeed on the merits and that the injunction would cause the government irreparable injury. Those determinations are binding at this stage, and they compel vacatur of the injunction here.

I. The district court's conclusion that plaintiffs are likely to succeed on the merits cannot be reconciled with the Supreme Court's determination that "the Government is likely to succeed on the merits." Add. 1. Because likelihood of success is the "sine qua non of the preliminary injunction analysis," *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024), the injunction can be vacated on that ground alone.

A. As the Supreme Court has now made clear, plaintiffs are not likely to succeed on their equal-protection claim. Nothing in the Constitution prevents the government from requiring its documents to state accurate biological facts about individuals that the President has deemed useful to identification rather than information that the President has determined "does not provide a meaningful basis for identification." App. 2.

Plaintiffs do not challenge the inclusion of a sex designation on passports. Instead, they challenge the government's definition of sex—arguing that the sex designation should reflect a person's self-assessed "gender identity," rather than a person's immutable biological characteristics. But as the Supreme Court reaffirmed in

*United States v. Skrmetti*, 605 U.S. 495 (2025), a policy does not discriminate based on sex if it applies equally to each sex without treating any member of one sex worse than a similarly situated member of the other. Here, the challenged policy applies equally, regardless of sex—defining sex for everyone in terms of biology rather than self-identification. Thus, in granting the government's stay motion in this case, the Supreme Court concluded that "[d]isplaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment." Add. 1.

The district court's conclusion that the challenged policy was motivated by animus toward trans-identifying individuals fares no better. It was entirely rational for the President to reject "gender identity" as a "basis for identification" in favor of a "biological" definition of sex—one grounded in facts that are "immutable." App. 1-2. And because the challenged policy has "a legitimate grounding," "quite apart from any [animus]," the Court "must accept that independent justification." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018). Thus, the Supreme Court concluded, on the same record presented here, that plaintiffs had "failed to establish that the Government's choice to display biological sex 'lack[s] any purpose other than a bare … desire to harm a politically unpopular group.'" Add. 1 (alterations in original) (quoting *Hawaii*, 585 U.S. at 705).

B. As the Supreme Court's stay order makes clear, plaintiffs are also not likely to succeed on their APA claim. Presidential action is not reviewable under the APA, and the Executive Order dictated the challenged policy here, pursuant to the Passport Act, 22 U.S.C. § 211a, which authorizes the President himself to determine the contents of passports and requires the Department to implement the President's decision. Because the Department's ministerial actions implementing the President's direction are neither subject to APA review nor arbitrary or capricious, the Supreme Court concluded that plaintiffs were not "likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." Add. 1 (citing 22 U.S.C. § 211a). That determination, like the Court's determination that the government is likely to succeed on plaintiffs' equal-protection claim, compels vacatur of the preliminary injunction because plaintiffs failed to show a likelihood of success on the merits of any of their claims.

II. Plaintiffs also failed to show that they would suffer irreparable harm in the absence of a preliminary injunction or that the balance of equities supports a preliminary injunction. The alleged harms that plaintiffs and the other members of the PI Class would suffer are either speculative or not cognizable. Moreover, even if plaintiffs could establish that they and other members of the PI Class would suffer irreparable harm, the balance of equities tilts decisively in the government's favor because, as the Supreme Court has determined, "the District Court's grant of class-

wide relief enjoins enforcement of an Executive Branch policy with foreign affairs implications concerning a Government document." Add. 1-2. The "irreparable injury" that the injunction would cause the government to suffer outweighs any harm to plaintiffs that the injunction would prevent. Add. 2 (quotation marks omitted).

## STANDARD OF REVIEW

This Court's "review of a district court's decision to grant or deny a preliminary injunction is for abuse of discretion." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024). "Under this rubric," the Court "examine[s] answers to abstract legal questions de novo, findings of fact for clear error, and judgment calls with significant deference to the trial court." *Id.* And "[i]f a trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 18 (2024) (alteration and quotation marks omitted).

## ARGUMENT

To determine whether preliminary injunctive relief is warranted, a district court must consider "the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships …; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024)

(alteration in original) (quotation marks omitted). When the government is the party opposing the injunction, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the Supreme Court has now made clear in granting a stay of the district court's classwide preliminary injunction, these factors all favor the government. This Court accordingly should vacate the injunction.

## I. Plaintiffs Failed To Show A Likelihood Of Success On The Merits Of Their Claims

The district court abused its discretion in determining that plaintiffs are likely to succeed on the merits of their claims. That conclusion conflicts with the Supreme Court's determination, on the same record presented here, that "the Government is likely to succeed on the merits." Add. 1. Because "[l]ikelihood of success on the merits is the sine qua non of the preliminary injunction analysis," *US Ghost Adventures*, 121 F.4th at 347, this Court may vacate the district court's injunction based solely on merits grounds; it need not consider the balance of equitable factors, *see id.* at 348 ("If the movant cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." (quotation marks omitted)).

### A. Plaintiffs Have Not Demonstrated A Likelihood Of Succes On Their Equal Protection Claim

As the Supreme Court held, "[d]isplaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment." Add. 1. That conclusion follows from well-settled

precedent. Equal protection does not demand that a policy "necessarily apply equally to all persons or require things which are different in fact … to be treated in law as though they were the same." *Michael M. v. Superior Court*, 450 U.S. 464, 469 (1981) (plurality opinion) (alteration in original) (quotation marks omitted); *see Nguyen v. INS*, 533 U.S. 53, 63-64 (2001) (explaining that equal protection is not violated by classifications that treat men and women differently where the two sexes "are not similarly situated," such as measures that "take[] into account a biological difference"). Accordingly, for decades, U.S. passports have included a sex designation—*i.e.*, a designation identifying the sex of the passport's holder. App. 842.

Plaintiffs do not challenge the inclusion of a sex designation on U.S. passports. Nor could they. Plaintiffs sought—and the district court granted—a classwide injunction that requires the government to continue issuing passports with a "sex designation." Add. 106. Thus, even plaintiffs accept that there are "differen[ces] in fact" that justify distinguishing people based on sex on U.S. passports. *Michael M.*, 450 U.S. at 469 (plurality opinion) (quotation marks omitted). What plaintiffs challenge is not the inclusion of a sex designation on U.S. passports, but how the government determines a person's sex for purposes of that designation. The 2021 policy determined a person's sex marker according to that person's "gender identity." App. 843. The 2021 policy thus "permitted all people … to obtain passports with sex designations that reflected" their purported identity, App. 5 (Complaint); App. 856-57 (Amended Complaint), whether "M," "F," or "X," App. 843. In contrast, the

Executive Order determines a person's sex according to that person's "immutable biological" characteristics. App. 1. The Order thus prohibits the government from allowing anyone to self-select a sex marker based on "gender identity." App. 2. It is that policy against self-selection that plaintiffs challenge here. According to plaintiffs, the sex designation on U.S. passports should "reflect[] the sex [people] live as and express, rather than the sex they were assigned at birth." App. 5 (Complaint); App. 856 (Amended Complaint).

The question is whether the Constitution requires the government to adopt plaintiffs' preferred definition of sex. As the Supreme Court determined, Add. 1, it does not. At the outset, it is implausible that equal-protection principles constrain how the President exercises his constitutional and statutory prerogative to speak to foreign governments on government property when identifying U.S. passport holders. And it becomes completely untenable where, as here, the challenged policy against self-selection does not discriminate against any suspect or quasi-suspect class and thus warrants only rational-basis review—which it easily satisfies.

### 1.    The Challenged Policy Warrants Only Rational-Basis Review

Equal protection generally demands only rational-basis review, unless a policy discriminates against a suspect or quasi-suspect class (or burdens a fundamental right, which is not at issue here). *See United States v. Skrmetti*, 605 U.S. 495, 509 (2025); *McKenna ex rel. McKenna v. Maine Dep't of Health & Hum. Servs.*, 152 F.4th 14, 21-22 (1st

Cir. 2025). Because the challenged policy does not so discriminate, heightened scrutiny is unwarranted and the deferential rational-basis standard applies.

> **a.** **The challenged policy does not discriminate based on sex**

The 2021 policy permitted "all people" to self-select a sex marker of "M," "F," or "X" based on their "gender identity." App. 5-6 (Complaint); App. 856-67 (Amended Complaint). The challenged policy reversed the 2021 policy, requiring everyone's sex marker to reflect their "immutable biological classification as either male or female," rather than their "self-assessed gender identity." App. 1. In defining sex based on biology rather than on self-identification, the challenged policy does not discriminate based on sex, because every passport, for every individual, must reflect immutable biological characteristics, not purported "gender identity."

The Supreme Court has long recognized that sex discrimination requires treating members of one sex differently from "similarly situated" members of the opposite sex. *Nguyen*, 533 U.S. at 63; *see Michael M.*, 450 U.S. at 469 (plurality opinion). The Court recently reaffirmed that principle in *Skrmetti*. The Court in that case rejected the suggestion that "mere reference to sex is sufficient to trigger heightened scrutiny." *Skrmetti*, 605 U.S. at 512. And the Court held that a law does not discriminate based on sex if it applies equally to each sex without treating any member of one sex differently from a similarly situated member of the opposite sex. *See id.* at 515 (emphasizing that under the challenged statute, "no minor may be administered

puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of any sex may be administered puberty blockers or hormones for other purposes" (emphases omitted)). That is the case here. Under the challenged policy, no one may self-select a marker of "M," "F," or "X" based on "gender identity"; every sex marker, for any individual, must reflect immutable biological characteristics instead. The challenged policy thus applies equally to members of each sex—defining sex for everyone in terms of biology rather than self-identification.

Plaintiffs acknowledge as much. In their own words: "Defendants have enacted a policy imposing a definition of 'sex' that affects *every person in the country in the same way*." ECF 78, at 1 (emphasis added). "[The Department] prohibits *all people* from having on their passport a sex designation different from that mandated by the Policy." *Id.* at 11 (emphasis added). A policy that prohibits "all people" from self-selecting a marker on their passport—and thus "affects every person in the country in the same way"—is not a policy that discriminates based on sex. *Id.* at 1, 11. By analogy, it would not be discrimination based on national origin for a law to define a person's national origin as the country in which the person was born (say, India), rather than the country with which the person self-identifies (say, Pakistan for an Indian born in Kashmir). As the Supreme Court explained in granting a stay of the district court's injunction, it is similarly not discrimination based on sex for the challenged policy to determine a person's sex according to the person's "immutable

biological" characteristics, rather than the person's "self-assessed gender identity." App. 1; *see* Add. 1 ("Displaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth … ."). Plaintiffs may prefer an identity-based definition of sex over a biology-based one, but the government's rejection of plaintiffs' preferred definition is not sex discrimination.

The district court nevertheless concluded that the challenged policy discriminates based on sex and thus triggers heightened scrutiny. Add. 30-35. In reaching that conclusion, the court misapplied the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020). Add. 31-32. At the outset, *Bostock* was a Title VII decision whose reasoning does not extend to the equal-protection context. *See Skrmetti*, 605 U.S. at 528 (Thomas, J, concurring); *id.* at 563-64 (Alito, J., concurring in part and concurring in the judgment). And regardless, the challenged policy, like the one in *Skrmetti*, does not discriminate based on sex even under *Bostock*'s reasoning. Here, "changing" a person's "sex" "does not alter the application of" the challenged policy. *Id.* at 520 (majority opinion). If a female sought to self-select her sex marker as male on a U.S. passport, the challenged policy would prohibit such self-selection—and would require instead that her sex marker reflect her "immutable biological" characteristics, regardless of her "self-assessed gender identity." App. 1. Change that person's sex from "female to male," *Skrmetti*, 605 U.S. at 520, and the challenged policy likewise would prohibit him from engaging in self-selection—and would still require that his sex marker reflect his "immutable biological" characteristics, regardless of his "self-

assessed gender identity," App. 1. Sex is therefore not "the but-for cause," *Skrmetti*, 605 U.S. at 521, of a person's inability to self-select a sex marker under the challenged policy.

The district court did not attempt to reconcile its sex-discrimination analysis with *Skrmetti*. In denying the government's motion to dissolve the classwide injunction, the district court "expresse[d] no opinion" on whether *Skrmetti* had abrogated its sex-discrimination analysis. App. 973. That silence is telling. *Skrmetti* makes clear that the challenged policy does not discriminate based on sex.

### b. The challenged policy does not discriminate based on trans-identifying status

As an alternative basis for heightened scrutiny, plaintiffs argued below that the challenged policy discriminates based on trans-identifying status. ECF 30, at 19-20. In issuing its classwide injunction, the district court did not rely on that argument, *see* Add. 35 n.6, 93-94, and for good reason: Under the challenged policy, no person, whether trans-identifying or not, may self-select a sex marker of "M," "F," or "X." The challenged policy therefore "does not classify on the basis of transgender status." *Skrmetti*, 605 U.S. at 517. Again, as plaintiffs acknowledge, the challenged policy applies equally to "all people," ECF 78, at 11, "affect[ing] every person in the country in the same way," *id.* at 1. It is plaintiffs who are seeking differential treatment—namely, a special accommodation from that neutral policy based on their gender identity. The government's refusal to grant plaintiffs preferential treatment cannot

plausibly be characterized as "discrimination" based on trans-identifying status. *See Schuette v. BAMN*, 572 U.S. 291, 298-315 (2014) (plurality opinion) (concluding that equal protection does not forbid banning affirmative action); *id.* at 316-17 (Scalia, J., concurring in the judgment) (same).

Even if the challenged policy discriminated based on trans-identifying status, heightened scrutiny would still be inappropriate because trans-identifying people are not a suspect or quasi-suspect class. Plaintiffs contend that trans-identifying people satisfy a multi-factor test for recognizing such a class. ECF 30, at 19-20. But that test has no basis in the text or original understanding of the Constitution, and the Supreme Court has "never embraced" a new suspect or quasi-suspect class under it. *Skrmetti*, 605 U.S. at 550 (Barrett, J., concurring) (emphasis omitted); *see id.* at 573-76 (Alito, J., concurring in part and concurring in the judgment) (observing that the Court has previously declined to recognize the poor, the elderly, illegal aliens, close relatives, and people with disabilities as suspect or quasi-suspect classes).

In any event, trans-identifying people do not satisfy plaintiffs' preferred test. First, trans-identifying people are not marked by the "obvious, immutable, or distinguishing characteristics" of a "discrete group." *Skrmetti*, 605 U.S. at 549-50 (Barrett, J., concurring) (quotation marks omitted); *see id.* at 574-76 (Alito, J., concurring in part and concurring in the judgment). Second, trans-identifying people have not "suffered a history of *de jure* discrimination." *Id.* at 554 (Barrett, J., concurring); *see id.* at 574-76 (Alito, J., concurring in part and concurring in the

judgment). Third, trans-identifying people are not politically powerless. *Id.* at 576

(Alito, J., concurring in part and concurring in the judgment); *see id.* at 555-56 (Barrett,

J., concurring) (noting that *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4

(1938), "equates political powerlessness with laws burdening those who lacked a

vote"). And finally, treating trans-identifying people as a quasi-suspect class "would

require courts to oversee all manner of policy choices normally committed to

legislative discretion." *Id.* at 551 (Barrett, J., concurring); *see City of Cleburne v. Cleburne*

*Living Ctr., Inc.*, 473 U.S. 432, 445 (1985) (holding that individuals with mental

disabilities are not a quasi-suspect class because governments must have "flexibility

and freedom from judicial oversight in shaping and limiting their remedial efforts").

### 2. The Challenged Policy Satisfies Rational-Basis Review

a. Because the challenged policy does not discriminate based on sex or any

other suspect or quasi-suspect characteristic, rational-basis review applies. Under that

standard, the government "has no obligation to produce evidence to sustain the

rationality of" the policy. *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993). Instead,

the policy "is presumed constitutional," and the burden is on the challengers " 'to

negative every conceivable basis which might support it,' whether or not the basis has

a foundation in the record." *Id.* at 320-321 (citation omitted). "Where there exist

'plausible reasons' for the relevant government action, '[the Court's] inquiry is at an

end.'" *Skrmetti*, 605 U.S. at 522. The challenged policy easily satisfies this undemanding standard.

It was entirely rational for the President to decide that "'[g]ender identity'" "does not provide a meaningful basis for identification" on passports, while biological sex does. App. 2. As the Executive Order explains, "'[g]ender identity' reflects a fully internal and subjective sense of self," "exist[s] on an infinite continuum," and may shift over time. *Id.*; *see* App. 1 (describing the "concept of self-assessed gender identity" as "fluid" and "ever-shifting"). Indeed, a person who claims to be "transgender now may not be transgender later." *Skrmetti*, 605 U.S. at 576 (Alito, J., concurring in part and concurring in the judgment). "[S]ome transgender individuals 'detransition' later in life—in other words, they begin to identify again with the gender that corresponds to their biological sex." *Id.* at 551 (Barrett, J., concurring). Thus, "gender identity" is not a trait that is "immutable" or "definitively ascertainable at the moment of birth." *Id.* at 550-51 (quotation marks omitted).

Given the "internal, fluid, and subjective" nature of "gender identity," the President rationally rejected it as a "basis for identification" in favor of a "biological" definition of sex—one grounded in facts that are "immutable." App. 1-2. Other designations on U.S. passports, such as a person's date or place of birth, similarly reflect immutable facts. A person cannot simply self-identify as having been born on December 31, 1969, in Richmond, if her birth certificate says she was in fact born on

January 1, 1970, in Raleigh, let alone on July 1, 1980, in New York. The President rationally decided that, just as a person may not self-select a date or place of birth, so too a person may not self-select a sex marker. And in the interest of uniformity, the President rationally decided to apply the same biology-based definition of sex throughout the federal government, making no exception for passports. App. 2.

b. In concluding that the challenged policy nevertheless failed rational-basis review, the district court claimed that the policy reflected "animus toward transgender Americans." Add. 40. That cannot be squared with the Supreme Court's binding determination, "on this record," that "respondents have failed to establish that the Government's choice to display biological sex 'lack[s] any purpose other than a bare … desire to harm a politically unpopular group.'" Add. 1 (alterations in original) (quoting *Trump v. Hawaii*, 585 U.S. 667, 705 (2018)).

In any event, as explained above, the challenged policy can "reasonably be understood," *Hawaii*, 585 U.S. at 705, to serve the government's legitimate interests in a meaningful basis for identification and a uniform definition of sex. *See supra* pp. 26-27. Thus, "[i]t cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" *Hawaii*, 585 U.S. at 706. Because the challenged policy has "a legitimate grounding" in the interests discussed above, "quite apart from any [animus]," the Court "must accept that independent justification." *Id.*

The district court's purported reasons for inferring animus also fail on their own terms. Add. 39-45. First, according to the district court, the Executive Order "announces" that "transgender women are not women and transgender men are not men." Add. 40. But plaintiffs themselves define "[t]ransgender people" as people who "have a gender identity different from their sex assigned at birth." App. 11 (Complaint); App. 863 (Amended Complaint). And the Executive Order simply defines "'[m]ale'" and "'[f]emale'" in terms of "sex," rather than "gender identity." App. 1. The fact that the Order adopts a biology-based definition of sex cannot, in and of itself, be considered evidence of animus. After all, the Supreme Court's own precedents refer to "men" and "women" in the same sense. *Skrmetti*, 605 U.S. at 558 (Alito, J., concurring in part and concurring in the judgment) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)); *see Bostock*, 590 U.S. at 655 (proceeding on "the assumption that 'sex'" in Title VII refers to "biological distinctions between male and female").

Second, the district court erred in finding that the Executive Order "imposes a 'broad and undifferentiated disability' on a discrete group of people." Add. 41. To the contrary, as plaintiffs themselves recognize, the Executive Order applies to "every person in the country in the same way." ECF 78, at 1. Any disproportionate burden on trans-identifying individuals is immaterial because disparate-impact claims are not cognizable under equal-protection principles. *See Skrmetti*, 605 U.S. at 517-19 (holding

that facially neutral laws do not discriminate based on gender identity even if they disproportionately burden trans-identifying individuals, such as by banning use of a medical procedure for a condition that "only transgender individuals" would seek to remedy through the procedure); *Washington v. Davis*, 426 U.S. 229, 242 (1976) (holding that a racially disproportionate impact alone does not establish racial discrimination). In any event, far from imposing any "broad" or "undifferentiated disability," Add. 41 (quotation marks omitted), the challenged policy governs the government's own speech on its own "property," 22 C.F.R. § 51.7(a). And "the transgender population" is not a "'discrete group'"; rather, "the category of transgender individuals is 'large, diverse, and amorphous.'" *Skrmetti*, 605 U.S. at 551 (Barrett, J., concurring); *see id.* at 577 (Alito, J., concurring in part and concurring in the judgment) ("[T]ransgender people make up a 'diverse' and 'amorphous class.'").

Third, the district court erred in finding that "the government does not defend the Passport Policy by reference to the Executive Order's express purposes." Add. 42. The Executive Order explicitly distinguishes its definition of sex (which is based on "immutable biological reality") from plaintiffs' preferred concept of "gender identity" (which the Order describes as an "internal, fluid, and subjective sense of self unmoored from biological facts"). App. 1. And the Order explains that such an "internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum," "does not provide a meaningful basis for

identification." App. 2. As explained above, *see supra* pp. 26-27, that justification

provides a sufficient basis, standing alone, to support the policy, and the government

defended the policy on this basis in district court as well. *See* ECF 53, at 12-13.

Fourth, the district court erred by inferring animus from the fact that the

challenged policy was adopted as "part of a constellation of close-in-time executive

actions," including one about military service by individuals with gender dysphoria

and another about "gender-affirming medical care" for minors. Add. 43-44. Contrary

to the district court's suggestion, none of those other executive actions reflects animus

toward trans-identifying people. In fact, the Supreme Court stayed an injunction

against the military policy, over the objection of plaintiffs who claimed that the policy

was motivated by animus. *See United States v. Shilling*, No. 24A1030, 2025 WL 1300282,

at *1 (U.S. May 6, 2025); Response in Opposition to the Application for a Stay at 20-

21, *Shilling*, No. 24A1030, 2025 WL 1278097, at *20-21 (May 2, 2025). The D.C.

Circuit has also stayed an injunction against the military policy, rejecting the notion

that the policy is "rooted in animus against transgender individuals." *Talbott v. United

States*, No. 25-5087, 2025 WL 3533344, at *10 (D.C. Cir. Dec. 9, 2025) (per curiam)

(opinion of Katsas, J., joined by Rao, J.). And in *Skrmetti*, the Supreme Court likewise

rejected the notion that policies about "gender-affirming care" discriminate against

trans-identifying people. *See* 605 U.S. at 516-18. The district court thus failed to

identify any evidence of animus—let alone evidence that would satisfy the much

higher standard of establishing that the challenged policy is "inexplicable by anything but animus." *Hawaii*, 585 U.S. at 706 (quotation marks omitted).

## B. Plaintiffs Have Not Demonstrated A Likelihood Of Success On Their APA Claim

The Supreme Court specifically found that plaintiffs are not likely to prevail on the merits of their APA claims. Add. 1 ("Nor are respondents likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow."). That ruling is both binding and correct. As discussed, the challenged policy consists of two changes: the withdrawal of the option to self-select a sex marker of "M" or "F" based on one's purported gender identity, and the removal of the option to self-select "X" as one's sex marker. *See* Add. 16; *supra* p. 6. The Executive Order dictated both of those changes pursuant to the President's statutory and constitutional authorities. Accordingly, the challenged policy is presidential action, unreviewable under the APA; and regardless, the Department's ministerial compliance with the President's Order was not arbitrary or capricious because the Department was *required* to comply. Add. 1.

### 1. The Challenged Policy Is Not Reviewable Under The APA

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The President is not an "agency" under the APA. *Id.* § 701(b)(1); *see Franklin v. Massachusetts*, 505 U.S. 788,

800-01 (1992). The President's actions therefore "are not subject to [the APA's] requirements" and "are not reviewable" under the APA. *Franklin*, 505 U.S. at 801.

The Passport Act commits to the President the power to make rules governing the issuance of passports. The Act provides: "The Secretary of State may grant and issue passports … under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. The statute thus supplements the President's inherent Article II authority to prescribe rules for the issuance of passports. *Haig v. Agee*, 453 U.S. 280, 293-94 (1981). And the President exercised this statutory and constitutional power in the Executive Order. App. 1-4.

Plaintiffs challenge as arbitrary or capricious what the district court referred to as the "Passport Policy," which consists of the two changes discussed above. Add. 15; *see supra* p. 6. Both of those changes were dictated by the Executive Order, which declares it to be "the policy of the United States to recognize two sexes, male and female"; instructs that "'[g]ender identity'" "does not provide a meaningful basis for identification"; provides that "[a]gency forms that require an individual's sex shall list male or female, and shall not request gender identity"; and directs the Secretary to "require that government-issued identification documents, including passports … , accurately reflect the holder's sex, as defined under" the Order. App. 1-2. Plaintiffs' challenge to the Passport Policy is thus a challenge to the Executive Order. And because the Executive Order is a presidential action that is "not subject to [the APA's]

requirements," *Franklin*, 505 U.S. at 801, plaintiffs may not challenge the Passport Policy as arbitrary or capricious under the APA.

Plaintiffs cannot evade that conclusion by purporting to challenge "[*a*]*gency* actions taken under the Executive Order." App. 57 (Complaint) (emphasis added); App. 919 (emphasis added). This is not a case where the challenged agency action is the exercise of discretion "delegated to an agency head but directed by the President." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001). Rather, this is a case where the exercise of discretion is "committed to … the President" himself, and the challenged agency action just ministerially carries out the President's decision. *Id.* Because the President's exercise of discretion committed to him is "not subject to [the APA's] requirements," the Passport Policy is "not reviewable" under the APA. *Franklin*, 505 U.S. at 801.[2]

---

[2] The Department did exercise some independent discretion in determining *how* to implement the Passport Policy. For example, the Department chose to rely on birth certificates and other documentation issued close to an applicant's birth to determine a passport applicant's sex. *See, e.g.*, App. 142. But the independent determinations made by the Department are not the agency actions that plaintiffs challenged or part of the Passport Policy that the district court enjoined. *See* Add. 15, 106; App. 55-59 (Complaint); App. 126-29 (Amended Complaint). Rather than imposing limits on how the Department may determine a person's biological sex under the Executive Order, the injunction invalidates the policy about whether sex should be defined in terms of biology at all. And that policy was adopted by the President pursuant to his own authorities, not by the Department.

## 2. In Any Event, Plaintiffs' APA Claim Fails On The Merits

Even if plaintiffs could proceed with their APA claim, that claim would fail because plaintiffs have not identified any "agency action" that was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Supreme Court has squarely held that plaintiffs are "[not] likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." Add. 1 (citing 22 U.S.C. § 211a). That determination is binding. It is also correct. As noted, the Passport Act directs "[t]he Secretary of State [to] grant and issue passports … under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. Thus, the statute itself requires the Department to follow the President's "rules," *id.*, and the President need not provide a reasoned explanation for those rules because he is not subject to the APA, *see Franklin*, 505 U.S. at 801.

Here, the two challenged changes—(1) the "withdr[awal]" of "the option" to self-select a sex marker based on "gender identity," and (2) the "remov[al]" of "the option" to "select 'X' as [a] sex marker"—were both dictated by the President's rules (*i.e.*, the Executive Order). Add. 15. Accordingly, the Passport Act required the Department to make both of those changes. The Department's decision to do so therefore was not "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). To the contrary, it would have been a violation of the Passport Act—and

thus "not in accordance with law" under the APA, *id.*—for the Department *not* to have followed the President's rules. And that is precisely what the injunction below requires: It compels the Department to violate the Passport Act by issuing passports *in contravention* of the "rules" that the President has "designate[d] and prescribe[d]," 22 U.S.C. § 211a.

The district court also erred in faulting the Department for "fail[ing] to offer a reasoned explanation for [its] decision to reverse [its] prior passport policy." Add. 54. The court viewed it as problematic that the record "merely suggests that the policy was adopted in accordance with Executive Order 14168." Add. 55. But because the Passport Act requires the Department to "grant and issue passports … under such rules as the President shall designate and prescribe," 22 U.S.C. § 211a, "the agency's path" was not just "reasonably … discern[ible]"; it was obvious—and mandatory. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). Far from "entirely fail[ing] to consider an important aspect of the problem," *id.*, the Department considered the only aspect relevant here: that the Passport Act required it to follow the President's rules. That requirement rendered irrelevant any other consideration in following those rules. In short, because Congress instructed the Department to follow the President's rules, which are not themselves subject to APA review, it could not have been arbitrary or capricious for the Department to have followed the President's rules here by making the changes dictated by the Executive Order.

Finally, even if the Executive Order and the changes that it dictated were subject to APA review, they are not arbitrary or capricious for the same reasons that they satisfy rational-basis review. *See supra* pp. 26-27.

## C. There Is No Paperwork Reduction Act Violation That Could Support The Injunction

In opposing the government's stay motion in this Court and the Supreme Court, plaintiffs made no attempt to defend the district court's classwide injunction based on a PRA violation. *See* Pl.-Appellees' Opp'n to Mot. for Stay Pending Appeal 18 n.2 (July 28, 2025) (stating only that plaintiffs "do not waive" their PRA claim, without defending the district court's analysis); Respondents' Opposition to Application for Stay at 24 n.9, *Trump v. Orr*, No. 25A319, 2025 WL 2855187, at *24 n.9 (U.S. Oct. 6, 2025) (stating that plaintiffs "maintain their APA claim that the Passport Policy violated the PRA" without defending the district court's analysis). For good reason, as there is no PRA violation that could even arguably support the district court's injunction.

The PRA requires the OMB Director's approval of forms used by the government to collect information. 44 U.S.C. § 3507(a)(2). The Act establishes a process for obtaining the OMB Director's approval. Under the Act, an agency generally must publish the form and provide 60 days for the public to comment. *Id.* §§ 3506(c)(2)(A), 3507(a)(1)(B). After that 60-day period, the agency may submit the form to the OMB Director for a decision on whether to approve the form. *Id.*

§ 3507(a)(1)(C). Before the OMB Director may make a decision, however, the agency must provide another 30 days for public comment. *Id.* § 3507(a)(1)(D), (b). After that 30-day period, the OMB Director may approve the form. If he does so, his approval may last for a period of up to three years. *Id.* § 3507(g).

The OMB Director's approval of the Department's last set of passport application forms was set to expire in April 2025. App. 843. In November 2024, the Department published passport application forms for 60 days of public comment as part of the PRA process for renewing the OMB Director's approval. *Id.*; *see* 89 Fed. Reg. 94,867 (Nov. 29, 2024); 89 Fed. Reg. 93,390 (Nov. 26, 2024); 89 Fed. Reg. 93,389 (Nov. 26, 2024). Consistent with the policy in effect at the time, the published forms allowed applicants to self-select an "X" marker. *See* App. 843. In late January 2025, after the change in Administration and the President's issuance of the Executive Order, the Department started using passport application forms that offered a sex marker of only "M" or "F." App. 847. The following month, the Department published those forms for 30 days of public comment as part of the same PRA process that had already begun. *Id.*; *see* 90 Fed. Reg. 9,800-801 (Feb. 18, 2025); 90 Fed. Reg. 9,652 (Feb. 14, 2025). Those forms differed from the forms that the Department had previously published during the 60-day comment period, but the PRA does not prohibit agencies from revising their forms in between the 60-day and 30-day comment periods. *See generally* 44 U.S.C. §§ 3506, 3507. *Cf. Kooritzky v. Reich*, 17 F.3d

1509, 1513 (D.C. Cir. 1994). In June 2025, after the close of the 30-day comment periods, the OMB Director approved the revised forms. App. 848, 969.

The district court initially concluded that plaintiffs were likely to succeed on their claim that the Department was violating the PRA by using passport application forms that the OMB Director had not approved. Add. 59. But as noted above, the OMB Director has since approved the use of forms that offer a sex marker of only "M" or "F." *See* App. 969. Because the OMB Director's approval completed the PRA process for those forms, there is no PRA violation that could support the district court's classwide injunction. Indeed, since the OMB Director's approval of the forms, the district court has never suggested that a PRA violation could support the injunction. *See* App. 973 (assuming, without deciding, that the government had "cured its failure to comply with the procedures required by the PRA").

## II.    The Other Factors Require Vacating The District Court's Injunction

Because plaintiffs are unlikely to succeed on the merits of their claims the Court need go no further to vacate the preliminary injunction. *See US Ghost Adventures*, 121 F.4th at 347. Nevertheless, the remaining factors—*i.e.*, whether plaintiffs likely faced irreparable harm in the absence of a preliminary injunction and the balance of the equities—likewise require vacatur of the district court's preliminary injunction.

## A. Plaintiffs Would Not Suffer Irreparable Harm In The Absence Of A Preliminary Injunction

Plaintiffs and the PI Class will not suffer irreparable harm absent a preliminary injunction, and the district court's determination to the contrary is wrong. The district court believed that trans-identifying individuals could experience "anxiety or distress" or "violence or harassment" "if required to use passports bearing a sex marker corresponding to their sex assigned at birth." Add. 60-61. For six of the named plaintiffs, the court concluded that those harms were "not speculative" because each of them "plan[ned] to travel internationally in 2025." Add. 62. And the court viewed such harms as irreparable because those plaintiffs would "thus be required to choose between forgoing international travel plans" and "travelling with passports bearing sex markers that correspond to their sex assigned at birth." Add. 62-63. The court then regarded such harms as "representative of the risk of irreparable harm faced by every member of the PI Class." Add. 99. The court's reasoning is flawed.

First, membership in the PI Class is not conditioned on whether an individual has concrete international travel plans, *see supra* pp. 8-9, so for the rest of the PI Class, the harms that the district court identified are speculative. Attempting to bridge that gap in the evidence, the court suggested that members of the PI class could experience irreparable harm in other ways—*i.e.*, through "interference with their treatment for gender dysphoria" and through "their inability to use their passports anywhere without outing themselves," such as "to rent a car," to "open bank ac-

counts and establish employment eligibility," to "travel domestically," or to "identify themselves in administrative settings." Add. 99-100. But membership in the PI Class is also not conditioned on a diagnosis of gender dysphoria, a medical condition that only "[s]ome" trans-identifying individuals have. *Skrmetti*, 605 U.S. at 502; *see supra* pp. 8-9. And unlike international travel, none of the other activities that the court mentioned requires a U.S. passport. Because an individual may engage in each of those other activities without using a U.S. passport, any harm would be self-inflicted. And "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (3d ed.), Westlaw (database updated Sep. 2025); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

In denying a stay, this Court stated that the government had "fail[ed] to contest" the "'uncontroverted evidence of the harms that transgender and non-binary people face' if required to use … passports" bearing sex designations corresponding to their biological sex. App. 977 (quoting Add. 96). But as the district court noted, *see* Add. 99, the government disputed the premise—*i.e.*, that members of the PI class would be "required to use such passports" in the first place, App. 977. The government argued below, as it does here, that because membership in the PI Class is not conditioned on having concrete international travel plans, plaintiffs failed to show that members of that class would be "required to use such passports" at all. *Id.*; *see* ECF 89, at 4 (noting that "[m]any members" of the PI Class "may not have travel

41

plans in 2025"). And that hole in plaintiffs' evidence renders the asserted harms to the class too speculative to support the classwide injunction.

Second, for all plaintiffs, being unable to force the government to describe their sex in the way they prefer does not give rise to any cognizable, let alone irreparable, harm. A U.S. passport is a government document; it represents the speech of the government, not plaintiffs. *See supra* p. 2. Plaintiffs may disagree with what the government has chosen to say, and that disagreement may cause "feelings of anxiety and distress." Add. 60. But that disagreement cannot count as irreparable injury, lest every policy disagreement with the government turn into irreparable injury. *See Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements."); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees … is not an injury sufficient to confer standing under Art. III … ."). Plaintiffs also assert that they will suffer "violence or harassment" going through airport security if they use "passports bearing a sex marker corresponding to their sex assigned at birth." Add. 61. But those alleged harms stem from the conduct of others, and the assertion that others will engage in violence or harassment is speculative, notwithstanding any particular plaintiff's past exposure to such conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (explaining that past exposure to harm does not in and of itself establish

entitlement to prospective relief); *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at \*2 (Sep. 8, 2025) (Kavanaugh, J., concurring in the grant of the application for stay) (same).

### B. Even If Plaintiffs Could Establish Irreparable Harm, The Balance Of The Equities Requires Vacating The Preliminary Injunction

In any event, any harm to plaintiffs in the absence of a preliminary injunction is substantially outweighed by the far more substantial irreparable injury to the government from forcing it to mispresent the sex of a nationwide class of individuals in official sovereign-to-sovereign communications. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). In granting a stay, the Supreme Court determined that "the District Court's grant of class-wide relief enjoins enforcement of an Executive Branch policy with foreign affairs implications concerning a Government document." Add. 1. The Supreme Court therefore concluded that the injunction would cause the government "irreparable injury." Add. 2 (quotation marks omitted).

As the Supreme Court recognized, the district court's classwide injunction irreparably harms the government and the public by blocking the President's exercise of his constitutionally and statutorily conferred power to prescribe rules of the issuance of passports. That power inheres in the President's Article II authority over "national security" and "foreign policy," *Agee*, 453 U.S. at 293, and it has been expressly "confirmed" by Congress in the Passport Act, *id.* at 294 (quotation marks omitted). Accordingly, the President's "authority is at its maximum," encompassing

"all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (Jackson, J., concurring in the judgment and opinion of the Court). The court's injunction nevertheless prevents the application of the President's rules to a nationwide class of Americans. Add. 105-06. And any time the government is enjoined from carrying out its responsibilities under a "statute[] enacted by representatives of [the] people," "it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quotation marks omitted) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

That injury is particularly pronounced here, where the injunction dictates the contents of official U.S. communications with foreign sovereigns. A passport, after all, is a "document by which the Government vouches for the bearer and for his conduct." *Agee*, 453 U.S. at 293. By requiring the government to let members of the class self-select their sex marker, the injunction deprives the government of control over its own speech. *See* 22 C.F.R. § 51.7(a) (recognizing that a U.S. passport is government "property"). Even worse, the injunction forces the government to misrepresent the sex of passport holders to foreign nations by using markers that reflect "the false claim that males can identify as and thus become women and vice versa." App. 1. And because of the injunction's classwide scope, the government will be forced to contradict both biological reality and its own declared policy on potentially "tens or hundreds of thousands" of passports. ECF 123-1, at 4 (Declaration of Ryan M.

Dooley). That is an intolerable intrusion on the President's foreign-affairs prerogatives.

For nearly 50 years, the Department has issued U.S. passports with a sex marker. *See supra* p. 3. It was not until the 2021 policy, instituted by the previous Administration, that the sex marker became entirely a matter of self-identification, including with the option of selecting an "X." App. 842. Plaintiffs' interests in maintaining the 2021 policy are substantially outweighed by the interests of the government and the public discussed above. The balance of equities therefore tips decisively in favor of vacating the class-wide injunction.

# CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH

*s/ Lewis S. Yelin*

LEWIS S. YELIN
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave. NW, Rm. 7239*
  *Washington, D.C. 20530*
  *(202) 514-3425*
  *lewis.yelin@usdoj.gov*

December 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,061 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Lewis S. Yelin*
Counsel for Appellants

**ADDENDUM**

# TABLE OF CONTENTS

On Application for Stay, No. 25A319 (U.S. Nov. 6, 2025) .................................................1

ECF 74, Memorandum and Order on Plaintiff's Motion to Stay Agency Action and for Preliminary Injunction, No. 25-10313 (D. Mass. Apr. 18, 2025).......... 14

ECF 75, Order of Preliminary Injunction, No. 25-10313 (D. Mass. Apr. 18, 2025) ............................................................................................................ 70

ECF 115, Memorandum and Order on Plaintiffs' Motion for Class Certification and Motion to Apply the Preliminary Injunction to the Classes, No. 25-10313 (D. Mass. June 17, 2025) ............................................... 73

ECF 116, Order of Preliminary Injunction, No. 25-10313 (D. Mass. June 17, 2025) ............................................................................................................ 105

# SUPREME COURT OF THE UNITED STATES

———————

No. 25A319

———————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* ASHTON ORR, ET AL.

ON APPLICATION FOR STAY

[November 6, 2025]

This case concerns an Executive Branch policy requiring all new passports to display an individual's biological sex at birth. The United States District Court for the District of Massachusetts preliminarily enjoined the Government from enforcing the policy, and the First Circuit declined to stay the injunction pending appeal. The Government then filed this stay application. Applying our familiar stay factors at this preliminary stage, we grant the application.

Displaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment. And on this record, respondents have failed to establish that the Government's choice to display biological sex "lack[s] any purpose other than a bare . . . desire to harm a politically unpopular group." *Trump* v. *Hawaii*, 585 U. S. 667, 705 (2018) (internal quotation marks omitted). Nor are respondents likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow. See 22 U. S. C. §211a.

For these reasons, the Government is likely to succeed on the merits. And the District Court's grant of class-wide relief enjoins enforcement of an Executive Branch policy with foreign affairs implications concerning a Government document. In light of the foregoing, the Government will

"suffer[] a form of irreparable injury" absent a stay. *Trump* v. *CASA, Inc.*, 606 U. S. 831, 861 (2025) (internal quotation marks omitted).

The application for stay presented to JUSTICE JACKSON and by her referred to the Court is granted. The June 17, 2025 order of the United States District Court for the District of Massachusetts, case No. 1:25–cv–10313, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting from the grant of application for stay.

As is becoming routine, the Government seeks an emergency stay of a District Court's preliminary injunction pending appeal. As is also becoming routine, this Court misunderstands the assignment.

Our task in deciding stay applications is not simply to make a "back-of-the-napkin assessment of which party has the better legal argument." *Noem* v. *Doe*, 605 U. S. \_\_\_, \_\_\_ (2025) (JACKSON, J., dissenting from grant of stay) (slip op., at 3). Rather, the actual nub of the project (if we choose to involve ourselves in the matter at all) is to fairly determine whether the applicant's showing justifies our extraordinary intervention. To do this, we consider not only the applicant's likelihood of success on the merits, but also whether the applicant will suffer irreparable harm absent emergency intervention, as well as the relative harm to the parties and the public interest in the grant or denial of a stay. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). Here, the balance-of-the-equities factor requires weighing the harm

to the Government from not being able to proceed immediately with its allegedly unlawful policy against the harm to the individuals who would be subjected to that policy. See *Williams* v. *Zbaraz*, 442 U. S. 1309 (1979) (Stevens, J., in chambers). Balancing the equities is an important part of the analysis because it avoids unnecessary real-world injury to people with colorable legal claims.

The Court ignores these critical limits on its equitable discretion today. The Government seeks to enforce a questionably legal new policy immediately, but it offers no evidence that it will suffer any harm if it is temporarily enjoined from doing so, while the plaintiffs will be subject to imminent, concrete injury if the policy goes into effect. The Court nonetheless fails to spill any ink considering the plaintiffs, opting instead to intervene in the Government's favor without equitable justification, and in a manner that permits harm to be inflicted on the most vulnerable party.

Such senseless sidestepping of the obvious equitable outcome has become an unfortunate pattern.[1] So, too, has my own refusal to look the other way when basic principles are selectively discarded. This Court has once again paved the way for the immediate infliction of injury without adequate (or, really, *any*) justification. Because I cannot acquiesce to this pointless but painful perversion of our equitable discretion, I respectfully dissent.

## I

For the past 33 years, across six Presidential administrations, transgender Americans have been able to obtain U. S. passports with sex markers that match their gender

––––––––––
[1] See, *e.g.*, *Noem* v. *National TPS Alliance*, 606 U. S. ___ (2025); *Noem* v. *Vasquez Perdomo*, 606 U. S. ___ (2025); *McMahon* v. *New York*, 606 U. S. ___ (2025); *Department of Homeland Security* v. *D. V. D.*, 606 U. S. ___ (2025); *Social Security Administration* v. *American Federation of State, County, and Municipal Employees*, 605 U. S. ___ (2025); *Noem* v. *Doe*, 605 U. S. ___ (2025); *Department of Ed.* v. *California*, 604 U. S. 650 (2025) (*per curiam*).

identity. From 1992 to 2010, passport applicants who wished to obtain passports with sex markers that were different from the sex assigned to them at birth had to submit evidence of surgical reassignment. In 2010, the State Department began allowing passport applicants to submit a doctor's certification avowing that they had undergone clinical treatment for gender transition. Beginning in 2021, the State Department allowed applicants to self-select the sex marker that matched their gender identity.

Through it all, the indisputable point of a passport remained: to "attes[t] to the identity and nationality of the bearer." 22 CFR §51.1 (2024). The State Department's sex-marker policies have thus long demonstrated that what is important for identification purposes is the bearer's gender identity *today*.

No matter. On January 22, 2025, the agency overhauled the rules for sex markers on passports, reverting to its pre-1992 practices. Its Passport Policy now requires that all new passports reflect the holders' sex *assigned at birth*. Why? Because two days earlier, on January 20, President Trump issued Executive Order No. 14168, characterizing transgender identity as "false" and "corrosive" to American society. 90 Fed. Reg. 8615 (2025). The order asserted that "the policy of the United States" is "to recognize two sexes, male and female," which it defined based on the sex assigned "at conception." *Ibid.* And the order directed the Secretary of State to require that any new government-issued identification documents reflect the holder's "biological" sex. *Id.*, at 8615–8616. The State Department responded by rescinding its prior sex-identification policies moving forward; transgender Americans who had previously obtained passports with sex markers reflecting their gender identity rather than their sex assigned at birth could continue to use those documents until they expire.

Several transgender Americans who want or need to obtain new passports filed a putative class action in the

District of Massachusetts, challenging the State Department's decision to upend 33 years of settled practice. They claimed that the Passport Policy violated the Equal Protection Clause twice over: It unlawfully discriminated on the basis of sex, and it lacked any rational basis because it was motivated by bare animus against transgender Americans. In addition, they claimed that the Passport Policy violated the Administrative Procedure Act (APA) insofar as it was arbitrary and capricious and was enacted without observance of the procedures that another statute—the Paperwork Reduction Act—requires.[2]

The District Court thoroughly examined the facts in evidence, considered applicable law, and issued a 56-page decision. It also issued an order preliminarily enjoining the Government from enforcing the Passport Policy against the plaintiffs. The court made a reasoned determination that the plaintiffs were likely to succeed on their legal claims, that they would suffer concrete and irreparable injuries without an injunction, and that, by contrast, the Government would experience no harm from an injunction temporarily preventing it from enforcing the new policy.

The Government appealed this order, and its appeal remains pending before the First Circuit. Two months later, the District Court granted the plaintiffs' motion for class certification and extended the preliminary injunction to a subset of the certified classes. The Government unsuccessfully sought a stay of the District Court's orders (from both the District Court and the First Circuit) pending appeal. So, the Government has now turned to this Court for a stay—and, for the first time, it has found an obliging audience.

_____

[2] The Paperwork Reduction Act requires federal agencies to provide 60-day notice in the Federal Register before changing government forms that collect information. 44 U. S. C. §3506(c)(2)(A).

## II

First principles of equitable relief illuminate the extent, and nature, of the Court's error in granting this stay. Stated succinctly, the indisputable touchstone of equity is fairness. See Black's Law Dictionary 679 (12th ed. 2024) (defining "equity" as "[t]he body of principles constituting what is fair and right"). Courts proceeding in equity "loo[k] for justice on both sides of the suit and beyond." P. Hoffer, The Law's Conscience 14 (1990). To do so, we consider, in addition to the merits, whether the movant will be irreparably harmed absent relief. *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 542 (1987). And we balance the harms that each party might face with and without court intervention. *Ibid.*

Where intervention is appropriate, the remedy must be tailored to "the peculiar rights of all the parties in interest." 1 J. Story, Commentaries on Equity Jurisprudence §28, p. 21 (13th ed. 1886). Indeed, the Court makes equitable determinations in light of "the necessities of the particular case." *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329 (1944). Courts exercising equity jurisdiction are not "mechanically obligated" to award relief "for every violation of law." *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313 (1982). Nor will courts sitting in equity grant relief if doing so would burden one party and be "of little advantage" to the other. *Di Giovanni* v. *Camden Fire Ins. Assn.*, 296 U. S. 64, 71 (1935).

These key principles are necessarily applicable to preliminary injunctions and other interim orders, which are forms of equitable relief. See *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 32 (2008) ("An injunction is a matter of equitable discretion"); *Trump* v. *International Refugee Assistance Project*, 582 U. S. 571, 580 (2017) (*per curiam*) ("In assessing the lower courts' exercise of equitable discretion, we bring to bear an equitable judgment of our own"). Just last Term, we emphasized, for example, that "[t]he

purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities as the litigation moves forward." *Lackey* v. *Stinnie*, 604 U. S. 192, 200 (2025) (internal quotation marks and citation omitted). A stay decision, made "before the legality" of the challenged government action "has been conclusively determined," presents a similar question. *Nken*, 556 U. S., at 434.[3] With these kinds of interim decisions, courts must, among other things, "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U. S., at 542.

Fortunately, here, the lower courts have already done this critical work. Based on its evaluation of the evidence related to the Passport Policy, the District Court reasonably determined that the plaintiffs were likely to suffer irreparable harm absent injunctive relief, and that the balance of the equities favored the plaintiffs. See 778 F. Supp. 3d 394, 426–429 (Mass. 2025). The First Circuit agreed and declined to stay the District Court's preliminary injunction. *Agatha* v. *Trump,* 151 F. 4th 9, 12–13 (2025).

At a minimum, then, the Government bears an "especially heavy burden" to obtain a stay from *this* Court. *Edwards* v. *Hope Medical Group for Women*, 512 U. S. 1301, 1302 (1994) (Scalia, J., in chambers) (internal quotation marks omitted). It can satisfy that burden only if it demonstrates that it is likely to succeed on the merits of its legal

—————

[3] Equity is at the heart of preliminary-injunction and stay determinations because these decisions require courts to decide disputes about the parties' interim status while litigation over the merits of the challengers' legal claims *is ongoing*. If the government is permitted to implement a harmful policy that turns out to be unlawful, the damage is done. Courts generally endeavor to ensure that plaintiffs with colorable legal claims have a meaningful opportunity to litigate those claims and actually obtain the relief they are requesting.

claims, that it will suffer irreparable harm from the preliminary injunction, and that the harm it experiences from not being able to implement its new policy outweighs the harm that its new policy will cause the plaintiffs. See *International Refugee Assistance Project*, 582 U. S., at 580.

As stay applications go, for the reasons explained in Part III–A, *infra*, this case is easy—the Government has come nowhere close to meeting this demanding standard, especially because it has failed to demonstrate *any* harm from the District Court's injunction, let alone harm that surpasses the injury to the plaintiffs if the Passport Policy were to go into effect. But the Court somehow sees fit to grant the Government's stay request regardless, waving away its abject failure to show any irreparable harm and promoting a patently inequitable outcome to boot.[4]

## III

### A

The Government maintains that immediate implementation of the Passport Policy is necessary to ensure that sex markers on passports accurately identify the holders. According to the Government, self-selected gender identity "does not provide a meaningful basis for identification," while sex assigned at birth apparently does. 90 Fed. Reg. 8616. The Government also contends that the Passport Policy is part of the President's effort to impose a uniform definition of sex throughout the Federal Government. The preliminary injunction, the Government says, impedes the

---

[4] Not only does the Court's stay determination produce inequity, but it is also part of a broader pattern of this Court using its emergency docket to cavalierly pick the winners and losers in cases that are still pending in the lower courts. See *ante,* at 1 (order). This way of handling stay determinations jeopardizes procedural fairness as well, because the lower courts have an obligation to fully and fairly consider the merits of the plaintiffs' legal claims despite the majority's declaration of the "likely" winner. The Court's stay-related pronouncements cannot be permitted to thwart the full legal process that our judicial system requires.

President from carrying out these supposedly legitimate objectives.

Thus, the Government's asserted harm from being subjected to the injunction—its *only* asserted harm—is that the President cannot, at least for now, enact his preferred policies regarding sex markers on U. S. passports. Even assuming, *arguendo*, that this purported injury counts as irreparable harm, it does not suffice to justify the extraordinary equitable remedy of a stay pending appeal.[5]

What the Government needs (and what it does not have) is an explanation for why it faces harm unless the President's chosen policy is implemented *now*. It suggests that there is an urgent foreign policy interest in dictating sex markers on passports, but does not elaborate as to what that interest might possibly be. All the Government is able to muster is the statement that "the injunction forces the government to misrepresent the sex of passport holders to foreign nations" and to "contradict . . . biological reality." Application for Stay of Injunction 34. But how urgent can this interest be when the Passport Policy itself allows transgender Americans who already have passports with sex markers reflecting their current gender identity to continue using those passports until they expire?

The Government also insists that gender identity is not a meaningful basis for identification—strangely begging the question why sex markers are required on passports at all.

_____

[5] It is far from clear that this asserted injury qualifies as irreparable harm for stay purposes. While we have suggested that the government suffers "a form of irreparable injury" when it is enjoined from effectuating a duly enacted statute, see *Maryland* v. *King,* 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers), an executive order lacks the force of a statute, and an injunction barring such an order does not generate the same sovereign injury. To think it always does would be to endorse the "facially absurd" proposition that the President is irreparably harmed any time he is temporarily prevented from doing something he wants to do. *D. V. D.,* 606 U. S., at ___–___ (SOTOMAYOR, J., dissenting from grant of stay) (slip op., at 11–12).

And, in any event, it provides no evidence of harmful confusion or other problems caused by transgender Americans who are using passports with sex markers corresponding to their current gender identity. To the contrary, as the plaintiffs' experiences demonstrate, it is gender-*in*congruent passports that cause confusion and fail to provide a meaningful basis for identification.

As for the Government's suggestion that the President is harmed by not being able to impose a uniform definition of sex across various regulatory schemes, that assertion is just another species of the far-fetched contention that the President must be injured whenever he is prevented from doing as he wishes. *Department of Homeland Security* v. *D. V. D.*, 606 U. S. ___, ___–___ (2025) (SOTOMAYOR, J., dissenting from grant of stay) (slip op., at 11–12). The Government also fails to explain why it needs a uniform definition of sex, much less why such a uniform definition needs to be imposed *now* such that it cannot await the outcome of this litigation.

At the end of the day, then, despite its heavy burden to support its bid for a stay, the Government has not identified or articulated any way in which it will *actually* be harmed if it cannot enact its new Passport Policy while the parties litigate whether that policy is lawful.[6]

---

[6]The Government's failure to show any harm from not being able to implement the Passport Policy immediately, much less a harm that outweighs the harm to the plaintiffs from the issuance of a stay, is sufficient to deny the stay application. But to the extent we consider the merits, the majority's confidence that the Government will probably succeed, *ante,* at 1 (order), is unfounded. To the contrary, as the District Court and the First Circuit concluded, the Passport Policy is likely arbitrary and capricious in violation of the APA. The State Department provided *zero* explanation for its reversal of 33 years of practice. And our precedent does not support the Court's suggestion that an agency can expediently end-run the APA's requirements simply because it is following the President's orders. *Ibid.* Even when an agency is bound by the decision of the Executive, it must still consider all relevant aspects of the problem

## B

For their part (and by contrast), the plaintiffs have shown they will suffer concrete injuries if the Government's Passport Policy is immediately enforced; namely, they will be unable to obtain passports with sex markers that match their gender identity. The District Court found that this is a significant harm, noting that transgender people who encounter obstacles to obtaining gender-congruent identity documents are almost twice as likely to experience suicidal ideation, and report more severe psychological distress, than transgender people who do not face such barriers.

In addition, the current record demonstrates that transgender people who use gender-incongruent passports are exposed to increased violence, harassment, and discrimination. For example, one of the plaintiffs, AC Goldberg, who is a transgender and intersex person, asserts that he has been sexually assaulted by Transportation Security Administration (TSA) officers conducting searches on his body. Another plaintiff, Chastain Anderson, attests to having been strip searched when traveling with identity documents that do not match her current gender expression. Another, Zaya Perysian, has been subjected to invasive patdowns by TSA agents to confirm her gender after they observed the disjunction between her female gender expression and the male sex marker on her passport. And two others, Ashton Orr and Ray Gorlin, have been accused of presenting fake identity documents, and were forced to out themselves as transgender and nonbinary to TSA agents.

Airport checkpoints are stressful and invasive for travelers under typical circumstances—even without the added friction of being forced to present government-issued

---

before changing its policy. See *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. 1, 29–32 (2020). The plaintiffs have colorable equal-protection claims as well, particularly in light of the animus evident in the Executive Order. See 90 Fed. Reg. 8615 (singling out transgender identity as "corrosive" to American society).

identification documents that do not reflect one's identity. Thus, by preventing transgender Americans from obtaining gender-congruent passports, the Government is doing more than just making a statement about its belief that transgender identity is "false." The Passport Policy also invites the probing, and at times humiliating, additional scrutiny these plaintiffs have experienced.

Given this, it is no surprise that each of the plaintiffs credibly testified that they would experience significant anxiety and fear for their safety if required to use passports that reflect their sex assigned at birth rather than their gender identity. Absent an injunction, the plaintiffs and the classes of transgender Americans they represent are forced to make a difficult choice that no other Americans face: use gender-incongruent passports and risk harassment and bodily invasions, on the one hand, or avoid all activities (travel, opening a bank account, renting a car, starting a new job) that may require a passport, on the other. The harm to these individuals from having to make that choice—before their legal challenges have even been resolved—is palpable.

\*    \*    \*

The documented real-world harms to these plaintiffs obviously outweigh the Government's unexplained (and inexplicable) interest in immediate implementation of the Passport Policy. That incongruity is where equity comes in. Because granting the stay application will be "of little advantage" to the Government, *Di Giovanni*, 296 U. S., at 71, while needlessly and significantly burdening the plaintiffs, equity cannot justify the Court's intervention. But, today, the Court refuses to answer equity's call. In my view, the Court's failure to acknowledge the basic norms of equity jurisdiction is more than merely regrettable. It is an abdication of the Court's duty to ensure that equitable standards

apply equally to all litigants—to transgender people and the Government alike.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, and REID SOLOMON-LANE, on behalf of themselves and others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) No. 1:25-cv-10313-JEK |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO STAY AGENCY ACTION AND FOR PRELIMINARY INJUNCTION

**KOBICK, J.**

For over thirty years, transgender Americans have been able to obtain a passport from the Department of State that reflects their gender identity rather than the sex they were assigned at birth. Initially, from 1992 to 2010, an applicant had to submit evidence of surgical reassignment to obtain such a passport. In a revised policy adopted in 2010, the State Department required transgender applicants to submit only a certification from a physician that they were receiving appropriate clinical treatment for gender transition to receive such a passport. And in 2021, the State Department again revised its policy to allow transgender applicants to receive a passport with a sex marker reflective of their gender identity without medical documentation, and to further

Add. 14

allow intersex, non-binary, and gender non-conforming applicants to select "X" as their sex marker rather than an "M" for male or an "F" for female.

On January 20, 2025, President Trump signed Executive Order 14168, which declares that "[i]t is the policy of the United States to recognize two sexes, male and female," with the terms "male" and "female" defined to mean "a person belonging, at conception, to the sex that produces the [small and] large reproductive cell[s]," respectively. The order asserts that it is a "false claim that males can identify as and thus become women and vice versa," and states that a person's gender identity "does not provide a meaningful basis for identification." The order directed the Secretary of State to make "changes to require that government-issued identification documents, including passports . . . accurately reflect the holder's sex," as that term is defined in the order. In late January 2025, to comply with the Executive Order's directive, the State Department made two substantive changes to its prior passport policy. First, it withdrew the option for Americans to obtain a passport reflective of either their gender identity or their sex assigned at birth, and instead required all passports to reflect only applicants' sex assigned at birth. Second, it removed the option for intersex, non-binary, and gender non-conforming applicants to select "X" as the sex marker on their passports. This Memorandum and Order refers to these changes as the "Passport Policy."

The plaintiffs—seven transgender or non-binary Americans—brought this lawsuit to challenge Executive Order 14168 and the State Department's Passport Policy. They claim that the Executive Order and Passport Policy offend the equal protection principles safeguarded by the Fifth Amendment to the United States Constitution, and further violate the Fifth Amendment rights to international travel and informational privacy. The plaintiffs also contend that the Passport Policy runs afoul of the Administrative Procedure Act because it is arbitrary and capricious and was adopted without complying with the procedural requirements of the Paperwork Reduction

Act. Pending before the Court is the plaintiffs' motion to stay the Passport Policy or for a preliminary injunction.

The plaintiffs have made a substantial showing that they are likely to succeed on the merits of their equal protection claim. The Executive Order and the Passport Policy on their face classify passport applicants on the basis of sex and thus must be reviewed under intermediate judicial scrutiny. That standard requires the government to demonstrate that its actions are substantially related to an important governmental interest. The government has failed to meet this standard. It does not defend its actions based on the express purposes set forth in the Executive Order, and it has not substantiated, with evidence or developed argument, its claim that its facially discriminatory policies bear a substantial relationship to an interest in maintaining uniform data on sex across government agencies. The plaintiffs have also demonstrated a likelihood of success on their separate argument that, under any standard of review, the Executive Order and Passport Policy are based on irrational prejudice toward transgender Americans and therefore offend our Nation's constitutional commitment to equal protection for all Americans. In addition, the plaintiffs have shown that they are likely to succeed on their claim that the Passport Policy is arbitrary and capricious, and that it was not adopted in compliance with the procedures required by the Paperwork Reduction Act and Administrative Procedure Act.

Six of the seven plaintiffs have demonstrated that they are likely to suffer irreparable harm if the Passport Policy is not enjoined pending full adjudication on the merits of this lawsuit. The balance of the equities and public interest strongly favor entering an injunction as to these plaintiffs. The Court will therefore grant the request for a preliminary injunction as to these plaintiffs, but will deny the plaintiffs' further request for a stay of the Passport Policy under 5

U.S.C. § 705, because, as formulated, their request exceeds the scope of relief made available under that statute.

## BACKGROUND

### I.    <u>Statutory and Regulatory Framework.</u>

#### A.    <u>General Background.</u>

A United States passport is a "travel document . . . issued under the authority of the Secretary of State attesting to the identity and nationality of the bearer." 22 C.F.R. § 51.1. The Secretary of State grants and issues passports to United States citizens "under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. To obtain a passport, an individual must "submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." *Id.* § 213. First-time passport applicants must submit a Form DS-11, applicants seeking to renew their passport must submit a Form DS-82, and certain applicants seeking to change their name or correct identifying information must submit a Form DS-5504 (collectively, the "passport forms"). *See* ECF 53-1, ¶ 3; 22 C.F.R. § 51.20(a). A passport applicant has the burden of establishing, among other things, their identity, 22 C.F.R. § 51.23(a), and that they are a U.S. citizen or non-citizen national, *id.* § 51.40. It is a crime to "willfully and knowingly" make a false statement in a passport application "with intent to induce or secure the issuance of a passport." 18 U.S.C. § 1542.

#### B.    <u>Passport Sex Markers: 1976-2024.</u>

Passports have been issued "since the earliest days of the Republic." *Haig v. Agee*, 453 U.S. 280, 293 (1981). For most of the country's history, however, American citizens have been permitted to travel abroad without a passport. *See Kent v. Dulles*, 357 U.S. 116, 121 (1958). Indeed,

American citizens could travel anywhere in the western hemisphere without a passport before 1961. *See Zemel v. Rusk*, 381 U.S. 1, 3 (1965). Not until 1978 did Congress enact a statute, 8 U.S.C. § 1185, declaring it unlawful for an American citizen to enter or depart from the United States without a valid passport. *See Agee*, 453 U.S. at 300 & n.47; 8 U.S.C. § 1185(b).

Two years earlier, in 1976, the State Department first "introduced sex as a required identity attribute" on passports, instructing applicants to indicate their sex as either male ("M") or female ("F"). ECF 53-1, ¶ 5. In 1992, the State Department began permitting applicants to select a sex marker that differed from their sex assigned at birth. *See id.* ¶ 6. Applicants were initially required to submit "evidence of surgical reassignment" to change their sex marker, but the State Department eliminated this requirement in 2010, when it began accepting "a physician's certification that the applicant had had appropriate clinical treatment for gender transition." *Id.* In 2021, it further revised its policy concerning passport markers, making two substantive changes: (1) applicants would be allowed to self-select their sex marker based on their gender identity; and (2) non-binary, intersex, and gender non-conforming applicants would be permitted to select a third sex marker, "X," in lieu of an "M" or "F" marker. *See id.* ¶¶ 7-8. The State Department also began using the term "gender" instead of "sex" on the passport forms, though it continued to use the term "sex" on passports it issued. *See id.*

The State Department updated the passport forms to reflect these changes and, in accordance with the Paperwork Reduction Act, published 60-day comment notices regarding these changes in the Federal Register. *See* 86 Fed. Reg. 51257 (Sept. 15, 2021), at 51434 (Form DS-82), 51434 (Form DS-5504), and 51435 (Form DS-11). The notices stated: "The Department's new policy permits passport applicants to select the gender marker on their passport without presenting medical documentation of gender transition. This policy change includes updating forms to add a

third gender marker 'X' for applicants identifying as non-binary, intersex, and/or gender non-conforming (in addition to the existing 'M' and 'F' gender markers)." *Id.* at 51434, 51435. The State Department began using the revised passport forms in April 2022, after receiving approval from the Office of Management and Budget ("OMB"). ECF 53-1, ¶ 8. In November 2024, the State Department issued 60-day comment notices requesting that OMB renew the forms, which are scheduled to expire on April 30, 2025. *See id.* ¶¶ 8-9; 89 Fed. Reg. 93389 (Nov. 26, 2024), at 93389 (Form DS-11), 93390 (Form DS-82); 89 Fed. Reg. 94867 (Nov. 29, 2024) (Form DS-5504).

C.    Executive Order 14168.

On January 20, 2025, President Trump signed Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Executive Order" or "EO"). 90 Fed. Reg. 8615 (Jan. 20, 2025). The first section, titled "Purpose," asserts that "ideologues" are engaged in a protracted effort to undermine "the biological reality of sex" to the detriment of "women." EO § 1. The first two paragraphs of this section read in full:

> Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.
>
> This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them,

replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

*Id.* Based on these premises, the Executive Order states that the Trump Administration will "recognize women are biologically female, and men are biologically male." *Id.*

In view of these purposes, the Executive Order asserts that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It then sets forth the following definitions:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

*Id.*

The Executive Order requires federal agencies to use the term "sex" instead of "gender" in all federal policies and documents when "administering or enforcing sex-based distinctions." *Id.* § 3(c). Accordingly, it directs the "Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, [to] implement changes to require that government-issued

identification documents, including passports . . . accurately reflect the holder's sex," as that term is defined in the Executive Order. *Id.* § 3(d). It further directs the Secretary of Health and Human Services ("HHS") to develop "clear guidance" expanding on the definitions set forth in the Executive Order. *Id.* § 3(a).

In accordance with the Executive Order, HHS released a document defining "sex" and related terms on February 19, 2025. *See* Dep't of Health & Hum. Servs., *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168* (Feb. 19, 2025).[1] HHS defines "sex" as "a person's immutable biological classification as either male or female"; it defines "female" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)"; and it defines "male" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm." *Id.* at 2.

D.    The Passport Policy.

Pursuant to the Executive Order, the State Department made two substantive changes to its prior passport policy: (1) it removed the option for applicants to obtain a passport with a sex marker reflecting either their gender identity or sex assigned at birth, and replaced it with the requirement that a passport must reflect an applicant's sex assigned at birth; and (2) it removed the option for non-binary, intersex, or gender non-conforming applicants to obtain a passport with an "X" sex marker. *See* ECF 53-1, ¶¶ 15, 20-21. On January 22, 2025, two days after the Executive Order was issued, the State Department informed all domestic passport agencies of these changes. *See id.* ¶ 15. The same instructions were issued to all diplomatic posts abroad the following day. *Id.*

---

[1] *See* https://perma.cc/N5V8-CHEC.

In late January 2025, the State Department replaced the passport forms available on its website, which offered an "X" sex marker, with earlier versions of the forms, which offered only "M" and "F" sex markers. *See id.* ¶ 17.[2] In mid-February 2025, the State Department issued 30-day comment notices indicating that, in accordance with Executive Order 14168, it had updated the passport forms to: (1) "replace the term 'gender' with 'sex'"; (2) "request the applicant's biological sex at birth," rather than permitting applicants to self-identify their sex; and (3) offer only "M" and "F" sex markers. 90 Fed. Reg. 9652 (Feb. 14, 2025) (Form DS-11); 90 Fed. Reg. 9800, 9800-01 (Feb. 18, 2025) (Forms DS-82 and DS-5400); *see* ECF 53-1, ¶ 20.

Because the State Department "does not have the capacity to adjudicate 'sex at conception,'" it relies on HHS's definitions of "male" and "female," rather than the Executive Order's definitions of these terms. ECF 53-1, ¶¶ 14, 21. The State Department asserts that the determination of an applicant's sex assigned at birth "can generally be adjudicated using a birth certificate," *id.* ¶ 18, but the Department may also conduct further investigation into an applicant's sex assigned at birth by looking to other documents or by calling the applicant, *see* ECF 30-4, ¶ 12.

## II.    **Factual Background.**

The following facts, which are undisputed, are drawn from the complaint, as well as affidavits and expert declarations submitted by the plaintiffs.

The plaintiffs are seven transgender or non-binary American citizens. ECF 1, ¶¶ 9, 16-22. The term "transgender" refers to individuals whose gender identity differs from the sex they were assigned at birth. ECF 30-1, ¶ 46. The term "non-binary" refers to individuals whose gender

---

[2] The following statement, titled "2025 Notice," is currently posted on the "Passport Forms" page of the State Department's website: "You may use all forms available on our site, including ones that expired before 2025. We are currently working to update our forms and will post the new versions as soon as they are available." U.S. Dep't of State, Bureau of Consular Affs., *Passport Forms* (last visited Apr. 18, 2025), https://perma.cc/27FP-2R9F.

identity is neither exclusively male nor exclusively female. *Id.* ¶ 49. Non-binary people are, according to the plaintiffs, a subset of transgender people because their gender identity does not match their sex assigned at birth. *See* ECF 65, at 18. An individual's sex is typically assigned at birth based on the appearance of their external genitalia. *See* ECF 30-1, ¶ 47.

Many transgender and non-binary people experience gender dysphoria, a medical condition defined as "the significant emotional distress or impairment in social, occupational, or other important areas of functioning that stems from the incongruence between a person's gender identity and sex designated at birth, and/or body characteristics." *Id.* ¶ 53. Gender dysphoria is a recognized diagnosis by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, and it can be effectively managed when appropriately treated. *Id.* ¶¶ 54, 56. Treatment protocols for gender dysphoria are detailed in two leading evidence-based clinical guidelines: the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, and the World Professional Association for Transgender Health Standards of Care for the Health of Transgender and Gender Diverse People. *Id.* ¶ 57. These guidelines reflect professional consensus about the psychological, psychiatric, hormonal, and surgical management of gender dysphoria, and they are supported by all major American medical associations. *Id.* The recognized standard of care for gender dysphoria consists of individualized treatment designed "to bring a person's body and expression of their sex in line with their gender identity." *Id.* ¶ 58. Such treatment is multimodal and may involve, among other things, social transition, hormone treatment, and gender-affirming surgeries. *See id.* ¶ 59. Social transition entails "living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity." *Id.* ¶ 77.

Plaintiffs Zaya Perysian, Chastain Anderson, and Bella Boe[3] are transgender women whose sex assigned at birth was male. ECF 30-3, ¶ 4; ECF 30-6, ¶ 5; *see* ECF 30-5, ¶ 5. Each has a driver's license with a female sex marker, and Boe previously obtained a passport with a female sex marker. ECF 30-3, ¶ 9; ECF 30-5, ¶¶ 7, 13; ECF 30-6, ¶ 10. Anderson and Perysian submitted expedited applications to renew their passports and obtain female sex markers on December 27, 2024 and January 23, 2025, respectively. ECF 30-3, ¶ 10; ECF 30-6, ¶ 10. They have received their renewed passports, but the passports bear male sex markers, rather than the female sex markers that they requested. ECF 30-3, ¶ 12; ECF 30-6, ¶ 11. Boe also applied to renew her passport on January 25, 2025, but as of the date of her declaration, she had not received a new passport. ECF 30-5, ¶ 13.

Plaintiffs Ashton Orr and Reid Solomon-Lane are transgender men whose sex assigned at birth was female. ECF 30-4, ¶ 5; ECF 30-8, ¶ 5. Each has a driver's license with a male sex marker, and Solomon-Lane's current passport also has a male sex marker. ECF 30-4, ¶ 8; ECF 30-8, ¶¶ 10-11. On January 16, 2025, Orr submitted an expedited application to renew his passport and obtain a male sex marker. ECF 30-4, ¶ 12. However, on February 11, 2025, a representative from the State Department called him to investigate his sex assigned at birth. *Id.* That representative informed Orr that, pursuant to the Executive Order, the State Department would only issue him a passport with a female sex marker. *Id.* He was given the opportunity to withdraw his renewal application and have his current passport, which has a female sex marker, returned to him. *Id.* Later that day, Orr received an email from the State Department informing him that his application is "on hold" until he provides "additional information" to complete his application. *Id.* at 7. Solomon-Lane has

---

[3] The Court allowed plaintiffs Bella Boe and Sawyer Soe's unopposed motion to proceed under pseudonym on March 18, 2025. ECF 60.

not attempted to renew his passport, which will expire in 2028, nor has he expressed an intention to do so. *See* ECF 30-8, ¶ 11.

Plaintiff Drew Hall is a non-binary person who expresses themselves in a feminine manner and whose sex assigned at birth was male. ECF 30-7, ¶¶ 5, 7. They have a driver's license and social security card with a female sex marker. *Id.* ¶ 10. On January 9, 2025, Hall applied to renew their passport and obtain an updated sex marker, and they received an email informing them that their application had been approved on February 11, 2025. *See id.* ¶ 12. As of the date of their declaration, they had not received their new passport, however, and they do not know what sex marker will be listed on it. *Id.* Plaintiff Sawyer Soe is also non-binary, and they feel that this term accurately captures their gender because it encompasses both masculine and feminine expression. ECF 30-9, ¶ 5. Their sex assigned at birth was female, and their previous passport, which expired in August 2019, had a female sex marker. *Id.* ¶¶ 5, 9. Soe has obtained a driver's license with an "X" sex marker, and they hope to also obtain a passport with an "X" marker. *Id.* ¶¶ 8, 11. They have not yet applied to renew their passport, but they will be required to travel internationally within the next two months. *See id.* ¶ 10.

Each of the plaintiffs would fear for their safety if required to travel with a passport bearing a sex marker that corresponds to their sex assigned at birth, rather than to their gender identity and expression. *See* ECF 30-3, ¶¶ 14-15; ECF 30-4, ¶ 15; ECF 30-5, ¶¶ 13-14; ECF 30-6, ¶¶ 12-13; ECF 30-7, ¶¶ 14-15; ECF 30-8, ¶¶ 11-12; ECF 30-9, ¶ 11. Three plaintiffs—Orr, Anderson, and Perysian—previously faced harassment or discrimination when travelling with identity documents bearing a sex marker corresponding to their sex assigned at birth rather than their gender identity. ECF 30-3, ¶ 8; ECF 30-4, ¶ 10; ECF 30-6, ¶ 13. In January 2025, a Transportation Security Administration ("TSA") officer accused Orr of presenting a false identification document when he

flew from West Virginia to New York, because the male sex marker on his driver's license did not match the female sex marker on his passport. ECF 30-4, ¶ 10. Similarly, in 2017, TSA agents pulled Anderson aside when she presented a driver's license with a male sex marker at an airport security checkpoint in Richmond, Virginia. ECF 30-6, ¶ 13. Anderson was isolated in a cubicle, where she waited for thirty minutes until a manager came in and performed a strip search of her body. *Id.* Perysian avers that before updating her driver's license, she was patted down by TSA agents who sought to confirm her gender after observing the disjunction between her female gender expression and the male sex marker on her identity documents. *See* ECF 30-3, ¶ 8. These experiences were "devastating" for Perysian, and they have occurred less frequently since she obtained a driver's license with a female sex marker. *See id.*

Each of the plaintiffs has, or until recently had, plans to travel internationally in 2025. Perysian, Orr, and Boe had planned to go on international trips in February and March of 2025, but they cancelled their respective trips because they were unable to obtain passports with sex markers matching their gender identities and other identity documents. *See* ECF 65, 27:23-28:12; ECF 30-4, ¶¶ 13-14; ECF 30-5, ¶¶ 9, 13-14; ECF 30-3, ¶¶ 10, 14. Soe, who works for a video game developer with a global presence, plans to travel internationally for work within the next three months, and Anderson has plans to attend a professional conference in France in October 2025. *See* ECF 30-9, ¶¶ 4, 10; ECF 30-6, ¶ 9. Hall, who is pursuing a Ph.D. at the University of British Columbia, travels between Canada and the United States several times a year, and they plan to travel to Wisconsin in May for a wedding and in July for an academic conference. ECF 30-7, ¶¶ 4, 9. Solomon-Lane plans to visit Montreal within the next year to visit friends, and he frequently travels internationally to visit his mother-in-law, who owns a home in Ireland. ECF 30-8, ¶ 9.

III.    **Procedural History.**

The plaintiffs filed their putative class action complaint on February 7, 2025, naming as

defendants Donald J. Trump, in his official capacity as President of the United States; the United

States of America; Marco Rubio, in his official capacity as Secretary of State; and the Department

of State. ECF 1. They intend to seek certification of the following classes of individuals under

Federal Rule of Civil Procedure 23:

> a.  All people who currently want, or in the future will want, to apply for, apply to
>     renew, or apply to change a U.S. passport and wish to use an "M" or "F" sex
>     designation on their passport that aligns with their gender identity but does not
>     match how the Executive Order defines their sex; and
> b.  All people who currently want, or in the future will want, to apply for, apply to
>     renew, or apply to change a U.S. passport and wish to use an "X" sex
>     designation.

ECF 1, ¶ 185.

Against all defendants, the complaint asserts claims for discrimination based on sex and

transgender status, in violation of the Fifth Amendment, *id.* ¶¶ 193-211 (Count 1); infringement of

the Fifth Amendment right to travel abroad, *id.* ¶¶ 212-20 (Count 2); infringement of the Fifth

Amendment right to privacy, *id.* ¶¶ 221-27 (Count 3); and a violation of the First Amendment right

to free speech and expression, *id.* ¶¶ 228-35 (Count 4). Against Secretary Rubio and the State

Department (the "Agency Defendants"), the complaint asserts three claims for violations of the

Administrative Procedure Act ("APA"). It alleges that the Passport Policy and related agency

actions violate the APA because they are "contrary to constitutional right, power, privilege, or

immunity," 5 U.S.C. § 706(2)(B), ECF 1, ¶¶ 236-39 (Count 5); arbitrary and capricious, 5 U.S.C.

§ 706(2)(A), ECF 1, ¶¶ 240-46 (Count 6); and without observance of procedure required by the

Paperwork Reduction Act, 5 U.S.C. § 706(2)(D), ECF 1, ¶¶ 247-51 (Count 7). The complaint

seeks, among other things, declaratory judgment that the Passport Policy and Executive Order

violate the plaintiffs' constitutional rights and that the Passport Policy violates the APA; and an injunction that prevents the defendants from enforcing the Passport Policy or Executive Order, insofar as it applies to passports, and requires the defendants to permit applicants to self-attest to their sex and have the ability to select an "X" sex marker. *See* ECF 1, at 56-57.

On February 18, 2025, the plaintiffs filed a motion to stay agency action and for a preliminary injunction. ECF 29. In support of their motion, the plaintiffs submitted, among other things, a memorandum of law, ECF 30; the declaration of Sarah D. Corathers, MD, the Clinical Director of the Division of Pediatric Endocrinology at Cincinnati Children's Hospital, ECF 30-1; the declaration of Ayden Scheim, Ph.D., an Assistant Professor of Epidemiology and Biostatistics in the Dornsife School of Public Health at Drexel University, ECF 30-2; and declarations filed by each of the named plaintiffs, ECF 30-3 to 30-9.[4] Pursuant to 5 U.S.C. § 705, the plaintiffs ask the Court to stay enforcement of the Passport Policy during the pendency of this litigation and to require the defendants to issue passports consistent with the prior passport policy. *See* ECF 29, at 1-2. Pursuant to Federal Rule of Civil Procedure 65(a), the plaintiffs ask the Court to enjoin the Agency Defendants from enforcing the Passport Policy against them during the pendency of this litigation. *Id.* at 2. They also ask for an order requiring the State Department to process and issue passports to them in accordance with its prior passport policy. *See id.* After receiving the government's opposition, ECF 53, which included a declaration submitted by Matthew Pierce, the Deputy Assistant Secretary for Passport Services in the Bureau of Consular Affairs at the State Department, ECF 53-1, and the plaintiffs' reply, ECF 62, the Court held a hearing and took the

---

[4] The plaintiffs contend in their motion that they are likely to succeed on the merits of Counts 1, 2, 3, 6, and 7 of their complaint, but did not move on Counts 4 and 5.

motion under advisement, ECF 64. The parties submitted supplemental briefs regarding the plaintiffs' request for a stay after the hearing. ECF 67-1, 69.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy . . . that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quotation marks and citations omitted). To secure a preliminary injunction, the plaintiffs must demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The first and second factors are "the most important," *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and courts consider them in tandem, *see Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

I.    **Likelihood of Success on the Merits.**

A.    Equal Protection Claim.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Implicit in this provision is a guarantee of equal protection of the laws. *See Sessions v. Morales-Santana*, 582 U.S. 47, 52 & n.1 (2017); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 231-32 (1995). Courts analyze Fifth Amendment equal protection claims against the federal government in "'precisely the same'" manner as Fourteenth Amendment equal protection claims against state and

local governments. *Morales-Santana*, 582 U.S. at 52 n.1 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).

The plaintiffs claim that Executive Order 14168 and the Passport Policy deprive them of their guarantee of equal protection by discriminating against them on the basis of sex and on the basis of transgender status without adequate justification. They further contend that the Executive Order and Passport Policy spring from unlawful animus toward transgender individuals. The government disagrees, contending that the Executive Order and Passport Policy do not classify on the basis of sex or transgender status, lack indicia of animus toward transgender people, and must be upheld under rational basis review.

     *1. Level of Scrutiny.*

The plaintiffs first contend that the Passport Policy discriminates against them on the basis of sex. Laws, governmental policies, or executive orders that expressly classify on the basis of sex or gender are subject to heightened judicial scrutiny. *See Morales-Santana*, 582 U.S. at 58 ("Laws granting or denying benefits 'on the basis of . . . sex' . . . differentiate on the basis of gender, and therefore attract heightened review under the Constitution's equal protection guarantee." (quoting *Califano v. Westcott*, 443 U.S. 76, 84 (1979))). To sustain the constitutionality of such policies, the government must advance an "'exceedingly persuasive justification,'" demonstrating that the classification "'serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* at 58-59 (quoting *United States v. Virginia*, 518 U.S. 515, 531, 533 (1996) ("*VMI*")). "[C]lassifications based on gender" and sex call for this intermediate standard of scrutiny because a person's gender and sex "generally provid[e] no sensible ground for differential treatment." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985).

The State Department's Passport Policy made two substantive changes to its prior policy: (1) where it once allowed applicants to obtain a passport with a sex marker reflecting their gender identity or sex assigned at birth, it now allows applicants to obtain a passport reflecting only their sex assigned at birth; and (2) where it once allowed non-binary, intersex, and gender non-conforming applicants to obtain a passport with an "X" sex marker, it has now eliminated that option. In making both substantive changes in conformance with Executive Order 14168, the State Department has drawn classifications based on sex. As to the first policy change, applicants are explicitly treated differently based on their sex assigned at birth. A person who identifies as female can receive a passport marked "F" if her sex assigned at birth was female, but not if her sex assigned at birth was male. Likewise, a person who identifies as male can receive a passport marked "M" if his sex assigned at birth was male, but not if his sex assigned at birth was female. Put more concretely, plaintiffs Zaya Perysian and Chastain Anderson, transgender women, were denied passports marked "F" because their sex assigned at birth was male, but an otherwise identically situated person who likewise identifies as female could receive a passport marked "F" if her sex assigned at birth was female. The differential treatment—in whether the applicant can obtain a passport with a sex marker that reflects their gender identity—is entirely dependent on the applicant's sex assigned at birth. Viewed from any angle, that amounts to a classification based on sex.

This conclusion accords with the logic undergirding the Supreme Court's holding in *Bostock v. Clayton County* that, for purposes of a Title VII claim, discrimination against a person for being transgender is necessarily discrimination on the basis of sex. 590 U.S. 644, 660-61, 669 (2020). The Court explained that if an employer fires a transgender woman who was assigned male at birth, but retains an otherwise identically situated woman assigned female at birth, "the

individual employee's sex plays an unmistakable and impermissible role in the discharge decision," because "transgender status" is "inextricably bound up with sex." *Id.* at 660-61. This same logic led the Tenth Circuit to conclude that when Oklahoma reversed a policy allowing transgender people to obtain birth certificates consistent with their gender identity, its new policy "intentionally discriminate[d] . . . based in part on sex." *Fowler v. Stitt*, 104 F.4th 770, 789 (10th Cir. 2024). Under the policy, a transgender woman could not get a birth certificate reflective of her gender identity, but if her sex assigned at birth had been female rather than male, she could get a birth certificate that matched her gender identity. *Id.* So, too, for a transgender man. *Id.* Under the Equal Protection Clause, as under Title VII, the inescapable conclusion was that the Oklahoma policy classified on the basis of sex. *Id.* at 793-794 (collecting cases applying *Bostock*'s reasoning to equal protection claims).[5]

The second change effected by the Passport Policy—that is, the reversal of the availability of an "X" marker on passports—likewise draws a classification based on sex. When it adopted forms allowing applicants to select "X" for their sex in 2021, the State Department explained that the "third gender marker 'X'" is "for applicants identifying as non-binary, intersex, and/or gender non-conforming." 86 Fed. Reg. at 51436; *see* ECF 53-1, ¶ 8 (the "third option of 'X' as a gender marker [was] for non-binary, intersex, and gender non-conforming persons"). The forms followed litigation that highlighted the complexity of medical evidence on biological sex, especially for intersex people, and the State Department's recognition that "some individuals are born neither male nor female." *Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020). The "X" option thus

---

[5] The government makes no developed argument in this case that *Bostock*'s reasoning does not apply to equal protection claims; indeed, its brief did not mention *Bostock*. But the Tenth Circuit, like other Courts of Appeals, has cogently explained why the logic holds in equal protection and Title VII cases alike. *See, e.g.*, *Fowler*, 104 F.4th at 789-94; *Kadel v. Folwell*, 100 F.4th 122, 153-54 (4th Cir. 2024) (en banc).

supplemented the existing "M" and "F" sex markers, allowing three options for the "sex" field on passports. 86 Fed. Reg. at 51436; *see* ECF 53-1, ¶ 8. Consequently, in 2021, the State Department recognized a conception of sex broader than the binary male and female markers it had previously used on passports. *See id.* But four years later, in Executive Order 14168, it became "the policy of the United States to recognize two sexes, male and female." EO § 2. In conformance with the Executive Order, the State Department reversed its prior policy and announced it would likewise recognize only two sexes, male and female. ECF 32-5; *see* ECF 53-1, ¶¶ 15, 17. That change—the withdrawal of the recognition of a more expansive conception of sex—is a straightforward classification based on sex. Whereas before, the State Department classified sex as broader than the male/female binary, it now classifies sex based only on the male/female binary.

These sex-based classifications are not incidental to the Passport Policy; rather, the sex-based line drawing is the very purpose of the Executive Order and Passport Policy. The Executive Order states plainly that the federal government now must recognize that "women are biologically female," "men are biologically male," and there are only "two sexes, male and female." EO §§ 1-2. And it directs the Secretary of State to require that passports adhere to those sex-based classifications. *Id.* § 3(d). The Secretary of State, in turn, adopted the Passport Policy to comply with the directive set forth in the Executive Order. ECF 53-1, ¶ 15. And the State Department's webpage describing the policy to the public—titled "Sex Marker in Passports"—leaves no doubt that the policy exists to make sex-based classifications. ECF 32-5. In accordance with the Executive Order, and as implemented by the State Department, the Passport Policy was designed and intended to enforce conformity to an individual's sex assigned at birth.

The government resists the conclusion that the Passport Policy classifies on the basis of sex, contending that the policy "'does not prefer one sex over the other.'" ECF 53, at 17 (quoting

*L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024)). But that misstates the inquiry, because "the Equal Protection Clause 'protect[s] *persons*, not *groups*.'" *Parents Involved in Cmty. Sch. v. Seattle Schs. Dist. No. 1*, 551 U.S. 701, 743 (2007) (quoting *Adarand*, 515 U.S. at 227); *see also United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any *person* the equal protection of the laws." (emphasis added)). It is not enough for the government to disclaim a sex classification because, in its telling, males as a group and females as a group are treated equally. *See Adarand*, 515 U.S. at 227; *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994). Rather, the focus of the inquiry must be whether, as applied to an individual, there exists a classification based on sex. Put otherwise, "any individual suffers an injury when he or she is disadvantaged by the government because of his or her [sex], whatever that [sex] may be." *Adarand*, 515 U.S. at 230. Here, the plaintiffs have been personally disadvantaged by the government—they can no longer obtain a passport consistent with their gender identity—because of their sex assigned at birth, while similarly situated people can obtain passports consistent with their gender identity if they have a different sex assigned at birth. The Constitution's "principle of consistency simply means that whenever the government treats any person unequally because of his or her [sex], that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Id*. at 229-30.

The government also maintains that the Passport Policy "'does not impose any special restraints on, and does not provide any special benefits to, applicants due to their sex.'" ECF 53, at 17 (quoting *Gore v. Lee*, 107 F.4th 548, 555 (6th Cir. 2024)). By now, it should be clear that this argument is mistaken. A person who identifies as female and is assigned female at birth can obtain

a passport reflecting her identity as female, while plaintiffs Zaya Perysian, Bella Boe, and Chastain Anderson cannot obtain a passport reflecting their identity as female, simply because they were assigned male at birth. Likewise, a person who identifies as male and is assigned male at birth can obtain a passport reflecting his identity as male, while plaintiffs Ashton Orr and Reid Solomon-Lane cannot obtain a passport reflecting their identity as male, simply because they were assigned female at birth. And a person who identifies as male or female, and who was assigned one of those sexes at birth, can obtain a passport reflecting their gender identity, while plaintiffs Drew Hall and Sawyer Soe cannot obtain a passport reflecting their non-binary gender identity, simply because they were assigned, respectively, male and female at birth. The Passport Policy does indeed impose a special disadvantage on the plaintiffs due to their sex, and the Court therefore concludes that it discriminates on the basis of sex.[6]

### 2. *Application of Intermediate Scrutiny.*

The conclusion that the Passport Policy discriminates on the basis of sex does not require invalidation of the policy; it simply requires the government to justify its adoption of the policy under intermediate scrutiny. *VMI*, 518 U.S. at 531-33. To defend a policy that classifies on the basis of sex or gender, the government bears the burden to demonstrate that the policy is substantially related to an important government objective. *See id.* at 533; *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 9 (1st Cir. 2012). The government's justification for

---

[6] The plaintiffs also contend that the Passport Policy warrants heightened scrutiny because transgender status should be recognized as a quasi-suspect class, and the policy discriminates against them on the basis of transgender status. Because the Court has already concluded that the Passport Policy is subject to heightened scrutiny because it classifies on the basis of sex, it need not, at this juncture, consider this distinct and factually intensive contention. *See Bowen v. Gilliard*, 483 U.S. 587, 602-03 (1987) (setting forth factors to consider in determining whether a group constitutes a suspect or quasi-suspect class); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (same); *City of Cleburne*, 473 U.S. at 441 (same).

the discriminatory policy "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *VMI*, 518 U.S. at 533. And "[f]ocusing on the differential treatment for denial of opportunity for which relief is sought," the Court must "determine whether the proffered justification is exceedingly persuasive." *Id.* at 532-33 (quotation marks omitted).

The State Department began implementing the Passport Policy two days after the issuance of Executive Order 14168 so as to remain "compliant" and "[c]onsistent with [the] directives set out" in that order. ECF 53-1, ¶¶ 15, 17. To determine the government's justification for the Passport Policy, then, the Court must look to the Executive Order. Section 1 of the Executive Order, titled "Purpose," sets forth three reasons for the government-wide change in policy regarding the definition of sex. First, the government asserts that "ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." EO § 1. Second, the government wishes to stop what it characterizes as an "attack" on "women"—defined as people "belonging, at conception, to the sex that produces the large reproductive cell"—"by depriving them of their dignity, safety, and well-being." *Id.* §§ 1, 2(b), 2(d). Third, the government believes that the "erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system." *Id.* § 1. Based on these purposes, the Executive Order directs the Secretary of State to update passports to reflect the holder's sex, as that term is defined in Section 2 of the order. *Id.* § 3(d).

The government does not attempt to justify the Passport Policy by reference to any of these express purposes of the Executive Order. Nor could it. It is obvious that the Passport Policy, which denies some applicants passports that reflect their gender identity, has no relation to any claimed

interest in keeping transgender women out of women's domestic abuse shelters, women's workplace showers, and other intimate single-sex places. Similarly, there is no connection between the State Department's prior policy—which allowed applicants to obtain personal-use passports consistent with their gender identity—and any deprivation of cisgender women's "dignity, safety, and well-being." *Id.* §§ 1, 2(b), 2(d). The sex listed on one person's passport has nothing to do with the dignity, safety, or wellbeing of another person. *Cf. Massachusetts*, 682 F.3d at 14-15 (rejecting the argument that denying federal recognition to same-sex marriages has any connection to the wellbeing of opposite-sex marriages). The government further offers no explanation for how a policy that allowed all individuals to obtain passports reflective of their gender identity had a "corrosive impact" on women and "the validity of the entire American system." EO § 1. Any such argument would strain logic, and so it is not surprising that the government does not try to justify the Passport Policy by reference to the stated purposes of the Executive Order.

Instead, the government claims that the Passport Policy advances a different purpose: maintaining a consistent definition of sex across the federal government. Passport data would not be useful for other agencies, the government asserts, if the State Department used a different definition of sex than other agencies. While this goal of consistency is not stated as an express purpose of the Executive Order or the Passport Policy, the government's aim to impose a uniform definition of sex across the federal government is apparent from the face of the Executive Order. That objective does not, however, rank as an important governmental interest that can sustain the constitutionality of the Passport Policy. Settled precedent instructs that a mere claim that a discriminatory policy is justified by an administrative convenience, like a desire for uniformity in data, cannot justify sex- and gender-based classifications. *See, e.g.*, *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 152 (1980) ("the requisite showing has not been made" under heightened

scrutiny "by the mere claim that it would be inconvenient to individualize determinations about widows as well as widowers"); *Craig v. Boren*, 429 U.S. 190, 198 (1976) (Supreme Court decisions "have rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications"). The government has introduced no evidence that, to the extent the definition of sex varied across federal agencies before the Executive Order, significant problems emerged. It has not argued that the State Department's prior policy allowing passport applicants to select "M," "F," or "X" consistent with their gender identity inhibited other agencies' functioning. Nor has the government introduced evidence that other agencies in fact rely on the State Department's records of passport applicants' sex, and to the extent they do, how they use that data.[7] On the record before the Court, there is no evidence of a substantial relationship between the Passport Policy and the asserted governmental interest in maintaining a consistent definition of sex across the federal government.

The "Constitution recognizes higher values than speed and efficiency," and the government has failed to proffer an exceedingly persuasive justification for the Passport Policy's sex-based discrimination. *Stanley v. Illinois*, 405 U.S. 645, 656-57 (1972). The plaintiffs are therefore likely to succeed on the merits of their equal protection claim.

---

[7] At the hearing on the plaintiffs' motion, the government pointed to the Tenth Circuit's statement in *Zzyym v. Pompeo* that "law enforcement . . . often uses passport data to identify victims and to locate criminal suspects." 958 F.3d at 1027. The government has not introduced comparable evidence in this case. But even if it had, the State Department updated its policy in 2021 to allow applicants to select an "M," "F," or "X" sex marker consistent with their gender identity *after* the court in *Zzyym* acknowledged the government's interest in making passport data useful for other federal agencies. *See* 86 Fed. Reg. at 51436. Thus, notwithstanding its potential interest in uniformity of data across federal agencies, the State Department concluded that this interest did not justify a binary sex policy that denied intersex, non-binary, and gender non-conforming individuals the option of a third sex marker.

3. *Animus.*

The plaintiffs further contend that, apart from the sex-based discrimination, the Passport Policy, and the Executive Order it implements, violate the guarantee of equal protection because they bear the hallmarks of policies driven by a bare desire to harm transgender Americans.

In a series of cases, the Supreme Court has invalidated on rational basis review government actions that burdened "historically disadvantaged or unpopular" groups, when the governmental justification for its action "seemed thin, unsupported, or impermissible." *Massachusetts*, 682 F.3d at 10. The first, *U.S. Department of Agriculture v. Moreno*, involved a statute that excluded from the food stamp program households containing unrelated individuals, the legislative history of which indicated that Congress wished to prevent "'hippie communes'" from participating in the program. 413 U.S. 528, 530-34 (1973). The Court rejected the government's argument that the statute furthered its interest in minimizing fraud and warned that the "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 534-38. In the second case, *City of Cleburne v. Cleburne Living Center, Inc.*, the Court invalidated a city's requirement that the proposed operator of a group home for people with intellectual disabilities obtain a special use permit, where the city's zoning ordinance did not require the same permit for comparable uses of the land. 473 U.S. at 447-50. Rejecting as illegitimate the city's asserted interests in avoiding negative reactions from property owners located near the group home, protecting group home residents from harassment by neighbors, keeping the home out of a flood plain, limiting the size of the home, and lessening congestion in the streets, the Court concluded that the city's policy rested on an "irrational prejudice" that offended equal protection principles. *Id.* at 449-50. The third case, *Romer v. Evans*, concerned a state constitutional amendment that prohibited state or local government action designed to protect gay and lesbian citizens and

repealed local ordinances that protected against discrimination on the basis of sexual orientation. 517 U.S. 620, 623-24 (1996). Unimpressed with the state's asserted interests in conserving resources and respecting citizens' freedom of association, the Court struck down the amendment because it "impos[ed] a broad and undifferentiated disability on a single named group" and because its "sheer breadth" suggested that it was born of animosity toward "the class it affects." *Id.* at 632-35. Recently, the Court reaffirmed this line of precedent, explaining that when a court cannot "'discern a relationship'" between a challenged policy and a legitimate state interest or when the policy is "'inexplicable by anything but animus,'" the governmental action is incompatible with the right of equal protection. *Trump v. Hawaii*, 585 U.S. 667, 706 (2018).

The plaintiffs are likely to succeed on their claim that the Executive Order, and the Passport Policy implementing that order, spring from the same sort of animus toward transgender Americans. Multiple considerations lead to this conclusion. First, on its face, the Executive Order announces that, for each and every purpose under federal law—regardless of medical nuance, reliance interests, or policy objectives—transgender women are not women and transgender men are not men. The order asserts that "women are biologically female, and men are biologically male," and it defines "women" and "men," respectively, only as persons "belonging, at conception, to the sex that produces the large reproductive cell" and "small reproductive cell." EO §§ 1, 2(b)-(e). It describes the "biological category of 'woman'" as "true" and calls it a "false claim that males can identify as and thus become women and vice versa." *Id.* §§ 1, 2(f). And it appears to deny "that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f). The order also facially demeans transgender people's identity, stating that one's gender identity "does not provide a

meaningful basis for identification." *Id.* § 2(g).[8] Viewed as a whole, the language of the Executive

Order is candid in its rejection of the identity of an entire group—transgender Americans—who

have always existed and have long been recognized in, among other fields, law and the medical

profession. *See, e.g.*, *Bostock*, 590 U.S. at 653-54 (recognizing transgender Americans); *Kosilek v.*

*Spencer*, 774 F.3d 63, 68-69 (1st Cir. 2014) (same); ECF 30-1, ¶¶ 42-43, 51, 53-54.

Second, Executive Order 14168 imposes a "broad and undifferentiated disability" on a

discrete group of people. *Romer*, 517 U.S. at 632. The order makes it the official "policy of the

United States" to recognize only "two sexes" based on people's "immutable biological

classification as either male or female." EO §§ 2, 2(a). Transgender Americans—individuals who,

by definition, have a gender identity different from their sex assigned at birth—are uniquely

affected by this policy, even though the Executive Order does not in so many words identify them

as the targeted group. *See* ECF 30-1, ¶ 48.[9] Sweeping in scope, the Executive Order directs federal

agencies to eradicate any use of the term "gender" in federal policies and documents, EO § 3(c);

orders agencies to "remove all statements, policies, regulations, forms, communications, or other

internal and external messages that promote or otherwise inculcate gender ideology," *id.* § 3(e);

and forbids the use of federal funds "to promote gender ideology," *id.* § 3(g). It requires that

"government-issued identification documents, including passports, visas, and Global Entry cards,"

as well as all transgender federal employees' personnel records, reflect only a person's sex, as

---

[8] It is undisputed that gender identity is fundamental to defining the category of transgender people, who are, definitionally, people whose gender identity diverges from their sex assigned at birth. ECF 30-1, ¶ 48.

[9] Erasing any doubt, OMB cited Executive Order 14168 soon after its issuance to proclaim that the "use of Federal resources to advance . . . transgenderism . . . is a waste of taxpayer dollars." Memorandum from Acting Director of the Office of Management and Budget Matthew J. Vaeth to the Heads of Executive Departments and Agencies, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs*, M-25-13 (Jan. 27, 2025), https://perma.cc/DP3B-9CK3.

defined in the order. *Id.* § 3(d). It orders that detained transgender women be moved from women's prisons or detention centers to men's prisons or detention centers, *id.* § 4(a), and strips all federal transgender prisoners of their access to gender-affirming medical care, *id.* § 4(c). It further directs rescission of prior Executive Orders addressing, among other topics, "Transgender Equality," "Supporting Transgender Youth in School," "Supporting Intersex Students," and "Confronting Anti-LGBTQI+ Harassment in Schools." *Id.* § 7(c). As in *Romer*, the "sheer breadth" of the Executive Order's impact—in this case, on transgender Americans—suggests it is "inexplicable by anything but animus toward the class it affects." 517 U.S. at 632; *see Hawaii*, 585 U.S. at 706.

Third, the government does not defend the Passport Policy by reference to the Executive Order's express purposes. Rather, the government relies on, as discussed, the argument that the Passport Policy and Executive Order advance a governmental interest in data consistency across federal agencies. In the 2020 case *Zzyym v. Pompeo*, the government invoked that same interest, among others, in defense of the State Department's prior policy that allowed applicants to obtain a passport consistent with a male or female gender identity, but did not allow for a third sex marker for intersex, non-binary, or gender non-conforming applicants. 958 F.3d at 1027. Although the Tenth Circuit found some of the governmental rationales for the binary sex policy unsupported, it did conclude that because law enforcement agencies may access passport data and a non-binary sex policy could introduce disuniformity across agencies, the State Department's reliance on that rationale was supported by the administrative record. *Id.* The court then remanded because it could not determine whether the State Department had relied on permissible or impermissible rationales for the policy. *Id.* at 1033-35. On remand, the State Department chose to change its policy to allow applicants to select an "M," "F," or "X" sex marker consistent with their gender identity. *See* 86 Fed. Reg. at 51436. Thus, notwithstanding the Tenth Circuit's recognition of a potential interest in

uniformity of data across federal agencies, the State Department concluded in 2021 that this interest was *not* weighty enough to justify a binary sex policy that denied intersex, non-binary, and gender non-conforming people the option of a third sex marker. The government has introduced no evidence or argument that any resultant inconsistency in data across federal agencies has given rise to problems, for law enforcement agencies or otherwise, in the years the policy was in effect. In view of that history and the evidentiary void, the Court cannot "discern a relationship" between the Passport Policy and any genuine interest in maintaining a uniform definition of sex across data kept by the State Department and other federal agencies. *Hawaii*, 585 U.S. at 706.

Fourth, Executive Order 14168 and the Passport Policy were part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-35 (1993) ("reject[ing] the contention" that a court's inquiry into whether a government acts with "hostility" toward religious belief "must end with the text of the laws at issue," and looking as well to a resolution adopted by the city council around the same time as the challenged ordinances); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (to determine whether a facially neutral government action is based on discriminatory intent, a court may look to the "historical background of the decision," "particularly if it reveals a series of official actions taken for invidious purposes"). Executive Order 14183, issued on January 27, 2025, prohibited transgender people from serving in the armed forces without an exemption. 90 Fed. Reg. 8757 (Jan. 27, 2025). It declared that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle," and that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.* § 1. Executive

Order 14187, titled "Protecting Children From Chemical and Surgical Mutilation," issued on January 28, 2025, effectively banned all gender-affirming medical care for transgender youth by federally funded institutions. *See* 90 Fed. Reg. 8771 (Jan. 28, 2025). It directed federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children," with the term "chemical and surgical mutilation" defined to include many treatments for gender dysphoria. *Id.* §§ 2(a), 2(c), 4; *see* ECF 30-1, ¶ 59. And finally, Executive Order 14201, titled "Keeping Men Out of Women's Sports," issued on February 5, 2025, faulted "sport-specific governing bodies" that either lack an "official position or requirements regarding trans-identifying athletes" or "allow men to compete in women's categories." 90 Fed. Reg. 9279 (Feb. 5, 2025). The order, which relies on the definitions of sex and other terms in Executive Order 14168, misgenders transgender women in its title and throughout the body of the order. *Id.* §§ 1, 4. Although aimed at different policy goals, each of these related orders, in tone and language, conveys a fundamental moral disapproval of transgender Americans. *See Windsor*, 570 U.S. at 770 (the Defense of Marriage Act violated equal protection principles in part because of the "strong evidence of [the] law having the purpose and effect of disapproval of th[e] class" of married gay and lesbian couples).

Americans are engaged in robust conversations about sex, gender, and identity that are characteristic of a free and open society. The Court expresses no view on whether the government interests underlying Executive Orders 14183, 14187, and 14201 may justify the burden they impose on transgender Americans. But neither can it ignore the moral disapproval conveyed in those orders or the depth and breadth of recent federal action affecting transgender people. Executive Order 14168 and the Passport Policy are part of a coordinated and rapid rollback of rights and protections previously afforded to transgender Americans, suggesting that these

challenged actions are built on a foundation of irrational prejudice toward fellow citizens whose gender identity does not match their sex assigned at birth. For all of these reasons, and under any standard of review, such targeting of a politically unpopular group runs afoul of our Nation's constitutional commitment to equal protection.

      B.    <u>Right to Travel and Invasion of Privacy Claims.</u>

      The plaintiffs next claim that the Passport Policy and Executive Order infringe their rights to international travel and informational privacy under the Due Process Clause of the Fifth Amendment. *See Kent*, 357 U.S. at 125 ("The right to travel," including the right to travel abroad, "is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment."); *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (noting two kinds of privacy interests that may be constitutionally protected: "the individual interest in avoiding disclosure of personal matters" and "the interest in independence in making certain kinds of important decisions"). The law is unsettled regarding the standard of review applicable to government actions alleged to infringe the right to international travel. *Compare Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1119-22 (10th Cir. 2021) (holding that there is no fundamental right to international travel and evaluating the statute authorizing revocation of plaintiff's passport under rational basis review), *with Eunique v. Powell*, 302 F.3d 971, 976 (9th Cir. 2002) (McKeown, J., concurring) (arguing that burdens on international travel should be evaluated under intermediate scrutiny), *and Woodward v. Rogers*, 344 F. Supp. 974, 988 (D.D.C. 1972) (the denial of a passport to an applicant who refused to swear an "Oath of Allegiance" violated the right to international travel because the requirement was "not reasonably justified" and "[could] be served by far less restrictive means"), *aff'd*, 486 F.2d 1317 (D.C. Cir. 1973). The law is also unsettled regarding the scope of the privacy rights described in *Whalen*. *See Nat'l Aeronautics & Space Admin. v. Nelson*,

562 U.S. 134, 138 (2011) (assuming without deciding the existence of a "constitutional privacy 'interest in avoiding disclosure of personal matters'" (quoting *Whalen*, 429 U.S. at 599-600)); *id.* at 162 (Scalia, J., dissenting) ("[T]here is no constitutional right to 'informational privacy.'"); *see also Gore*, 107 F.4th at 561-65 (surveying cases and explaining that any constitutionally protected right to informational privacy must be narrowly construed); *id.* at 578-84 (White, J., dissenting) (surveying cases and concluding that transgender status falls within ambit of constitutionally protected informational privacy interests).

Under the doctrine of constitutional avoidance, federal courts must avoid deciding "constitutional issues where alternative grounds for resolution are available." *Am. Civil Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013); *see Mills v. Rogers*, 457 U.S. 291, 305 (1982) ("It is this Court's settled policy to avoid unnecessary decisions of constitutional issues."). The Court has already explained that the plaintiffs are likely to prevail on the merits of their Fifth Amendment equal protection claim. Having so concluded, the Court will decline, at this juncture, to address the plaintiffs' separate informational privacy and right to travel claims under the Fifth Amendment, as resolution of the constitutional disputes attending those claims would have no further effect on the plaintiffs' entitlement to the relief requested in their motion.

C.    Administrative Procedure Act Claims.

The plaintiffs separately claim that the Passport Policy violates the Administrative Procedure Act because it is arbitrary and capricious and was adopted "without observance of procedure required by" the Paperwork Reduction Act, 44 U.S.C. §§ 3501 *et seq. See* 5 U.S.C. §§ 706(2)(A), (D). The State Department and Secretary Rubio, as the Agency Defendants, respond that these claims are not subject to judicial review or, in the alternative, that the plaintiffs have not

demonstrated a likelihood of success on either APA claim. The plaintiffs have the better of each of these arguments.

##### 1. *Reviewability of the Passport Policy.*

The Agency Defendants contend that the plaintiffs' APA claims are not amenable to judicial review for three distinct reasons: (1) the Passport Policy is a presidential action, not an agency action, and therefore is not subject to review under the APA; (2) the Passport Policy is the type of action "traditionally regarded as committed to agency discretion," *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); and (3) the Passport Policy implicates a foreign affairs decision made by the federal government.

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Presidential actions, like executive orders, are not, however, subject to APA review because "the President is not an agency within the meaning of the [APA]." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The Agency Defendants argue that because the Passport Policy implements Executive Order 14168, it is similarly not reviewable under the APA.

This argument finds no foothold in the text of the APA or on-point case law. Under the APA, the term "agency" is defined as "each authority of the Government of the United States," which includes the State Department. 5 U.S.C. § 701(b)(1). The APA contains no exception for agency actions, like the State Department's Passport Policy, that carry out an executive order. *See id.* § 704. As the Ninth Circuit recently explained, "final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see id.* (neither the Supreme Court nor any Court of Appeals has ever "excepted a final rule from APA review because it carried out a presidential directive"); *accord Chamber of Com. of U.S.*

*v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA[.]"). Indeed, the First Circuit recently rejected a similar argument that an OMB directive was unreviewable under the APA simply because it implemented executive orders. *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025) ("[T]he District Court did not review the *President's* actions for consistency with the APA. Rather, it reviewed—and ultimately enjoined—the *Agency Defendants'* actions under the Executive Orders.").

The Agency Defendants nonetheless maintain that the Passport Policy is unreviewable because the Passport Act gives the President "broad discretionary authority" to issue rules for passports. ECF 53, at 7. Under the Passport Act, "[t]he Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. This permissive language recognizes the Executive's "substantial discretion" to issue passports. *Agee*, 453 U.S. at 294 & n.26. But the key Supreme Court decision barring judicial review of discretionary presidential action, *Franklin v. Massachusetts*, "is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993). The final step of executive action that directly affected the plaintiffs here was the Passport Policy, not Executive Order 14168. The Executive Order directed the State Department to "implement changes to require that government-issued identification documents, including passports, . . . accurately reflect the holder's sex." EO § 3(d). The State Department, in turn, "evaluat[ed] how to implement this policy" and, deferring in part to HHS's guidance, "interpreted its obligations under E.O. 14168" as being met by defining "[s]ex at birth, which can generally be adjudicated using a birth

certificate," instead of "'sex at conception,'" which it lacks "the capacity to adjudicate." ECF 53-1, ¶¶ 14-15, 18. The State Department thus made at least three independent determinations in formulating the Passport Policy: (1) it departed from the Executive Order's definition of "female," "male," and "sex," which depend on the size of the reproductive cells produced by a person at "conception," EO §§ 2(a), (d)-(e); (2) it chose to defer to HHS's guidance on the meaning of these terms, which likewise does not turn on "sex at conception"; and (3) it determined what sources of evidence to consult in order to assess a person's sex at birth.

These facts distinguish this case from *Detroit International Bridge Company v. Government of Canada*, upon which the Agency Defendants principally rely. *See* 189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017) (subsequent history omitted). In *Detroit International*, the court held that the State Department's issuance of a permit for an international bridge was presidential action not subject to APA review. *Id.* at 98-105. Even though the President had issued an executive order allowing the State Department to issue such permits, the court reasoned, the Department's role was purely ministerial because it "exercised discretionary authority committed to the President by" the International Bridge Act of 1972, which required the President alone to approve these bridges. *Id.* at 96-97, 100-02; *see* 33 U.S.C. § 535(b) ("No bridge may be constructed, maintained, and operated . . . unless the President has given his approval thereto."). Here, by contrast, the State Department's implementation of the President's Executive Order does not constitute a "ministerial act" in which "nothing is left to the exercise of the official's discretion or judgment." *In re Soares*, 107 F.3d 969, 974 (1st Cir. 1997); *see* Ministerial, *Black's Law Dictionary* (12th ed. 2024) (defining "ministerial" as "involving an act that involves obedience to instructions or laws instead of discretion, judgment, or skill"). The government's declaration confirms, as explained, that the State Department exercised judgment in interpreting

and complying with the Executive Order. ECF 53-1, ¶¶ 14-15, 18; *see Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) (distinguishing *Detroit International* where the State Department needed "to exercise its judgment" implementing a presidential proclamation).

The Agency Defendants next contend that even if the policy constitutes agency action, it is not reviewable because the APA excludes judicial review of "agency action . . . committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "The APA establishes a 'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16-17 (2020) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). To honor this presumption, the agency-discretion exception has been read "'quite narrowly,'" *id.* at 17 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)), and confined "to those rare 'administrative decision[s] traditionally left to agency discretion,'" *id.* (quoting *Lincoln*, 508 U.S. at 191).

The Passport Act, as discussed, affords the Executive "substantial discretion" to issue passports. *Agee*, 453 U.S. at 294 & n.26 (citing 22 U.S.C. § 211a). But "while the power of the Secretary of State over the issuance of passports is expressed in broad terms," Congress did not "give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." *Kent*, 357 U.S. at 127-28. To the contrary, the State Department's passport decisions are subject to judicial review and can be struck down if they fail "to pass scrutiny by the accepted tests." *Id.* at 129. In *Kent v. Dulles*, for example, the Supreme Court overturned the State Department's refusal to issue passports based on political beliefs or associations. *Id.* at 130. In subsequent cases, the Supreme Court reviewed whether actions taken by the State Department with respect to passports complied with the Passport Act, looking to whether the agency's action was "sufficiently substantial and consistent to compel the conclusion that Congress has approved it."

*Agee*, 453 U.S. at 306 (quotation marks omitted) (Secretary's revocation of passport complied with Passport Act); *see also Zemel*, 381 U.S. at 10-13 (Secretary's refusal to validate passports for travel to Cuba was consistent with Passport Act). And in a case relied upon extensively by the Agency Defendants here, *Zzyym v. Pompeo*, the Tenth Circuit reviewed an APA challenge to the State Department's prior binary sex policy for passports to assess whether the policy was arbitrary and capricious. 958 F.3d at 1022-32; *see also Shachtman v. Dulles*, 225 F.2d 938, 940-41 (D.C. Cir. 1955) (finding that "the discretion residing in the Secretary [under 22 U.S.C. § 211a] is subject in its exercise to some judicial scrutiny," including whether the reason for refusing a passport "was arbitrary"). These precedents compel the conclusion that the Passport Act furnishes a "meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), and that the State Department's determinations with respect to passports are "not one of those areas traditionally committed to agency discretion," *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019).

Finally, the Agency Defendants contend that the Passport Policy should not be subject to judicial review because passports implicate foreign affairs. "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Agee*, 453 U.S. at 292. Nevertheless, in the course of exercising its power of judicial review, the Supreme Court has distinguished cases involving "passport refusals based on the character of the particular applicant" from those implicating "foreign policy considerations affecting all citizens." *Zemel*, 381 U.S. at 13. In *Kent*, the Court "held that Congress had not authorized the Secretary of State to inquire of passport applicants as to affiliation with the Communist Party." *Regan v. Wald*, 468 U.S. 222, 240 (1984). By contrast, in *Zemel*, the Court upheld "a refusal by the Secretary of State to validate the passports of United States citizens for travel to Cuba." *Id.* at 241.

The Agency Defendants fail to explain how the Passport Policy pertains to foreign relations rather than a characteristic of passport applicants. The Passport Policy was adopted to implement Executive Order 14168, which set a policy on sex across the federal government, including for all domestic purposes. Nothing in the Executive Order mentions foreign relations, and the government's declaration in this case does not justify the Passport Policy on foreign affairs or national security grounds; instead, it avers that the policy was promulgated to comply with Executive Order 14168. *See* ECF 53-1, ¶¶ 15, 17. Accordingly, the Court concludes that the Passport Policy is based on "characteristic[s] peculiar" to applicants like the plaintiffs—namely, their sex and gender. *Zemel*, 381 U.S. at 13. It is not, therefore, a matter so intertwined with foreign relations that it is insulated from judicial review. *See Zzyym*, 958 F.3d at 1022-34 (reviewing State Department rules regarding passports); *Salem v. Pompeo*, No. 19-cv-363-LDH-CLP, 2024 WL 1364320, at *4 (E.D.N.Y. Mar. 31, 2024) (same).

### 2.  *Whether the Passport Policy Is Arbitrary and Capricious.*

The Agency Defendants do not dispute that, to the extent the Passport Policy is reviewable, it is a "final agency action" subject to APA review. *See* 5 U.S.C. § 704. For an agency action to be "final," the action "must mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted); *see Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (final agency action "must be a definitive statement of the agency's position with direct and immediate consequences" (brackets and quotation marks omitted)). Both conditions are met here. The State Department finalized the Passport Policy in late January 2025, when, among other things, it instructed all domestic and foreign passport agencies that the Policy would take immediate effect, updated its

website with information concerning the Policy, and replaced the passport forms on its website with earlier versions of those forms, which conformed to the Policy but are expired. *See* ECF 53-1, ¶¶ 15-17. Expedited passport applications have been processed in accordance with the Passport Policy since as early as January 24, 2025, and all passport applications have been processed in accordance with the Policy since February 7, 2025. *See* ECF 53-1, ¶ 18. The Passport Policy is thus the "consummation" of the Agency Defendants' decisionmaking process from which "legal consequences" have already begun to flow. *See Bennett*, 520 U.S. at 178 (quotation marks omitted).

The APA authorizes courts to "hold unlawful and set aside" final agency actions found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A). "'The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained.'" *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "An agency action is arbitrary and capricious when the agency 'relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Assoc'd Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). The APA provides for a narrow and deferential scope of review, and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The plaintiffs contend that the Passport Policy is arbitrary and capricious because, among other things, the Agency Defendants have failed to offer a reasoned explanation for their decision to reverse the State Department's prior passport policy.[10] While an agency "'may change its existing position on an issue,'" it must provide "a reasoned explanation for the change" that addresses any factual findings undergirding the changed policy that contradict those supporting the prior policy. *Housatonic River Initiative v. U.S. Env't Prot. Agency, New Eng. Region*, 75 F.4th 248, 270 (1st Cir. 2023) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and citing *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *accord Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025). The agency must also "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of California*, 591 U.S. at 33. The record contains no evidence that the Agency Defendants fulfilled these obligations here. The Passport Policy—posted on the Department of State's website—does not make factual findings, does not explain why the facts supporting the Department's prior passport policy no longer carry weight, and does not address reliance interests affected by its

---

[10] The government argues that, for purposes of assessing the plaintiffs' likelihood of success on their APA claims, the Court should not consider any of the declarations submitted by the plaintiffs and should "instead focus on the materials that were before the Department when it developed the Policy." ECF 53, at 6. Ordinarily, judicial review of agency action is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The Court cannot, however, ascertain the materials that were before the State Department when it developed the Passport Policy because the government has not yet filed the administrative record. And when asked at the motion hearing whether the State Department had considered any materials other than the Executive Order, counsel for the government demurred. *See* ECF 65, at 57:12-59:7. It would, therefore, be appropriate to consider the declarations as "supplemental evidence" to the extent that they would facilitate the Court's comprehension of the Passport Policy. *City of Taunton v. EPA*, 895 F.3d 120, 127 (1st Cir. 2018). But this issue is, ultimately, beside the point, because the Court's analysis of the plaintiffs' APA claim is limited to the materials submitted by the government.

reversal of the prior policy. *See* U.S. Dep't of State, *Sex Marker in Passports*, (last visited Apr. 18, 2025), perma.cc/B38H-QS22. Instead, it merely suggests that the policy was adopted in accordance with Executive Order 14168. *See id.* Further, there is no evidence before the Court that, in adopting the Passport Policy, the Agency Defendants took steps to identify facts bearing on its policy change, attempted to identify potential reliance interests, or sought to determine how any such interests may be impacted by the policy changes.[11]

Quite the contrary: the record indicates that the State Department considered virtually nothing aside from the Executive Order's directive when it developed the Passport Policy. *See* 90 Fed. Reg. 9652 (Feb. 14, 2025) (stating only that the passport forms had been revised "[t]o comply with E.O. 14168"); 90 Fed. Reg. 9800 (Feb. 18, 2025) (same); ECF 53-1, ¶¶ 15-21 (similar). The Agency Defendants do not dispute this characterization of their decisionmaking process, and indeed affirm that the Passport Policy was adopted and announced mere days after the President signed Executive Order 14168. *See* ECF 53, at 10-12; ECF 53-1, ¶¶ 10, 15-17. Instead, they argue that because the State Department issues passports "under such rules as the President shall designate and prescribe," 22 U.S.C. § 211a, the Executive Order's directive is reason enough, for

---

[11] A comparison between the State Department's prior actions in relation to identity fields on passports and its current Passport Policy process underscores the lack of reasoned decisionmaking here. The State Department does not require that passports bear an applicant's name assigned at birth; rather, it allows passport applicants to apply for, and receive, passports with a changed name that reflects their current identity. In adopting its current policy on name changes on passports, now codified at 22 C.F.R. § 51.25, the State Department issued a notice of proposed rulemaking that set a 60-day comment period for interested members of the public to weigh in on the proposed changes to the regulation. *See* 72 Fed. Reg. 10095 (Mar. 7, 2007). The notice explained that the revisions to the regulation were "intended to clarify what is required of an applicant whose name has changed and to reflect more accurately Department practice in this regard." *Id.* at 10096. After the comment period ended, the Department issued a notice of final rule in the Federal Register that, among other things, addressed comments submitted by the public. *See* 72 Fed. Reg. 64930, 64930-31 (Nov. 19, 2007). Through this process, the Department solicited feedback, which allowed it to consider any pertinent facts and whether any reliance interests in the prior rule were implicated by its changes.

purposes of arbitrary-and-capricious review, to justify their adoption of the Passport Policy. That argument fundamentally misstates the law. Even in a domain, such as this, where Congress has "confer[red] broad authority" on an agency, the agency remains subject to the requirements of the APA and its actions remain subject to review for arbitrariness. *Dep't of Commerce*, 588 U.S. at 771-77 (reviewing agency action under the arbitrary and capricious standard even though the relevant statute left "much to the Secretary's discretion"); *see also Su*, 121 F.4th at 16 ("[T]here is . . . nothing untenable about analyzing the impacts, costs, and benefits of alternative policy options when issuing a rule that implements an executive order."). The Agency Defendants' position would contravene settled precedent and would improperly insulate wide swaths of agency action from judicial review, so long as the government could point to a related executive order and a conferral of broad authority on an agency.

The State Department has included sex on passports for roughly fifty years. *See* ECF 53-1, ¶ 5. For over half that time—from 1992 to January 2025—it has permitted applicants, with various requirements for medical documentation, to select a sex marker that differs from their sex assigned at birth. *See id.* ¶¶ 5-10. In announcing that it would reverse course and issue passports with sex markers that only correspond to an applicant's sex assigned at birth, the State Department jettisoned its practice of more than thirty years with no explanation of the facts on which it premised its new determination and no consideration of the reliance interests in its prior policy. On this record, the Court cannot conclude that the State Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted). The plaintiffs are, accordingly, likely to succeed on the merits of their claim that the Passport Policy is arbitrary and capricious, in violation of the APA.

3.  *Whether the Passport Policy Complies with the Paperwork Reduction Act.*

The plaintiffs next claim that the Passport Policy was adopted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), because the Agency Defendants failed to comply with the procedures set forth in the Paperwork Reduction Act ("PRA") when they replaced the passport forms on the State Department's website. The Agency Defendants replaced the forms in effect on January 19, 2025 with earlier forms that had been promulgated in accordance with a prior passport policy that did not allow the option of an "X" sex marker. *Compare* ECF 33-2 to 33-4 (passport forms promulgated under the prior passport policy indicating that applicants can self-identify their gender and choose an "M," "F," or "X" marker), *with* ECF 33-5 to 33-7 (passport forms used immediately before the prior passport policy, which require applicants to identify their sex by choosing either an "M" or "F" marker).

The PRA provides, in pertinent part, that federal agencies must "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information, to solicit comment to," among other things, "evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency." 44 U.S.C. § 3506(c)(2)(A). Instruments for collecting such information under the PRA "include tax forms, Medicare forms, financial loan applications, job applications, questionnaires, compliance reports, and tax or business records." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 33 (1990); *see* 44 U.S.C. § 3502(3) (defining "collection of information"). The parties agree that the passport forms are covered by the PRA, and the Agency Defendants concede that the State Department uploaded prior versions of the forms without first issuing a 60-day notice. *See* ECF 53, at 4-5; ECF 53-1, ¶¶ 17, 20 (noting that the State Department uploaded prior versions of the forms in late-January and published 30-day comment notices in

mid-February); ECF 30, at 16-17. Given these undisputed facts, the plaintiffs have established a substantial likelihood of succeeding on their claim that the Agency Defendants uploaded the prior versions of the passport forms "without observance of procedure required by [the PRA]," in violation of the APA. 5 U.S.C. § 706(2)(D).

The Agency Defendants' counterarguments are unpersuasive. They first contend that APA review is impliedly foreclosed because although the PRA authorizes an individual to challenge the validity of information collection forms when defending against an enforcement action, it does not create a private cause of action. *See* ECF 53, at 16 (citing 44 U.S.C. § 3512(b) and 5 U.S.C. § 702). But whether the PRA establishes a private right of action is not pertinent here, because the plaintiffs do not assert a direct claim under the PRA. Rather, they assert an APA claim alleging that the State Department's issuance of new forms without the requisite 60-day notice under the PRA was taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see* ECF 1, ¶ 250. The APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014), and courts have routinely concluded that such suits include APA claims alleging violations of the PRA, *see, e.g.*, *Hyatt v. OMB*, 908 F.3d 1165, 1172-75 (9th Cir. 2018) (finding jurisdiction to hear plaintiff's PRA petition under the APA); *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-cv-322-JDB, 2025 WL 452707, at *7 (D.D.C. Feb. 11, 2025) (plaintiff "established a substantial likelihood of success as to its PRA-notice claim" alleging that the government "violated the APA by acting contrary to . . . the PRA").

The Agency Defendants next contend that the plaintiffs "cannot argue that the State Department failed to go through proper procedures" because the prior passport forms were promulgated in accordance with the PRA's notice and comment requirements. ECF 53, at 16. In

addition to its notice and comment requirements, however, the PRA provides that an "agency shall not conduct or sponsor the collection of information unless," among other things, the Director of the OMB "has approved the proposed collection of information." 44 U.S.C. § 3507(a)(2). And the "Director may not approve a collection of information for a period in excess of 3 years." *Id.* § 3507(g). The Agency Defendants concede that the Director's approval of the prior passport forms, which were promulgated in 2021, has expired. *See* ECF 53, at 4, 16; ECF 33-5 to 33-7 (copies of the passport forms currently posted to the State Department's website, each of which lists an expiration date between November 2022 and December 2023). Thus, although the prior passport forms were promulgated in accordance with the PRA's notice and comment requirements, the Agency Defendants were nevertheless required to obtain the Director's approval before they began using those forms again in January 2025. *See* 44 U.S.C. § 3507(a)(2). Because the Agency Defendants failed to do so, the plaintiffs have established a substantial likelihood of success on their claim that the Agency Defendants violated the APA by failing to comply with the PRA.

## II.    <u>Irreparable Harm.</u>

The plaintiffs assert that, absent injunctive relief while this case is adjudicated, they will experience irreparable harm. Irreparable harm is "an injury that cannot adequately be compensated for by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005); *see Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (noting that to establish a likelihood of irreparable harm, "[i]t is usually enough if the plaintiff shows that its legal remedies are inadequate"). The plaintiffs must "demonstrate that irreparable injury is *likely*," rather than merely *possible*, "in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). That said, "the injury need not have been inflicted . . . or be

certain to occur;" "a strong threat of irreparable injury before trial is an adequate basis." Charles A. Wright, Arthur R. Miller, Mary K. Kane & Alexandra D. Lahav, 11A Fed. Prac. & Proc. § 2948.1 (3d ed. Apr. 2025 update). Irreparable harm is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Vaquería Tres Monjitas*, 587 F.3d at 485.

Every plaintiff except for Soe has been diagnosed with gender dysphoria, a medical condition that describes "the significant emotional distress" and impairment in functioning "that stems from the incongruence between a person's gender identity and sex designated at birth." ECF 30-1, ¶ 53; *see* ECF 30-3, ¶ 5; ECF 30-4, ¶ 6; ECF 30-5, ¶ 6; ECF 30-6, ¶ 6; ECF 30-7, ¶ 6; ECF 30-8, ¶ 6. Gender dysphoria can be effectively managed with appropriate treatment, ECF 30-1, ¶ 56, and the recognized standard of care is "designed to bring a person's body and expression of their sex in line with their gender identity," *id.* ¶ 58. Part of this treatment "includes living one's life consistently with one's gender identity, including using identity documents." *Id.* ¶ 77. Indeed, the plaintiffs report that obtaining gender-concordant identity documents has decreased their feelings of anxiety and distress and improved their feelings of safety and comfort—largely because they need not fear being outed when presenting identity documents that reflect their gender identity and expression. *See* ECF 30-3, ¶¶ 6, 8-9; ECF 30-4, ¶¶ 7-8; ECF 30-5, ¶¶ 7-8; ECF 30-6, ¶¶ 7-8; ECF 30-7, ¶¶ 8, 10-11; ECF 30-8, ¶¶ 7, 10-11; ECF 30-9, ¶ 8.

The plaintiffs' inability to obtain passports bearing sex markers consistent with their gender identity and expression is thus likely to impede efforts to treat and manage their gender dysphoria. *See* ECF 30-1, ¶ 77. Each plaintiff avers that they would experience anxiety or distress, or fear for their safety, if required to use a passport with a sex marker that corresponds to their sex assigned at birth rather than their gender identity. *See* ECF 30-3, ¶¶ 8, 12, 14; ECF 30-4, ¶¶ 7, 14-15; ECF

30-5, ¶¶ 8-11; ECF 30-6, ¶¶ 8, 12-15; ECF 30-7, ¶¶ 14-15; ECF 30-8, ¶ 11; ECF 30-9, ¶¶ 8, 11. Empirical research substantiates these concerns. According to meta-analyses commissioned by the World Health Organization and conducted by the plaintiffs' expert epidemiologist, Dr. Scheim, possessing gender-concordant identity documents is "associated with a 47% reduction in the odds of serious psychological distress." ECF 30-2, ¶ 30. Dr. Scheim further reports that transgender individuals "who had changed the gender marker on their passport were 18% less likely to meet criteria for serious psychological distress, 16% less likely to have seriously considered suicide in the past year, and 34% less likely to have attempted suicide in the past year, as compared to those who had the correct gender [marker] on some of their documents but had not corrected their passport." *Id.* ¶ 37.

Transgender individuals are also more likely to experience violence or harassment if required to use passports bearing a sex marker corresponding to their sex assigned at birth. *See id.* ¶ 22 ("In the 2015 United States Transgender Survey . . . 32% of respondents who had presented an identity document that did not match their gender presentation had at least one negative experience, including verbal harassment (25%), denial of service (16%), being asked to leave a venue (9%), and assault (2%)."); *see generally* ECF 31-2 (2015 United States Transgender Survey). Among transgender people who passed through airport security in a single year, those who used a passport bearing a sex marker corresponding to their sex assigned at birth were over 10% more likely to be questioned about their name or gender than those who used a passport with an updated sex marker. *See* ECF 30-2, ¶ 23 (reporting that 6% of those with an updated marker were questioned, as compared to 17.6% of those without an updated marker). Three of the plaintiffs have already experienced harassment when presenting identity documents bearing sex markers corresponding to their sex assigned at birth. In 2017, Anderson was detained by TSA agents and

strip searched when she presented a driver's license displaying her sex assigned at birth. *See* ECF 30-6, ¶ 13. In January of this year, Orr was accused by TSA agents of presenting a "fake identification document" because his passport bore a female sex marker whereas his driver's license bore a male sex marker. ECF 30-4, ¶ 10; *see also id.* ¶ 9 (Orr noting that, in 2023, an Icelandic car rental agency initially refused to rent him a car because the sex markers on his driver's license and passport did not match). And Perysian avers that prior to updating her driver's license, she experienced "significant harassment" when airport employees noticed the disjunction between her gender expression and the sex marker on her driver's license, including pat downs by TSA agents seeking to confirm her gender. *See* ECF 30-3, ¶ 8.

These are not speculative harms. Each of the plaintiffs plans to travel internationally in 2025—Perysian, Anderson, and Soe for work, *see* ECF 30-3, ¶¶ 10, 13; ECF 30-6, ¶ 9; ECF 30-9, ¶ 10; Orr for medical care, *see* ECF 30-4, ¶ 13; Hall for their Ph.D. program, *see* ECF 30-7, ¶ 9; Boe for an extracurricular, *see* ECF 30-5, ¶ 9; and Solomon-Lane to visit family and friends, *see* ECF 30-8, ¶ 9. Perysian, Orr, and Boe already cancelled international travel plans scheduled for February and March of 2025 because they were unable to obtain passports bearing sex markers corresponding to their gender identities. *See* ECF 30-3, ¶¶ 10, 13-14; ECF 65, at 27:23-28:12. Anderson and Soe risk losing opportunities for professional advancement if they also conclude that they are unable to travel with a passport that does not bear a sex marker corresponding to their gender identity. *See* ECF 30-6, ¶¶ 9, 14-15; ECF 30-9, ¶¶ 10-11.

Absent a preliminary injunction, Perysian, Orr, Anderson, Boe, Hall, and Soe will be unable to obtain passports bearing sex markers that align with their gender identity and expression. These plaintiffs will thus be required to choose between forgoing international travel plans—including the medical appointments, and academic and professional opportunities, giving rise to

those plans—or travelling with passports bearing sex markers that correspond to their sex assigned at birth. If the plaintiffs use such passports, they are likely to experience worsened gender dysphoria, anxiety, and psychological distress, and they will face a greater risk of experiencing harassment and violence. Injuries like these cannot be accurately measured or compensated by money damages or other legal remedies. The Court therefore concludes that each of these plaintiffs has demonstrated that they are likely to experience irreparable harm absent a preliminary injunction. *See Ross-Simons of Warwick*, 102 F.3d at 19 ("If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."). Solomon-Lane, however, currently possesses a valid passport that bears a sex marker consistent with his gender identity. ECF 30-8, ¶ 11. While he would likely experience the aforementioned harms if required to travel with a passport bearing a sex marker that corresponds to his sex assigned at birth, he is not at risk of experiencing those harms while using his current passport, which does not expire until 2028. *See id.*; *see also* U.S. Dep't of State, *Sex Marker in Passports*, (last visited Apr. 18, 2025), perma.cc/B38H-QS22 ("All passports—including those with an X marker or those listing a sex different from your sex at birth—will remain valid for travel until their expiration date."). The Court thus concludes that Solomon-Lane is not likely to experience irreparable harm prior to the full adjudication of this case on the merits, and, accordingly, is not entitled to preliminary injunctive relief.

### III.    **Balance of the Equities and the Public Interest.**

The final factors, the balance of the equities and the public interest, also favor the plaintiffs. The plaintiffs have demonstrated that they are likely to face significant hardships absent a preliminary injunction, including psychological distress, lost professional and medical opportunities, and the increased risk of experiencing harassment or violence. The government

contends, in vague terms, that the injunctive relief sought by the plaintiffs will impair the State Department's ability to operate effectively, but it has not produced any evidence specifically supporting this contention. Nor does the record support such an inference. The plaintiffs seek an injunction requiring the State Department to issue them passports pursuant to the policy in effect as of January 19, 2025—i.e., to issue them passports with an "M," "F," or "X" sex marker that aligns with their gender identity. Such passports would bear sex markers that match the plaintiffs' gender expression as well as the sex markers on the plaintiffs' driver's licenses and other identity documents. *See* ECF 30-3, ¶ 9; ECF 30-4, ¶ 8; ECF 30-5, ¶ 7; ECF 30-6, ¶¶ 7, 10; ECF 30-7, ¶ 10; ECF 30-9, ¶ 8. There is no evidence that this relief, which is narrow and limited to the named plaintiffs, is likely to "impair" the State Department's effective functioning. Nor is there evidence that the State Department's functioning was impaired during the nearly three years that it processed and issued passports in precisely the manner requested by the plaintiffs. The Court accordingly concludes that the balance of the equities and the public interest support the injunctive relief sought by the plaintiffs. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994))).

## IV.    <u>Scope of Relief.</u>

The plaintiffs request two forms of interim equitable relief: a stay of agency action issued pursuant to 5 U.S.C. § 705 and a preliminary injunction as to the individual plaintiffs issued pursuant to Rule 65(a). Section 705 provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or

rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The provision codified

courts' "traditional authority" to grant stays pending review of an agency action or court order.

*Sampson v. Murray*, 415 U.S. 61, 68 n.15, 76 (1974). The principles governing a "traditional stay

granted by an appellate court pending review of an inferior court's decision" thus also govern "the

authority of courts charged by statute with judicial review of agency decisions." *Id.* at 73-74 (citing

*Scripps-Howard Radio v. Fed. Commc'ns Comm'n*, 316 U.S. 4 (1942)); *see All. for Hippocratic*

*Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 255-56 (5th Cir. 2023) ("Circuit courts have

interpreted [5 U.S.C. § 705] as providing something akin to the general stay power recognized by

Rule 18 of the Federal Rules of Appellate Procedure." (citing *Ohio v. Nuclear Regul. Comm'n*, 812

F.2d 288, 290 (6th Cir. 1987), and *In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985))),

*rev'd and remanded on other grounds sub nom. Food & Drug Admin. v. All. for Hippocratic Med.*,

602 U.S. 367 (2024).

An order staying an agency rule or policy pending full adjudication on the merits is similar

to a preliminary injunction prohibiting enforcement of that rule or policy. *See Nken*, 556 U.S. at

428. "Both can have the practical effect of preventing some action before the legality of that action

has been conclusively determined." *Id.* Stays and preliminary injunctions nevertheless "serve

different purposes." *Id.* While an injunction "is a means by which a court tells someone what to

do or not to do," a stay "operates upon the [administrative] proceeding itself" by "halting or

postponing some portion of the proceeding, or by temporarily divesting [a rule or policy] of

enforceability." *Id.*; *see* Stay, Black's Law Dictionary (12th ed. 2024) (defining stay as the

"postponement or halting of a proceeding, judgment, or the like"). Put differently, although an

agency may effectively be required to *refrain from acting* pursuant to either form of equitable

relief, an agency may only be affirmatively *directed to act* pursuant to an injunction. *See Nken*, 556 U.S. at 429.

An example offered by the Supreme Court in *Scripps-Howard Radio v. Federal Communications Commission* illustrates this distinction. There, the Court contrasted a request to stay the Federal Communications Commission's ("FCC") decision to *grant* an application to modify a radio station's broadcasting license with a request to stay the FCC's decision to *deny* such an application. *See* 316 U.S. at 14. The Court explained that while the FCC's decision to grant an application to modify a license would be "susceptible of being stayed on appeal," its decision to deny the application would not be susceptible to a stay, because "[a] stay of an order denying an application would in the nature of things stay nothing." *Id.* at 14, 16. In other words, a stay cannot "operate as an *affirmative authorization* of that which [an agency] has refused to authorize." *Id.* at 14 (emphasis added); *accord Sampson*, 415 U.S. at 76.

In their request for a stay under 5 U.S.C. § 705, the plaintiffs seek two distinct forms of relief. They first ask the Court to "stay enforcement of the [Passport] Policy during the pendency of this litigation." ECF 29, at 1. This is a prototypical example of a stay. While such an order would "have the practical effect of preventing" the government from enforcing the Passport Policy, it would achieve "this result by temporarily suspending the source of [the government's] authority to act," not by affirmatively "directing [the government's] conduct." *Nken*, 556 U.S. at 428-29. Second, the plaintiffs ask the Court to "require the Agency Defendants to process and issue passports consistent with the [prior passport policy], including permitting (i) changes to the sex designation on passports, including allowing individuals to self-attest to what their sex is, and (ii) the use of an 'X' sex designation on passports." ECF 29, at 1-2. This is a prototypical example of an injunction: the plaintiffs are requesting an order that affirmatively "directs the conduct of

[the government], and does so with the backing of [the Court's] full coercive powers." *Nken*, 556 U.S. at 428; *cf. Scripps-Howard*, 316 U.S. at 14. This latter form of relief—which would apply to "*all* processing of passport applications, renewals, or changes," ECF 67-1, at 1 (emphasis added)— is considerably broader than the preliminary injunctive relief sought under Rule 65(a), which would apply only "as to Plaintiffs," ECF 29, at 2.

The plaintiffs' latter request for affirmative relief, which is in the nature of injunctive relief rather than a stay, exceeds the scope of relief made available by Section 705. An order staying the Passport Policy would be distinct from an order directing the State Department to reinstate its prior passport policy that existed as of January 19, 2025. The plaintiffs nevertheless contend, in support of their request for affirmative relief under Section 705, that "courts routinely 'reinstate . . . rules previously in force'" when "granting APA challenges to agency action." ECF 67-1, at 2 (quoting *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987)). It is well established that "'[w]hen a court *vacates* an agency's rules'" under 5 U.S.C. § 706(2), "the vacatur restores the status quo before the invalid rule took effect and the agency must initiate another rulemaking proceeding if it would seek to confront the problem anew.'" *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103-04 (D.D.C. 2018), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) (quoting *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004)) (emphasis added); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (the effect of vacatur was to "automatically resurrec[t]" the prior standard). But vacatur of a rule or policy under Section 706 following full adjudication on the merits is distinct from an order staying a rule or policy under Section 705 pending adjudication on the merits. Thus, where courts have stayed agency action under Section 705, they have regarded any additional affirmative relief as in the nature of injunctive relief. *See, e.g.*, *Gomez v. Trump*, 485

F. Supp. 3d 145, 202-05 (D.D.C. 2020) (holding that plaintiffs established entitlement to stay of State Department's "No-Visa Policy" and, separately, to preliminary injunction requiring State Department to process certain visa applications submitted by all "eligible applicants"); *Maryland v. U.S. Dep't of Agric.*, No. 25-cv-0748-JKB, 2025 WL 800216, at *22-24 (D. Md. Mar. 13, 2025) (staying large-scale reductions of force and issuing temporary restraining order requiring reinstatement of all government workers terminated pursuant to those reductions).

The plaintiffs have not, however, affirmatively requested or explained why they are entitled to injunctive relief that extends beyond the scope of their request under Rule 65(a). Instead, they limited their request for injunctive relief to the individual plaintiffs. *See* ECF 29, at 2. The Court will, accordingly, deny the plaintiffs' request for a stay under Section 705 because it seeks affirmative relief in the nature of a preliminary injunction, and the plaintiffs have forfeited the argument that they are entitled to an affirmative injunction that would effectively reinstate the State Department's prior passport policy nationwide. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (an "injunction [should be] no broader than necessary to achieve its desired goals").

Pursuant to Rule 65(a), the plaintiffs request a preliminary injunction preventing the government from enforcing the Passport Policy and Executive Order "as applied to passports against Plaintiffs," and requiring the State Department to process and issue passports to the plaintiffs consistent with the prior passport policy. ECF 29, at 2. They specifically request an order requiring the State Department to "permit (i) changes to the sex designation on Plaintiffs' passports, including allowing Plaintiffs to self-attest to what their sex is, or (ii) an 'X' designation on any of the Plaintiffs' passports where that is requested by the Plaintiff." *Id.* The Court concludes that the plaintiffs are entitled to such relief. As discussed, the plaintiffs have established a

substantial likelihood of success on the merits of their claim that Executive Order 14168 and the Passport Policy violate their Fifth Amendment equal protection rights, and that the Passport Policy violates the APA. With the exception of Solomon-Lane, the plaintiffs are also likely to suffer irreparable harm absent a preliminary injunction, and the balance of the equities weighs in their favor. Further, the preliminary injunction requested by the plaintiffs accords with the government's position regarding the appropriate scope of relief. *See* ECF 69, at 1 ("Defendants maintain that if any relief is warranted, it should be a targeted injunction at the particular agency action held to be invalid . . . [and] limited to the plaintiffs against whom the Department is held to have taken unlawful action.").

## CONCLUSION AND ORDER

For the foregoing reasons, the plaintiffs' Motion to Stay Agency Action and for a Preliminary Injunction, ECF 29, is GRANTED IN PART and DENIED IN PART. A separate order will issue memorializing the preliminary injunction entered by the Court.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: April 18, 2025

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|   |   |   |
|---|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, and REID SOLOMON-LANE, on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | No. 1:25-cv-10313-JEK |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

**ORDER OF PRELIMINARY INJUNCTION**

**KOBICK, J.**

For the reasons set forth in the Memorandum and Order issued today, ECF 74, the plaintiffs' motion to stay agency action and for preliminary injunction, ECF 29, is GRANTED IN PART and DENIED IN PART. The plaintiffs are likely to succeed on the merits of their claim that the Passport Policy, as defined in the Memorandum and Order, *see* ECF 74, at 2, 8, and Executive Order 14168 violate the equal protection principles safeguarded by the Fifth Amendment to the United States Constitution; their claim that the Passport Policy is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A); and their claim that the Passport Policy was adopted without observance of the procedure required by the Paperwork Reduction Act, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D). Plaintiffs Ashton Orr, Zaya

Perysian, Sawyer Soe, Chastain Anderson, Drew Hall, and Bella Boe have demonstrated that each of the remaining factors governing their request for preliminary injunctive relief weighs in their favor. Orr, Perysian, Soe, Anderson, Hall, and Boe are likely to experience irreparable harm absent a preliminary injunction because they do not currently possess passports with sex markers that correspond to their gender identities and expressions, and they will not be able to obtain such passports absent an injunction. In addition, the balance of the equities and the public interest favor an injunction for these plaintiffs. Plaintiff Reid Solomon-Lane is not, however, likely to suffer irreparable harm absent a preliminary injunction because he currently possesses a valid passport bearing a sex marker that corresponds to his gender identity and expression, and his passport remains valid until 2028. Solomon-Lane is therefore not entitled to a preliminary injunction.

Accordingly, pursuant to Federal Rule of Civil Procedure 65(a), the Court ORDERS as follows:

1.    Defendants Marco Rubio, in his official capacity as Secretary of State, and the Department of State (jointly, the "Agency Defendants"), as well as all officers, agents, employees, attorneys, and any other persons acting in concert with or behalf of the Agency Defendants, are ENJOINED from enforcing the Passport Policy as to plaintiffs Orr, Perysian, Soe, Anderson, Hall, and Boe. The Agency Defendants are further ENJOINED as to plaintiffs Orr, Perysian, Soe, Anderson, Hall, and Boe to process and issue passports consistent with the State Department's policy as of January 19, 2025, and to permit (a) changes to the sex designation on Orr, Perysian, Soe, Anderson, Hall, and Boe's passports, including allowing these plaintiffs to self-attest to their sex, and (b) an "X" sex designation on any passport where that is requested by Orr, Perysian, Soe, Anderson, Hall, or Boe.

2.    The plaintiffs' request for a stay of the Passport Policy under 5 U.S.C. § 705 is DENIED.

3.    This preliminary injunction shall take effect immediately upon the docketing of this Order and shall remain in effect until the entry of judgment in this matter, unless this Court, the United States Court of Appeals for the First Circuit, or the United States Supreme Court orders otherwise.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: April 18, 2025                                        UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ASHTON ORR, ZAYA PERYSIAN,
SAWYER SOE, CHASTAIN ANDERSON,
DREW HALL, BELLA BOE, REID
SOLOMON-LANE, VIKTOR AGATHA,
DAVID DOE, AC GOLDBERG, RAY
GORLIN, AND CHELLE LEBLANC,
on behalf of themselves and
others similarly situated,

     Plaintiffs,

v.                 No. 1:25-cv-10313-JEK

DONALD J. TRUMP, in his official
capacity as President of the United States;
U.S. DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as
Secretary of State; and UNITED STATES
OF AMERICA,

     Defendants.

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND MOTION TO APPLY THE PRELIMINARY INJUNCTION TO THE CLASSES

**KOBICK, J.**

At issue in this case are two changes that the State Department made to its policy concerning passport sex markers pursuant to Executive Order 14168 (Jan. 20, 2025). Whereas the State Department previously permitted transgender passport applicants to self-select male ("M") or female ("F") sex markers that correspond to either their gender identity or sex assigned at birth, it now requires that passports reflect only the holder's sex assigned at birth. And whereas the State Department previously allowed intersex, non-binary, and gender non-conforming applicants to

select "X" as the sex marker on their passports, it now issues passports only with an "M" or "F" marker. Jointly, these changes constitute the "Passport Policy."

On April 18, 2025, the Court entered a preliminary injunction barring enforcement of the Passport Policy against six of the seven original plaintiffs and requiring the State Department to issue those plaintiffs passports consistent with their gender identities. The plaintiffs subsequently amended the complaint to add five additional plaintiffs, each of whom is transgender or non-binary, like the original plaintiffs, and two of whom are also intersex.

Pending before the Court are the plaintiffs' motions to certify two classes under Federal Rule of Civil Procedure 23(b)(2) and to apply the preliminary injunction to certain members of those classes. The government does not dispute that the plaintiffs' proposed classes meet the criteria for certification under Federal Rule of Civil Procedure 23(a), but it contends that the classes are insufficiently ascertainable and fail to qualify for Rule 23(b)(2) certification. The government also opposes the plaintiffs' request to extend the preliminary injunction to a subset of the proposed classes. Following a hearing, the Court invited and received supplemental briefing from the parties on modified class definitions. Upon consideration of the parties' arguments, and for the following reasons, the Court will grant the plaintiffs' motions to certify two classes under Rule 23(b)(2) and to apply the preliminary injunction to a subset of each of those classes.

## BACKGROUND

The Court recites only the facts and procedural history relevant to the pending motions. A detailed description of the statutory and regulatory framework governing the issuance of passports, as well as the factual background of this case, is set out in the Court's April 18, 2025 Memorandum and Order granting in part and denying in part the plaintiffs' motion to stay agency action and for

a preliminary injunction. *See Orr v. Trump*, --- F. Supp. 3d ---, 2025 WL 1145271, at *2-7 (D. Mass. Apr. 18, 2025), *appeal docketed*, No. 25-1579 (1st Cir. June 13, 2025).

## I.    __Factual Background.__

The State Department has included sex as an identity attribute on passports since 1976. ECF 53-1, ¶ 5. From 1992 to 2021, the State Department permitted applicants to select a sex marker that differed from their sex assigned at birth, provided they submitted the requisite medical documentation. *See id.* ¶¶ 6-7. Then, in 2021, the State Department made two substantive changes to its policy concerning passport sex markers: (1) applicants were allowed to self-select their sex marker based on their gender identity; and (2) non-binary, intersex, and gender non-conforming applicants were permitted to select a third marker, "X," in lieu of an "M" or "F" marker. *See id.* ¶¶ 7-8.

On January 20, 2025, President Trump signed Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Executive Order"). 90 Fed. Reg. 8615 (Jan. 20, 2025). The Executive Order states that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It then sets forth the following definitions, among others:

a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

…

d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.
e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

*Id.*

The Executive Order directed the Secretary of State to implement policy changes to require that passports "accurately reflect the holder's sex," as that term is defined in the Executive Order. *Id.* § 3(d). Pursuant to this directive, the State Department made two substantive changes to its policy concerning passport sex markers in late January 2025: (1) it removed the option for applicants to obtain a passport with a sex marker reflecting either their gender identity or sex assigned at birth, and replaced it with the requirement that a passport reflect an applicant's sex assigned at birth; and (2) it removed the option for non-binary, intersex, or gender non-conforming applicants to obtain a passport with an "X" sex marker. *See* ECF 53-1, ¶¶ 15, 20-21.

## II.    <u>Procedural Background.</u>

Plaintiffs Ashton Orr, Zaya Perysian, Sawyer Soe, Chastain Anderson, Drew Hall, Bella Boe, and Reid Solomon-Lane, each of whom is transgender or non-binary, filed the original class action complaint in February 2025. ECF 1. Named as defendants were Donald J. Trump, in his official capacity as President of the United States; the United States of America; Marco Rubio, in his official capacity as Secretary of State; and the U.S. Department of State. *Id.* Against all defendants, the complaint asserted an equal protection claim alleging discrimination on the basis of sex and transgender status, a claim for infringement of the right to travel abroad, and a claim for infringement of the right to informational privacy, all in violation of the Fifth Amendment, as well as a claim for violation of the First Amendment right to free speech and expression. *Id.* ¶¶ 193-235. Against Secretary Rubio and the State Department, the complaint alleged that the Passport Policy and related agency actions violate the Administrative Procedure Act ("APA") because they are unconstitutional, arbitrary and capricious, and without observance of procedure required by the Paperwork Reduction Act ("PRA"). *Id.* ¶¶ 236-51. The plaintiffs sought declaratory and

injunctive relief, and asked the Court to hold unlawful, vacate, and set aside the Passport Policy under 5 U.S.C § 706(2). *Id.* at 56-57.

In February 2025, the plaintiffs filed a motion to stay agency action and for a preliminary injunction, ECF 29, which the government opposed, ECF 53. The Court held a hearing in March 2025, ECF 64, after which it allowed the parties to submit supplemental briefing regarding the scope of relief, ECF 67, 69. On April 18, 2025, the Court granted in part and denied in part the plaintiffs' motion. ECF 74.

The Court concluded that the plaintiffs are likely to succeed on the merits of their equal protection claim because (1) the Executive Order and Passport Policy discriminate on the basis of sex and the government failed to demonstrate that the policies are substantially related to an important government interest, and (2) the Executive Order and Passport Policy are rooted in irrational prejudice toward transgender Americans. *See id.* at 16-32. The Court further determined that the plaintiffs are likely to succeed on their claims that the Passport Policy violates the APA because it is arbitrary and capricious and because it was adopted without observance of procedure required by the PRA. *See id.* at 33-46. The uncontroverted record evidence—including affidavits submitted by each of the named plaintiffs and expert declarations submitted by Dr. Ayden Scheim, an epidemiologist, and Dr. Sarah Corathers, an endocrinologist—demonstrated that six of the seven original plaintiffs were likely to experience irreparable harm absent preliminary injunctive relief. *See id.* at 46-50. Transgender and non-binary people who possess passports bearing sex markers that conflict with their gender identity and expression are, as Dr. Scheim explained, significantly more likely to experience psychological distress, suicidality, harassment, discrimination, and violence. *See id.* at 47-49. And, as Dr. Corathers reported, obtaining gender-concordant identity documents is part of the standard of care for treating gender dysphoria, a

medical diagnosis shared by six of the seven original plaintiffs. *See id.* at 47. Further, the plaintiffs would, as explained in their declarations, experience anxiety and psychological distress or fear for their safety if they were required to travel with passports bearing a sex designation corresponding to their sex assigned at birth, largely because they would effectively "out" themselves every time they presented their passports. *See id.* at 47-48. Indeed, three of the plaintiffs had previously been harassed when using identity documents that listed their sex assigned at birth. *See id.* at 48-49. The plaintiffs averred that they would forgo planned international travel, and related medical and professional opportunities, if they were unable to obtain passports with a sex marker that aligns with their gender identity and expression. *See id.* at 49-50.

Concluding that the balance of the equities and the public interest favored the plaintiffs, the Court awarded preliminary injunctive relief to the six original plaintiffs who did not possess passports bearing a sex marker that aligns with their gender identity. *See id.* at 56; ECF 75.[1] But the Court denied the plaintiffs' request to stay the Passport Policy and order the reinstatement of the prior passport policy under 5 U.S.C. § 705, because the plaintiffs' request exceeded the scope of relief available under that statute. *See* ECF 74, at 55.

On April 25, 2025, the plaintiffs filed an amended complaint that asserted the same claims and sought the same relief as the original complaint but named five additional plaintiffs—Viktor Agatha, David Doe,[2] AC Goldberg, Ray Gorlin, and Chelle LeBlanc—each of whom is transgender or non-binary, and two of whom are also intersex. ECF 76. Five days later, the plaintiffs moved to certify two classes, ECF 77, and to apply the preliminary injunction to certain

---

[1] The Court found that Solomon-Lane was not likely to experience irreparable harm absent interim equitable relief because he possesses a passport with a sex marker corresponding to his gender identity and expression, and his passport remains valid until its expiration in 2028. *See* ECF 74, at 50; ECF 30-8, ¶ 11.

[2] David Doe has been granted leave to proceed under pseudonym. ECF 100.

members of those classes, ECF 79. The plaintiffs' motion sought certification of the following classes under Federal Rule of Civil Procedure 23(b)(2):

1. All people who currently want, or in the future will want, a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class"); and

2. All people who currently want, or in the future will want, a U.S. passport and wish to use an "X" sex designation ("X Designation Class").

*See* ECF 76, ¶ 273; ECF 77, at 1. Excluded from the proposed classes were any judge presiding over this action and the plaintiffs in *Schlacter v. U.S. Department of State*, No. 25-cv-01344 (D. Md. filed Apr. 25, 2025). *See* ECF 76, ¶ 274; ECF 77, at 1.

After receiving the government's oppositions, ECF 88, 89, the Court held a hearing and took the motions under advisement, ECF 103. At the hearing, the Court observed that the plaintiffs' proposed class definitions did not tie membership in the classes to an individual's status as transgender or non-binary, even though gender identity is integral to the plaintiffs' claims. To address this concern, as well as the government's contention that the proposed classes were improperly defined by reference to subjective criteria, the Court invited the parties to submit supplemental briefing on the following modified class definitions:

1. A class of all people (1) who are transgender and/or have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class"); and

2. A class of all non-binary people who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an "X" designation ("X Designation Class").

ECF 104, at 2. These modified class definitions would likewise exclude the plaintiffs in *Schlacter* and any judge presiding over this action. *See id.*

In response, the government maintained its prior objections to class certification, while noting that the revised class definitions cured some deficiencies in the plaintiffs' proposal. ECF 107, at 1. The government did not raise new objections to these modified class definitions. *See id.* at 1-3. The plaintiffs, for their part, proposed replacing the phrase "all people . . . who are transgender" in the M/F Designation Class definition with the phrase "all people . . . whose gender identity is different from the sex assigned to them under the Passport Policy." ECF 108, at 1. This proposed modification would not substantively modify the definition of the M/F Designation Class because it simply clarifies the term "transgender." *See* ECF 78-13, ¶ 48 (defining the term "transgender"). The plaintiffs also proposed modifying the X Designation Class to include all "transgender, and/or intersex people, and/or people who were not assigned a binary sex at birth," rather than only non-binary people. ECF 108, at 2. Although some of these modifications are not warranted,[3] the plaintiffs' request to use the term "transgender" rather than "non-binary" in the X Designation Class does not significantly alter that class because non-binary people, who do not

---

[3]    The plaintiffs' proposal to expressly include intersex people in the X Designation Class definition will not be adopted. Although two of the plaintiffs are intersex, both have been designated as representatives of the M/F Designation Class. *See* ECF 77, at 1-2. The proposed X Designation Class representatives are non-binary, but neither is intersex. *See id.* at 2. Unlike non-binary people, who do not fully identify with a binary sex, intersex people "are born with sex characteristics that do not fit typical binary notions" of sex. ECF 78-13, ¶ 33. As the State Department previously recognized, some intersex people are, biologically, "born neither male nor female." *Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020). While non-binary people and intersex people may have significant overlapping legal interests, intersex people are uniquely positioned to argue that the Passport Policy "injects inaccuracy into the data" by assigning them a binary sex that lacks any biological basis. *Id.* It is therefore not clear that non-binary class representatives could fully represent the interests of intersex class members. *See* Fed. R. Civ. P. 23(a)(4). For similar reasons, the Court will not adopt the plaintiffs' request to include "people who were not assigned a binary sex at birth" in the X Designation Class definition. ECF 108, at 2. Every plaintiff in this litigation, even those who are intersex, was assigned a binary sex at birth, and the plaintiffs have produced no evidence of any person *not* assigned a binary sex at birth.

identify exclusively with a binary sex, are a subset of transgender people whose gender identity does not match their sex assigned at birth. *See* ECF 74, at 10; ECF 65, at 18.

In view of the foregoing, the Court will consider whether to certify under Rule 23(b)(2), and whether to apply the preliminary injunction to a subset of, the following two classes:

1. A class of all people (1) whose gender identity is different from the sex assigned to them under the Passport Policy and/or who have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class"); and

2. A class of all people whose gender identity is different from the sex assigned to them under the Passport Policy and who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an "X" designation ("X Designation Class").

Both classes would exclude the plaintiffs in *Schlacter* and any judge presiding over this action.

## DISCUSSION

## I.    <u>Motion for Class Certification.</u>

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). Class certification is appropriate only where the district court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a)"—numerosity, commonality, typicality, and adequacy of representation—and one of the provisions of Rule 23(b) are met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003). Under Rule 23(b)(2)—the subsection of Rule 23(b) invoked by the plaintiffs here—certification is warranted where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The plaintiffs contend that the proposed classes satisfy each of the Rule 23(a) factors and Rule 23(b)(2). The government does not dispute that the proposed classes satisfy the Rule 23(a) factors. It does, however, oppose class certification on two grounds. First, it contends that because the plaintiffs in the *Schlacter* case—who bring comparable claims, and seek comparable relief, to the plaintiffs in this case—are excluded from the class definitions, any relief obtained will not affect the entire class, as required by Rule 23(b)(2). Second, the government argues that the proposed classes are not ascertainable because it is not possible to objectively determine whether someone's gender identity differs from their sex assigned at birth.

A.    The Rule 23(a) Factors.

The proposed classes, as modified, satisfy the Rule 23(a) factors. First, "the class[es] [are] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the United States, there are over 1.5 million people who identify as transgender, *see* ECF 78-13, ¶ 48, and over 1.2 million people who identify as non-binary, *id.* ¶ 49. While the record does not indicate exactly how many people fall within the M/F Designation Class and the X Designation Class, the proposed classes no doubt exceed the "low threshold for numerosity," which the First Circuit has pegged at around 40 members. *García-Rubiera v. Calderón*, 570 F.3d 443, 460 (1st Cir. 2009).

Second, "there are questions of law or fact common to the class[es]." Fed. R. Civ. P. 23(a)(2). "A question is common if it is 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 28 (1st Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The commonality requirement presents "a low bar, and courts have generally given it a permissive application." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 (1st Cir.

2008) (quotation marks omitted). At bottom, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (quoting *Falcon*, 457 U.S. at 157).

Members of both classes have suffered the same injury because the Passport Policy uniformly prohibits them from obtaining a passport with a sex designation that aligns with their gender identity, which is different from their sex assigned at birth. *See Parent/Pro. Advoc. League*, 934 F.3d at 28 ("[C]ommon answers typically come in the form of 'a particular and sufficiently well-defined set of allegedly illegal policies [or] practices' that work similar harm on the class plaintiffs." (quoting *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014))). As a direct result of the Passport Policy, each class member is unable to obtain an "M," "F," or "X" sex marker that aligns with their gender identity and expression. *See* ECF 53-1, ¶ 21. Questions of law are also common to the classes. As to the APA claims, common questions include (1) whether the claims are reviewable; (2) if so, whether the Passport Policy is arbitrary and capricious because it was not accompanied by a reasoned explanation when promulgated; and (3) whether it was adopted without observance of the procedures required by the PRA. Common questions raised by the equal protection claim include (1) whether the Passport Policy and Executive Order discriminate on the basis of sex or transgender status; (2) if so, whether the policies satisfy the appropriate level of means-ends scrutiny; and (3) whether the policies are rooted in unconstitutional animus toward a disfavored group. The Fifth Amendment right-to-travel and privacy claims raise common questions concerning the scope of these rights and the standard of review applicable to government actions alleged to infringe each right. And common questions pertaining to the First Amendment claim include whether passport sex designations are personal or government speech and whether the forced disclosure of a passport holder's sex assigned at birth is compelled speech.

Third, "the claims or defenses of the representative parties are typical of the claims or defenses of the class[es]," Fed. R. Civ. P. 23(a)(3), largely for the same reasons that the commonality requirement is satisfied. *See Dukes*, 564 U.S. at 349 n.5 (noting that the commonality and typicality requirements "tend to merge" (quotation marks omitted)). The proposed class representatives' APA and constitutional claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members"—namely, the adoption and enforcement of the Passport Policy, which bars members of both classes from obtaining passports bearing sex designations that align with their gender identity. *García-Rubiera*, 570 F.3d at 460 (quotation marks omitted).

Fourth, "the representative parties will fairly and adequately protect the interests of the class[es]." Fed. R. Civ. P. 23(a)(4). This requirement has two parts: "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). The plaintiffs proposed to represent the M/F Designation Class are Orr, Perysian, Anderson, Hall, Boe, Solomon-Lane, Agatha, Doe, Goldberg, and LeBlanc. ECF 77, at 1-2. The plaintiffs proposed to represent the X Designation Class are Soe and Gorlin. *Id.* at 2. There is no evidence that the proposed class representatives have any interests that conflict with members of their respective classes. To the contrary, the proposed representatives seek relief that will equally benefit themselves and the members of the classes they would represent. Members of the M/F Designation Class seek the ability to obtain an "M" or "F" passport sex designation that aligns with their gender identity, and members of the X Designation Class seek the ability to obtain an "X" designation.

The proposed class representatives' chosen counsel—the American Civil Liberties Union ("ACLU"), the ACLU of Massachusetts ("ACLUM"), and Covington and Burling LLP—are also "qualified, experienced, and able to vigorously conduct the proposed litigation." *Andrews*, 780 F.2d at 130 (comma added). Counsel with the ACLU and the ACLUM have decades of combined experience litigating class actions and, more specifically, litigating claims pertaining to transgender individuals' civil rights and civil liberties, including their ability to access identity documents. *See* ECF 78-15 (declaration of Jon W. Davidson, Senior Counsel at the ACLU); ECF 78-16 (declaration of Jessie J. Rossman, Legal Director of the ACLUM). The Covington and Burling team also has significant experience litigating complex civil litigation and class actions, and it has already devoted substantial resources to litigating this case. *See* ECF 78-17.

    B.    <u>Rule 23(b)(2).</u>

Federal Rule of Civil Procedure 23(b)(2) permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). "'[C]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." *Id.* at 361 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

The proposed classes lie in the heartland of Rule 23(b)(2). The government's conduct—that is, its enforcement of the Passport Policy—uniformly impacts members of the M/F and X

Designation Classes by preventing them from obtaining passports with a sex marker consistent with their gender identity. The plaintiffs also seek an "indivisible" remedy: an order enjoining the government from enforcing the Passport Policy against class members and requiring the government to issue them passports in accordance with the policy that was in effect immediately before the adoption of the Passport Policy. *See* ECF 76, at 68. This is the sort of uniform, class-wide remedy contemplated by Rule 23(b)(2). *See Dukes*, 564 U.S. at 360; *Healthy Futures of Texas v. Dep't of Health & Hum. Servs.*, 326 F.R.D. 1, 9 (D.D.C. 2018) ("[T]his Court would need to enter only a single program-wide injunction on behalf of the class if it agrees with Healthy Futures's claims on the merits. Such is precisely the situation that Rule 23(b)(2) envisions."). The plaintiffs have, accordingly, demonstrated that certification is proper under Rule 23(b)(2).

The government resists this conclusion on two grounds, neither of which has merit. It first contends that any remedy obtained by the plaintiffs will not be "indivisible" because the plaintiffs exclude from the proposed classes the plaintiffs in *Schlacter v. U.S. Department of State*—another case brought by transgender and non-binary plaintiffs to challenge the Executive Order and Passport Policy—who would likely fall within the proposed classes were they not expressly excluded. *See generally* ECF 1, *Schlacter v. U.S. Dep't of State*, No. 25-cv-01344 (D. Md.). But as the Supreme Court noted in *Dukes*, the "key to the (b)(2) class" is that the challenged conduct "can be enjoined or declared unlawful only as to all of the *class members* or as to none of them." 564 U.S. at 360 (emphasis added and quotation marks omitted). The key is not, as the government would have it, whether the challenged conduct can be enjoined as to every *potential* class member. Because the *Schlacter* plaintiffs are excluded from the proposed classes, they are not, by definition, "class members." *See* ECF 77, at 1 ("No person who is a plaintiff in *Schlacter . . . is included in*

*either class*." (emphasis added)). Their exclusion thus has no impact on whether any remedy obtained in this case is "indivisible."

The government next argues that excluding the *Schlacter* plaintiffs from the proposed classes is tantamount to creating "an opt-out mechanism," which is not permitted for Rule 23(b)(2) classes. ECF 88, at 6; *see Dukes*, 564 U.S. at 362 ("Rule [23] provides no opportunity for (b)(1) or (b)(2) class members to opt out."). This argument conflates the function of a class definition with the function of an opt-out mechanism. As then-Judge Jackson observed in *Healthy Futures of Texas v. Department of Health and Human Services*, "the 'class definition' and 'opt-out' mechanisms involve different decision makers, serve different functions, and take place at markedly different times." 326 F.R.D. at 9. The class definition sets the parameters for determining class membership *before* a class is certified. *See id.*; Herbert B. Newberg & William B. Rubenstein, 3 Newberg & Rubenstein on Class Actions § 7:27 (6th ed. June 2025 update) (hereinafter "Newberg & Rubenstein on Class Actions"). An opt-out mechanism, in contrast, permits the members of an *already-certified* class the opportunity to remove themselves from the class before final judgment is entered. *See Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 51 (1st Cir. 2010); *Healthy Futures*, 326 F.R.D. at 9; 6 Newberg & Rubenstein on Class Actions § 18:45. Excluding the *Schlacter* plaintiffs from the proposed classes in this case is, accordingly, consistent with the purposes of Rule 23(b)(2) class certification. *See Healthy Futures*, 326 F.R.D. at 9-10.

The Supreme Court endorsed this approach to certifying nationwide classes in *Califano v. Yamasaki*. In that case, the district court certified under Rule 23(b)(2) a nationwide class of social security beneficiaries "whose benefits have been or will be reduced or otherwise adjusted without prior notice and opportunity for a hearing." 442 U.S. at 689. Class actions asserting similar claims had previously been brought in other districts, so, "[a]s a precautionary measure," the district court

"excluded all persons who had participated as plaintiffs or members of a plaintiff class in litigation against the Secretary on similar issues" where a decision on the merits had been issued. *Id.* In affirming the district court's certification of this nationwide class, the Supreme Court praised its "sensitivity to ongoing litigation of the same issue in other districts"; that is, its decision to exclude class members in comparable litigation. *Id.* at 703. Exclusion of the *Schlacter* plaintiffs from the proposed classes in this case, as in *Califano*, reflects a similar sensitivity: it ensures that this litigation does "not improperly interfere with the litigation of similar issues" in the Maryland court and generates "the benefit of adjudication by different courts in different factual contexts." *Id.* at 702. Accordingly, the plaintiffs' proposed exclusion of the *Schlacter* plaintiffs is no barrier to certification under Rule 23(b)(2) in this matter.

C.      Ascertainability.

The government next opposes certification on the basis that membership in the classes is not sufficiently ascertainable. Membership in the classes depends on an individual's gender identity, which, the government contends, cannot objectively be assessed. *See* ECF 105, at 24-25; ECF 107, at 2-3.

The rule that classes be "ascertainable" or "definite" is an "implied requirement" of class certification in certain cases. *See* 1 Newberg & Rubenstein on Class Actions § 3:1; *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015) ("[T]he definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable."). A class is ascertainable where it is defined by reference to "'objective criteria.'" *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012) (quoting 5 Moore et al., Moore's Federal Practice § 23.21[3][a] (3d ed. 2012)). In *Matamoros v. Starbucks Corporation*, for example, the First Circuit deemed a class comprising "all individuals who were employed as baristas at any Starbucks store" in Massachusetts between

certain dates to be ascertainable because it was defined by reference to the "objective standard of job titles." 699 F.3d at 138-39.

While the ascertainability requirement applies to Rule 23(b)(3) classes seeking monetary relief, the requirement does not apply to all Rule 23(b)(2) classes seeking declaratory or injunctive relief. *See* 1 Newberg & Rubenstein on Class Actions § 3:7; Joseph M. McLaughlin, 1 McLaughlin on Class Actions: Law & Practice § 4:2 (21st ed. Oct. 2024 update) (hereinafter "McLaughlin on Class Actions") ("The ascertainability requirement applicable to (b)(3) and (b)(1) classes generally does not apply to (b)(2) classes that seek only injunctive or declaratory relief."). Unlike members of Rule 23(b)(2) classes, which are "mandatory," *Dukes*, 564 U.S. at 362, members of Rule 23(b)(3) classes are permitted to opt out of the class to preserve their claims and avoid the preclusive effect of class judgment. *See* 1 Newberg & Rubenstein on Class Actions § 3:7; 1 McLaughlin on Class Actions § 4:2. Upon certification of a Rule 23(b)(3) class, a court must order the distribution of individualized notice to class members apprising them of, among other things, the preclusive effect of class judgment and their opt-out rights. Fed. R. Civ. P. 23(c)(2)(B)(v), (vii). Ensuring that the identity of Rule 23(b)(3) class members can be ascertained is therefore necessary to safeguard those class members' due process rights and ensure that they will receive the requisite notice. *See* 1 Newberg & Rubenstein on Class Actions § 3:7; 1 McLaughlin on Class Actions § 4:2.

Notice to members of Rule 23(b)(2) classes, in contrast, is optional. *See* Fed. R. Civ. P. 23(c)(2)(A). Consistent with the rationale for ensuring that Rule 23(b)(3) classes are ascertainable, the First Circuit has hinged the applicability of the ascertainability requirement to Rule 23(b)(2) classes on whether notice is due to class members. In *Yaffe v. Powers*, it reversed a district court's decision not to certify a Rule 23(b)(2) class based on that court's determination that the class was

not ascertainable. 454 F.2d 1362, 1366 (1st Cir. 1972), *abrogated on other grounds by Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478 (1978). "Although notice to and therefore precise definition of the members of the suggested class are important to certification of a subdivision (b)(3) class," the First Circuit explained, "notice to the members of a (b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited." *Id.* Thus, the district court had erred in applying the ascertainability requirement for Rule 23(b)(3) classes to the proposed Rule 23(b)(2) class before it. *Id.* The First Circuit further noted that Rule 23(b)(2) classes are "uniquely suited to civil rights actions in which the members of the class are often incapable of specific enumeration," *id.* (quotation marks omitted), because the benchmark for certification of a Rule 23(b)(2) class is whether the defendant's conduct applies "generally to the class," Fed. R. Civ. P. 23(b)(2).

*Yaffe* contrasts with *Crosby v. Social Security Administration of the United States*, in which the First Circuit affirmed a district court's decision not to certify a Rule 23(b)(2) class of social security claimants where the relief sought by the plaintiffs would have required the distribution of individualized notice to all class members. 796 F.2d 576 (1st Cir. 1986). The *Crosby* plaintiffs proposed a class of "all present and future claimants for disability benefits who have not had a hearing held within a reasonable time and/or who have not had a decision rendered in such a hearing for benefits within a reasonable time from the date of Request of Hearing." *Id.* at 578 (emphasis and quotation marks omitted). As relevant here, the First Circuit reasoned that "[b]ecause the standard of 'within a reasonable time' makes class members impossible to identify prior to individualized fact-finding and litigation," the proposed class failed to satisfy the ascertainability requirement. *Id* at 580. And "[w]ithout an identifiable class of disability

claimants," the Court could not grant class-wide relief, which would have required the dissemination of individualized notices to class members. *Id.*

Read together, *Yaffe* and *Crosby* indicate that the ascertainability requirement applies to Rule 23(b)(2) classes only where individualized notice will be sent to class members. This approach accords with the approach taken by other Courts of Appeals[4] and with leading treatises.[5] Here, the ascertainability requirement does not apply because the plaintiffs do not propose distributing notice to members of the proposed classes, and no party contends that notice is required for these classes. *See Yaffe*, 454 F.2d at 1366. The government's concern that the proposed classes are insufficiently definite because putative class members' gender identity cannot be objectively verified thus presents no bar to Rule 23(b)(2) certification. The Court will, accordingly, certify the M/F and X Designation Classes, as modified.

###### D.    Appointment of Class Counsel.

Plaintiffs' counsel at the ACLU, the ACLUM, and Covington and Burling will be appointed as class counsel. *See* Fed. R. Civ. P. 23(g)(1). When appointing class counsel, courts must consider:

---

[4] *See Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("[A]scertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief."); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[W]hile the lack of identifiability is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule 23(b)(2)."); *Shelton v. Bledso*, 775 F.3d 554, 561 (3d Cir. 2015) ("Because the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action.").

[5] *See, e.g.*, 1 Newberg & Rubenstein on Class Actions § 3:7 ("Of course, this conclusion [that the ascertainability requirement does not apply to Rule 23(b)(2) classes] would not apply to (b)(2) classes in which plaintiffs seek notice and opt-out rights; in such cases, 'a precise class definition becomes just as important as in the Rule 23(b)(3) context.'" (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004))); 1 McLaughlin on Class Actions § 4:2 (noting that the ascertainability requirement "generally does not apply to (b)(2) classes," but that, "[o]f course, if discretionary notice or opt out rights are afforded (b)(2) class members, the greater precision demanded of a (b)(3) class is demanded").

(1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). For the reasons discussed in connection with Rule 23(a)(4)'s adequacy requirement, each of these factors favors the plaintiffs. Plaintiffs' counsel have zealously litigated this case since its inception: they filed the original complaint within a month of the Executive Order's issuance, and they have since devoted substantial time and energy to this case, which has already proceeded through multiple rounds of motion practice. Collectively, plaintiffs' counsel have decades of experience litigating complex civil cases and class actions, and counsel with the ACLU and ACLUM, in particular, have expertise representing LGBTQ+ individuals. *See generally* ECF 78-15, 78-16, 78-17. The Covington and Burling team has covered many of the expenses involved with this case, including expert fees. *See* ECF 78, at 20. Appointment is, accordingly, appropriate under Rule 23(g).

## II.     Motion to Extend the Preliminary Injunction.

The plaintiffs move to apply the preliminary injunction awarded to six of the original plaintiffs to a subset of the M/F and X Designation Classes—namely, those class members who face the same irreparable harm (the "PI Class").[6] The plaintiffs define the proposed PI Class to include all individuals who are (1) members of the M/F Designation Class or the X Designation Class, and (2) either (a) do not have a currently valid passport, (b) need to renew their current passport because it expires within one year, (c) need to make changes to their passport to have the

---

[6] The term "PI Class" is used only to refer to the subset of M/F Designation Class and X Designation Class members who are eligible for preliminary injunctive relief. The PI Class is not being separately certified under Rule 23(b)(2).

sex designation on it align with their gender identity or to reflect a name change, or (d) need to apply for another passport because their passport was lost, stolen, or damaged. ECF 80, at 6. The government opposes the motion to extend the preliminary injunction, arguing that the plaintiffs have failed to establish that members of the PI Class will suffer irreparable harm absent a preliminary injunction, and that, regardless, the balance of the equities favors the government.

A.    Legal Standard.

"A preliminary injunction is an extraordinary and drastic remedy . . . that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quotation marks and citations omitted). To secure a preliminary injunction, the plaintiffs must demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The first and second factors are "the most important," *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and courts consider them in tandem, *see Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

B.    Likelihood of Success on the Merits.

The plaintiffs contend, and the Court agrees, that the Court's reasoning regarding the original plaintiffs' likelihood of success on their equal protection and APA claims applies with equal force to the PI Class members' claims. The government does not dispute this. Instead, to challenge the PI Class members' likelihood of success on the merits, the government reasserts the same arguments that it raised in opposition to the original preliminary injunction motion. *See* ECF

89, at 1. The Court previously considered each of these arguments and found them unpersuasive. *See* ECF 74, at 16-46.

The Court's analysis regarding the original plaintiffs' equal protection and APA claims centered on the text of the Executive Order and the Passport Policy, as well as the government's conduct in development and implementation of the policy. The government has not produced any evidence since the first preliminary injunction motion was decided that would alter this analysis. It has not, for example, produced additional evidence pertaining to its reasons for adopting the Passport Policy, which would bear on whether the Policy is substantially related to an important government interest, as required to survive intermediate scrutiny, or whether it is the product of reasoned decisionmaking, as required to survive arbitrary and capricious review. The only individualized attribute of the original plaintiffs that factored into the Court's analysis of these claims was their transgender or non-binary identity. Every member of the proposed classes shares one or both of these identities. The Court therefore concludes that the PI Class members are likely to succeed on the merits of their equal protection and APA claims for the reasons discussed in its April 18, 2025 Memorandum and Order.

C.     Irreparable Harm.

The plaintiffs contend that, absent preliminary injunctive relief, members of the PI Class would experience irreparable harm that is "identical to the injuries experienced" by Orr, Perysian, Soe, Anderson, Hall, and Boe. ECF 80, at 9. Preliminary injunctive relief is available only where the moving party can "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy," *Rio Grande Cmty. Health Ctr.,*

*Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005), and it is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," *Irizarry*, 587 F.3d at 485.

Under First Circuit precedent, a party seeking class-wide preliminary injunctive relief need not provide individualized proof that each class member is likely to experience irreparable harm, so long as it can establish that the risk of irreparable harm faced by certain class members is representative of the risk faced by all class members. In *United Steelworkers of America, AFL-CIO v. Textron, Inc.*, the defendant appealed a preliminary injunction requiring it to resume paying health insurance premiums for approximately 200 of its retired former employees. 836 F.2d 6, 7-8 (1st Cir. 1987). Although the plaintiffs had provided direct evidence, in the form of an affidavit, of the harm that a few retirees experienced after losing their health insurance, the First Circuit had "no difficulty" finding the preliminary injunction order—which applied to all 200 retirees— lawful. *Id.* at 8-9. Since it was undisputed that the defendant had ceased paying the health insurance premiums for all 200 retirees, the First Circuit held that the district court could take the specific harms faced by two retirees "as illustrative of what could occur among all retirees." *Id.* at 8. Those "illustrative" harms sufficed to demonstrate that every retiree was likely to experience irreparable harm absent preliminary injunctive relief. *See id.* at 9. Citing *Textron*, the Second Circuit has similarly held that "plaintiffs should be allowed to adduce evidence of harm representatively, so long as they lay a foundation that the representative plaintiffs are similarly situated with regard to the issue of irreparable harm." *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 58 (2d Cir. 2004); *see also Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (the entry of a class-wide preliminary injunction is appropriate where a court can "infer that all (or virtually all) members of a group are irreparably harmed").

The named plaintiffs have laid the requisite foundation for the Court to find that the risk of irreparable harm they face is representative of the risk faced by all members of the PI Class. To start, the named plaintiffs who are eligible for preliminary injunctive relief (the "PI-eligible plaintiffs")—that is, every plaintiff except for Solomon-Lane and Goldberg, both of whom have valid passports bearing sex markers consistent with their gender identities, ECF 78-6, ¶ 11; ECF 78-10, ¶ 12—are similarly situated to members of the PI Class. *See LaForest*, 376 F.3d at 58. Each PI-eligible plaintiff is either transgender or non-binary, and each except Soe has been diagnosed with gender dysphoria. *See* ECF 78-1, ¶¶ 5-6; ECF 78-2, ¶¶ 4-5; ECF 78-3, ¶¶ 5-6; ECF 78-4, ¶¶ 6-7; ECF 78-5, ¶¶ 5-6; ECF 78-7, ¶ 5; ECF 78-8, ¶¶ 5, 9; ECF 78-9, ¶¶ 5-6; ECF 78-11, ¶¶ 5, 7; ECF 78-12, ¶¶ 5-6. The PI-eligible plaintiffs, like members of the PI Class, have an imminent need to replace or renew their passport or do not currently possess a passport with a sex designation that aligns with their gender identity. *Compare* ECF 80, at 6, *with* ECF 78-1, ¶¶ 14, 17; ECF 78-2, ¶ 12; ECF 78-3, ¶ 11; ECF 78-4, ¶ 12; ECF 78-5, ¶ 13; ECF 78-7, ¶¶ 9, 11; ECF 78-8, ¶¶ 11, 13; ECF 78-9, ¶ 12; ECF 78-11, ¶ 10; ECF 78-12, ¶ 10. And it is undisputed that the PI-eligible plaintiffs and PI Class members face the same injury: they cannot obtain a passport with a sex designation that aligns with their gender identity because, under the Passport Policy, the State Department will issue passports only with a sex designation that aligns with the holder's sex assigned at birth. *See* ECF 53-1, ¶¶ 15, 21.

Through Dr. Corathers' and Dr. Scheim's expert declarations, the plaintiffs have introduced uncontroverted evidence of the harms that transgender and non-binary people face if they are required to use passports bearing sex designations aligning with their sex assigned at birth rather than their gender identity. *See* ECF 78-13 (Corathers declaration); ECF 78-14 (Scheim declaration). Citing large-scale studies, Dr. Scheim reports that transgender people with gender-

discordant identity documents have an elevated risk of encountering problems with airport security and experiencing harassment or violence when traveling, particularly to countries that criminalize transgender expression. ECF 78-14, ¶¶ 22-23. Transgender people who face obstacles in obtaining gender-concordant identity documents are also twice as likely to have suicidal ideation, and experience higher psychological distress, than transgender people who do not encounter such obstacles. *Id.* ¶ 33. In contrast, transgender people who have obtained gender-concordant identity documents generally—and passports, specifically—are significantly less likely to experience anxiety, serious psychological distress, and suicidality. *See id.* ¶¶ 29-35, 37. Transgender people are also significantly less likely to experience discrimination, harassment, and violence when they possess gender-concordant identity documents. *See id.* ¶¶ 25-27, 36, 38. Dr. Corathers likewise reports that "living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity," is part of the recognized standard of care for treating gender dysphoria, a medical condition that describes "the significant emotional distress" and impairment in functioning "that stems from the incongruence between a person's gender identity and sex designated at birth." ECF 78-13, ¶¶ 53, 58, 77. Taken together, these expert declarations establish that requiring transgender and non-binary people to use passports bearing sex markers corresponding to their sex assigned at birth increases their risk of experiencing anxiety, psychological distress, suicidality, discrimination, harassment, and violence.

The plaintiffs' declarations demonstrate the imminence of these risks. Every plaintiff avers that they would experience significant anxiety or fear for their safety if required to use a passport bearing a sex marker that corresponds to their sex assigned at birth rather than their gender identity and expression. *See* ECF 78-1, ¶¶ 16-17; ECF 78-2, ¶¶ 14-15; ECF 78-3, ¶¶ 13-14, 16; ECF 78-4, ¶¶ 14-15; ECF 78-5, ¶¶ 14-15; ECF 78-6, ¶¶ 11-12; ECF 78-7, ¶ 11; ECF 78-8, ¶ 14; ECF 78-9,

¶¶ 10, 14-15, 17; ECF 78-10, ¶¶ 14-16, 18; ECF 78-11, ¶¶ 11-12, 14; ECF 78-12, ¶¶ 12-14. Six of the plaintiffs further report that they have been harassed when presenting identity documents bearing sex markers corresponding to their sex assigned at birth rather than their gender identity. *See* ECF 78-1, ¶¶ 9-10; ECF 78-2, ¶ 8; ECF 78-3, ¶¶ 12-13; ECF 78-9, ¶ 16; ECF 78-10, ¶ 14; ECF 78-11, ¶ 11. Due to these risks, three plaintiffs have already cancelled international travel plans because they were unable, under the Passport Policy, to obtain passports bearing a sex marker that aligns with their gender identity. *See* ECF 78-1, ¶ 15; ECF 78-2, ¶¶ 10, 13; ECF 78-5, ¶ 9. And nearly all of the PI-eligible plaintiffs aver that they are likely or certain to cancel international travel plans if they are unable to update the sex marker on their passports. *See* ECF 78-1, ¶ 17; ECF 78-2, ¶¶ 13-14; ECF 78-3, ¶¶ 14-15; ECF 78-5, ¶¶ 14-15; ECF 78-8, ¶¶ 12, 14; ECF 78-9, ¶¶ 9, 14-15; ECF 78-11, ¶¶ 14-15; ECF 78-12, ¶¶ 11, 14.

Based on this evidence, every PI-eligible plaintiff has established that they are likely to experience irreparable harm. Absent preliminary injunctive relief, these plaintiffs may effectively be forced to out themselves as transgender or non-binary every time they present their passport—whether for international travel or to verify their identity in administrative settings, such as employment paperwork or opening a bank account. *See* ECF 78-1, ¶¶ 7, 16; ECF 78-2, ¶¶ 6, 12; ECF 78-3, ¶¶ 7-8, 12, 14, 16; ECF 78-4, ¶¶ 7-8, 11, 15; ECF 78-5, ¶¶ 8, 14; ECF 78-7, ¶¶ 8-9; ECF 78-8, ¶¶ 9, 14; ECF 78-9, ¶ 15; ECF 78-11, ¶¶ 8, 14; ECF 78-12, ¶¶ 7, 13. The PI-eligible plaintiffs are therefore unable to use their passports without a heightened risk of experiencing anxiety, psychological distress, suicidality, discrimination, harassment, and violence. ECF 78-13, ¶¶ 53, 58, 77; ECF 78-14, ¶¶ 22-38. These are the types of injuries that cannot adequately be measured or compensated by money damages or a later-issued remedy. *See* ECF 74, at 49-50; *Textron*, 836

F.2d at 9 (irreparable harm established where retirees faced risk of "serious emotional harm" after their former employer ceased paying life insurance premiums).

The risk of irreparable harm faced by the PI-eligible plaintiffs is representative of the risk of irreparable harm faced by every member of the PI Class. The PI-eligible plaintiffs are, as discussed, similarly situated to members of the PI Class. *See LaForest*, 376 F.3d at 58. And corroborating the empirical research summarized in the plaintiffs' expert declarations, the PI-eligible plaintiffs have uniformly averred that they cannot use their current passports, which reflect their sex assigned at birth, without experiencing significant anxiety and fearing for their safety. Although only around half of the PI-eligible plaintiffs report having been personally harassed or assaulted when presenting a passport or identity document reflecting their sex assigned at birth, all transgender and non-binary people are at greater risk of experiencing discrimination, harassment, or violence if they are required to use a passport reflecting their sex assigned at birth. The Court accordingly concludes that the risk of irreparable harm faced by the PI-eligible plaintiffs is representative of the risk faced by all PI Class members. *See id.*; *Textron*, 836 F.2d. at 8.

In the government's view, the plaintiffs have nevertheless failed to show that all PI Class members face an imminent risk of irreparable harm because membership in the PI Class is not conditioned on whether an individual has concrete international travel plans. *See* ECF 89, at 4. This argument fails because it confuses a condition that is sufficient to establish irreparable harm with a condition that is necessary to do so. The Court previously concluded that the original plaintiffs were likely to experience irreparable harm, absent interim equitable relief, in part because they would be forced to choose between cancelling their international travel plans or using passports that reflect their sex assigned at birth. *See* ECF 74, at 49-50. But as discussed, PI Class members' risk of experiencing irreparable harm also arises from the interference with their

treatment for gender dysphoria and from their inability to use their passports anywhere without outing themselves. In addition to facilitating international travel, passports function as federal identity documents. The plaintiffs in this case have, for example, used their passports to rent a car, ECF 78-1, ¶ 9; open bank accounts and establish employment eligibility, ECF 78-4, ¶ 13; travel domestically, ECF 78-10, ¶ 13; and identify themselves in administrative settings, ECF 78-6, ¶ 11. PI Class members are likely to experience irreparable harm absent interim equitable relief because they face a heightened risk of interference with treatment for gender dysphoria and of experiencing anxiety, psychological distress, discrimination, harassment, or violence *any* time they use their passports, not simply because they face these risks when using their passports for international travel.

### D.    Balance of the Equities and the Public Interest.

The balance of the equities and the public interest favor granting preliminary injunctive relief to members of the PI Class. The plaintiffs have demonstrated that members of the PI Class are likely to face significant hardships absent preliminary injunctive relief. The government contends that the balance of the equities nevertheless tilts in its favor, primarily because of the administrative burden associated with class-wide relief. While this burden may be more than *de minimis*, it does not outweigh the equities favoring the PI Class.

The government first claims that the State Department lacks the capacity to determine which passport applicants are likely to suffer irreparable harm and, therefore, which applicants are eligible for preliminary injunctive relief. *See* ECF 89, at 5-6; ECF 89-1, ¶ 11. That argument fails because the Court has already concluded that all members of the PI Class share the same risk of irreparable harm as the class representatives. The State Department has neither the duty nor the prerogative to independently make that determination. If an individual is a member of the PI Class,

that individual would be entitled to relief under the preliminary injunction. And because the PI Class is defined by reference to objective criteria—namely, whether someone is a member of the M/F Designation Class or X Designation Class and whether that individual is seeking a passport for one of the four reasons enumerated in the PI Class definition—determining whether an applicant fits the class definition will not be time- or resource-intensive. As the plaintiffs contend, eligibility for relief can be determined through a straightforward form that asks passport applicants to check a box if they meet the criteria for the PI Class. *See* ECF 108, at 5.

Next, the government argues that it would suffer an undue burden if the preliminary injunction were dissolved at a later date, and the State Department were to choose to replace passports that it issued while the injunction was in effect with passports that adhered to the Passport Policy. This argument, which is speculative, does not weigh strongly against extending the preliminary injunction to the PI Class. The government has not produced evidence that the State Department would, in fact, consider reissuing passports issued pursuant to the preliminary injunction if that injunction is later dissolved, much less any evidence that it is likely to do so. *See generally* ECF 89-1. To the contrary, the State Department has stated that all passports issued before the adoption of the Passport Policy that bear an X marker or a sex other than the holder's sex assigned at birth will remain valid until their expiration date. *See Sex Marker in Passports*, U.S. Dep't of State (last visited June 2, 2025), https://perma.cc/N6Y5-EK7D. There is no indication, on this record, that the State Department would adopt a different policy toward any passports issued pursuant to a preliminary injunction that is later dissolved.

The government further contends that the State Department will be burdened by classwide preliminary injunctive relief because it will be required to process passport applications that it may not otherwise have received. This argument has some merit, insofar as every additional passport

application that the State Department receives entails its own cost in terms of the time and resources required to process it. But the narrow definition of the PI Class suggests that any additional burden will not be substantial. As discussed earlier, an individual fits within the PI Class only if they are seeking a new passport for one of four reasons. *See* ECF 80, at 6. Three of these reasons pertain to circumstances where the individual would be required to apply for a new passport irrespective of the availability of injunctive relief. *See id.* (applicant qualifies for the PI Class if they (1) lack a valid passport, (2) have a valid passport that will expire within one year, or (3) need to replace a lost, stolen, or damaged passport). The State Department is unlikely to receive a significant number of passport applications that it would not otherwise have received from PI Class members who fit these circumstances. While the State Department is likely to receive relatively more applications from individuals who are applying for the fourth reason—they have a valid passport but want to update their sex marker or name—it has not offered evidence of the number of additional applications from such individuals it anticipates receiving. *See generally* ECF 89-1 (declaration of Matthew Pierce, the Deputy Assistant Secretary for Passport Services). Nor has it identified any specific ways in which the burden associated with processing additional passport applications is likely to impede the State Department's functioning. That burden, consequently, is too ill-defined and speculative to shift the balance of the equities.

Apart from its arguments concerning administrative burdens, the government asserted for the first time at the hearing that the Executive Branch will suffer a "constitutional harm" if it is required to print communications—that is, sex markers—addressed to foreign sovereigns that are inconsistent with its policies. ECF 105, at 53; *see Haig v. Agee*, 453 U.S. 280, 292 (1981) (a passport is "a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer"). Separation of powers considerations exist any time a

federal court enters a preliminary injunction—which is, after all, an "extraordinary" remedy, *Voice of the Arab World,* 645 F.3d at 32—against the Executive Branch. Those considerations may be heightened here, where Congress has granted the Executive Branch "broad rule-making authority" concerning the issuance of passports. *Zemel v. Rusk*, 381 U.S. 1, 12 (1965).

Yet the government has failed to develop its argument beyond asserting that *any* injunction pertaining to the Executive's control over the issuance of passports inflicts, in essence, a *per se* constitutional injury. It has not identified any specific ways in which an injunction requiring the State Department to issue passports bearing sex designations with which it disagrees is likely to injure the Executive Branch's relations with foreign sovereigns. PI Class members, on the other hand, have demonstrated that they are likely to succeed on the merits of their claims that the Passport Policy violates their constitutional right to equal protection of the laws and runs afoul of the safeguards of the APA. The preliminary relief awarded by this Court is narrowly tailored to provide relief only to those Americans whose rights have likely been violated by the Passport Policy and who, absent that relief, are likely to suffer irreparable harm. Even assuming a preliminary injunction inflicts some constitutional harm on the Executive Branch, such harm is the consequence of the State Department's adoption of a Passport Policy that likely violates the constitutional rights of thousands of Americans. The balance of the equities and the public interest thus favor the PI Class. *See Textron*, 836 F.2d at 7 ("The heart of the matter is whether 'the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants.'" (quoting *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987))).

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the plaintiffs' motion for class certification, ECF 77, is GRANTED as MODIFIED by this Court. The following classes are CERTIFIED:

1. A class of all people (1) whose gender identity is different from the sex assigned to them under the Passport Policy and/or who have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class");

2. A class of all people whose gender identity is different from the sex assigned to them under the Passport Policy and who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an "X" designation ("X Designation Class").

Excluded from these classes are any judge presiding over this action and the plaintiffs in *Schlacter v. U.S. Department of State*, No. 25-cv-01344 (D. Md. filed Apr. 25, 2025).

Plaintiffs Ashton Orr, Zaya Perysian, Chastain Anderson, Drew Hall, Bella Boe, Reid Solomon-Lane, Viktor Agatha, David Doe, AC Goldberg, and Chelle LeBlanc are APPOINTED as representatives of the M/F Designation Class. Plaintiffs Sawyer Soe and Ray Gorlin are APPOINTED as representatives of the X Designation Class. Plaintiffs' counsel from the American Civil Liberties Union, the American Civil Liberties Union of Massachusetts, and Covington & Burling LLP are APPOINTED as class counsel.

The plaintiffs' motion to apply the preliminary injunction to the classes, ECF 79, is GRANTED. A separate order will issue memorializing the preliminary injunction entered by the Court.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: June 17, 2025                    UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
                                    )
ASHTON ORR, ZAYA PERYSIAN,          )
SAWYER SOE, CHASTAIN ANDERSON,      )
DREW HALL, BELLA BOE, REID          )
SOLOMON-LANE, VIKTOR AGATHA,        )
DAVID DOE, AC GOLDBERG, RAY         )
GORLIN, AND CHELLE LEBLANC,         )
on behalf of themselves and         )
others similarly situated,          )
                                    )
            Plaintiffs,             )
                                    )
v.                                  )    No. 1:25-cv-10313-JEK
                                    )
DONALD J. TRUMP, in his official    )
capacity as President of the United States; )
U.S. DEPARTMENT OF STATE; MARCO     )
RUBIO, in his official capacity as  )
Secretary of State; and UNITED STATES )
OF AMERICA,                         )
                                    )
            Defendants.             )
                                    )
```

## <u>ORDER OF PRELIMINARY INJUNCTION</u>

**KOBICK, J.**

For the reasons set forth in the Memorandum and Order issued today, ECF 115, the

plaintiffs' motion to apply the preliminary injunction to a subset of the M/F and X Designation

Classes, ECF 79, is GRANTED. Pursuant to Federal Rule of Civil Procedure 65(a), the Court

ORDERS as follows:

1.     The Preliminary Injunction Class ("PI Class") shall include all individuals who are:

(1) a member of the M/F Designation Class or the X Designation Class; and (2) either (a) do not

have a currently valid passport, (b) need to renew their current passport because it expires within

one year, (c) need to make changes to their passport to have the sex designation on it align with

their gender identity or to reflect a name change, or (d) need to apply for another passport because their passport was lost, stolen, or damaged.

2.      Defendants Marco Rubio, in his official capacity as Secretary of State, and the U.S. Department of State (jointly, the "Agency Defendants"), as well as all officers, agents, employees, attorneys, and any other persons acting in concert with or behalf of the Agency Defendants, are ENJOINED from enforcing the Passport Policy, as that term is defined in today's Memorandum and Order, *see* ECF 115, at 1-2, as to members of the PI Class. The Agency Defendants are further ENJOINED to process and issue passports to members of the PI Class consistent with the State Department's policy as of January 19, 2025, and to permit members of the PI Class to self-select a sex designation—"M," "F," or "X"—that is different from the sex assigned to those individuals under the Passport Policy.

3.      If the Agency Defendants conclude that it is necessary to request additional information to determine whether a passport applicant is a member of the PI Class, they may instruct applicants to attest, by checking a box, to the following statement when they submit their passport application: "If I am selecting a sex marker that is different than the sex on my original birth certificate, or if I am selecting an 'X' sex marker, I confirm that a least one of the following is true: (1) my gender identity is different from the sex assigned to me at birth, or (2) I have been diagnosed with gender dysphoria. I further confirm that I am applying for a passport because one of the following is true: (1) I do not have a currently-valid passport, (2) I need to renew my current passport because it expires within one year, (3) I need to make changes to my passport to have the sex designation on it align with my gender identity or to reflect a name change, or (4) I need to apply for another passport because my passport was lost, stolen or damaged."

4.      No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the circumstances of this case, as the class members seek to vindicate important constitutional and statutory rights, and the defendants have not requested any security.

5.      This preliminary injunction shall take effect immediately upon the docketing of this Order and shall remain in effect until the entry of judgment in this matter, unless this Court, the United States Court of Appeals for the First Circuit, or the United States Supreme Court orders otherwise.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: June 17, 2025                                    UNITED STATES DISTRICT JUDGE