No. 25-1579

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT
―――――――――――

ASHTON ORR; ZAYA PERYSIAN; SAWYER SOE; CHASTAIN
ANDERSON; DREW HALL; BELLA BOE; REID SOLOMON-LANE;
VIKTOR AGATHA; DAVID DOE; AC GOLDBERG; RAY GORLIN;
CHELLE LEBLANC, on behalf of themselves and others similarly
situated,
*Plaintiffs-Appellees*
v.

DONALD J. TRUMP, in the official capacity as President of the United
States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in the official
capacity as Secretary of State; UNITED STATES OF AMERICA,
*Defendants-Appellants*.
―――――――――――

Appeal from the U.S. District Court for the District of Massachusetts
―――――――――――

# BRIEF FOR PLAINTIFFS-APPELLEES
―――――――――――

MALITA PICASSO
SRUTI J. SWAMINATHAN
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2500


ROBERT C. GIANCHETTI
Covington & Burling LLP
30 Hudson Yards
New York, NY 10001
212-841-1000

ISAAC D. CHAPUT
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
415-591-6000

JESSIE J. ROSSMAN
JENNIFER M. HERRMANN
American Civil Liberties Union
Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
617-482-3170

# TABLE OF CONTENTS

INTRODUCTION .................................................................................... 1

STATEMENT OF THE CASE .................................................................. 7

    A.    Factual Background ................................................................. 7

    B.    Procedural Background ............................................................ 8

           1.    The district court enjoins the Policy. ........................... 10

           2.    The injunction protects class members for months before it is stayed by the Supreme Court. ................... 12

           3.    Relevant subsequent proceedings ................................ 14

SUMMARY OF ARGUMENT .................................................................. 15

STANDARD OF REVIEW ...................................................................... 19

ARGUMENT ......................................................................................... 19

I.    THE STAY ORDER DOES NOT PREDETERMINE THE ULTIMATE RESOLUTION OF PLAINTIFFS' CLAIMS, WHICH CAN PROCEED BELOW. ................................................ 20

II.    THE STAY ORDER DOES NOT PRECLUDE PLAINTIFFS FROM PURSUING THEIR APA CLAIM, WHICH REMAINS LIVE AND RIPE FOR DEVELOPMENT BELOW ............................................................................................ 23

    A.    The Stay Order Did Not Address Reviewability, and the District Court Can Find the Policy Reviewable Under the APA. ..................................................................... 23

    B.    The Stay Order Does Not Foreclose the District Court from Finding the Policy Is Arbitrary and Capricious. ......... 29

III.    THE STAY ORDER DOES NOT PRECLUDE PLAINTIFFS FROM PURSUING THEIR EQUAL PROTECTION

CLAIMS, WHICH REMAIN LIVE AND RIPE FOR DEVELOPMENT BELOW.............................................34

 A. The Stay Order Did Not Address Plaintiffs' Claim that the Policy Intentionally Targets Transgender People for Differential Treatment in Violation of Equal Protection. ...............................................34

 B. The Stay Order Expressly Left Open the Opportunity for Plaintiffs to Develop the Record for Their Animus Claim. ...................................................37

 C. The Stay Order Does Not Foreclose Plaintiffs' Sex Discrimination Claim.............................................40

 D. The Stay Order Does Not Preclude Plaintiffs from Probing Defendants' Vague and Ever-Shifting Justifications for the Policy. .................................41

IV. THE STAY ORDER DOES NOT PRECLUDE THE DISTRICT COURT FROM HOLDING THAT PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT RELIEF. ..........................................................................43

V. THE STAY ORDER DOES NOT PRECLUDE THE DISTRICT COURT FROM FINDING THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS AT FINAL JUDGMENT. ..........45

CONCLUSION ......................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State,*
766 F. Supp. 3d 74 (D.D.C. 2025) ....................................... 32

*Biden v. Texas,*
597 U.S. 785 (2022) .......................................................... 27

*Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v.*
*U.S. Dep't of Health & Hum. Servs.,*
557 F. Supp. 3d 224 (D. Mass. 2021) .......................... 40, 46

*Bowen v. Mich. Acad. of Fam. Physicians,*
476 U.S. 667 (1986) ............................................................ 4

*Chamber of Com. of U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ......................................... 26

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ....................................................... 44, 45

*Corp. Techs., Inc. v. Harnett,*
731 F.3d 6 (1st Cir. 2013) ............................................... 19

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) .......................................................... 30

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ...................................................... 24, 25

*Garland v. Cargill,*
602 U.S. 406 (2024) .......................................................... 27

*Heller v. Doe,*
509 U.S. 312 (1993) .......................................................... 42

*Hous. Auth. of S.F. v. Turner,*
2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) ................... 32

*Kingdom v. Trump,*
  2025 WL 1568238 (D.D.C. June 3, 2025) ........................................... 32

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ................................................................... 29, 30

*Louisiana v. Biden,*
  622 F. Supp. 3d 267 (E.D. La. 2022) ................................................ 32

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................... 31

*Moyle v. United States,*
  144 S. Ct. 540 (2024) .................................................................. 21

*New York v. Kennedy,*
  155 F.4th 67 (1st Cir. 2025) .......................................................... 31

*New York v. Trump,*
  133 F.4th 51 (1st Cir. 2025) .......................................................... 26

*New York v. U.S. Dep't of Health & Hum. Servs.,*
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............................................... 27

*Noem v. Vasquez Perdomo,*
  146 S. Ct. 1 (2025) ..................................................................... 45

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) ....................................................... 35, 36, 38, 40

*Pub. Citizen v. U.S. Trade Representative,*
  5 F.3d 549 (D.C. Cir. 1993) .......................................................... 24

*Regan v. Wald,*
  468 U.S. 222 (1984) .................................................................... 46

*Rhode Island Coal. Against Domestic Violence v. Bondi,*
  794 F. Supp. 3d 58 (D.R.I. 2025) .................................................... 32

*Romer v. Evans,*
  517 U.S. 620 (1996) .................................................................... 42

*In re Section 301 Cases,*
570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) .................................. 28, 33

*Shalala v. Ill. Council on Long Term Care, Inc.,*
529 U.S. 1 (2000) .................................................................. 22

*State v. Su,*
121 F.4th 1 (9th Cir. 2024) .................................................. 26, 31

*Trump v. Boyle,*
145 S. Ct. 2653 (2025) ........................................................ 3, 21

*Trump v. Hawai'i,*
585 U.S. 667 (2018) .......................................................... 16, 39

*Trump v. Illinois,*
146 S. Ct. 432 (2025) ............................................................ 22

*Trump v. Wilcox,*
145 S. Ct. 1415 (2025) ........................................................... 22

*U.S. Dep't of Agric. v. Moreno,*
413 U.S. 528 (1973) .............................................................. 42

*United States v. Sevilla-Oyola,*
770 F.3d 1 (1st Cir. 2014) ...................................................... 46

*United States v. Virginia,*
518 U.S. 515 (1996) .............................................................. 42

*Univ. of Tex. v. Camenisch,*
451 U.S. 390 (1981) .............................................................. 21

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC,*
121 F.4th 339 (1st Cir. 2024) .................................................. 19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) .............................................................. 39

*Whole Women's Health v. Jackson,*
141 S. Ct. 2494 (2021) ........................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................46

*Zemel v. Rusk*,
    381 U.S. 1 (1965)..............................................................46

**Statutes**

5 U.S.C. § 704 .....................................................................24

5 U.S.C. § 1301 ...................................................................28

15 U.S.C. § 715d .................................................................28

16 U.S.C. § 1005 .................................................................29

19 U.S.C. § 2411 .................................................................28

19 U.S.C. § 2417 .................................................................28

22 U.S.C. § 211a ...........................................................16, 27

31 U.S.C. § 7110 .................................................................28

38 U.S.C. § 111 ...................................................................28

40 U.S.C. § 121 ...................................................................28

42 U.S.C. § 5164 .................................................................28

50 U.S.C. § 3809 .................................................................28

**Other Authorities**

Presidential Memorandum No. 7949, 83 Fed. Reg. 7949 (Feb.
    20, 2018)..........................................................................27

Executive Order 14160, 90 Fed. Reg. 8615 (Jan. 20, 2025).....................7

11A Wright & Miller, Federal Practice and Procedure § 2950 .............21

# INTRODUCTION

For months, the district court's injunction was a bulwark protecting transgender, nonbinary, and intersex Americans from severe harms. But now that the Supreme Court has stayed the class-wide injunction through the disposition of a timely petition for a writ of certiorari, it no longer protects any class members. And since the district court has stayed all proceedings pending resolution of this appeal, every day this appeal is prolonged further delays Plaintiffs' chance for permanent relief from "a variety of immediate and irreparable harms." App. 976.

Because all parties now agree that the injunctions should be vacated, Plaintiffs respectfully submit that the most efficient course of action is for this Court to do so itself, or remand for the district court to dissolve the injunctions, without further proceedings or additional analysis. Rather than analyzing the legal issues that underlie a non-operative injunction, this Court's limited judicial resources could be better spent resolving live disputes. On the other side of the scale, there is every reason to progress this case in the district court to discovery, final judgment, and the opportunity for permanent relief as swiftly as

possible, all of which remain impossible while this appeal remains pending.

In this procedural posture, an opinion from this Court decisively instructing the district court how to rule on Plaintiffs' claims would be premature. At the same time, as described by the district court, guidance from this Court about "how the Supreme Court's analysis affects the plaintiffs' claims" "will clarify the issues in this case moving forward." Supp. App. 2. Accordingly, Plaintiffs explain in this brief why the Stay Order does not foreclose their claims and how the district court can find in Plaintiffs' favor at final judgment.

Although the Stay Order included one sentence about each of the three claims at issue in the stay petition before the Supreme Court, those three sentences alone do not predetermine the ultimate resolution of this case in the district court. To begin, Plaintiffs have a series of claims that were not the basis of the injunctions and therefore were not addressed or affected by the Stay Order—including claims for violations of the constitutional rights to international travel, informational privacy, and against compelled speech, as well as claims that the challenged passport policy (the "Policy") discriminates on the basis of transgender status in

violation of equal protection. Even as to the claims on which the Supreme Court did speak, its preliminary, emergency-docket statement does not foreclose a ruling in Plaintiffs' favor on final judgment and the entry of permanent injunctive relief below. As the Supreme Court has recently explained, its "interim orders are *not conclusive* as to the merits" (even if they may "inform" how lower courts may decide "like" cases). *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (emphasis added). Once proceedings resume below, discovery can commence and the district court will apply binding law to those facts based on further briefing. That binding law indicates that, on remand, the district court could find in favor of Plaintiffs on both their Administrative Procedure Act ("APA") and equal protection claims.

To begin, the Stay Order does not foreclose Plaintiffs' APA claims. The government cannot defend its actions under ordinary arbitrary and capricious review because the Department of State ("Department") failed to conduct fact-finding; consider key aspects of the issue including harm and reliance interests; or explain its actions. Instead, the government argues that this case is unreviewable under the APA because it challenges presidential (rather than agency) action, and, alternatively,

that the Policy survives arbitrary and capricious review because the President ordered the agency to take the challenged actions.

The district court remains free to address, and reject, both of these arguments in the first instance on remand. *First*, the Stay Order does not address APA reviewability, and neither the APA itself nor Supreme Court precedent has ever exempted agency action from APA review simply because it was undertaken pursuant to a presidential directive, even one involving statutory reference to the presidential authority to issue such directives. For good reason. Doing so would fly in the face of the "strong presumption that Congress intends judicial review of administrative action" under the APA. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). *Second*, if the Stay Order's single sentence about the likelihood of success on the arbitrary and capricious claim were treated as governing law, it would upend long-settled administrative law and all but eviscerate meaningful judicial review of agency action. Under Defendants' view, the President could always immunize agency conduct from a finding of arbitrary and capriciousness by issuing an executive order directing the agency to act. Yet courts throughout the country regularly find that agency actions precipitated by

presidential direction violate the APA, including where such direction is statutorily authorized. The district court is not precluded from finding that the Stay Order did not eradicate this well-established case law with a single, preliminary sentence.

Plaintiffs' equal protection claim is likewise not foreclosed by the Stay Order, and the district court can still find for Plaintiffs at final judgment. *First*, Plaintiffs still have a live claim that the Policy discriminates on the basis of transgender status that was not before the Supreme Court and that the Stay Order did not address. *Second*, the Stay Order expressly left open the possibility for Plaintiffs to prove their claim that the Policy was motivated by animus after discovery on a full record. *Third*, the district court can still find, after additional discovery, that the Policy was *intended* to discriminate on the basis of sex, including by enforcing sex stereotypes. *Fourth*, nothing in the Stay Order spoke to the government's purported justifications for the Policy—under either heightened scrutiny or rational basis review—and discovery will shed light on the viability of those justifications.

In short, if this Court provides any guidance to the district court, it can confirm that:

- The Stay Order does not address or affect Plaintiffs' claims based on the right to travel, right to informational privacy, and free speech.

- The Stay Order does not address or affect Plaintiffs' equal protection claim that the Policy discriminates on the basis of transgender status.

- The Stay Order does not predetermine Plaintiffs' APA claim or their equal protection claim that the Policy was motivated by animus or that it intentionally discriminates based on sex, including enforcing sex stereotypes.

- The Stay Order does not predetermine the district court's determination about Plaintiffs' irreparable injury or the balancing of equities and public interest.

The claims in this case are live, and there is much for the district court to address below. It has now been a year since the case was filed, and no discovery on any of the constitutional claims has occurred. Every day inflicts yet more irreparable injury on Plaintiffs. Plaintiffs respectfully request that this Court expeditiously return this case to the

district court so that they can commence discovery and pursue the opportunity for permanent relief from the harmful Policy.

## STATEMENT OF THE CASE

### A.     Factual Background

U.S. passports first included sex markers in 1976. App. 842. Across administrations, the State Department has permitted applicants to change their sex markers from the sex as listed on their birth certificates since 1992. From 1992 to 2021, the Department allowed applicants to indicate a sex different from the one on their birth certificate with various forms of medical documentation. App. 842. In 2021, the Department eliminated the requirement to submit evidence of medical treatment and also joined many other countries and U.S. states in permitting the "X" (for "unspecified") marker. App. 677.

On January 20, 2025, President Trump issued Executive Order 14160, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Order" or "EO"), titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." App. 1–4. The EO purports to define sex for all government documents by reference to the capacity to produce either the large or small reproductive cell "at

conception," and asserts that sex is "not changeable" and is "grounded in fundamental and incontrovertible reality." App. 1.

Two days later, the Department began implementing its Policy. It prohibited issuing passports with sex markers that aligned with a holder's gender identity—instead mandating that applicants use their sex assigned at birth. Defs. Add. 21. It also prohibited issuing passports with "X" sex markers—forcing all individuals into classifications of only "M" (for male) or "F" (for female). *Id.* Rather than using the EO's definition of sex based on capacity at conception to generate the large or small reproductive cell, the Department instead required that passports reflect an applicant's sex assigned at birth; as the Department has conceded, it is impossible for it to determine sex on the basis set forth in the EO. App. 204, 667–68, 846–47, 928.

## B.  Procedural Background

In February 2025, seven transgender or nonbinary Plaintiffs filed this class action on behalf of themselves and similarly situated Americans. App. 5–63. Five other Plaintiffs later joined. D. Ct. Dkt. 87-1. Plaintiffs and the classes are transgender, intersex, and nonbinary Americans who want the same thing as their fellow citizens: usable

passports that enable them to travel without threat of harassment or violence.

Plaintiffs asserted that the Policy violates the APA because it is arbitrary and capricious and was adopted without observance of procedures required by law. Plaintiffs also asserted claims for denial of equal protection under the Fifth Amendment for three independent reasons: the Policy (1) discriminates on the basis of transgender status, (2) is motived by anti-transgender animus, and (3) is an impermissible sex-based classification that fails heightened scrutiny (and would fail rational basis review). And Plaintiffs alleged that the Policy violated their Fifth Amendment rights to international travel and informational privacy and the First Amendment right against compelled speech. *See* App. 45–60.[1]

---

[1] The district court also found that the Department violated the Paperwork Reduction Act ("PRA"). Plaintiffs are no longer pursuing their PRA-based APA claim.

### 1. The district court enjoins the Policy.

On April 18, 2025, the district court granted Plaintiffs' motion to enjoin the Policy against six of the seven named Plaintiffs.[2]  Defs. Add. 14–69.  The injunction was based on three independent findings of likelihood of success on the merits.  *First*, that Plaintiffs were likely to succeed in showing that the Policy classified on the basis of sex, and Defendants failed to show that it satisfied heightened scrutiny.  Defs. Add. 29–38.  *Second*, that the Policy was likely motived by impermissible animus towards transgender and nonbinary Americans, leaving it unable to survive even rational basis review.  Defs. Add. 39–45.  *Third*, that the Policy was likely arbitrary and capricious in violation of the APA.  Defs. Add. 46–59.

The district court found that the unrebutted evidence demonstrated an increased risk that transgender and nonbinary people "experience violence or harassment if required to use passports bearing a sex marker corresponding to their sex assigned at birth."  Defs. Add. 61.  The

---

[2] The district court found that because the seventh named Plaintiff possessed a passport with a sex marker that matched his gender identity that was not set to imminently expire, that Plaintiff was not likely to face irreparable injury prior to final judgment.  Defs. Add. 63.

evidence showed that being forced to use a gender-discordant passport heightened risks of experiencing "worsened gender dysphoria, anxiety, and psychological distress, and . . . harassment and violence." Defs. Add. 63.  As one example, one Plaintiff was detained and "strip searched" when presenting her valid driver's license with an incorrect sex marker, while others were exposed to "significant harassment," intrusive inspections, and false accusations of falsifying government documents.  Defs. Add. 62.

Finally, the district court concluded that the balance of equities and public interest favored Plaintiffs, who demonstrated credible, concrete harms compared to Defendants' "vague" contentions about "impaired" Department functioning (which were contradicted by years of experience processing passports as Plaintiffs requested).  Defs. Add. 63–64.

On June 17, 2025, the district court certified two classes and granted a class-wide injunction.[3] Defs. Add. 73–107.  The court concluded that the classes faced the same irreparable injuries as the named Plaintiffs.  The undisputed evidence showed that people with gender-

---

[3] The district court extended the injunction to a Preliminary Injunction Class of class members who, essentially, lacked a valid passport that aligned with their gender identity or would soon have such a passport expire.  Defs. Add. 104.  This brief refers to the injunction as "class-wide."

discordant identity documents "have an elevated risk of encountering problems with airport security and experiencing harassment or violence when traveling, particularly to countries that criminalize transgender expression." Defs. Add. 97. They also "are twice as likely to have suicidal ideation, and experience higher psychological distress." *Id.* The expert evidence made clear that "requiring transgender and non-binary people to use passports bearing sex markers corresponding to their sex assigned at birth increases their risk of experiencing anxiety, psychological distress, suicidality, discrimination, harassment, and violence." *Id.*

Again, the district court found that the balance of equities and public interest favored Plaintiffs, finding that the severe harms inflicted on class members outweighed the government's asserted interest in carrying out an unconstitutional, unlawful policy. Defs. Add. 103.

## 2. The injunction protects class members for months before it is stayed by the Supreme Court.

From June 17 to November 6, 2025, the injunction safeguarded the rights of transgender, nonbinary, and intersex Americans. There is no evidence in the record that the government—or anyone else—suffered concrete harm from issuing passports as they had been issued for years.

The district court and this Court both denied motions to stay the injunction pending appeal.  *See* D. Ct. Dkt. 130.

Defendants sought an emergency stay pending appeal from the Supreme Court on September 19, 2025.  In a brief order dated November 6, 2025, the Supreme Court granted the government's stay application, concluding that Plaintiffs had not shown, on the record as presented, that they were likely to succeed on the merits.  *See* Defs. Add. 1–2.  The Supreme Court's reasoning about the likelihood of success was outlined in three sentences, one for each claim that supported the injunction. Defs. Add. 1.  The Court also stated that the government suffered an irreparable injury in the form of being enjoined from carrying out its preferred policy.  Defs. Add 1–2.  The Court did not discuss any injury to Plaintiffs, weighing of the equities, or the public interest.

Justice Jackson, joined by Justices Sotomayor and Kagan, dissented.  Defs. Add. 2–13.  In an eleven-page opinion, Justice Jackson explained that the Policy was "questionably legal," the district court "thoroughly examined the facts in evidence," and "the plaintiffs have shown they will suffer concrete injuries if the Government's Passport Policy is immediately enforced."  Defs. Add. 3, 5, 11.

### 3. Relevant subsequent proceedings

After the Stay Order, Defendants moved the district court to stay proceedings as to Plaintiffs' APA claims, pending resolution of this appeal.[4]  D. Ct. Dkt. 156.  Plaintiffs opposed a stay and requested that the district court issue an indicative ruling that it would dissolve the injunctions if this Court remanded for that purpose.  D. Ct. Dkt. 168.

On January 26, 2026, the district court granted Defendants' motion to stay Plaintiffs' APA claims and denied Plaintiffs' motion for an indicative ruling.  Supp. App. 1–2.  It observed that the Supreme Court's Stay Order included only "three sentences" of reasoning as to "the merits of the claims addressed in [the district court's] preliminary injunction orders," and however the district court interpreted "[t]he meaning of those three sentences," "the effect of the Supreme Court's analysis on the plaintiffs' claims would feature prominently in any subsequent appeal." *Id.*  As a result, the district court explained that the "First Circuit's guidance" would "clarify the issues in this case moving forward."  *Id.*  For that reason, while the district court credited its "prior conclusion that the

---

[4] The district court previously stayed discovery regarding Plaintiffs' constitutional claims pending appeal of the preliminary injunction.  D. Ct. Dkt. 137.

Passport Policy inflicts tangible harm on the certified classes," it concluded that it would be best to "allow[] the First Circuit to explain first how the Supreme Court's analysis affects the plaintiffs' claims." *Id*.

## SUMMARY OF ARGUMENT

This Court should vacate the injunctions, or remand for dissolution of the injunctions by the district court, without further proceedings or additional analysis. All parties agree that the injunctions should be vacated. Now that the Supreme Court has stayed the class-wide injunction through the disposition of a timely petition for a writ of certiorari, it no longer protects class members. And because the district court stayed all proceedings pending this appeal, any further delay prolongs the deprivation of Plaintiffs' opportunity for discovery and, ultimately, final relief from severe harms being inflicted every day. Vacatur of the injunctions would result in the precise relief all parties agree is appropriate at this juncture, conserve judicial resources, move this case to swift discovery and resolution, and serve the interests of justice.

If the Court provides guidance to the district court about the proper interpretation of the Stay Order, Plaintiffs respectfully submit their views on that Stay Order and the viability of their claims below.

The Stay Order expressed the Court's preliminary view on a truncated timeline, in an emergency posture, without discovery, about the *likelihood* of success on the claims as they were teed up for review at that time. The entirety of the Court's analysis of the likelihood of success was as follows:

> Displaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment. And on this record, respondents have failed to establish that the Government's choice to display biological sex "lack[s] any purpose other than a bare . . . desire to harm a politically unpopular group." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018) (internal quotation marks omitted). Nor are respondents likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow. See 22 U. S. C. §211a.

Defs. Add. 1. These three sentences do not preclude Plaintiffs from pursuing their claims to final judgment, and those claims remain ripe for factual development in discovery and legal development in further briefing before the district court.

The district court will be able to find, after full briefing, that the Policy is reviewable under the APA and that it is arbitrary and capricious. The government sidesteps ordinary APA principles and instead argues that the Policy is not reviewable at all because it is presidential action, and separately, that it cannot be arbitrary and capricious because the Department was following an executive order. Plaintiffs anticipate demonstrating to the district court that these arguments are wrong as a matter of settled administrative law and would eviscerate APA review while transferring enormous power to administrative agencies. Courts have rejected those arguments from administrations of both political parties, and embracing those arguments now would fundamentally transform—and undermine—administrative law.

Likewise, with the benefit of discovery, the district court will be able to find that the Policy violates the Fifth Amendment's equal protection guarantee. The district court expressly did not rule on Plaintiffs' claim that the Policy discriminates on the basis of transgender status, so that claim was not before, and was not foreclosed by, the Supreme Court. The two equal protection theories that were before the Supreme Court also

remain viable on remand.  On the animus claim, the Supreme Court held only that there was no likelihood of success "on *this* record," Defs. Add. 1 (emphasis added), and discovery below will be critical to developing a record that more fully demonstrates animus.  On the sex discrimination claim, the district court will benefit from discovery to support the argument that the Policy was *intended* to discriminate on the basis of sex, including by enforcing sex stereotypes—issues that the Supreme Court did not address.  And with respect to all of Plaintiffs' equal protection theories, nothing in the Stay Order spoke to the government's proffered justifications for the Policy under any level of constitutional scrutiny.

Finally, the Stay Order does not preclude the district court from finding at final judgment that class members will suffer irreparable injuries without relief—including threats of violence and harassment and severe psychological distress—or that those harms outweigh any purported harm to the government from not being able to carry out its policy.

## STANDARD OF REVIEW

This Court reviews the district court's grant of the preliminary injunction "for abuse of discretion." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (citation omitted). A court abuses its discretion if it makes a "material error of law," ignores "a material factor deserving significant weight," relies on an "improper factor," or otherwise "makes a serious mistake in weighing [the relevant factors]." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (citation omitted).

## ARGUMENT

In light of the Supreme Court's stay, this Court should vacate or remand for the district court to dissolve the injunctions so that this case can progress expeditiously below. In this posture, decisive instruction from this Court to the district court about how to rule on Plaintiffs' claims would be premature. If this Court chooses to provide some guidance on remand, Plaintiffs offer their views below about why the Stay Order does not preclude the district court from ruling in favor of Plaintiffs' claims and lay out some of the arguments they anticipate making in the district court on these issues.

# I. THE STAY ORDER DOES NOT PREDETERMINE THE ULTIMATE RESOLUTION OF PLAINTIFFS' CLAIMS, WHICH CAN PROCEED BELOW.

Defendants overstate the import of the Stay Order to the ultimate merits of Plaintiffs' claims.

As a threshold matter, the Stay Order did not address many of the claims in Plaintiffs' Complaint that could support permanent injunctive relief—Plaintiffs' right to travel, informational privacy, First Amendment, and transgender discrimination claims—because these claims were not the basis for the preliminary injunction. As a result, the Stay Order does not impact those claims, and the district court can evaluate them in the first instance.

Additionally, the Stay Order concerned only the likelihood of success on three claims in an emergency posture and therefore does not foreclose permanent relief after the parties have a full opportunity to develop the facts and their legal arguments before the district court. The Supreme Court's three-sentence reasoning reflected a preliminary view of the likelihood of success on the merits. Like any assessment of *likelihood* of success on the merits, the Supreme Court's holding went no further than concluding that Plaintiffs had not, at that stage, shown they

were "*likely* to prevail." Defs. Add. 1 (emphasis added). As noted, the Supreme Court's "interim orders are *not conclusive* as to the merits." *Boyle*, 145 S. Ct. at 2654 (emphasis added); *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" at final judgment); 11A Wright & Miller, Federal Practice and Procedure § 2950 (same). This Court can—and should—conclude that the Stay Order does not predetermine the ultimate viability of Plaintiffs' claims and instruct the district court accordingly.

This understanding of the limitations of such preliminary likelihood-of-success determinations is evident from the Supreme Court's own cases: on multiple occasions, that Court has reversed its initial emergency determination when it issued a final opinion. *Compare Whole Women's Health v. Jackson*, 141 S. Ct. 2494 (2021) (denying stay of injunction on emergency docket), *with* 595 U.S. 30, 51 (2021) (vacating injunction based on final merits findings); *compare Moyle v. United States*, 144 S. Ct. 540 (2024) (granting stay of injunction on emergency docket), *with* 603 U.S. 324 (dissolving stay and dismissing writ as improvidently granted).

Justices have described the procedural limitations of the Supreme Court's emergency docket and the risks of making substantive law in that rushed posture. *See, e.g.*, *Trump v. Wilcox*, 605 U.S. __, 145 S. Ct. 1415, 1419 (2025) (Kagan, J., dissenting) (noting that the emergency docket "should not be used to overrule or revise existing law[,]" because the decisions are made "with little time, scant briefing, and no oral argument"); *Trump v. Illinois*, 607 U.S. __, 146 S. Ct. 432, 435 (2025) (Alito, J., dissenting) ("[T]he Court reaches out and expresses tentative views on other highly important issues on which there is no relevant judicial precedent and on which we have received scant briefing and no oral argument."). Given these critical restraints, there are good reasons why such preliminary statements are not, and should not be read to be, new substantive holdings of law.

That is particularly true where, as here, the opposite conclusion would suggest that the Supreme Court overturned decades of APA precedent without explanation or acknowledgement. The Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio.*" *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). And, as described below, basic administrative law holds that

agency actions are reviewable, the Supreme Court has never exempted agency action from APA review because the agency took actions under presidential orders that were authorized by statute, and courts across the country have squarely held that agency actions implementing presidential orders are both reviewable under the APA and capable of violating the APA as arbitrary and capricious. *Infra* Part II. That the Stay Order does not even reference those cases' reasoning further underscores that it did not intend to address—let alone overrule—this authority.

## II. THE STAY ORDER DOES NOT PRECLUDE PLAINTIFFS FROM PURSUING THEIR APA CLAIM, WHICH REMAINS LIVE AND RIPE FOR DEVELOPMENT BELOW.

Below, Plaintiffs lay out the arguments they anticipate making in the district court about why the Stay Order both does not address the issue of APA reviewability and does not foreclose Plaintiffs' argument that the Policy is arbitrary and capricious.

### A. The Stay Order Did Not Address Reviewability, and the District Court Can Find the Policy Reviewable Under the APA.

Defendants do not argue that the Supreme Court's Stay Order spoke to the Policy's reviewability under the APA. And for good reason:

it did not. At most, the single APA sentence in the Stay Order reflected a preliminary view about the distinct issue of whether the Policy was arbitrary and capricious, a sentiment that presupposes APA analysis in the first place. *See* Defs. Add. 1. Defendants separately argue here that the Policy is not subject to APA review under the narrow exception established in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). Defs. Br. 32–34. The Stay Order does not bar the district court from deciding this issue in the first instance in Plaintiffs' favor.

The text of the APA makes clear that final "agency action" is reviewable. 5 U.S.C. § 704. In line with this unambiguous language, *Franklin* exempts from APA review only presidential action that has both a direct and final effect. *See* 505 U.S. at 796–800. This exception is "limited to those cases in which the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties." Defs. Add. 48 (emphasis added) (quoting *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993)). Neither the text of the APA nor *Franklin* carved out agency action that is *preceded* by executive orders. *Franklin* addressed the reviewability of presidential action that occurred after agency action. It

has no bearing where the chronology is reversed and the "final step" is carried out by the agency after presidential action.

*Franklin* therefore poses no obstacle to APA review here, where the "target stop[ped] moving" with the agency. 505 U.S. at 798. Acting first, the President's order did not itself revise the passport rules, but instead simply directed all government agencies to "implement changes to require that government-issued identification documents . . . reflect the holder's sex, as defined by section 2 of this order." App. 2. The Department subsequently enacted and implemented such changes, taking the "final action" that carried "direct" consequences for class members. *Cf. Franklin*, 505 U.S. at 796. The district court's factual finding—undisturbed by the Stay Order—is that "[t]he final step of executive action that directly affected the plaintiffs here was the Passport Policy, not [the EO]." Defs. Add. 48. That such agency action is subject to APA review is further underscored by the fact that the Department "made at least three independent determinations in formulating the Passport Policy," including departing from the EO's definition of "female," "male," and "sex"; deferring to HHS's guidance on

the meaning of these three terms; and determining the proper evidence to assess a person's sex at birth.  Defs. Add. 48–49.

The existence of the EO and the Passport Act does not change this conclusion.

Federal appellate courts have "never excepted a final rule from APA review because it carried out a presidential directive."  *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA.").  Indeed, this Court has already noted that presidential directives do not shield agency actions from APA review.   In *New York v. Trump*, 133 F.4th 51 (1st Cir. 2025), the government defendants attempted to evade APA review by highlighting the President's direction to subordinate agencies.  This Court declined to stay a preliminary injunction of agency action in the face of this argument, explaining that "the District Court did not review the *President's* actions for consistency with the APA.  Rather, it reviewed— and ultimately enjoined—the *Agency Defendants'* actions under the Executive Orders."  *Id.* at 70 n.17 (emphasis in original).  Mirroring this

understanding, the Supreme Court routinely conducts APA review of agency actions that implement presidential directives. *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406 (2024) (reviewing regulations implementing a presidential memorandum regarding bump fire stocks, *see* 83 Fed. Reg. 7949 (Feb. 20, 2018)); *Biden v. Texas*, 597 U.S. 785 (2022) (reviewing actions implementing Executive Order 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021)).

The Passport Act—which was not even cited in the EO—does not alter APA reviewability of the Policy. The Passport Act's text confirms the Department's central role in promulgating the Policy. While the statute describes the President's role as "designat[ing] and prescrib[ing]" "rules," it expressly vests the authority to "grant and issue passports" in "[t]he Secretary of State" and Department "employees," using the Department's "electronic systems." 22 U.S.C. § 211a. What is more, neither the APA nor any Supreme Court precedent has ever exempted agency actions from ordinary APA review simply by virtue of a statutory reference to presidential authority to issue directives. To the contrary, courts have conducted APA review of agency action in the face of such statutory language. *See, e.g.*, *New York v. U.S. Dep't of Health & Hum.*

*Servs.*, 414 F. Supp. 3d 475, 521 (S.D.N.Y. 2019) (conducting APA review of rules driven by executive order, where both President and agency have statutory authority to promulgate rules under 40 U.S.C. § 121(c)); *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1316–21, 1323–26 (Ct. Int'l Trade 2022) (conducting APA review of imposition and modification of tariffs in accordance with executive direction, where agency had statutory authority under 19 U.S.C. §§ 2411(b)(2), 2417(a)(1), to take action "subject to the specific direction, if any, of the President regarding any such action").

Critically, the Passport Act is not, as the government implicitly suggests, a one-off anomaly that should be especially immune from APA review. Statutes referencing presidential authority to issue directives are ubiquitous.[5] To adopt Defendants' unprecedented view that such

---

[5] *See, e.g.*, 5 U.S.C. § 1301 (rules for civil service administration); 15 U.S.C. § 715d (rules barring interstate transportation of contraband oil); 31 U.S.C. § 7110 (rules governing agreements between states and heads of executive agencies regarding federal project assistance); 38 U.S.C. § 111(a) (rules governing Department of Veteran Affairs reimbursement of contractors' necessary travel expenses). There are also any number of federal statutes providing the President with authority that may be delegated to agencies under rules the President creates. *See, e.g.*, 42 U.S.C. § 5164 (rules for federal emergency assistance for local disaster response); 50 U.S.C. § 3809(b) (rules governing Selective Service (continued…)

statutory language renders the APA inoperative would insulate broad swaths of agency action from judicial review.  On remand, the district court remains free to reject this outcome, which runs counter to both longstanding precedent and the recently confirmed understanding of the APA's scope.  *E.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 416 (2024) (Thomas, J., concurring) (warning against "strip[ping] courts of judicial power").

**B.  The Stay Order Does Not Foreclose the District Court from Finding the Policy Is Arbitrary and Capricious.**

Defendants argue that even if the Policy is reviewable under the APA, it is not arbitrary and capricious.  *See* Defs. Br. 35–37.  The Stay Order's single, preliminary sentence that Plaintiffs are not "likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow," Defs. Add. 1, does not definitively resolve whether the EO and the Passport Act displace well-established administrative law prohibiting arbitrary and capricious agency action.

---

System); 16 U.S.C. § 1005 (rules governing federal assistance for local flood control projects).

Instead, this dispute remains open for the district court to resolve in the first instance on remand.

The Supreme Court recently reaffirmed the bedrock principle that Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 603 U.S. at 391 (cleaned up). Judicial analysis of whether agency action is "reasonable and reasonably explained" to ensure that it is not arbitrary and capricious is a core part of this system. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 776 (2019). No mere "empty ritual," the arbitrary and capricious analysis "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 785.[6] Endorsing Defendants' position that no agency action taken pursuant to an executive order could ever be arbitrary and capricious would upend basic principles of administrative law by "allow[ing] presidential administrations to issue agency

---

[6] *Contra* Defs. Br. 35 (arguing neither Department nor President need "provide a reasoned explanation").

regulations that evade APA-mandated accountability by simply issuing an executive order first." *Su,* 121 F.4th at 16.

The government's sole citation in support of its argument sets out the general arbitrary and capricious standard in a case that *did not* involve any presidential action and *did* conclude that the agency acted arbitrarily and capriciously. *See* Defs. Br. 36 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

On the opposite side of the ledger, appellate courts have recognized that agency action directed by presidential action can still be arbitrary and capricious in violation of the APA. For example, the Ninth Circuit held that an agency rule was arbitrary and capricious notwithstanding the existence of a precipitating executive order, explaining that President Biden's actions did "not exempt [the agency] from basic APA requirements of reasoned decisionmaking." *Su*, 121 F.4th at 17; *see also New York v. Kennedy*, 155 F.4th 67, 75–76 (1st Cir. 2025) (denying petition for stay of an injunction of an agency communiqué prompted by an executive order in part based on holding that the government did "not put forth any argument" sufficient to show likelihood of success under arbitrary and capricious standard). District courts nationwide, including

in this circuit, have similarly subjected agency actions stemming from executive orders to full arbitrary and capricious analysis. *See, e.g.*, *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 70 (D.R.I. 2025) (granting preliminary injunction on the basis that plaintiffs were likely to succeed in their allegation that the agency action directed by presidential action was arbitrary and capricious because agencies "cannot avert the arbitrary and capricious analysis by simply deferring to the relevant Executive Order" (cleaned up)).[7]  Courts have concluded

---

[7] *See also Kingdom v. Trump*, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (collecting cases, finding agency action arbitrary and capricious, and declining to adopt government's view that "the President could unilaterally eviscerate the judicial oversight that Congress contemplated in passing the APA simply by issuing a carbon-copy executive order mandating that an agency act in a particular way before it does so"); *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, 766 F. Supp. 3d 74, 83 (D.D.C. 2025) (granting preliminary injunction based on arbitrary and capricious review of agency action implementing executive order after rejecting defendants' argument that presidential directive made order non-reviewable); *Hous. Auth. of S.F. v. Turner,* 2025 WL 3187761, at *18–19 (N.D. Cal. Nov. 14, 2025) (granting preliminary injunction based on arbitrary and capricious review of agency action implementing executive order and finding that reliance on executive order "is no explanation at all"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (E.D. La. 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement.  A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order." (citation omitted)).

that agency action precipitated by presidential direction violated the APA even where there was statutory language regarding presidential authority to issue such directives. *See, e.g.*, *In re Section 301 Cases*, 570 F. Supp. 3d at 1317, 1338–43 (finding that agency's failure to adequately respond to comments violated the APA where agency action was directed by President and the operative statute instructed the agency to act "subject to the specific direction, if any, of the President regarding such action").

The district court remains free to conclude that the Stay Order's single, preliminary sentence does not eradicate the long-standing and foundational APA principles described above. Under Defendants' view, no Department action could ever be arbitrary and capricious so long as it was implemented pursuant to an executive order. The President could direct the Department to refuse to issue passports to all applicants with names that begin with the letter J, the Department could implement a policy that does so without any analysis, and a federal court would be prohibited from concluding that the Department's actions were arbitrary and capricious. Such an outcome stands in stark contrast to black-letter administrative law, and could be rejected by the district court on remand.

III. **THE STAY ORDER DOES NOT PRECLUDE PLAINTIFFS FROM PURSUING THEIR EQUAL PROTECTION CLAIMS, WHICH REMAIN LIVE AND RIPE FOR DEVELOPMENT BELOW.**

Plaintiffs' equal protection claims remain viable for resolution by the district court. *First*, the Supreme Court did not address Plaintiffs' claim that the Policy intentionally targets transgender people for differential treatment in violation of equal protection. *Second*, the Stay Order expressly left open the opportunity for Plaintiffs to continue to develop the record for and advance their claim that the Policy is motivated by animus in violation of equal protection. *Third*, the Supreme Court's preliminary statement about Plaintiffs' equal protection claim does not preclude Plaintiffs from continuing to argue—after factual discovery and more extensive briefing—that the Policy was intended to discriminate on the basis of sex. And *fourth*, the Stay Order does not address the government's proffered justifications for the Policy.

A. **The Stay Order Did Not Address Plaintiffs' Claim that the Policy Intentionally Targets Transgender People for Differential Treatment in Violation of Equal Protection.**

The district court's preliminary injunction decisions never ruled on Plaintiffs' claim that the Policy discriminates on the basis of transgender

status, so that claim was never before this Court or the Supreme Court. As the district court explained, "[t]he plaintiffs also contend that the Passport Policy warrants heightened scrutiny because transgender status should be recognized as a quasi-suspect class, and the policy discriminates against them on the basis of transgender status. Because the Court has already concluded that the Passport Policy is subject to heightened scrutiny because it classifies on the basis of sex, it need not, at this juncture, consider this distinct" claim. Defs. Add. 35 n.6. The transgender discrimination claim was therefore not before the Supreme Court and, indeed, is not before this Court now.

What is more, nothing in the Stay Order forecloses Plaintiffs' transgender-status discrimination claim. The Supreme Court has long recognized that, even when a policy appears neutral on its face, the policy may ultimately be shown to have a discriminatory purpose, meaning that the policymakers designed it "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). With the benefit of discovery, Plaintiffs expect to demonstrate to the district court that the Policy was designed with the intent to target transgender people for differential

treatment. While the Policy's consequences on the lives of transgender people may be so inevitable and foreseeable as to create a "strong inference" of Defendants' discriminatory intent, *id.* at 280 n.25, discovery and development of the factual record will allow the district court to thoroughly consider Plaintiffs' transgender-status discrimination claim. The Stay Order does not prevent this claim from proceeding to discovery and cannot be interpreted to have abrogated *Feeney* and its progeny.

The Stay Order's single sentence noting an absence of differential treatment was limited to the Court's analysis of Plaintiffs' claim that the Policy created a facial *sex classification* in violation of equal protection, since the transgender status claim was not before the Supreme Court. *See* Defs. Add. 1. Before the district court, Plaintiffs should be afforded the opportunity to seek discovery so that they can develop a robust record that will demonstrate that Defendants intended the Policy to target transgender people for differential, harmful treatment, and that such discrimination is subject to heightened scrutiny.

**B.    The Stay Order Expressly Left Open the Opportunity for Plaintiffs to Develop the Record for Their Animus Claim.**

The Supreme Court was clear that its statement about Plaintiffs' animus claim was based on the preliminary record at that time, stating "on *this record*, [Plaintiffs] have failed to establish that the Government's choice to display biological sex lacks any purpose other than a bare desire to harm a politically unpopular group."  Defs. Add. 1 (emphasis added) (cleaned up).

It remains undisputed that the government has declared that "transgender women are not women and transgender men are not men," has employed language "facially demean[ing] transgender people's identity," and has candidly rejected "the identity of an entire group— transgender Americans—who have always existed and have long been recognized."  Defs. Add. 40–41; *see also* Defs. Add. 10–11 n.6 (Jackson, J., dissenting) ("The plaintiffs have colorable equal protection claims as well, particularly in light of the animus evident in the Executive Order.").  The government continues to take "[s]weeping" actions that impose a "broad and undifferentiated disability" on transgender and nonbinary Americans.  Defs. Add. 41–42.  Defendants cannot articulate a bona fide

relationship "between the Passport Policy and any genuine interest in maintaining a uniform definition of sex." Defs. Add. 43. And the challenged Policy remains "part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language." *Id*.

While the Supreme Court determined that these findings *alone* were inadequate to support affirmance of the district court's ruling on Plaintiffs' animus claim, it did not disturb the findings themselves. In the district court, Plaintiffs can engage in discovery to examine the decision-making process underlying the Policy, and may uncover yet more evidence demonstrating that the Policy is inexplicable by anything other than animus. Indeed, the Stay Order's language that animus was not yet shown "on this record" *anticipates* that such discovery can occur. Defs. Add. 1; *see also* Defs. Add. 7 n.3 (Jackson, J., dissenting) (in the context of preliminary injunction and stay determinations, "[c]ourts generally endeavor to ensure that plaintiffs with colorable legal claims have a meaningful opportunity to litigate those claims and actually obtain the relief they are requesting").

*Trump v. Hawai'i*, 585 U.S. 667 (2018), does not foreclose further litigation of Plaintiffs' animus claim. *Hawai'i* was an Establishment Clause decision that did not engage with the governing equal protection principles established by decades of precedent. Additionally, in *Hawai'i*, the Supreme Court upheld a challenged executive order noting that it directed "a worldwide review process undertaken by multiple Cabinet officials and their agencies" to identify the countries whose nationals would be barred from entry and included a web of "significant exceptions." *Id.* at 707, 709. The extent to which any such process undergirded the Policy at issue here should be the subject of discovery.

Plaintiffs anticipate that discovery will further crystalize the lack of any rational basis for the Policy and the fact that it was driven by misinformation and impermissible stereotyping. As courts have recognized, proof of animus or other forms of invidious and impermissible discrimination may be uncovered through the precise types of discovery Plaintiffs will pursue. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (courts may look to "historical background," the "specific sequence of events," "[d]epartures from the normal procedural sequence," "legislative or administrative history," and

the statements of public officials "in determining whether racially discriminatory intent existed"); *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 245 (D. Mass. 2021) (discussing breadth of permissible discovery into animus).

## C. The Stay Order Does Not Foreclose Plaintiffs' Sex Discrimination Claim.

In the Stay Order, the Supreme Court determined that the Policy did not offend equal protection principles because it does not subject anyone to differential treatment on its face. But nothing in the Stay Order forecloses Plaintiffs from continuing to advance the argument that the Policy discriminates based on sex because the Policy was adopted (at least in part) to further the government's objective of forcing people into roles based on sex stereotypes. *See Feeney*, 442 U.S. at 279. Ultimately, as with other aspects of Plaintiffs' equal protection claim, Plaintiffs are entitled to discovery to develop the argument that the Policy does not merely elicit a recitation of historical facts, as the Stay Order suggests, but rather was aimed at enforcing sex stereotypes.

### D. The Stay Order Does Not Preclude Plaintiffs from Probing Defendants' Vague and Ever-Shifting Justifications for the Policy.

Nothing in the Stay Order speaks to the distinct issue of the government's justifications for the Policy; the district court's findings on that score remain undisturbed and further litigation below may shed light on them.

Throughout this litigation, the government has put forward a constantly changing series of justifications for the Policy that the Supreme Court did not address and that has never been subject to discovery. The EO asserts purported justifications such as combatting "ideologues who deny the biological reality of sex," protecting "intimate single-sex spaces and activities designed for women," preventing "depriv[ation of women's] . . . dignity, safety, and well-being," and stopping "erasure of sex in language and policy." App. 1. Below, the government alleged an interest in data consistency across the government by using one definition of sex. Defs. Add. 37. Now before this Court, the government claims that the Policy satisfies rational basis review because a "plausible reason[]" for the Policy using "biological sex"

is because alternatives are not a sound "basis for identification." Defs. Br. 26–27 (cleaned up).

None of these justifications have been subject to discovery and testing. Under heightened scrutiny, the government's justifications for the Policy must be sufficiently important and "genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Even under rational basis review, the government's justification must be rationally related to a legitimate government interest. *See Romer v. Evans*, 517 U.S. 620, 632–33 (1996) (to satisfy rational basis review, a justification for the law must be grounded in a "factual context" that allows the court to "ascertain some relation between the classification and the purpose it served"); *Heller v. Doe*, 509 U.S. 312, 321 (1993) (holding that rational basis review must have a "footing in the realities of the subject addressed by the legislation"); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–36 (1973) (invalidating food stamp policy under rational basis review where it was based on government's "unsubstantiated assumptions"). Discovery can examine, for instance, the government's assertions that passport sex markers are connected to protection of "intimate single-sex spaces"—an

assertion that is facially implausible. Discovery can also examine the government's assertions that the Policy serves the interest of data consistency—an assertion that is already contradicted by years of contrary experience.

Perhaps most importantly, discovery will help probe the claim that the Policy survives rational basis review because it provides "meaningful basis for identification." Defs. Br. 27. Discovery can examine whether the government's interest in accurate identification is rationally advanced by using sex assigned at birth on passports. That is especially relevant when sex assigned at birth appears to have no connection to current visual identification that passports are used for, and some people are *not* assigned male or female at birth, yet the Policy refuses to recognize those designations.

## IV. THE STAY ORDER DOES NOT PRECLUDE THE DISTRICT COURT FROM HOLDING THAT PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT RELIEF.

The Stay Order did not discuss the irreparable injury to Plaintiffs, let alone disturb the district court's findings about that harm. Based on uncontroverted evidence, the district court found "that [Plaintiffs] will suffer a variety of immediate and irreparable harms from the present

enforcement of the challenged policy." App. 977.  The same is true today: Class members have been harmed since the stay, and they will continue to be harmed without relief.  Plaintiffs reiterate here the injuries that class members face to underscore why swift remand for further litigation below is appropriate.

The district court found that the Policy interferes with medical treatments; magnifies the risks of "suicidal ideation," "serious psychological distress"; and increases risks of "harassment or violence when traveling, particularly to countries that criminalize transgender expression."  Defs. Add. 97.  In contrast, the district court found that transgender, nonbinary, and intersex people who receive and use identity documents that align with their gender identity are "significantly less likely" to experience these harms.  *Id.*  Defendants do not contest these findings.

Critically, the irreparable injuries here are not based solely on past harms.  The district court found—again based on unrebutted evidence— a genuine risk of future harm.  Defs. Add. 96–98 (citing expert evidence and "large-scale studies" showing "elevated" future "risk" of these issues); *cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (noting that

"[p]ast wrongs" may be "evidence bearing on whether there is a real and immediate threat of repeated injury" (cleaned up)). The record shows that Plaintiffs face a "sufficient likelihood" that they "will again be wronged in a similar way" absent permanent relief. *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2–3 (2025) (Kavanaugh, J., concurring in the grant of application for stay) (cleaned up) (quoting *Lyons*, 461 U.S. at 111).

## V. THE STAY ORDER DOES NOT PRECLUDE THE DISTRICT COURT FROM FINDING THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS AT FINAL JUDGMENT.

The Stay Order did not finally determine either the balance of equities or the public interest. When evaluating whether to issue a permanent injunction, the district court can still find that the balance tilts in favor of Plaintiffs.

The district court found that the "uncontroverted evidence" demonstrated Plaintiffs face a risk of physical violence, harassment, being "outed" when using their passports, psychological distress, and other serious harms. Defs. Add. 96, 60. By contrast, the government relies on the Stay Order to assert that it is irreparably harmed because the President has been "block[ed]" from exercising "his constitutionally and statutorily conferred power to prescribe rules of the issuance of

passports." Defs. Br. 43. While the Supreme Court preliminarily said that not being able to execute a preferred policy "with foreign affairs implications" is in some sense irreparable, Defs. Add. 1, the district court's role at final judgment will be to "balance" each side's harms, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Ultimately, the measure of Defendants' asserted harm should be resolved by the district court in the first instance,[8] against a backdrop where the Supreme Court has held that the President does not have plenary control over *all* matters related to passports, and that various aspects of the passport issuance process *do not* implicate the President's foreign-affairs powers. *See, e.g.*, *Zemel v. Rusk*, 381 U.S. 1, 13 (1965) (refusing to issue a passport "based on the character of the particular applicant" does not implicate the President's foreign-policy powers); *Regan v. Wald*, 468 U.S. 222, 241 (1984) ("selectively deny[ing] passports on the basis of political belief or affiliation" does not implicate foreign-affairs powers).

---

[8] Defendants' foreign-affairs argument in this Court is undeveloped and therefore waived. *See United States v. Sevilla-Oyola*, 770 F.3d 1, 13 (1st Cir. 2014). In any event, the government has consistently failed to explain—let alone support with evidence—how sex markers on passports could possibly implicate foreign affairs.

The Stay Order also rested on the Supreme Court's view that Plaintiffs had not established a likelihood of success on the merits of the subset of claims before it, and it therefore did not weigh the irreparable injury caused by other violations of Plaintiffs' rights. At final judgment and on a full record, the district court can find that any injury to the government is outweighed by sufficiently serious injuries to Plaintiffs.

## CONCLUSION

The Court should vacate the injunctions or remand for the district court to dissolve them without further proceedings or analysis. If the Court issues guidance to the district court about the Stay Order and Plaintiffs' claims, Plaintiffs respectfully submit that their claims remain viable.

March 2, 2026

Respectfully submitted,

*/s/ Isaac D. Chaput*
ISAAC D. CHAPUT
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
415-591-6000
ichaput@cov.com

MALITA PICASSO
SRUTI J. SWAMINATHAN

American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2500
mpicasso@aclu.org
sswaminathan@aclu.org

JESSIE J. ROSSMAN
JENNIFER M. HERRMANN
American Civil Liberties Union
Foundation of Massachusetts,
Inc.
One Center Plaza, Suite 850
Boston, MA 02108
617-482-3170
jrossman@aclum.org
jherrmann@aclum.org

ROBERT C. GIANCHETTI
Covington & Burling LLP
30 Hudson Yards
New York, NY 10001
212-841-1000
rgianchetti@cov.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 9,072 words. The response complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared using proportionally spaced 14-point Century Schoolbook typeface.

*/s/ Isaac D. Chaput*
Isaac D. Chaput

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2026, a true copy of the foregoing will be electronically filed with the Clerk of Court for the United States Court of Appeals for the First Circuit using the CM/ECF system, which will then send a notification of such filing to counsel of record.

/s/ Isaac D. Chaput
Isaac D. Chaput